## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## Case No. 1:25-cv-21417

Kevin O'Leary,

      Plaintiff,

v.

Benjamin Armstrong,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kevin O'Leary ("O'Leary") hereby sues the Defendant, Benjamin Armstrong ("Armstrong" a/k/a Bitboy Crypto) and alleges as follows:

## INTRODUCTION AND NATURE OF THE CASE

1.    Plaintiff Kevin O'Leary, an internationally renowned entrepreneur, investor, and television commentator, files this action against Defendant Ben Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods intended to destroy O'Leary's reputation. Adding to the suffering of those affected by a tragic boating accident that has already been adjudicated in court, Armstrong, a cryptocurrency influencer whose media empire has collapsed amid scandal, repeatedly and falsely labeled O'Leary a "murderer." Armstrong has also alleged without any factual basis that O'Leary paid "millions" to cover up his own role in the tragic boating accident. In reality, O'Leary was not operating the vessel involved; his wife was, and she was conclusively exonerated by a court after a 13-day trial. Armstrong's defamatory statements are driven by a desperate attempt to regain relevance and notoriety amid his own public fall from grace, and have caused substantial harm to O'Leary.

2.     Armstrong's cryptocurrency influencer empire recently collapsed. In late 2023, his own company ousted him citing "substance abuse" issues and claiming he committed "emotional, physical, and financial damage" against his own employees. Recently, the New York Times published an article about Armstrong noting that he was "once the most popular Cryptocurrency YouTuber in the world [but that] [n]ow his empire has collapsed."

3.     Following his dramatic fall from grace, Armstrong has initiated a defamatory campaign against O'Leary from his private X/Twitter account. In the last week, Armstrong has averaged two defamatory posts per day labeling O'Leary and his wife as murderers. Alarmingly, Armstrong recently escalated his harassment by releasing O'Leary's private cell phone number and urging his followers to "call a real life murderer."

4.     Armstrong's statements are neither protected opinions nor mere hyperbole—they are deliberate falsehoods published with actual malice. Armstrong's intent is unmistakable: to exploit O'Leary's prominence for media attention, inflict lasting damage on his reputation, and divert public scrutiny from Armstrong's own personal and professional collapse. Armstrong knew, or recklessly disregarded, that his allegations concerning the tragic boating accident were completely devoid of any factual basis.

5.     Throughout his career, O'Leary has consistently advocated for accountability and personal responsibility. Through this lawsuit, O'Leary seeks to hold Armstrong accountable for his intentional and reckless dissemination of defamatory lies, and to redress the significant damage Armstrong has caused to O'Leary's reputation.

## THE PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Kevin O'Leary is a citizen of Canada and resides in Miami-Dade County, Florida. O'Leary first achieved prominence through SoftKey Software Products, a company he co-founded in 1986 and successfully grew into a global software powerhouse. In 1999, he sold SoftKey to Mattel for $4.2 billion, solidifying his reputation as a visionary leader and credible business figure. Since 2009, O'Leary has been a star on the hit television series Shark Tank, where his astute investment insights and sharp negotiating skills earned him a dedicated audience and the nickname "Mr. Wonderful." Today, as Chairman of O'Leary Ventures, he actively oversees a diverse portfolio of startups, leveraging the reputation he has meticulously cultivated over decades.

7.      Defendant Benjamin Armstrong resides in Georgia. Before pivoting into cryptocurrency content creation in 2017, Armstrong dabbled in businesses such as graphic design and car washes. Quickly branding himself as a self-styled "crypto icon," he aggressively grew his online presence, moving into a larger studio in 2020 to amplify his reach. Armstrong regularly boasted of substantial cryptocurrency holdings, claiming a peak value of $40 million. His notoriety peaked with over 3 million followers across his social media pages, where he often promoted his perceived expertise. Yet Armstrong's reputation dramatically imploded in late 2023 when his own company, HIT Network, publicly expelled him, citing his toxic behavior and accusing him of causing significant "emotional, physical, and financial damage" to employees and the Bitboy Crypto community at large.

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, excluding interest.

9.      This Court has personal jurisdiction over Armstrong under Fla. Stat. §§ 48.193(1)(a)(1) and (1)(a)(2). Armstrong's defamatory X/Twitter posts, accessible statewide, targeted and tagged O'Leary—a prominent Florida resident who lists his location as "Miami Beach, Florida" on his X/Twitter profile—inflicting harm in Florida. X/Twitter users who resided in Florida viewed the multiple tweets at issue in this case while they were in Florida. Armstrong also carries on business in Florida, often livestreaming from Florida, tweeting from Florida, and attending cryptocurrency industry events in Florida such as Quantum Miami, Expoverse, and the Bitcoin Miami Conference.

10.     Venue is proper in this District because a substantial part of the events or omissions giving rise to O'Leary's claims occurred in this District and, alternatively, because Armstrong is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

### A.  O'Leary Builds a Highly Successful Career and Personal Brand.

11.     Kevin O'Leary has established himself as a candid, savvy truth-teller through a dynamic career as a businessperson, investor, author, and television personality. He initially gained prominence by co-founding SoftKey Software Products, a major force in the educational software market, later rebranding as The Learning Company before being acquired by Mattel for $4.2 billion.

12.     O'Leary further enhanced his standing in the business world with ventures such as StorageNow Holdings, which showed his ability to skillfully transform modest investments into significant returns. He also founded O'Leary Funds and O'Shares ETFs, collectively managing assets exceeding one billion dollars, demonstrating his financial expertise.

13.     In 2009, O'Leary rose to mainstream prominence as a featured investor on the hit television show Shark Tank. Known for delivering blunt yet insightful business advice, he rapidly became a popular and well-respected figure, earning the moniker "Mr. Wonderful," and investing millions of dollars into promising startups and supporting founders in scaling their businesses.

14.     Because of his reputation as a truth-teller who provides reasoned analysis, O'Leary is regularly invited to share his perspective and commentary on major television networks, including CNN and Fox, where he engages audiences on topics ranging from cryptocurrency to economic forecasting. His informed perspectives reinforce his dedication to credibility, which remains a cornerstone of his public persona and ongoing business success.

**B.   Armstrong's Empire Collapses.**

15.     Armstrong was once one of the most popular cryptocurrency influencers on X/Twitter and YouTube, attracting over a million followers with his enthusiastic endorsements and a lavish lifestyle.

16.     At the peak of his popularity, Armstrong had more than 3.3 million followers across his social media pages.

17.     Yet his empire began to collapse in August 2023, when he was removed from his own production company, HIT Network, following allegations of misconduct and violent behavior at his office.

18.     The HIT Network seized control of his former X/Twitter account, which currently has one million followers.

19.     Armstrong subsequently faced significant financial losses and his wife filed for divorce. Armstrong's reputation suffered further after multiple accusations, including workplace harassment and disputes with former business partners, became public.

20.     In February 2025, the New York Times ran an article about Armstrong's "dramatic collapse." The article reported Armstrong as saying he was going through a "midlife crisis," but boldly predicting that "I'm going to be rich again. Everybody kind of sees that. It's just a matter of how and when."

21.     Today, Armstrong has about 100,000 followers on X/Twitter, which is not as many as he used to have.

22.     With a significantly diminished reach today, Armstrong appears motivated to draw attention to himself through public feuds or controversies, including defaming well-known figures such as O'Leary, as a strategy to regain relevance in the crypto space and, in his words, become "rich again."

**C.   Armstrong Wages a Defamatory Campaign.**

23.     Beginning in late March 2025, Armstrong, using his private X/Twitter handle @BenArmstrongsX began to wage a campaign of harassment against O'Leary and his wife.

24.     Over the course of about a week, Armstrong fired off over ten tweets accusing O'Leary and his wife of murder and paying millions to cover up their roles in a murder.

25.     The defamatory posts that are the subject of O'Leary's defamation causes of action are summarized and pasted below.

26.     Armstrong launched his defamatory campaign on March 17, 2025. On that day, he posted the following: "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto." Over 30,000 people viewed this tweet.



27.     On March 19, 2025, Armstrong unleashed another tweet accusing O'Leary of committing "actual crimes": "Doesn't everybody think it's weird that I've been publicly calling … @kevinolearytv [a] murderer[] and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."



28.     Ten minutes later, in a clear escalation, Armstrong tweeted again—this time publishing O'Leary's private cell phone number and encouraging the public to harass him: "Have you ever wanted to call a real life murderer?! You can NOW! @kevinolearytv is waiting for your call."



29.     Following the tweet, O'Leary began receiving communications from strangers who had obtained his number directly from Armstrong's post.

30.     That post was removed for violating X/Twitter's terms of service.

31.     One X/Twitter user posted on the tweet tagging and asking Grok, an Artificial Intelligence chatbot, to "explain [Armstrong's] absurd claim."

32.     Grok is an AI chatbot. It is integrated into X/Twitter. Grok can offer general fact-checking by pulling from web sources and its own knowledge. It can also flag misleading information.

33.     Grok replied to the tweet and set the record straight based on publicly available information: "No evidence supports the 'murderer' claim about Kevin O'Leary. It may refer to a 2019 boat crash where his wife was acquitted; he wasn't charged."



34.     Despite Grok's post stating there was "no evidence" to support his claims, Armstrong persisted in pushing his false narrative.

35.     Like clockwork, Armstrong was back at it again the next morning. On March 20,

2025, Armstrong noted that X/Twitter had removed his post of O'Leary's phone number and again

called him a murderer: "That's right guys – I was forced to delete the murderer @kevinolearytv's

phone number by X. I was in X jail for 12 hours."



36.     That afternoon, Armstrong lashed out again on X/Twitter: "Hey how is another free

day @kevinolearytv? Do you ever think [of] the couple you murdered?"



37.     By 8:55 AM on March 21, 2025, he was back at it: "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up. Not a single cease and desist has been sent to me Kev. Wonder why?"



38.     Armstrong repeated his strategy of provoke, go viral, and cash in on outrage as the day progressed.

39.     Just six minutes later, he fired off another post: "Hey @kevinolearytv, what in the fuck are [you] going to do with me? You can't sue me. You can't stop me. You can't shut me up. I'm a rabid dog with my teeth sunk deep into your leg."



40.     Armstrong's pattern was relentless—misstate, provoke, repeat.

41.     Armstrong's statements—that O'Leary is a murderer, was involved in a murder, or paid to cover one up—are categorically false and defamatory per se. He published them with actual malice, fully aware they were false or with reckless disregard for the truth.

42.     Armstrong was fully aware of the publicly available reporting on the boating accident (detailed further below), which made clear that O'Leary was never charged with any crime, and that his wife was acquitted—even of a minor regulatory offense. He also knew that a Canadian court had found the other vessel at fault for failing to display its lights. Despite these undisputed facts, Armstrong has willfully continued his defamatory campaign against O'Leary, acting with reckless disregard for the truth. His motive is plain: to elevate his public profile, grow his following, and profit from a narrative he knows to be false and deeply damaging.

### D. **Mr. O'Leary Faces No Charges, and a Canadian Court Exonerates Mrs. O'Leary After Carefully Reviewing the Video Evidence.**

43.     On August 24, 2019, the O'Learys' boat tragically collided with another vessel, a *Nautique*, resulting in the death of two people. Linda O'Leary was driving. She was not impaired, and at the time of the incident, she was a highly experienced boater operating the vessel cautiously and with due care and attention. Tragically, the collision occurred with a completely unlit vessel, operating in violation of basic safety standards on a moonless night—making it virtually invisible.

44.     Following the tragic crash, Linda O'Leary was charged with a regulatory offense: careless operation of a vessel under the Small Vessel Regulations of the Canada Shipping Act. Importantly, she was *not* charged with impaired driving or any other alcohol-related offense. Kevin O'Leary was not charged with any crime or infraction arising from the accident.

45.     After a 13-day trial in which a Canadian court heard extensive testimony, Linda was acquitted of the regulatory charge.

46.     Judge Richard Humphrey, after reviewing video footage and witness statements, concluded that the *Nautique*'s lights had been turned off so its passengers could stargaze in the darkness of Lake Joseph.

47.     He noted that surveillance video from lakefront cottages showed the O'Leary boat was lit and visible, while the *Nautique* was not.

48.     Footage from the *Nautique* dock shows the stargazers departing in a large, well-lit boat—only for the lights to suddenly go dark mid-lake.

49.     Separate video, taken from the cottage where the O'Learys had been dining, showed Linda carefully checking and activating the ski boat's navigation lights before departing.

50.     Additional surveillance captured the moment of the crash in the distance: the light from the O'Learys' boat is seen stopping abruptly and bouncing back in the dark. The *Nautique*'s lights only become visible 49 seconds after the collision.

51.     At trial, the collision reconstruction evidence presented by police ultimately supported the defense more than the prosecution, according to Judge Humphrey. The court heard that during a police re-enactment of the incident—conducted at the same lake and around the same time of night—a police boat, travelling slowly, nearly collided with the same vessel.

52.     Following an oral ruling acquitting Linda, Judge Humphrey issued nearly 100 pages of written reasoning, meticulously summarizing and analyzing the testimony of each witness.

53.     Judge Humphrey concluded that the evidence demonstrated Linda was a competent and cautious boat operator, familiar with the waters she was navigating. He noted: "She took precautions to ensure her boat was properly equipped for night navigation… The boat was in good working order and had all required navigational lights activated. Alcohol played no part."

54.     In sum, the publicly available evidence makes clear that Kevin was not operating the boat, was never charged, and that Linda was acquitted of all charges.

55.     Armstrong is compounding the pain of all those affected by the tragic accident by falsely insinuating murder and dishonoring the memory of the deceased—exploiting their deaths as a means to gain followers and generate attention.

**E.  Armstrong's Campaign of Harassment Harms O'Leary and His Reputation.**

56.     Armstrong's X/Twitter posts have caused, and continue to cause, enormous harm to O'Leary and his reputation. Viewed thousands of times, these posts repeatedly accuse O'Leary of being a murderer who orchestrated a cover-up to conceal his alleged crimes.

57.     Although O'Leary initially chose to ignore Armstrong's conduct, he has now, regrettably, concluded that Armstrong will not stop his campaign of defamation and invasion of privacy unless he is held legally accountable.

58.     All conditions precedent to the filing of this action have occurred, have been waived, or have otherwise been satisfied.

**CLAIMS FOR RELIEF**

**COUNT I**
**Defamation Per Se**
**The March 17, 2025 8:49 AM Post**

59.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

60.     On March 17, 2025 at 8:49 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

61.     The post stated, "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto."

62.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed about 31,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1901616966986539114. A copy of this post as it appears on X/Twitter is included at paragraph 26 above.

63.     The post was read by individuals residing in Florida.

64.     The March 17, 2025 8:49 AM post is of and concerning O'Leary.

65.     The March 17, 2025 8:49 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

66.     The March 17, 2025 8:49 AM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

67.     The March 17, 2025 8:49 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

68.     By publication of the March 17, 2025 8:49 AM post, Armstrong caused harm to O'Leary's reputation.

69.     Armstrong published the March 17, 2025 8:49 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

70.     As a direct and proximate result of the publication of the March 17, 2025 8:49 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

<u>**COUNT II**</u>
**Defamation Per Se**
**The March 19, 2025 12:32 PM Post**

71.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

72.     On March 19, 2025 at 12:32 PM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

73.     The post stated, "Doesn't everybody think it's weird that I've been publicly calling both @gordonlawltd & @kevinolearytv murderers and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."

74.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed nearly 15,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902397680938110986. A copy of this post as it appears on X/Twitter is included at paragraph 27 above.

75.     The post was read by individuals residing in Florida.

76.     The March 19, 2025 12:32 PM post is of and concerning O'Leary.

77.     The March 19, 2025 12:32 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

78.     The March 19, 2025 12:32 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

79.     The March 19, 2025 12:32 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

80.     By publication of the March 19, 2025 12:32 PM post, Armstrong caused harm to O'Leary's reputation.

81.     Armstrong published the March 19, 2025 12:32 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the

statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

82.     As a direct and proximate result of the publication of the March 19, 2025 12:32 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT III
### Defamation Per Se
### The March 19, 2025 12:42 PM Post

83.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

84.     On March 19, 2025 at 12:42 PM, Armstrong published another post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

85.     The post stated, "Have you ever wanted to call a real life murderer?! You can NOW! @kevinolearytv is waiting for your call."

86.     The post was published to a worldwide audience on X/Twitter, and as of March 19, 2025, it had been viewed over 18,000 times. The post is no longer available online as it was removed for violating X/Twitter's terms of service. A copy of the post as it appears on X/Twitter can be viewed at paragraph 28.

87.     The post was read by individuals residing in Florida.

88.     The March 19, 2025 12:42 PM post is of and concerning O'Leary.

89.     The March 19, 2025 12:42 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

20

90.     The March 19, 2025 12:42 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

91.     The March 19, 2025 12:42 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

92.     By publication of the March 19, 2025 12:42 PM post, Armstrong caused harm to O'Leary's reputation.

93.     Armstrong published the March 19, 2025 12:42 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

94.     As a direct and proximate result of the publication of the March 19, 2025 12:42 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT IV
### Defamation Per Se
### The March 20, 2025 11:32 AM Post

95.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

96.     On March 20, 2025 at 11:32 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

97.     The post stated, "That's right guys – I was forced to delete the murderer @kevinolearytv's phone number by X. I was in X jail for 12 hours. Meaning I guess I'm an X-Con now."

98.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 9,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902745039823896647. A copy of this post as it appears on X/Twitter is included at paragraph 35 above.

99.     The post was viewed by individuals residing in Florida.

100.    The March 20, 2025 11:32 AM post is of and concerning O'Leary.

101.    The March 20, 2025 11:32 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

102.    The March 20, 2025 11:32 AM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

103.    The March 20, 2025 11:32 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

104.    By publication of the March 20, 2025 11:32 AM post, Armstrong caused harm to O'Leary's reputation.

105.    Armstrong published the March 20, 2025 11:32 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

106.    As a direct and proximate result of the publication of the March 20, 2025 11:32 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT V
### Defamation Per Se
### The March 20, 2025 12:27 PM Post

107.    Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

108.    On March 20, 2025 at 12:27 PM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

109.    The post stated, "Hey how is another free day @kevinolearytv? Do you ever think [of] the couple you murdered?"

110.    The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 10,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902758962467860745. A copy of this post as it appears on X/Twitter is included at paragraph 36 above.

111.    The post was viewed by individuals residing in Florida.

112.    The March 20, 2025 12:27 PM post is of and concerning O'Leary.

113.    The March 20, 2025 12:27 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

114.    The March 20, 2025 12:27 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

115.    The March 20, 2025 12:27 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

116.     By publication of the March 20, 2025 12:27 PM post, Armstrong caused harm to O'Leary's reputation.

117.     Armstrong published the March 20, 2025 12:27 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

118.     As a direct and proximate result of the publication of the March 20, 2025 12:27 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

**COUNT VI**
**Defamation Per Se**
**The March 21, 2025 8:55 AM Post**

119.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

120.     On March 21, 2025 at 8:55 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

121.     The post stated, "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up. Not a single cease and desist has been sent to me Kev. Wonder why?"

122.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 6,500 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1903068035574886482. A copy of this post as it appears on X/Twitter is included at paragraph 37 above.

123.     The post was viewed by individuals residing in Florida.

124.    The March 21, 2025 8:55 AM post is of and concerning O'Leary.

125.    The March 21, 2025 8:55 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder and paid millions to cover up his role in a murder.

126.    The March 21, 2025 8:55 AM post is false and defamatory. The allegation that O'Leary murdered individuals and paid millions to cover it up harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

127.    The March 21, 2025 8:55 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal and amoral conduct.

128.    By publication of the March 21, 2025 8:55 AM post, Armstrong caused harm to O'Leary's reputation.

129.    Armstrong published the March 21, 2025 8:55 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

130.    As a direct and proximate result of the publication of the March 21, 2025 8:55 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT VII
## Publication of Private Facts

131.    Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

132.    On March 19, 2025, Armstrong publicly disclosed O'Leary's personal cell phone number on X/Twitter without Plaintiff's knowledge or consent. A copy of that post can be found at paragraph 28 above.

133.    Armstrong encouraged his followers to harass O'Leary.

134.    At all relevant times, O'Leary maintained a reasonable expectation of privacy in his personal contact information, particularly given his status as a public figure subjected to harassment.

135.    Armstrong's disclosure was not of legitimate public concern and had no newsworthy value. Rather, it was intended to provoke public attention and harassment, and to subject O'Leary to ridicule, threats, and disruption. As such, the release of his cell phone number was offensive.

136.    Following the disclosure, O'Leary was flooded with unwanted communications causing him damage.

137.    O'Leary has suffered damages as a direct and proximate result of Defendant's wrongful disclosure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kevin O'Leary respectfully requests that the Court award him relief against Defendant Armstrong as follows:

138.    Actual and compensatory damages in excess of $75,000, as well as interest, reasonable attorneys' fees, and costs, as allowed by law;

139.    Punitive damages, as allowed by law; and

140.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

The Plaintiff demands a jury trial on all claims or issues triable by a jury.


Dated: March 26, 2025                    Respectfully submitted,

                                         **MARCUS NEIMAN**
                                         **RASHBAUM & PINEIRO LLP**

                                         By: /**s**/Jeffrey A. Neiman
                                         Jeffrey A. Neiman, Esq.
                                         Florida Bar No. 544469
                                         jneiman@mnrlawfirm.com
                                         Brandon S. Floch, Esq.
                                         Florida Bar No. 125218
                                         bfloch@mnrlawfirm.com

                                         One Biscayne Tower
                                         2 S. Biscayne Blvd., Ste. 2530
                                         Miami, Florida 33131
                                         Telephone: (305) 400-4260

                                         *Attorneys for Kevin O'Leary*