# EXHIBIT 4

**Online Reputation and Repair Assessment**

**Expert Witness Report**

Regarding:

KEVIN O'LEARY

Plaintiff,

v.

BENJAMIN ARMSTRONG,

Defendant.

Prepared By:

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

June 4th, 2025

# TABLE OF CONTENTS

**Section 1: Expert Witness Engagement and Basic Findings**............................................................**4**

    Engagement Summary..............................................................................................................5

    List of Documents Reviewed - Appendix A.............................................................................5

    Basic Findings and Conclusions..............................................................................................6

**Section 2: Expert Witness Qualifications**...............................................................................**7**

    Sameer Somal Biography........................................................................................................8

    Articles Authored by and Featuring Sameer Somal - Appendix B1.........................................8

    Recent Speaking Engagements and References - Appendix B2.................................................8

    Continuing Legal Education (CLE) Programs - Appendix B3...................................................8

    Expert Witness Case History - Appendix B4............................................................................8

    Alexandra Lajoux Biography..................................................................................................9

    Alexandra Lajoux's CV and Bibliography – Appendix C........................................................9

    About Blue Ocean Global Technology LLC...........................................................................10

    Statement of Compensation...................................................................................................11

**Section 3: Defamation and Its Impact on Reputation**..........................................................**12**

    Tort Law per the Florida Law...............................................................................................13

    Defamation per Se................................................................................................................14

    Internet Defamation..............................................................................................................16

    Severity and Impact of Defamation.......................................................................................20

    Malice Involved in the Case of Defamatory Statements..........................................................23

**Section 4: The High Visibility Factor: Reputational Sensitivity of a High–Profile Public Figure..
25**

    Hard-Earned Positive Reputation of Mr. O'Leary.................................................................26

    Reputation is Brand and Currency.........................................................................................28

**Section 5: Inappropriate Use of Social Media Platforms**.....................................................**30**

    Permanent and Defining Nature of Internet and Social Media................................................31

    Bad-Faith Use of Social Media to Spread Misinformation......................................................33

    Knowledge of Falsehood and the Continual Nature of Defamation..........................................35

    Involvement of Artificial Intelligence...................................................................................36

**Section 6: Nuances of Reputation Management**....................................................................**38**

    What is Online Reputation Management (ORM).....................................................................39

    Build....................................................................................................................................40

    Monitor................................................................................................................................41

    Repair..................................................................................................................................43

Digital Reputation................................................................................45

**Section 7: Legal Cases**.................................................................**47**

Invasion of Privacy..............................................................................48

Defamation Per Se...............................................................................51

**Section 8: Assessment of Damages**.............................................**59**

Rationale for Recommendation of Damages........................................60

Summary Findings...............................................................................62

Damages..............................................................................................64

Reputational Damages.........................................................................64

Rehabilitation Damages.......................................................................67

Punitive Damages................................................................................70

*\*Disclaimer: Please note that I am not making any legal conclusions and/or providing any legal advice. All information, content, and materials available hereunder are for informational purposes only, in furtherance of the expert testimony being provided. In addition, please note that some of the observations made in the reputational harm background sections of the report are based on materials that I have previously published. - Sameer Somal*

## Section 1: Expert Witness Engagement and Basic Findings

Engagement Summary

List of Documents Reviewed - Appendix A

Basic Findings and Conclusions

## ENGAGEMENT SUMMARY

Mr. Brandon S. Floch, Esq. of Marcus Neiman Rashbaum & Pineiro LLP, engaged me to ascertain the damages associated with the defamatory statements made by the Defendant, Mr. Armstrong, about Mr. Kevin O'Leary over the platform X (previously Twitter).

A large portion of my professional time as CEO of Blue Ocean Global Technology is spent on actual digital reputation and public impressions in client situations. As such, I feel confident in my ability to approach this case from the lens of both an expert witness and a professional with a track record of successfully mitigating reputational damages originating from false or defamatory statements published on the internet. As a digital reputation expert, I apply my cumulative knowledge and experience to assess an individual's damages and recommend the appropriate course of action to remediate damages moving forward.

## LIST OF DOCUMENTS REVIEWED - APPENDIX A

## BASIC FINDINGS AND CONCLUSIONS

After a thorough analysis of the defamatory posts made about Mr. Kevin O'Leary, my basic findings and conclusions are:

Mr. Kevin O'Leary has incurred significant damages resulting from the defamatory and false statements made constantly by the Defendant, consisting of: (a) Reputational Damages, (b) Rehabilitative Damages, and (c) Punitive Damages.

Reputational Damages: in the range of $15,600 - $78,000

Rehabilitation Damages: $45,000 - $50,000 monthly for 18 - 24 months = in the range of $810,000 - $1,200,000

Punitive Damages: as the court deems fit.

## Section 2: Expert Witness Qualifications

Sameer Somal Biography

Articles Authored by and Featuring Sameer Somal - Appendix B1

Recent Speaking Engagements and References - Appendix B2

Continuing Legal Education (CLE) Programs - Appendix B3

Expert Witness Case History - Appendix B4

Alexandra Lajoux Biography

Alexandra Lajoux's CV and Bibliography -  Appendix C

About Blue Ocean Global Technology LLC

Statement of Compensation

## Sameer Somal Biography

Sameer Somal is the CEO of Blue Ocean Global Technology LLC and Co-Founder of Girl Power Talk. He is a CFA Charterholder, a CFP® professional, and a Chartered Alternative Investment Analyst[SM]. Sameer leads client engagements focused on digital transformation, risk management, and technology development.

A testifying subject matter expert witness in economic damages, intellectual property, and internet defamation, he authors CLE programs with the Philadelphia Bar Foundation. Sameer is a frequent speaker at private industry and public sector conferences, including engagements with the Federal Home Loan Bank (FHLB), Global Digital Marketing Summit, IBM, New York State Bar Association (NYBSA), US Defense Leadership Forum, and US State Department's Foreign Service Institute. He proudly serves on the Board of Directors of Future Business Leaders of America (FBLA) and Girl Power USA.

Committed to building relationships, Sameer is an active member of the Abraham Lincoln Association (ALA), Academy of Legal Studies in Business (ALSB), American Bar Association (ABA), American Marketing Association (AMA), Business Transition Council, International Trademark Association (INTA), and Society of International Business Fellows (SIBF). A graduate of Georgetown University, he held leadership roles at Bank of America, Morgan Stanley, and Scotiabank. Sameer is also a CFA Institute 2022 Inspirational Leader Award recipient and was named an Iconic Leader by the Women Economic Forum.

### Articles Authored by and Featuring Sameer Somal - Appendix B1

### Recent Speaking Engagements and References - Appendix B2

### Continuing Legal Education (CLE) Programs - Appendix B3

### Expert Witness Case History - Appendix B4

# Alexandra Lajoux Biography

Alexandra (Alex) Reed Lajoux, Ph.D., M.B.A., is the founding principal of Capital Expert Services, LLC, owned by Blue Ocean Global Technology, a U.S.-based technology company powered by Girl Power Talk, based in India. She serves as an advisor to the National Association of Corporate Directors (NACD), where she holds the title Chief Knowledge Officer Emeritus in recognition of her 15 years in that role. Recently named to the NACD Directorship 100, she is regarded as a trusted source of useful insights and introductions in the field of corporate governance, M&A, and the professional disciplines that underlie these two domains. She has expertise in not only financial capital but also human and intellectual capital.

Dr. Lajoux views issues from multiple perspectives, ranging from the latest regulatory standards in key industries to emerging best practices across domains. A Series Editor for De Gruyter Publishing, she has published or contributed to books on corporate finance, human capital, insurance fintech, and intellectual property, among other topics. She has worked with a major audit firm in the development of a series titled Human Capital.

As editor-in-chief of NACD's *Directors' Monthly* for more than 15 years, Dr. Lajoux helped NACD develop the world's largest library of director-centric thought leadership publications. In addition, Dr. Lajoux has conceptualized and authored/coauthored all nine titles in the McGraw-Hill Art of M&A series (1989-2024), as well as books on valuation with Robert A. G. Monks (Wiley, 2010), on money with Peet van Biljon (De Gruyter 2020), and on municipal sustainability (De Gruyter 2021). Her articles have appeared in *Financier Worldwide, Risk & Compliance*, and *Capital Insights*, and her works are cited in more than 950 academic studies.

She holds a Ph.D. in Comparative Literature from Princeton University, an M.B.A. from Loyola University Maryland, and a B.A. from Bennington College. She is fluent in English and French and has conversational competence in German and Spanish.

# Alexandra Lajoux's CV and Bibliography – Appendix C

# ABOUT BLUE OCEAN GLOBAL TECHNOLOGY LLC

Blue Ocean Global Technology LLC is an 8(a) minority-owned small business established in 2012 to provide digital transformation, business consulting, and technology development services. Guided by proactive communication, our innovative team of analytics, creative, legal, marketing, and strategy professionals collaborates to solve client challenges and deliver tech-empowered results. We are relentlessly committed to earning trust on merit. We respect two of our clients' most precious assets: time and reputation.

Our team of global professionals is committed to learning, excellence, and helping our clients — both individuals and entities — achieve optimal results when it comes to repairing, building, and protecting their online reputation.

Blue Ocean Global Technology creates and promotes top digital assets that accelerate growth and brand equity. We effectuate comprehensive reputation management services, which often include Search Engine Optimization (SEO), Social Media Marketing (SMM), and web development. When an individual or organization faces a reputation crisis or legal or public relations issues that involve the internet, we specialize in assessing the extent and type of harm caused by the defamatory content and calculating the compensatory damages owed. In addition, we have recognized expertise in mitigating the impact of this harm and proactively restoring and enhancing the reputations of those who have been defamed.

## STATEMENT OF COMPENSATION

The current market rate for Sameer Somal is $900/hour, which covers research, investigation, testing, analysis, writing, reading, interviewing, responding, and the time required to author his expert witness report. All payments are made to Blue Ocean Global Technology LLC. For research and support, Dr. Alexandra Lajoux's current market rate is $750/hour.

## Section 3: Defamation and Its Impact on Reputation

---

Tort Law per the Florida Law

Defamation Per Se

Internet Defamation

Severity and Impact of Defamation

Malice Involved in the Case of Defamatory Statements

# Tort Law per the Florida Law

Defamation, also known as defamation of character, is a legal term defined as the "act of making a false statement to a third party, resulting in harm to one's reputation." In Common Law jurisdictions, defamation is considered a civil wrong and may also be referred to as the "tort of defamation." More specifically, it can be broken down into two types:

- Slander: the spoken communication of a false statement to a third party resulting in harm to one's reputation.
- Libel: the written or published communication of a false statement to a third party resulting in harm to one's reputation.

Under Florida Law, which criminalizes defamation as a first-degree misdemeanor, four elements are required to prove defamation: The accused:

- Published or made a false statement,
- About the Plaintiff,
- To a third party, and
- Caused injury to the Plaintiff

Within the state law, several defenses to defamation exist, including truth, privilege, lack of damages, limitation, and retraction within a reasonable time. However, none of these defenses are applicable to the present case, as the intentionally defamatory statements were made falsely, outside the scope of privilege, harmfully, repeatedly, and permanently, with no retraction. Indeed, they are still available on the Defendant's account on the internet.

Florida law requires actual malice to be proved in the case of defamation of public figures. This means that while private individuals merely have to prove negligence in making the false statement, for public figures, including celebrities, malicious intent must be proved to establish harm.

In this case, the malice in the Defendant's acts is clearly substantiated by his repeated false statements in the face of the facts, his willful ignorance of the truth, and his assertions equating the Plaintiff's silence in the face of lies to endorsement of them. Furthermore, the Defendant's malice is evident in his casual attitude toward the lawsuit and Court orders.

# DEFAMATION PER SE

Defamation per se is a subcategory of defamation, where malice is presumed under certain statements without any other proof or specific damages, given the severity of the statements that are prima facie harmful to an individual's reputation. The nature of this kind of defamation is considered far more grievous than traditional defamation. These statements typically involve accusations of criminal conduct, claims of contagious disease, or allegations of incompetence or dishonesty in one's trade or profession. The law assumes harm, even in the absence of tangible loss or damage, as a consequence of such remarks.

In Florida, specifically, four categories of statements are classified as defamation per se, where the court presumes damages:

- Stating that someone is involved in a crime of moral turpitude.
- Asserting that an individual suffers from a highly contagious, infectious, or loathsome disease.
- Alleging unchastity or engagement in inappropriate sexual activity.
- Claiming that a person has acted in a manner that undermines the integrity or standards of their profession or occupation.

In the present case, the Defendant, Mr. Armstrong, has repeatedly and continuously asserted that Mr. O'Leary and his wife, Linda O'Leary, are guilty of murder and worse, despite being aware of the falsity of his statements. The Defendant repeatedly uses the term "murder" to describe the situation that occurred in a 2019 boating incident that did not even involve Mr. O' Leary as a responsible party. He continually presented the statement that Mr. O'Leary and his wife murdered two people in Toronto, engaging with AI to proliferate his false narrative and openly inviting O'Leary to sue him, claiming that everything was true.

Making such extreme statements, especially regarding a public personality such as Mr. O'Leary, clearly falls within the first parameter or defamation per se in Florida. The Defendant explicitly alleges that Mr. O'Leary was involved in a crime of the highest degree and implies that he is willing to commit it again. Without any factual basis, and indeed ignoring the facts when presented by other sources, Mr. Armstrong has continued his defamatory campaign on X

(formerly Twitter), with the intent to malign Mr. O'Leary's reputation and public image.

## INTERNET DEFAMATION

Online defamation, also known as internet defamation, occurs when false statements are made about an individual or business on the internet, leading to harm to their reputation. This form of defamation includes both written and published false statements and spoken false statements in the digital realm.

Internet defamation typically occurs through various online platforms, such as social media, blogs, forums, review sites, or other websites where individuals can express their opinions or share information. Internet defamation can include false accusations, libelous statements, malicious rumors, negative reviews based on false information, or any other form of harmful and false communication that damages someone's reputation.

In this case, Mr O'Leary was targeted by the Defendant in a defamatory campaign that has severely jeopardized his professional reputation and personal life. This campaign was driven by false and misleading statements published on his public Twitter account, which have garnered thousands of views and hundreds of likes and reshares. Some of the defamatory statements made on his account include:

| Date | Defamatory Statement | Views |
|---|---|---|
| March 17, 2025 | "Calling my shots a few days early, <br><br> Hi <br><br> @cryptomanran <br><br><br> Hi <br><br> @kevinolearytv <br><br><br> The reality of what you have done begins getting unveiled. <br><br> Hey Kev - I write in print that you and your wife are guilty | 31K |

| | | |
|---|---|---|
| | Of murder.<br><br>Let the truth ring. It will." | |
| March 17, 2025 | "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto." | 31K |
| March 17, 2025 | "The thing is, defamation is only when the claims are false.<br><br>So when people understand that Kevin O' Leary and Ran Neuner destroyed my channel to fuck retail investors, things are gonna feel a lot different around here." | 16K |
| March 19, 2025 | "Let's ask<br>@ABCSharkTank<br> why they put murderers on TV?<br><br>@kevinolearytv<br> and his wife, Linda O'Leary, murdered a couple in Toronto & covered it up." | 29K |
| March 19, 2025 | "Hey<br>@kevinolearytv<br><br><br>I thought you eat guys like me for breakfast?<br><br>I won't stop until the case is reopened, Mr. Wonda '2inch'" | 14K |
| March 19th | "Doesn't everybody think it's weird that I've been publicly | 15K |

| 2025 | calling both @gordonlawltd & @kevinolearytv murderers and yet not a single word or legal action?<br><br>It's almost like they "can't" because a lawsuit would open up their actual crimes, and they know it." | |
| March 21, 2025 | "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up.<br>Not a single cease and desist has been sent to me, Kev. Wonder why?" | 6.9K |
| March 21, 2025 | "Hey @kevinolearytv , what in the fuck are going to do with me?<br><br>You can't sue me. You can't stop me. You can't shut me up.<br><br>I'm a rabid dog with my teeth sunk deep into your leg.<br><br>Your usual tricks don't work.<br><br>Going to be hard to put the rabid dog down with everyone watching." | 16K |

This is a non-exhaustive list of the defamatory statements, which also include a removed post where Mr. Armstrong posted Mr. O'Leary's mobile number, a Twitter poll asking users who they think killed the couple, including both O'Leary's names, and reposts of other defamatory statements made in response to his tweets.

The defamation involved allegations and assertions on platform X, including the posting of private information of the Plaintiff, and engagement with AI chatbots. While the post that

showed Mr. O'Leary's phone number was taken down by X, the other posts continue to be publicly available. Further, Mr. O'Leary went on to allege the same defamatory statements on YouTube and his podcasts, exacerbating the harm through multimedia formats. These, hence, hurt his reputation and have become a part of his permanent digital image.

## SEVERITY AND IMPACT OF DEFAMATION

The severity and impact of the defamation in this case cannot be overstated. The defendant blatantly impugned Mr. O'Leary's character and reputation by explicitly accusing him of repeated criminal acts. He attacked Mr. O'Leary's integrity in statements that were viewed by over 30,000 people on his X platform alone and liked more than 500 times.

The statements not only accused Mr. O'Leary of past crimes but also suggested Mr. O'Leary was likely to commit them again, as when Mr. Armstrong claimed "his life is in danger" in the tweet dated March 17th, 2025. The defamatory statements have had severe repercussions for Mr. O'Leary both personally and professionally. They have resulted in a loss of credibility, damage to his public persona, and harm to his relationships. It tainted the brand of Mr. O'Leary and people who pay to be associated with his brand. They have also opened him to a high and widespread degree of scrutiny and forced him to revisit a past trial that was a source of distress and trauma for him already.

In my conversation with Mr. O'Leary, he shared how the entire situation was distressing for him and his wife.

> *"It was very traumatic for my wife, who was at the wheel that day. It also got a lot of people who had forgotten about it asking us about it again, including an increase in frequency of comments on social media, which other people see...Everyone asked about the status of the litigation. We settled over 2 years ago, despite the payouts not being confirmed. It brought back that narrative all over again."*

Further, in the age of digital media and rapid information dissemination, false statements spread quickly and are challenging to correct, exacerbating the harm caused. The severity of the statements made highlights the importance of addressing them swiftly and effectively to mitigate the damage inflicted.

As stated earlier, Mr. Armstrong revealed personal information about Mr. O'Leary, publicly tweeting his mobile number. Worse yet, he actively encouraged people to call. The Plaintiff did, in fact, receive calls from strangers who got access to his number through the post. Since the number was shared globally, Mr. O'Leary got calls at all hours of the day. This included getting

calls on live TV. Mr. O'Leary shared, *"It has gone up dramatically since I was on Fox. The Fox producer, in fact, saw it live because I was getting hundreds of hits when we were on the air."* This, of course, meant he had to explain the entire situation to the Fox reporters and producers, who are his professional network.

Mr. O'Leary also shared how this is damaging to him in the long term.

> *"I cannot change my phone number. I have had it for a long time and have a lot of relationships through it. It's like equity to me… we also got hacked on Twitter because of the number being public. I still get 20-40 calls a day from random people, and I block them all."*

This constitutes a clear breach of privacy, which is only compounded by the fact that Mr. O'Leary is a well-known personality and his privacy is synonymous with his security and safety.

Another unique feature of the defamation was Mr. Armstrong's engagement with artificial intelligence (AI) chatbots and their negative repercussions for Mr. O'Leary. In response to the defamatory posts, users replied by engaging Grok, an integrated AI chatbot, to fact-check the claims.



While Grok initially denied the claim as false, Mr. Armstrong persevered in his untrue claims, despite knowing and seeing information that proved that they had no factual basis. In further engaging with the chatbot and asserting false claims as true, Mr. Armstrong fed false information to the chatbot, which is known to take information from unfiltered comments made through its chat function.[1] AI, which continuously learns from its interaction with users, may then record these false claims as true, affecting Mr. O'Leary's digital reputation and footprint irreparably in a world that is swiftly becoming dependent on AI for data and research.

It is evident that the intentional spread of misinformation has caused significant harm to the Plaintiff, necessitating proactive measures to restore Mr. O'Leary's reputation and address the damage inflicted by these unfounded allegations.

---

[1] See Anisha Sircar,  The 'Unhinged' AI Chatbot: How Elon Musk's Grok Is Shaking Up Social Media, Forbes, March 19, 2025. Sirar describes the Grok mode "Unhinged" as follows: "This mode, combined with Grok's real-time access to X posts, means the AI is constantly learning from the platform's unfiltered, often chaotic discourse." https://www.forbes.com/sites/anishasircar/2025/03/19/the-unhinged-ai-chatbot-how-elon-musks-grok-is-shaking-up-social-media/

## MALICE INVOLVED IN THE CASE OF DEFAMATORY STATEMENTS

If a Defamation Plaintiff is a public figure, he or she must prove that a Defendant acted with actual malice. Actual malice can be shown with evidence that a Defendant (1) knew that the statements were false when made or (2) recklessly disregarded the truth or falsity of the statements at the time they were made.[2] By either standard, malice refers to the state of mind or *mens rea* behind the false statements made by the Defendant. It implies intention and ill-will behind the act, and not simply a misunderstanding, mistake, or misinformation. This element of bad faith, or *mala fide*, is crucial because it elevates the seriousness of the defamation and can result in more severe consequences for the party responsible.

The present facts establish a strong case of malicious intent by Mr. Armstrong. His series of tweets was aimed at particularly defaming the well-known name of the Plaintiff, unprompted and without any legal excuse. He deliberately continued to malign Mr. O'Leary's reputation, despite the knowledge that his claims were false. This is due to the public nature of the 2019 accident trial, which not only established the fact that Mr. O'Leary was never driving his boat but also acquitted his wife without any fault. Mr. Armstrong's knowledge of the falsity of the statements is further evident through his interaction with Grok, the AI chatbot that precisely stated that the claims were false. Despite this knowledge, Mr. Armstrong continued to defame Mr. O'Leary on X.

The malice behind his actions is also demonstrated by Mr. Armstrong posting Mr. O'Leary's private mobile number publicly and even encouraging users to call him. As mentioned, even to this day, Mr. O'Leary continues to get calls from random numbers. Two days after his initial tweets, the Defendant continued to post false tweets, twisting Mr. O' Leary's silence into an admission of guilt, claiming that he was stating the truth because Plaintiff had not yet responded or filed a lawsuit. This showcases his intent to sensationalize his statements, fraudulently present them as truthful, and take advantage of their viral nature to get more clicks and fame in the social media world. With reckless disregard for the truth, the Defendant intended to gain undue popularity by running down the reputation of Mr. O'Leary.

---

[2] <u>Mishiyev v. Davis</u>, 402 So. 3d 443, 451 (Fla. 2d DCA 2025)

Additionally, the Defendant's *mala fide* intention against Mr. O'Leary is deeply rooted in time. Even before the inception of the cause of action in the present case, the Defendant has engaged in making defamatory videos against Mr. O'Leary on YouTube and through podcasts.

It is also worth noting that Mr. Armstrong did not appear in court and ignored the summons following the lawsuit. These acts showcase his casual attitude towards the case and the entire situation. His intention was to simply "go viral" while ignoring the grave nature of his actions and their impact on Mr. O'Leary's life.

## Section 4: The High Visibility Factor: Reputational Sensitivity of a High-Profile Public Figure

Hard-Earned Positive Reputation of Mr. O'Leary

Reputation is Brand and Currency

# HARD-EARNED POSITIVE REPUTATION OF MR. O'LEARY

Building a reputation is a gradual and cumbersome process requiring consistent effort, integrity, and patience. Repeated actions, not isolated successes, are the key to developing an impeccable reputation. One misstep, especially in the age of social media, can jeopardize years of hard-earned trust.

Mr. O'Leary has established himself as a credible, accomplished, and principled business professional, public figure, and author. His career trajectory has ranged from founding and scaling technology and investment enterprises to becoming a nationally and internationally recognized voice on business and finance. He has been characterized by diligence, resilience, and demonstrable success, earning him the nickname Mr. Wonderful.

Through ventures such as SoftKey and The Learning Company, culminating in a multi-billion dollar acquisition by Mattel Inc., Mr. O'Leary has demonstrated strategic foresight and operational competence. He has since extended this credibility into the financial services sector, founding and managing investment vehicles such as O'Leary Funds and O'Shares Investments, as well as maintaining an active role in private equity through O'Leary Ventures.

In his capacity as a public figure, including his long-standing role on the television program *Shark Tank*, Mr. O'Leary has acquired a reputation for honesty, directness, and a disciplined approach to evaluating business opportunities. This public persona is not a product of media fabrication but is firmly rooted in a track record of professional accomplishments and sound judgment.

Mr. O'Leary's reputation is a valuable and hard-earned asset that underpins his credibility in financial markets, media, and public discourse. It is not only integral to his professional engagements but also central to the trust placed in him by investors, partners, and the public. Any unwarranted or defamatory challenge to that reputation risks causing material harm to his standing and the economic value of his name and professional brand. Nancy Cheung, Managing Director of PR and Branding for Kevin O'Leary Ventures, talked about how they had to reassure the networks and investors, *"I had to speak with StartEngine because a lot of their investors were calling. We did damage control a lot in the background, reassuring them [about the*

*allegation]. For the brand and Kevin's mental health, I also had to go into Facebook and Instagram and block out words like 'murderer' and others that were associated. We were getting flooded with comments."*

Mr. O'Leary also had to speak to the ABC network that he started on Shark Tank with, and reassure them and other stakeholders that there was nothing new to the 2019 case.

## REPUTATION IS BRAND AND CURRENCY

Reputation is an individual's crucial intangible asset. It is not merely a peripheral aspect of personal or corporate identity but rather a determining factor that drives economic value creation and competitive advantage.

There exists a plethora of academic and non-academic studies that show how reputations, especially those of high-profile personalities and celebrities like Mr. O'Leary, influence market value, stakeholder perception, and brand value. Academic studies have found specific correlations between celebrity endorsements and short-term financial performance, brand equity, and long-term financial performance.[3] One landmark study found that negative news about a celebrity reduces the shareholder value of brands they endorse, supporting the economic correlation between celebrity reputation and commercial outcomes.[4] Similarly, according to research published in the *International Journal of Advertising*, a celebrity's brand and endorsements are psychologically intertwined with public perception. Negative press diminishes endorsement effectiveness and consumer trust.[5]

It is undisputed that Mr. O'Leary has cultivated a strong reputation, nationally as well as internationally recognized public persona over the long course of his professional journey. His reputation is his brand and currency and is derived from a multitude of sources, including TV franchises and shows, endorsements and business ventures, and book deals. His personal brand serves as a business asset. This is evident from Mr. O'Leary's exemplary social media presence and massive followers. Here's a table demonstrating some figures:

[3] Hedhelhi, Kamel L. et alia, Celebrity Endorsements: Investigating the Interactive Effects of Internalization, Identification, and Product Type on Consumers' Attitudes and Intentions, *Journal of Retailing and Consumer Services*, 58(1), citing Chung et al., 2013 and Elberse and Verleun, 2012, Farrell et al., 2000; Garthwaite, 2014 for immediate impact; Seno and Lukas, 2007, for brand equity; and for brand valuation in the long run Agrawal and Kamakura, 1995, and Farrell et al., 2000.
[4] Elberse, A., & Verleun, J. (2012). The Economic Value of Celebrity Endorsements. *Journal of Advertising Research*, *52*(2), 149–165. https://doi.org/10.2501/JAR-52-2-149-165.
[5] Amos, C., Holmes, G., & Strutton, D. (2008). Exploring the relationship between celebrity endorser effects and advertising effectiveness: A quantitative synthesis of effect size. *International Journal of Advertising*, *27*(2), 209–234. https://doi.org/10.1080/02650487.2008.11073052

| Social Media handles of Mr. O'Leary | No. of Followers |
| --- | --- |
| Instagram | 1.7M |
| LinkedIn | 4M |
| Twitter/X | 1.1M |
| YouTube | 1.08M |
| Facebook | 816K |

The above table shows a large following and is consistent with Mr. O'Leary's impeccable reputation as a social media personality, a public speaker, an entrepreneur, and a business leader. However, it must be noted that these are not merely numbers but the outcome of years of hard-earned trust and goodwill. Behind these numerical figures lies the faith and admiration of millions of people who have instilled their trust in Mr. O'Leary's expertise, insights, persona, and character. These symbolize his hard-earned reputation—a reputation that is tantamount to his personal brand and currency.

The reputation Mr. O'Leary has built over the years, however sterling, can be tarnished. Attacks on his good name have cost him reputationally, financially, and emotionally. The defamation not only raised grave new allegations concerning him but also brought up allegations from the past that had begun to die down. Mr. O'Leary in my interview mentioned, *"When the boat accident actually happened, I lost millions in revenue. Because all the networks dropped me until the trial was ongoing. After we were found not guilty, it started to come back."*

Now, these allegations have renewed the struggles Mr. O'Leary faced then in clearing his name. Many networks or potential employers for his speaking or media engagements may have simply decided not to engage anymore because they prefer someone with a cleaner image. Ms. Cheung also shared how she has to field questions about the case again.

*"I still get asked monthly about the accident and court case. It died down, and then, since the BitBoy tweets, especially from the crypto community, I get asked what really happened."*

This opportunity cost can not be quantified since it simply can not be known to him or his team.

## Section 5: Inappropriate Use of Social Media Platforms

Viral Nature of Internet and Social Media

Bad-faith Use of Social Media to Spread Misinformation

Knowledge of Falsehood and the Constant Nature of Defamation

Involvement of AI

## PERMANENT AND DEFINING NATURE OF INTERNET AND SOCIAL MEDIA

Today, the internet is an integral part of our lives. Its indispensable nature comes from the convenience with which it connects millions and provides the world's knowledge on fingertips. However, beneath its surface of convenience and information lies an unforgiving and defining nature that shapes our identities, perceptions, and interactions.

One of the most striking characteristics of the Internet is its permanence. Stories and posts made online, even when redacted or taken down, can be impossible to erase from the web archive. The right to be forgotten, unfortunately, is not entirely achievable on the internet, leading to far-reaching consequences. A negligent tweet or an embarrassing photo can resurface, requiring abundant caution and self-censorship when it comes to one's digital footprint. This digital footprint can influence career opportunities, social interactions, and personal relationships. Managing one's online presence has become a crucial aspect of modern life, as a single misstep can have long-lasting repercussions.

Adding to the complexity, the viral and defining nature of the internet allows the flow of ideas, trends, and information to spread like wildfire and shape cultures, prospective, public discourse, and even individual identities. The information on the internet impacts public opinion and behavior without the required verification of the veracity of the information.

As per a widely cited Pew Research study, 64% of Americans believe that misinformation on social media leads to confusion about the actual facts. Yet that same study shows that one in four have shared a story that turned out to be false.[6] As of April 2025, the Pew Research Center surveys support restrictions on false information online, although support for such restrictions is falling in comparison to earlier years.[7]

The court of public opinion can be swift and harsh, with viral moments often leading to intense

---

[6] "Many Believe Fake News Is Sowing Confusion; 23 percent say they have shared a made-up news story, either knowingly or not." Pew Research Center, December 15, 2016. https://www.journalism.org/wp-content/uploads/sites/8/2016/12/PJ_2016.12.15_fake-news_FINAL.pdf

[7] Christopher St. Aubin, Support dips for U.S. government, tech companies restricting false or violent online content Pew Research Center (2025), https://www.pewresearch.org/short-reads/2025/04/14/support-dips-for-us-government-tech-companies-restricting-false-or-violent-online-content/.

backlash. This scrutiny can lead to what is commonly referred to as "cancel culture," where individuals or entities face significant consequences for their actions or statements, sometimes without a chance for redemption or explanation.

This culture is particularly strong for entities that are well known on the internet, and a large part of their livelihood is their digital brand. People are naturally attracted to negative information, and they weigh negative information more heavily than positive information when learning about others and making decisions.[8] When it comes to celebrities, viral or sensational news spreads much quicker, and people are likely to believe it to be true.

For Mr. O'Leary, the credibility of his public image is crucial as a judge on an international show. The severe allegations made and asserted to be true repeatedly by the Defendant have become a permanent part of Mr. O'Leary's reputation, with people wondering and discussing a past judgment that was passed in his favor. It impacts his business and personal relationships, and puts him on media trial for committing one of the gravest crimes, causing economic loss and emotional distress.

---

[8] "Why We're Drawn to Bad News" Psychology Today, February 25, 2025. https://www.psychologytoday.com/us/blog/putting-psychology-into-practice/202502/why-were-drawn-to-bad-news. See also Elizabeth Mohn, "Negativity Bias," EBSCO, 2024.

## Bad-Faith Use of Social Media to Spread Misinformation

Mr. Armstrong built his investment empire as a cryptocurrency influencer by leveraging social media, and particularly Twitter. This is pertinent to the case, as while he had attracted 3.3 million followers at his peak, Mr. Armstrong's empire has fallen, leading to severe economic, personal, and reputational losses. He is well aware of the viral nature and power of the platform and how sensationalized news spreads to garner engagement and profit for the poster, i.e., him. He used his digital influence to defame the Plaintiff, with disregard for Mr. O'Leary's rights or his own duties to use the platform responsibly.

Mr. Armstrong, hence, intentionally and knowingly leveraged this nature of social media to spread misinformation about Mr. O'Leary and his wife. He waged a targeted campaign to garner interest from his audience by posting repeatedly to provoke a response from Mr. O'Leary on the platform and thus boost his own followership.

The Defendant's baseless accusations were presented with a tone and framing calculated to provoke outrage, gain attention, and drive engagement. Such conduct suggests intentional or reckless disregard for the truth, as well as for the foreseeable consequences of spreading such a serious and defamatory claim. Tweets posted as "daily reminders," polls on public opinion of whether Mr. O'Leary is a murderer (41% of votes agreed), podcasts, and youtube videos all relentlessly framing Mr. O'Leary as a "murderer" clearly show his bad faith intention to shape opinion against the Plaintiff and benefit from the engagement. In an escalatory manner, he even posted the telephone number of Mr. O'Leary, simply to garner more engagement from his posts, with a complete disregard for his victim's privacy or security.



Mr. Armstrong aimed to pull down the status and reputation of Mr. O'Leary as a well-known, trusted, and recognized investor and media personality to bolster his own visibility and to gain profits. It should also be noted that this is not the first time that Mr. Armstrong has used his social media to defame and bring down individuals. His X feed is a testament to him posting derogatory comments and unfounded allegations against multiple online personalities and other individuals. This is in addition to his previous videos or podcasts about Mr. O'Leary himself. This showcases a pattern of bad-faith use of social media to exploit controversy and regain digital engagement at a time when the Defendant's online influence was demonstrably in decline.

## KNOWLEDGE OF FALSEHOOD AND THE CONTINUAL NATURE OF DEFAMATION

In my opinion, the intent behind the defamation and its gravity is clarified by the tone, method, and continuity in which the posts were made by Mr. Armstrong. There are two aspects that add to the severity of the allegations.

Firstly, as mentioned, Mr. Armstrong posted these blatant allegations starting March 17, 2025, for a period of over 5 days. The defamatory statements were made constantly, increasing in severity every day. Despite one of his tweets being deleted and his account being suspended for 12 hours, Mr. Armstrong persisted in his campaign. He used different formats, including text posts, polls, images, and videos, to increase engagement and continuously defame Mr. O'Leary.

Secondly, Mr. Armstrong had knowledge of his actions and the falsity of the statements. This is evidenced by multiple factors, the least of which is that the judgments relating to the 2019 accident and the 2021 acquittal of Mrs. O'Leary were publicly available. Further, when other users and Mr. Armstrong himself engaged with Grok, an artificial informational chatbot integrated into Twitter, the bot confirmed there was no evidence of the claims being made. However, Mr. Armstrong continued to push his false narrative. Additionally, despite having his posts removed and suspended for 12 hours, the Defendant did not pause his campaign, fact-check, or redact his previous posts but continued defaming Mr. O'Leary despite his knowledge of the falsehood.

Throughout this defamatory campaign, as established earlier, Mr. Armstrong has constantly called Mr. O'Leary a "murderer," claimed he and his wife were guilty of the 2019 accident and the unfortunate demise of a couple in Toronto, and also implied that Mr. O'Leary is capable and willing to kill Mr. Armstrong. These grave statements are clearly defamatory, made with full knowledge of their harm, and made with the intent to ruin Mr. O'Leary's good name and for Mr. Armstrong's benefit.

# INVOLVEMENT OF ARTIFICIAL INTELLIGENCE

Artificial intelligence has been playing a central, transformative role in many industries and parts of our lives. In this age, AI is also becoming prominent in shaping and maintaining individual and business reputations. As social media, search engines, and online content distribution systems become progressively governed by algorithmic processes, AI not only influences what information surfaces publicly but also how reputational narratives are constructed, disseminated, and reinforced.

Moreover, AI chatbots such as ChatGPT, Gamma, and Grok have also become a centralized database for anyone to gain a summary of their or others' digital reputation. A simple prompt with the name and institutional affiliation of an individual is capable of giving a largely comprehensive summary of the individual's information compiled by the AI from multiple sources, including articles, social media profiles, and conversations on public platforms. Hence, as AI continues to learn and train its algorithms, publicly available information or misinformation about individuals will shape the data from which it is informed and trained. When AI tools are deliberately engaged and fed misinformation about individuals, the impact of this information is compounded, as such interactions have the potential to re-train the AI algorithm and cause damage to the digital image of individuals presented by AI chatbots in their responses.

During the timeline of the multiple defamatory statements made on X, another user engaged Grok, an integrated AI chatbot in X, to fact-check the claims. While Grok denied the claims, Mr. Armstrong did not relent and replied to it, claiming that alcohol was found in Mrs. O'Leary's blood, implying that she caused the accident.



As mentioned earlier, Grok's AI learns from user responses.[9] Generative AI chatbots such as Grok "automatically learn from past interactions how best to answer questions and improve conversation flow routing."[10] While private information and context are not saved in Grok, public information or facts are integrated and might be quoted back in future interactions.



Grok's position on using live user interactions for its learning base over time.

This possibility of the user interaction being used for adaptive knowledge training of the chatbots makes the implication irresponsible and another act that amplifies the damage of the defamation, as such information, though false, may now be a permanent part of the AI's information database and resurface in future queries.

---

[9] See Note 1.

[10] IBM, WHAT IS A CHATBOT? IBM (2025), https://www.ibm.com/think/topics/chatbots (last visited May 30, 2025).

## Section 6: Nuances of Reputation Management

What is Online Reputation Management (ORM)

Build

Monitor

Repair

Digital Reputation

# What is Online Reputation Management (ORM)

In today's digital age, our online presence plays a key role in shaping how we are perceived by others. Whether one is an individual or a business, online reputation can make or break one's success. This is where Online Reputation Management (ORM) comes into play. ORM refers to the strategy and tactics used to always present the client's personal and/or professional brand in the best possible light on the internet. It typically involves promoting positive brand messaging and managing negative criticism most appropriately.

Blue Ocean Global Technology defines ORM as the process of building, monitoring, and repairing the digital content that appears when any name the client is known by is searched for on the internet. In essence, this pertains to the methods by which an individual or entity ensures the accurate online representation of the client. The emergence of social media allows negative content and false information to be shared easily and circulated among large numbers of internet users. Such falsehoods can vary from business practices to allegations of criminal activities. Even a defamatory tweet on X or a post on Facebook can lead to harm to reputation, multiplied by the reach of the published content and popularity of the publisher.

Online reputation determines how one is perceived by others when they search for a particular name directly or stumble across it online. Consequently, ORM proactively influences what information people will find.

# BUILD

A build campaign in online reputation management (ORM) refers to a strategic approach aimed at enhancing and managing the reputation of a brand or individual on the internet. It involves implementing various tactics to improve one's online presence, build a positive image, and mitigate any negative information or reviews that may exist. The term *"Build"* refers to an overarching initiative or project undertaken by an entity. It could encompass various aspects of the business, such as developing products or services, establishing brand identity, improving infrastructure, or any other effort geared toward enhancing the company's overall standing.

The primary goal of a build campaign is to establish a strong and favorable online reputation for the brand or individual. This includes creating and optimizing digital assets such as websites, social media profiles, and online directories. Additionally, it involves actively monitoring and responding to customer feedback, reviews, and comments across various online platforms.

By implementing effective ORM strategies within a build campaign, businesses and individuals can proactively manage their brand's perception in the digital landscape. This helps ensure that any negative information is addressed promptly and appropriately.

Furthermore, an effective build campaign in ORM goes beyond just managing existing content; it focuses on consistently enhancing the brand's online presence through content creation, search engine optimization (SEO), social media engagement, and other techniques. By doing so, it helps individuals establish credibility, trustworthiness, and authority within their respective industries.

Lastly, a build campaign plays an integral role in online reputation management by actively working towards enhancing a personal or organizational brand's image while effectively managing its online presence. Through careful planning and implementation of various strategies within this campaign framework, individuals and organizations can safeguard their reputation while maximizing their potential for success in today's digital age.

# Monitor

Monitoring is the key to addressing potentially harmful rumors and falsehoods before they erupt into a full-blown crisis. Unfortunately, people, and even thriving businesses, can be blindsided by defamatory content on the internet. Monitoring is a proactive step towards managing that risk. The monitor strategy in ORM involves continuously tracking, analyzing, and responding to what is being said about a person, brand, or business online. The goal is to stay informed about any mentions, reviews, or discussions happening in digital spaces that can affect reputation. Monitoring is crucial for quickly identifying negative content, addressing potential issues before they escalate, and capitalizing on positive feedback.

1. Tracking Mentions and Conversations: This involves utilizing various tools and techniques to track mentions across social media platforms, news articles, blogs, forums, and other relevant online channels. Such an effort produces valuable insights into public perception and can identify both positive and negative trends.

2. Monitoring Reviews and Customer Feedback: Online reviews and customer feedback are powerful indicators of reputation. Continuously monitoring review platforms, social media comments, and direct feedback channels enables a client to understand customer or fan experiences, identify areas for improvement, and address concerns promptly. This proactive approach to review management is crucial for maintaining a positive perception.

3. Identifying and Addressing Negative Content: Early detection of negative content, such as critical articles, unfavorable reviews, or defamatory comments, is paramount in mitigating potential reputational damage. The monitor strategy involves actively scanning online sources for such content and establishing protocols for appropriate and timely responses. Addressing negative content strategically can prevent its spread and minimize its impact.

4. Engaging with Positive Mentions: Acknowledging and amplifying positive feedback and mentions online can significantly bolster a reputation. The monitor strategy includes identifying positive comments, reviews, and articles and engaging with them through

likes, shares, or thoughtful responses. This not only shows appreciation but also reinforces positive sentiment and encourages further positive engagement.

5. Monitoring for Potential Crisis Situations: Identifying early warning signs of a potential crisis is a critical aspect of reputation management. This involves monitoring for sudden spikes in negative mentions, emerging themes of concern, or escalating customer complaints. Early detection allows for proactive intervention and the implementation of crisis communication strategies to minimize damage.

6. Managing Search Engine Results: Monitoring search engine results for a name or brand is crucial for understanding the first impressions stakeholders, such as celebrity fans, will have. This involves regularly checking search rankings for both positive and negative content and implementing strategies to ensure that positive and accurate information is prominently displayed.

7. Regular Reporting and Analytics: To effectively manage an online reputation, it's essential to establish regular reporting mechanisms and analyze the data collected through monitoring efforts. This includes tracking the volume and sentiment of mentions, identifying key influencers, and assessing the overall health of an online reputation. These insights inform ongoing ORM strategies and allow for data-driven decision-making.

Furthermore, for public personalities like Mr. O'Leary, it is particularly important to monitor and manage their online presence. Considering how crucial his brand is to his success as a media personality, it is his currency. Furthermore, as an investor and an integral part of the finance industry, upholding his reputation is essential to protecting his investments and potential investment opportunities.

# REPAIR

A negative reputation can adversely affect one's personal well-being and public perception. Defamatory content erodes trust and compromises opportunities. Public relations firms and digital reputation specialists focus on the reduction and removal of online content to repair the online profile for an individual or organization. Experienced companies have effective strategies in place for replacing negative search results with positive coverage.

Fixing a damaged online reputation involves using various methods to improve how a person or organization appears online. Because the digital world is always changing, it is important to regularly update one's personal or professional online presence. Repairing online reputation isn't a one-time task; rather, it is an ongoing effort that requires checking in regularly, using new online tools when they become useful, and adjusting one's approach as search engines change how they rank online content.

These ongoing changes to ranking algorithms can make obtaining success from SEO techniques challenging, even for experienced service providers with a track record of results. Search engines seek to deliver the most accurate and helpful results, which include balancing positive and negative content.

Hundreds of calculations and contributing factors are involved in search engine results. Specific aspects of those algorithms, and an associated scoring or ranking framework, apply to Online Reputation Management. Research on all aspects of each unique situation is required for each Online Reputation Management repair case. It requires a customized approach each time. To identify the best solution for an individual, Online Reputation Management professionals conduct thorough analyses of both positive and negative assets and then test the feasibility of both the removal and suppression of content.

An integrated team of professionals, including technical experts, analysts, engineers, and programmers, consistently studies and navigates digital trends in analytics, keyword research, link analysis, and SERPs to conduct highly efficient and effective SEO campaigns. Keywords &

URL targeting may be used to mitigate negative links and safeguard against future damage to a reputation.

In a reputation repair and rehabilitation campaign, the focus is on proactively improving upon a reputation that was harmed and viewed by clients and prospective clients. To counteract the resulting negative sentiment, we recommend an ORM rehabilitation campaign.

# DIGITAL REPUTATION

Mr. O'Leary became a target of serious, negative, and unproven claims after the Defendant's egregious false statements were published on the internet, thereby defaming him. The negative content available online against Mr. O'Leary has caused significant damage that a robust rehabilitation campaign can attempt to repair.

The way for him to restore a neutral reputation is to create positive digital assets that will appear whenever people search for them online, counteracting the negative sentiment.

Historically, traditional avenues of communication included print media, television, and radio—each with its limitations. However, with the mass adoption of social media and the internet, the use of traditional media has become fragmented. The internet has significantly altered the way reputational damage spreads, making it far more accessible, rapid, and difficult to contain.

**How the Digital Landscape Fuels Reputational Harm**

- **Affordability:**

  Previously, publishing defamatory content to a large audience was costly. Print, television, and radio required substantial financial resources. In contrast, the internet allows anyone to disseminate information, whether true or false, to millions of people at little to no cost. The widespread availability of affordable mobile devices and free internet access in public spaces has only exacerbated this issue, enabling defamatory content to reach vast audiences instantly.

- **Convenience:**

  Social media and online platforms have made it extremely easy for individuals to share their thoughts and opinions, whether accurate or not. Websites, blogs, vlogs, and comment sections allow for rapid dissemination of unverified claims, with no requirement for expertise or accountability. Furthermore, digital platforms facilitate the

effortless downloading and resharing of defamatory content, making harmful information nearly impossible to erase once it has entered the public domain.

- **Widespread Outreach:**

Unlike traditional media, which is often restricted by geographical boundaries, social media content reaches a global audience. This significantly amplifies the damage suffered by victims, as defamatory statements spread across jurisdictions, making legal remedies more complex. Additionally, the sheer volume of online content makes it challenging to quantify the precise harm caused by defamatory publications.

## Section 7: Legal Cases

Invasion of Privacy

Defamation Per Se

# INVASION OF PRIVACY

**Shaktman v. State 553 So. 2d 148 (1989)**

- Facts:

  The petitioner, Shaktman, was charged with violating the Racketeer Influenced and Corrupt Organization (RICO) statute, conspiracy, bookmaking, and conspiracy to commit bookmaking. Law enforcement had received a tip that Shaktman, previously convicted of bookmaking, was engaged in similar activities. A pen register was installed on November 28, 1983, on phones at co-defendant Mart's residence. The petitioner moved to suppress the evidence and dismiss charges, arguing the use of a pen register violated their right to privacy under Article I, Section 23 of the Florida Constitution.

- Judgment:

  The Florida Supreme Court held that installing a pen register implicates the constitutional right to privacy under Article I, Section 23, because it collects personal information (dialed phone numbers) not intended for third-party disclosure. The court noted that such intrusion into the right to privacy can only be permitted when the state demonstrates a founded suspicion that the phone was used for criminal activity.

- Relevance to the Case:

  The case above highlights the importance of protecting an individual's privacy, especially their personal information such as contact details. Exposing or misusing such detail is a violation of an individual's right. Similarly, Mr. Armstrong released Mr. O'Leary's contact number to the X platform and encouraged strangers to contact him on the false pretext that him being a murderer.

**Gawker Media, LLC v. Bollea, 129 So.3d 1196 (Fla. 2d DCA 2014)**

- Facts:

Hulk Hogan (Terry Bollea) was videotaped having sex with Heather Clem without his knowledge or consent. Bollea claimed he was depressed due to his impending divorce and gave in to Heather's advances, believing Bubba Clem (Heather's husband) approved. Bubba Clem testified that he burned the video to a DVD, labeled it "Hogan," and stored it in a drawer.

Gawker editor A.J. Daulerio published a two-minute excerpt of the 30-minute tape, including 10 seconds of explicit content.

- Judgment:

The jury delivered a verdict in favor of Bollea. The jury awarded him $115 million in compensatory damages, which included $60 million for emotional distress. The jury awarded Bollea an additional $25 million in punitive damages. The decision underscored that free speech has boundaries, especially when it infringes on personal privacy.

- Relevance to the Case:

Mr. Armstrong publishing Mr. O'Leary's personal number is a stark violation of his right to privacy. Since it was released along with the false allegation of Mr. O'Leary being a criminal, the malicious nature of the action makes the privacy violation egregious.

**Andrews v. Marriott Int 'l, Inc. 61 N.E.3d 1105**

- Facts:

On February 4, 2008, Michael Barrett obtained information from Blackwell Inn, a hotel owned and operated by Ohio State University (OSU), that Erin Andrews was a guest there. Barrett requested and was given a room next to hers, then altered her peephole to record her privately. He later posted the videos online.

- Judgment:

The hotel was found liable for disclosing Andrews' room number and placing Barrett in an adjacent room. The jury found for Andrews, returning a $55 million verdict on March 7, 2016. The jury divided the responsibility for paying the award – Barrett must pay just over $28 million, and West End $27 million.

- Relevance to the case:

In the case above, the plaintiff's privacy was violated due to her room details being shared and being secretly recorded without permission. The case established the importance of consent when private information is being shared. Without consent of the individual, exposing private information such as someone's contact number, especially of a celebrity, is a violation of privacy.

# DEFAMATION PER SE

**Burnett v. National Enquirer, Inc., 193 Cal.Rptr. 206**

- Facts:

  In January 1976, the actress Carol Burnett was dining at the Rive Gauche restaurant in Georgetown, Washington, D.C. She drank "two or three" glasses of wine but was not drunk. She exchanged parts of her dessert, a chocolate soufflé, with diners at a couple of neighboring tables after they became curious about it. Later, as she was leaving the restaurant, she was introduced to Henry Kissinger, who was also dining in the restaurant. In March of that year, the National Enquirer published a short item about the incident, "Carol Burnett and Henry K. in Row".

- Judgment:

  The *National Enquirer* published a false statement about the respondent, which was found to be libelous on its face, thus, the respondent was awarded compensatory damages without needing to prove special damages. The court also noted that the publication is read nationally by 16 million people. The potential for harm through a repetition of a libel by such an institution is tremendous. Carol Burnett won $50,000 compensatory and $750,000 punitive damages, which was reduced to $150,000, and a new trial was permitted on the issue of punitive damages.

- Relevance to the case:

  The plaintiff was exposed in a private setting to a wide range of readers and the information shared was false as well. Such actions combined represent a lack of respect for the truth and privacy of an individual. Considering Mr. Armstrong published Mr. O'Leary's phone number and continued to accuse him of a crime without proof, he showed disregard and negligent attitude towards Mr. O'Leary's privacy and reputation. Despite being corrected by AI, he persisted, displaying his negligent and malicious intent.

**Ventura v. Kyle 8 F. Supp. 3d 1115 (D. Minn. 2014)**

- Facts

  In *Ventura v. Kyle, Jesse Ventura*, a former wrestler and Governor of Minnesota, filed a defamation lawsuit against Chris Kyle, a Navy SEAL and author of "American Sniper," after Kyle described an alleged altercation with Ventura in his book. Kyle claimed that Ventura made disparaging remarks about Navy SEALs and the Iraq War, leading to Kyle punching Ventura. Ventura denied the incident, asserting that Kyle fabricated the story for publicity. Kyle was killed while the lawsuit was pending, and his wife, Taya Kyle, as executrix of his estate, became the defendant. The case involved claims of defamation, appropriation, and unjust enrichment. The procedural history included a motion for partial summary judgment by Kyle, which was denied, and later a motion for summary judgment by Taya Kyle, which was also denied.

- Judgment:

  Where the plaintiff is a public figure, which the plaintiff here clearly is, a defamation claim requires (1) a false and defamatory statement about the plaintiff; (2) an unprivileged publication of the statement to a third party; (3) a tendency to harm the plaintiff's reputation in the community; and (4) the defendant acted with actual malice. The burden is on the plaintiff to prove each of these elements. This case hinges on the falsity of the statements and whether the defendant acted with actual malice. The plaintiff submitted several sworn statements from witnesses at the wake that deny the altercation portrayed in American Sniper, as well as photos from a graduation the next day that show no physical injuries of the sort described in the book. The court found this evidence to be convincing enough to submit to a jury. The assertion that actual malice cannot be inferred from a false statement is only true if the statement relates to an ambiguous event. The event in question here was determined not to be ambiguous, as a jury could reasonably conclude that the defendant fabricated the story of the altercation. The jury awarded damages of $500,000 for defamation and recommended damages of approximately $ 1.35 million for unjust enrichment.

- Relevance to the case:

The court explained that the defense of actual malice against defamation doesn't apply when a specific event is the focal point. In the current case, Mr. Armstrong used the boating accident to imply Mr. O'Leary was intoxicated and committed murder. Even though the court didn't convict Mr. O'Leary of the crime, Mr. Armstrong continued to defame him on X and his podcast.

**Bouveng v. NYG Capital LLC 175 F. Supp. 3d 280, 336-44 (S.D.N.Y. 2016)**

- Facts

The plaintiff, Hanna Bouveng, brought this action against the defendants for quid pro quo sexual harassment, defamation, and two other claims. The plaintiff was employed with the defendant, wherein she alleged to have encountered several sexual overtures at the hands of Wey, her superior. When Bouveng refused to engage in sexual activities with him, Wey allegedly sent emails to her family and friends to humiliate her, and Bouveng was terminated from her employment. Later, Wey published six Blog articles containing 66 defamatory statements.

- Judgment

The plaintiff was awarded $1.5 million on her defamation claim against all defendants, in addition to other damages awarded under her other claims in the suit.

In reviewing the jury award, the trial court further stated that

> *"..in the internet age in which we live, an individual's online presence is as important-perhaps more important, early on, than her physical presence.*
>
> *Acting out of pure malice and spite, Defendants used the internet to ensure that no prospective employer would interview Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Defendants have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never*

> *obtained, or the jobs she lost, as a result of their egregiously defamatory*
> *falsehoods. Having caused the harm, Defendants cannot escape the liability."*

- Relevance to the case

> This case establishes that an individual's online presence outweighs their
> physical presence in the age of the internet. It serves as a precedent that
> defamatory information available on the internet causes insurmountable damage
> to the concerned person's professional reputation. Considering the sensitive
> reputation of a public figure like Mr. O'Leary, the negative impact of the
> defamatory content has intensified.

## Bently Reserve L.P. v. Papaliolios, 218 Cal.App.4th 418

- Facts

Andreas Papaliolios, using the pseudonym "Sal R..," posted a negative review on Yelp
about the Jones Building and its owners, including plaintiffs Christopher Bentley and his
wife. In the review, Papaliolios accused the building's owners of evicting tenants,
contributing to the deaths of three tenants, and other misconduct. The plaintiffs alleged
that these statements were false, defamatory, and damaging to their reputation and
business.

The plaintiffs filed a defamation lawsuit, contending that the statements constituted libel.
They provided evidence refuting the claims, including proof that two of the supposedly
deceased tenants were alive and that evictions had not occurred as described. Papaliolios
argued his review was a mere opinion or substantially true and, therefore, non-libelous.

- Judgment

The court denied Papaliolios's anti-SLAPP motion and stated that the Internet
commentary does not ipso facto get a free pass under defamation law. Papaliolios's
review, in part, is susceptible to being read as containing factual assertions, not just mere
opinion. It ruled that the plaintiffs had demonstrated a probability of prevailing on their

libel claim and determined that the statements in the Yelp review were provably false and defamatory.

- Relevance to the Case

This case showcases that readers coming across false information presented as factual assertions are likely to believe it as the truth. When the reach of Mr. Armstrong's social media presence is evaluated, which include X and his podcast, even if his false statements are proven wrong, the statements will remain on the internet and will continue to cause Mr. O'Leary reputation damage.

**Aldous v. Bruss, 405 S.W.3d 847 (Tex. App. 2013)**

- Facts:

Eric Bruss, a police officer serving in the Santa Fe, Texas, police department, filed a defamation lawsuit against Michael Aldous in January 2009. Bruss alleged that in February 2008, he arrested Michael for driving while intoxicated (DWI). Later in the same year, another officer from the Santa Fe police department arrested Michael's father, Warren Aldous, for a traffic offense.

Following Warren's arrest, Michael allegedly began to repeatedly make and spread false statements about Bruss's professional reputation. Michael publicly accused Bruss of various criminal offenses, which Bruss claimed were untrue. Additionally, Michael disseminated false statements via email and on the internet. Bruss argued that these defamatory statements constituted slander per se, directly targeting his professional reputation and casting doubt on his honesty, integrity, and virtue, and were made with malice.

Bruss asserted that Michael intentionally published numerous false statements and falsely accused him of crimes. Bruss claimed that he suffered shame, public embarrassment, humiliation, and mental anguish due to Michael's false and defamatory statements, both in the past and ongoing. Bruss sought compensation for actual and exemplary damages, as well as pre- and post-judgment interest, and legal costs.

- Rationale:

  *"Bruss sued Warren for defamation per se. As is relevant to our analysis of the propriety of the trial court's damages award, Warren admitted to making false statements accusing Bruss of criminal acts and injury to his office, profession, and occupation. These types of statements fall within the categories of statements that are defamatory per se…. In such a case, the plaintiff is entitled to recover general damages, such as for loss of reputation."*

- Judgment:

  The court upheld the judgment of the District Court, affirming Defamation Per Se. It noted that reasonable and fair-minded people could have determined that $150,000.00 would be a sufficient amount to compensate Bruss for the injury to his reputation caused by Warren's defamatory statements.

- Relevance to the case:

  Since the statements from Mr. Armstrong were accusations of criminal activity and directly impugned Mr. O'Leary's character as a murderer and criminal. Such defamatory statements are considered defamation per se. The plaintiff is entitled to recover general damages.

## Shanley et al v. Hutchings 2:22-cv-00549 (D. Utah)

- Facts

  Ms. Shanley and Ms. Hutchings are both writers of paranormal romance fiction who interacted in an online community in 2016. During this time, Ms. Hutchings made several public and highly defamatory statements about Ms. Shanley. She accused her of being a homewrecker, sexually coercing male models, engaging in racist behavior, and making false rape and child molestation allegations, including against her own child. Ms. Hutchings also incited others against Ms. Shanley, offered a cash reward to locate her, and posted a threatening image of a man with a noose, expressing extreme hostility.

- Judgment:

The court found that while topics like rape, child abuse, and human trafficking are generally matters of public concern, Ms. Hutchings' posts did not contribute to a broader public debate. Instead, they were targeted personal attacks against Ms. Shanley, accusing her of serious crimes without evidence. The court emphasized that merely posting on public social media does not make defamatory content a matter of public concern. It also concluded that the volume and nature of Ms. Hutchings' posts demonstrated at least negligence, as no reasonable person would make such grave accusations without verifying their truth.

The court granted summary judgment on Shanley's defamation claims. A jury awarded her $6.8 million in damages: $1.15 million in economic damages, $1.15 million in non-economic damages, and $4.5 million in punitive damages.

- The court highlighted the defense of public concern cannot be used when they're demonstrably false and used to harm the victim's reputation. It also pointed out that no reasonable person would make such grave accusations without verifying the truth. Similarly, Mr. Armstrong utilized false information to damage Mr. O'Leary's reputation and published it on X and his podcast, exposing the falsehoods to a large audience.

**Lafferty v. Jones, 2022 WL 18110184 (Nov. 10, 2022 Conn. App.)**

- Facts:

The plaintiffs alleged that following the 2012 Sandy Hook shooting, "Jones and the rest of the Jones defendants acted together to develop, disseminate, and propagate statements. Regarding the incident. According to the plaintiffs, Jones made these comments even though he "does not in fact believe that the Sandy Hook [s]hooting was a hoax- and he never has." The plaintiffs asserted that Jones had developed a "very lucrative business model" pedaling "conspiracy-minded falsehoods like those about Sandy Hook" for immense monetary gain. He made these statements on his podcast, Infowars. Specifically, the defendant began telling his audience that the Sandy Hook shooting was a government-sponsored hoax designed to lead to gun control. In furtherance of this objective, the defendant began making comments questioning the veracity of the Sandy Hook shootings and the sincerity of the reactions of some of the plaintiffs.

- Judgment:

While considering whether the defendants' conduct was reckless, intentional, or malicious to evaluate the damages, the court ruled that the "defendants' conduct was intentional, malicious, and certain to cause harm by virtue of their infrastructure, ability to spread content, and massive audience". The court further observed that the "defendants repeated the conduct and attacks on plaintiffs for nearly a decade, including during the trial, wanton, malicious, and heinous conduct that caused harm to the plaintiffs". According to the court, this "depravity and cruel, persistent conduct" by the defendants indicated "the highest degree of reprehensibility and blameworthiness."

After considering all the factors, the court awarded the sum of $10 million in punitive damages to each of the fifteen plaintiffs. To conclude, the court awarded common law punitive damages for attorneys' fees in the total amount of $321,650,000.00 and costs in the total amount of $1,489,555.95, and awarded CUTPA punitive damages in the amount of $150,000,000.00

- Relevance to the case:

The court pointed out that the negligent and malicious nature of Mr. Jones' defamatory statements deserved "the highest degree of reprehensibility and blameworthiness." The same applies to this case. Impugning someone's character, especially a public figure, as a murderer and criminal, is a serious accusation. When coupled with the fact that the Defendant leaked Mr. O'Leary's number to strangers and encouraged them to call him shows the malicious intent behind his actions and aggravates the harm they caused.

## Section 8: Assessment of Damages

Rationale for Recommendation of Damages

Summary Findings

Damages

## RATIONALE FOR RECOMMENDATION OF DAMAGES

In my professional opinion, this case is a prime example of how deliberate misinformation, inciting comments, and twisting of facts can impact and harm an individual's reputation, especially in the fast-moving media and television industry, where face value is everything. Public figures, especially those with long-standing careers built on trust, such as Mr. O'Leary, are uniquely vulnerable to such attacks. The direct and relentless allegations by the Defendant of Mr. O'Leary having murdered a couple, along with other fraudulent associations on several platforms, were scandalous, leading to more clicks, views, shares, and discussion. This media interest has been harmful to Mr. O'Leary's brand, which is built on integrity, trust, rationality, and fair-mindedness, all traits essential for an investor.

In a world where online images create definitive perceptions, anyone searching for Mr. O'Leary. i.e, "Mr. Wonderful," is likely to come across these allegations and the surrounding controversy, including the present lawsuit. Although the Plaintiff needed to file this lawsuit in order to restrain the Defendant and bring him to justice, it unfortunately will also become part of Mr. O'Leary's online narrative as a disfavourable result. These negative search results harm his credibility and brand reputation as a well-known investor and media personality. This lawsuit will also lead back to the 2019 suit, which the O'Learys had started to put behind them, compounding both the reputational harm and emotional distress.

It is difficult to quantify the precise value of Mr. O'Leary's brand, and even more challenging to pinpoint the precise extent of damage to the brand currently and in the long term. This is particularly true for the opportunity cost of future engagements, since many individuals in the media industry may not want to work with Mr. O'Leary, given the controversy, where they would have before.

However, the damage in this case is not speculative. It is grounded in real-world consequences. It is clear that individuals such as Mr. O'Leary represent a well-established personal brand, supported by decades of media presence, consumer trust, and commercial activity. Any harm to his image can impact brand equity and have economically measurable ramifications. What amplifies the harm is also an inability to effectively counter the defamatory content. The

consequences of the false statements and defamatory communications against Mr. O'Leary are both real and material, warranting a recommendation for significant damages to address the extensive harm caused.

These harms justify a significant award of damages, not just to compensate Mr. O'Leary but to deter future acts of reckless misinformation targeting public figures.

# SUMMARY FINDINGS

1. **Online defamation of Mr. O'Leary by Mr. Armstrong**

   Mr. Armstrong conducted a defamatory campaign against Mr. O'Leary on X (Twitter), posting multiple false accusations of murder, which garnered thousands of views and shares. Despite some posts being removed, the damage persists due to the permanent nature of digital content.

2. **Mr. O'Leary's Hard-Earned Reputation**

   Mr. O'Leary has built a strong reputation as a successful entrepreneur, investor, and TV personality (e.g., Shark Tank). His credibility is tied to his professional brand, which includes business ventures such as SoftKey and O'Leary Funds. He also has a strong presence on the internet, with 1.7 million Instagram followers and 4 million LinkedIn followers.

3. **Unique sensitivity of Mr. O'Leary's reputation**

   For public figures like Mr. O'Leary, false allegations, such as murder accusations, become ingrained in their digital footprint, influencing public perception, current and future career opportunities, and personal relationships. Mr. Armstrong exploited this dynamic, using sensationalized tweets to provoke outrage and engagement, knowing that these falsehoods would spread rapidly. Furthermore, Mr. O'Leary's reputation is his currency, and the defamatory attacks threaten his economic and professional standing.

4. **Violation of Mr. O'Leary's right to privacy**

   While perpetuating falsehoods against Mr. O'Leary online, Mr. Armstrong posted his personal telephone number online, violating Mr. O'Leary's privacy and multiplying the distress caused. Furthermore, Mr. O'Leary received multiple calls from strangers on the number published on X/Twitter as well as faced attempts to hack into his social accounts

because of the breach.

## 5. Usage of AI to perpetuate defamation against Mr. O'Leary

Mr. Armstrong fed false information into the AI's learning ecosystem as it compiles data from online sources, meaning defamatory content can corrupt AI-generated summaries of a person's reputation. On March 19, 2025, a user had fact-checked Mr. Armstrong's claims using Grok, which refuted them. In exchange, Mr. Armstrong claimed alcohol was found in Mrs. O'Leary's blood, implying that she caused the accident. While being another act of defamation, this false information could have become a permanent part of the AI's information database and resurface in future queries.

# DAMAGES

## Reputational Damages

Reputations hold immense value because they are built on perceptions, beliefs, and opinions that others hold about an individual. These perceptions can shape how people view and interact with someone, influencing their trust, willingness to converse, and business prospects. Trust and relationships are intangible aspects of human interactions that cannot be easily measured or quantified. Trust is built over time through consistent behavior, reliability, and integrity. It develops as individuals demonstrate their competence, honesty, and ability to keep their promises. Relationships, on the other hand, are built on mutual understanding, respect, and shared experiences.

Reputational damages form part of general compensatory damages in defamation law. These damages are presumed by the law, i.e., the law presumes that harm to one's reputation ipso facto merits a claim for damages. These damages also take into account non-economic losses such as humiliation. The presence of malicious intent to harm to reputation, as in the present case, supports consideration for a reputational damage award.

The risks and ramifications of reputational damages are intense and intangible—i.e., there is no single standard to determine a liquidated value associated with harm to a specific personal or organizational reputation or brand. Courts often rely on multiple factors when awarding such damages. The brand capital built by Mr. O'Leary over his years in the industry, whether as an investor or as the well-known personality of "Mr.Wonderful," is invaluable and built on intangible factors such as perception, belief, and opinion. While quantifying the damage to this capital precisely may be challenging because it involves complex emotions, subjective perceptions, and individual ideas, I have structured it through the impressions model and ring theory accepted by courts in my previous experience. These models are precisely meant to capture the subjective nature of reputation and brand by giving a framework to assess the damage.

The rings of harm model is based on calculating how many people the defamatory statements reached and assigning a dollar value to reach proportional to how they would be impacted by the statements. The three rings include:

- Ring 1: The Innermost circle comprising family, friends, and close acquaintances
- Ring 2: Neighbors, co-workers, and work friends, etc.
- Ring 3: The broad audience of strangers who do not know Mr. O'Leary personally but who include Mr. O'Leary's audience as well as viewers and followers of the Defendant as "Bitboy," and others on the internet who witnessed the controversy between the two. In this case, this is the biggest and most affected circle.

In the current scenario, while the inner circle is not heavily impacted by the defamation. The harm did reach the second ring as Mr. O'Leary and his team had to constantly reassure the networks they work with about the statements. It brought up all the controversy regarding the 2019 case back, with people asking about its status again, and wondering if there was something new to this case. This adds to the long-term harm where networks, media houses, and businesses can choose not to associate themselves with Mr. O'Leary's brand anymore, where previously they were attracted by his stellar image and reputation.

Further, Mr. O'Leary's reputation has suffered incurable losses in the third ring, owing to the defamatory campaign unleashed by the Defendant. These people, mostly strangers, number in the thousands conservatively. Those outside his inner circle are left with false impressions about him, which hurt his public and professional image, while also resurfacing negative news about the 2019 case baselessly again. The Defendant posted deliberate false statements on social media platforms, i.e., Twitter/X, which has a large viewership.

For instance, the Defendant's Twitter/X account has 103,000 followers. However, the tweets were likely to be viewed by non-followers on Mr. Armstrong's public profile, as is evidenced by the viewer count on the posts. Aggregating the total number of views from followers and visitors on some of the most viewed posts from March 2025 brings the number to 156,000 views on X. [11]

Conservatively, at least 10% of the 156,000 views can be a proximate number of unique individuals who were exposed to these defamatory statements on X, i.e., 15,600 people.. A logical basis for damages is attaching a dollar amount to the audience members exposed to the defamatory statements. For instance, awarding only $1 to each of the 15,600 people who were exposed to the false association translates to $15,600. Similarly, $5 to each person would amount to $78,000 and $156,00 when awarding $10. And in the event that the economic impact of each viewer was $100, the damage would amount to $1,560,000.

A landmark study by Vitrue on the value of fans put the number at $3.60 per fan, using Facebook as an example. A study that same year by Syncapse put the value at $136.38 per fan.[12] In present dollar values, this number would be even greater. However, my analysis is limited to a range of smaller dollar values to be conservative. Using the figure of $3.60 as the value per fan affected by the defamatory materials, the value would be $56,160.

Based on the invaluable nature of Mr. O'Leary's brand and the large number of people reached, I recommend reputational damage in the lower ranges calculated above, between **$15,600 (assigning a value of $1 per consumer) - $78,000 (assigning a value of $5 per consumer).**

---

[11] Note: Some of these followers and visitors, as mentioned, went so far as to call Mr. O' Leary after the Defendant published Mr. O'Leary's personal contact number on his Twitter/X handle, bringing hundreds of calls from strangers who had obtained his number from the Defendant's post, which continues till date. These calls reinforce the fact that the content on the Defendants' X account was not only viewed by people but affected their opinion of Mr. O' Leary.

[12] Mikal E. Belikov, "Understanding the Value of a Facebook Fan," NBC News, December 3, 2011. https://www.nbcnews.com/id/wbna45534286

**Rehabilitation Damages**

In defamation law, rehabilitation damages are a form of compensation awarded by the courts to restore the reputational damage accrued to the Plaintiffs. These differ from general compensatory damages as they primarily take into consideration the cost to rebuild the Plaintiff's tarnished reputation. While awarding damages, courts have often relied on the cost of rehabilitation to make good the damage caused to the aggrieved party. I employ rehabilitation damages as an empirical method to measure harm by calculating the cost to repair over the cost to inflict, intending to restore the original brand characteristics of Mr. O'Leary's brand.

These defamatory posts have not only caused harm to Mr. O'Leary's carefully curated brand, but they have also resurfaced an otherwise decided 2019 lawsuit involving Mr. O'Leary and his wife, which resulted in a 2021 acquittal of Mr. O'Leary's wife of all charges. It is also noteworthy to mention that Mr. O'Leary was not even charged in the said lawsuit, which showcases Mr. Armstrong's disdain for the judicial process. The negative press being received by Mr. O'Leary is hence on two fronts: the grave allegations by Mr. Armstrong that tarnish the brand image based on trust and integrity that Mr. O'Leary had cultivated, and the previous damage from being involved in a murder trial despite his wife already being acquitted.

The 2019 case in addition to this lawsuit compound the negative search results when someone searches for Mr. O'Leary. While this suit was initiated by him, it must be noted that his hand was forced by the relentless and taunting nature of Mr. Armstrong's post, even saying that he can not be sued. Mr. O'Leary, Nancy Cheong, and his entire team have already had to do damage control about the situation by constantly fielding questions about the new and old lawsuits.

Implementing an effective online reputation management strategy, which includes building new assets and strengthening older ones, is critical in rebuilding a positive image and solidifying Mr. O'Leary's brand. The campaign will play a major role in counteracting at least some of the negative sentiment against Mr. O'Leary and returning his digital image to what it was before. Furthermore, the entire process usually takes a considerable amount of time and effort, which should also be considered as factors for determining the damages.

A rehabilitation campaign, based on the standard of the online reputation management industry,

would likely cost and consist of the following components:

*A restoration campaign is required to help rehabilitate and rebuild the reputation of Mr. Kevin O'Leary:*

- Target keywords: 6

    - Kevin O'Leary Defamation
    - Kevin O'Leary Defamation Case
    - Shark Tank Kevin O'Leary Murder Defamation Lawsuit
    - Kevin O'Leary Defamation Controversy
    - Kevin O'Leary Murderer Case
    - Kevin O'Leary Boat Case

- Target search engines: Google, Bing, Yahoo, DuckDuckGo, and SearchEncrypt
- Creating positive digital assets: 500+
- Estimated timeline: 18 - 24 Months

Additional considerations for the campaign include:

*Process*

- An effective rehabilitation campaign requires ongoing analysis and testing. Close attention is given to a comprehensive yet fluid list of all search results that populate for a particular keyword. The initial focus is on the initial group of 15 priority keywords.

- The process is first applied to each keyword within the Google search engine. As the campaign yields results, a similar framework is implemented for the keywords on four other major search engines: Bing, Yahoo, DuckDuckGo, and Search Encrypt.

- The image optimization process based on media files provided by the client simultaneously impacts progress on the standard search results as well.

- A web page with a higher authoritative number of backlinks features more prominently on the search results relative to similar websites without comparable interlinking strength. Throughout the campaign, link-building strategies are used to further strengthen the new

digital assets created.

- Monthly progress reports highlighting work performed and results, often including backlinks, profiles, articles, and other tangible updates, are key for transparency and to judge the effectiveness of the campaign

Content & Publication

- 500+ Positive Digital Assets will need to be created to counteract the negative sentiment against Mr. O'Leary. New positive links are required to rank. Given the limited scope of content, attention, and quality required to represent him, internal writers and external PR professionals are involved. Initial information for content creation, biographical information, topics, and sources will be identified and collected.
- Building and maintaining high authority profiles that can rank on specific Search Engine Results Pages (SERPS) will be one core element of our process.
- A plan for the promotion and demotion of existing content within each keyword is required.

Considering all the factors involved and the need for restoration and strengthening of Mr. O'Leary's online presence to protect against the defamatory narrative, the estimated costs for a rehabilitation campaign, inclusive of SEO and approved written, photo, video, and public relations content by Mr. O'Leary:

**[Range $45,000 - $50,000 monthly] x for 18 - 24 months = $810,000 - $1,200,000**

**Punitive Damages**

Mr. O'Leary is entitled to the requisite punitive damages as part of unliquidated damages to be awarded in this lawsuit. Punitive damages are awarded in cases where defamatory statements were made out of actual malice. A determination of *mens rea* (mental state) is essential for an award of punitive damages. In the case of punitive damages, it is extremely difficult to assign a dollar value because reputations are intangible.

The Defendants actions supports the finding of actual malice in his launching the defamatory campaign on Mr. O'Leary. This is evident from the Defendant's own statements. Additionally, as mentioned earlier, the Defendant has been engaging in defaming Mr. O'Leary for a long time through YouTube videos and podcasts. This lays emphasis on and concretises his *mens rea* and warrants a claim for punitive damages.

The following are a few statements made by the Defendant that suggest that he was motivated by actual malice against Mr. O'Leary:

| Statement No. | Platform | *Mala Fide* Statement |
|---|---|---|
| 1. | Twitter/X<br><br>Post dated 3.21.2025 | *"I'm a rabid dog with my teeth sunk deep into your (Kevin O'Leary's) leg."* |
| 2. | Twitter/X<br><br>Post dated 3.19.2025 | *"Have you ever wanted to call a real life murderer?! You can NOW!"*<br>Publishing Mr.O'Leary's personal contact number on Twitter/X. |

The above cited statements throw light on the *mala fid*e intention behind the Defendant's

consistent defamatory tweets on Twitter/X. For instance, *Statement No. 1* sheds light on the ill will and malice inherent in the Defendant's actions. The Defendant himself admits to his relentless behaviour by referring to himself as a rabid dog, with his teeth sunk deep into Mr. O'Leary's leg, suggesting that he would not let this matter rest and would continue harassing Mr. O'Leary.

Furthermore, the Defendant's ill-will and malice against Mr. O'Leary led him to the extent that he published Mr. O'Leary's personal contact number on his Twitter/X account, violating his privacy and causing him distress. (*Statement No. 2*)

In light of the aforementioned statements cited, it becomes apparent that the Defendant was motivated by ill will and malice in launching this defamatory campaign against Mr. O'Leary. These circumstances warrant the awarding of punitive damages in the interest of justice and fairness.

**Undertaking:**

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

# Appendix A

## Documents Reviewed

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

June 4th, 2025

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 1:25-cv-21417

Kevin O'Leary,

      Plaintiff,

v.

Benjamin Armstrong,

      Defendant.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Kevin O'Leary ("O'Leary") hereby sues the Defendant, Benjamin Armstrong ("Armstrong" a/k/a Bitboy Crypto) and alleges as follows:

### INTRODUCTION AND NATURE OF THE CASE

1.     Plaintiff Kevin O'Leary, an internationally renowned entrepreneur, investor, and television commentator, files this action against Defendant Ben Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods intended to destroy O'Leary's reputation. Adding to the suffering of those affected by a tragic boating accident that has already been adjudicated in court, Armstrong, a cryptocurrency influencer whose media empire has collapsed amid scandal, repeatedly and falsely labeled O'Leary a "murderer." Armstrong has also alleged without any factual basis that O'Leary paid "millions" to cover up his own role in the tragic boating accident. In reality, O'Leary was not operating the vessel involved; his wife was, and she was conclusively exonerated by a court after a 13-day trial. Armstrong's defamatory statements are driven by a desperate attempt to regain relevance and notoriety amid his own public fall from grace, and have caused substantial harm to O'Leary.

2.      Armstrong's cryptocurrency influencer empire recently collapsed. In late 2023, his own company ousted him citing "substance abuse" issues and claiming he committed "emotional, physical, and financial damage" against his own employees. Recently, the New York Times published an article about Armstrong noting that he was "once the most popular Cryptocurrency YouTuber in the world [but that] [n]ow his empire has collapsed."

3.      Following his dramatic fall from grace, Armstrong has initiated a defamatory campaign against O'Leary from his private X/Twitter account. In the last week, Armstrong has averaged two defamatory posts per day labeling O'Leary and his wife as murderers. Alarmingly, Armstrong recently escalated his harassment by releasing O'Leary's private cell phone number and urging his followers to "call a real life murderer."

4.      Armstrong's statements are neither protected opinions nor mere hyperbole—they are deliberate falsehoods published with actual malice. Armstrong's intent is unmistakable: to exploit O'Leary's prominence for media attention, inflict lasting damage on his reputation, and divert public scrutiny from Armstrong's own personal and professional collapse. Armstrong knew, or recklessly disregarded, that his allegations concerning the tragic boating accident were completely devoid of any factual basis.

5.      Throughout his career, O'Leary has consistently advocated for accountability and personal responsibility. Through this lawsuit, O'Leary seeks to hold Armstrong accountable for his intentional and reckless dissemination of defamatory lies, and to redress the significant damage Armstrong has caused to O'Leary's reputation.

## THE PARTIES, JURISDICTION, AND VENUE

6.     Plaintiff Kevin O'Leary is a citizen of Canada and resides in Miami-Dade County, Florida. O'Leary first achieved prominence through SoftKey Software Products, a company he co-founded in 1986 and successfully grew into a global software powerhouse. In 1999, he sold SoftKey to Mattel for $4.2 billion, solidifying his reputation as a visionary leader and credible business figure. Since 2009, O'Leary has been a star on the hit television series Shark Tank, where his astute investment insights and sharp negotiating skills earned him a dedicated audience and the nickname "Mr. Wonderful." Today, as Chairman of O'Leary Ventures, he actively oversees a diverse portfolio of startups, leveraging the reputation he has meticulously cultivated over decades.

7.     Defendant Benjamin Armstrong resides in Georgia. Before pivoting into cryptocurrency content creation in 2017, Armstrong dabbled in businesses such as graphic design and car washes. Quickly branding himself as a self-styled "crypto icon," he aggressively grew his online presence, moving into a larger studio in 2020 to amplify his reach. Armstrong regularly boasted of substantial cryptocurrency holdings, claiming a peak value of $40 million. His notoriety peaked with over 3 million followers across his social media pages, where he often promoted his perceived expertise. Yet Armstrong's reputation dramatically imploded in late 2023 when his own company, HIT Network, publicly expelled him, citing his toxic behavior and accusing him of causing significant "emotional, physical, and financial damage" to employees and the Bitboy Crypto community at large.

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, excluding interest.

9.      This Court has personal jurisdiction over Armstrong under Fla. Stat. §§ 48.193(1)(a)(1) and (1)(a)(2). Armstrong's defamatory X/Twitter posts, accessible statewide, targeted and tagged O'Leary—a prominent Florida resident who lists his location as "Miami Beach, Florida" on his X/Twitter profile—inflicting harm in Florida. X/Twitter users who resided in Florida viewed the multiple tweets at issue in this case while they were in Florida. Armstrong also carries on business in Florida, often livestreaming from Florida, tweeting from Florida, and attending cryptocurrency industry events in Florida such as Quantum Miami, Expoverse, and the Bitcoin Miami Conference.

10.     Venue is proper in this District because a substantial part of the events or omissions giving rise to O'Leary's claims occurred in this District and, alternatively, because Armstrong is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

### A.  O'Leary Builds a Highly Successful Career and Personal Brand.

11.     Kevin O'Leary has established himself as a candid, savvy truth-teller through a dynamic career as a businessperson, investor, author, and television personality. He initially gained prominence by co-founding SoftKey Software Products, a major force in the educational software market, later rebranding as The Learning Company before being acquired by Mattel for $4.2 billion.

12.     O'Leary further enhanced his standing in the business world with ventures such as StorageNow Holdings, which showed his ability to skillfully transform modest investments into significant returns. He also founded O'Leary Funds and O'Shares ETFs, collectively managing assets exceeding one billion dollars, demonstrating his financial expertise.

13.　　In 2009, O'Leary rose to mainstream prominence as a featured investor on the hit television show Shark Tank. Known for delivering blunt yet insightful business advice, he rapidly became a popular and well-respected figure, earning the moniker "Mr. Wonderful," and investing millions of dollars into promising startups and supporting founders in scaling their businesses.

14.　　Because of his reputation as a truth-teller who provides reasoned analysis, O'Leary is regularly invited to share his perspective and commentary on major television networks, including CNN and Fox, where he engages audiences on topics ranging from cryptocurrency to economic forecasting. His informed perspectives reinforce his dedication to credibility, which remains a cornerstone of his public persona and ongoing business success.

**B.　Armstrong's Empire Collapses.**

15.　　Armstrong was once one of the most popular cryptocurrency influencers on X/Twitter and YouTube, attracting over a million followers with his enthusiastic endorsements and a lavish lifestyle.

16.　　At the peak of his popularity, Armstrong had more than 3.3 million followers across his social media pages.

17.　　Yet his empire began to collapse in August 2023, when he was removed from his own production company, HIT Network, following allegations of misconduct and violent behavior at his office.

18.　　The HIT Network seized control of his former X/Twitter account, which currently has one million followers.

19.　　Armstrong subsequently faced significant financial losses and his wife filed for divorce. Armstrong's reputation suffered further after multiple accusations, including workplace harassment and disputes with former business partners, became public.

5

20. In February 2025, the New York Times ran an article about Armstrong's "dramatic collapse." The article reported Armstrong as saying he was going through a "midlife crisis," but boldly predicting that "I'm going to be rich again. Everybody kind of sees that. It's just a matter of how and when."

21. Today, Armstrong has about 100,000 followers on X/Twitter, which is not as many as he used to have.

22. With a significantly diminished reach today, Armstrong appears motivated to draw attention to himself through public feuds or controversies, including defaming well-known figures such as O'Leary, as a strategy to regain relevance in the crypto space and, in his words, become "rich again."

## C. **Armstrong Wages a Defamatory Campaign.**

23. Beginning in late March 2025, Armstrong, using his private X/Twitter handle @BenArmstrongsX began to wage a campaign of harassment against O'Leary and his wife.

24. Over the course of about a week, Armstrong fired off over ten tweets accusing O'Leary and his wife of murder and paying millions to cover up their roles in a murder.

25. The defamatory posts that are the subject of O'Leary's defamation causes of action are summarized and pasted below.

26.     Armstrong launched his defamatory campaign on March 17, 2025. On that day, he posted the following: "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto." Over 30,000 people viewed this tweet.



27.     On March 19, 2025, Armstrong unleashed another tweet accusing O'Leary of committing "actual crimes": "Doesn't everybody think it's weird that I've been publicly calling … @kevinolearytv [a] murderer[] and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."



28.     Ten minutes later, in a clear escalation, Armstrong tweeted again—this time publishing O'Leary's private cell phone number and encouraging the public to harass him: "Have you ever wanted to call a real life murderer?! You can NOW! @kevinolearytv is waiting for your call."



29.    Following the tweet, O'Leary began receiving communications from strangers who

had obtained his number directly from Armstrong's post.

30.    That post was removed for violating X/Twitter's terms of service.

31.     One X/Twitter user posted on the tweet tagging and asking Grok, an Artificial Intelligence chatbot, to "explain [Armstrong's] absurd claim."

32.     Grok is an AI chatbot. It is integrated into X/Twitter. Grok can offer general fact-checking by pulling from web sources and its own knowledge. It can also flag misleading information.

33.     Grok replied to the tweet and set the record straight based on publicly available information: "No evidence supports the 'murderer' claim about Kevin O'Leary. It may refer to a 2019 boat crash where his wife was acquitted; he wasn't charged."



34.     Despite Grok's post stating there was "no evidence" to support his claims, Armstrong persisted in pushing his false narrative.

35.     Like clockwork, Armstrong was back at it again the next morning. On March 20,

2025, Armstrong noted that X/Twitter had removed his post of O'Leary's phone number and again

called him a murderer: "That's right guys – I was forced to delete the murderer @kevinolearytv's

phone number by X. I was in X jail for 12 hours."



36.     That afternoon, Armstrong lashed out again on X/Twitter: "Hey how is another free

day @kevinolearytv? Do you ever think [of] the couple you murdered?"



37.    By 8:55 AM on March 21, 2025, he was back at it: "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up. Not a single cease and desist has been sent to me Kev. Wonder why?"



38.     Armstrong repeated his strategy of provoke, go viral, and cash in on outrage as the day progressed.

39.     Just six minutes later, he fired off another post: "Hey @kevinolearytv, what in the fuck are [you] going to do with me? You can't sue me. You can't stop me. You can't shut me up. I'm a rabid dog with my teeth sunk deep into your leg."



40.     Armstrong's pattern was relentless—misstate, provoke, repeat.

41.     Armstrong's statements—that O'Leary is a murderer, was involved in a murder, or paid to cover one up—are categorically false and defamatory per se. He published them with actual malice, fully aware they were false or with reckless disregard for the truth.

42.     Armstrong was fully aware of the publicly available reporting on the boating accident (detailed further below), which made clear that O'Leary was never charged with any crime, and that his wife was acquitted—even of a minor regulatory offense. He also knew that a Canadian court had found the other vessel at fault for failing to display its lights. Despite these undisputed facts, Armstrong has willfully continued his defamatory campaign against O'Leary, acting with reckless disregard for the truth. His motive is plain: to elevate his public profile, grow his following, and profit from a narrative he knows to be false and deeply damaging.

**D. Mr. O'Leary Faces No Charges, and a Canadian Court Exonerates Mrs. O'Leary After Carefully Reviewing the Video Evidence.**

43.     On August 24, 2019, the O'Learys' boat tragically collided with another vessel, a *Nautique*, resulting in the death of two people. Linda O'Leary was driving. She was not impaired, and at the time of the incident, she was a highly experienced boater operating the vessel cautiously and with due care and attention. Tragically, the collision occurred with a completely unlit vessel, operating in violation of basic safety standards on a moonless night—making it virtually invisible.

44.     Following the tragic crash, Linda O'Leary was charged with a regulatory offense: careless operation of a vessel under the Small Vessel Regulations of the Canada Shipping Act. Importantly, she was *not* charged with impaired driving or any other alcohol-related offense. Kevin O'Leary was not charged with any crime or infraction arising from the accident.

45.     After a 13-day trial in which a Canadian court heard extensive testimony, Linda was acquitted of the regulatory charge.

46.     Judge Richard Humphrey, after reviewing video footage and witness statements, concluded that the *Nautique*'s lights had been turned off so its passengers could stargaze in the darkness of Lake Joseph.

47.     He noted that surveillance video from lakefront cottages showed the O'Leary boat was lit and visible, while the *Nautique* was not.

48.     Footage from the *Nautique* dock shows the stargazers departing in a large, well-lit boat—only for the lights to suddenly go dark mid-lake.

49.     Separate video, taken from the cottage where the O'Learys had been dining, showed Linda carefully checking and activating the ski boat's navigation lights before departing.

50. Additional surveillance captured the moment of the crash in the distance: the light from the O'Learys' boat is seen stopping abruptly and bouncing back in the dark. The *Nautique*'s lights only become visible 49 seconds after the collision.

51. At trial, the collision reconstruction evidence presented by police ultimately supported the defense more than the prosecution, according to Judge Humphrey. The court heard that during a police re-enactment of the incident—conducted at the same lake and around the same time of night—a police boat, travelling slowly, nearly collided with the same vessel.

52. Following an oral ruling acquitting Linda, Judge Humphrey issued nearly 100 pages of written reasoning, meticulously summarizing and analyzing the testimony of each witness.

53. Judge Humphrey concluded that the evidence demonstrated Linda was a competent and cautious boat operator, familiar with the waters she was navigating. He noted: "She took precautions to ensure her boat was properly equipped for night navigation… The boat was in good working order and had all required navigational lights activated. Alcohol played no part."

54. In sum, the publicly available evidence makes clear that Kevin was not operating the boat, was never charged, and that Linda was acquitted of all charges.

55. Armstrong is compounding the pain of all those affected by the tragic accident by falsely insinuating murder and dishonoring the memory of the deceased—exploiting their deaths as a means to gain followers and generate attention.

16

### E.  **Armstrong's Campaign of Harassment Harms O'Leary and His Reputation.**

56.     Armstrong's X/Twitter posts have caused, and continue to cause, enormous harm to O'Leary and his reputation. Viewed thousands of times, these posts repeatedly accuse O'Leary of being a murderer who orchestrated a cover-up to conceal his alleged crimes.

57.     Although O'Leary initially chose to ignore Armstrong's conduct, he has now, regrettably, concluded that Armstrong will not stop his campaign of defamation and invasion of privacy unless he is held legally accountable.

58.     All conditions precedent to the filing of this action have occurred, have been waived, or have otherwise been satisfied.

### CLAIMS FOR RELIEF

### COUNT I
**Defamation Per Se**
**The March 17, 2025 8:49 AM Post**

59.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

60.     On March 17, 2025 at 8:49 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

61.     The post stated, "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto."

62.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed about 31,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1901616966986539114. A copy of this post as it appears on X/Twitter is included at paragraph 26 above.

17

63. The post was read by individuals residing in Florida.

64. The March 17, 2025 8:49 AM post is of and concerning O'Leary.

65. The March 17, 2025 8:49 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

66. The March 17, 2025 8:49 AM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

67. The March 17, 2025 8:49 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

68. By publication of the March 17, 2025 8:49 AM post, Armstrong caused harm to O'Leary's reputation.

69. Armstrong published the March 17, 2025 8:49 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

70. As a direct and proximate result of the publication of the March 17, 2025 8:49 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT II
### Defamation Per Se
### The March 19, 2025 12:32 PM Post

71. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

18

72.     On March 19, 2025 at 12:32 PM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

73.     The post stated, "Doesn't everybody think it's weird that I've been publicly calling both @gordonlawltd & @kevinolearytv murderers and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."

74.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed nearly 15,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902397680938110986. A copy of this post as it appears on X/Twitter is included at paragraph 27 above.

75.     The post was read by individuals residing in Florida.

76.     The March 19, 2025 12:32 PM post is of and concerning O'Leary.

77.     The March 19, 2025 12:32 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

78.     The March 19, 2025 12:32 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

79.     The March 19, 2025 12:32 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

80.     By publication of the March 19, 2025 12:32 PM post, Armstrong caused harm to O'Leary's reputation.

81.     Armstrong published the March 19, 2025 12:32 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the

statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

82.     As a direct and proximate result of the publication of the March 19, 2025 12:32 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

**COUNT III**
**Defamation Per Se**
**The March 19, 2025 12:42 PM Post**

83.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

84.     On March 19, 2025 at 12:42 PM, Armstrong published another post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

85.     The post stated, "Have you ever wanted to call a real life murderer?! You can NOW! @kevinolearytv is waiting for your call."

86.     The post was published to a worldwide audience on X/Twitter, and as of March 19, 2025, it had been viewed over 18,000 times. The post is no longer available online as it was removed for violating X/Twitter's terms of service. A copy of the post as it appears on X/Twitter can be viewed at paragraph 28.

87.     The post was read by individuals residing in Florida.

88.     The March 19, 2025 12:42 PM post is of and concerning O'Leary.

89.     The March 19, 2025 12:42 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

20

90.     The March 19, 2025 12:42 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

91.     The March 19, 2025 12:42 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

92.     By publication of the March 19, 2025 12:42 PM post, Armstrong caused harm to O'Leary's reputation.

93.     Armstrong published the March 19, 2025 12:42 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

94.     As a direct and proximate result of the publication of the March 19, 2025 12:42 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT IV
### Defamation Per Se
### The March 20, 2025 11:32 AM Post

95.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

96.     On March 20, 2025 at 11:32 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

97.     The post stated, "That's right guys – I was forced to delete the murderer @kevinolearytv's phone number by X. I was in X jail for 12 hours. Meaning I guess I'm an X-Con now."

21

98.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 9,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902745039823896647. A copy of this post as it appears on X/Twitter is included at paragraph 35 above.

99.     The post was viewed by individuals residing in Florida.

100.    The March 20, 2025 11:32 AM post is of and concerning O'Leary.

101.    The March 20, 2025 11:32 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

102.    The March 20, 2025 11:32 AM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

103.    The March 20, 2025 11:32 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

104.    By publication of the March 20, 2025 11:32 AM post, Armstrong caused harm to O'Leary's reputation.

105.    Armstrong published the March 20, 2025 11:32 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

106.    As a direct and proximate result of the publication of the March 20, 2025 11:32 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT V
### Defamation Per Se
### The March 20, 2025 12:27 PM Post

107.    Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

108.    On March 20, 2025 at 12:27 PM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

109.    The post stated, "Hey how is another free day @kevinolearytv? Do you ever think [of] the couple you murdered?"

110.    The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 10,000 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1902758962467860745. A copy of this post as it appears on X/Twitter is included at paragraph 36 above.

111.    The post was viewed by individuals residing in Florida.

112.    The March 20, 2025 12:27 PM post is of and concerning O'Leary.

113.    The March 20, 2025 12:27 PM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder.

114.    The March 20, 2025 12:27 PM post is false and defamatory. The allegation that O'Leary murdered individuals harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

115.    The March 20, 2025 12:27 PM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal conduct.

116.     By publication of the March 20, 2025 12:27 PM post, Armstrong caused harm to O'Leary's reputation.

117.     Armstrong published the March 20, 2025 12:27 PM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

118.     As a direct and proximate result of the publication of the March 20, 2025 12:27 PM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

**COUNT VI**
**Defamation Per Se**
**The March 21, 2025 8:55 AM Post**

119.     Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

120.     On March 21, 2025 at 8:55 AM, Armstrong published a post on his X/Twitter account TheBitBoy (@BenArmstrongsX).

121.     The post stated, "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up. Not a single cease and desist has been sent to me Kev. Wonder why?"

122.     The post was published to a worldwide audience on X/Twitter, and as of March 26, 2025, it has been viewed over 6,500 times. The post remains available online at the URL: https://x.com/BenArmstrongsX/status/1903068035574886482. A copy of this post as it appears on X/Twitter is included at paragraph 37 above.

123.     The post was viewed by individuals residing in Florida.

24

124. The March 21, 2025 8:55 AM post is of and concerning O'Leary.

125. The March 21, 2025 8:55 AM post is intended to convey, and understood by readers of ordinary intelligence as conveying, the factual accusation that O'Leary committed murder and paid millions to cover up his role in a murder.

126. The March 21, 2025 8:55 AM post is false and defamatory. The allegation that O'Leary murdered individuals and paid millions to cover it up harms his reputation so as to lower him in the estimation of the community and deter third persons from associating or dealing with him.

127. The March 21, 2025 8:55 AM post is defamatory per se in that it tends to affect O'Leary in his profession or occupation and accuses him of engaging in illegal and amoral conduct.

128. By publication of the March 21, 2025 8:55 AM post, Armstrong caused harm to O'Leary's reputation.

129. Armstrong published the March 21, 2025 8:55 AM post knowing it was false or with reckless disregard for the truth, in that he was aware at the time of publication that the statement he made was false or, at minimum, had a high degree of awareness that the statement was probably false.

130. As a direct and proximate result of the publication of the March 21, 2025 8:55 AM post, O'Leary has suffered damages, including injury to reputation, embarrassment, humiliation, emotional distress, and economic damages, in an amount to be determined at trial.

## COUNT VII
### Publication of Private Facts

131. Plaintiff repeats, realleges, and incorporates the above paragraphs as though fully set forth herein.

25

Case 1:25-cv-21417-RKA Document 15-4 Entered on FLSD Docket 06/05/2025 Page 100 of 272

132.    On March 19, 2025, Armstrong publicly disclosed O'Leary's personal cell phone number on X/Twitter without Plaintiff's knowledge or consent. A copy of that post can be found at paragraph 28 above.

133.    Armstrong encouraged his followers to harass O'Leary.

134.    At all relevant times, O'Leary maintained a reasonable expectation of privacy in his personal contact information, particularly given his status as a public figure subjected to harassment.

135.    Armstrong's disclosure was not of legitimate public concern and had no newsworthy value. Rather, it was intended to provoke public attention and harassment, and to subject O'Leary to ridicule, threats, and disruption. As such, the release of his cell phone number was offensive.

136.    Following the disclosure, O'Leary was flooded with unwanted communications causing him damage.

137.    O'Leary has suffered damages as a direct and proximate result of Defendant's wrongful disclosure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kevin O'Leary respectfully requests that the Court award him relief against Defendant Armstrong as follows:

138.    Actual and compensatory damages in excess of $75,000, as well as interest, reasonable attorneys' fees, and costs, as allowed by law;

139.    Punitive damages, as allowed by law; and

140.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

The Plaintiff demands a jury trial on all claims or issues triable by a jury.


Dated: March 26, 2025

Respectfully submitted,

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**

By: /**s**/Jeffrey A. Neiman
Jeffrey A. Neiman, Esq.
Florida Bar No. 544469
jneiman@mnrlawfirm.com
Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@mnrlawfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

*Attorneys for Kevin O'Leary*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
Kevin O'Leary

## DEFENDANTS
Benjamin Armstrong

**(b)** County of Residence of First Listed Plaintiff  Miami-Dade, County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Cobb County, GA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey A. Neiman, Marcus Neiman Rashbaum & Pineiro LLP, 100 SE 3rd Ave. Ste. 805, Fort Lauderdale, FL 33394, 954-462-1200

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)* *(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee – Conditions of Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Acts
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)
*(See instructions):* a) Re-filed Case ☐ YES ☒ NO  b) Related Cases ☐ YES ☒ NO
JUDGE: 　　　　　　DOCKET NUMBER:

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Defamation Per Se and Publication of Private Action
LENGTH OF TRIAL via 　　 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 　　　　CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE  3/26/25
SIGNATURE OF ATTORNEY OF RECORD  /s/ Jeffrey A. Neiman

FOR OFFICE USE ONLY : RECEIPT #　　AMOUNT　　IFP　　JUDGE　　MAG JUDGE

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

<table>
<tr><td>Kevin O'Leary</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="text-align:center"><i>Plaintiff(s)</i></td><td>)</td></tr>
<tr><td style="text-align:center">v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Benjamin Armstrong</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="text-align:center"><i>Defendant(s)</i></td><td>)</td></tr>
</table>

Civil Action No.   1:25-cv-21417

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Benjamin Armstrong
2107 Clearvista Dr NW
Acworth, GA 30101

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jeffrey A. Neiman
Marcus Neiman Rashbaum & Pineiro, LLP
100 SE 3rd Ave Ste 805
Fort Lauderdale, FL 33394-0002
jneiman@mnrlawfirm.com
(954) 462-1200

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 1:25-cv-21417

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

| From: | cmecfautosender@flsd.uscourts.gov |
|---|---|
| To: | flsd_cmecf_notice@flsd.uscourts.gov |
| Date: | 3/27/2025 6:57:43 AM |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Southern District of Florida

**Notice of Electronic Filing**

The following transaction was entered on 3/27/2025 at 7:57 AM EDT and filed on 3/26/2025
Case Name:          O'Leary v. Armstrong
Case Number:        1:25-cv-21417-BB
Filer:
Document Number: 2(No document attached)

Docket Text:
**Clerks Notice of Judge Assignment to Judge Beth Bloom.**

**Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Marty Fulgueira Elfenbein is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (ksr)**

1:25-cv-21417-BB Notice has been electronically mailed to:

Brandon Scott Floch     bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman     jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| Kevin O'Leary | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. 1:25-cv-21417 |
| Benjamin Armstrong | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Benjamin Armstrong
2107 Clearvista Dr NW
Acworth, GA 30101

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jeffrey A. Neiman
Marcus Neiman Rashbaum & Pineiro, LLP
100 SE 3rd Ave Ste 805
Fort Lauderdale, FL 33394-0002
jneiman@mnrlawfirm.com
(954) 462-1200

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**

Date:   Mar 27, 2025
_____

*s/ K. Rivers*
_____
Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-cv-21417-BLOOM/Elfenbein

KEVIN O'LEARY,

      Plaintiff,

v.

BENJAMIN ARMSTRONG,

      Defendant.

_____/

**ORDER REQUIRING SCHEDULING REPORT**
**AND CERTIFICATES OF INTERESTED PARTIES**[1]

    **THIS CAUSE** is before the Court upon a *sua sponte* review of the record. **Within twenty-one (21) days of an appearance by a Defendant in this case**, the parties are directed to prepare and file a joint scheduling report, as required by Local Rule 16.1. The joint scheduling report and proposed order shall include all information required by Local Rule 16.1(b)(2) and (3). In addition, at the time of filing the joint scheduling report, the parties, including governmental parties, must file certificates of interested parties and corporate disclosure statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party (to the extent they have not already done so). Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the certificates.

    ***Detailed Discovery Schedule***: Local Rule 16.1(a) provides for a differentiated case

---

[1] The parties must not include Judge Bloom and the assigned U.S. Magistrate Judge as interested parties unless they have an interest in the litigation.

management system based on the complexity of each case and the requirement for judicial involvement. That system categorizes cases along three case management tracks: expedited, standard, or complex.

- Expedited track cases are relatively non-complex, require 1 to 3 days of trial, and between 90 and 179 days for discovery from the date of the scheduling order.
- Standard track cases require 3 to 10 days of trial, and between 180 and 269 days for discovery from the date of the scheduling order.
- Complex track cases are unusually complex, require over 10 days of trial, and between 270 and 365 days for discovery from the date of the scheduling order.

"The following factors [are] considered in evaluating and assigning cases to a particular track: the complexity of the case, number of parties, number of expert witnesses, volume of evidence, problems locating or preserving evidence, time estimated by the parties for discovery and time reasonably required for trial, among other factors." S.D. Fla. L.R. 16.1(a)(3).

Fed. R. Civ. P. 26(b)(1) allows discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. The parties shall participate in good faith in developing a detailed discovery plan, including any agreed-upon limitation on scope, frequency and the extent of discovery. The parties shall include in their scheduling report any unique discovery matters, including any electronically stored information that should be preserved and accessed. The parties shall establish a detailed schedule for the preservation, disclosure and access of each different type or category of electronically stored information.

Consistent with the differentiated case management system, other relevant local rules (such as Local Rule 16.2, regarding mediation), and the twin goals of expeditious and attentive case

management, the Court anticipates the following scheduling deadlines in the run of cases:

- Selection of a mediator and scheduling of a time, date and place for mediation within 30 days of the scheduling order.
- Deadline to amend pleadings and join parties within 60 days of the scheduling order.
- Completion of all discovery consistent with the case management track guidelines, and 120 days prior to trial.
- Completion of mediation prior to the deadline for dispositive pre-trial motions.
- Deadline for dispositive pre-trial motions and *Daubert* motions (which include motions to strike experts) 100 days prior to trial.
- Deadline for submission of joint pre-trial stipulation, proposed jury instructions and verdict form, or proposed findings of fact and conclusions of law, as applicable, 40 days prior to trial.
- Calendar call one week prior to trial.

Those deadlines are not exhaustive of deadlines which may be set in the scheduling order.

The parties should address their joint scheduling report and their proposed pre-trial deadlines both to the differentiated case management system and to the Court's anticipated deadlines. The parties are encouraged to explain their proposed deadlines in light of those overarching guidelines, including as to the factors listed in Local Rule 16.1(a)(3). **The parties are cautioned that if they fail to submit a joint scheduling report by the applicable deadline, the Court may unilaterally set this case on a case management track in accordance with Local Rule 16.1(a) and calculated as if the scheduling report had been timely filed.**

As part of the joint scheduling report, the parties shall jointly complete and file with the Court the *Election to Jurisdiction by a United States Magistrate Judge for Final Disposition of Motions* appended to this Order as **Attachment A**. The Court will not accept unilateral submissions. A "Yes" should be checked only if all parties agree. If the parties consent to a full disposition of the case by the Magistrate Judge, including trial and entry of final judgment, the parties shall jointly file the *Election to Jurisdiction* form appended to this Order as **Attachment B**. The parties are advised that even if they do not consent to jurisdiction by the Magistrate Judge,

in accordance with 28 U.S.C. § 636(b), the Court may still refer motions to the Magistrate Judge for a report and recommendations.

The parties are advised that the failure to comply with any of the procedures contained in this Order or the Local Rules may result in the imposition of appropriate sanctions, including, but not limited to, the dismissal of this action or entry of default.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 27, 2025.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-21417-BLOOM/Elfenbein

KEVIN O'LEARY,

      Plaintiff,

v.

BENJAMIN ARMSTRONG,

      Defendant.

_____/

## ELECTION TO JURISDICTION BY A UNITED STATES
## MAGISTRATE JUDGE FOR FINAL DISPOSITION OF MOTIONS

In accordance with the provisions of 28 U.S.C. § 636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge decide the following motions and issue a final order or judgment with respect thereto:

1. Motions for Costs                       Yes _____ No _____

2. Motions for Attorney's Fees        Yes _____ No _____

3. Motions for Sanctions              Yes _____ No _____

4. Motions to Dismiss                Yes _____ No _____

5. Motions for Summary Judgment    Yes _____ No _____


_____      _____
(Date)             (Signature—Plaintiff's Counsel or Plaintiff if *pro se*)


_____      _____
(Date)             (Signature—Defendant's Counsel or Defendant if *pro se*)


**Attachment A**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-21417-BLOOM/Elfenbein

KEVIN O'LEARY,

      Plaintiff,

v.

BENJAMIN ARMSTRONG,

      Defendant.

_____ /

## MAGISTRATE JUDGE JURISDICTION FOR TRIAL

      In accordance with the provisions of 28 U.S.C. § 636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge conduct any and all further proceedings in the case, including TRIAL, and entry of final judgment with respect thereto.


_____      _____
(Date)                 (Signature—Plaintiff's Counsel or Plaintiff if *pro se*)


_____      _____
(Date)                 (Signature—Defendant's Counsel or Defendant if *pro se*)


**Attachment B**

# AMENDED AFFIDAVIT OF PROCESS SERVER

Job # DB2501084

**Client Info:**

HD Investigative Group
16155 SW 117th Ave, B20
Miami, FL  33177

**Case Info:**

| | |
|---|---|
| **PLAINTIFF:** | UNITED STATES DISTRICT COURT |
| KEVIN O'LEARY | County of Southern District, Florida |
| -versus- | Court Case # **1:25-cv-21417** |
| **DEFENDANT:** | |
| BENJAMIN ARMSTRONG | |

**Service Info:**

**Received by Joshua Kes: on March, 27th 2025 at 02:35 PM**
**Service: I Served BENJAMIN ARMSTRONG**
**With: SUMMONS IN A CIVIL ACTION; CIVIL COVER SHEET; COMPLAINT AND DEMAND FOR JURY TRIAL; EXHIBITS;**
by leaving with **BENJAMIN ARMSTRONG, INDIVIDUALLY**

**At Other 1300 RED JOHN DRIVE DAYTONA BEACH, FL 32124**
Latitude: **29.140025,**   Longitude: **-81.149659**

On **3/28/2025** at **11:13 AM**
**Manner of Service: PERSONAL SERVICE**
INDIVIDUAL SERVICE WAS PERFORMED BY DELIVERING TO THE WITHIN NAMED PERSON A TRUE COPY OF THIS PROCESS, WITH
THE DATE AND HOUR OF SERVICE ENDORSED BY ME. AT THE SAME TIME, I DELIVERED THE WITHIN NAMED PERSON A COPY OF
THE COMPLAINT, PETITION, OR OTHER INITIAL PLEADING OR PAPER.

**Served Description:  (Approx)**

Age: **42**, Sex: **Male**, Race: **White-Caucasian**, Height: **5' 10"**, Weight: **200**, Hair: **Gray** Glasses:  **No**

**Military Status:**

**Military Status = No**

I certify that I am over the age of 18, have no interest in the above action, and I am authorized in the jurisdiction in which this
service was made.

Signature of Server:_____
**Joshua Kes**
Lic # **Court Appointed**

**HD Investigative Group**
16155 SW 117th Ave, B20
Miami, FL  33177

Job # DB2501084

SUBSCRIBED AND SWORN to before me this _____28_____ day of ___March_____ , __2025__ , by **Joshua Kes** , Proved to me
on the basis of satisfactory evidence to be the person(s) who appeared before me by:
[X] physical presence [___] online presence.



Mikhael Goldgisser
Comm: HH 382214
Expires: April 25, 2027
Notary Public - State of Florida

*Mikhael Goldgisser*
_____
NOTARY PUBLIC for the state of Florida



1 of 1

| From: | cmecfautosender@flsd.uscourts.gov |
|---|---|
| To: | flsd_cmecf_notice@flsd.uscourts.gov |
| Date: | 4/21/2025 10:14:58 AM |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Order |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Southern District of Florida

**Notice of Electronic Filing**

The following transaction was entered on 4/21/2025 at 11:14 AM EDT and filed on 4/21/2025
Case Name:         O'Leary v. Armstrong
Case Number:       1:25-cv-21417-BB
Filer:
Document Number: 6(No document attached)

Docket Text:
**PAPERLESS ORDER: THIS CAUSE is before the Court upon a *sua sponte* review of the record. Plaintiff filed the instant action on March 26, 2025. ECF No. [1]. Plaintiff perfected service on March 28, 2025, generating a response deadline of April 18, 2025. ECF No. [5]. To date, Defendant has failed to respond or request an extension of time in which to do so. Accordingly, it is ORDERED AND ADJUDGED  that Defendant must file a response to the Complaint on or before April 25, 2025. Failure to do so may result in appropriate sanctions, including the entry of default. Signed by Judge Beth Bloom (tsn)**


1:25-cv-21417-BB Notice has been electronically mailed to:

Brandon Scott Floch      bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman      jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:

April 18, 2025

United States District Court
Southern District of Florida
Case No 1:25-cv-21417
Attn: Clerk Office
400 North Miami Avenue
Miami Florida, 33128

FILED BY _MC_ D.C.

APR 2 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

To Whom it may concern,
I am writing this letter in response to case number 1:25-cv-21417. I have been incarcerated since March 25, 2025, in Florida, and have been extradited to Cobb County Georgia where I am serving a 70- day sanction. When I have completed serving the 70 days I will be going to an in- patient mental health facility, due to a mental break caused by traumatic circumstances of losing my company 18 months ago. I am asking for a continuation on this case listed above. After the mental health facility, I plan on staying at 462 Fincher Road, Canton, Ga 30114.
Thank You for your consideration. It is my prayer that you will grant this motion for continuance.

Sincerely,

Benjamin Armstrong     / p.p. Ashleigh Armstrong
462 Fincher Road              Ashleigh Armstrong
Canton, Georgia 30114      assistant

April 18, 2025

United States District Court
Southern District of Florida
Case No 1:25-cv-21417
Attn: Clerk Office
400 North Miami Avenue
Miami Florida, 33128

To Whom it may concern,
I am writing this letter on behalf of my nephew Benjamin
Armstrong. Ben has been incarcerated since March 25, 2025, in
Florida, and had been extradited to Cobb County Georgia where
he is serving a 70- day sanction. When he has completed serving
the 70 days he will be going to an in- patient mental health
facility, due to his mental break caused by traumatic
circumstances of losing his company 18 months ago. We are
asking for a continuation on this case on his behalf. After the
mental health facility he will be staying at 462 Fincher Road,
Canton, Ga 30114.
Thank You for your consideration. It is our prayer that you will
grant this motion for continuance.

Sincerely,

Timothy Smithwick
5615 State Route 176
Drakesboro, Ky 42337

FLAT RATE ENVELOPE
POSTAGE REQUIRED

*FIRMLY TO SEAL*

Retail

**US POSTAGE PAID**
**$10.10**
Origin: 30188
04/18/25
1295920359-21

**PRIORITY MAIL®**

0 Lb 1.80 Oz
**RDC 03**

EXPECTED DELIVERY DAY: 04/21/25

C075

SHIP TO:
400 N MIAMI AVE
MIAMI FL 33128-1801

**USPS TRACKING® #**

9505 5105 9589 5108 5697 42



0001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

**PRIORITY**®
**MAIL**

FROM:
Benjamin Armstrong
462 Fincher Rd.
Canton, Ga. 30114

TO:
United States District Court
Southern District of Florida
Attn: Clerk Office
400 North Miami Avenue
Miami, Fl 33128





USPS.COM/PICKUP

how2recycle.info
PAPER POUCH



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.
Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023

U.S. District Court

Southern District of Florida

Civil Docket For Case #: 1:25-cv-21417-BB

April 28, 2025



FILED BY _____ D.C.

APR 3 0 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

I am writing this letter in response to the complaint of O'Leary vs Armstrong case #

1:25-Cv-21417-BB. I am writing on behalf of my nephew. He is unable to

respond due to being incarceration at Cobb County corrections facility in Georgia and he is

experiencing mental health issues and he will be going to a mental health treatment facility

immediately after being released from incarceration. I

am asking for a continuance on his behalf until time served and appropriate mental health

treatment is obtained.

Thank you for your consideration.


Timothy Smithwick, Uncle to the defendant

5615 SR 176

Drakesboro, Ky 42337

**Extremely Urgent**

JOLONDA SMITHWICK
(423) 596-5515
5615 ST RT 176
DRAKESBORO KY 42337

0.2 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 29 APR 2025



SHIP SOUTHERN DISTRICT OF
TO: U.S DISTRICT COURT
400 N MIAMI AVE

U.S DISTRICT COURT
400 N MIAMI AVE
RM 8N09
MIAMI FL 33128

MIAMI FL 33128-

P:RED    S:MGRN   335
335-2841   X
1ZGH1080133731 7269          2330
SAT08485 XLE 02-1 Apr 30 07:33:29 2025
US 3010 HIPPS-25.3.2 SAT08485 XLE_02-1SL



UPS NEXT DAY AIR SAVER   1P
TRACKING #: 1Z GH1 080 13 3731 7269



BILLING: P/P



REF #2: CS

RECD BY          D.C.

APR 30 2025

ANGELA E. NOBLE
CLERK U.S. DIST CT.
S.D. OF FLA - MIAMI 12.6V 03/2025

SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes, If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

U.S. District Court

Southern District of Florida

Civil Docket For Case #: 1:25-cv-21417-BB



FILED BY _____ D.C.

APR 3 0 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

April 28, 2025

I am writing this letter in response to the complaint of O'Leary vs Armstrong case #

1:25-Cv-21417-BB. I am writing on behalf of my nephew. He is unable to

respond due to being incarceration at Cobb County corrections facility in Georgia and he is

experiencing mental health issues and he will be going to a mental health treatment facility

immediately after being released from incarceration. I

am asking for a continuance on his behalf until time served and appropriate mental health

treatment is obtained.

Thank you for your consideration.


Timothy Smithwick, Uncle to the defendant

5615 SR 176

Drakesboro, Ky 42337

**Extremely Urgent**

Express



JOLONDA SMITHWICK
(423) 596-5515
5615 ST RT 176
DRAKESBORO KY 42337

SHIP SOUTHERN DISTRICT OF
TO: U.S DISTRICT COURT
400 N MIAMI AVE

0.2 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 29 APR 2025

U.S DISTRICT COURT
400 N MIAMI AVE
RM 8N09
MIAMI FL 33128

MIAMI FL 33128-

P:RED      S:MGRN   335

**335-2841**    X



1ZGH1080133731 7269
SAT08485 XLE 02-1 APR 30 07:33:29 2025
US 3310 HIPPS-25,3.2 SAT08485 XLE_02-1SL

2330

**UPS NEXT DAY AIR SAVER   1P**
TRACKING #: 1Z GH1 080 13 3731 7269



BILLING: P/P

REF #2: CS

 UPS
SEE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-21417

KEVIN O'LEARY,

      Plaintiff,

v.

BENJAMIN ARMSTRONG,

      Defendant.

_____/

## PLAINTIFF'S MOTION FOR CLERK'S ENTRY OF DEFAULT AGAINST DEFENDANT BENJAMIN ARMSTRONG

Plaintiff Kevin O'Leary ("O'Leary") pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, respectfully requests that the Clerk of the Court enter default against Defendant, Benjamin Armstrong ("Armstrong"), and in support thereof states:

1.      On March 26, 2025, Plaintiff O'Leary filed his complaint. ECF No. 1.

2.      On March 27, 2025, a process server served Defendant Armstrong with the Summons and Complaint, as evidenced by the Return of Service. ECF No. 5.

3.      Pursuant to that service, Armstrong's deadline to respond was April 18, 2025. *Id.*

4.      On April 21, 2025, following a *sua sponte* review of the docket, the Court noted Armstrong's failure to timely respond and ordered him to respond no later than April 25, 2025. ECF No. 6. The Court further noted that "[f]ailure to do so may result in appropriate sanctions, including the entry of default." *Id.*

5.      That same day, the Clerk docketed a letter from Armstrong addressed to the Clerk's Office. ECF No. 7.

6.   In the letter, Armstrong requested a continuance, stating he was currently incarcerated in Cobb County, Georgia for a period of 70 days. *Id.* He further indicated that, upon release, he planned to enter a "mental health facility" and then reside at 462 Fincher Road, Canton, GA 30114. *Id.*

7.   The Court granted Armstrong's request and extended the deadline for his Answer or response to May 2, 2025. ECF No. 8. The Clerk was directed to mail a copy of the Order to 462 Fincher Road, Canton, GA 30114. *Id.*

8.   The following day, the Clerk filed a notice confirming compliance with the Court's mailing instructions. ECF No. 9.

9.   Out of an abundance of caution, on April 24, 2025, Plaintiff O'Leary mailed a copy of the entire civil docket sheet (including the paperless orders) to Armstrong at the following addresses:

| | | |
|---|---|---|
| Benjamin Charles Armstrong | | Benjamin Charles Armstrong |
| SOID: 000827869 | *and* | 462 Fincher Road |
| Cobb County Adult Detention Center | | Canton, GA 30114-7637 |
| PO Box 100110 | | |
| Marietta, GA 30061-7010 | | *(Last known home address)* |

10.   The first address corresponds to the proper mailing location for inmates at the Cobb County Adult Detention Center. Floch Decl. at ¶ 5. That mailing was delivered on April 29, 2025. *Id.* at ¶9.

11.   The second address is Armstrong's last known address, and mailing to that address was delivered on April 28, 2025. *Id.* at ¶¶6, 8.

12.   The May 2, 2025 deadline for Armstrong to respond to the Complaint has expired, and Armstrong has failed to answer or otherwise respond.

13.     O'Leary is informed and believes that Armstrong is over the age of 18, is not an incompetent person, and is not a member of the military service, as set forth in the accompanying declaration. Floch Decl. at ¶¶ 11-12.

14.     Concurrent with this electronic filing, Plaintiff is mailing Armstrong this Motion for Clerk's Default and the Declaration of Brandon S. Floch.

WHEREFORE, Plaintiff O'Leary respectfully requests that the Clerk enter a default against Defendant Benajmin Armstrong.

Dated: May 5, 2025                          Respectfully submitted,

                                           **MARCUS NEIMAN**
                                           **RASHBAUM & PINEIRO LLP**

                                           By: */s/ Brandon S. Floch*
                                           Jeffrey A. Neiman, Esq.
                                           Florida Bar No. 544469
                                           jneiman@mnrlawfirm.com
                                           Brandon S. Floch, Esq.
                                           Florida Bar No. 125218
                                           bfloch@mnrlawfirm.com

                                           One Biscayne Tower
                                           2 S. Biscayne Blvd., Ste. 2530
                                           Miami, Florida 33131
                                           Telephone: (305) 400-4260

                                           *Attorneys for Kevin O'Leary*

3

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, the foregoing Motion for Entry of Default was electronically filed with the Clerk of Court using the CM/ECF system. I further certify that a copy of the Motion and Declaration was sent by U.S. Mail, postage prepaid, to Defendant at his last known addresses as follows:

**Benjamin Charles Armstrong**
SOID: 000827869
Cobb County Adult Detention Center
PO Box 100110
Marietta, GA 30061-7010

**Benjamin Charles Armstrong**
462 Fincher Road
Canton, GA 30114-7637

By: */s/ Brandon S. Floch*
Brandon S. Floch, Esq.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-21417

KEVIN O'LEARY,

      Plaintiff,

v.

BENJAMIN ARMSTRONG,

      Defendant.

_____/

## DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR CLERK'S DEFAULT

I, Brandon Floch, declare as follows:

1.     I am one of the attorneys representing Plaintiff Kevin O'Leary in the above-captioned matter.

2.     The Summons and Complaint were served on Defendant Benjamin Armstrong on March 27, 2025, as shown by the Proof of Service filed at ECF No. 5.

3.     On April 21, 2025, the Court issued a paperless order extending Defendant Armstrong's deadline to respond to the Complaint to May 2, 2025. ECF No. 8.

4.     Defendant Armstrong is currently incarcerated at the Cobb County Adult Detention Facility in Georgia.

5.     The mailing address for legal mailing for inmates housed at that facility is:

Cobb County Adult Detention Center
Inmate's full name and SOID #
PO Box 10011
Marietta, GA 30061

6.     Defendant's last known residential address is 462 Fincher Road, Canton, GA, 30114.

7.     On April 24, 2025, I caused the entire civil docket sheet in this matter—including the paperless order granting Defendant until May 2, 2025 to respond to the Complaint—to be mailed to both of the addresses listed above.

8.     Attached to this declaration as **Exhibit A** is a true and correct copy of the USPS postal label, enclosure, and proof of delivery showing the mailing was delivered to Defendant's Canton address on April 28, 2025.

9.     Attached to this declaration as **Exhibit B** is a true and correct copy of the USPS postal label, enclosure, and proof of service showing the mailing was delivered to the Cobb County Detention Facility address on April 29, 2025.

10.    As of the date of this declaration, Defendant has not filed an answer or any responsive pleading, and the May 2, 2025, deadline to do so has passed.

11.    Based on my review of the Department of Defense Servicemembers Civil Relief Act (SCRA) website, Defendant is not an active member of the military service.

12.    I am informed and believe Defendant is over the age of 18 and is not an incompetent person.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2025 in Miami, Florida

By: */s/Brandon S. Floch*
Brandon S. Floch, Esq.

Dated: May 5, 2025                  Respectfully submitted,

                                    **MARCUS NEIMAN
                                    RASHBAUM & PINEIRO LLP**

                                    By: /s/Brandon S. Floch
                                    Jeffrey A. Neiman, Esq.
                                    Florida Bar No. 544469
                                    jneiman@mnrlawfirm.com
                                    Brandon S. Floch, Esq.
                                    Florida Bar No. 125218
                                    bfloch@mnrlawfirm.com

                                    One Biscayne Tower
                                    2 S. Biscayne Blvd., Ste. 2530
                                    Miami, Florida 33131
                                    Telephone: (305) 400-4260

                                    *Attorneys for Kevin O'Leary*

# EXHIBIT A



*Cut on dotted line.*

## Instructions

1. **Please use a laser or laser-quality printer.**

2. **Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.**

3. **Place label so that it does not wrap around the edge of the package.**

4. **Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.**

5. **Please use this shipping label on the "ship date" selected when you requested the label.**

6. **If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.**

---

**9405 5301 0935 5140 8799 69**

| | |
|---|---|
| Print Date: **2025-04-24** | **PRIORITY MAIL®** $8.75 |
| Ship Date: **2025-04-24** | **Extra Services:** $0.00 |
| | **Fees:** <u>$0.00</u> |
| | **Total:** $8.75 |

**From:** MILENA ORDENES
2 S BISCAYNE BLVD STE 2530
MIAMI FL 33131-1806

**To:**

BENJAMIN CHARLES ARMSTRONG
462 FINCHER RD
CANTON GA 30114-7637

\* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking®
service on PRIORITY MAIL® service with use of this electronic rate shipping label.
Refunds for unused postage paid labels can be requested online 30 days from the
print date.

---

**UNITED STATES POSTAL SERVICE®** *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*

MFE

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:25–cv–21417–BB

O'Leary v. Armstrong
Assigned to: Judge Beth Bloom
Cause: 28:1332 Diversity–Libel, Assault, Slander

Date Filed: 03/26/2025
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel &
Slander
Jurisdiction: Diversity

**Plaintiff**

**Kevin O'Leary**                    represented by   **Brandon Scott Floch**
Marcus Neiman Rashbaum & Pineiro LLP
2 South Biscayne Blvd.
Suite 2530
Miami, FL 33131
305–434–4943
Email: bfloch@mnrlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Adam Neiman**
Marcus Neiman & Rashbaum LLP
100 Southeast Third Avenue
Suite 805
Fort Lauderdale, FL 33394
954 462 1200
Fax: 9546882492
Email: jneiman@mnrlawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Benjamin Armstrong**                    represented by   **Benjamin Armstrong**
462 Fincher Road
Canton, GA 30114
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 03/26/2025 | 1 | COMPLAINT against Benjamin Armstrong. Filing fees $ 405.00 receipt number AFLSDC–18317364, filed by Kevin O'Leary. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Neiman, Jeffrey) (Entered: 03/26/2025) |
| 03/26/2025 | 2 | Clerks Notice of Judge Assignment to Judge Beth Bloom.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Marty Fulgueira Elfenbein is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (ksr) (Entered: 03/27/2025) |
| 03/27/2025 | 3 | Summons Issued as to Benjamin Armstrong. (ksr) (Entered: 03/27/2025) |
| 03/27/2025 | 4 | Order Requiring Scheduling Report and Certificates of Interested Parties. Signed by Judge Beth Bloom on 3/27/2025. *See attached document for full details.* (ls) (Entered: 03/27/2025) |
| 03/31/2025 | 5 | SUMMONS (Affidavit) Returned Executed on 1 Complaint with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Kevin O'Leary. |

| | | |
|---|---|---|
| | | Benjamin Armstrong served on 3/28/2025, response/answer due 4/18/2025. (Neiman, Jeffrey) (Entered: 03/31/2025) |
| 04/21/2025 | 6 | PAPERLESS ORDER: **THIS CAUSE** is before the Court upon a *sua sponte* review of the record. Plaintiff filed the instant action on March 26, 2025. ECF No. 1 . Plaintiff perfected service on March 28, 2025, generating a response deadline of April 18, 2025. ECF No. 5 . To date, Defendant has failed to respond or request an extension of time in which to do so. Accordingly, it is **ORDERED AND ADJUDGED** that Defendant must file a response to the Complaint on or before April 25, 2025. Failure to do so may result in appropriate sanctions, including the entry of default. Signed by Judge Beth Bloom (tsn) (Entered: 04/21/2025) |
| 04/21/2025 | | Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 4/25/2025. (ls)(per DE #6) (Entered: 04/21/2025) |
| 04/21/2025 | 7 | LETTER/MOTION for Continuance Responses due by 5/5/2025. (ls) (Entered: 04/21/2025) |
| 04/21/2025 | 8 | PAPERLESS ORDER granting Defendant's Motion to Continue. ECF No. 7 . Defendant shall respond to the Complaint on or before May 2, 2025. As Defendant is currently incarcerated, the Clerk of the Court is directed to mail a copy of this Order to him at 462 Fincher Rd. Canton, GA 30114. Signed by Judge Beth Bloom (tsn) (Entered: 04/21/2025) |
| 04/21/2025 | | Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 5/2/2025. (ls)(per DE #8) (Entered: 04/22/2025) |
| 04/22/2025 | 9 | CLERK'S NOTICE of Compliance re 8 Order on Motion to Continue. (ls) (Entered: 04/22/2025) |



# EXHIBIT B



*Cut on dotted line.*

## Instructions

1. **Please use a laser or laser-quality printer.**

2. **Adhere shipping label to package with tape or glue - DO NOT TAPE OVER BARCODE. Be sure all edges are secure. Self-adhesive label is recommended.**

3. **Place label so that it does not wrap around the edge of the package.**

4. **Each shipping label number is unique and can be used only once - DO NOT PHOTOCOPY.**

5. **Please use this shipping label on the "ship date" selected when you requested the label.**

6. **If a mailing receipt is required, present the article and Online e-Label Record at a Post Office for postmark.**

**9405 5301 0935 5140 8565 40**

| | | |
|---|---|---|
| Print Date: **2025-04-24** | PRIORITY MAIL® | $8.75 |
| Ship Date: **2025-04-24** | Extra Services: | $0.00 |
| | Fees: | $0.00 |
| | Total: | $8.75 |

**From:** MILENA ORDENES
2 S BISCAYNE BLVD STE 2530
MIAMI FL 33131-1806

**To:** COBB COUNTY ADULT DETENTION CENTER SOI
BENJAMIN CHARLES ARMSTRONG
PO BOX 100110
MARIETTA GA 30061-7010

* Commercial Pricing PRIORITY MAIL® rates apply. There is no fee for USPS Tracking®
service on PRIORITY MAIL® service with use of this electronic rate shipping label.
Refunds for unused postage paid labels can be requested online 30 days from the
print date.

**UNITED STATES POSTAL SERVICE**® *Thank you for shipping with the United States Postal Service!*
*Check the status of your shipment on the USPS Tracking® page at usps.com*

MFE

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:25−cv−21417−BB

O'Leary v. Armstrong
Assigned to: Judge Beth Bloom
Cause: 28:1332 Diversity−Libel, Assault, Slander

Date Filed: 03/26/2025
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel & Slander
Jurisdiction: Diversity

**Plaintiff**

**Kevin O'Leary**          represented by   **Brandon Scott Floch**
Marcus Neiman Rashbaum & Pineiro LLP
2 South Biscayne Blvd.
Suite 2530
Miami, FL 33131
305−434−4943
Email: bfloch@mnrlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Adam Neiman**
Marcus Neiman & Rashbaum LLP
100 Southeast Third Avenue
Suite 805
Fort Lauderdale, FL 33394
954 462 1200
Fax: 9546882492
Email: jneiman@mnrlawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Benjamin Armstrong**          represented by   **Benjamin Armstrong**
462 Fincher Road
Canton, GA 30114
PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 03/26/2025 | 1 | COMPLAINT against Benjamin Armstrong. Filing fees $ 405.00 receipt number AFLSDC−18317364, filed by Kevin O'Leary. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Neiman, Jeffrey) (Entered: 03/26/2025) |
| 03/26/2025 | 2 | Clerks Notice of Judge Assignment to Judge Beth Bloom. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Marty Fulgueira Elfenbein is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (ksr) (Entered: 03/27/2025) |
| 03/27/2025 | 3 | Summons Issued as to Benjamin Armstrong. (ksr) (Entered: 03/27/2025) |
| 03/27/2025 | 4 | Order Requiring Scheduling Report and Certificates of Interested Parties. Signed by Judge Beth Bloom on 3/27/2025. *See attached document for full details.* (ls) (Entered: 03/27/2025) |
| 03/31/2025 | 5 | SUMMONS (Affidavit) Returned Executed on 1 Complaint with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Kevin O'Leary. |

| | | Benjamin Armstrong served on 3/28/2025, response/answer due 4/18/2025. (Neiman, Jeffrey) (Entered: 03/31/2025) |
|---|---|---|
| 04/21/2025 | 6 | PAPERLESS ORDER: **THIS CAUSE** is before the Court upon a *sua sponte* review of the record. Plaintiff filed the instant action on March 26, 2025. ECF No. 1 . Plaintiff perfected service on March 28, 2025, generating a response deadline of April 18, 2025. ECF No. 5 . To date, Defendant has failed to respond or request an extension of time in which to do so. Accordingly, it is **ORDERED AND ADJUDGED** that Defendant must file a response to the Complaint on or before April 25, 2025. Failure to do so may result in appropriate sanctions, including the entry of default. Signed by Judge Beth Bloom (tsn) (Entered: 04/21/2025) |
| 04/21/2025 | | Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 4/25/2025. (ls)(per DE #6) (Entered: 04/21/2025) |
| 04/21/2025 | 7 | LETTER/MOTION for Continuance Responses due by 5/5/2025. (ls) (Entered: 04/21/2025) |
| 04/21/2025 | 8 | PAPERLESS ORDER granting Defendant's Motion to Continue. ECF No. 7 . Defendant shall respond to the Complaint on or before May 2, 2025. As Defendant is currently incarcerated, the Clerk of the Court is directed to mail a copy of this Order to him at 462 Fincher Rd. Canton, GA 30114. Signed by Judge Beth Bloom (tsn) (Entered: 04/21/2025) |
| 04/21/2025 | | Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 5/2/2025. (ls)(per DE #8) (Entered: 04/22/2025) |
| 04/22/2025 | 9 | CLERK'S NOTICE of Compliance re 8 Order on Motion to Continue. (ls) (Entered: 04/22/2025) |



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

KEVIN O'LEARY

          PLAINTIFF(S)

          v.

BENJAMIN ARMSTRONG,

          DEFENDANT(S).

CASE NUMBER
1:25−cv−21417−BB

**DEFAULT BY CLERK F.R.Civ.P.55(a)**

# Clerk's Default

It appearing that the defendant(s) herein, is/are in default for failure to appear, answer, or otherwise plead to the complaint filed herein within the time required by law.

Default is hereby entered against defendant(s)

**Benjamin Armstrong**

as of course, on the date May 6, 2025.

**Angela E. Noble**
CLERK OF COURT

By   /s/ *Lisa Streets*
Deputy Clerk

cc: Judge Beth Bloom
    Kevin O'Leary

**DEFAULT BY CLERK F.R.Civ.P.55(a)**

CV−37 (10/01)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 25-cv-21417-BLOOM/Elfenbein

KEVIN O'LEARY,

     Plaintiff,

v.

BENJAMIN ARMSTRONG,

     Defendant.

_____/

### ORDER ON DEFAULT JUDGMENT PROCEDURE

**THIS CAUSE** is before the Court upon the Clerk's Entry of Default as to Defendant Benjamin Armstrong ("Defendant"), filed on May 6, 2025. Upon review of the record, it appears that Defendant has indeed failed to respond to the Complaint.

Accordingly, it is **ORDERED AND ADJUDGED** that the Plaintiff must file one of the following two responses by **June 5, 2025**:

**(1)** Where there is only one Defendant, or where there are multiple Defendants,[1] but no allegations of joint and several liability, and no possibility of inconsistent liability between Defendants, Plaintiff shall file a *Motion for Default Final Judgment*.

The *Motion for Default Final Judgment* must include affidavits of any sum certain due by Defendants, and any other supporting documentation necessary to determine Plaintiff's measure of damages. The *Motion* shall also be accompanied by (1) the necessary affidavit under the Servicemembers Civil Relief Act, 50 U.S.C. § 3931(b), if applicable; (2) a proposed order which

---

[1] If there are multiple Defendants, Plaintiff must state in the *Motion for Default Final Judgment* that there are no allegations of joint and several liability, and set forth the basis why there is no possibility of inconsistent liability.

details both the **factual and legal basis for default**; and (3) a proposed final judgment.[2] Pursuant to the CM/ECF Administrative Procedures, the proposed orders **shall be submitted to the Court by e-mail in Word format** at bloom@flsd.uscourts.gov. Plaintiff shall send a copy of the *Motion* to Defendant's counsel, or to Defendant if he does not have counsel. In the Certificate of Service, Plaintiff shall indicate that notice was sent and the address or addresses where notice was sent. Plaintiff <u>shall not</u> rely solely on the Court's CM/ECF system to effect such service.

If Defendant fails to move to set aside the Clerk's Default, default final judgment may be entered, which, simply put, means that Plaintiff may be able to take Defendant's property or money, and/or obtain other relief against Defendant.

**(2)** Alternatively, where there are multiple Defendants and allegations of joint and several liability, or the possibility of inconsistent liability between Defendants, Plaintiff shall file a <u>*Notice of Joint Liability*</u>. *See Frow v. De La Vega*, 82 U.S. 552, 554 (1872); 10A Charles Alan Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 2690 (3d ed. 1998) (citing *Frow*, 82 U.S. at 554); *see also Gulf Coast Fans, Inc. v. Midwest Elecs. Imp., Inc.*, 740 F.2d 1499, 1512 (11th Cir. 1984).

The *Notice of Joint Liability* must briefly describe the allegations and advise the Court of the status of the other Defendants' liability. Once liability is resolved as to all Defendants, Plaintiff may move for the entry of default final judgment against Defendants, as described in (1) above, no later than 14 days thereafter.

Plaintiff's failure to file a *Motion for Default Final Judgment* or *Notice of Joint Liability* within the specified time will result in sanctions, including but not limited to, **dismissal** without prejudice as to these Defendants.

---

[2] These last two are required by Local Rule 7.1(a)(2).

Case No. 25-cv-21417-BLOOM/Elfenbein

**DONE AND ORDERED** in Chambers at Miami, Florida, on May 6, 2025.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114

Benjamin Armstrong
1300 Red John Dr.
Daytona Beach, FL 32124

Benjamin Charles Armstrong
SOID: 000827869
Cobb County Adult Detention Center
PO Box 100110
Marietta, GA 30061-7010

| From: | **cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> |
|---|---|
| To: | **flsd_cmecf_notice@flsd.uscourts.gov** <flsd_cmecf_notice@flsd.uscourts.gov> |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Set/Reset Deadlines |
| Date: | 22.04.2025 07:47:07 (+02:00) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered on 4/22/2025 at 7:47 AM EDT and filed on 04/21/2025

**Case Name:**       O'Leary v. Armstrong
**Case Number:**    1:25-cv-21417-BB
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 5/2/2025. (ls)(per DE #8)**

**1:25-cv-21417-BB Notice has been electronically mailed to:**

Brandon Scott Floch       bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman       jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

**1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114

| From: | **cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> |
|---|---|
| To: | **flsd_cmecf_notice@flsd.uscourts.gov** <flsd_cmecf_notice@flsd.uscourts.gov> |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Set/Reset Deadlines |
| Date: | 21.04.2025 12:02:06 (+02:00) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered on 4/21/2025 at 12:02 PM EDT and filed on 4/21/2025

| **Case Name:** | O'Leary v. Armstrong |
|---|---|
| **Case Number:** | 1:25-cv-21417-BB |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**Reset Response/Answer Due Deadline: Benjamin Armstrong response/answer due 4/25/2025. (ls)(per DE #6)**


**1:25-cv-21417-BB Notice has been electronically mailed to:**

Brandon Scott Floch     bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman     jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

**1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

| From: | **cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> |
|---|---|
| To: | **flsd_cmecf_notice@flsd.uscourts.gov** <flsd_cmecf_notice@flsd.uscourts.gov> |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Order on Motion to Continue |
| Date: | 21.04.2025 17:18:45 (+02:00) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Southern District of Florida**

## Notice of Electronic Filing

The following transaction was entered on 4/21/2025 at 5:18 PM EDT and filed on 4/21/2025
**Case Name:**      O'Leary v. Armstrong
**Case Number:**      1:25-cv-21417-BB
**Filer:**
**Document Number:** 8(No document attached)

**Docket Text:**
**PAPERLESS ORDER granting Defendant's Motion to Continue. ECF No. [7]. Defendant shall respond to the Complaint on or before May 2, 2025. As Defendant is currently incarcerated, the Clerk of the Court is directed to mail a copy of this Order to him at 462 Fincher Rd. Canton, GA 30114. Signed by Judge Beth Bloom (tsn)**


**1:25-cv-21417-BB Notice has been electronically mailed to:**

Brandon Scott Floch      bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman      jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

**1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114

| From: | **cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> |
|---|---|
| To: | **flsd_cmecf_notice@flsd.uscourts.gov** <flsd_cmecf_notice@flsd.uscourts.gov> |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Clerk's Notice (Other) |
| Date: | 22.04.2025 07:48:01 (+02:00) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Southern District of Florida**

## Notice of Electronic Filing

The following transaction was entered on 4/22/2025 at 7:48 AM EDT and filed on 4/22/2025
**Case Name:** O'Leary v. Armstrong
**Case Number:** 1:25-cv-21417-BB
**Filer:**
**Document Number:** 9(No document attached)

**Docket Text:**
**CLERK'S NOTICE of Compliance re [8] Order on Motion to Continue. (ls)**

**1:25-cv-21417-BB Notice has been electronically mailed to:**

Brandon Scott Floch     bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman     jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

**1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114

| From: | **cmecfautosender@flsd.uscourts.gov** <cmecfautosender@flsd.uscourts.gov> |
|---|---|
| To: | **flsd_cmecf_notice@flsd.uscourts.gov** <flsd_cmecf_notice@flsd.uscourts.gov> |
| Subject: | Activity in Case 1:25-cv-21417-BB O'Leary v. Armstrong Order |
| Date: | 30.04.2025 11:37:41 (+02:00) |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Southern District of Florida

### Notice of Electronic Filing

The following transaction was entered on 4/30/2025 at 11:37 AM EDT and filed on 4/30/2025
**Case Name:** O'Leary v. Armstrong
**Case Number:** 1:25-cv-21417-BB
**Filer:**
**Document Number:** 11(No document attached)

**Docket Text:**
**PAPERLESS ORDER striking ECF No. [10] as it is not an authorized filing. Signed by Judge Beth Bloom (tsn)**


**1:25-cv-21417-BB Notice has been electronically mailed to:**

Brandon Scott Floch     bfloch@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com

Jeffrey Adam Neiman     jneiman@mnrlawfirm.com, erodriguez@mnrlawfirm.com, mordenes@mnrlawfirm.com, rrivas@mnrlawfirm.com

**1:25-cv-21417-BB Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114

**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix B1

## Articles Authored By and Featuring Sameer

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

June 4th, 2025

# Articles Authored:
# Sameer Somal

**Article:** **Honesty in the Halls of Justice: Lincoln's Lesson for Lawyers**

Date: May 6th, 2025

Publication: **nysba.org**

Web address: https://nysba.org/honesty-in-the-halls-of-justice-lincolns-lesson-for-lawyers/

**Article:** **Abraham Lincoln: A model for ethical leadership**

Date: February 13th, 2025

Publication: **abajournal.com**

Web address: https://www.abajournal.com/voice/article/abraham-lincoln-a-model-for-ethical-leadership#google_vignette

**Article:** **How Expert Witnesses Influence Personal Injury Outcomes**

Date: December 5th, 2024

Publication: **blueoceanglobaltech.com**

Web address: https://www.blueoceanglobaltech.com/blog/how-expert-witnesses-influence-personal-injury-outcomes/



**Article:** **Defamation and Reputation Management in the Digital Age**

Date: **August 28th, 2024**

Publication: **cshlaw.com**

Web address: **https://www.cshlaw.com/resources/defamation-and-reputation-management-in-the-digital-age/**

---

**Article:** **Calculation of economic damages in defamation cases**

Date: **August 19th, 2024**

Publication: **today.westlaw.com**

Web address: **https://today.westlaw.com/Document/Ib84b22585e4911ef9a5f906d9a270520/View/FullText.html**

---

**Article:** **How to Improve Your Law Firm's Digital Presence for Growth**

Date: **August 1st, 2024**

Publication: **Georgia Bar Journal**

Web address: **https://digitaleditions.walsworth.com/publication/?i=828375&p=60&view=issueViewer**



## Article:  Maximizing Your Impact as an Expert Witness

Date:                      June 31st, 2024

Publication:               glginsights.com

Web address:               https://glginsights.com/articles/maximizing-your-impact-as-an-expert-witness/

## Article:  The Challenges of Protecting Intellectual Property in the Digital Age

Date:                      May 15th, 2024

Publication:               legalreader.com

Web address:               https://www.legalreader.com/challenges-of-protecting-intellectual-property-in-the-digital-age/

## Article:  The Role of Digital Evidence in Modern Crime Investigations

Date:                      February 26th, 2024

Publication:               hgexperts.com

Web address:               https://www.hgexperts.com/expert-witness-articles/the-role-of-digital-evidence-in-modern-crime-investigations-66468



**Article:**  **Brand activism and authentic solidarity**

Date:                          March 30th, 2023

Publication:                 philanthropynewsdigest.org

Web address:               https://philanthropynewsdigest.org/features/
                            commentary-and-opinion/brand-activism-and-
                            authentic-solidarity

**Article:**  **Stop Cyberbullying: Here's Everything You Need to Know**

Date:                          March 17th, 2023

Publication:                 blueoceanglobaltech.com

Web address:               https://www.blueoceanglobaltech.com/blog/
                            guide-to-stop-cyberbullying/

**Article:**  **The Many Benefits of Hiring a Fractional CMO**

Date:                          January 11th, 2023

Publication:                 blueoceanglobaltech.com

Web address:               https://www.blueoceanglobaltech.com/blog/
                            benefits-of-fractional-cmo/



**Article:**  **Tackling the Double Disadvantage Issues of Intersectionality**

Date:                     December 19th, 2022

Publication:              goodmenproject

Web address:              https://goodmenproject.com/featured-content/tackling-the-double-disadvantage-issues-of-intersectionality/

---

**Article:**  **Aspiring next-gen advisers crave inspiration**

Date:                     November 30th, 2022

Publication:              investmentnews.com

Web address:              https://www.investmentnews.com/aspiring-next-gen-advisers-crave-inspiration-228723

---

**Article:**  **Best Practices for Building Diversity and Inclusion into your Business**

Date:                     November 23rd, 2022

Publication:              Medium

Web address:              https://medium.com/illumination/best-practices-for-building-diversity-and-inclusion-into-your-business-adcf069e581



**Article:** **The Complete Guide to Removing Damaging Content from the Internet**

Date: **November 19th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/ complete-guide-remove-negative-damaging- content/**

**Article:** **4 Ways Parents Can Deal With a Cyberbully Child**

Date: **November 9th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/ ways-of-dealing-with-a-cyberbully/**

**Article:** **Eight Reasons Why Africa Is Primed for Impact Investing**

Date: **October 14th, 2022**

Publication: **cfainstitute.org**

Web address: **https://blogs.cfainstitute.org/ investor/2022/10/14/eight-reasons-why-africa-is- primed-for-impact-investing/? fbclid=IwAR0WtufGa5e- No0aFd5EI_dONJWRJMb76keCvaYSVttfnPgxkjlGIP DqznQ**



**Article:   Your Online Reputation and the Need to Monitor It**

Date:                              September 24th, 2022

Publication:                   blueoceanglobaltech.com

Web address:                 https://www.blueoceanglobaltech.com/blog/
monitor-your-online-reputation/

**Article:   6 Social Media Community Management Tips for Better Customer Loyalty**

Date:                              August 19th, 2022

Publication:                   enterpriseviewpoint.com

Web address:                 https://enterpriseviewpoint.com/6-social-media-
community-management-tips-for-better-
customer-loyalty/

**Article:   Internet Defamation: How an Expert Witness Can Protect You in Court**

Date:                              August 10th, 2022

Publication:                   blueoceanglobaltech.com

Web address:                 https://www.blueoceanglobaltech.com/blog/
internet-defamation-expert-witness/



**Article:** **Emotional Distress Damages: Ways to Deal with Defamation**

Date: **July 31st, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/emotional-distress-damages/**

**Article:** **Social Media and Online Defamation – Control The Narrative**

Date: **July 22nd, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/social-media-and-online-defamation/**

**Article:** **Sentiment Analysis to Build and Monitor Your Online Reputation**

Date: **July 13th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/sentiment-analysis/**



### Article:  How We Tackled Cyberbullying: A Case Study

Date:                          **June 23rd, 2022**

Publication:               **blueoceanglobaltech.com**

Web address:             **https://www.blueoceanglobaltech.com/blog/
how-we-tackled-cyberbullying-a-case-study/**

### Article:  The Nuances of Digital Transformation in the Emerging Digital Era

Date:                          **June 22nd, 2022**

Publication:               **enterpriseviewpoint.com**

Web address:             **https://enterpriseviewpoint.com/the-nuances-
of-digital-transformation-in-the-emerging-
digital-era/**

### Article:  Your Online Reputation: 7 Things CEOs Must Know

Date:                          **May 25th, 2022**

Publication:               **blueoceanglobaltech.com**

Web address:             **https://www.blueoceanglobaltech.com/blog/ceo-
online-reputation-management/**



## Article:  Internet Defamation and Cyberbullying on the Rise

Date:                            **May 6th, 2022**

Publication:                **blueoceanglobaltech.com**

Web address:              **https://www.blueoceanglobaltech.com/blog/
internet-defamation-and-cyberbullying/**

## Article:  Cases of Online Defamation and Ways to Handle It, By-Rights

Date:                            **May 1st, 2022**

Publication:                **blueoceanglobaltech.com**

Web address:              **https://www.blueoceanglobaltech.com/blog/
cases-of-online-defamation/**

## Article:  10 Actionable Ways to Remove Negative Content From Google Search

Date:                            **April 25th, 2022**

Publication:                **blueoceanglobaltech.com**

Web address:              **https://www.blueoceanglobaltech.com/blog/
remove-negative-content-from-google-search/**



**Article:** **How to Remove Unwanted Links From Google Search**

Date: **April 23rd, 2022**

Publication: **blueoceanglobaltech.com**

Web address: https://www.blueoceanglobaltech.com/blog/remove-unwanted-google-links/

**Article:** **Closing the Gap: Gender Lens Investing and the Future of Finance**

Date: **April 21st, 2022**

Publication: **cfainstitute.org**

Web address: https://blogs.cfainstitute.org/investor/2022/04/21/closing-the-gap-gender-lens-investing-and-the-future-of-finance/?fbclid=IwAR3_82c8s_fRKY27Ml2DE2UpzDKDqa3WuZ4zNczy4wP5EmOVD8koORdloKE

**Article:** **How to Delete Information From Google?**

Date: **April 17th 2022**

Publication: **blueoceanglobaltech.com**

Web address: https://www.blueoceanglobaltech.com/blog/how-to-delete-information-from-google/



**Article:** **Online Reputation Management: FAQs**

Date: **April 17th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/online-reputation-management-faqs/**

**Article:** **Personal Reputation Management Service for Individuals Today**

Date: **April 15th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/personal-reputation-management-service-for-individuals-today/**

**Article:** **How Much Does Online Reputation Management Cost?**

Date: **April 12th, 2022**

Publication: **blueoceanglobaltech.com**

Web address: **https://www.blueoceanglobaltech.com/blog/online-reputation-management-cost/**



**Article:   All About Online Defamation and Protecting Yourself From It**

Date:                                   April 11th 2022

Publication:                       blueoceanglobaltech.com

Web address:                      https://www.blueoceanglobaltech.com/blog/protection-against-online-defamation/

**Article:   14 Effective Marketing Tips for Cosmetic Surgeons**

Date:                                   March 21st, 2022

Publication:                       freepressdirectory.com

Web address:                      https://www.freepressdirectory.com/14-effective-marketing-tips-for-cosmetic-surgeons/

**Article:   5 Lessons To Learn From Famous Corporate Reputation Crises**

Date:                                   March 18th, 2022

Publication:                       worth.com

Web address:                      https://www.worth.com/corporate-reputation-crises-lessons-famous-cases/



**Article:  Defamation of Character and Emotional Distress Damage Charges**

Date:                              **March 17th, 2022**

Publication:                    **blueoceanglobaltech.com**

Web address:                 **https://www.blueoceanglobaltech.com/blog/defamation-of-character-and-emotional-distress/**

**Article:  How to Delete a Negative Google Review to Save Your Business**

Date:                              **March 17th, 2022**

Publication:                    **blueoceanglobaltech.com**

Web address:                 **https://www.blueoceanglobaltech.com/blog/how-to-delete-a-negative-google-review/**

**Article:  Why a Reputation Management Agency Is a Necessity for Your Business?**

Date:                              **March 10th, 2022**

Publication:                    **blueoceanglobaltech.com**

Web address:                 **https://www.blueoceanglobaltech.com/blog/reputation-management-agency/**



**Article:   How to Prove Defamation and Calculate Damages?**

Date:                                  **February 25th, 2022**

Publication:                    **blueoceanglobaltech.com**

Web address:                  **https://www.blueoceanglobaltech.com/blog/
how-to-prove-defamation/**

---

**Article:   Online Reputation Management, and Why It Is
Important**

Date:                                  **February 16th 2022**

Publication:                    **Business.com**

Web address:                  **https://www.business.com/articles/what-is-
online-reputation-management/**

---

**Article:   Spotlight on SPACs: More Risk Than Opportunity?**

Date:                                  **January 31st, 2022**

Publication:                    **cfainstitute.org**

Web address:                  **https://blogs.cfainstitute.org/
investor/2022/01/31/spotlight-on-spacs-more-
risk-than-opportunity/?
fbclid=IwAR392L1NmYTc9BDh51EkLxA5s4s-
pR7MTNjY7GKlYUsCfUf0dZBS05U2jq0**



**Article:** **Protecting your reputation in a post fact-check world**

Date: January 8th, 2022

Publication: Reputation Today

Web address: https://reputationtoday.in/protect-your-online-reputation/

**Article:** **The Nuances of Digital Transformation in the Emerging Digital Era**

Date: June 30th, 2021

Publication: NEW STARTUPS

Web address: https://www.new-startups.com/digital-transformation/

**Article:** **Be Prepared to Respond to a Digital Reputation Crisis**

Date: May 12th, 2021

Publication: Industry Today

Web address: https://industrytoday.com/be-prepared-to-respond-to-a-digital-reputation-crisis/



**Article:** **GameStop, Artificial Intelligence, Social Media, and the Future of Investing**

| | |
|---|---|
| Date: | **May 5th, 2021** |
| Publication: | **Enterprising Investor** |
| Web address: | **https://blogs.cfainstitute.org/investor/2021/05/05/gamestop-artificial-intelligence-social-media-and-the-future-of-investing/#__prclt=mgMGqrb5** |

**Article:** **Online Brand Management During the Coronavirus Pandemic**

| | |
|---|---|
| Date: | **April 30th, 2021** |
| Publication: | **startup.info** |
| Web address: | **https://startup.info/online-brand-management-during-the-coronavirus-pandemic/** |

**Article:** **When to use Big Data and when not to: it should be guided by thoughtful human expertise**

| | |
|---|---|
| Date: | **February 24th, 2021** |
| Publication: | **Business Times** |
| Web address: | **https://www.businesstimes.com.sg/wealth-investing/when-to-use-big-data-and-when-not-to-it-should-be-guided-by-thoughtful-human** |



**Article:   When to Use Big Data — and When Not To**

Date:                        January 25th, 2021

Publication:                 Enterprising Investor

Web address:                 https://blogs.cfainstitute.org/
                             investor/2021/01/25/when-to-use-big-data-and-
                             when-not-to/


**Article:   Your Online Reputation: 7 Things CEOs Must Know
            (Blue Ocean Blog)**

Date:                        November 25th, 2020

Publication:                 Blue Ocean Global Technology

Web address:                 https://www.blueoceanglobaltech.com/blog/ceo-
                             online-reputation-management/


**Article:   Building & Protecting Your Digital Presence During
            the COVID-19 Pandemic**

Date:                        November 24th, 2020

Publication:                 GoodFirms

Web address:                 https://www.goodfirms.co/blog/building-
                             protecting-your-digital-presence-during-the-
                             covid-19-pandemic



**Article:** **Aiming For A Digital Transformation? Don't Forget Your Online Reputation**

Date: November 24th, 2020

Publication: Chief Executive

Web address: https://chiefexecutive.net/aiming-for-a-digital-transformation-dont-forget-your-online-reputation/

**Article:** **Why People Drive Artificial Intelligence Today and Tomorrow (CFA Institute)**

Date: November 23rd, 2020

Publication: CFA Institute

Web address: https://blogs.cfainstitute.org/investor/2020/11/23/why-people-drive-artificial-intelligence-today-and-tomorrow/

**Article:** **On-Page Optimization Lets You Take Control of Your Business Success (ReadWrite)**

Date: September 23rd, 2020

Publication: ReadWrite

Web address: https://readwrite.com/2020/09/23/on-page-optimization-lets-you-take-control-of-your-business-success/



## Article:   Online Reputation Marketing: 7 Solid Tips for Social Media

Date:                          April 20th, 2020

Publication:              Co-schedule Blog

Web address:            https://coschedule.com/blog/online-reputation-marketing/

## Article:   Have Controversial Opinions on the Current Crisis? Here's How to Manage Your Online Reputation

Date:                          April 19th, 2020

Publication:              Real Leaders

Web address:            https://real-leaders.com/stories/social-impact/have-controversial-opinions-on-the-current-crisis-heres-how-to-manage-your-online-reputation/

## Article:   How Google's BERT Algorithm Affects Your Website's Traffic

Date:                          March 31st, 2020

Publication:              Blue Ocean Global Technology

Web address:            https://www.blueoceanglobaltech.com/blog/google-bert-algorithm-impacts-website-traffic/



## Article:  The Role of SEO in Online Reputation Management

Date:                           **January 9th, 2020**

Publication:                    **Search Engine Watch**

Web address:                    https://www.searchenginewatch.com/2020/01/09/role-of-seo-in-online-reputation-management/

## Article:  Why your Company's Online Reputation Matters

Date:                           **December 18th, 2019**

Publication:                    **Entrepreneur.com**

Web address:                    https://www.entrepreneur.com/article/343983

## Article:  Negative Press is Inevitable for Modern CEOs – And that's not a bad thing.

Date:                           **October 26th, 2019**

Publication:                    **CEOWorld.in**

Web address:                    https://ceoworld.biz/2019/10/26/negative-press-is-inevitable-for-modern-ceos-and-thats-not-a-bad-thing/



**Article:** **How to Manage Fake Reviews on Google, Facebook and Glassdoor**

Date: **September 10th, 2019**

Publication: **The Manifest**

Web address: https://themanifest.com/online-reputation-management/blog/manage-fake-reviews

---

**Article:** **Reverse SEO for Law Firms: How to Protect Yourself and Your Clients Against Negative Content**

Date: **July 28th, 2019**

Publication: **Blue Ocean Global Technology**

Web address: https://www.blueoceanglobaltech.com/blog/reverse-seo-for-law-firms-how-to-protect-yourself-and-your-clients-against-negative-content/

---

**Article:** **SEO vs. ORM — What is the difference? | Blue Ocean Global Tech**

Date: **May 18th, 2019**

Publication: **Medium**

Web address: https://medium.com/@SameerSomal/seo-vs-orm-what-is-the-difference-blue-ocean- global-tech-5eaacb401de4



## Article:  6 Tips for Increasing Positive Online Reviews

| Date: | March 15th, 2019 |
| --- | --- |
| Publication: | Clutch |
| Web address: | https://clutch.co/bpo/resources/6-tips-increasing-positive-online-reviews |

## Article:  How to Improve or Restore your Online Reputation

| Date: | August 16th, 2018 |
| --- | --- |
| Publication: | Social Media Examiner |
| Web address: | https://www.socialmediaexaminer.com/improve-restore-online-reputation/ |

## Article:  Online Reputation Management: A Guide for Social Media Marketers

| Date: | June 14th, 2018 |
| --- | --- |
| Publication: | Social Media Examiner |
| Web address: | https://www.socialmediaexaminer.com/online-reputation-management-guide-for-social-media-marketers/ |



**Article:** **The Importance of Online Reputation Management for Legal Professionals**

Date: **May 1st, 2018**

Publication: **Daily Journal**

Web address: https://www.dailyjournal.com/articles/347395-the-importance-of-online-reputation-management-orm-for-legal-professionals?platform=hootsuite

**Article:** **7 Steps to Successful Live Chat Implementation**

Date: **April 19th, 2018**

Publication: **Hub Spot**

Web address: https://blog.hubspot.com/service/live-chat-implementation

**Article:** **A dedication to Internet Defamation Issues**

Date: **April 15th, 2018**

Publication: **Iris**

Web address: https://www.iris.xyz/fintech/a-dedication-to-internet-defamation-issues/



## Article:  Rank Higher on Google with These 7 SEO Trends

Date:                              April 3rd,2018

Publication:                   Blue Ocean Global Technology

Web address:                 https://www.blueoceanglobaltech.com/blog/
rank-higher-on-google-with-these-7-seo- trends/

## Article:  The Importance of Online Reputation Management for Legal Professionals

Date:                              March 26th,2018

Publication:                   Blue Ocean Global Technology

Web address:                 https://www.blueoceanglobaltech.com/blog/the-
importance-of-online-reputation-management-
orm-for-legal-professionals/

## Article:  Digital Reputation Management 101

Date:                              March 7th, 2018

Publication:                   CFA Institute Blog

Web address:                 https://blogs.cfainstitute.org/
investor/2018/03/07/digital-reputation-
management-101/



**Article:** **7 proactive steps to safeguard your online reputation**

Date: Dec 14th, 2017

Publication: Ragan.com

Web address: https://www.ragan.com/7-proactive-steps-to-safeguard-your-online-reputation/

---

**Article:** **Case Study: Why Efficient Online Reputation Repair Involves More Than Content Suppression**

Date:

Publication: Experts.com

Web address: https://www.experts.com/articles/why-efficient-online-reputation-repair-involves-more-than-content-suppression-by-sameer-somal

---

**Article:** **How Do I Restore My Reputation After Receiving a Negative Review**

Date: April 19th, 2016

Publication: Blue Ocean Global Technology

Web address: https://www.blueoceanglobaltech.com/blog/how-do-i-restore-my-reputation-after-receiving-a-negative-review/



**Article:  Protect Your Online Business Reputation: Best Reputation Management Tips (part 2)**

| | |
|---|---|
| Date: | **March 19th, 2016** |
| Publication: | **Blue Ocean Global Technology** |
| Web address: | **https://www.blueoceanglobaltech.com/blog/protect-your-online-business-reputation-best-reputation-management-tips-part-2/** |

**Article:  Protect Your Online Business Reputation: Best Reputation Management Tips (Part 1)**

| | |
|---|---|
| Date: | **February 19th, 2016** |
| Publication: | **Blue Ocean Global Technology** |
| Web address: | **https://www.blueoceanglobaltech.com/blog/protect-your-online-business-reputation-best-reputation-management-tips-part-1/** |

**Article:  How to Protect your Online Reputation and Reduce Negative Reviews**

| | |
|---|---|
| Date: | **January 19th, 2016** |
| Publication: | **Blue Ocean Global Technology** |
| Web address: | **https://www.blueoceanglobaltech.com/blog/how-to-protect-your-online-reputation-and-reduce-negative-reviews/** |



**Article:** **Engaging keynotes on reputation management, digital engagement and leadership**

| | |
|---|---|
| Date: | - |
| Publication: | A- Speakers |
| Web address: | https://www.a-speakers.com/speakers/sameer-somal-keynote-speaker/ |



# Relevant Articles Featuring: Sameer Somal

**Article:**  **5 Reasons to Include Social Media in your Business PR Strategy**

| | |
|---|---|
| Date: | **September 13th, 2020** |
| Publication: | **Small Business Rainmaker** |
| Web address: | https://www.smallbusinessrainmaker.com/small-business-marketing-blog/5-reasons-to-include-social-media-in-your-business-pr-strategy |

**Article:**  **101 Experts Reveal How to Produce Content that Creates Engagements and Attract Backlinks**

| | |
|---|---|
| Date: | **September 2nd, 2020** |
| Publication: | **Guerrilla** |
| Web address: | https://theguerrilla.agency/create-engagement-attract-links |



## Article:  Automation is poised to lead us out of the crisis, and empower people – here is how

| | |
|---|---|
| Date: | **June 23rd, 2020** |
| Publication: | **Data Driven Investor** |
| Web address: | https:// www.datadriveninvestor.com/2020/06/23/ automation-is-poised-to-lead-us-out-of-the-crisis-and-empower-people-here-is-how/ |

## Article:  Digital Transformation: 6 Tips For Success

| | |
|---|---|
| Date: | **June 18th, 2020** |
| Publication: | **Blue Ocean Global Technology** |
| Web address: | https://www.blueoceanglobaltech.com/blog/ digital-transformation-tips-for-success/ |

## Article:  How Does Content Influence SEO – 25 SEO Experts Share Their Opinions

| | |
|---|---|
| Date: | **June 12th, 2020** |
| Publication: | **Rightly Written** |
| Web address: | https://www.rightlywritten.com/how-does-content-influence-seo-25-seo-experts-share-their-opinions/ |



**Article:   How to Remove A Picture or Image from Google**

Date:                                May 1st, 2020

Publication:                        Brand Yourself

Web address:                       https://brandyourself.com/blog/guide/how-to-
remove-a-picture-or-image-from-google/

**Article:   How to get High-Quality Backlinks – 28 SEO experts
Share Their Tips**

Date:                                April 7th, 2020

Publication:                        Authority Builders

Web address:                       https://authority.builders/blog/get-high-quality-
backlinks/

**Article:  How Amazon Search Engine Optimization Works**

Date:                                February 16th, 2020

Publication:                        Buy Box Experts

Web address:                       https://www.buyboxexperts.com/blog/how-does-
amazon-search-engine-optimization-work/



## Article:  How to Manage Your Online Reputation

Date:                          January 24th, 2020

Publication:                   NYSBA

Web address:                   https://nysba.org/how-to-manage-your-online-reputation/

## Article:  SEO Techniques – 34 SEO Experts Reveal Their Top Strategies for 2020

Date:                          January 6th, 2020

Publication:                   Flash Point Marketing

Web address:                   https://flashpointmarketing.biz/seo-techniques/

## Article:  Broken Link Building Tips for Increasing Search Rankings, Authority, & Traffic

Date:                          November 25th, 2019

Publication:                   Databox

Web address:                   https://databox.com/broken-link-building-tips-for-increasing-search-rankings-authority-traffic



**Article:** **How Moving Companies Can Improve Their Online Reviews – An Expert Roundup**

Date:            October 31st, 2019

Publication:     Vonigo

Web address:     https://www.vonigo.com/moving-companies-improve-online-reviews/

---

**Article:** **How to Optimize for Voice Search: Goals, SEO Strategies, & Tools**

Date:            October 29th, 2019

Publication:     GoodFirms

Web address:     https://www.goodfirms.co/resources/seo-for-voice-search

---

**Article:** **SEO for Startups: 150 Experts Explain What to Do and What to Avoid**

Date:            October 14th, 2019

Publication:     Databox

Web address:     https://databox.com/seo-for-startups



**Article:  15 Website Speed Optimization Tips that Anyone can Implement**

Date:                      September 30th, 2019

Publication:              Databox

Web address:              https://databox.com/website-speed-optimization-tips

**Article:  2019 SEO Marketing Trends**

Date:                      July 9th, 2019

Publication:              Daily Inbox

Web address:              https://dailyinbox.com/2019-seo-marketing-trends/

**Article:  Sameer Somal – How to Protect Your Online Reputation from Negative Press**

Date:                      February 4th, 2019

Publication:              Business Innovators Radio Network

Web address:              https://businessinnovatorsradio.com/sameer-somal-how-to-protect-your-online-reputation-from-negative-press/



**Article:** **How to Increase Sales Page Conversations: 40 Experts Weigh In**

Date: November 21st, 2018

Publication: The Hoth

Web address: https://www.thehoth.com/blog/sales-page-conversion-optimization/

**Article:** **Social Media Clean Up: How to Guide for Students**

Date: August 31st, 2018

Publication: Smart Social

Web address: https://smartsocial.com/social-media-clean-up/

**Article:** **How to Drive Traffic to your Website**

Date: July 6th, 2018

Publication: Traffic Masters

Web address: https://www.traffic-masters.net/blog/how-to-drive-traffic-to-your-website/



## Article:  Sameer Somal On the Digital Revolution Of The Internet

Date:                 **June 5th, 2018**

Publication:          **Attorney At Law Magazine**

Web address:          **https://attorneyatlawmagazine.com/sameer-somal**



**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix B2

## Recent Speaking Engagements and References

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

**June 4th, 2025**

# Recent Speaking Engagements

| InterCon USA 2021 |
| --- |
| Legal Marketing Association (Orlando, FL) |
| Empowering A Billion Women (Austin, TX) |
| Legal Marketing Association (Philadelphia, PA) |
| CFA Institute VBA Netherlands (Amsterdam, Netherlands) |
| Clear Law Institute (Arlington, VA) |
| Mobile Growth Summit (New York, NY) |
| FPA National BE Conference (Baltimore, MD) |
| Benchbar Conference (Atlantic City, NJ) |
| Legal Week (New York, NY) |
| The US State Department's Foreign Service Institute (McLean, VA) |
| Global Digital Marketing Summit, Mick Law (Phoenix, AZ) |
| Dimensional Fund Advisors (Austin, TX) |
| SEI Investments (Oaks, PA) |
| The Pennsylvania Bar Institute (Philadelphia, PA) |
| The Philippines HR Summit (Manilla, Philippines) |
| Women Economic Forum (Delhi, India) |
| CFA Institute Leaders Conference (San Jose) |
| The LavaCon Content Strategy Conference (Las Vegas, NV) |
| Georgetown University (Washington, D.C.) |
| NAPFA Annual Conference (Phoenix, AZ) |
| Finance Logix Technology Conference (Las Vegas, NV) |
| FPA of New York (New York, NY) |



New York State Bar (Albany, NY)

Scotiabank Executive Strategy Retreat (Grand Cayman, Cayman Islands)

Project Management Institute (Los Angeles, CA)

Montgomery County Paralegals Association (Bluebell, PA)

Legal Marketing Association (Orlando, FL)

Empowering A Billion Women (Austin, TX)

Legal Marketing Association (Philadelphia, PA)

CFA Institute VBA Netherlands (Amsterdam, Netherlands)

Clear Law Institute (Arlington, VA)

Mobile Growth Summit (New York, NY)

FPA National BE Conference (Baltimore, MD)

Benchbar Conference (Atlantic City, NJ)

Legal Week (New York, NY)

The US State Department's Foreign Service Institute (McLean, VA)

Global Digital Marketing Summit, Mick Law (Phoenix, AZ)

Dimensional Fund Advisors (Austin, TX)

SEI Investments (Oaks, PA)

The Pennsylvania Bar Institute (Philadelphia, PA)

The Philippines HR Summit (Manilla, Philippines)

Women Economic Forum (Delhi, India)

CFA Institute Leaders Conference (San Jose)

The LavaCon Content Strategy Conference (Las Vegas, NV)

Georgetown University (Washington, D.C.)

NAPFA Annual Conference (Phoenix, AZ)

Finance Logix Technology Conference (Las Vegas, NV)

FPA of New York (New York, NY)



# References And Testimonials



# Blue Ocean Global Technology



| Website | Directions | Save | Call |

5.0 ★★★★★ 415 Google reviews

Marketing agency in New York City, New York

**Located in:** 70 Pine

**Address:** 70 Pine St #1324, New York, NY 10005, United States

**Hours:** Open 24 hours ▾

**Phone:** +1 202-276-7589

**Appointments:** blueoceanglobaltech.com



# Blue Ocean Global Technology



70 Pine St #1324, New York, NY, United States

5.0 ★★★★★ 415 reviews 

Sort by: Newest ▾

All    reputation manag... 71    presentation 34    trust 30    networking 19    +6

 **Karim Shokeir**
1 review

⋮

★★★★★ a year ago

I have met the co-founder Sameer Somal last November and he has been very helpful, friendly and welcoming too. Since then he has influenced me to become a better person, also his advice on networking were great. This company has a great online reputation and a strong brand name. Highly recommend to do business with!!

 Like

 **Ronald Higginbotham**
5 reviews

⋮

★★★★★ 6 months ago
**Positive:** Professionalism, Quality, Responsiveness, Value

Sameer Somal is the go to expert in reputation management. He was a keynote speaker at our Project Management Institute (PMI) event and provided tremendous insights into the impact of reputation and how it impacts both short-term and long-term success.

 Like

 **Zeev Wexler**
3 reviews

⋮

★★★★★ a year ago
As CEO of Wexler Consulting, I can say with confidence that Blue Ocean Global Technology is a team you can trust. We have been fortunate to collaborate with their firm on client cases. Their online reputation management, SEO, and web development capabilities are always a leap up the value curve. Co-founder Sameer Somal is a man of integrity. His team is relentlessly dedicated to delivering results. Sameer is also a sought after speaker at events globally to share perspective and actionable ideas for building an authentic digital presence. Highly recommended.

 Like





**Eileen Overbaugh**
1 review

 ★★★★★ 6 months ago

I had the pleasure of hearing Sameer speak on the topic of "The New Networking: Build Relationship Capital Online and Offline". His advice and guidance were both sincere and practical. In follow up conversations, the authenticity of his message and his genuine passion for connecting people, and for building trusting and meaningful relationships, shines through.

👍 Like



**Matthew Cullen**
2 reviews

 ★★★★★ 6 months ago
**Positive:** Professionalism, Responsiveness

I am President of CFA Virginia and we recently had Sameer Somal speak at our Annual Meeting. I was extremely impressed with Sameer's presentation and preparation. He shared so many networking skills that seem so straightforward and intuitive, but take consistent intentional effort to master! I would highly recommend Sameer! Sincerely, Matthew Cullen

👍 Like



**Jordan Edwards**
3 reviews

 ★★★★★ 9 months ago
Blue Ocean Global Technology (BOGT) goes above and beyond for its clients. It is world class at developing the relationship. BOGT would be a great investment for any company looking to build its online presence. Thank you for all the help you have provided me!

👍 Like





**Brittney Bagiardi**
Business Development &
Marketing Assistant
Manager
February 4, 2020, Brittney
worked with Sameer in
different groups

The Legal Marketing Association's Tampa City Group was honored to have Sameer come to speak with us regarding Online Reputation Management. Sameer is an energetic presenter who took the time to answer each and every one of our questions. His expertise was evident in his polished presentation, and our members were engaged thoroughly. All communications leading up to the event were timely and friendly, and I have enjoyed my time working with Sameer on this speaking engagement.

| Dismiss | Ask for revision | Add to profile |

 RE: Thanks from PBI

 **Barbara Thornton <bthornton@pbi.org>**
Sameer Somal;  Laura Powers
Wednesday, April 3, 2019 at 7:56 AM
Show Details

Hi Sameer and Laura,
Thank you for teaching our PBI CLE audience about social media. The audience appreciated the information you shared with them. These things, they said, were what they found most valuable about your presentation:

- Practical suggestions about use of social media
- First time I've seen a panel of non-lawyers – very good
- Information not usually available to lawyers, but should know
- Very knowledgeable presenters and practical information – excellent
- Use of LinkedIn; examples of problem postings

Sincerely,
Barb

 Barbara K. Thornton
Program Manager
Pennsylvania Bar Institute
www.pbi.org





## Thank you for speaking at our Mick Law Conference



**Zia Sabir <zsabir@micklawpc.com>**
Sameer Somal
Thursday, April 18, 2019 at 8:25 AM
Show Details

Dear Sameer,

Thank you for presenting "Online Reputation Management: Building & Protecting Your Digital Presence" at our 2018 Conference in Arizona this past October. While our leadership team at Mick Law enjoyed the most memorable presentation, the feedback we received from our clients was exceptional. The content was fresh, relevant and informative. Digital marketing and representing a company online is certainly a challenge for many. You were able to enhance the overall education mandate of the event by providing clarity on a difficult subject and actionable takeaways. Its obvious that you live this subject and prepare well before you address an audience. We also consistently heard great comments in that your program was helpful and entertaining.

I think it is also important to note that you were truly "present" for our entire event. Having attended and organized many national conference events, you put in an above and beyond effort to both meet as many attendees as possible prior to your session. You then made a point of being accessible and conversing with them throughout the rest of the conference.

Please feel free to use me as a reference for other groups who are considering having you speak. I will of course continue to recommend you and welcome the opportunity to have you back again in the future. Thank you for making our event such a priority and contributing to its overall success. I look forward to being in touch again soon.

With Gratitude,

-Zia



Zia Sabir
VP, Business Development
Mick | Law P.C.
816 South 169th Street
Omaha, Nebraska 68118



 FW: Possible Speaking Opportunity

 **Najah Samuel** <nsamuel@tasanet.com>
Monday, March 12, 2018 at 10:20 AM
To: 'Sameer S. Somal'; Marguerita Cheng

Najah!

Thank you so much for referring Sameer Somal. He presented to the Montgomery County Paralegal Association on Saturday, March 10 for part 1 of a two part topic (the 2nd part is scheduled for September) and it was WONDERFUL!

Not only is Sameer a great speaker, he is very outgoing, professional, and intelligent! It was a great topic, very informative, and I received so much positive feedback after the presentation!!!

THANK YOU! THANK YOU! THANK YOU!!!!

*Sincerely,*

Nancy A. Marchese



THE RIGHT ADVICE MAKES THE DIFFERENCE

*Attorneys at Law*

**Nancy A. Marchese, Pa. C.P.**
**3770 Ridge Pike**
**Collegeville, PA 19426**
**Tel: 610.489.3300, x148**
**Fax: 610.489.1157**
www.millerturetsky.com



**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix B3

## Continuing Legal Education (CLE) Programs

Kevin O'Leary

*Plaintiff,*

v.

Benjamin Armstrong

*Defendant.*

Prepared By:

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

June 4th, 2025

# Continuing Legal Education (CLE) Programs:

The foundation of Blue Ocean Global Technology is education. With the abundance mentality, our team is relentless in our pursuit of going to bed a little bit smarter every day. This is the miracle of compound interest applied to knowledge. By authoring Continuing Legal Education CLE programs and staying ahead of trends as global educators, speakers, and expert witnesses, we offer perspective and help our clients make the most informed decisions.

## CLE Presentation 1: AI in Legal Research

### Description:

This program explores the transformative impact of artificial intelligence on legal research, tailored specifically for attorneys and legal professionals. Offering a comprehensive overview, it traces the evolution and current applications of AI in the legal sector, emphasizing its critical role in enhancing efficiency, accuracy, and accessibility. Participants will discover how AI technologies—ranging from natural language processing to predictive analytics—are revolutionizing legal research by automating document analysis, refining search capabilities, and generating data-driven case strategies.

Attendees will also gain valuable insights into the perception and impact of AI tools among their peers, learning how to integrate these technologies into their workflows seamlessly. The program contrasts the benefits of AI-driven legal research with traditional methods, showcasing how AI can streamline processes and improve legal outcomes. This session aims to equip legal professionals with the knowledge and tools necessary to harness AI effectively, ensuring they remain at the forefront of innovation in the legal industry.

## Learning objectives:

> Overview of AI tool safety and best practices.

> Pros and cons of using AI for research.

> Overview of a sampling of different AI research tools available.

> General instructions for how to use AI research tools.



# CLE Presentation 2: Introduction to Online Reputation Management (ORM) For Attorneys & Clients

## Description:

This Continuing Legal Education (CLE) program addressed the ever-growing importance of Online Reputation Management (ORM) for lawyers. Recognizing the power of online information in shaping public perception, the program equipped participants with the essential knowledge and tools to navigate the digital landscape effectively. The program will provide context on the American Bar Association's Ethical Guidelines for social media use by attorneys. Gain a practical understanding of how lawyers can promote themselves online while adhering to professional ethics standards.

## Learning objectives:

> Understand the importance of Online Reputation Management (ORM)

> Learn the ramifications of you are what you are online. (Google Test)

> Provide an overview of the ORM lifecycle: building, repairing and monitoring.

> Practical insights into the complexities of online defamation through case studies.

> Review the practical tips for successfully managing your online reputation.

> Practical tools and strategies for monitoring online reputation.



# CLE Presentation 3: Advanced Online Reputation Management (ORM) For Attorneys & Clients

## Description:

This CLE program focuses on the critical intersection of Online Reputation Management (ORM) and contemporary legal practice. Information on the internet directly impacts your personal and professional reputation. A proactive approach to ORM creates opportunities for attorneys and mitigates inevitable reputation risk. This program furnishes attendees with actionable strategies for cultivating & maintaining a positive online reputation. It will also provide practical and legal guidance on the rise of internet defamation. Attendees will receive knowledge and practical tools to effectively manage their individual and firm online reputations.

## Learning objectives:

> Develop proactive strategies for cultivating and maintaining a positive online reputation

> Gain a foundational understanding of defamation law and its key elements.

> Analyze the challenges posed by online falsehoods to an attorney's reputation through case studies.

> Understand the American Bar Association's standards and applicable state mandates for ethical technology use and social media conduct.

> Learn best practices for responding to negative comments and reviews.

> Receive practical experience on how reputation campaigns are implemented for individuals and organizations, including law firms.



# CLE Presentation 4: Using Social Media Effectively and Ethically in Your Law Practice 2019

## Description:

Capitalize on social media's opportunities - Social media has infiltrated the practice of law at every point of the profession. As attorneys from large and small firms alike, you understand that it is essential to develop the tools to be more productive in your social media use, work style, digital reputation, communications, public relations and marketing. To stay competitive, you must build, manage, monitor and, when required, repair your social media presence to capitalize on the opportunities afforded by this medium.

> **Know the rules** - In addition, it is critical for you to understand the Rules of Professional Conduct, which govern communications, including social media. Marketing and development guru Laura Powers, and digital reputation expert Sameer Somal, will examine how you can communicate a brand, build a niche, expand networks, enhance your online presence, and grow business while not running afoul of the rules.

> **Explore the possibilities -** You will explore the most popular social media platforms, the do's and don'ts of social media communications, and the impact these platforms have - and will continue to have - on the practice of law.

> **Materials -** All attendees will receive the course book as a digital download. A printed copy of the course book is available, at a discount to attendees, for $30. Additional copies are available at full price. If you wish to purchase the printed version of the course book, please call PBI Customer Service at 800-932- 4637. Printed versions of the course book will not be distributed at the course; please allow up to two weeks after the program for the printed versions of the course book to be shipped.
> Recorded live in March 2019.



# CLE Presentation 5: Introduction to Online Reputation Management (ORM) For Attorneys & Clients :

## Description:

By its very definition, reputation is an intangible and complex concept because it is comprised of impressions, emotions and perceptions. All organizations, including law firms, achieve results from their reputation. The internet has empowered the consumer and revolutionized how information that was once printed in newspapers or shared on the nightly evening news can be created by anyone and accessed from a device that fits comfortably in the palm of our hand. Individual and firm success are now directly correlated with how and what is communicated online.

When promoted effectively online, digital marketing helps businesses accelerate their growth. Conversely, negative information circulating on the internet can harm businesses and ruin personal lives. Law firms lose contracts, lawyers lose jobs, and most importantly - their reputation.

With choice overload and an expansive new group of online communication platforms, social media adds a new wavelength of opportunity and liability for attorneys. New platforms such as LegalZoom or RocketLawyer offer simplicity, efficiency and scale. In the wake of new competitors and our collective dependence on the internet, digital communication has quickly become the foundation for survival and sustainable growth.

## Learning objectives:

> Understand the importance of Online Reputation Management (ORM)

> Learn the ramifications of you are what you are online. (Google Test)

> Provide an overview of the ORM lifecycle: building, repairing and monitoring.

> Discuss the importance of high-quality content, keyword density, cross linking, and domain authority when building digital assets.

> Review the 10 practical tips for successfully managing your online reputation.



# CLE Presentation 6: Advanced Online Reputation Management (ORM) For Attorneys & Clients

## Description:

Our individual ability to build new relationships, foster trust, and earn respect all contributes to building a reputation. Every day there are 5.5 billion searches performed for a plethora of reasons, including finding a restaurant in a new city, buying mom a gift, or researching the next law firm to engage. The world is literally at our fingertips, but most people only bother to go through detailed information on first page of Google. In fact, 94% of people only look at the first page of Google search results. The general public, including experts and bloggers, can express inaccurate opinions. Their views can then be shared and amplified through a labyrinth of social media channels. The proliferation of performance and peer review websites such as Avvo, Martindale-Hubbell and Yelp also leaves the average attorney more vulnerable than ever before.

In the age of digital Darwinism, we are now guilty until proven innocent. Internet Defamation lawsuits are on the rise. And even when we are innocent, we still may be guilty online. If negative results appear for an attorney or client, their online reputation can quickly damage their offline reputation — and affect their life.

## Two examples:

> A client is exonerated and found not guilty of all criminal charges, but when the client or his/her company is Googled, news articles appear highlighting the now dismissed accusations.

> A partner is accused of harassment from a disgruntled ex-employee. When any prospective or current clients Google the firm, defamatory content appears on page 1 of search results and may adversely affects the reputation of each attorney

The exact nature of reputation issues varies considerably. Assessing reputation damage is not a perfect science. For many companies, Online Reputation Management, SEO, and negative link suppression are synonymous. Search engines employ complicated algorithms: hundreds of calculations and contributing factors are involved when a search engine results page populates. Many experts agree that Google's algorithm often favors negative press and even mugshots.



## Learning Objectives:

› Provide online reputation management guidelines for lawyers, their firms, and their clients.

› Highlight the difference between suppression and removal of defamatory content.

› Review The US Digital Millennium Copyright Act, Section 230 and options for content removal & suppression.

› Share best practices for responding to negative online comments and reviews.

› Review of Internet Defamation & reputation management cases resulting from court case filings, negative news editorials, embarrassing images & videos, negative customer reviews, employee slander, erroneous information and mistaken identity.

› Sameer will be delivering two CLE presentations for the New York State Bar Association in May and June 2024.



**Prepared By:**

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

# Appendix B4

## Expert Witness Case History

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

June 4th, 2025

# Expert Witness Case History

Vilma Nokaj V. North East Dental Management, LLC, Formerly Known As Garden State Dental Management, LLC, D/B/A Family Dental Group, Dr. Michal Gelbart, Dr. Fred Friedman, Dr. Lawrence Stein, Virginia Wicke, Carolyn Totillo, Justine Antonatos, And Maria Farides, Also Referred To As Nokaj V. NEDM, Et Al

Atmosphere Hospitality Management, LLC, V. ZelJkaCurtullo, Shiba Investments Inc., And Karim Merali

Iryna Boyko V. Benny The Bum's Restaurant And Vladimir A. Mosendz

K.G.S., Individually, And As Guardian And Next Friend Of Baby Doe V. Thehuffingtonpost.Com, Inc., D/B/A The Huffington Post; MirahRiben; David G. Kennedy; The Kennedy Law Firm; Amber Geislinger; WALA-TV; Meredith Corp.; WBRC, LLC; Raycom Media, Inc.; And Fictitious Parties "A-Z,"

Susan Edwards V. Aegis Wealth Group, LLC Dba Everspire, And Gerilyn Merrill

Christopher Brown V. Damon Dash; Poppington LLC D/B/A Dame Dash Studios; The Dash Group LLC; And Raquel Horn

Monique Bunn V. Damon Anthony Dash, Dame Dash Studios D/B/A Poppington LLC, Raquel Horn And The Dash Group LLC

John Cooksey V. Roosevelt Benford

Adam M Ludwin, Esq., Ludwin Law Group, P.A., & Joanna Zeitlin, Plaintiffs V. Matthew B. Proman, A/K/A Matt Proman

Lawrence A. Dordea V. Maggie Freleng, Obsessed Network, LLC., Sue L. Gless Thorne, John W. Hardin & Jason C. Baldwin

Aris Hines & Brandi Thomason V. Terry S. Johnson, Individually And In His Official Capacity As Sheriff Of Alamance County, Randy Jones, In His Official Capacity As Deputy Sheriff Of Alamance County, John Doe Corporation, In Its Capacity As Surety On The Official Bond Of The Sheriff Of Alamance County, NGM Insurance Company, And Doe Deputies 1-10



Idlibi, Ammar, A V. Hartford Courant Co.

Rick Dobbins & Kate Preston V. Raul Harris & Desert State Mortgage, LLC

Jay Lopez V. OFC. Collins, Et. Al

Board Of Directors Of Wilmington Education Organization And Wilmington Education Organization D/B/A Coastal Preparatory Academy V. Shandra Gilles

GOLO, LLC V. Goli Nutrition Inc., Et Al

Nested Bean Inc. V. Dreamland Baby Co.

Patrice Gordon V. Board Of Education For The City Of Chicago

Larry Washington, Jr. V. Board Of Education For The City Of Chicago

Donovan Robinson V. Board Of Education For The City Of Chicago

John Johnson V. Board Of Education For The City Of Chicago

Uri Ottensoser V. Meta Platforms LLC

Dennis P. Block, Individually And Doing Business As Dennis P. Block & Associates, Hasti Rahsepar, An Individual, Paul Eric Gold, An Individual, Azam Riesen, An Individual V. John Doe, Brett Schulte, An Individual, Daniel Bramzon, An Individual; BASTA Inc, A California Corporation And Does 4 Through 50

Leslie Lilien V. Olaplex, Olaplex Holdings

Damon Fryer V. Parker Nirenstein



Providence Capital Funding Inc V. Lozamira Inc, Rosa Lozano, Maria, Miramontes, Karina Miramontes, Gerardo Lozano, Fernanda Lozano And Does 1-20

Maximized Marketing, LLC And Brad Pender V. Richard Baldwin, Jennifer Baldwin And Ring A Ding

Robert L Brown Jr., On Point Offshore, LLC, William E. Echard, Christopher C. Wiles, And Maximillian A. Merrill, Individually And Derivatively On Behalf Of Onslow Bay Marine Group, LLC, V. John Bradley Knight Jr., And Onslow Bay Marine Group, LLC.

Maximized Marketing, LLC V. Baldwin Motors, Inc., D/B/A Baldwin Subaru And Baldwin Motors Lincoln

SMG Arts Management LLC, A California Limited Liability Company V. Seagull Arts Management, A California Corporation And Steven Wagner, An Individual And Does 1-10

Velocity Agency, LLC D/B/A Velocity Digital Advertising V. Mary Beth St. John A.K.A. Jane Doe

Jane Doe #1-12 V. Seacoast Christian Community Church, Inc., D/B/A Seacoast Church, Josh Surratt, Jeff Leinberger, Jon Hohm, Kelli Hohm, Chris Petry, Tomelex Copeland, Sam Lesky, Stacy Kotowski, Jim Fleming, & Josh Ray

Brian Menge V. City Of Highland Park, A Municipal Corporation

Shalz Construction LLC, A Colarado Limited Liability Company; And Bradley Shalz, Individually V. Great Lakes Insurance, SE F/K/A Great Lakes Reinsurance (UK) PLC, A Foreign Corporation

Kashyap P Patel, Individually And On Behalf Of The KASH Foundation, Inc., The KASH Foundation, Inc. An Idaho Corporation V. Jim Stewartson, An Individual

Elliot Fisher V. Nicole Dodson

PurCo Fleet Services Inc. V. Robin Cassalia And Dennis Cassalia, An Individual

Belya Et Al V. Kapral Et Al



Kline & Specter, P.C. V. Thomas E. Bosworth, And: Bosworth Law

Silkroad Tranz, INC. V. Payne Trucking Co.

Ocean Pest Control, LLC And Steve Vasaturo V. Harsha Rebelly, Megan Elizabeth Rebelly, AndCorry & Rebelly, Inc.

State Of New Jersey V. Eric S. Grundledger

Melvin Hall V. Bradley Shaw, Giovanni Narducci, F/K A John Roberson, Central Indiana Protection Agency, INC

Christopher E. Dorworth V. Joel Micah Greenberg, Andrew W. Greenberg, Suegreenberg, Abby Greenberg, AWG,INC., Greenberg Dental Associates, LLC, Greenberg Dental & Orthodontics, P.A., Greenberg Dental Specialty Group, LLC, And A.B.

Binwager V. Camping

Dr. Richard Radnovich V. Kate Whitten, Molly Seaman, Lynne Karcher, The Mcclatchy Company, LLC, The Idaho Statesman; Legacy.Com, Inc, Sky Lynch William Heatter, Shari Stickler-Wheeler, Greg Croasdale, Becka Pollardy, Sean Jalisco, David Eisenhauer, Daryl Vickers, Verdeana Grant, Does 1 Through 10.

Yifat V. Schnur And Yifat V. Schnur, Esq., LLC V. John Balestriere, Jillan Mcneil, Matthew Schmidt, Brian Grossman, Jin Lee, The Law Firm Of Balestriere Fariello, Balestriere LLC, Hillary Lawson, Kristina Hallman, Stephanie Caldwell, Moira Hathaway, Macey Speight, Rosemarie Peterson, Lauren Fuller, Jeremy Saland And Crotty Saland P.C.

Dutch Clips, LLC D/B/A Dutchware Gear (Pennsylvania Based LLP) V. Ripstop By The Roll LLC (North Carolina Based LLP) (RBTR)

Capital Wealth Advisors, INC. And Willam N. Beynon Vs. Capital Wealth Advisors, LLC, Michael D. Heller, LLC D/B/A Talent Resources, Benjamin Steiner, Thomas Beynon, And Tiffany Cummins

Craig Deligdish V. David Bender

Crowley, Hoge & Fein, P.C. V. Yoseph Seyoum V. Christopher G' Hoge



Steven Nix V. Gardendale Funeral Home, Inc. D/B/A The New Gardendale Funeral Home; And Fictitious Parties "A-Z"

Bruce D. Thomsen And Debra L. Bruno-Thomsen V. Chris T. Alatsas And Shirley A. Alatsas

Hillary Thomas V. Jean Pierre Conte A/K/A J-P Conte

Crowley, Hoge & Fein, P.C. V. Yoseph Seyoum V. Christopher G' Hoge

Broc Barton & Elevate Entertainment LLC V. Amy Oberbeck

Michael Merhling D/B/A Country Bait & Tackle V. Selective Insurance Company Of South Carolina

Douglas J. Roger, M.D. V County Of Riverside, A Municipality Of The State Of California; Riverside County Sheriff's Department, A Public Entity And Agency Of The County; Stanley Sniff, An Individual And Does 1-25

Derrick May, Joseph Shelton, John Griffin, Daniel Hibbs, Chance Smith, Jon Pearson, And Optimum Energy Partners, LLC, V. Andrew Gautreaux And Phillip D. Peterson



**Prepared By:**

*Sameer S. Somal*

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix C

## Alexandra Lajoux's CV And Biography

Kevin O'Leary

*Plaintiff,*

v.

Benjamin Armstrong

*Defendant.*

Prepared By:

Sameer Somal, CFA

CEO, Blue Ocean Global Technology

June 4th, 2025

**Dr. Alexandra Reed Lajoux**
1050 30th St NW, Washington, DC 20007, United States
(202) 870-5467• arlajoux@capitalexpertservices.com

## Experience

| | |
|---|---|
| **Capital Expert Services**<br>*Founding Principal* | Washington, DC<br>2016 – Present |
| **National Association of Corporate Directors**<br>*Chief Knowledge Officer* | Washington, DC<br>2005 –2016 |
| **Voices for Children of Florida**<br>*Corporate Secretary* | Florida<br>October 2024 – Present |
| **City of Fernandina Beach**<br>*Former Candidate* | Florida<br>2019 – 2020 |
| **Commonwealth Academy**<br>**Lab School of Washington**<br>*Avocational Pursuits* | Washington DC<br>2000 – 2004<br><br>1999 - 2001 |
| **Arthur Andersen & Co.**<br>*Editor-in-Chief, HR Director* | 1987 –1991 |
| **Alexis & Co.**<br>*President* | 1987 – 1988 |
| **Lane and Edson, LLP**<br>*Publications Director* | 1984 – 1987 |
| **Export Information Group**<br>*Associate Publisher and Editor-in-Chief* | 1983 – 1984 |
| **Lambert's World of Trade**<br>*Managing Editor* | 1980 – 1983 |
| **Hay Group - Greater Philadelphia Area**<br>*Editor-in-Chief, Mergers & Acquisitions* | 1978 – 1980 |
| **Information for Industry**<br>*Editor* | 1977 – 1978 |
| **SUNY-Oswego**<br>*Associate Professor of French* | 1974 – 1975 |
| **Princeton University**<br>*Graduate Teaching Assistant* | June 1974 – August 1974 |
| **INTRAV**<br>*Assistant Manager, Hospitality Desk at Berlin Hilton* | |

## Selected *Board* and **A**ssociation **M**emberships

*Voices for Children of Florida*
*Campaigns & Elections Magazine*
*Caux Round Table for Moral Capitalism*
*Board of M&A Standards*
*Association of Princeton Graduate Alumni*
*City of Fernandina Beach - Parks and Recreation Advisory Committee*

**Amelia Island Chapter of the Daughters of the American Revolution**
**American Bar Association**
**American Society for Legal History**
**Federated Republican Women of Nassau**

## Education

- Ph.D. in Comparative Literature from Princeton University
- M.B.A. from Loyola University Maryland
- B.A. from Bennington College

## Languages

- English - Fluent
- French - Fluent
- German - Conversational
- Spanish - Conversational

## Interviews and Podcasts

- Interview With Alexandra Lajoux. Stuart Levine & Associates. Sep 4th, 2024
- Challenge Team Reminded Facilitator of Her Glory Days in Academia. Interview with IdeaConnection facilitator Alexandra Lajoux
- Business Valuations During Of COVID with Alexandra Reed Lajoux (Podcast). July 14, 2020
- Lajoux, Alexandra, Interviewed by Sarder TV (2018)

## Webinars and Symposiums

- Increased Risk Reporting Requirements, Webinar hosted by the European Confederation of Directors' Associations (ecoDa), AIG, and the Federation of European Risk Management Associations (FERMA). March 9 , 2017.
- Anti-Corruption Regulations in Emerging and Expeditionary Markets. Center for Corporate Ethics and Governance, A RAND LAW, BUSINESS, AND REGULATION CENTER (Symposium Participants: Alexandra Lajoux)

- Sunday Book Review: November 17, 2024 – The Books on Due Diligence Edition. Compliance Podcast Network.

Dr. Lajoux has been cited in 950+ papers and by several authorities including in Delaware Court cases and a proposal for homeland security by the United States General Accounting Office.

## BOOKS ABOUT M&A/VALUATION

Lajoux, Alexandra Reed, and Capital Expert Services, LLC. *The Art of M & A : A Merger, Acquisition, and Buyout Guide.* 6th ed, McGraw-Hill, 2024.

Lajoux, Alexandra Reed. *The Art of M & A Integration: A Guide to Merging Resources, Processes, and Responsibilities*. 2nd ed, McGraw-Hill, 2006.

Lajoux, Alexandra Reed, and Charles Elson. *The Art of M & A Due Diligence : Navigating Critical Steps and Uncovering Crucial Data*. 2nd ed, McGraw-Hill, 2011.

Lajoux, Alexandra Reed, and Dennis J. Roberts. *The Art of Bank M & A : Buying, Selling, Merging, and Investing in Regulated Depository Institutions in the New Environment*. McGraw-Hill Education, 2014.

Lajoux, Alexandra Reed, and H. Peter Nesvold. *The Art of M & A Structuring : Techniques for Mitigating Financial, Tax, and Legal Risk*. McGraw-Hill, 2006.

Lajoux, Alexandra Reed, and J. Fred Weston. *The Art of M & A Financing and Refinancing : A Guide to Sources and Instruments for External Growth.* McGraw-Hill, 1999.

Monks, Robert A. G. and Alexandra R. Lajoux, *Corporate Valuation for Portfolio Investment: Analyzing Assets, Earnings, Cash Flow, Stock Price, Governance, and Special Situations.* Wiley, 2010.

Nesvold, H. Peter, Jeffrey Anapolsky, and Alexandra Reed Lajoux. *The Art of Distressed M & A : Buying, Selling, and Financing Troubled and Insolvent Companies*. McGraw-Hill, 2011.

Nesvold, H. Peter, Elizabeth Bloomer Nesvold, and Alexandra Reed Lajoux. *The Art of M & A Valuation and Modeling : A Guide to Corporate Valuation*. McGraw-Hill Education, 2016.

Smith, Kenneth William, and Alexandra Reed Lajoux. *The Art of M & A Strategy : A Guide to Building Your Company's Future through Mergers, Acquisitions, and Divestitures*. McGraw-Hill, 2012.

## BOOKS ABOUT MANAGEMENT/GOVERNANCE

Epstein, Adam J. *The Perfect Corporate Board : A Handbook for Mastering the Unique Challenges of Small-Cap Companies*. McGraw-Hill, 2013. Foreword by Alexandra Reed Lajoux.

Lajoux, Alexandra Reed. *Empowering Municipal Sustainability : A Guide for Towns, Cities, and Citizens*. De Gruyter, 2022.

Lajoux, Alexandra Reed, and Arthur Andersen LLP. *HR Director : The Arthur Andersen Guide to Human Capital.* 2000 ed, Profile Pursuit, 2001.

Lajoux, Alexandra Reed, and Andersen (Firm*). HC : Human Capital*. 2001 ed, Profile Pursuit, 2002.

Lajoux, Alexandra Reed. *Lambert's World of Trade, Finance and Economic Development*. Vol. 1: An International Directory of Government Contacts. Lambert Publ., 1984.

Lajoux, Alexandra Reed. *Lambert's World of Trade, Finance and Economic Development*. Vol. 2: An International Directory of Government Contacts. Lambert Publ., 1984.

Monks, Robert A. G. *The Emperor's Nightmare : Saving American Democracy in the Age of* Citizens United. Edited by Alexandra Reed Lajoux, De Gruyter, 2022.

Nash, John M., and Alexandra Lajoux. *A Corporate Director's Guide to Responsibility and Liability under Current State Law and Federal Securities Laws*. Rev. [ed.], Publications, 1988.

Sherman, Howard D., Kiichi Mochizuki, Bruce Babcock, and Alexandra Reed Lajoux. *Redressing Structural Imbalances in Japanese Corporate Governance : An International Prospective*. Washington, D.C.: Institutional Shareholder Services, 1993.

Van Biljon, Peet & Lajoux, Alexandra. *Making Money: The History and Future of Society's Most Important Technology,* DeGruyter, 2020.

## ARTICLES ABOUT M&A/VALUATION

Forestier, Benjamin and Alexandra R. Lajoux. "Breakeven: zeroing in on a much-neglected concept in finance." *Financier Worldwide Magazine*, April 2024.

Forestier, Benjamin, Alexandra R. Lajoux, and Eric Vega Dominguez, "Geopolitical risk in cross-border M&A: tough times ahead before and after closing." *Financier Worldwide Magazine*, July 2024.

Lajoux, Alexandra R. "Financial regulation in the US: as the world turns and the pendulum swings." *Financier Worldwide Magazine*, September 018.

Lajoux, Alexandra R. "Investment banker liability in M&A: complex, unsettled law heightens need for expert counsel." *Financier Worldwide Magazine*, May 2019.

Lajoux, Alexandra R. "M&A deal financing: risks and recommendations." *Financier Worldwide Magazine,* December 2023.

Lajoux, Alexandra R. and Antonio Nieto-Rodriguez, "'Project M&A' – 10 ways to apply the science of project management to the art of M&A." *Financier Worldwide Magazine*, April 2016.

Lajoux, Alexandra R. and Dennis J. Roberts, "Risk Management: Practical Lessons From Preliminary Due Diligence in Bank M&A." *Risk and Compliance Magazine*, Oct-Dec 2013.

Lajoux, Alexandra R. "Role of the Board in M&A." *Harvard Law School Forum on Corporate Governance*. September 2015.

Monks, Robert A.G. and Alexandra R. Lajoux, "Hybrid Techniques for Valuation," *Wiley Online Library.* 2012.

Monks, Robert A.G., and Alexandra R. Lajoux,  "Market Value Drivers of Public Corporations: Genius, Liberty, Law, Markets, Governance, and Values." *Wiley Online Library*, 2012.

Monks, Robert A.G., and Alexandra R. Lajoux. "Situational Valuation: Equity Values throughout the Corporate Life Cycle." *Wiley Online Library*, 2012.

Monks, Robert A.G., and Alexandra R. Lajoux. "Valuation Based on Assets." *Wiley Online Library,* 2012.

Monks, Robert A.G., and Alexandra R. Lajoux. "Valuation Based on Cash Flow." *Wiley Online Library*, 2012.

Monks, Robert  A.G. and Alexandra R. Lajoux. "Valuation Based on Earnings." *Wiley Online Library*, 2012.

Monks, Robert  A.G. and Alexandra R. Lajoux,  "Valuation Based on Securities Prices." *Wiley Online Library*, 2012.

Monks, Robert A. G. and  Alexandra Reed Lajoux. "Valuation Based on Earnings." *Wiley*, 2013.

## ARTICLES ABOUT MANAGEMENT/ GOVERNANCE

Bucher, Mallory, and Alexandra R. Lajoux, NACD *Director Essential Series: Reports on Corporate Governance Topics* (Collection of Reports), NACD, 2024 - 2025.

Kim, Madeline and Alexandra R. Lajoux "New Tax and Appropriations Law Delivers Mixed Financial News for Corporate Boards." NACD Online Article August 2021.

Lajoux, Alexandra Reed. "Defying Critics and Curbs, Buybacks Persist: Should Executives Benefit from Them?" *Directors & Boards*, vol. 46, no. 5, 2022, pp. 18–25.

Lajoux, Alexandra R. "Rising Directors' Pay Still Lags Other Industries'." *Outlook of the Federal Home Loan Bank System*, 1988.

Lajoux, Alexandra R.  "The Post-Election Boardroom: Six Scenarios for Planning Ahead." *NACD Directorship,* Fall 2024.

Lajoux, Alexandra R. "Corporate Tax Rates, Federal Agency Authority, and More Under Siege."  *NACD Directorship,* Fall 2024.

Lajoux, Alexandra R.  "Profiles of Corporate Governance in Leading Countries : United States." *The Handbook of International Corporate Governance : A Definitive Guide*, 2009.

Lajoux, Alexandra R. "High Court Decisions May Prompt New Challenges to Longtime Governance Rules."  *NACD Online Article,* July 2024.

Lajoux, Alexandra R. "Boards Confront New Standards Amid Regulatory Limbo."  *NACD Directorship* Summer 2024.

Lajoux, Alexandra, "Congress Targets Pay as Challenges to Climate Rule and More Advance in Q2.". *NACD Directorship* Spring 2024.

Lajoux, Alexandra. "New SEC Release Revives Complex Issue of Clawbacks," *NACD Online Article*, November 2021.

Lajoux, Alexandra. " Coping with Clawbacks: A Director's Guide for 2023." *NACD Online Article*, November 2022.

Lajoux, Alexandra. "Latest Delaware Decisions Reveal the Limits of the Business Judgment Rule." *NACD Online Article*, June 2024.

Lajoux, Alexandra. "Lawmakers Focus on Accountability, AI in Q1 2024.*" NACD Directorship* Winter 2024.

Lajoux, Alexandra. "Defining Municipal Identity - Beyond Boundaries." *Academia Letters*, 2022.

Lajoux, Alexandra. "A Voice of Reason: BlackRock's Newest Letter Can Help Boards Navigate Difficult Shoals," *NACD,* 2022.

Lajoux, Alexandra R. "Are Universal Proxies in the Cards for 2022?" *NACD*, August 2021.

Lajoux, Alexandra R. "SEC Approves New Nasdaq Rule on Board Diversity Disclosures."  *NACD*, August 2021.

Lajoux, Alexandra R. "SEC's New Reg S-K Is Good News for Investors and Directors Alike," *NACD*, August 2020.

Lajoux, Alexandra. "Will There Be More 'October Surprises' for Boardrooms?" *NACD,* October 2020.

Lajoux, Alexandra "Advance Notice Bylaws: A Brief History and Four Recommendations." *NACD*, January 2023.

Lajoux, Alexandra R. "How Will SEC's Newest Pay Disclosure Rule Shape Board Views of Executive and Company Performance?" *NACD*, August 2022.

Lajoux, Alexandra. "Understanding the Implications of the CARES Act." *NACD*, April 2020.

Lajoux, Alexandra R. "US federal proxy rules and executive compensation," *Financier Worldwide*, November 2010.

Lajoux, Alexandra R. "Risk oversight: of 'rogues', reporting systems, and reasonable doubt" (Panel Contributor).  *Financier Worldwide Magazine*, October 2011.

Lajoux, Alexandra R. "Roundtable Corporate governance" (Panel Member).  *Financier Worldwide Magazine*, March 2011.

Lajoux, Alexandra "Roundtable Corporate governance.*" Financier Worldwide Magazine*, March 2010.

Lajoux, Alexandra R. "Corporate governance in America 2010 – report from the National Archives of Washington, DC." *Financier Worldwide Magazine*. May 2010.

Lajoux, Alexandra, and Martin Sikora. "Finding Your Way around Washington." *The Mergers & Acquisitions Handbook,* McGraw-Hill, 1994.

Lajoux, Alexandra. "Foro Mundial sobre Gobierno Corporativo. Banco Internacional de Reconstrucción y Fomento. Banco Mundial" *World Bank*, 2003.

Lajoux, Alexandra. "Opportunity knocks for kids at risk." *Trustee : the journal for hospital governing boards*. 49. 26-7. (May 1996).

Lajoux, Alexandra. "All in a day's (school) work." *Trustee : the journal for hospital governing boards*. 49. 16-20. (April 1996).

Lajoux, Alexandra. "Teach your children wellness." *The Volunteer leader,* 37. 14-5. (February 1996).

Lajoux, Alexandra. "Things go better with COKE." T*rustee : the journal for hospital governing boards*. 48. 26-7. (July 1995).

Lajoux, Alexandra. "Not-so-random acts of kindness." *Trustee : the journal for hospital governing boards*. 48. 25. (April 1995).

Lajoux, Alexandra. "Coca-Cola helps value at-risk teens." *The Volunteer leader*. 36. 8-9. (February 1995).

Raber, Roger W., and Alexandra R. Lajoux. "Profiles of Corporate Governance in Leading Countries : United States." *The Handbook of International Corporate Governance : A Definitive Guide,* 2009.

Lajoux, Alexandra R. "Looking for a Board  Seat? Networks are the Way to Find and Be Found." *Bluesteps* [need date]

**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix D1

## Inventory Of Unfavorable Search Engine Analysis

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

*Sameer D. Somal*

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

**June 4th, 2025**



# Table of Contents

Table of Contents.................................................................................................................1

Keyword List.......................................................................................................................3

Yahoo Search Results..........................................................................................................4

Duckduckgo Search Results................................................................................................5

Google Search Results.........................................................................................................6

Google Images.....................................................................................................................7

Google News........................................................................................................................8

Kevin O'Leary Bitboy..........................................................................................................9

    Location: Ontario...................................................................................................9

    Location: New York..............................................................................................11

    Location: Chicago.................................................................................................13

Kevin O'Leary Bitboy Case...............................................................................................15

    Location: Ontario.................................................................................................15

    Location: Chicago.................................................................................................17

    Location: California..............................................................................................19

Kevin O'Leary Bitboy Lawsuit..........................................................................................21

    Location: Ontario.................................................................................................21

    Location: Florida..................................................................................................23

    Location: New York..............................................................................................25

    Location: California..............................................................................................27

Kevin O'Leary Boat Defamation Case...............................................................................29

    Location: Ontario.................................................................................................29

    Location: New York..............................................................................................30

    Location: Chicago.................................................................................................31

    Location: California..............................................................................................32

Kevin O'Leary Crypto Influencer Bitboy Case.................................................................33

    Location: Ontario.................................................................................................33

    Location: New York..............................................................................................35

    Location: Chicago.................................................................................................37

    Location: California..............................................................................................39

Kevin O'Leary Defamation.................................................................................................41

    Location: Ontario.................................................................................................41

    Location: Florida..................................................................................................43

    Location: New York..............................................................................................45

    Location: Chicago.................................................................................................47

    Location: California..............................................................................................49

Kevin O'Leary Defamation Case........................................................................................51

    Location: Ontario.................................................................................................51

    Location: Florida..................................................................................................52

    Location: New York..............................................................................................53

    Location: Chicago.................................................................................................54

    Location: California..............................................................................................55


Kevin O'Leary Lawsuit ............................................................................................................56
   Location: Ontario ..............................................................................................................56
   Location: California ...........................................................................................................57
Kevin O'Leary Linda O'Leary Defamation Case .....................................................................58
   Location: Ontario ..............................................................................................................58
   Location: Florida .............................................................................................................. 59
   Location: New York .......................................................................................................... 60
   Location: California ...........................................................................................................61
Kevin O'Leary Murder Defamation Case .................................................................................62
   Location: Florida ..............................................................................................................62
   Location: New York ..........................................................................................................63
Kevin O'Leary Murder Defamation Lawsuit ............................................................................64
   Location: Florida ..............................................................................................................64
   Location: California ...........................................................................................................65
Kevin O'Leary Murderer Lawsuit ........................................................................................... 66
   Location: Ontario ..............................................................................................................66
Kevin O'Leary Sues Crypto Influencer ................................................................................... 68
   Location: Ontario ..............................................................................................................68
   Location: Florida .............................................................................................................. 70
   Location: New York .......................................................................................................... 72
   Location: California ...........................................................................................................74
Kevin O'Leary Sues Crypto Influencer ................................................................................... 76
   Location: Ontario ..............................................................................................................76
   Location: Florida .............................................................................................................. 78
   Location: New York .......................................................................................................... 80
   Location: Chicago .............................................................................................................82
   Location: California ...........................................................................................................84
Shark Tank Kevin O'Leary Murder Defamation Lawsuit ........................................................ 86
   Location: Ontario ..............................................................................................................86
   Location: Florida ..............................................................................................................87
   Location: New York .......................................................................................................... 88
   Location: Chicago .............................................................................................................89
   Location: California ...........................................................................................................90

## Keyword List

- Kevin O'Leary Bitboy
- Kevin O'Leary Bitboy Case
- Kevin O'Leary Bitboy Lawsuit
- Kevin O'Leary Boat Defamation Case
- Kevin O'Leary Crypto Defamation Case
- Kevin O'Leary Crypto Influencer Bitboy Case
- Kevin O'Leary Defamation
- Kevin O'Leary Defamation Allegations
- Kevin O'Leary Defamation Case
- Kevin O'Leary Defamation Charges
- Kevin O'Leary Defamation Lawsuit
- Kevin O'Leary Lawsuit
- Kevin O'Leary Legal Battle with Bitboy
- Kevin O'Leary Libel Lawsuit
- Kevin O'Leary Linda O'Leary Defamation Case
- Kevin O'Leary Murder Accusation Lawsuit
- Kevin O'Leary Murder Defamation Case
- Kevin O'Leary Murder Defamation Lawsuit
- Kevin O'Leary Murder Lawsuit
- Kevin O'Leary Murderer Defamation
- Kevin O'Leary Murderer Lawsuit
- Kevin O'Leary News Defamation
- Kevin O'Leary Reputation Lawsuit
- Kevin O'Leary Shark Tank Defamation Case
- Kevin O'Leary Statement Against Bitboy
- Kevin O'Leary Sues Bitboy
- Kevin O'Leary Sues Crypto Influencer
- Kevin O'Leary YouTube Defamation Case
- Shark Tank Kevin O'Leary Defamation Lawsuit
- Shark Tank Kevin O'Leary Murder Defamation Lawsuit

**Blue Ocean**
GLOBAL TECHNOLOGY

## Yahoo Search Results





Screenshot taken on 6/1/25

# Duckduckgo Search Results



Screenshot taken on 6/1/25

**Blue Ocean**
GLOBAL TECHNOLOGY

## Google Search Results



Screenshot taken on 6/1/25

Blue Ocean
GLOBAL TECHNOLOGY™

# Google Images



Screenshot taken on 6/1/25

**Blue Ocean**
GLOBAL TECHNOLOGY

# Google News



Screenshot taken on 6/1/25



# Kevin O'Leary Bitboy

## Location: Ontario

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash




Screenshot taken on 6/1/25

**Position: 6**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.mollywhite.net/micro/entry/202503272352


Molly White
https://www.mollywhite.net › micro › entry

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark
Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



### BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false
claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry

### Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for
repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 7**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 10**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news    ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...    ⋮



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry    ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 7**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 10**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



# Kevin O'Leary Bitboy Case

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'**Leary a 'real-life murderer' · Shark Tank panelist Kevin **O'**Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 5**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...  ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin O'Leary is suing crypto influencer BitBoy for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...  ⋮

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25

**Position: 8**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago  ⋮

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/

Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 5**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-o
ver-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin O'Leary is suing crypto influencer BitBoy for defamation, alleging false
claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him
killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25

**Position: 8**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam
Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

Molly White
https://www.mollywhite.net › micro › entry

### Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/11216522997139798/



Facebook · Daily Business Review
1 month ago

### Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 5**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-o
ver-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin O'Leary is suing crypto influencer BitBoy for defamation, alleging false
claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago                                              ⋮

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam
Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25

**Position: 8**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ... ⋮

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him
killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



# Kevin O'Leary Bitboy Lawsuit

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling **Kevin O'Leary** a 'real-life murderer' · Shark Tank panelist **Kevin O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 6**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...        

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 6**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 6**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 6**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

Molly White: "BitBoy also suggested that O'L..."

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



# Kevin O'Leary Boat Defamation Case

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 2**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash





Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮

BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin O'Leary is suing crypto influencer BitBoy for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 2**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer' · Shark Tank panelist Kevin O'Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry ⋮

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 2**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash


Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352


Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news   ⋮

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 2**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...   ⋮



### BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry   ⋮

### Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



# Kevin O'Leary Crypto Influencer Bitboy Case

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25



**Position: 6**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



YouTube · Discover Crypto
1.9L+ views · 2 years ago

Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/

 Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 6**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news ⋮

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/

 Facebook · Daily Business Review
1 month ago ⋮

### Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮

### BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 6**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs





YouTube · Discover Crypto
1.9L+ views · 2 years ago

Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)



Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam
Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago ⋮

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25



**Position: 6**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs



Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)

 Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25



# Kevin O'Leary Defamation

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'**Leary a 'real-life murderer' · Shark Tank panelist Kevin **O'**Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'**Leary is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 5**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news    ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...    ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary

 Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...    ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a ' ...**

**BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer'. From dlnews.com. Things just got worse for **BitBoy** in his saga of ...



Screenshot taken on 6/1/25



**Position: 5**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

Molly White
https://www.mollywhite.net › micro › entry ⋮

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

**BitBoy sued for defamation for calling Kevin O'Leary a ' ...**

**BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer'. From dlnews.com. Things just got worse for **BitBoy** in his saga of ...

Screenshot taken on 6/1/25



**Position: 5**

**Link:** <u>https://www.mollywhite.net/micro/entry/202503272352</u>



Molly White
https://www.mollywhite.net › micro › entry ⋮

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news  ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...  ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry  ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 5**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary




Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... 

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



**Position: 5**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary

 

Screenshot taken on 6/1/25



# Kevin O'Leary Defamation Case

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a... ⋮     

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25