

## Location: California

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



# Kevin O'Leary Lawsuit

## Location: Ontario

**Position: 4**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25



## Location: California

**Position: 4**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25



# Kevin O'Leary Linda O'Leary Defamation Case

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:** https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



### BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

### Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news    ⋮

BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 6**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...    ⋮



BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 7**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry    ⋮

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



# Kevin O'Leary Murder Defamation Case

## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling **Kevin O'Leary** a 'real-life murderer' · Shark Tank panelist **Kevin O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news   ⋮

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry   ⋮

### Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989

Hachyderm.io
https://hachyderm.io › ...   ⋮

### Molly White: "BitBoy also suggested that O'L..."

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



# Kevin O'Leary Murder Defamation Lawsuit

## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ... ⋮

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'**Leary a 'real-life murderer' · Shark
Tank panelist Kevin **O'**Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for
repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 5**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him
killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



# Kevin O'Leary Murderer Lawsuit

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news   ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry   ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Position: 6**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary

 Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...   ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a ' ...**



**BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.youtube.com/watch?v=xSH1Ku0FRAs





YouTube · Discover Crypto
1.9L+ views · 2 years ago

**Kevin O'Leary EXPOSED (Murder, Fraud, Bribes, & CEX)**

Today, I'm exposing Kevin O'Leary for who he really is; a supporter of Sam Bankman-Fried. There's a lot about him that people don't know.

Screenshot taken on 6/1/25

**Position: 9**

**Link:** https://hachyderm.io/@molly0xfff/114237950123607989



Hachyderm.io
https://hachyderm.io › ...

**Molly White: "BitBoy also suggested that O'L..."**

Molly White @molly0xfff@hachyderm.io. BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he ...

Screenshot taken on 6/1/25



# Kevin O'Leary Sues Crypto Influencer

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 5**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash


Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/


Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary

 

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash


Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/


Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary




Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

**BitBoy sued for defamation for calling Kevin O'Leary a ' ...**

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news      ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash



Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...      ⋮



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago                                            ⋮

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...



Screenshot taken on 6/1/25



# Kevin O'Leary Sues Crypto Influencer

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash




Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 5**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary

 

Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



**Location: Florida**

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news    ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...    ⋮

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...



Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/

 Facebook · Daily Business Review
1 month ago    ⋮

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary




Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...
**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news    ⋮

### BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash

 Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...    ⋮     

### BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/

 Facebook · Daily Business Review
1 month ago    ⋮

### Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary





Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news   ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**
https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash


Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...   ⋮           

**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin **O'Leary** is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**
https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/


Facebook · Daily Business Review
1 month ago                                                      ⋮

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 6**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-... ⋮

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...



Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**

https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/


dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer' · Shark Tank panelist Kevin O'Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 3**

**Link:**

https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash


Decrypt
https://decrypt.co › news-explorer › title=bitboy-faces-a...



**BitBoy Faces a Defamation Lawsuit From Kevin O'Leary ...**

Kevin O'Leary is suing crypto influencer **BitBoy** for defamation, alleging false claims about a 2019 boat crash. Armstrong's public controversies have led to ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:**

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/


Facebook · Daily Business Review
1 month ago

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Gary Cardone, the prominent crypto investor, must testify in the sanctions hearing. The underlying case stems from a settlement with one of ...

Screenshot taken on 6/1/25



**Position: 7**

**Link:** https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary





Crypto Craft
https://www.cryptocraft.com › news › 1334915-bitboy-...

BitBoy sued for defamation for calling Kevin O'Leary a ' ...

**BitBoy** sued for defamation for calling Kevin O'Leary a 'real-life murderer'. From dlnews.com. Things just got worse for BitBoy in his saga of ...

Screenshot taken on 6/1/25



# Shark Tank Kevin O'Leary Murder Defamation Lawsuit

## Location: Ontario

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Florida

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

 dlnews.com
https://www.dlnews.com › People & culture news   ⋮

BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352

 Molly White
https://www.mollywhite.net › micro › entry   ⋮

Quote from man sued: "What are you gonna do, sue me?"

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: New York

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: Chicago

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'Leary** a 'real-life murderer' · Shark Tank panelist Kevin **O'Leary** sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25



## Location: California

**Position: 1**

**Link:**
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/



dlnews.com
https://www.dlnews.com › People & culture news ⋮

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life ...**

28 Mar 2025 — **BitBoy** sued for defamation for calling Kevin **O'**Leary a 'real-life murderer' · Shark Tank panelist Kevin **O'**Leary sues influencer. · The case is ...

Screenshot taken on 6/1/25

**Position: 4**

**Link:** https://www.mollywhite.net/micro/entry/202503272352



Molly White
https://www.mollywhite.net › micro › entry ⋮

**Quote from man sued: "What are you gonna do, sue me?"**

27 Mar 2025 — Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

Screenshot taken on 6/1/25

**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

# Appendix E

## Inventory Of Unfavorable Links & Social Media Analysis

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

**Prepared By:**

*Sameer S. Somal*

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

**June 4th, 2025**

# Table of Contents

Table of Contents.................................................................................................................... 1

Examples of Unfavourable Links and Media.............................................................................2

    Articles.................................................................................................................................3

Tool Description...................................................................................................................... 8

Domain Overview.................................................................................................................... 9

Examples of Unfavourable Content - Domain Ratings............................................................. 11

Examples of Unfavourable Content - Backlinks and Referring Domains............................... 12

Traffic Analysis of Unfavourable Links................................................................................... 13

Examples of Unfavourable Social Media Content.................................................................. 14

    X.........................................................................................................................................14

        X Metrics..................................................................................................................... 41

        X Engagements............................................................................................................ 42

    Youtube.............................................................................................................................. 44

    Facebook............................................................................................................................45

    LinkedIn.............................................................................................................................47

TRANSPARENT    INNOVATIVE    COLLABORATIVE

Blue Ocean
GLOBAL TECHNOLOGY™

# Examples of Unfavourable Links and Media

| Links | Date | Title |
|---|---|---|
| https://hachyderm.io/@molly0xfff/114237950123607989 | Mar 28, 2025 | Molly White: "BitBoy also suggested that O'Leary was trying to …" - Hachyderm.io |
| https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/ | Mar 28, 2025 | BitBoy sued for defamation for calling Kevin O' Leary a 'real-life murderer' |
| https://decrypt.co/news-explorer?pinned=974665&title=bitboy-faces-a-defamation-lawsuit-from-kevin-oleary-over-false-claims-about-boat-crash | Mar 28, 2025 | BitBoy sued for defamation for calling Kevin O' Leary a 'real-life murderer' |
| http://www.law.com/dailybusinessreview/2025/03/27/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/ | Mar 27, 2025 | Shark Tank Kevin O' Leary Sues Crypto Influencer BitBoy |
| https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary | NA | BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer' |
| https://www.mollywhite.net/micro/entry/202503272352 | NA | BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer' |

2

TRANSPARENT        INNOVATIVE        COLLABORATIVE

# Articles

Title: Molly White: "BitBoy also suggested that O'Leary was trying to …" - Hachyderm.io

Article Link: https://hachyderm.io/@molly0xfff/114237950123607989

Published Date: Mar 28, 2025



3



Title: Shark Tank Kevin O' Leary Sues Crypto Influencer BitBoy

Article Link:
http://www.law.com/dailybusinessreview/2025/03/27/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/

Published Date: Mar 27, 2025





NEWS

**Shark Tank Kevin O'Leary Sues Crypto Influencer BitBoy**

Shark Tank Kevin O'Leary sued a crypto influencer, Benjamin "BitBoy" Armstrong, for allegedly publishing defamatory falsehoods intended to destroy O'Leary's reputation.

March 27, 2025 at 08:26 AM

⏱ 3 minute read

Litigation

By Tommaso Baronio

Investor and star of "Shark Tank" Kevin O'Leary, testifies before the Senate Banking Committee about cryptocurrency and the collapse of FTX, at the Capitol in Washington, Wednesday, Dec.

4

Title: BitBoy sued for defamation for calling Kevin O' Leary a 'real-life murderer'

Article Link:
https://www.dlnews.com/articles/people-culture/kevin-oleary-accuses-bitboy-defamation-calling-him-murderer/

Published Date: Mar 28, 2025



Kevin O'Leary is suing Ben 'Bitboy' Armstrong for defamation. Illustration: Gwen P. Source: Shutterstock, @TheBitBoyX YouTube Channel

**BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer'**

Home » People & culture » BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer'

5

Title: BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer'

Article Link:

https://www.cryptocraft.com/news/1334915-bitboy-sued-for-defamation-for-calling-kevin-oleary



6

**Blue Ocean**
GLOBAL TECHNOLOGY™

Title: BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer'

Article Link: https://www.mollywhite.net/micro/entry/202503272352

### Quote from man sued: "What are you gonna do, sue me?"

Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people.

> 27.    On March 19, 2025, Armstrong unleashed another tweet accusing O'Leary of committing "actual crimes": "Doesn't everybody think it's weird that I've been publicly calling … @kevinolearytv [a] murderer[] and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."

(O'Leary and his wife were indeed involved in a boating collision that killed two people in 2019; O'Leary states in the lawsuit that it was his wife driving the boat, and she was acquitted of any charges.)

BitBoy also suggested that O'Leary was trying to have him killed, and claimed he'd swatted him. Shortly after, he posted O'Leary's cell phone number and encouraged his followers to "call a real life murderer"

7

TRANSPARENT    INNOVATIVE    COLLABORATIVE

# Tool Description

- **Ahrefs**: Has a wide range of SEO metrics, including:
  - Domain Rating (DR): Ahrefs' proprietary metric that measures the strength of a website's backlink profile. DR is calculated on a scale of 1 to 100, with 100 being the strongest.
  - URL Rating (UR): Ahrefs' proprietary metric that measures the strength of a single page's backlink profile. UR is calculated on a scale of 1 to 100, with 100 being the strongest.
  - Backlinks: The number of backlinks pointing to a website or page.
  - Referring domains: The number of unique websites that link to a website or page.
  - Keyword Difficulty (KD): A metric that measures how difficult it is to rank for a given keyword in search engine results pages (SERPs). KD is calculated on a scale of 0 to 100, with 100 being the most difficult.
  - Search volume: The average number of monthly searches for a given keyword.
  - Organic traffic: The number of visitors to a website or page who arrived there through organic search results.

TRANSPARENT    INNOVATIVE    COLLABORATIVE

# Domain Overview

hachyderm.io/

Ahrefs:



law.com/

Ahrefs:



dlnews.com/

Ahrefs:



cryptocraft.com/

Ahrefs:



9

TRANSPARENT    INNOVATIVE    COLLABORATIVE

mollywhite.net/

Ahrefs:



TRANSPARENT          INNOVATIVE          COLLABORATIVE

# Examples of Unfavourable Content - Domain Ratings

| Link | Domain Rating |
|---|---|
| hachyderm.io/ | 82 |
| law.com | 86 |
| dlnews.com/ | 70 |
| cryptocraft.com/ | 40 |
| mollywhite.net/ | 63 |

11

# Examples of Unfavourable Content - Backlinks and Referring Domains

| Links | Backlinks | Referring Domains |
|---|---|---|
| hachyderm.io/ | 2,047,011 | 9,718 |
| law.com | 5,387,706 | 41,994 |
| dlnews.com/ | 395,059 | 5,311 |
| cryptocraft.com/ | 1,364,627 | 580 |
| mollywhite.net/ | 52,791 | 2,310 |

TRANSPARENT    INNOVATIVE    COLLABORATIVE

## Traffic Analysis of Unfavourable Links

| Target | Visits | Unique Visitors | Pages / Visits | Avg. Visit Duration | Bounce Rate |
|---|---|---|---|---|---|
| youtube.com | 42,824,140,358 | 2,845,266,217 | 8.38 | 23:51 | 33.09% |
| facebook.com | 9,144,869,165 | 1,511,830,926 | 7.47 | 16:18 | 48.30% |
| x.com | 3,389,562,292 | 716,757,369 | 8.64 | 16:56 | 47.22% |
| linkedin.com | 1,357,393,123 | 373,703,722 | 6.49 | 11:40 | 40.30% |
| decrypt.co | 977,187 | 712,483 | 2.03 | 11:38 | 80.06% |
| law.com | 848,235 | 611,794 | 2.22 | 6:40 | 67.53% |
| cryptocraft.com | 215,002 | 72,895 | 1.73 | 4:54 | 71.05% |
| dlnews.com | 205,034 | 162,530 | 1.16 | 8:05 | 92.31% |
| hachyderm.io | 76,971 | 34,676 | 1.37 | 11:21 | 75.60% |
| mollywhite.net | 2,902 | 1,961 | 2.49 | 4:48 | 63.30% |
| **Total** | 56,718,290,269 | 5,449,154,573 | 41.98 | 20:11 | 61.88% |

13

TRANSPARENT    INNOVATIVE    COLLABORATIVE

# Examples of Unfavourable Social Media Content

X

Link: https://x.com/BenArmstrongsX/status/1901591210688418012

Reply: 22                    Like:  154              Views: 31k

Repost: 18                        Bookmark: 6



Link: https://x.com/BenArmstrongsX/status/1902363777351229608

Reply: 44              Like: 101          Views: 28.5k

Repost: 122           Bookmark: 5



The BitBoy ✔
@BenArmstrongsX

Let's ask @ABCSharkTank why they put murderers on TV?

@kevinolearytv and his wife, Linda O'Leary, murdered a couple in Toronto & covered it up.

Gary Potash
Susanne Brito

people.com/crime/shark-ta...

Shark Tank Star Kevin O'Leary's Wife Acquitted in 2019 Boat Crash that Killed 2

From people.com

Last edited 4:17 PM · Mar 19, 2025 · **28.5K** Views

💬 44          ⇄ 122          ♡ 101          🔖 5

15

Link: https://x.com/BenArmstrongsX/status/1902397230151008448

Reply: 4                    Like: 30              Views: 13.8k

Repost: 5                    Bookmark:



16

Link: https://x.com/BenArmstrongsX/status/1902397680938110986

Reply: 19                    Like:  97              Views: 15k

Repost: 7                    Bookmark: 2



17

Link: https://x.com/BenArmstrongsX/status/1902403639961878854

Reply: 1                    Like:  2          Views: 741

Repost: 5                   Bookmark:



TRANSPARENT        INNOVATIVE        COLLABORATIVE

Link: https://x.com/BenArmstrongsX/status/1902745039823896647

Reply: 26                    Like:  58              Views: 9348

Repost: 4                    Bookmark: 1



19

Link: https://x.com/BenArmstrongsX/status/1902758962467860745

Reply: 13                Like:  51            Views: 11.8k

Repost: 1                Bookmark: 4



20

Link: https://x.com/BenArmstrongsX/status/1902878355461927029

Reply: 7                    Like: 19              Views: 8264

Repost: 2              Bookmark: 3



21

TRANSPARENT   INNOVATIVE   COLLABORATIVE

Link: https://x.com/BenArmstrongsX/status/1903068035574886482

Reply: 4        Like: 30        Views: 6919

Repost: 3        Bookmark: 1



22

Link:  https://x.com/BenArmstrongsX/status/1903069439471304876

Reply:  20                 Like:  102            Views: 16.4k

Repost:  14               Bookmark:



23

Link:  https://x.com/BenArmstrongsX/status/1903803190161678505

Reply: 4                        Like: 30              Views: 8451

Repost:  2                  Bookmark:



**The BitBoy** ✓
@BenArmstrongsX

All this, was it a good idea @cryptomanran?

Huh @kevinolearytv?

More fun contests coming soon.

Giving away a full eth on a contest to get your new nickname out there Ran.

By the time I'm done with you, people will actually feel comfortable enough to call you the fag irl

3:37 PM · Mar 23, 2025 · **8,451** Views

💬 4          ⟲ 2          ♡ 30          🔖          ⬆

24

Link: https://x.com/BenArmstrongsX/status/1904238718954684701

Reply: 16                Like: 47                Views: 12.3k

Repost: 3                Bookmark: 1



**The BitBoy** ✓
@BenArmstrongsX

Just so we are clear on @kevinolearytv's situation.

His wife was driving the boat.
His wife was drunk.
His wife killed a couple by running into them.

Those are all FACTS in the case.

She was drunk. She was driving. But somehow... she wasn't drunk driving the boat. Amazing!

8:27 PM · Mar 24, 2025 · **12.3K** Views

💬 16          ⟲ 3          ♡ 47          🔖 1          ⬆

TRANSPARENT          INNOVATIVE          COLLABORATIVE

Link: https://x.com/BenArmstrongX/status/1904238806104211805

Reply: 2                   Like: 15              Views: 8,050

Repost:                    Bookmark:



26

TRANSPARENT        INNOVATIVE        COLLABORATIVE

Link: https://x.com/BenArmstrongsX/status/1904240516096483395

Reply: 1                     Like:  1              Views: 658

Repost:                     Bookmark:



27

Link: https://x.com/molly0xFFF/status/1905463033578561913

Reply: 2                Like: 31        Views: 2,321

Repost: 3                Bookmark:



9:02 AM · Mar 28, 2025 · **2,324** Views

28



Link: https://x.com/JWill10317/status/1901606543855845620

Reply: 1          Like: 7          Views: 16.9k

Repost: 3          Bookmark:

**Jen Willi** ✔
@JWill10317

Libel. Defamation. Slander.

Something tells me Kevin O'Leary and Ran can lawyer outspend.

Perhaps, Ben believes all press is good press.



> 🟠 **The BitBoy** ✔ @BenArmstrongsX · Mar 17
> Calling my shots a few days early
>
> Hi @cryptomanran
>
> Hi @kevinolearytv ...

5:38 PM · Mar 17, 2025 · **16.9K** Views

💬 1          🔁 3          ♡ 7          🔖          ⬆

29

TRANSPARENT          INNOVATIVE          COLLABORATIVE




Link: https://x.com/molly0xFFF/status/1905461106010706314

Reply: 14          Like: 315          Views: 22.5k

Repost: 39          Bookmark: 22

← **Post**

**Molly White** ✓
@molly0xFFF

Quote from man sued: "What are you gonna do, sue me?"

Kevin O'Leary has sued crypto personality Ben Armstrong (aka "BitBoy Crypto") for repeatedly claiming O'Leary murdered two people

> 27.    On March 19, 2025, Armstrong unleashed another tweet accusing O'Leary of committing "actual crimes": "Doesn't everybody think it's weird that I've been publicly calling ... @kevinolearytv [a] murderer[] and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it."

`ALT`

8:55 AM · Mar 28, 2025 · **22.5K** Views

💬 14          🔁 39          🤍 315          🔖 20          ⬆️

30

TRANSPARENT          INNOVATIVE          COLLABORATIVE

Link: https://x.com/molly0xFFF/status/1905461107998732355

Reply: 2          Like: 42          Views: 3,162

Repost: 4          Bookmark: 1

**Molly White** ✅
@molly0xFFF

O'Leary and his wife were indeed involved in a boating collision that killed two people in 2019; O'Leary states in the lawsuit that it was his wife driving the boat, and she was acquitted of any charges

O'Leary v Bitboy complaint:



Defendant.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Kevin O'Leary ("O'Leary") hereby sues the Defendant, Benjamin Armstrong ("Armstrong" a/k/a Bitboy Crypto) and alleges as follows:

**INTRODUCTION AND NATURE OF THE CASE**

1. Plaintiff Kevin O'Leary, an internationally renowned entrepreneur, investor, and television commentator, files this action against Defendant Ben Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods intended to destroy O'Leary's reputation. Adding to the suffering of those affected by a tragic boating accident that has already been adjudicated in court, Armstrong, a cryptocurrency influencer whose media empire

Complaint – #1 in O'Leary v. Armstrong (S.D. Fla., 1:25-cv-21417) – CourtListener.com

From courtlistener.com

8:55 AM · Mar 28, 2025 · **3,165** Views

💬 2          🔁 4          ♡ 42          🔖 1          ⬆

TRANSPARENT          INNOVATIVE          COLLABORATIVE

Link: https://x.com/yourfriendSOMMI/status/1901705130568974490

Reply: 27          Like: 145          Views: 10.3k

Repost: 4          Bookmark: 2



32



Link: https://x.com/yourfriendSOMMI/status/1901728503026114679

Reply:               Like:  17            Views:  1,726

Repost:              Bookmark:



yourfriendSOMMI ❤️💛💚💙✓🏴
@yourfriendSOMMI

Backstory: 2 years ago, BitBoy declared CryptoBanter to be running a
Secret Pedophile Ring.

Then it just went away.

> **The BitBoy** ✓
> @BenArmstrongsX
>
> Calling my shots a few days early
>
> Hi @cryptomanran
>
> Hi @kevinolearytv
>
> The reality of what you have done begins getting
> unveiled.
>
> Hey Kev - I write in print that you and your wife are
> guilty of murder.
>
> Let the truth ring. It will.
>
> 10:07 pm · 17/3/2025 · **21K** Views
> 💬 20      ↺ 14      ❤️ 116      🔖 5      ↥

1:43 AM · Mar 18, 2025 · **1,726** Views

💬        ↺        ❤️ 17        🔖        ↥

33

TRANSPARENT          INNOVATIVE          COLLABORATIVE

Link: https://x.com/cryptonator1337/status/1905603779044536372

Reply: 1          Like: 1          Views: 814

Repost:                    Bookmark:



**CR1337** ✓
@cryptonator1337

BitBoy sued for defamation for calling Kevin O'Leary:

'Armstrong posted O'Leary's personal phone number with a message inviting followers to "call a real-life murderer."

Bye, bye, Bitboy, bye bye!

pacermonitor.com/public/case/57...

6:21 PM · Mar 28, 2025 · **814** Views

♡ 1          ⟲          ♡ 1          🔖          ⬆

34

Link: https://x.com/i/broadcasts/1gqxvjDkqrOxB

Views:  100



35



Link: https://x.com/bitcoinvista/status/1905662584054796594

Reply: 2                  Like:  1              Views:  146



TRANSPARENT          INNOVATIVE          COLLABORATIVE



Link: https://x.com/RobertFreundLaw/status/1905272898509815919

Reply: 3                     Like: 12                 Views: 1391

Repost:                      Bookmark:



TRANSPARENT      INNOVATIVE      COLLABORATIVE

Link: https://x.com/ProtosLive/status/1905611834742505624

Views:  68



38

Link: https://x.com/CryptoCraft/status/1905700677705408943

Views: 146



TRANSPARENT    INNOVATIVE    COLLABORATIVE

Link: https://x.com/CryptoCraft/status/1905700677705408943

Like: 1                 Views: 43



**Inside Solana**
@InsideSolana

BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer' – Inside Solana



BitBoy sued for defamation for calling Kevin O'Leary a 'real-life murderer' – Inside Sola…

From insidesolana.com

8:30 PM · Mar 28, 2025 · 43 Views

40

TRANSPARENT          INNOVATIVE          COLLABORATIVE

## X Metrics

- **Reply:** A direct response to another post. Replies appear as part of a threaded conversation and are visible to the original poster and others, based on privacy settings.
- **Repost:** Sharing another account's post with your followers by clicking the Repost button. Reposts retain the original attribution and are commonly used to amplify content.
- **Like:** Clicking the heart icon to express appreciation for a post. This action notifies the post's author and can influence content recommendations.
- **Bookmark:** Saves a post privately for later. Accessed via the share icon. Bookmarks can be organized into folders by Premium subscribers. They are not visible to others.
- **Views:** Indicates how many times a post has been seen. Reflects the reach of a post.

41

TRANSPARENT    INNOVATIVE    COLLABORATIVE



## X Engagements

| Links | Reply | Repost | Like | Bookmark | Views |
|---|---|---|---|---|---|
| https://x.com/BenArmstrongsX/status/1904238718954684701 | 16 | 3 | 47 | 1 | 12,300 |
| https://x.com/BenArmstrongsX/status/1904238806104211805 | 2 | 0 | 15 | 0 | 8,050 |
| https://x.com/BenArmstrongsX/status/1904240516096483395 | 1 | 0 | 1 | 0 | 658 |
| https://x.com/BenArmstrongsX/status/1901591210688418012 | 22 | 18 | 154 | 6 | 31,000 |
| https://x.com/BenArmstrongsX/status/1902363777351229608 | 44 | 122 | 101 | 5 | 28,500 |
| https://x.com/BenArmstrongsX/status/1902397230151008448 | 4 | 5 | 30 | 0 | 13,800 |
| https://x.com/BenArmstrongsX/status/1902397680938110986 | 19 | 7 | 97 | 2 | 15,000 |
| https://x.com/BenArmstrongsX/status/1902403639961878854 | 1 | 5 | 2 | 0 | 741 |
| https://x.com/BenArmstrongsX/status/1902745039823896647 | 26 | 4 | 58 | 1 | 9,348 |
| https://x.com/BenArmstrongsX/status/1902758962467860745 | 13 | 1 | 51 | 4 | 11,800 |
| https://x.com/BenArmstrongsX/status/1902878355461927029 | 7 | 2 | 19 | 3 | 8,264 |
| https://x.com/BenArmstrongsX/status/1903068035574886482 | 4 | 3 | 30 | 1 | 6,919 |
| https://x.com/BenArmstrongsX/status/1903069439471304876 | 20 | 14 | 102 | 0 | 16,400 |
| https://x.com/BenArmstrongsX/status/1903803190161678505 | 4 | 2 | 30 | 0 | 8,451 |
| https://x.com/molly0xFFF/status/1905463033578561913 | 2 | 3 | 31 | 0 | 2,321 |
| https://x.com/JWill10317/status/1901606543855845620 | 1 | 3 | 7 | 0 | 16.9k |
| https://x.com/molly0xFFF/status/1905461106010706314 | 14 | 39 | 315 | 22 | 22.5k |
| https://x.com/molly0xFFF/status/1905461107998732355 | 2 | 4 | 42 | 1 | 3,162 |
| https://x.com/yourfriendSOMMI/status/1901705130568974490 | 27 | 4 | 145 | 2 | 10.3k |
| https://x.com/yourfriendSOMMI/status/1901728503026114679 | 0 | 0 | 17 | 0 | 1,725 |

42

TRANSPARENT    INNOVATIVE    COLLABORATIVE

| | | | | | |
|---|---|---|---|---|---|
| https://x.com/cryptonator1337/status/1905603779044536372 | 1 | 0 | 1 | 0 | 811 |
| https://x.com/i/broadcasts/1gqxvjDkqrOxB | 0 | 0 | 0 | 0 | 99 |
| https://x.com/bitcoinvista/status/1905662584054796594 | 2 | 0 | 1 | 0 | 141 |
| https://x.com/RobertFreundLaw/status/1905272898509815919 | 3 | 0 | 12 | 0 | 1,388 |
| https://x.com/ProtosLive/status/1905611834742505624 | 0 | 0 | 0 | 0 | 67 |
| https://x.com/CryptoCraft/status/1905700677705408943 | 0 | 0 | 0 | 0 | 144 |
| https://x.com/InsideSolana/status/1905636040104108410 | 0 | 0 | 0 | 0 | 42 |
| **Total** | **235** | **239** | **1308** | **48** | **181,131** |

43

TRANSPARENT   INNOVATIVE   COLLABORATIVE

# Youtube

Link: https://www.youtube.com/watch?v=CCDfmf1nYhI
Views: 28
Comments: 1
Channel Subscribers: 241



Link: https://www.youtube.com/watch?v=bEyA1dloO9U
Views: 541
Comments: 1



44

# Facebook

Profile: https://www.facebook.com/DailyBusinessReview
Followers: 5.8K
Likes: 4.9K



Link:

https://www.facebook.com/DailyBusinessReview/posts/shark-tank-kevin-oleary-sues-crypto-influencer-bitboy/1216522997139798/



45

Profile: https://www.facebook.com/cryptocraftdotcom
Followers: 318
Likes: 238



Link:
https://www.facebook.com/cryptocraftdotcom/posts/interesting-story-bitboy-sued-for-defamation-for-calling-kevin-oleary-a-real-lif/1165110248646556/



46

# LinkedIn



Connections: 500
Followers: 1,427

Link:
https://www.linkedin.com/posts/tommasobaronio_shark-tank-kevin-oleary-sues-crypto-influe
ncer-activity-7311024649365082113-Xj9E
Reactions: 10



47

TRANSPARENT    INNOVATIVE    COLLABORATIVE





Connections: 500
Followers: 4,796

Link:
https://www.linkedin.com/posts/ben-armstrong-7467ab30_kevin-oleary-and-his-wife-murdered-a-couple-activity-7308613262793736193-id1d/

Comments: 2



48



Connections: 500
Followers: 3,415

Link:
https://www.linkedin.com/posts/jeffrey-neiman-50a98727_shark-tank-kevin-oleary-sues-crypto-influencer-activity-7311441513555652608-9gxJ/
Reactions: 59
Comments: 3
Repost: 1



When they come for your client's reputation, sometimes you have no choice but to fight back with a lawsuit.

**Brandon Floch**



49

**LinkedIn Estimation For 1st Post**

Key Metrics Given
Follower Count: 1,427
Connections: 500+
Post Reactions: 10

**LinkedIn's Algorithm Basics**

1. **Initial Reach:**
    a. LinkedIn typically shows your post to 10–25% of your followers/connections initially.
    b. Reference: LinkedIn's help docs and marketing studies.

2. **Engagement-Driven Amplification:**
    a. If early engagement (likes/comments) is strong, LinkedIn expands reach to 2–5x the initial audience.
    b. Reference: Hootsuite's LinkedIn benchmarks.

**Step-by-Step Estimation**

1. Initial Impressions (First Few Hours)
- Conservative Estimate: 10% of connections + followers = (1,427 + 500) × 10% = 190 impressions.
- Optimistic Estimate: 25% = (1,927) × 25% = 480 impressions.

2. Engagement Amplification

- With 10 reactions, the post likely performed average-to-good (not viral, but not ignored).
- LinkedIn's algorithm may 2–3x the reach if engagement is decent.
    - Low Amplification (2x): 190 × 2 = 380 impressions.
    - High Amplification (3x): 480 × 3 = 1,440 impressions.

3. Organic Spread (Shares, Comments, Profile Visits)

- If the post triggered profile visits or follows, LinkedIn may further boost it.
- Estimated Add-On: +10–20% of amplified reach.
    - Example: 300 × 1.2 = 456 impressions.

TRANSPARENT   INNOVATIVE   COLLABORATIVE

**Final Estimate Range**

Based on the above:

- Low End: ~ 400–500 impressions (if engagement was slow).
- Mid-Range: ~700–1,000 impressions (typical for 10 reactions with 1K+ followers).
- High End: ~1,200–1,700 impressions (if the post resonated strongly).

*Most Likely: 500-1200 impressions.*

**Cross-Checking with Industry Benchmarks**

- Average LinkedIn Engagement Rate: ~2–6% (reactions/impressions).
  - Source: RivalIQ's 2024 report.

- Calculating Backwards:
  - If 10 reactions = 2% engagement → 10 / 0.02 = 500 impressions.
  - If 10 reactions = 1% engagement → 10 / 0.001 = 1000 impressions.

*This aligns with our 500–1200 estimate.*

**Estimation for the 3 LinkedIn Posts:**

| Post | Followers | Connection | Engagement | Initial Reach (10–25%) | Amplification | Final Impression Range | Notes |
|------|-----------|------------|------------|------------------------|---------------|------------------------|-------|
| 1 | 1,427 | 500+ | 10 reactions | 193–482 | 386–1,446 | 500–1,200 | Reactions-only → moderate boost. |
| 2 | 4,796 | 500+ | 2 comments | 530–1,324 | 1,060–6,620 | 1,500–3,000 | Comments and higher follower count drive higher amplification. |
| 3 | 3,415 | 500+ | 59 reactions, 3 comments, 1 repost | 392–980 | 1,960–4,900 | 3,000–7,000+ | Repost = massive algorithmic priority. |

**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

www.blueoceanglobaltech.com

# Appendix F

## Legal Cases

Kevin O'Leary

*Plaintiff,*

v.

## Benjamin Armstrong

*Defendant.*

Prepared By:

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**

June 4th, 2025

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 92 of 271



# Shaktman v. State

**553 So. 2d 148 (1989)**

Bernard SHAKTMAN, et al., Petitioners, v. STATE of Florida, Respondent.

No. 72272.

**Supreme Court of Florida.**

October 12, 1989.

Rehearing Denied December 28, 1989.

*149 Mel Black, Alan Karten and Martin Saxon, Miami, Alan E. Weinstein, Miami Beach, Harvey N. Shenberg, Miami, and Nathaniel Barone, Jr., Coral Gables, for petitioners.

Robert A. Butterworth, Atty. Gen., and Michele L. Crawford, Asst. Atty. Gen., Miami, and Janet Reno, State Atty., and Joel D. Rosenblatt, Asst. State Atty., Miami, for respondent.

BARKETT, Justice.

We have for review Shaktman v. State, 529 So. 2d 711, 719 (Fla. 3d DCA 1988), in which the district court certified the following two questions to be of great public importance:[1]

(1) Whether article I, section 23, of the Florida Constitution[[2]] is implicated when a law enforcement agency installs a pen register device[[3]] on the telephone of an individual? (2) If the answer to (1) is yes, then is the compelling state interest test satisfied if the law enforcement agency involved in the installation has founded suspicion and meets the criteria established by sections 119.011(3)(a), (b), (c) and 119.011(4)[, Florida Statutes (1983)]?

We approve the decision of the district court and, in the context of this case, answer both

questions in the affirmative.

Petitioners were charged by information on November 13, 1984, with violation of the Racketeer Influenced and Corrupt Organization statute,[4] conspiracy to violate that statute, bookmaking,[5] and conspiracy to commit bookmaking. The Miami Beach Police Department received information from an undisclosed person that petitioner *150 Shaktman, a probationer from a prior bookmaking conviction,[6] was again engaged in similar criminal activity. An investigation was conducted to determine whether Shaktman was involved in illegal gambling. During the physical surveillance of Shaktman on October 12, 1983, investigators observed him at a Miami Beach cafe conversing with petitioner Mart, who was known to police for his gambling and bookmaking activities, and with Norman Rothman, who was known to police to have a lengthy felony record. Shaktman was overheard discussing illegal gambling activites. Physical surveillance was thereafter extended to petitioner Mart.

On November 28, 1983, the circuit court approved the state's motion for a lease line for pen register operation on three instruments located in petitioner Mart's Miami Beach apartment. Pen register activity was provided from December 6, 1983, until January 17, 1984, when the state received court approval of its application to intercept wire and oral communication. Ultimately, the information obtained from that intercept, together with the information obtained from a concurrent investigation by the Metro-Dade Police Department, led to the filing of formal charges.

The circuit court denied petitioners' consolidated motions to suppress evidence and to dismiss the information. The district court affirmed the circuit court and concluded that although article I, section 23 of the Florida Constitution applies to the facts of this case, the governmental intrusion by a criminal justice agency as defined in section 119.011(4), for the purposes defined in section 119.011(3), was permitted because the government satisfied the compelling state interest test. Shaktman, 529 So. 2d at 716. We approve.

In Olmstead v. United States, 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), Justice Brandeis wrote:

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect... . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone the most comprehensive of rights and the right most valued by civilized men.

Id. at 478 (Brandeis, J., dissenting).

Fifty-two years later, while legal scholars continued to debate whether the federal constitution provided express or implied privacy protections, the people of Florida unequivocally declared for themselves a strong, clear, freestanding, and express right of privacy as a constitutional fundamental right. This provision was approved by the voters as article I, section 23 of the Florida Constitution, adopted in 1980, when the people exercised their sovereign power to amend the state's organic law.

This right ensures that individuals are able "to determine for themselves when, how and to what extent information about them is communicated to others." A. Westin, Privacy and Freedom 7 (1967). See also T. Emerson, The System of Freedom of Expression 548 (1970) (arguing that "the main thrust of any realistic system for the protection of privacy" must be the prevention of "outside persons from obtaining information about individuals seeking privacy"). One of its ultimate goals is to foster the independence and individualism which is a distinguishing mark of our society and which can thrive only by assuring a zone of privacy into which not even government may intrude without invitation or consent.

The right of privacy, assured to Florida's citizens, demands that individuals be free from uninvited observation of or interference in those aspects of their lives which fall within the ambit of this zone of privacy unless the intrusion is warranted by the necessity of a compelling state interest. In an opinion which predated the adoption of section 23, the First District aptly characterized the nature of this right:

A fundamental aspect of personhood's integrity is the power to control what we *151 shall reveal about our intimate selves, to whom, and for what purpose.

Bryon, Harless, Schaffer, Reid & Assocs., Inc. v. State ex rel., Schellenberg, 360 So. 2d 83, 92 (Fla. 1st DCA 1978), quashed and remanded on other grounds, 379 So. 2d 633 (Fla. 1980). Because this power is exercised in varying degrees by differing individuals, the parameters of an individual's privacy can be dictated only by that individual. The central concern is the inviolability of one's own thought, person, and personal action. The inviolability of that right assures its preeminence over "majoritarian sentiment"[7] and thus cannot be universally defined by consensus.

The telephone numbers an individual dials or otherwise transmits represent personal information which, in most instances, the individual has no intention of communicating to a third party. This personal expectation is not defeated by the fact that the telephone company has that information. As the Supreme Court of Colorado noted:

The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government.... [I]t is somewhat idle to speak of assuming risks in a contexts where, as a practical matter, the telephone subscriber has no realistic alternative.

People v. Sporleder, 666 P.2d 135, 141 (Colo. 1983) (citations omitted).

We agree with the Third District that the privacy interests of article I, section 23 are implicated when the government gathers telephone numbers through the use of a pen register. See Winfield v. Division of Pari-Mutuel Wagering, 477 So. 2d 544, 548 (Fla. 1985). This gathering of private information clearly affects a matter within that zone of privacy. Accordingly, we adopt the analysis of the district court and answer the first certified question in the affirmative.[8]

Having found that petitioners were entitled to the protections of article I, section 23, the district court nevertheless permitted the installation of pen registers, concluding that the compelling state interest test required by article I, section 23, had been satisfied in this case. Shaktman, 529 So. 2d at 718.

Like all of our other fundamental rights, the fundamental right of privacy is not absolute. In Winfield, the Court found that while a citizen may enjoy a privacy interest in his or her bank records, that privacy interest must yield to the interest of the state under certain circumstances. Justice Adkins, writing for the Court, explained that

[t]he right of privacy is a fundamental right which we believe demands the compelling state interest standard. This test shifts the burden of proof to the state to justify an intrusion on privacy. The burden can be met by demonstrating that the challenged regulation serves a compelling state interest and accomplishes its goal through the use of the least intrusive means.

Winfield, 477 So. 2d at 547 (citations omitted). The Court recognized in Winfield that the compelling state interest test represented a strong standard of review, one of the more demanding placed upon the government.[9]

We agree with the district court that the compelling state interest test articulated in Winfield must be applied to the issue before us. Because the pen register intrudes upon fundamental privacy interests, the state has the burden of demonstrating both that the intrusion is justified *152 by a compelling state interest and that the state has used the least intrusive means in accomplishing its goal.

We also agree with the state that a legitimate, ongoing criminal investigation satisfies the compelling state interest test when it demonstrates a clear connection between the illegal activity and the person whose privacy would be invaded. To justify the intrusion into private lives by the use of a pen register, article I, section 23 requires that the state demonstrate two things. First, it must show a reasonable founded suspicion[10] that the targeted telephone line was being used for a criminal purpose. We are satisfied on this record that the law enforcement agencies had such a reasonable founded suspicion.

Second, the state must show that the least intrusive means have been employed. Petitioners contend that the state has failed to demonstrate that the use of the pen register was the least intrusive means available to accomplish its goal. Petitioners urge that the procedural requirements imposed by current federal[11] and state[12] statutes offer more enhanced protection than that offered under then-controlling law, thereby demonstrating that less intrusive means were available. Specifically, petitioners argue that the trial court omitted from its order a limit on the duration of its use, the type of information sought, a statement demonstrating founded suspicion, and the making of periodic reports to the authorizing court.

As a crucial component of the second prong of this analysis, article I, section 23 requires adherence to procedural safeguards which, at a minimum, necessitate judicial approval prior to the state's intrusion into a person's privacy. Thus, in analyzing whether the least intrusive means were utilized, one must consider procedural safeguards in conjunction with the extent of the actual intrusion into privacy. There is no question that the law enforcement agencies in this case applied for pen register operation in accordance with established state procedures at the time of the request and that the authorizing court complied with those procedures.

We find from the record that the order which authorized the pen register application was based upon reasonable founded suspicion. Furthermore, although the order did not set a time limit for the duration of the pen register, pen register surveillance continued for a period of time less than that authorized by the current legal requirement.[13] Considering all the circumstances, we find that the pen register installed here was the least intrusive means and we are satisfied that there was no procedural violation which would defeat the application of this standard.

Accordingly, for the reasons expressed, we answer the certified questions in the affirmative and approve the decision of the district court.

It is so ordered.

OVERTON, McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.

EHRLICH, C.J., concurs specially with an opinion.

EHRLICH, Chief Justice, concurring specially.

I concur. I write only to emphasize the method by which we determine the applicability *153 of article I, section 23, of the Florida Constitution. In Winfield v. Division of Pari-Mutuel Wagering, 477 So. 2d 544, 548 (Fla. 1985), this Court stated:

The citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.

The words "unreasonable" or "unwarranted" harken back to the federal standard of "reasonable expectation of privacy," which protects an individual's expectation of privacy only when society recognizes that it is reasonable to do so. The deliberate omission of such words from article I, section 23, makes it clear that the Florida right of privacy was intended to protect an individual's expectation of privacy regardless of whether society recognizes that expectation as reasonable.

However, this emphasis on each individual's expectations of privacy does not mean that the individual's subjective expectations are dispositive of the applicability of article I, section 23. In Winfield, this Court characterized the interest protected as "an individual's legitimate expectation of privacy." Id. (emphasis added). Therefore, the zone of privacy covered by article I, section 23, can be determined only by reference to the expectations of each individual, and those expectations are protected provided they are not spurious or false. A determination of whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation; for example, in cases where disclosure of purportedly private information is sought, circumstances such as the kind of information, where is it kept, who has access to it and under what circumstances.

In this case, the information sought was the telephone numbers dialed by an individual. Access to this information is very limited. Although the telephone company has the information, its records are not open to the public. As with the bank records at issue in Winfield, the individual certainly expected that the information would not be released without authorization. Such personal and private information comes within the zone of privacy protected by article I, section 23, of the Florida Constitution.

NOTES

[1] We have discretionary jurisdiction. Art. V, § 3(b)(4), Fla. Const.

[2] That section provides:

Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

[3] The Florida Statutes define a pen register as:

a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached ... § 934.02(20), Fla. Stat. (Supp. 1988). See also 18 U.S.C. § 3126(3) (1988); United States v. New York Tel. Co., 434 U.S. 159, 161 n. 1, 98 S. Ct. 364, 366-67 n. 1, 54 L. Ed. 2d 376 (1977); United States v. Giordano, 416 U.S. 505, 549 n. 1, 94 S. Ct. 1820, 1842 n. 1, 40 L. Ed. 2d 341 (1974) (Powell, J., concurring in part and dissenting in part). See generally J. Carr, The Law of Electronic Surveillance § 3.2(c)(2)(B) (1988); 2 G. Trubow, Privacy Law and Practice § 11.04[8] (1988).

[4] § 895.03, Fla. Stat. (1983).

[5] § 849.25, Fla. Stat. (1983).

[6] Shaktman v. State, 433 So. 2d 580 (Fla. 3d DCA 1983).

[7] L. Tribe, American Constitutional Law 1311 (2d ed. 1988).

[8] We add that the district court concluded and the petitioners now concede that article I, section 12 of the Florida Constitution, is not implicated by the facts of this case.

[9] Such a standard is entirely appropriate in view of the fact that the drafters of article I, section 23 intended to make the right to privacy as strong as possible. Winfield v. Division

of Pari-Mutuel Wagering, 477 So. 2d 544, 548 (Fla. 1985). See also Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 673, 744-50 (1978).

[10] In deciding whether police had founded suspicion of criminal activity sufficient to justify a stop of a motor vehicle, the Court has looked to "the cumulative impact of the circumstances perceived by the officers." Kehoe v. State, 521 So. 2d 1094, 1096 (Fla. 1988). Accord Tamer v. State, 484 So. 2d 583, 584 (Fla. 1986). We find that definition to be suitable for the inquiry at hand, when coupled with the added requirement that such suspicion must be reasonable.

[11] 18 U.S.C.A. §§ 3121-3127 (West Supp. 1986) (effective ninety days after October 21, 1986. Pub.L. No. 99-508, § 302, 1986 U.S.Code Cong. & Admin. News (100 Stat.) 1872).

[12] §§ 934.32-934.33, Fla. Stat. (Supp. 1988) (effective October 1, 1988. Ch. 88-184, § 11, Laws of Fla.).

[13] We add that there is no statutory requirement for the making of periodic reports relative to pen register operation; however, the issuing court may require periodic reports in connection with the interception of wire, oral, or electronic communication. § 934.09(6), Fla. Stat. (Supp. 1988).

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

GAWKER MEDIA, LLC; NICK DENTON;     )
and A.J. DAULERIO,                   )
                                     )
            Petitioners,             )
                                     )
v.                                   )        Case No. 2D15-2857
                                     )
TERRY GENE BOLLEA, professionally    )
known as HULK HOGAN,                 )
                                     )
            Respondent.              )
_____ )

Opinion filed July 2, 2015.


Petition for Writ of Mandamus to the Circuit
Court for Pinellas County; Pamela A.M.
Campbell, Judge.

Gregg D. Thomas and Rachel E. Fugate of
Thomas & LoCicero PL, Tampa; and Seth
D. Berlin and Alia L. Smith of Levine
Sullivan Koch & Schultz, LLP, Washington,
District of Columbia, for Petitioners.

David M. Caldevilla of de la Parte & Gilbert,
P.A., Tampa; Kenneth G. Turkel and
Christina K. Ramirez of Bajo Cuva Cohen &
Turkel, P.A., Tampa; and Charles J. Harder
and Douglas E. Mirell of Harder Mirell &
Abrams LLP, Los Angeles, California, for
Respondent.


NORTHCUTT, Judge.

This controversy sprang from a seed planted sometime in 2006, when Terry Bollea, a celebrated former professional wrestler known publicly as "Hulk Hogan," had sex with Heather Clem, then married to Bollea's friend Todd Clem, a "shock jock" radio personality whose nom de scène is "Bubba the Love Sponge."  The encounter was videotaped, with audio, allegedly without Bollea's knowledge.  Six years later, in October 2012, a celebrity news and gossip website named Gawker.com posted an excerpt of the videotape to the Internet.  Litigation ensued.

After a brief initial foray into federal court, in December 2012 Bollea filed suit in Florida's Sixth Circuit seeking injunctive relief and damages from Heather Clem, sundry entities and individuals affiliated with the Gawker site, and others.  The circuit court case is ongoing, and it has darkened our door more than once.[1]  Before us today is a mandamus proceeding in which the Gawker defendants contend that the circuit court's June 19, 2015, order setting trial for the week of July 6 deviates from Florida Rule of Civil Procedure 1.440.  Indeed the order violates the rule, and we grant the petition.

To place the issue in proper context, it must be noted that one of the initial Gawker defendants was a Budapest-based company named Blogwire Hungary Szellemi Alkotást Hasznosító, KFT.  Blogwire contested the attempted exercise of Florida long-arm jurisdiction over it, and it appealed the circuit court's order denying its

---

[1]Blogwire Hung. Szellemi Alkotst Hasznost, KFT v. Bollea, 162 So. 3d 1116 (Fla. 2d DCA 2015); Gawker Media, LLC v. Bollea, 160 So. 3d 424 (Fla. 2d DCA 2014); Bollea v. Clem, 151 So. 3d 1241 (Fla. 2d DCA 2014); Gawker Media, LLC v. Bollea 129 So. 3d 1196 (Fla. 2d DCA 2014).

-2-

motion to dismiss on that ground.  Consequently, and significantly, long after the other defendants either had been dismissed from the case or had filed answers and affirmative defenses to Bollea's complaint, Blogwire had not done so.  On April 17, 2015, this court reversed and remanded for further proceedings on Blogwire's motion to dismiss.  Blogwire Hung. Szellemi Alkotst Hasznost, KFT v. Bollea, 162 So. 3d 1116 (Fla. 2d DCA 2015).

While Blogwire's appeal was pending in the fall of 2014, Bollea grew eager to place at least part of the action at issue.  He moved the circuit court to sever the claims against Blogwire from the balance of the case and to set the claims against the other defendants for trial.  Over the Gawker defendants' strenuous objections, the court granted the motion.  By order dated November 4, 2014, the court severed the claims as mentioned, and it tentatively scheduled trial against all defendants other than Blogwire for July 2015.  At a hearing the next month, the court finalized the trial date as July 6, memorializing the same in a written order setting trial entered February 18, 2015.  The Gawker defendants challenged both rulings by petitions for writ of certiorari, contending that severing defendants is not permitted and that, because Blogwire had not answered the complaint, the case was not at issue and could not be set for trial.  We consolidated the petitions and, on May 7, 2015, we quashed both orders.[2]  Gawker Media, LLC v. Bollea, Case Nos. 2D14-5591, 2D15-1259, consolidated.

─────────────────────

[2]Our May 7, 2015, order simply informed the parties of our ruling and advised that an opinion explaining our reasoning would follow.  However, subsequent events, which we will describe, may have mooted that proceeding.

The instant proceeding was occasioned by what happened in the following weeks.  Bollea was determined to maintain the July 6 trial date, if possible.  In a May 19, 2015, letter to the judge and again at a May 29 motions hearing, his counsel asked the court to keep the July 6 date reserved, theorizing that if Bollea voluntarily dismissed Blogwire from the case, the issues raised in the certiorari proceeding would vanish and his suit could proceed to trial against the other defendants as planned.  At the May 29 hearing the court agreed to keep the July 6 trial date open.  It also orally granted Bollea's pending motion to file an amended complaint seeking punitive damages.

As foretold, on June 18, the day before a scheduled case management conference, Bollea filed a notice of voluntary dismissal with prejudice as to Blogwire and filed his amended complaint seeking punitive damages by interlineation in the prayer for relief.  He also filed a "notice that action is still at issue," asking the circuit court to reset the case for trial beginning on the previously scheduled date, July 6.

The next day, June 19, the circuit court entered a written order reflecting its earlier oral ruling that Bollea could amend his complaint to seek punitive damages.  The order also stated that "[n]o further pleading by Defendants in response to plaintiff's Amended Complaint, as amended by interlineation, is required, and Gawker Defendants are deemed to have denied Mr. Bollea's claim for punitive damages."

In the meantime, on the morning of June 19, the Gawker defendants had filed a written objection to Bollea's notice that the case was at issue, pointing out among other things that under rule 1.440 a case is not at issue until twenty days have elapsed after the pleadings are closed.  At the case management conference that day, the

-4-

Gawker defendants emphatically opposed setting the case for trial.  But the circuit court, persuaded by Bollea's side that it could disregard the opponents' objections as innocuous technicalities, entered a written order setting trial for July 6.  Three days later, on June 22, the Gawker defendants filed the instant proceeding in this court.[3]

Although we easily understand why Bollea and the circuit court went to lengths to preserve the July 6 trial date, their efforts were futile from the outset—by the time the court entered its June 19 order scheduling the trial for July 6, the window for doing so had been closed for weeks.  Rule 1.440(a) provides that an action is deemed at issue "after any motions directed to the last pleading served have been disposed of or, if no such motions are served, 20 days after service of the last pleading."  Thereafter, under subsection (b) a party must serve a notice that the action is at issue and ready to be scheduled for trial.  Per subsection (c), the court must then enter an order setting trial no fewer than thirty days hence.  The rule thus prescribes a minimum interval of fifty days between service of the last pleading and commencement of trial.

Fifty days prior to July 6 was May 17, which was a Sunday.  Therefore, to permit a trial on July 6, the last pleading in the case must have been served no later than Friday, May 15; Bollea's notice that the action was at issue must have been filed

---

[3]The Gawker defendants initially pursued relief by filing a motion in the earlier certiorari case.  They asked us to enforce our May 7, 2015, ruling by quashing the June 19 order setting trial or, "[t]o the extent that a motion to enforce [the] prior order is the improper remedy to seek in this instance, . . . to convert their motion to the appropriate form in which to permit consideration of their application."  By separate order we have treated the Gawker defendants' motion as a petition for writ of mandamus and Bollea's response to the motion as a response to that mandamus petition.

no sooner than June 4 or later than June 6; and the court's order setting trial must have been entered no later than June 6.

None of that happened, of course. As of May 15, the case simply was not at issue. This court had quashed both the order severing the claims against Blogwire from the rest of the case and the February order setting the action against the other defendants for trial. Blogwire had yet to answer Bollea's complaint; its motion to dismiss for lack of personal jurisdiction was pending and awaiting further proceedings pursuant to this court's disposition of Blogwire's appeal the previous month. Finally, as of May 15 the question whether Bollea would be permitted to amend his pleadings to seek punitive damages was unsettled, and it would not be decided until the motions hearing on May 29.

Bollea attempted to eliminate the Blogwire hindrance by dismissing it from the suit on June 18. But according to rule 1.440, this was far too late for purposes of a July 6 trial date. (In fact, it was already too late when Bollea's counsel first raised the possibility of dismissing Blogwire in his May 19 letter to the judge.) And in any event, Bollea filed his amended complaint seeking punitive damages from the other defendants on June 18, as well. Even in Blogwire's absence, then, under rule 1.440 the case against the remaining defendants would not be at issue until twenty days later, on July 8. Even if the circuit court acted on that very day, it could not set a trial date earlier than August 7.

This was not altered by the court's declaration that the defendants were excused from responding to Bollea's new punitive damages claim. Rule 1.440(b)

provides that "[t]he party entitled to serve motions directed to the last pleading may waive the right to do so by filing a notice for trial at any time after the last pleading is served."  In other words, the rule grants that party, not the court, discretion to dispense with the prescribed twenty-day interlude before the action is at issue.  Regardless, even if Bollea's and the court's machinations had placed the action at issue on June 19, at that point the court could set trial no earlier than July 19.

The June 19 order setting trial for July 6 plainly violated rule 1.440.  For many years, the appellate courts of this state have emphasized that the rule's specifications are mandatory and they have admonished trial courts to strictly adhere to them.  Teelucksingh v. Teelucksingh, 21 So. 3d 37 (Fla. 2d DCA 2009); Broussard v. Broussard, 506 So. 2d 463 (Fla. 2d DCA 1987); R.J. Reynolds Tobacco Co. v. Anderson, 90 So. 3d 289 (Fla. 2d DCA 2012) (table decision) (text of order available at 2012 WL 2428282); Tucker v. Bank of N.Y. Mellon, 39 Fla. L. Weekly D789 (Fla. 3d DCA Apr. 16, 2014); Lurtz v. Bank of N.Y. Mellon, 162 So. 3d 11 (Fla. 4th DCA 2014); BAC Home Loans Servicing L.P. v. Parrish, 146 So. 3d 526 (Fla. 1st DCA 2014); Genuine Parts Co. v. Parsons, 917 So. 2d 419 (Fla. 4th DCA 2006); Precision Constructors, Inc. v. Valtec Constr. Corp., 825 So. 2d 1062 (Fla. 3d DCA 2002); Dep't of Revenue v. Marcovitch, 765 So. 2d 944 (Fla. 5th DCA 2000); Cardozo v. Cardozo, 705 So. 2d 145 (Fla. 4th DCA 1998); S.W.T. v. C.A.P., 595 So. 2d 1084 (Fla. 4th DCA 1992); Rivera v. Rivera, 562 So. 2d 833 (Fla. 1st DCA 1990); Lauxmont Farms, Inc. v. Flavin, 514 So. 2d 1133 (Fla. 5th DCA 1987); Bennett v. Cont'l Chems., Inc., 492 So. 2d

-7-

724 (Fla. 1st DCA 1986); <u>Fireman's Fund Ins. Co. v. Weissing</u>, 448 So. 2d 630 (Fla. 4th DCA 1984); <u>Foremost Ins. Co. v. Barkett</u>, 441 So. 2d 179 (Fla. 4th DCA 1983).

Indeed, a trial court's obligation to hew strictly to the rule's terms is so well established that it may be enforced by a writ of mandamus compelling the court to strike a noncompliant notice for trial or to remove a case from the trial docket.  <u>Anderson</u>, 90 So. 3d at 289, 2012 WL 2428282 at *1; <u>Parsons</u>, 917 So. 2d at 421; <u>Weissing</u>, 448 So. 2d at 631; <u>Barkett</u>, 441 So. 2d at 180.

Still, notwithstanding the compulsory nature of rule 1.440, in some instances appellate courts have held that a party waived its objection to an order setting trial contrary to the rule.  For example, in <u>Parrish v. Dougherty</u>, 505 So. 2d 646 (Fla. 1st DCA 1987), the appellant's attorney appeared at the trial and participated without objecting to the manner in which it had been set.  In <u>Correa v. U.S. Bank National Ass'n</u>, 118 So. 3d 952 (Fla. 2d DCA 2013), the appellant agreed to a rescheduled trial date, participated in the trial, and made no objection to any deviation from rule 1.440.  In both instances, the appellants were deemed to have waived their assertions of error based on the rule.  For two reasons, however, such cases have no bearing here.  First, of course, is that the Gawker defendants began insisting on compliance with rule 1.440 and objecting to the July trial date in the fall of 2014, and they consistently have done so ever since.

The second reason that the waiver cases are inapplicable to this proceeding is more nuanced but nonetheless significant: whereas this is a mandamus proceeding, those cases were plenary appeals from final judgments.  The two types of

-8-

proceedings serve very different purposes, entailing very different requirements.  In an appeal from a final judgment the lower court's rulings are reviewed for reversible legal error.  Generally speaking, a judgment may be reversed only for an error that has been preserved by timely objection in the lower court and that has prejudiced the complaining party in a way that likely affected the result.  Goldschmidt v. Holman, 571 So. 2d 422 (Fla. 1990) (stating no judgment may be reversed unless a court finds error resulting in a miscarriage of justice); see also § 59.041, Fla. Stat. (2015) (same); Aills v. Boemi, 29 So. 3d 1105 (Fla. 2010) (holding that, except in cases of fundamental error, an appellate court cannot consider any ground for objection not presented to the trial court).  Thus, the appellant's failure to make a timely objection waives the issue on appeal, as happened in Parrish and Correa.

Mandamus is a different animal altogether.  Its purpose is not to review a lower court ruling for prejudicial error; rather, it is meant to enforce the respondent's unqualified obligation to perform a clear legal duty.  State ex rel. Buckwalter v. City of Lakeland, 150 So. 508 (Fla. 1933).  If the petitioner is entitled to demand performance of the duty, he or she need not preserve the issue beyond making the demand.  Further, it is unnecessary for the petitioner to suffer prejudice as a result of the respondent's dereliction.  All that must be shown is that (1) the respondent is duty-bound to act under the law, and (2) the respondent has failed or refused to do so.  Pleus v. Crist, 14 So. 3d 941 (Fla. 2009).   A third and final element is that the petitioner must have no adequate legal remedy for the respondent's failure to carry out its duty.  Id.; Sturdivant v. Blanchard, 422 So. 2d 1028 (Fla. 1st DCA 1982).

-9-

By this point in our discussion it is obvious that the first two elements have been satisfied here.  The third element is present, as well.  It is true that the Gawker defendants have available to them the legal remedy of pursuing an appeal from any future final judgment, in which they could complain of the errant order scheduling the trial.  But owing to the mentioned differences between a mandamus proceeding and an appeal, the appellate remedy is not an _adequate_ one.  As we have established, a party is absolutely entitled to strict conformance with the terms of rule 1.440, including its mandated fifty-day hiatus between the service of the last pleading and the trial date.  Whereas a writ of mandamus can preserve and effectuate this right in full, an appeal following entry of final judgment is inherently incapable of doing so because the appellant already will have been forced to trial in violation of the rule.

To be sure, a number of the authorities we have cited as exemplifying strict enforcement of rule 1.440 have been appeals from final judgments as opposed to pretrial writ proceedings.  But those appeals simply could not have afforded relief commensurate with that available by writ of mandamus.  An appellate reversal and remand for a new trial many months after the appellant was forced into the first trial in violation of rule 1.440 is a far and lesser cry from a writ of mandamus enforcing the rule prior to the offending trial date.

An appeal from a final judgment is an inadequate remedy for yet another significant reason.  To the extent that in an appeal the court must be concerned with whether an infringement of the appellant's rights has been preserved for review and has prejudiced the appellant, and insofar as the court otherwise must apply appellate

-10-

decisional rules that are inapplicable to mandamus proceedings, the appellant's rights have been diminished by the court's inability to unqualifiedly enforce them.

Again, in some of the cases cited previously the appellate courts granted relief without apparent concern for these limiting principles of appellate review. But, certainly, such magnanimity on the part of an appeal court panel cannot be predicted or depended upon, as the appellants learned in HSBC Bank USA, N.A. v. Serban, 148 So. 3d 1287 (Fla. 1st DCA 2014) (holding that a violation of rule 1.440 caused no harm), and Labor Ready Southeast, Inc. v. Australian Warehouses Condominium Ass'n, 962 So. 2d 1053 (Fla. 4th DCA 2007) (holding that under the circumstances of the case the appellant was not prejudiced by violation of rule 1.440). See also Mourning v. Ballast Nedam Constr., Inc., 964 So. 2d 889 (Fla. 4th DCA 2007) (to same effect). In those cases the appellate courts, applying decisional rules governing appeals, declined to enforce the trial courts' clear legal duty to strictly comply with rule 1.440. Thus, they illustrate the inadequacy of an appeal from a final judgment as a remedy for a trial court's failure to perform its duties under the rule. Moreover, because appellate rules of decision are inapplicable to mandamus proceedings, the holdings in Serban, Labor Ready, and others of their ilk are not germane here.

The same is true of the few cases in which deviations from rule 1.440 have been challenged by petitions for writ of certiorari. The decisional rules governing certiorari are even more restrictive than those at play in appeals. Citizens Prop. Ins. Corp. v. San Perdido Ass'n, 104 So. 3d 344, 351 (Fla. 2012) (stating that a departure from the essential requirements of law necessary for the issuance of writ of certiorari

must be "something more than just a legal error"); <u>Haines City Cmty. Dev. v. Heggs</u>, 658 So. 2d 523, 527 (Fla. 1995) (noting that a departure from the essential requirements of law must extend "far beyond legal error") (quoting <u>Jones v. State</u>, 477 So. 2d 566, 569 (Fla. 1985) (Boyd, C.J., concurring specially))). Even so, in <u>Globe Life & Accident Insurance Co. v. Preferred Risk Mutual Insurance Co.</u>, 539 So. 2d 1192 (Fla. 1st DCA 1989), the court held that an order setting the case for trial in the absence of a notice that the case was at issue violated the essential requirements of law and resulted in a miscarriage of justice, warranting a writ of certiorari.

But in a more recent certiorari case involving a departure from rule 1.440, the Third District declined to issue the writ, observing that the petitioner was required to demonstrate more than a simple legal error. <u>Sundale, Ltd. v. Williams Paving Co.</u>, 913 So. 2d 740 (Fla. 3d DCA 2005). Rather, the court wrote, the petitioner had to establish why it had no adequate remedy on appeal from a final judgment. The court observed that "[petitioner] has not even attempted to allege how an appeal cannot remedy this legal error." <u>Id.</u> at 740.

<u>Sundale</u> is problematic for two reasons. First, as we have shown, the notion that an appeal from a final judgment is adequate to remedy a violation of rule 1.440 is plainly incorrect. Second, <u>Sundale</u> misstated the certiorari test in a slight but important way. Contrary to <u>Sundale</u>'s suggestion, certiorari may be precluded not by the availability of a mechanism for correcting the error itself; rather, the remedy must alleviate <u>the harm that results from the error</u>. <u>See, e.g.</u>, <u>J.C. v. Dep't of Children & Family Servs.</u>, 83 So. 3d 883, 887 (Fla. 2d DCA 2012) (observing that to obtain a writ of

-12-

certiorari the petitioner must demonstrate that the trial court departed from the essential requirements of law and that the trial court's order "caused irreparable harm that cannot be remedied on postjudgment appeal").  In many certiorari cases, this difference may be an abstraction without much practical impact.  But the distinction is hugely important in a mandamus proceeding, which focuses only on the duty owed and failed by the respondent and is wholly unconcerned with whether the petitioner has been injured by the respondent's dereliction.

Notwithstanding our view that Sundale was incorrectly decided and that, as a certiorari proceeding, it is immaterial to this case, we likely should address its unfortunate influence on two previous decisions by this court.  In 2011, we issued what was in effect a citation per curiam decision denying a petition for writ of mandamus in reliance on Sundale.  Dolan v. Bank of Am., 63 So. 3d 761 (Fla. 2d DCA 2011) (table decision) (text of order available at 2011 WL 2565556).  The result in that case might well have been correct.  But as we have explained, Sundale, a certiorari case, should have played no part in the disposition of that mandamus proceeding.

More troubling is our decision two years later in Jay Properties Beach Condo LLC v. Wells Fargo Bank, N.A., 146 So. 3d 34 (Fla. 2d DCA 2013) (table decision) (text of order available at 2013 WL 6905332).  There, we denied an emergency petition for writ of certiorari apparently on the ground that "[a] claim that the trial court erred by scheduling the case for trial is reviewable on appeal and not by petition for writ of certiorari," citing Sundale.  As we have seen, that is simply untrue.

Ironically, sandwiched between those two mistaken cases was our 2012

-13-

decision in <u>Anderson</u>, 90 So. 3d 289, 2012 WL 2428282 *1.  In that mandamus case we quashed an order denying the petitioner's motion for continuance of trial and ordered further proceedings in compliance with rule 1.440.  Unsurprisingly, <u>Sundale</u> was not mentioned in that order.

We discuss these dispositions because Bollea emphasizes <u>Jay Properties</u> in the response he filed in this case.  He maintains that it is controlling here, and that we cannot grant the Gawker defendants the relief they seek without departing from our own precedent.  But the fact is that we are not bound by the results or reasoning in any of those cases.  The reason is that <u>Dolan</u>, <u>Jay Properties</u>, and <u>Anderson</u> all were unpublished dispositions.  The disposition orders are discoverable online, but they were not meant to be printed in the official reporter of this court's decisions.  Indeed, in the printed reporter they appear merely as entries among the table decisions; the associated "opinions" are not reproduced.  As such, they have no precedential value. <u>See</u> <u>Citizens Prop. Ins. Corp. v. Ashe</u>, 50 So. 3d 645, 651 n.3 (Fla. 1st DCA 2010). They do not enunciate the law of this district, and they are of no consequence to our decision today.

We grant the petition for writ of mandamus.  The circuit court shall straightaway rescind its June 19, 2015, order setting this action for trial and remove the action from the July 6, 2015, trial docket.  This direction is effective immediately, and it shall remain in force notwithstanding the filing of a motion for rehearing, if any.

CASANUEVA and CRENSHAW, JJ., Concur.

-14-



Login

Enter keywords, casename, or case..

Browse cases > Appellate Court of Illinois First District, Second Division > 2016 > September   ...

Bookmark        PDF        Share        CaseIQ

## Andrews v. Marriott Int'l, Inc.

**Appellate Court of Illinois First District, Second Division**

Sep 6, 2016

Judgment        Subsequent References        CaseIQ

### Case Information

📰 CITATION CODES

406 Ill. Dec. 837 ⊟    61 N.E.3d 1105 ⊟    2016 Ill. App. 122731 ⊟

See more information ...

Important Paras

- ¶ 16 First, plaintiff argues that Preferred's motion was improperly designated as a motion to dismiss and

Read More ...

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.

Illinois Official Reports Appellate Court

Decision Under Review Appeal from the Circuit Court of Cook County, No. 10-L-8186; the Hon. Kathy Flanagan, Judge, presiding. Judgment Affirmed. *2 Counsel on Appeal Power Rogers & Smith, P.C., of Chicago (Sean M. Houlihan, of counsel), and Greene Broillet & Wheeler, of Santa Monica, California (Bruce A. Broillet, Scott H. Carr, Alan Van Gelder, and Tobin M. Lanzetta, of counsel), for appellant. Pretzel & Stouffer, Chtrd., of Chicago (Robert Marc Chemers and Scott L. Howie, of counsel), for appellee. Panel PRESIDING JUSTICE PIERCE delivered the

Justices Neville and Hyman concurred in the judgment and opinion.

OPINION

¶ 1  In 2008, while plaintiff, Erin Andrews, was a guest of The Blackwell Inn (Blackwell), she was secretly recorded on video in the privacy of her hotel room by another guest, Michael David Barrett. Plaintiff filed this action sounding in negligence and invasion of privacy against defendant, Preferred Hotel Group (Preferred),[1] the service provider of Blackwell's online reservation system, for, among other things, Blackwell's disclosure of the details of her hotel stay to Barrett. Plaintiff's theory of liability is that Preferred was either (1) engaged in a joint venture operation of the hotel or (2) voluntarily assumed a duty to protect plaintiff's privacy. Preferred moved to dismiss the complaint pursuant to sections 2-615 and 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619(a)(9) (West 2010)) arguing that it did not owe a duty to plaintiff and was not engaged in a joint venture to operate Blackwell. After two years of discovery, the circuit court granted Preferred's section 2-619(a)(9) motion to dismiss. Plaintiff appeals from the dismissal, which we affirm for the following reasons.

Plaintiff's complaint also contained allegations against other defendants for similar events that occurred at other hotels on other dates. Those counts were all dismissed on procedural grounds. --------

¶ 2  BACKGROUND

¶ 3  Relevant to plaintiff's claims against Preferred, the following facts are taken from the complaint. On February 4, 2008, Andrews was a guest at Blackwell located in Columbus, Ohio. Blackwell is owned and operated by Ohio State University (OSU). In the days leading up to her hotel stay, Illinois resident Michael David

Login

hotel and asked to be assigned the room next door to her. Blackwell granted Barrett's requests. After checking into the hotel on February 4, Barrett retrofitted the peephole on Andrew's hotel room door. In doing so, he was able to record video of her activities in the room, including changing and dressing. Eventually, he posted these videos on the Internet. *3 ¶ 4 Defendant Preferred is a corporation with its principal place of business in Chicago, Illinois. It provides marketing, sales and reservation services to its network of hotels for a fee. Blackwell is a member of Preferred's network and utilizes Preferred's marketing and Internet reservation services. Andrews alleged that Preferred is liable for Blackwell's staff disclosing her hotel stay and room number to Barrett and assigning him the room next door to her, without her prior consent thereby allowing him to engage in his tortious activities. ¶ 5 Plaintiff's theory of liability is that Preferred "owned, operated, controlled, maintained, managed, supervised, handled reservations for and/or were otherwise responsible for The Blackwell Inn" and that Blackwell "was the agent and/or joint venture of Preferred *** acting within the course, scope and authority of said agency and/or venture." Preferred "had a duty to exercise reasonable and ordinary care and action in and about the ownership, management, maintenance, supervision, control and operation of Blackwell and its reservation system, and each of their employees, agents, servants and independent contractors, all to the benefit of the guests." Preferred was "negligent in the selection, hiring, training and supervision of each and every other defendant as an agent and/or joint venturer." Plaintiff also alleged that Preferred and OSU were associated with the purpose of "carrying out a specific enterprise for profit." Preferred and OSU had a community of interest and proprietary interest in Blackwell; Preferred had a right to govern the hotel's policies and share in the hotel's profits and losses. Based on this theory, plaintiff alleged claims against Preferred for negligent infliction of emotional distress and invasion of privacy. ¶ 6 In response to the complaint, Preferred filed a hybrid motion to dismiss

Login

motion to dismiss with a section 2-619 motion to dismiss. 735 ILCS 5/2-619.1 (West 2010). Preferred argued that the claims must be dismissed pursuant to section 2-615 of the Code because plaintiff failed to allege sufficient facts to support the conclusory allegation that Preferred owed plaintiff a legal duty. Preferred also argued dismissal of the claims pursuant to section 2-619(a)(9) of the Code because Preferred did not owe a duty to plaintiff for the acts of Blackwell's staff, there was no principal-agent or joint venture relationship between Preferred and Blackwell and Preferred had no knowledge that Andrews was a guest at the hotel. ¶ 7 Attached to Preferred's motion to dismiss was a written agreement governing the relationship between Preferred and OSU. The preamble to the agreement provides that Preferred "is a service organization designed to provide marketing, sales and reservation services to member hotels." In return for these services, Blackwell pays membership and booking fees to Preferred, it agrees to "conform strictly" with Preferred's "Quality Assurance Program" (Standards of Excellence) and allows Preferred "to evaluate the quality of the property and related services rendered at the hotel *** from time to time *** and bear the cost of these evaluations." The agreement explains that Preferred will invoice Blackwell every 30 days for any amounts owed and if any amounts remain unpaid after 60 days, Preferred has the right to suspend all services and charge 1.5% per month on the unpaid sums. ¶ 8 The affidavit of Xen Riggs, the associate vice president of administration and planning at OSU, was also attached to Preferred's motion to dismiss. In this affidavit, Mr. Riggs attested that Blackwell is owned by OSU, its operations are governed by OSU's board of trustees and it is managed by OSU's office of administration and planning. Blackwell runs a deficit, but if it were to make a profit, any profit would solely benefit OSU. Preferred does not have any *4 employees at Blackwell, does not handle any phone calls to Blackwell, and does not have any involvement in the operations or management of Blackwell. ¶ 9 Also supporting Preferred's motion was the affidavit

Login

operations. Mr. Mastrandrea averred that Preferred provides online hotel reservation services to Blackwell via Preferred's Internet booking engine (iBook). Blackwell maintains a link to iBook on its website. Preferred's involvement with reservations made with Blackwell are limited to those made through the iBook platform. A guest inputs the reservation information into iBook, which then electronically sends the reservation request to Blackwell's computer system, and if accepted, the guest receives electronic confirmation including the room rate and type. Preferred's involvement with reservations at Blackwell is limited to providing the platform for the electronic transmittal of reservation confirmation to and from the hotel and its guests via the Internet. If room reservations are made other than through iBook, Preferred does not have access to any guest identity or information. Preferred never has had access to Blackwell's guest list or any guest's room number. Preferred has no access to any information regarding guests who booked their rooms directly through the hotel or through any other means. Because Preferred does not have access to guest identities or guest room numbers, if someone called their office requesting this information, Preferred could not give the caller any such information. ¶ 10 Mr. Mastrandrea also attested that Preferred has no ownership interest in the hotel and does not share in its profits or losses. Preferred charges Blackwell a fee for membership in the network and for its booking services. Preferred has no involvement in the operation or management of its member hotels, including Blackwell's policies and procedures regarding safety and/or privacy. There are no "Preferred" employees at Blackwell or any of its member hotels and it does not handle phone calls placed to the member hotels. According to Preferred's records, Andrews's reservation was not made through Preferred's system, and therefore, it had no knowledge that Andrews was a guest at the hotel. Barrett made a reservation through iBook on Blackwell's website for which Preferred was paid a service fee. However, Preferred's actions in respect to Barrett's reservation were limited to the

system and a confirmation notice sent to Barrett over the Internet. ¶ 11 At plaintiff's request, the circuit court permitted discovery regarding the matters raised in the motion to dismiss. This discovery was conducted over a two-year period and included the deposition of Mr. Mastrandrea. ¶ 12 At his deposition, Mastrandrea testified that Preferred's "Standards of Excellence" are comprised of "1600 items of guest service standards that we provide to the hotel to manage their service to guests." Member hotels are required to comply with the standards. Once a year, third-party independent inspectors perform a check to determine the level of compliance. The inspectors prepare a report that informs the hotels of their aggregate compliance score and ways to improve. A follow-up inspection is required only if a hotel falls below 70% compliance. The compliance reports are reviewed by one of Preferred's regional managers. A Preferred executive only reviews an inspection report if the compliance score is lower than 70%. Preferred relies on the hotels to make the inspector's suggested corrections. If corrections are not successfully made, Preferred might request an improvement plan from the hotel and follow up as needed. If a hotel still fails to remediate, then Preferred reviews the results and possibly extends the improvement plan or takes further action. Preferred has close to 800 *5 member hotels. In its history Preferred has terminated its relationship with only three or four hotels. All of Blackwell's inspections have exceeded a 70% compliance rate, and therefore, no executive at Preferred has been referred to review Blackwell's reports. There are no standards or inspection criteria that address hotel staff informing a third party about other guests staying at the hotel or granting a guest's request to be placed in the hotel room next to another guest without prior consent. ¶ 13 After completion of discovery, plaintiff filed a written response to the motion to dismiss. Plaintiff argued that Preferred's motion should be denied because it was a "disguised motion for summary judgment," Preferred's " 'evidence' " merely refutes plaintiff's ultimate facts, which does not constitute

Login ▾

of care to plaintiff. Plaintiff asserted that Preferred owed her a duty of care because either it was in a joint venture with OSU in the operation of Blackwell or Preferred voluntarily assumed a duty of care. Plaintiff contended that because Preferred requires its member hotels to comply with the "Standards of Excellence" that includes matters of privacy (communicating a guest's room number in writing rather than verbally and requiring identification before issuing a duplicate key), Preferred voluntarily assumed a duty to protect the privacy of guests at its member hotels. Plaintiff also argued that Preferred exercised control over the safety measures and policies of Blackwell and these actions created a joint venture, giving rise to Preferred's liability for the actions of Blackwell's staff. ¶ 14 After the hearing, the circuit court granted Preferred's motion to dismiss pursuant to section 2-619(a)(9) of the Code. The circuit court found that the parties' discovery established that "[t]he relationship between Preferred and Blackwell was limited to services provided for electronic transmittal of requests to Blackwell in transmission of confirmation numbers back to guests." The agreement between Preferred and OSU/Blackwell was the "limitation of the undertaking," and the discovery established that Preferred does not have access to room numbers or other information concerning guests. Preferred is simply "a contract service provider; they charge for their services and they get paid for their services." Although plaintiff alleged that Preferred and OSU were engaged in a joint venture, plaintiff was unable to provide the court with any evidence to dispute Preferred and OSU's "contractual relationship." Preferred and OSU's written agreement for services defined their duties "which do *** not cover the conduct alleged in the complaint," and therefore, Preferred cannot be held liable to plaintiff for the acts of Blackwell's staff. In view of this ruling, the circuit court found Preferred's section 2-615 motion to dismiss moot and also ordered that there was "not [*sic*] just reason for delay of appeal or enforcement of this order." Thereafter, plaintiff timely filed this appeal.

Login ▼

¶ 16 First, plaintiff argues that Preferred's motion was improperly designated as a motion to dismiss and, therefore, should have been denied outright. Plaintiff contends that the motion was a "disguised" summary judgment motion that did not involve an "affirmative matter" but merely refuted plaintiff's well-pled allegations. In response, defendant disagrees and argues that if its arguments for dismissal were more appropriate for summary judgment rather than section 2-619 dismissal, reversal is only required where the nonmovant was prejudiced by the misdesignation. *6 ¶ 17 "The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of litigation" (*Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003)) and is "similar to a summary judgment motion because [it] '*** essentially amounts to a summary judgment procedure.' " *Peterson v. Randhava*, 313 Ill. App. 3d 1, 9 (2000) (quoting *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 724 (1997)). These types of motions are similar because in order to rule on them we must determine "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether the dismissal is proper as a matter of law." *Raintree Homes*, *Inc*. *v*. *Village of Long Grove*, 209 Ill. 2d 248, 254 (2004). Misdesignation of a motion for summary judgment as a motion to dismiss is not fatal to the movant's right to prevail where the nonmoving party did not suffer any prejudice or unfair surprise due to the error. *Peterson*, 313 Ill. App. 3d at 9. ¶ 18 Here, the affirmative matter presented in Preferred's motion is that it did not owe a duty of care to plaintiff because it did not have a principal-agent or joint venture relationship with the hotel and did not otherwise voluntarily undertake a duty of care. To support its motion, Preferred attached to its motion a copy of the written agreement between Preferred and OSU/Blackwell and the Riggs and Mastrandrea affidavits. Over the course of two years, the circuit court permitted the parties to

Login

Therefore, in this instance, where a defined issue was raised in Preferred's motion and plaintiff was granted time to conduct lengthy discovery on Preferred's assertions, we find that, whether viewed as a motion to dismiss or a motion for summary judgment, plaintiff was not prejudiced in the designation of the motion to dismiss as a motion under section 2-619(a)(9) of the Code. ¶ 19 The circuit court dismissed plaintiff's complaint pursuant to section 2-619(a)(9) of the Code, which permits the involuntary dismissal of a claim where the claim asserted is "barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010). Affirmative matter is "something in the nature of a defense which negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). "Unless the affirmative matter is already apparent on the face of the complaint, the defendant must support the affirmative matter with an affidavit or with some other material that could be used to support a motion for summary judgment." *Pleasant Hill Cemetery Ass'n v. Morefield*, 2013 IL App (4th) 120645, ¶ 21. Once a defendant has presented adequate affidavits or other evidence of support, " 'the defendant [has] satisfie[d] the initial burden of going forward on the motion' " and the burden then shifts to the plaintiff who is required to establish that the affirmative matter is either unfounded or involves an issue of material fact. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 37 (quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). A plaintiff may overcome this burden by presenting "affidavits or other proof." 735 ILCS 5/2-619(c) (West 2010). However, a plaintiff cannot rely on the allegations from his own complaint to refute such evidence. *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1101-02 (2009). In addition, if a plaintiff does not come forward with a counteraffidavit refuting the evidentiary facts in the defendant's affidavit or other

Login    ▾

that plaintiff "failed to carry the shifted burden of going forward." *Hodge*, 156 Ill. 2d at 116; *Pleasant Hill Cemetery Ass'n*, 2013 IL App (4th) 120645, ¶ 21. *7 ¶ 20 The affirmative matter raised by Preferred in its motion to dismiss, and supported with affidavits and deposition testimony, is that it did not owe a duty of care to plaintiff and it was not in a joint venture with Blackwell, and therefore, it could not be held liable for Blackwell's disclosure of details regarding plaintiff's hotel stay to Barrett or the assignment of Barrett to the room next to plaintiff without her prior consent. ¶ 21 Plaintiff argues that Preferred can be held liable for the events that occurred at Blackwell because either (1) Preferred was a member of a joint venture with Blackwell to operate the hotel or (2) Preferred voluntarily assumed a duty of care to plaintiff. She contends that these theories of liability involve questions of fact that should have precluded dismissal of her claims.

¶ 22 *Joint Venture*

¶ 23 A joint venture is an association of two or more persons to carry out a single enterprise for profit. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 843 (1992). Members of a joint venture are vicariously liable for the joint venturers' negligent acts committed during the course of the venture. *Hiatt v. Western Plastics, Inc.*, 2014 IL App (2d) 140178, ¶ 72. Ordinarily whether a joint venture exists is a question of fact; however, where there is no evidence to support the existence of a joint venture, its existence can be decided as a matter of law. *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 444 (1992); *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 134 (2007). "The existence of a joint venture is shown by allegations demonstrating (1) a community of interest in the purpose of the joint association, (2) a right of each member to direct and govern the policy and conduct of the other members, and (3) a right to joint control and management of the property used in the enterprise." *Romanek v. Connelly*, 324 Ill. App. 3d 393, 405

Login ▾

agreement is not essential to establish a joint venture (*Hiatt*, 2014 IL App (2d) 140178, ¶ 73), and its existence "may be inferred from the facts and circumstances demonstrating that the parties in fact entered into a joint venture" (*O'Brien*, 227 Ill. App. 3d at 843). However, the most significant element to consider in determining whether a joint venture exists is the intent of the parties. *Thompson v. Hiter*, 356 Ill. App. 3d 574, 582 (2005). ¶ 24 Plaintiff claims Preferred is liable for Blackwell's actions because Preferred and OSU were engaged in a joint venture to operate Blackwell. Plaintiff argues Preferred and OSU/Blackwell's course of conduct created a joint venture, specifically, Preferred's control over the operations and policies of Blackwell and the sharing of reservation fees. We disagree and find that, on the record before us, Preferred and OSU were nothing more than two separate entities contracting with one another for a particular service from which each would derive their own individual profit. ¶ 25 The record before us includes a written agreement between Preferred and OSU that governs their relationship regarding limited services for Blackwell. Under the agreement, Preferred provides OSU/Blackwell with marketing, sales, and reservation services in exchange for a fee. The agreement does not mention the creation of a joint venture or enterprise, and Preferred and OSU's rights and obligations under the agreement are different from one another. In fact, we found nothing in the agreement to infer that Preferred and OSU intended to operate Blackwell as a joint venture enterprise. Furthermore, as we discuss below, plaintiff has not provided any "affidavits or other proof" to refute Preferred's affidavits and testimony *8 supporting the affirmative matter that Preferred and OSU/ Blackwell did nothing to create a joint venture either through the written agreement or through their conduct.

¶ 26 *Common Interest*

¶ 27 As to the first element necessary to establish a joint venture, plaintiff contends

Login

Preferred's hotel network and Blackwell having access to Preferred's iBook reservation system, which evidences a joint venture relationship. We are not persuaded. Nothing in the parties' agreement or conduct, as developed from the discovery in the record, supports the conclusion that they shared a community of interest in association with Blackwell. Certainly, both parties expected to benefit from their contractual association, but this does not indicate the intention to create a joint venture to operate Blackwell. See *Kaporovskiy v. Grecian Delight Foods*, *Inc*., 338 Ill. App. 3d 206, 212 (2003). In fact, the agreement indicates that Preferred and Blackwell had two different interests in doing business with one another. Preferred would allow Blackwell the use of its reservation system so that Internet users could book a hotel stay, and Preferred would be paid a fee for reserving a room using its iBook service. This fee would be earned regardless of whether the reservation proved profitable to Blackwell. In return, Blackwell would sell a room and generate revenue from that and other services. There is no evidence Preferred would financially benefit beyond the fee earned through iBook. Simply put, two distinct entities doing business together does not equate to the establishment of a joint venture. See *id*.

¶ 28 *Right to Govern Blackwell's Policy and Joint Control Over the Enterprise*

¶ 29 Next, as to the second and third joint venture elements, plaintiff suggests that Preferred's contractual requirement that its member hotels comply with its "Standards of Excellence" equates to Preferred's right to direct the conduct and policy of Blackwell and exert control over its operation. Contractual agreements that require one party to perform or forbid performance of a particular act does not equate to control of management for the purpose of imposing a joint venture. *Kaporovskiy*, 338 Ill. App. 3d at 212 (limiting one contracting party from selling competing food products did not equate to "control over property" or policy); *Barton*

Login ▼

absent in a contractual relationship where doctor has discretion in patient treatment even though hospital supplied doctor with necessary equipment and personnel). ¶ 30 Here, the written agreement does not give Preferred any degree of joint control over the operation of Blackwell. Although Preferred requires that its member hotels follow the "Standards of Excellence," the evidence before us establishes that member hotels, including Blackwell, are not required to be in complete compliance with Preferred's standards and the hotels may interpret the standards and make adjustments or improvements at their discretion. Preferred merely provides a list of standards that it wants its member hotels to meet at a 70% or higher level, but Preferred does not actually engage in any management or control over the hotel, its operations, or its staff. According to Mr. Mastrandrea's affidavit and deposition testimony, which has not been refuted by plaintiff through "affidavits or other proof," Preferred does not have any employees at Blackwell, Preferred does not and never had access to Blackwell's guest list or the assignment of hotel room numbers. Therefore, we find that Preferred and Blackwell did not have "mutuality of control" over the hotel's property and policies necessary to establish that element of a joint venture. *9 ¶ 31 Although plaintiff also contends that there was a sharing in the profits and the losses of Blackwell, there is no evidence in the record to support this conclusion. Preferred's receiving a fee for its marketing and reservation services is not akin to having a common interest and sharing profits in the operation of Blackwell. *Landers-Scelfo v. Corporate Office Systems, Inc*., 356 Ill. App. 3d 1060, 1066 (2005) (cooperation between two entities consisting of one handling of the payroll and human resources function of another company for a fee is insufficient as a matter of law to show a joint venture existed). There is nothing in the record to suggest that Preferred and Blackwell were anything other than two separate entities doing business with one another for their separate financial benefit. More than a mere interest in another entity's success must be asserted to allege a joint venture.

**Login**

it" is not enough to turn a business relationship into a joint venture sufficient to impose vicarious liability on a contracting party. *Kaporovskiy*, 338 Ill. App. 3d at 212. While Preferred may have hoped for Blackwell's continued success so that it could earn more fees through its booking and reservation services, this is not enough to support the legal conclusion that these entities were engaged in a joint venture. Finally, after two years of discovery, a further indication that no joint venture existed is the evidence that Preferred would collect booking fees even if Blackwell operated at a financial loss. ¶ 32 In the absence of any one of the required elements, a joint venture cannot be found to exist in fact or in law. *Powell v. Dean Foods Co*., 2013 IL App (1st) 082513-B, ¶ 76. It is plaintiff's burden to show that she can support her claim that Preferred engaged in a joint venture to operate Blackwell. *Petry v. Chicago Title & Trust Co*., 51 Ill. App. 3d 1053, 1057 (1977). Beyond mere conclusory allegations, plaintiff has failed to support her legal conclusion or establish that a question of fact exists as to the existence of a joint venture. Therefore, we affirm the ruling of the circuit court that Preferred did not have a duty to plaintiff on this basis.

¶ 33 *Voluntary Undertaking*

¶ 34 Next, plaintiff argues that whether Preferred voluntarily assumed a duty to protect her privacy as a guest of Blackwell is a question of fact that precludes dismissal under section 2-619(a)(9) of the Code. We disagree and find that no genuine issue of material fact exists as to whether Preferred voluntarily undertook a duty to protect the privacy of Blackwell's guests. ¶ 35 Negligence cannot be established unless the defendant owed the plaintiff a duty of care. *LaFever v. Kemlite Co*., 185 Ill. 2d 380, 388 (1998). Whether a duty of care exists is a question of law. *Id*.; *Chelkova v. Southland Corp*., 331 Ill. App. 3d 716, 722 (2002). Illinois courts have adopted section 324A of the Restatement (Second) of Torts (1965),

Login ▾

performance of a voluntary undertaking. The relevant sections of section 324A of the Restatement provide as follows:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

See *Bell v. Hutsell*, **2011 IL 110724**, ¶¶ 12-14; *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204 (1979). Under this theory, the scope of an assumed duty " 'is limited to the extent of the undertaking' " and must be narrowly construed. *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 123 (quoting *Bell*, **2011 IL 110724**, ¶ 12); *Siklas v. Ecker Center for Mental Health, Inc.*, 248 Ill. App. 3d 124, 131 (1993); *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992). To determine the extent of the voluntary undertaking we consider, on a case by case basis, both the specific act undertaken and a reasonable assessment of its underlying purpose. *Bourgonje v. Machev*, 362 Ill. App. 3d 984 (2005). ¶ 36 Plaintiff argues that Preferred's voluntary undertaking was evidenced by

"Standards of Excellence," which included two standards involving guest privacy; (2) Preferred's hiring of independent inspectors to review compliance with these standards; and (3) the appearance of Preferred's signage in the hotel informing hotel guests that the hotel is a member in Preferred's network. Plaintiff contends that, because Preferred has two privacy-related standards (that the hotel communicate the room rate and room number in writing at check-in and proof of identity must be shown before a duplicate key is issued), the absence of a standard relating to disclosing guest identity and room number or placing a guest next to another on request is a breach of voluntary undertaking to protect a guest's privacy. Further, plaintiff argues that Preferred negligently failed to prevent Blackwell from disclosing the identity of Andrews, the dates of her stay, her room number, and in granting Barrett's request to be assigned a room next door to Andrews. Plaintiff asserts that even though Preferred does not have a standard specifically prohibiting these acts, the failure to employ such standards was a breach of the privacy standards it did embrace. ¶ 37 We find that Preferred's actions do not rise to the level of a voluntary undertaking under the Restatement. The extent of Preferred's undertaking is reflected in the written contract between Preferred and Blackwell: Preferred allowed Blackwell to join Preferred's member network and agreed to let Blackwell use Preferred's online booking platform for a fee. As explained by Mr. Mastrandrea, although Preferred provides its hotels with a list of guest standards to follow, Preferred has no employees at its member hotels and exercises no control over the policies, procedures, and general operation of these hotels. Plaintiff fails to identify anything in the record to support its assertion that Preferred assumed any duty to protect the privacy of Blackwell's guests under its marketing and reservation agreement with Blackwell other than the two standards related to written room rates and room assignment and issuance of duplicate keys. Plaintiff does not provide any support for her assertion that Preferred "render[ed] services to another which *** [it]

**Login**

it is clear that the extent of Preferred's undertaking to Blackwell was to provide a reservation platform for booking rooms over the Internet and issuing the two aforementioned standards. There is no evidence that supports the conclusion that, by providing this service and publishing these standards, Preferred voluntarily undertook an additional duty to protect the privacy of other guests of Blackwell, of which it had no knowledge or connection whatsoever, by undertaking duties to instruct Blackwell's staff against giving guest information or room numbers or assigning guests in the manner that is alleged in this complaint. *11 ¶ 38 There is no evidence to conclude that Preferred could have voluntarily undertaken a duty to protect plaintiff's privacy where Preferred only contracted with OSU/Blackwell for marketing and reservation services and did not have contact with or put forth any service for plaintiff's benefit. Mastrandrea testified that plaintiff did not book her hotel room through Preferred's iBook system. Other than guests who used the iBook reservation system, Preferred has no contact with any other Blackwell guest and does not have access to Blackwell records to learn the identity, duration or room assignment for anyone staying at the hotel. Defendant supported its motion to dismiss with affidavits and other evidence to show that this affirmative matter defeated plaintiff's claims. Plaintiff was afforded ample opportunity to discover evidence that would refute defendant's affirmative matter or demonstrate that a question of material fact exists. The allegations contained in plaintiff's complaint are insufficient to refute the affirmative matter properly raised and produced by defendant.

*Hollingshead*, 396 Ill. App. 3d at 1101-02

. ¶ 39 To the extent that Preferred's quality standards that hotels put room rates and numbers in writing at check-in and that called for identification prior to issuing duplicate room keys may be relevant to the issue of a voluntary undertaking, we find this is insufficient to expand the undertaking to include all other conceivable

Andrews v. Marriott Int'l, Inc. | 406 Ill. Dec. 837 | Ill. App. Ct. | Judgmen...   https://www.casemine.com/judgement/us/5914ac7cadd7b0493473d9a2/amp

**Login** ▾

considered these two standards to be security related they do not extend the duty of care to an act that was not voluntarily undertaken. The complained of acts did not involve oral identification of a room number at check-in or the giving of a duplicate key to a room without producing identification. Preferred did not undertake a privacy standard for its member hotels that it should not identify guests or their rooms over the phone or assign adjoining rooms upon request and without the other guests' consent. Plaintiff has not demonstrated a plausible argument to extend the theory of voluntary undertaking to conduct that is the equivalent to a failure to perform. ¶ 40 We conclude, based on this record, there is no evidence to support a finding that a voluntary undertaking was made by Preferred to protect the privacy of plaintiff. We find that the circuit court properly found that Preferred did not voluntarily undertake a duty of care to protect plaintiff's privacy and therefore properly dismissed the complaint. *Tedrick v. Community Resource Center, Inc.*,

235 Ill. 2d 155

(2009) (dismissal of a complaint sounding in negligence against a husband's mental health care providers was upheld where the providers could not have voluntarily undertaken a duty to protect the wife from his violent acts because the providers did not render a service to the wife or for her protection); *Pippin v.*

*Chicago Housing Authority*, 78 Ill. 2d 204

(1979) (summary judgment for landlord upheld in wrongful death action of a social guest of the tenant on landlord's premises because landlord did not voluntarily undertake a duty to protect the guest where landlord did not provide "protective services" itself but rather hired a third party to provides "protective services" on the premises); *cf. Nelson v. Union Wire Rope Corp.*,

31 Ill. 2d 69

(1964) (defendant insurance company owed a duty to protect plaintiff construction workers from injury where it voluntarily advertised, planned, directed, and

Login

construction project and filed reports with the insurance agency and insured relied on these inspections). *12

¶ 41 CONCLUSION

¶ 42 For the foregoing reasons, we affirm the judgment of the circuit court. ¶ 43 Affirmed.



© 2023 Gauge Data Solutions Pvt. Ltd.

**FindLaw.**

Find a Lawyer     Legal Forms & Services ⌄     Learn About the Law ⌄     Legal Professionals ⌄     Blogs

FINDLAW   /   CASE LAW   /   CALIFORNIA   /   CA CT. APP.   /   BURNETT V. NATIONAL ENQUIRER INC

BURNETT v. NATIONAL ENQUIRER INC (1983)

Court of Appeal, Second District, Division 2, California.

Carol BURNETT, Plaintiff and Respondent, v. NATIONAL ENQUIRER, INC., Defendant and Appellant.

Civ. 66447.

Decided: July 18, 1983

Williams & Connolly by John G. Kester, Harold Ungar, Washington, D.C., Selvin & Weiner by Paul P. Selvin, Los Angeles, for defendant and appellant. Barry B. Langberg, Stephen S. Monroe, Paul S. Ablon, Richard P. Towne, Hayes & Hume, Beverly Hills, for plaintiff and respondent. Jack C. Landau, Judy D. Lynch, Pierson, Ball & Dowd by J. Laurent Scharff, Washington, D.C., for amici curiae.

On March 2, 1976, appellant caused to appear in its weekly publication, the National Enquirer, a "gossip column" headlined "Carol Burnett and Henry K. in Row," wherein a four-sentence item specified in its entirety that:

"In a Washington restaurant, a boisterous Carol Burnett had a loud argument with another diner, Henry Kissinger.   Then she traipsed around the place offering everyone a bite of her dessert.   But Carol really raised eyebrows when she accidentally knocked a glass of wine over one diner and started giggling instead of apologizing.   The guy wasn't amused and 'accidentally' spilled a glass of water over Carol's dress."

Maintaining the item was entirely false and libelous,[1] an attorney for Ms. Burnett, by telegram the same day and by letter one week later, demanded its correction or retraction "within the time and in the manner provided for in Section 48(a) of the Civil Code of the State of California," failing which suit would be brought by his client [respondent herein], a well known actress, comedienne and show-business personality.

In response to the demand, appellant on April 6, 1976, published the following retraction, again in the National Enquirer's gossip column:

"An item in this column on March 2 erroneously reported that Carol Burnett had an argument with Henry Kissinger at a Washington restaurant and became boisterous, disturbing other guests.   We understand these events did not occur and we are sorry for any embarrassment our report may have caused Miss Burnett."

On April 8, 1976, respondent, dissatisfied with this effort in mitigation, filed her complaint for libel in the Los Angeles Superior Court.   Trial before a jury resulted in an award to respondent of $300,000 compensatory damages and $1,300,000 punitive damages.   The trial court by remittitur thereafter rendered its judgment in respondent's favor for $50,000 compensatory and $750,000 punitive damages.   This appeal followed.

As formulated by appellant, apart from two claimed irregularities occurring upon the trial, the principal issues here are whether the National Enquirer is excluded from the protection afforded by Civil Code section 48a,[2] and whether the damage award and penalty specified in the judgment can stand.

Prior to addressing the merits of appellant's contentions and in aid of our disposition, we set out the following further facts pertaining to the publication complained of and descriptive of the nature and character of the National Enquirer, which were adequately established in the proceedings below.

On the occasion giving rise to the gossip column item hereinabove quoted, respondent, her husband and three friends were having dinner at the Rive Gauche restaurant in the Georgetown section of Washington, D.C.   The date was January 29, 1976.   Respondent was in the area as a result of being invited to be a performing guest at the White House.   In the course of the dinner, respondent had two or three glasses of wine.   She was not inebriated.   She engaged in banter with a young couple seated at a table next to hers, who had just become engaged or were otherwise celebrating.   When curiosity was expressed about respondent's dessert, apparently a chocolate souffle, respondent saw to it the couple were provided with small amounts of it on plates they had passed to her table for the purpose.   Perhaps from having witnessed the gesture, a family behind respondent then offered to exchange some of their baked alaska for a portion of the souffle, and they, too, were similarly accommodated.   As respondent was later leaving the restaurant, she was introduced by a friend to Henry Kissinger, who was dining at another table, and after a brief conversation, respondent left with her party.

There was no "row" with Mr. Kissinger, nor any argument between the two, and what conversation they had was not loud or boisterous.   Respondent never "traipsed around the place offering everyone a bite of her dessert," nor was she otherwise boisterous, nor did she spill wine on anyone, nor did anyone spill water on her and there was no factual basis for the comment she " * * * started giggling instead of apologizing.".

The impetus for what was printed about the dinner was provided to the writer of the item, Brian Walker, by Couri Hays, a freelance tipster paid by the National Enquirer on an ad hoc basis for information supplied by him which was ultimately published by it, who advised Walker he had been informed respondent had taken her Grand Marnier souffle around the restaurant in a boisterous or flamboyant manner and given bites of it to various other people; that he had further but unverified information respondent had been involved in the wine-water spilling incident;  but that, according to his sources, respondent was "specifically, emphatically" not drunk.   No mention was made by Hays of anything involving respondent and Henry Kissinger.

Having received this report, Walker spoke with Steve Tinney, whose name appears at the top of the National Enquirer gossip column, expressing doubts whether Hays could be trusted.   Tinney voiced his accord with those doubts.   Walker then asked Gregory Lyon, a National Enquirer reporter, to verify what Walker had been told by Hays.   Lyon's inquiry resulted only in his verifying respondent had shared dessert with other patrons and that she and Kissinger had carried on a good natured conversation at the restaurant.

In spite of the fact no one had told him respondent and Henry Kissinger had engaged in an argument, that the wine-water spilling story remained as totally unverified hearsay, that the dessert sharing incident was only partially bolstered, and that respondent was not under any view of the question inebriated, Walker composed the quoted item and approved the "row" headline.

The National Enquirer is a publication whose masthead claims the "Largest Circulation Of Any Paper In America."   It is a member of the American Newspaper Publishers Association.   It subscribes to the Reuters News Service.   Its staff call themselves newspaper reporters.   It describes its business as "newspaper" in its filings with the Los Angeles County Assessor and in its applications for insurance.   A State Revenue Department has ruled it qualifies as a newspaper and is thus exempt from sales and use tax.   The United States Department of Labor describes it as "belonging to establishments primarily engaged in publishing or printing and publishing newspapers."

By the same token the National Enquirer is designated as a magazine or periodical in eight mass media directories and upon the request and written representation of its general manager in 1960 that "In view of the feature content and general appearance [of the publication], which differ markedly from those of a newspaper * * *," its classification as a newspaper was changed to that of magazine by the Audit Bureau of Circulation. It does not subscribe to the Associated Press or United Press International news services. According to a statement by its Senior Editor it is not a newspaper and its content is based on a consistent formula of "how to" stories, celebrity or medical or personal improvement stories, gossip items and TV column items, together with material from certain other subjects. It provides little or no current coverage of subjects such as politics, sports or crime, does not attribute content to wire services, and in general does not make reference to time. Normal "lead time" [3] for its subject matter is one to three weeks. Its owner allowed it did not generate stories "day to day as a daily newspaper does."

Did the trial court err in holding the National Enquirer was not a newspaper within the provisions of Civil Code § 48a? No.

At appellant's request, the trial court herein made its determination [4] after hearing and based on extensive evidence that the National Enquirer was not a newspaper for purposes of the application of Civil Code section 48a (see fn. 2).

In so concluding, while it took into account the indicia relating to status detailed above, it relied upon the most fundamental of those considerations which have been deemed sufficient to justify the designation of that particular class as the beneficiary of the protection afforded by the statute, namely, that newspapers by virtue of the manner in which they are obliged to operate are not generally in a position adequately to guard against the publication of material which is untrue, such that:

"In view of the complex and far-flung activities of the news services upon which newspapers and radio stations must largely rely and the necessity of publishing news while it is new, newspapers and radio stations may in good faith publicize items that are untrue but whose falsity they have neither the time nor the opportunity to ascertain."  (Werner v. Southern Cal. etc. Newspapers (1950) 35 Cal.2d 121, 128, 216 P.2d 825.)

The preferred status thus being seen as hinging on the inability of newspapers to verify information while optimally disseminating news, the trial court focused on the element of time as that element was related to appellant's publication process or business mode and found crucial to its determination the National Enquirer should not be characterized as a newspaper evidence showing the reason for that preferred status to be lacking.

Appellant contends the rationale so employed by the trial court was erroneous and in support of the claim maintains that the special classification approved in Werner v. Southern Cal. etc. Newspapers, supra, 35 Cal.2d 121, 216 P.2d 825, depended on the public's interest in the "free dissemination of news," without reference to questions of timeliness; that the cases of Pridonoff v. Balokovich (1951) 36 Cal.2d 788, 228 P.2d 6 (§ 48a to be applied in favor of all participants—e.g., columnists, critics, editors —in newspaper publications), Maidman v. Jewish Publications, Inc. (1960) 54 Cal.2d 643, 7 Cal.Rptr. 617, 355 P.2d 265 (§ 48a applicable to weekly newspaper), Kapellas v. Kofman (1969) 1 Cal.3d 20, 81 Cal.Rptr. 360, 459 P.2d 912 (§ 48a applicable to editorial) and Field Research Corp. v. Superior Court (1969) 71 Cal.2d 110, 114, fn. 4, 77 Cal.Rptr. 243, 453 P.2d 747 (language in footnote implying § 48a applies to "publishing * * * enterprises") constitutes an unbroken line of authority consistent with appellant's position; and that Briscoe v. Reader's Digest Assn. (1971) 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (§ 48a applicable to the named defendant) "clearly [holding] § 48a applicable to a magazine—indeed to a monthly magazine that published digests of other magazine articles, rather than current happenings," requires a like result with respect to the National Enquirer. Further support for the conclusion, it is said, derives from language appearing in Johnson v. Harcourt, Brace, Jovanovich, Inc. (1974) 43 Cal.App.3d 880, 894, 118 Cal.Rptr. 370, and Harris v. Curtis Publishing Co. (1942) 49 Cal.App.2d 340, 353–354, 121 P.2d 761.

An understanding of the pertinent authorities differing from that so proferred by appellant, however, appears in Morris v. National Federation of the Blind (1961) 192 Cal.App.2d 162, 13 Cal.Rptr. 336 and in Montandon v. Triangle Publications, Inc. (1975) 45 Cal.App.3d 938, 120 Cal.Rptr. 186, (hg. den. 5–8–75). In Morris, the court examined the issue in terms of a newspaper-magazine dichotomy, and observed that:

[T]he statute [§ 48a] on its face applies only to publication 'in a newspaper, or . by radio broadcast.'  No California decision has specifically determined whether this provision applies also to magazines. However, our Supreme Court, in holding the statute constitutional, has noted the interest of the public in the free dissemination of news (Werner v. Southern Calif. etc. Newspapers, 35 Cal.2d 121, 128 [216 P.2d 825] * * *).  Particular emphasis was placed upon the pressures upon media of news dissemination for publishing 'news while it is new,' and the resultant limitation of time and opportunity for ascertaining the complete accuracy of all items printed.  Both dissenting opinions (pp. 138, 153 [216 P.2d 825] ) asserted arbitrary and discriminatory classification in the omission of magazines from the protected group.  Law review comment has assumed the exclusion of magazines from protection (64 Harv.L.Rev., 678, 679).

"Although one decision (Harris v. Curtis Publishing Co., 49 Cal.App.2d 340, 353–354 [121 P.2d 761] * * *) has assumed application of section 48a to magazines, it does not discuss the point, which apparently was not raised by the briefs.  Another (Shumate v. Johnson Publishing Co., 139 Cal.App.2d 121, 129–130 [293 P.2d 531] * * * implies that the statute does not extend to magazines.  * * *.

"On full review of the statute, we conclude that it applies only to a publication in a newspaper or by radio.  Its terms are clear.  The Legislature conspicuously failed to include magazines in the protected group.  We are bound by this apparently intended omission.  Extension of the statute requires amendment rather than interpretation."

(Morris v. National Federation of the Blind, supra, 192 Cal.App.2d 162, 165–166, 13 Cal.Rptr. 336.)

Employing a similar analysis, the court in Montandon agreed with the conclusion reached in Morris.  In doing so, however, it was further obliged to confront the intervening and apparently contrary holding in Briscoe v. Readers Digest Association, Inc., supra, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34, which it rationalized as follows:

"In Briscoe v. Reader's Digest Association, Inc. (1971) 4 Cal.3d 529, [93 Cal.Rptr. 866, 483 P.2d 34] * * *, an action against the publisher of Reader's Digest for invasion of plaintiff's right of privacy by publishing the fact that some 11 years prior to the publication he had hijacked a truck and fought a gun battle with police, the trial court sustained without leave to amend a demurrer to the complaint.  The Supreme Court reversed, holding that the complaint did state a cause of action for invasion of privacy by publication of plaintiff's name in the article.  The court stated further that allegations in the complaint were not sufficient to state a 'false light' cause of action, one which is in substance equivalent to a libel claim, because the plaintiff had not complied with the requirements of section 48a.

"As Briscoe involved not a newspaper but a magazine, it would appear that the court is holding that section 48a applies to a magazine as well as a newspaper.  Unfortunately, no discussion appears therein of the cases which hold that the section does not apply to magazines.  Nor is there any discussion of the reasons upon which the holding is based.  * * * *.  Moreover, the court in Briscoe cited as the only support for its holding, Werner, supra, and Kapellas v. Kofman (1969) 1 Cal.3d 20 [81 Cal.Rptr. 360, 459 P.2d 912] * * *, both of which were libel actions against newspapers and contained no discussion of the application of section 48a to magazines.

"Section 48a was originally adopted in 1931 (Stats.1931, ch. 1018, p. 2034, § 1) and applied only to newspapers.  It was amended in 1945 (Stats.1945, ch. 1489, p.

2763, § 5) to add radio.   The statute on its face applied only to ' "a newspaper" and radio broadcast.'   It is significant in light of the decision in Morris, supra, in 1961 that the section did not apply to magazines, that the Legislature has not amended it to include magazines.   It is also significant that the Legislature in 1949 provided in section 48.5 of the Civil Code that the term 'radio broadcast' as used in part 2 of the code is 'defined to include both visual and sound radio broadcasting.'   If, as defendant claims, the Legislature intended to include magazines it has had abundant opportunity to do so.

"In Briscoe, supra, [4 Cal.3d] page 543 [93 Cal.Rptr. 866, 483 P.2d 34], the court said:  * * * * * * 'We hold today only that, as pleaded, plaintiff has stated a valid cause of action, sustaining the demurrer to plaintiff's complaint was improper, and that the ensuing judgment must therefore be reversed.'  [Italics added.]   In view of the court's statement limiting its opinion to a matter of pleading and the other matters above stated, Briscoe can be considered as authority for overruling the determination in Morris, supra, [192 Cal.App.2d] page 162 [13 Cal.Rptr. 336], that section 48a does not apply to magazines." 5

(Montandon v. Triangle Publications, Inc., supra, 45 Cal.App.3d 938, 951–952, 120 Cal.Rptr. 186 (hg. den. 5–8–75); see also Alioto v. Cowles Communications, Inc., 519 F.2d 777 (9th Cir.), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975);   Cameron v. Wernick (1967) 251 Cal.App.2d 890, 892, fn. 1, 60 Cal.Rptr. 102.)

   From the foregoing it would appear no definitive exposition of the scope of § 48a has been articulated sufficiently for us to say the question of its application here is without doubt.   We nevertheless are of the opinion that what emerges as the better view from the authorities discussed is the proposition that the protection afforded by the statute is limited "to those who engage in the immediate dissemination of news on the ground that the Legislature could reasonably conclude that such enterprises * * * * cannot always check their sources for accuracy and their stories for inadvertent publication errors * * *."  (Field Research Corp. v. Superior Court, supra, 71 Cal.2d 110, 114, 77 Cal.Rptr. 243, 453 P.2d 747.)

Seen in this light, the essential question is not then whether any publication is properly denominated a magazine or by some other designation, but simply whether it ought to be characterized as a newspaper or not within the contemplation of § 48a, a question which must be answered, as the trial court supposed, in terms which justify an expanded barrier against damages for libel in those instances, and those only, where the constraints of time as a function of the requirements associated with production of the publication dictate the result.[6]

   Having so decided, we are also satisfied to conclude without extensive recitation of the evidence that the trial court consistently with the foregoing rationale correctly determined the National Enquirer should not be deemed a newspaper for the purposes of the instant litigation.

Was there error associated with the award to respondent of $750,000 in punitive damages?   Yes.

In order, first, to provide the framework employed by us in rejecting certain contentions raised by appellant under this heading, we set out preliminarily the following considerations and principles fundamental to our conclusions.

Nearly twenty years ago, it was announced in New York Times Co. v. Sullivan (1964) 376 U.S. 254 at pp. 279–280, 84 S.Ct. 710, at pp. 725–726, 11 L.Ed.2d 686 that:

"The constitutional guarantees [relating to protected speech] require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' "

The constitutional privilege thus defined was extended three years later in Curtis Publishing Co. v. Butts (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, to include within its protection not only public officials but also "public figures," such that:

"Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth."

(Gertz v. Welch (1974) 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789.)

What was intended to be accomplished in each of these instances was to make available an "antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander" (Ibid.), which rule holds publishers responsible for their false utterances even where an absence of "malice" is positively established, as for example in the case of a defamation which mistakenly or negligently identifies a party as its subject, "intending" another.   (See Taylor v. Hearst (1895) 107 Cal. 262, 40 P. 392.)

Finally, in Gertz v. Welch, supra, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, because it was thought "the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual," (Id., at pp. 345–346, 94 S.Ct. at 3009–3010;  emphasis added) a wholesale extension of the New York Times test to such persons was rejected as one which would abridge that legitimate state interest to an unacceptable degree, and it was held instead that:

" * * * so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual,"

but that:

" * * * the States may not permit recovery of presumed ( [i.e., compensatory damages without evidence of actual loss) or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."

so that:

" * * * In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury."

(Ibid., at pp. 347, 349, 350, 94 S.Ct. at pp. 3010, 3011, 3012;  see also Rosenbloom v. Metromedia, Inc. (1971) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296.)

These aspects of the scope of the New York Times rule having been related, we observe additionally that, as will hereinafter be seen, the reference in the rule to "actual malice" may prove confusing when juxtaposed to similar terms commonly employed in the law relating to libel,[7] where, as in a case like the one before us, those terms are involved with the question of punitive damages.   The difference, nevertheless, between the concept of malice as the term is used respecting liability for libel and the meaning of the word as it provides the basis for recovery of punitive damages for that tort, at least in California, has been clearly articulated in the case of Davis v. Hearst (1911) 160 Cal. 143, 116 P. 530.   Thus it was there pointed out that for purposes of the distinction it is necessary only to define two of the several terms (see fn. 7),

namely malice in law and malice in fact, the former being understood as:

"* * * that malice which the law presumes (either conclusively or disputably) to exist upon the production of certain designated evidence, which malice may be fictional and constructive merely, and which, arising, as it usually does, from what is conceived to be the necessity of proof following a pleading, which in turn follows a definition, is to be always distinguished from true malice or malice in fact."

and the latter referring to:

"* * * a state of mind arising from hatred or ill-will, evidencing a willingness to vex, annoy, or injure another person,"

or to:

"the motive and willingness to vex, harass, annoy, or injure,"

that is to say to:

"malus animus —indicating that the party was actuated either by spite or ill will towards an individual, or by indirect or improper motives, though these may be wholly unconnected with any uncharitable feeling towards anybody."

(Id., at pp. 160, 162, 164, 116 P. 530.)

As illustrative of the respective functions of these terms in a libel case and in amplification of what is meant by malice in fact, the Davis court went on to point out that:

"It has been said that malice is not a necessary ingredient, is no part of the gist of our civil action for [libel].   No particular harm can be worked by the declaration that malice is a necessary part of every action for libel, if it be understood that the particular malice there referred to is the constructive or fictional malice which we have designated malice in law.   There is, however, a general provision of the law allowing punitive damages in the discretion of the jury, in an action not arising from contract— in other words, in any action sounding in tort, 'where the defendant has been guilty of * * * malice, express or implied.'   (Civ.Code, sect. 3294.)   Enough has been said to show what a fertile field for error is the language just quoted, when attempt is made to apply it to malice, express or implied, under all their varying definitions.

"It should be apparent that the malice, and the only malice, contemplated by section 3294 is malice in fact, and that the phrase 'express or implied' has reference only to the evidence by which that malice is established;

"And while in the cases this malice, the existence of which we have declared to be essential to a recovery of punitive damages, is sometimes called express malice, sometimes actual malice, sometimes real malice, and sometimes true malice, it is always in its analysis malice of the one kind, the malice of evil motive.   (Witcher v. Jones [Com.Pl.] 17 N.Y.Supp. 491; Union Mutual Life Ins. Co. v. Thomas, [C.C.A.] 83 Fed. 803, * * *; Miner v. Bradstreet Co., 170 Mo. 486 [73 S.W. 668], * * *; French v. Deane, 19 Colo. 504 [36 P. 609], * * *; Inman v. Ball, 65 Iowa 543 [22 N.W. 666], * * *; Miller v. Kirby, 74 Ill. 242; * * *.   While such malice in fact is essential to an award of exemplary damages, it may be proved directly or indirectly, that is to say by direct evidence of the evil motive and intent, or by legitimate inferences to be drawn from other facts and circumstances in evidence.

* * * * *.''

(Ibid., at pp. 161, 162, 163, 116 P. 530.)   (Emphasis added.)

The matter herein was tried upon the premise respondent is a "public figure" and there was employed in establishing the liability of appellant the New York Times standard, expressed in the trial court's instruction to the jury that:

"In addition, plaintiff must prove by clear and convincing evidence that defendant published the item complained of with actual malice—that is, that the defendant published the item either knowing that it was false or with reckless disregard for whether it was true or false."

   On the question of punitive damages, however, the jury was instructed that such damages could be imposed if appellant had been shown "by a preponderance of the evidence" to have been "guilty of malice," which was defined as:

"conduct which is intended by the defendant to cause injury to the plaintiff or carried on by the defendant with a conscious disregard for the rights of others."

Appellant asserts this instruction constituted prejudicial error in that, even apart from Civil Code section 48a, the law under the circumstances present requires that punitive damages may not be awarded to a public figure without proof of the publisher's hatred or ill will by clear and convincing evidence.   Stated another way, appellant maintains that a "standard" of proof expressed in the trial court's "intended-conscious disregard" language, and a "burden" of proof based on a preponderance of the evidence, are inadequate in any libel case of the type present here.   Support for the proposition, in appellant's view, is found in Gertz v. Welch, supra, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 and from the other cases similar to it which are cited above.

We are of the opinion that in so contending appellant is mistaken.   As can be ascertained from what we have set out above, the "actual malice" required by New York Times to be established by "clear and convincing evidence" refers to that aspect of malice, properly denominated malice in law, necessary to find liability for libel and not to malice in fact, essential to the recovery of punitive damages, which under the cases discussed may be arrived at on the basis of applicable state standards, here on the basis of a preponderance of the evidence.   (See Cantrell v. Forest City Pub. Co. (1974) 419 U.S. 245, 251–252, 95 S.Ct. 465, 469–470, 42 L.Ed.2d 419;  cf. Smith v. Wade (1983) 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632.[8]   Moreover, as also appears from what we have said, the definition of malice in fact is not controlled by New York Times or its progeny, but is instead that articulated in Davis v. Hearst, namely, "the motive and willingness to vex, harass, annoy, or injure" or the " 'malus animus — indicating that the party was actuated either by spite or ill-will towards an individual, or by indirect or improper motives, though these may be wholly unconnected with any uncharitable feeling towards anybody.' "   (Davis v. Hearst, supra, 160 Cal. 143, at pp. 162, 164, 116 P. 530, Ibid., at pp. 162, 164, 116 P. 530, quoting from Hicks v. Faulkner, 8 Q.B.Div. 167), a standard which we think was adequately conveyed by the trial court's instruction.[9]

   It is next contended, however, that regardless of what we have just said, the punitive damages assessed herein are still legally unsupportable.   More specifically it is urged (a) the amount of those damages was grossly excessive;  (b) such damages were impermissibly disproportionate to the compensatory damages awarded;  (c) that the trial court erred in revising the ratio between punitive and compensatory damages on its remittitur;  and (d) that insufficient evidence was present which would show appellant ratified the acts of its employees, so as to justify its liability for punitive damages under Civil Code section 3294(b).[10]

appellant ratified the acts of its employees, so as to justify its liability for punitive damages under Civil Code section 3294(b).

In addressing the claims that the penalty award was excessive and disproportionate, we accept as reiterative of settled principles those observations related in Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 927–928, 148 Cal.Rptr. 389, 582 P.2d 980 (fns. omitted) to the effect that:

"As we pointed out in Bertero v. National General Corp., supra, 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608], our review of punitive damage awards rendered at the trial level is guided by the 'historically honored standard of reversing as excessive only those judgments which the reviewing court, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice.'  (13 Cal.3d at p. 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608].)   Stating the matter somewhat differently in a similar case, we indicated that an appellate court may reverse such an award 'only " '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' " '   (Schroeder v. Auto Driveaway Co. (1974) 11 Cal.3d 908, 919, 114 Cal.Rptr. 622, 523 P.2d 662 * * *.)

"In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages.   One factor is the particular nature of defendant's acts in light of the whole record;  clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal.   (See Bertero v. National Ins. Corp., supra, 13 Cal.3d 43, 65 [118 Cal.Rptr. 184, 529 P.2d 608];  Fletcher v. Western National Life Ins. Co., supra, 10 Cal.App.3d 376, 408–409 [89 Cal.Rptr. 78];  Ferraro v. Pacific Fin. Corp. (1970) 8 Cal.App.3d 339, 352–353 [87 Cal.Rptr. 226] * * *.)   Another relevant yardstick is the amount of compensatory damages awarded;  in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small.   (But cf. Finney v. Lockhart (1950) 35 Cal.2d 161, 164 [217 P.2d 19] * * *.)   Also to be considered is the wealth of the particular defendant;  obviously, the function of deterrence * * * will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.   (See Bertero, supra, [13 Cal.3d] at p. 65 [118 Cal.Rptr. 184, 529 P.2d 608];  Roemer v. Retail Credit Co. (1975) 44 Cal.App.3d 926, 937 [119 Cal.Rptr. 82] * * *;  Wetherbee v. United Ins. Co. of America (1971) 18 Cal.App.3d 266, 270–271 [95 Cal.Rptr. 678] * * *;  Ferraro v. Pacific Fin. Corp., supra, 8 Cal.App.3d 339, 353 [87 Cal.Rptr. 226];  MacDonald v. Joslyn (1969) 275 Cal.App.2d 282, 293–294 [79 Cal.Rptr. 707] * * *.)   By the same token, of course, the function of punitive damages is not served by an award which in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter."

(See also Roemer v. Retail Credit Co., supra, 44 Cal.App.3d 926, 937, 119 Cal.Rptr. 82;  Wetherbee v. United Ins. Co. of America (1971) 18 Cal.App.3d 266, 271, 95 Cal.Rptr. 678.)

We likewise accept the proposition it is our duty to intervene in instances where punitive damages are so palpably excessive or grossly disproportionate as to raise a presumption they resulted from passion or prejudice.   (See Rosener v. Sears, Roebuck & Co. (1980) 110 Cal.App.3d 740, 749–750, 168 Cal.Rptr. 237;  Zhadan v. Downtown L.A. Motors (1976) 66 Cal.App.3d 481, 496, 136 Cal.Rptr. 132.)

Viewing the record in the light of these principles, and assuming, as we will hereinafter decide, that the award of compensatory damages was proper, we are of the opinion the award to respondent of $750,000 in order to punish and deter appellant was not justified.

In so concluding, we are persuaded the evidence fairly showed that while appellant's representatives knew that part of the publication complained of was probably false and that the remainder of it in substance might very well be, it was nevertheless determined to present to a vast national audience in printed form statements which in their precise import and clear implication were defamatory, thereby exposing respondent to contempt, ridicule and obloquy and tending to injure her in her occupation.   We are also satisfied that even when it was thought necessary to alleviate the wrong resulting from the false statements it had placed before the public, the retraction preferred was evasive, incomplete and by any standard, legally insufficient.[11]   (See Turner v. Hearst (1896) 115 Cal. 394, 402–403, 47 P. 129;  Behrendt v. Times-Mirror (1938) 30 Cal.App.2d 77, 88, 85 P.2d 949.)   In other words, we have no doubt the conduct of appellant respecting the libel was reprehensible and was undertaken with the kind of improper motive which supports the imposition of punitive damages.

Nevertheless, evidence on the point of appellant's wealth adequately established appellant's net worth to be some $2.6 million and its net income for the period under consideration to be about $1.56 million, such that the penalty award, even when substantially reduced by the trial court based on its conclusion the jury's compensatory verdict was "clearly excessive and * * * not supported by substantial evidence," continued to constitute about 35% of the former and nearly half the latter.

Such being the case, and in the effort required of us to find acceptable only that balance between the gravity of a defendant's illegal act and a penalty necessary to properly punish and deter such unlawful conduct as will serve the function of punitive damages, we hold the exemplary award herein to be excessive, and require either that it be reduced to the sum of $150,000 or that appellant be granted a new trial on that issue.   (See Rosener v. Sears, Roebuck & Co., supra, 110 Cal.App.3d 740, 757, 168 Cal.Rptr. 237.)

Having so decided, it is unnecessary for us to address appellant's further contention the trial court was bound on its remittitur, at least as to an upper limit of punitive damages, to the ratio of damages established by the jury.[12]

We also summarily reject the claim the malice in fact established herein should not have been attributed to appellant, since it is clear to us from the record the acts of the individuals involved in publishing the defamatory statements were ratified in accordance with the requirements of Civil Code section 3294(b).   (See fn. 10.)

Was there error associated with the award to respondent of $50,000 in compensatory damages?   No.

We have previously recited those considerations, both legal and factual, which underlie our conclusion appellant's liability herein was established upon clear and convincing evidence.   It remained nevertheless for respondent to establish the actual damage she had suffered as a result of the publication involved.   Whether such damage necessarily encompassed both special and general damages was a matter dependent upon whether the publication was or was not libelous on its face, in accordance with Civil Code section 45a which provides that:

"A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face.   Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof.   Special damage is defined in Section 48a of this code."

That what was printed here was libelous on its face seems abundantly clear, in that the message conveyed was that respondent had been boisterous and loudly argumentative in a public dining place, had "traipsed" around the restaurant sharing part of her dinner indiscriminately, and had "raised eyebrows" when she boorishly giggled instead of apologizing after spilling wine on another, a message which reasonably carried the implication respondent's actions were the result of some objectionable state of inebriation.   Nor is the character of the publication altered by the consideration it might have been interpreted innocently.

"The fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself.   The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it

appear from the language itself.    The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that at least some of the readers will take it in its defamatory sense.    * * * It would be a reproach to the law to hold that a defendant intent on destroying * * * reputation * * * could achieve his purpose without liability by casting his defamatory language in the form of an insinuation that left room for an unintended innocent meaning."

(MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 549, 551, 343 P.2d 36;  Fairfield v. Hagan (1967) 248 Cal.App.2d 194, 200–201, 56 Cal.Rptr. 402.)

Accordingly, it was incumbent upon respondent to show only those general damages caused by appellant's wrong, i.e., damages arising from respondent's loss of reputation, shame, mortification and injured feelings.    In this regard her own testimony was to the following effect:

"Q    When was the first time that you had any knowledge of that article or the contents of that article?

"A    I believe it was the day that it came out.

"Q    What was your reaction?

"A    Well, I was absolutely—I was stunned.    * * * *

I felt very, very angry.    I started to cry.    I started to shake.

"Q    Why such a reaction to this [article]?

"A    Well, it portrays me as being drunk.    It portrays me as being rude.    It portrays me as being uncaring.    I portrays me as being physically abusive.

It is disgusting, and it is a pack of lies.

I—It hurts.    It hurts, because words, once they are printed, they've got a life of their own.    Words, once spoken, have a life of their own.

How was I going to explain this to my kids, my family, the people I care about?

How am I going to go talk to things * * * against alcoholism?

"Q    [Y]ou mentioned something about work against alcoholism.

What is that?

"A    It didn't start out as any kind of a crusade at all.    I think I must have spoken about it many years ago, first maybe in a magazine article for McCall's or Redbook or Ladies' Home Journal, or something like that, when, in a sense, I came out of the closet about my parents.

I told about my background.

" * * * * * *

Then I was asked about it on a few talk shows, and then I started getting requests to do various public service things relating to abuse of alcohol, which I was very happy to do.

"Q    And you have done a number of public service things—

Yes.

"Q    —relating to abuse of alcohol?

"A    Yes.

"Q    Now, when you first heard about this article, when you first heard what the article said, I take it, from what you said, that you at least interpreted the language of the article as inferring that you were intoxicated?

"A    I think anyone who can read would.

"Q    And your reaction—one of the reactions you had—we are not talking about now, but at the time you heard about this article, one of the reactions you had was, as you described it, related to this work that you had been doing, the—let's say image, for lack of a better word, the image that you have in respect to this working against abuse of alcohol?

"A    Yes.    I mean, it hurts.    If you think you are going to get up there and talk to somebody and say, 'Hey, you know, there is a way, there is a cure for this, and people have been cured—'  If I get up and talk about that and somebody having read that or heard about it says, 'Who is she to get up there and tell me what to do, she runs around having fights with people and throws wine on them,' I mean, what—You see what I'm getting at?

I tell you what really hurts is that I know—I really know that most people believe what they read.    And that hurts.

"Q    What did you—And I preface this by saying, and obviously you know it already, that we have to describe the feelings that you had, both physical and mental, at the time you found out about this article.    What did you feel physically, if anything different than usual?

"A    Well, I don't think I would be different from anybody else, if anyone in here just put their name on that.    Some people might get a headache.    My stomach just went back and forth, and did flip flops.    My stomach did flip flops.    I cried.    When you cry and your stomach does that, your heart pounds real fast.    You shake.    You cry. You calm down, you cry;  you calm down, then you start thinking about all the ramifications, about, 'Oh, my God, should I call my kids?    Are they going to hear about this in school or should I talk to them about it and say, 'Hey, it didn't happen'?    Should I call my relatives?    What should I do?    Should I ignore anything that anybody is going to say to me today?    But what am I going to do tomorrow?'

"Q    Was the article that had been read to you still on your mind as you were walking to rehearsal?

"A    Yes.

"Q   Did anything unusual happen to you during the time you were walking?

"A   I was crossing the street and a cab driver yelled out at me and said, 'Hey, Carol, I didn't know you liked to get into fights.'

"Q   This, apparently, obviously, was a person that you did not know?

"A   No.   It was a cab driver.

"Q   Does the article still concern you?

"A   Yes.

"Q   Why is that?

"[A]

When I am dead and gone, it's going to be in my files.

My kids, my grandchildren, great-grandchildren, whatever—everybody's got a file on people, library, if you will—they can look that up.

And unless—it's always going to be with me."

The foregoing, in our view, when combined with the further evidence of respondent's prominence in the public eye, her professional standing and the fact the National Enquirer is read by some 16 million persons, was sufficient to support an award of $50,000 in compensatory damages.[13]   (See Scott v. Times-Mirror Co. (1919) 181 Cal. 345, 365, 184 P. 672;   Douglas v. Janis (1974) 43 Cal.App.3d 931, 940, 118 Cal.Rptr. 280;   see also Allard v. Church of Scientology (1976) 58 Cal.App.3d 439, 450, 129 Cal.Rptr. 797.)

   Was there any other reversible error present in the matter?   No.

Finally it is maintained the trial court committed prejudicial error in its rulings respecting two incidents which occurred during the course of the trial.

   In the first of these, as an accommodation to respondent's lawyer, counsel for appellant, in the presence of the jury, read aloud the following from deposition testimony.

"Q   Do you have any agreement at this time with the National Enquirer as to any possible liability that you may have concerning this article, such as an indemnification agreement?

"A   Yes, obliquely, I have been told.

"I believe, although I do not specifically remember, although I think I specifically remember Iain Calder, the editor and chief of the National Enquirer, told me that I would be in no way held personally reliable [sic] and that we have insurance.


"And to this day everything that is written in the column is covered—"

There then transpired the following exchange between the trial court and counsel for the parties.

"[COUNSEL FOR APPELLANT:] I have to move for a mistrial on behalf of all of my clients.   There has been a reference to insurance.   The incredibly embarrassing thing for me professionally and ethically is that I was the instrumentality, if you will, of exposing this.

"THE COURT:  Well, unfortunately, you know, I guess all of us—this can happen to all of us.


"And I can give—I'm going to deny the motion for a mistrial, but I'm going to—If you want, I can give an admonition that I think is contained in BAJI 1.04, or whatever the appropriate number is.   I'd be happy to do that.

"Sometimes that calls undue attention to it.   Whatever your pleasure is.   I can cover it that way.


"So why don't we just have a stipulation that there was no insurance or something like that.

   "[COUNSEL FOR APPELLANT:  Well, I'm sure not trying to be difficult, because I'd love to have this done.   *  *  *  *

"[COUNSEL FOR RESPONDENT:] How about just telling them that they should ignore the last comment?

" 'There is no insurance applicable to this case.' "

"[COUNSEL FOR APPELLANT:] Well, I'd sure like to tell them for their purposes there is no insurance that is applicable to this case;  that the witness was in error.

"THE COURT:  Fine."

The trial court then advised the jury what they had heard was erroneous and that there "was no insurance in the case."

We find no error in this of which appellant may complain.   Having joined in fashioning the corrective admonition, it cannot now be heard to say the cure was worse than the disease (Cf. Weirum v. RKO General, Inc. (1975) 15 Cal.3d 40, 50, 123 Cal.Rptr. 468, 539 P.2d 36), and had nothing further been said to the triers of fact, the disclosure described would not have warranted a mistrial.   (See Packard v. Moore (1937) 9 Cal.2d 571, 580, 71 P.2d 922.)

   In the second incident referred to, at least a number of the jurors became aware of a verbal denunciation of the National Enquirer by television star Johnny Carson on his program "The Tonight Show," wherein he asserted essentially that the publication was composed of fabrications authored by liars.   After examining each juror concerning the effect of the tirade on the juror's ability to participate in a fair and impartial trial and being satisfied in the premises, the trial court excused two of the triers

of fact, seated the only available alternate, and proceeded with a panel of twelve, from which it was agreed nine could determine the cause.   No more was required.   (See People v. Manson (1977) 71 Cal.App.3d 1, 28, 139 Cal.Rptr. 275;  People v. Byers (1970) 10 Cal.App.3d 410, 416, 88 Cal.Rptr. 886;  People v. Blackwell (1967) 257 Cal.App.2d 313, 321–323, 64 Cal.Rptr. 642.)

The judgment is affirmed except that the punitive damage award herein is vacated and the matter is remanded for a new trial on that issue only, provided that if respondent shall, within 30 days from the date of our remittitur, file with the clerk of this court and serve upon appellant a written consent to a reduction of the punitive damage award to the sum of $150,000, the judgment will be modified to award respondent punitive damages in that amount, and as so modified affirmed in its entirety.   (Rosener v. Sears Roebuck & Co., supra, 110 Cal.App.3d 740, 757, 168 Cal.Rptr. 237.)   Each party to bear her or its costs on appeal.

I concur in the affirmance of the judgment, but I dissent from that part of the majority opinion reducing the award of punitive damages.

Our decision in Allard v. Church of Scientology (1976) 58 Cal.App.3d 439, 129 Cal.Rptr. 797, fully supports the majority view herein.   But I am now convinced it was a mistake in Allard to have uncritically applied the rule and majority view of Cunningham v. Simpson (1969) 1 Cal.3d 301, 81 Cal.Rptr. 855, 461 P.2d 39, thus resulting in a reduction of the punitive damages in Allard.   Unlike Dr. Frankenstein, we did not create a "monster."   Nonetheless by our Allard decision we helped nurture an improper and growing practice in the appellate courts to reduce punitive damages simply because of some sort of "disproportion."   While consistent with established case law, I believe the practice needs limiting if it is not in fact error.

The weakness in Allard and in the present majority opinion is its undue weight and emphasis on the presumption that just because an award of punitive damages is a certain percentage greater than actual damage it must have been a result of passion and prejudice.   I think such a presumption is a non sequitur.   In each case it is just as probable that the verdict was the result of fair, honest, cool and dispassionate deliberations of the jury concluding that it would take at least that much money to teach the defendant a lesson and to insure that it will not offend again.

In reducing a jury's award of punitive damages, the court is in effect reweighing the evidence, which is a function of the jury and should be interfered with only upon a clear and convincing showing that the jury was driven by passion and prejudice.   Interference with the jury's award should not rest upon indulging in a presumption based merely on comparing punitive and compensatory damages nor merely upon an award which to the appellate court's mind is "too much."   As Justice Mosk stated in his dissent in Cunningham v. Simpson, supra, 1 Cal.3d 301, 311–312, 81 Cal.Rptr. 855, 461 P.2d 39:  "Part of the damages awarded here were punitive.   Again, the law on this subject is clear.   '[The jury's estimate]' of what would be sufficient as a punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them . to fix such sum which expressed their judgment in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed.'   (Di Giorgio Fruit Corp. v. AFL–CIO (1963) supra, 215 Cal.App.2d 560, 581 [30 Cal.Rptr. 350], quoting Scott v. Times-Mirror Co. (1919) 181 Cal. 345, 367 [184 P. 672, 12 A.L.R. 1007].)"

Admittedly, some of the foregoing considerations apply equally to an award made or resulting from a reduction by a trial judge alone as well as to an award made by a jury.   But it must be remembered that our inquiry at bench is not into the motives of the jury.   Rather, our inquiry is whether the trial court erred in reducing the amount of punitive damages from that which the jury had fixed.   The act of the trial court appears to have been an attempt to be moderate.   Reducing an award of punitive damages from $1,300,000 to $750,000 does not seem to me to be an act of passion or prejudice.   In the absence of a showing by appellant that the reduction was the result of bias by the trial court, its determination should be upheld on appeal.

In assessing the correct amount of punitive damages, of equal importance as the majority's view of proportionality based on comparison of compensatory damages are the facts considered and expressly relied on by the trial court at bench in refusing and fixing the amount of punitive damages in denying the motion for new trial.   Among these are:  "[t]he conduct of the defendant was highly reprehensible, . [was a] fabrication and reckless disregard; . [f]ailure by top management to publish an adequate correction is substantial evidence of malice and bad faith; . defendant's net worth amounted to approximately $2,600,000 and it had earnings of $1,300,000 after taxes for the last ten month period; . the defendant has absolutely no remorse for its misdeeds; . it is the policy of the National Enquirer to publish two or three unflattering articles about celebrities every week; . [t]he defendant engages in a form of legalized pandering designed to appeal to the readers' morbid sense of curiousity[;]  [t]his style of journalism has been enormously profitable to the defendant; . [a]n award of $1,300,000 will probably not amount to 'capital punishment' (bankruptcy), . because of the defendant's strong cash position."

The fact is that this is a publication read nationally by 16 million people.   The potential for harm through a repetition of a libel by such an institution is tremendous.   There are others to be protected from the harm.   If the risk to an intentional wrongdoer that he will be adequately punished is slight, the defendant may well chance it again.   It can in effect "write it off" as an expense or cost of doing business.   Thus punitive damages need to be more than "an expense" item or "cost of doing business" which the defendant can calculate and absorb.   In a case such as this, reference to the ratio of compensatory to punitive damages, such as emphasized in the majority opinion, is neither helpful nor relevant.   (Vossler v. Richards Mfg. Co. (1983) 143 Cal.App.3d 952, 192 Cal.Rptr. 219.)   Perhaps some cases lend themselves to comparison of various ratios.   I think most do not.   Ratio examination of the amount of compensatory damage to amount of punitive damage does not really tell us what is necessary to teach a defendant, such as the one at bench, not to abuse its privilege of the freedom of the press.   On the other hand, considerations of punitive damage to defendant's wealth may be more germane.   As stated in Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 582 P.2d 980:  "[A]lso to be considered is the wealth of the particular defendant;  obviously, the function of deterrence . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort."   Yet to reduce the award from $750,000 to $150,000, as suggested by the majority in this case would do just that.

I would affirm the trial judge's determination of the proper amount of punitive damages.

FOOTNOTES

1.   "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."   (Civ.Code, § 45.)

2.   "§ 48a.   Libel in newspaper;  slander by radio broadcast."1.   Special damages;  notice and demand for correction.   In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided.   Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected.   Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous."2.   General, special and exemplary damages.   If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages;  provided that no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast "with actual malice and then only in the discretion of the court or jury, and actual malice shall

not be inferred or presumed from the publication or broadcast."3.    Correction prior to demand.    A correction published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as the statements claimed in the complaint to be libelous, prior to receipt of a demand therefor, shall be of the same force and effect as though such correction had been published or broadcast within three weeks after a demand therefor."4.    Definitions.    As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:"(a)    'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;"(b)    'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he had expended as a result of the alleged libel, and no other;"(c)    'Exemplary damages' are damages which may in the discretion of the court or jury be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice;"(d)    'Actual malice' is that state of mind arising from hatred or ill will toward the plaintiff;  provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice."

3.    If a "deadline" is the time by which an article must be placed in the printing process in order to be completed for distribution, by one accepted definition "lead time" is the period from the deadline to such point of completion, or, put another way, is the shortest period of time between completion of an article and the time it is published.

4.    The determination referred to is that ultimately made immediately prior to trial.    Earlier, in January of 1980, appellant moved for partial summary judgment on the ground the "hatred or ill will" required to be shown under § 48a (see fn. 3) could not be established by respondent, thereby precluding punitive damages.    That motion was granted.    In February 1980, respondent moved to modify or vacate the order.    After consideration of this motion, the prior order was modified to state that a triable issue of fact existed whether "hatred or ill will" could be shown but that as a matter of law the National Enquirer was a newspaper "within the meaning of newspaper as said term is contained in Civil Code § 48(a)."Within six months following the modification, respondent moved to vacate both prior rulings and this motion was granted upon the premise "the issue of whether or not defendant National Enquirer is a newspaper or magazine for purposes of Civil Code § 48(a) and this action is a triable issue of fact which shall be determined upon trial."While appellant now suggests the "newspaper" issue should at least have been submitted to the jury, its trial brief on the point specifically concluded that "The question of the newspaper or magazine status of The National Enquirer under Civil Code § 48(a) is one for the Court.    Montandon v. Triangle Publications, Inc., 45 Cal.App.3d 938, 953 [120 Cal.Rptr. 186] (1975)."

5.    The Montandon court further observed that:"Johnson v. Harcourt, Brace, Jovanovich, Inc. (1974) 43 Cal.App.3d 880 [118 Cal.Rptr. 370] * * *, is an action for invasion of the plaintiff's right of privacy by republication of an article from The Nation magazine in a college English textbook.    Judgment of the trial court sustaining the defendant's demurrer without leave to amend was affirmed.    In the opinion reference is made to Kapellas, supra, [1 Cal.3d] page 20 [81 Cal.Rptr. 360, 459 P.2d 912], and in Briscoe, supra, [4 Cal.3d] page 529 [93 Cal.Rptr. 866, 483 P.2d 34], to the California Supreme Court's determination that a false light action is in substance equivalent to a defamation suit and that a plaintiff alleging false light, therefore, must also satisfy the requirements of malice and demand for retraction within 20 days of notice of the publication.    [C]iting Civil Code section 48a the court stated:  'Although Briscoe extended the coverage of section 48a to encompass magazines, under the conclusion we here reach we do not determine whether the retraction requirement extends to the publication of books.'  (Johnson, supra, [43 Cal.App.3d] p. 894 [118 Cal.Rptr. 370].)'"As we have pointed out hereinbefore, we do not consider Briscoe as authority for the proposition that section 48a applies to magazines, nor do we consider that the mere reference in Johnson, supra, p. 880 [118 Cal.Rptr. 370], to section 48a adds anything to the issue, particularly as the court refused to go into the application of section 48a to books and the question of its application to magazines was not before the court."  (Montandon v. Triangle Publications, Inc., supra, 45 Cal.App.3d 938, 952–953, 120 Cal.Rptr. 186.)

6.    In so saying we are mindful of the semantic and substantive difficulties inherent in the use in the present context of such words as "immediate" ("timely") and "news," it being the case that the former might be seen as a function of occurrence, or of discovery, or something else and the latter may be regarded as the product of the media, or as dependent for its definition upon the perception of its recipient or delineated in some other fashion.    (See generally, Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789;  Winters v. New York (1948) 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840;  Hannegan v. Esquire, Inc. (1946) 327 U.S. 146, 158, 66 S.Ct. 456, 462, 90 L.Ed. 586;  Goldman v. Time, Inc., 336 F.Supp. 133, 138 (N.D.Cal.1971).

7.    So, it has been remarked that:  " 'The jumble in some modern text books on slander and libel concerning malice, actual malice, malice in law, malice in fact, implied malice, and express malice (all derived from judicial utterances, it is true) is a striking testimony of the limitations of the human " 'mind.'    Ullrich v. New York Press Co., 23 Misc. 168, 171 [50 N.Y.S. 788], * * * " quoted in Davis v. Hearst (1911) 160 Cal. 143, 155, 116 P. 530.)In the recent case of Smith v. Wade (1983) U.S. at p. , fn. 6, 103 S.Ct. 1625 at p. 1630, fn. 6, 75 L.Ed.2d 632 at p. 640, fn. 6, a matter involving punitive damages under 42 U.S.C. § 1983, the majority declined to use the term "actual malice," observing that "While the term may be an appropriate one, we prefer not to use it, simply to avoid the confusion and ambiguity that surrounds the word 'malice'."

8.    "[Appellant] argues that the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance.   * * *"The argument overlooks a key feature of punitive damages—that they are never awarded as of right, no matter how egregious the defendant's conduct.   * * *"There has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability."  (Smith v. Wade, supra, (1983) U.S. at pp. – , 103 S.Ct. 1625 at p. 1638, 75 L.Ed.2d 632 at pp. 648–649.)In the matter before us, of course, the "threshold" for punitive damages may be viewed as dependent both upon the substantive finding of conscious, as opposed to reckless, disregard, and upon the degree of proof—preponderance versus clear and convincing—necessary to support the finding.    Whether conscious disregard found from a preponderance of evidence constitutes a higher threshold than reckless disregard found from clear and convincing evidence, we are satisfied the two are sufficiently similar that the application of the former, even in a context involving First Amendment issues, was justified.

9.    In Taylor v. Superior Court (1979) 24 Cal.3d 890, 157 Cal.Rptr. 693, 598 P.2d 854, a case involving punitive damages in a personal injury action brought against an intoxicated driver it was recited that:"Section 3294 of the Civil Code authorizes the recovery of punitive damages in noncontract cases 'where the defendant has been guilty of oppression, fraud, or malice, express or implied.'    As we recently explained, 'This has long been interpreted to mean that malice in fact, as opposed to malice implied by law, is required.  [Citations.]    The malice in fact, referred to . as animus malus, may be proved under section 3294 either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences).    [Citation.]'  [Bertero v. National General Corp. (1974) 13 Cal.3d 43, 66 [118 Cal.Rptr. 184, 529 P.2d 608] * * *.)"Other authorities have amplified the foregoing principle.    Thus it has been held that the 'malice' required by section 3294 'implies an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others.'  (Ebaugh v. Rabkin (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706] * * *;  see Gombos v. Ashe (1958) 158 Cal.App.2d 517, 527 [322 P.2d 933] * * *;  Stein, Damages and Recovery (1972) Nominal and Punitive Damages, § 186, at p. 369;  Prosser, Law of Torts (4th ed. 1971) § 2, at pp. 9–10.)    In Dean Prosser's words:  'Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action "punitive" or "exemplary" damages.    [¶] Something more than the mere commission of a tort is always required for punitive damages.    There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.'    (Ibid., fns. omitted, italics added.)"Defendant's successful demurrer to the complaint herein was based upon

plaintiff's failure to allege any actual intent of defendant to harm plaintiff or others.   Is this an essential element of a claim for punitive damages?   As indicated by Dean Prosser, courts have not limited the availability of punitive damages to cases in which such an intent has been shown.   As we ourselves have recently observed, in order to justify the imposition of punitive damages the defendant ' ". must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights.   [Citations.]" '   (Italics added;  Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980] * * *, quoting from Silberg v. California Life Ins. Co. (1977) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103] * * *;  accord, Seimon v. Southern Pac. Transportation Co. (1977) 67 Cal.App.3d 600, 607 [136 Cal.Rptr. 787] * * *;  G.D. Searle & Co. v. Superior Court (1975) 49 Cal.App.3d 22 [122 Cal.Rptr. 218] * * *.)"   (Id., at pp. 894−895, 157 Cal.Rptr. 693, 598 P.2d 854;  see also Cantrell v. Forest City Pub. Co., supra, 419 U.S. 245, 251−252, 95 S.Ct. 465, 469−470, 42 L.Ed.2d 419;  cf. Roemer v. Retail Credit Co. (1975) 44 Cal.App.3d 926, 119 Cal.Rptr. 82;  Field Research Corp. v. Patrick (1973) 30 Cal.App.3d 603, 106 Cal.Rptr. 473.)

10.    The statute provides in pertinent part that:"An employer shall not be liable for [punitive] damages . based upon acts of an employee of the employer, unless the employer * * * ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.   With respect to a corporate employer, the * * * ratification, or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation."

11.    The retraction appeared as the eighth item of a ten-item gossip column, whereas the libelous item was contained as the fourth item.   The headline to the gossip column containing the retraction failed to make any reference to the retraction although the defamatory item was highlighted by a large headline at the top of the column.   Even though the original defamatory item was further emphasized by its placement adjacent to a picture of Barbara Walters, the retraction was not placed next to a picture of a prominent celebrity.   The purported retraction was also substantially shorter and occupied less column space than the original item.   It repeated the substance of some of the defamatory statements while failing to refer to others.   Most notably, it never stated that Carol Burnett was not inebriated.   By inference it suggested that only the few published statements were false while the rest must have been true.   It equivocated by ambiguously stating "we understand" that the events did not occur.

12.    We are sensitive to the fact that all facets of defamation law since the New York Times case have been under the rigid scrutiny of the Supreme Court of the United States for the purpose of reconciling the common law and/or state law of defamation with the guarantees of the First Amendment.In effecting that reconciliation, the high court has announced significant changes with respect to the rule of liability and the need of clear and convincing evidence to establish liability.   It has announced too substantial restrictions respecting the recovery of damages where the New York Times standard for liability is not adhered to.   (See Gertz v. Welch, supra, 418 U.S. 323, 349−350, 94 S.Ct. 2997, 3011−3012, 41 L.Ed.2d 789.)   But while a review of the decisions of that court on the subject reveals a wide spectrum of opinion concerning the propriety of punitive damages in instances like the one before us, we do not find in any of these authorities an announcement of definitive principles which a state must apply to awards of such damages when, as here, the New York Times test has been satisfied.   We have therefore applied the law of this state on that question, as we perceive it to be.

13.    It is also urged by appellant it was improper for the trial court to instruct the jury it could consider respondent's particular susceptibilities and circumstances in arriving at actual damages.   If there were error in that respect, we deem it harmless in light of the evidence adduced on the issue.   (Cal. Const., Art. VI, § 13.)

 ROTH, Presiding Justice.

GATES, J., concurs.

**Was this helpful?**    Yes    No



### Welcome to FindLaw's Cases & Codes

A free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and statutes visit FindLaw's Learn About the Law.

Go to Learn About the Law  ›

BURNETT v. NATIONAL ENQUIRER INC (1983)

**BURNETT v. NATIONAL ENQUIRER INC (1983)**

**Docket No:** Civ. 66447.

**Decided:** July 18, 1983

**Court:** Court of Appeal, Second District, Division 2, California.

Need to find an attorney?

**Search our directory by legal issue**

Enter information in one or both fields (Required)

**Legal issue**

**I need help near** (city, ZIP code or county)

Bengaluru, Karnataka

**Find a lawyer** ›

**For Legal Professionals**

› Practice Management
› Legal Technology
› Law Students



**Go to Learn About the Law** ›

**Get a profile on the #1 online legal directory**

Harness the power of our directory with your own profile. Select the button below to sign up.



Get email updates from FindLaw Legal Professionals



**Enter your email address to subscribe**

\* Indicates required field

Email \*

>

## Need to find an attorney?

**Search our directory by legal issue**

Enter information in one or both fields (Required)

**Legal issue**

**I need help near** (city, ZIP code or county)

Bengaluru, Karnataka ⊗

**Find a lawyer** >

⬆ BACK TO TOP

**Questions?**

At FindLaw.com, we pride ourselves on being the number one source of free legal information and resources on the web. Contact us.

**Stay up-to-date with how the law affects your life.** Sign up for our consumer newsletter.

**ENTER YOUR EMAIL ADDRESS**

>

**FOLLOW US:**   f   ▶   X

**ABOUT US** >

Our Team

Accessibility

Contact Us

**FIND A LAWYER** >

By Location

By Legal Issue

By Lawyer Profiles

By Name

**SELF-HELP RESOURCES**

Legal Forms & Services

**LEGAL RESEARCH**

Learn About the Law

State Laws

U.S. Caselaw

U.S. Codes

**LEGAL NETWORK**

**FindLaw.com** Free, trusted legal information for consumers and legal professionals

**SuperLawyers.com** Directory of U.S. attorneys with the exclusive Super Lawyers rating

**Abogado.com** The #1 Spanish-language legal website for consumers

**LawInfo.com** Nationwide attorney directory and legal consumer resources

Copyright © 2025, FindLaw. All rights reserved.

Terms > | Privacy > | Disclaimer > | Cookies > | Manage Preferences >

# United States Court of Appeals

## For the Eighth Circuit

---

No. 14-3876

---

Jesse Ventura, also known as James G. Janos

*Plaintiff - Appellee*

v.

Taya Kyle, as Executor of the Estate of Chris Kyle

*Defendant - Appellant*

-------------------------------

33 Media Companies and Organizations; The First Amendment Scholars; Thomas
More Law Center

*Amici on Behalf of Appellant*

---

Appeal from United States District Court
for the District of Minnesota - Minneapolis

---

Submitted: October 20, 2015
Filed: June 13, 2016

---

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

---

RILEY, Chief Judge.

Before his death, Chris Kyle was a sniper for a United States Navy Sea, Air and Land (SEAL) team.[1]  He authored the book <u>American Sniper: The Autobiography of the Most Lethal Sniper in U.S. Military History</u> (<u>American Sniper</u>).  In the book, Kyle described punching a "celebrity" referred to as "Scruff Face" who was making offensive remarks about the SEALs at a gathering following the funeral of a SEAL killed in combat.  In interviews about the book, Kyle revealed "Scruff Face" was James Janos, better known as Jesse Ventura.  Ventura, who was at the bar but denied a fight occurred, sued Kyle in this diversity action[2] under Minnesota law for defamation, misappropriation, and unjust enrichment, alleging Kyle fabricated the incident.  The jury found in favor of Ventura on the defamation claim, awarding $500,000 in damages, and found in Kyle's favor on the misappropriation claim.  Serving in its advisory role as to the equitable unjust-enrichment claim, the jury recommended an award of approximately $1.35 million, which the district court adopted.  Kyle appeals the district court's denial of his motion for judgment as a matter of law or a new trial.  Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand, in part.

## I.      BACKGROUND

The alleged altercation underlying this action occurred at McP's, a bar in Coronado, California, where Kyle and some friends were gathered in October 2006 after the funeral of a fellow SEAL.  According to Kyle,

> Scruff started running his mouth about the war and everything and anything he could connect to it. President Bush was an asshole. We were only over there [Iraq] because Bush wanted to show up his father. We

---

[1]Kyle was killed in 2013 and his wife Taya Kyle, as executor of his estate, was substituted as the defendant.  We continue to refer to the defendant in this case as "Kyle."

[2]<u>See</u> 28 U.S.C. § 1332(a)(1).

were doing the wrong thing, killing men and women and children and murdering. . . .

     Scruff said he hates America.

Kyle approached Scruff and asked him to "cool it."  "You deserve to lose a few," Scruff replied.  Kyle was "calm," but Scruff swung at him.  Kyle "laid him out. Tables flew. Stuff happened. Scruff Face ended up on the floor. [Kyle] left."

On January 4, 2012, the day after his book was released, Kyle was interviewed on a radio program and the television program "The O'Reilly Factor" to promote the book.  During the radio interview, one of the hosts said there was a caller on the line who was saying Kyle was "in a bar fight with Jesse [Ventura]," a political commentator who formerly served as the Governor of Minnesota and in the Navy special forces.  When asked if this was true, Kyle confirmed it was.  During the television interview later that day, host Bill O'Reilly asked Kyle, "[Y]ou say you knocked Jesse Ventura to the floor with a punch. Now, you don't mention his name, but everybody knows who that is. . . . [T]hat happened?"  Kyle again confirmed he "knocked him down."  In the interviews, Kyle described the events similarly to the way he did in the book, adding that after he punched Ventura, "I took off running, because the cops were already outside. . . . [C]ops were watching, they saw the whole thing happen."

Kyle's editor described the publicity resulting from Kyle's radio interview as "priceless" in an email, and Kyle's publicist agreed the publicity response was "HOT, hot, hot!"  The book was by all accounts a success.  In 2014, Kyle's editor testified 1.5 million copies had been sold.

After the interviews, Ventura sued Kyle for defamation, misappropriation, and unjust enrichment on the grounds that Kyle fabricated the entire interaction with Ventura.  Kyle moved for summary judgment on Ventura's claims of misappropriation and unjust enrichment, emphasizing he had "provided the Court

-3-

with case after case, all rejecting these types of . . . claims in the context of expressive works." The district court denied the motion.

At the close of discovery, Kyle moved for summary judgment on all claims. The district court concluded Kyle was not entitled to summary judgment on Ventura's defamation claim because "Ventura has proffered sufficient evidence upon which a jury could conclude that Kyle's statements [in the book] were materially false." The district court noted there were conflicting eyewitness accounts of the alleged incident, and photos of Ventura from the following day showed no visible injuries. The district court also rejected Kyle's rehearsed motion as to the misappropriation and unjust-enrichment claims.

The case was tried in summer 2014, almost eight years after the alleged altercation. Ventura testified he had a normal evening without any verbal or physical altercation. Three people who were with him that evening also testified they witnessed no altercation. However, these people were not in Ventura's immediate vicinity for the entire evening, and one testified he was hard of hearing.

Ventura also introduced evidence Kyle told different versions of the story. For example, in the book, Kyle alleged Ventura took the first swing, but he did not mention that in his interviews. Kyle mentioned in the interviews, but not the book, that the police saw the whole incident. Ventura produced a letter from the Coronado police department stating there was no police record mentioning Ventura's or Kyle's name. Ventura introduced photos of himself at a graduation event the day after the alleged incident that show no obvious injuries, despite Kyle having written "rumor has it he showed up at the BUD/S graduation with a black eye."

The jury watched part of Kyle's video-recorded deposition recounting his version of the evening's events. Kyle also presented several witnesses who were at the bar that evening, who testified they either heard Ventura make the alleged

-4-

comments, witnessed some type of physical altercation, or both.   All of Kyle's witnesses were current or former SEALs or friends or family of SEALs.

At least seven witnesses testified they overheard some of Ventura's remarks, and offered generally similar accounts of what Ventura said.   At least seven witnesses testified they saw Kyle (or an unidentified man, for those who did not know Kyle) punch Ventura; saw Ventura on the ground or getting up off the ground; or heard a "commotion" or "yelling."   Witness estimates of the timing and location of the incident were not consistent.

When questioned on cross-examination, Ventura agreed he had previously made controversial comments such as, "More and more we're seeing an Army run by Christianist extremists and an accompanying cadre of what can only be described as neo-Nazis."

Two witnesses from HarperCollins, American Sniper's publisher, also testified at trial.  Sharyn Rosenblum, HarperCollins's publicist for Kyle's book, testified about the general process of preparing the book for publication and said she did not know who "Scruff Face" was when she read the manuscript of the book, and did not ask. She testified she did not see the "Scruff Face" subchapter as relevant to her publicity campaign for the book but she wanted to focus on "the themes of the war, military service, love of country, [and] the patriotism to serve one's country."   She was "surprise[d]" when Ventura's name came up in Kyle's interview.   When asked whether "the Ventura story ha[d] any impact on the success of the book," Rosenblum replied it was "a very insignificant part" and did not impact the book's success. Kyle's editor, Peter Hubbard, testified the "Scruff Face" story was not relevant to his decision to enter into a book contract with Kyle.   Hubbard indicated he never suggested incorporating that subchapter into HarperCollins's marketing campaign for the book.  He characterized the "mention of Jesse Ventura" as having a "negligible" effect on the success of the book.

Ventura's counsel sought to impeach the HarperCollins witnesses by questioning them about Kyle's and HarperCollins's insurance coverage to show HarperCollins had "a direct financial interest in the outcome of th[e] litigation" and the witnesses were biased in favor of Kyle.  See Fed. R. Evid. 411 (permitting questioning about insurance coverage to show a witness's bias).  Kyle's counsel objected to this testimony prior to its introduction, but the district court allowed it. See Fed. R. Evid. 403 (providing that otherwise admissible evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice").

Ventura's counsel asked Rosenblum, "[A]re you aware that the legal fees for the estate's attorneys . . . are being paid by the insurance company for HarperCollins?" and "Are you aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance?" Rosenblum denied knowledge of HarperCollins's insurance policy.  Ventura's counsel asked Hubbard if he knew about any insurance provisions in Kyle's contract with HarperCollins.  He said he did not.  Kyle's counsel moved for a mistrial after both inquiries.  The district court denied both motions.

Then, during closing arguments, Ventura's counsel opined:

Sharyn Rosenblum testified that she did not know her company's *insurer is on the hook if you find that Jesse Ventura was defamed*. Both her and Peter Hubbard also testified that they do not know that their company's insurer was paying for the defense of this lawsuit. But they are not the disinterested, unbiased witnesses they were put in front of you for you to believe. It's hard to believe that they didn't know about the insurance policy because it's right in Kyle's publishing contract. Paragraph 6.B.3. of Exhibit 82, *Chris Kyle is an additional insured for defamation* under the publisher's insurance policy.

-6-

Kyle's counsel did not object in front of the jury, but moved again for a mistrial due to the insurance references once the jury was excused. The district court again denied the motion. Kyle's counsel did not ask for a curative instruction and the district court did not give one.

The jury struggled to reach a verdict. At noon on the fourth full day of deliberations, the jury reported they could not reach a unanimous decision. The district court instructed the jury to continue deliberating, yet they could not reach a verdict that day. The next morning the parties consented to permitting a 9-1 decision, but to no avail. The jury ultimately reached an 8-2 verdict on the fifth full day of deliberations. The jury found for Ventura on the defamation claim, made an advisory recommendation in Ventura's favor on the unjust-enrichment claim, and found for Kyle on the misappropriation claim. The jury awarded damages of $500,000 for defamation and recommended damages of approximately $1.35 million for unjust enrichment. The district court adopted the jury's recommendations as to the unjust-enrichment claim and accompanying damages award.

Among other assigned errors we need not reach, Kyle moved for judgment as a matter of law or a new trial, contending the jury was incorrectly instructed about the falsity element of defamation, the actual-malice requirement applicable in public figure defamation cases, and the applicable burdens of proof.[3]   Kyle argued the

---

[3] The jury instruction on the elements of defamation described the basis for the defamation claim as follows: "Plaintiff Jesse Ventura claims that Chris Kyle defamed him by asserting in American Sniper, as well as on television and radio, that Mr. Ventura said 'he hates America,' the SEALs 'were killing men and women and children and murdering,' and the SEALs 'deserve to lose a few.'" The jury was then instructed that Ventura was required to prove the "story" was "defamatory" and "materially false" and Kyle "published the story knowing it was false, believing it was false, or having serious doubts about its truth."

unjust-enrichment judgment violated Minnesota law and the First Amendment and Ventura did not prove the amount he was enriched.  Finally, he sought a new trial on the grounds that the jury's "awards were tainted by the admission of prejudicial testimony and argument regarding [Kyle's] insurance."  The district court denied Kyle's motion.  Kyle appeals.

We vacate the defamation judgment and damages award and remand that claim for a new trial.  We further reverse the unjust-enrichment judgment, and vacate the accompanying damages award.[4]

## II.    DISCUSSION

### A.    Defamation Claim

The district court may grant a new trial on all or some issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  Fed. R. Civ. P. 59(a)(1)(A), (B).  We review the district court's denial of a new trial "for a 'clear abuse of discretion.'"  Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015) (quoting Burris v. Gulf Underwriters Ins. Co., 787 F.3d 875, 878 (8th Cir.

---

During deliberations, the jury asked, "when referring to Mr. Ventura's story (Punching Out Scruff Face) is the 'story' the sub-chapter or the 3 lines? ('he hates America,' 'we[']re killing men & women and children and murdering,' 'deserve to lose a few')."  Over Kyle's objection, the district court responded, "'The story,' as used in [the instructions] refers to the statements Mr. Kyle made about Mr. Ventura in the Punching Out Scruff Face subchapter and on television and radio, which include the three statements identified in your question. You are instructed to consider each element . . . as to the story as a whole."  Kyle argues these instructions were contradictory and leave unclear the basis for the defamation judgment, but we do not reach this assigned error because we conclude a new trial is warranted on other grounds.

[4]We need not decide Kyle's other assignments of error.

-8-

2015)).  Kyle argues he is entitled to a new trial because the district court clearly abused its discretion by permitting Ventura to ask questions that put prejudicial information before the jury and to invoke Kyle's insurance in closing argument.

Initially, we reject Ventura's assertion Kyle waived any objection to the insurance testimony and argument because he did not object to the admission of his publishing agreement, which states, "Author will be named as an additional insured under the terms of any insurance policy that Publisher *may* carry which covers the cost of claims."  (Emphasis added).  In the event the jury analyzed the lengthy publishing contract's fine print and learned Kyle *may* have had insurance, this evidence alone would not permit Ventura's counsel to argue to the jury that an insurance policy including Kyle actually existed and the "insurer is on the hook." See, e.g., City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 758 (6th Cir. 1980) ("[W]hile mention of the contractually-mandated insurance may have been inevitable, it was prejudicial error for counsel for the City to inject into the trial the idea that Kiewit had insurance which would cover any damages the defendant would be obliged to pay.").  Counsel's argument would have been improper and prejudicial, even if the jury already was aware of an insurance policy.  See id.  The record presented to this jury contained no evidence establishing an insurance policy covering Kyle, which makes Ventura's counsel's argument more improper and prejudicial.

We next consider the insurance testimony elicited from the HarperCollins employees.  At trial, Ventura's counsel asked Rosenblum whether she was aware Kyle's attorneys were "being paid by the insurance company for HarperCollins" and "HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance."  Ventura's counsel asked Hubbard whether he was "aware of any insurance provision in [HarperCollins's] contract [with Kyle]" and inquired "you obtain insurance coverage in the case when an author may get sued for libel or defamation, correct?"  These questions assumed facts never in evidence—an insurance policy purchased by HarperCollins that covered Kyle, and Kyle's attorneys

-9-

were paid by the insurer.  Both witnesses denied awareness of any insurance policy. Kyle's counsel objected to this questioning before Ventura's counsel's cross-examination, tried to object at the time, and moved for a mistrial after each witness testified.  The district court permitted this cross-examination, by which Ventura's counsel ostensibly sought to show the HarperCollins witnesses were biased in favor of Kyle because HarperCollins and Kyle were covered by the same insurance policy.

Rule 411 of the Federal Rules of Evidence prohibits the introduction of insurance evidence to prove whether a person acted wrongfully but permits it for other purposes, such as proving a witness's bias.  For example, we have permitted the use of evidence of insurance to show bias where a defense witness was employed by the defendant's insurance company.  See, e.g., Charter v. Chleborad, 551 F.2d 246, 248 (8th Cir. 1977) (per curiam); see also 23 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5367 (1st ed. 1980) ("The paradigm case for use of evidence of insurance to show bias is in the cross-examination of a claims adjuster or insurance company doctor.").

Other "economic tie[s]" may "influence the witness to favor the insurance company," including "ownership of stock in the company, or a promise of employment, or a promise to pay the witness directly for his testimony."  Wright & Graham, supra § 5367 (footnotes omitted).

> A majority of jurisdictions addressing this issue have applied a "substantial connection" analysis in order to balance the probative value and potential prejudice . . . . The substantial connection analysis looks to whether a witness has "a sufficient degree of connection with the liability insurance carrier to justify allowing proof of this relationship as a means of attacking the credibility of the witness." These courts have rejected a mere "commonality of insurance" approach, holding that the likelihood of bias is so attenuated that the risk of prejudice substantially outweighs the probative value.

-10-

<u>Bonser v. Shainholtz</u>, 3 P.3d 422, 425 (Colo. 2000) (quoting <u>Otwell v. Bryant</u>, 497 So. 2d 111, 114 (Ala. 1986)) (finding a "substantial connection" between an expert witness and the defendant's insurance company where the defendant and the expert witness were both members of a small insurance trust for dentists, "the expert witness had cofounded the trust," payments of claims "could result in a rise in premiums charged to all members," and "all members would be required to absorb a share" of any judgment exceeding the amount in the trust); <u>cf.</u> Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.").

Here, there is no evidence Rosenblum and Hubbard had any economic tie or "substantial connection" to HarperCollins's insurance carrier.  They were not currently or formerly employed by the insurance company, seeking employment with the insurance company, paid for their testimony by the insurance company, or holders of stock in the insurance company.  <u>See</u> Wright & Graham, <u>supra</u> § 5367.  There was no risk Rosenblum and Hubbard might personally contribute to the payment of any judgment in favor of Ventura.  Ventura even failed to show a judgment in his favor could adversely affect Rosenblum's and Hubbard's employment with HarperCollins.

As a matter of basic evidentiary foundation, Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about any insurance coverage or possible insurance payment.  Rosenblum and Hubbard had no personal knowledge on the topic and were not qualified to testify on the subject.  <u>See</u> Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Ventura's counsel argued in closing, "It's hard to believe that [Rosenblum and Hubbard] didn't know about the insurance policy because it's right in Kyle's

-11-

publishing contract."  The one-line mention of insurance contained in the lengthy small-print contract merely acknowledges HarperCollins "*may* carry" insurance. (Emphasis added).  The publishing contract does not establish HarperCollins actually purchased insurance, much less that Rosenblum and Hubbard knew about it.

It is difficult to envision how Rosenblum and Hubbard could have been biased or even influenced by an insurance policy of which they were unaware.  Even if they had been aware of a policy, any "connection" they had to the insurance carrier was far too remote to create a risk of bias strong enough to outweigh the substantial prejudice of Ventura's counsel's pointed and repeated references to unproven insurance.[5]  See Fed. R. Evid. 403.

---

[5]The district court also concluded Taya Kyle "opened the door to [questions about insurance] by testifying about the financial impact of this litigation and her use of the book's proceeds," so-called "poor mouthing," Weiss v. La Suisse, Société D' Assurances Sur La Vie, 293 F. Supp. 2d 397, 413 (S.D.N.Y. 2003).  We respectfully disagree.

Taya Kyle only testified on redirect examination about her use of the book's proceeds after Ventura's counsel had cross-examined her about how much of the proceeds she had donated, insinuating she was insufficiently generous.  Kyle's counsel attempted to rebut this insinuation by asking Taya Kyle whether "this lawsuit had any impact upon what you have done with the proceeds from American Sniper?" and "Would you be able to pay the Plaintiff?"  We also note the district court correctly rejected Ventura's "poor-mouthing" argument only the day before, explaining in an order, "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from American Sniper are at risk, as she testified."  It also is confusing how Taya Kyle's purported "poor-mouthing" "opened the door" to the cross-examination of *other* witnesses about HarperCollins's insurance policy, particularly witnesses so disconnected and with no personal knowledge on the subject.  Cf. Fed. R. Evid. 602.

-12-

We now consider Ventura's counsel's statement during closing argument that HarperCollins's "*insurer is on the hook if you find that Jesse Ventura was defamed*" and "*Kyle is an additional insured for defamation under the publisher's insurance policy*." (Emphasis added). As noted already, what insurer? What insurance policy?[6]

Ventura suggests Kyle's counsel did not "timely object[] during closing." We are not convinced Kyle's counsel's motion for a mistrial as soon as the jury was excused was necessarily untimely. See Lange v. Schultz, 627 F.2d 122, 127 (8th Cir. 1980) ("'[C]ounsel must either make an objection or . . . move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel . . . should[] make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury.'" (quoting Thomson v. Boles, 123 F.2d 487, 495-96 (8th Cir. 1941) ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument *or at its close*." (emphasis added)))). However, Ventura did not object at trial to the timeliness of Kyle's motion for mistrial made after closing and instructions. The district court likewise did not question the motion's timeliness and instead ruled on the motion's merits, a general topic on insurance admissibility raised before, during, and at the end of trial. Ventura's timeliness argument now is itself untimely.[7]

---

[6]From our review, these unsupported, improper, and prejudicial statements were not heat of the moment argument, but were strategic and calculated.

[7]The dissent concludes the district court did not err in denying Kyle's motion for mistrial because the motion made "after the retirement of the jury was untimely." Post at 23. The district court did not deny the motion because it was untimely. What is untimely is Ventura's timeliness argument on appeal—not preserved in the district court—and it should not be addressed in the first instance on the appeal of this case. See, e.g., Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004) ("Ordinarily, this court will not consider arguments raised for the first time on appeal.").

When deciding whether to grant a new trial due to improper remarks by counsel, we consider whether: (1) "the remarks in question 'were . . . minor aberrations made in passing'"; (2) the district court took "'specific curative action'"; and (3) "'the size of the damage award . . . suggest[s] that counsel's comment had a prejudicial effect.'" <u>Gilster v. Primebank</u>, 747 F.3d 1007, 1011-12 (8th Cir. 2014) (quoting <u>Whittenburg v. Werner Enters. Inc.</u>, 561 F.3d 1122, 1131-32 (10th Cir. 2009)). "'[T]he weight of the evidence' is another relevant factor in determining 'whether the improper argument deprived a party of a fair trial.'" <u>Id.</u> at 1013 (quoting <u>Stollings v. Ryobi Techs., Inc.</u>, 725 F.3d 753, 760 (7th Cir. 2013)).

Although relatively brief, Ventura's counsel's closing remarks about insurance "'were not minor aberrations made in passing.'" <u>Id.</u> at 1011 (quoting <u>Whittenburg</u>, 561 F.3d at 1131). Given Ventura's repeated efforts to introduce evidence of HarperCollins's and Kyle's insurance at trial, it is difficult to see how Ventura's counsel's comments were anything other than "a deliberate strategic choice" to try to influence and enhance damages by referencing an impersonal deep-pocket insurer. <u>Id.</u> ("[W]e cannot say that this improper argument [counsel's vouching and sympathy-arousing personal experience] 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.'" (quoting <u>Whittenburg</u>, 561 F.3d at 1132-33)); <u>cf.</u> <u>Indamer Corp. v. Crandon</u>, 217 F.2d 391, 394 (5th Cir. 1954) (noting "defendant consistently sought to inject into the case the fact that the plaintiff had been protected by insurance"); <u>Altenbaumer v. Lion Oil Co.</u>, 186 F.2d 35, 36 (5th Cir. 1950) (per curiam) (observing references to insurance were "continuously brought" to the jury's attention, which was a "gravely prejudicial error" necessitating a new trial).

Second, the jury did not receive a specific curative instruction, only the general reminder that "arguments of counsel are not evidence." <u>Gilster</u>, 747 F.3d at 1012 (determining the "reminder that counsel's arguments are not evidence" was an insufficient curative instruction, particularly where the court overruled the

-14-

defendant's contemporaneous objection).  But see Jones v. Nat'l Am. Univ., 608 F.3d 1039, 1048-49 (8th Cir. 2010) (citing "the district court's admonition to the jury prior to closing arguments that statements made by the attorneys are not evidence" as one factor supporting the decision to deny a new trial under the plain error standard).

Third, the jury awarded Ventura $500,000 in damages, which is probably "'not beyond the bounds of rationality.'"  Gilster, 747 F.3d at 1012 (quoting Whittenburg, 561 F.3d at 1132).  Yet, as was the case in Gilster, "we cannot say that th[e] improper argument 'did not accomplish the purpose which it was clearly intended to accomplish, namely, the enhancement of damages.'"  Id. (quoting Whittenburg, 561 F.3d at 1132-33).

Fourth, this was a close case that could have "go[ne] either way."  Id. at 1013.  After five days of deliberations, the jury could only reach an 8-2 verdict.  Although there was extrinsic evidence suggesting the falsity of Kyle's assertions that he punched Ventura and police witnessed that altercation arising from the alleged statements, the trial essentially was a credibility contest between Ventura, Kyle, and their respective eyewitnesses.

Finally, the risk of prejudice is high.  In Halladay v. Verschoor, 381 F.2d 100, 112 (8th Cir. 1967), we explained it was "utterly repugnant to a fair trial or . . . a just verdict" for the jury to hear that "the damages sued for . . . will be taken care of by an insurance . . . company."  We observed that "it has been almost universally held that the receipt of such evidence constitutes prejudicial error sufficient to require reversal."  Id.; cf. Transit Cas. Co. v. Transamerica Ins. Co., 387 F.2d 1011, 1013-14 (8th Cir. 1967) ("The fact that [the plaintiff] was reinsured and stood to bear only five percent of [its] loss is a fact that obviously would impress the jury, and might well lead it to return a defendant's verdict . . . [and] [t]he interjection of the issue of reinsurance was prejudicial error.").

-15-

In light of this precedent, we must conclude Ventura's counsel's closing remarks, in combination with the improper cross-examination of two witnesses about Kyle's insurance coverage, prevented Kyle from receiving a fair trial. The district court clearly abused its discretion in denying a new trial. <u>See</u>, <u>e.g.</u>, <u>Frymire-Brinati v. KPMG Peat Marwick</u>, 2 F.3d 183, 188 (7th Cir. 1993) ("Collectively, . . . [the errors] presented the jury such a skewed picture that the verdict is unreliable and must be set aside."); <u>Malek v. Fed. Ins. Co.</u>, 994 F.2d 49, 55 (2d Cir. 1993) (reversing judgment because "[a]lthough each of the erroneous evidentiary rulings . . . , standing alone, may be insufficient to justify reversal, we cannot say that the cumulative effect is harmless"). <u>But</u> <u>see</u> <u>SEC v. Infinity Grp. Co.</u>, 212 F.3d 180, 196 (3d Cir. 2000) (rejecting cumulative error doctrine for civil cases). We remand the defamation claim for a new trial.[8]

## B.    Unjust-Enrichment Claim

Kyle argues the unjust-enrichment judgment is inconsistent with Minnesota law and would be prohibited by the First Amendment even if it did comport with Minnesota law. Kyle also asserts "Ventura presented no competent evidence Kyle was enriched." We agree Kyle was not unjustly enriched as a matter of Minnesota law, so we do not consider Kyle's constitutional arguments or review the district court's factual findings.[9]

---

[8]We note the complications that can arise when a general verdict form is used in public-figure defamation cases. <u>See</u>, <u>e.g.</u>, <u>Greenbelt Co-op. Pub. Ass'n v. Bresler</u>, 398 U.S. 6, 11 (1970); <u>West v. Media Gen. Operations, Inc.</u>, 120 F. App'x 601, 602, 619 (6th Cir. 2005) (unpublished) (collecting cases).

[9]The district court concluded Kyle forfeited any challenge to the unjust-enrichment judgment because Kyle filed a motion for judgment as a matter of law with the district court under Federal Rule of Civil Procedure 50, which governs issues tried to a jury, not Federal Rule of Civil Procedure 52, which governs actions tried without a jury or with an advisory jury. The district court stated that, even if it were to treat Kyle's motion as a Rule 52 motion, Rule 52 applies only to factual findings,

Under Minnesota law, "to prevail on a claim of unjust enrichment, a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012). We agree with Kyle that "Ventura cannot maintain a claim for unjust enrichment because he had no pre-existing contractual or quasi-contractual relationship with Kyle." See id. ("We have limited the application of unjust enrichment to claims premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched.").

Although Ventura is correct that "[a] quasi-contract will be imposed" where "a benefit was conferred unknowingly or unwillingly," we reject Ventura's assertion that Ventura conferred a "benefit" on Kyle by Ventura's mere existence as a colorful figure who might inspire people to make up stories about him. Galante v. Oz, Inc., 379 N.W.2d 723, 725-26 (Minn. Ct. App. 1986). Ventura's unjust-enrichment claim is not allowed by Minnesota law.

_____

whereas Kyle raised legal arguments.

We cannot agree with the district court's conclusion that Kyle improperly attempted to "advance new theories" in his motion for judgment as a matter of law because he waited until after the trial to argue that equitable remedies such as unjust enrichment are not available when adequate legal remedies exist. Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir. 1986). Kyle raised this point in his trial brief. He also raised several arguments for why Ventura's unjust-enrichment claim failed as a matter of law in both of his motions for summary judgment, his trial brief, and his reply trial brief. See Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 715-16 (8th Cir. 2008) (finding a "lengthy footnote" in the plaintiff's brief in opposition to the defendant's motion to amend its answer was "sufficient to avoid waiver on appeal"). On the record in this case, we conclude Kyle has preserved the issue.

-17-

Furthermore, even if Ventura had proven the other elements of unjust enrichment, the equitable remedy would still not be available because "'there is an adequate remedy at law available'" for public figures—money damages for defamation.[10]  Bame, 721 F.3d at 1030 (quoting ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 305 (Minn. 1996)).  The district court concluded Ventura's legal remedy was inadequate because:

> damages available to [Ventura] on his defamation claim were limited to those necessary to remedy the injury to his reputation. . . . [T]he jury was expressly advised—*at [Kyle's] behest*—that it could *not* award additional damages for unjust enrichment if it found that [Ventura's] "damages award for defamation . . . provide[d] him with an adequate remedy". . . . [Ventura's] defamation claim provided him with no means to obtain the disgorgement of [Kyle's] ill-gotten gains . . . . [Ventura's] legal remedy was inadequate to fully ameliorate [Kyle's] wrongful conduct, and the defamation claim did not preclude the unjust-enrichment claim as a matter of law.

(Fifth insertion in original).

This conclusion was erroneous.  First, whether there is an adequate remedy at law is a question of law, not a factual question for the jury.  ServiceMaster of St. Cloud, 544 N.W.2d at 305.  The jury, not aware of the legal/equitable distinction, likely would have interpreted "adequate" to mean "enough money."  Even if the adequacy of the legal remedy were a proper question for the jury, we note the inconsistency in the jury's verdict.  The jury determined $500,000 would "fairly and adequately" compensate Ventura for Kyle's defamation, but then suggested an award

---

[10]The unjust-enrichment award cannot be based on Ventura's misappropriation claim because, although Ventura did not prevail, an adequate legal remedy was *available.*  Cf. United States v. Bame, 721 F.3d 1025, 1031-32 (8th Cir. 2013).

of approximately $1.35 million for unjust enrichment, which required the jury to find the opposite—that the defamation award was an inadequate remedy.

Second, as a matter of law, adequate legal remedies were available. Neither the district court nor Ventura cited any case awarding profits in a defamation case under an unjust-enrichment theory, or even suggesting money damages are an inadequate remedy in a public-figure defamation case. We find none. Cf. Silvercorp Metals Inc. v. Anthion Mgmt. LLC, No. 150374/2011, 2012 WL 3569952, at *12 (N.Y. Sup. Ct. Aug. 16, 2012) (unreported) ("[T]he factual allegations supporting Silvercorp's unjust enrichment claim are identical to those giving rise to the defamation claim [and merge into the defamation claim]."). In one of the few cases addressing the issue, a New York state trial court observed:

> Libel has been [a] field of much litigation in both England and this country. . . . [I]t is significant that in none of these cases has an action such as is brought by the plaintiff in this case been instituted. The plaintiff recognizes this fact and states: "We are undertaking to prove additional facts never before pleaded in a libel suit, namely, that the defendant had and received money by virtue of his libellous publication." The absence of attempts to bring an action similar to the instant one is evidence of the recognition by the legal profession and the courts that such an action would not lie under the common law.

Hart v. E.P. Dutton & Co., 93 N.Y.S.2d 871, 879 (N.Y. Sup. Ct. 1949); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 23 (1990) ("[I]mperfect though it is, *an action for damages* is the *only* hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored." (emphasis added) (quoting Rosenblatt v. Baer, 383 U.S. 75, 93 (1966) (Stewart, J., concurring))); Cason v. Baskin, 20 So. 2d 243, 254 (Fla. 1944) (en banc). In Minnesota, the defamation action generally applies to all "claims that arise as a consequence of . . . purported defamatory statements." Mahoney & Hagberg v. Newgard, 729 N.W.2d 302, 310 (Minn. 2007).

-19-

We cannot accept Ventura's unjust-enrichment theory, because it enjoys no legal support under Minnesota law.  Ventura's unjust-enrichment claim fails as a matter of law.

## III.  CONCLUSION

We reverse the unjust-enrichment judgment and vacate and remand the defamation judgment for a new trial.

SMITH, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's reversal of the unjust-enrichment judgment. *See supra* Part II.B. However, I disagree with majority's decision to vacate and remand the defamation judgment for a new trial because of references to insurance in trial testimony and closing argument. *See supra* Part II.A.

In an eleven-day trial, the subject of insurance arose on the second day following the testimony of Taya Kyle ("Taya")—Kyle's widow. Ventura's counsel asked the court "to address . . . the admissibility of the insurance policy that's applicable here" in light of Taya's testimony "that she's had to pay the expenses associated with this litigation"; "that if she gives the money away to charity, that she wouldn't be able to pay a judgment; and that if she gave the money away, she may not be able to feed her children as a result of this litigation." Ventura's counsel argued that courts addressing this issue "have found that this is an instance where an insurance policy should, in fact, be admitted to counteract testimony that is clearly inaccurate." Ventura's counsel explained that when presented with the "opportunity to do recross on Ms. Kyle, [he] plan[ned] to ask her about whether there is an insurance policy that, in fact, covers the legal expenses and will pay a judgment, because that is the case." Ventura's counsel sought "permission to raise the issue of insurance" in light of Taya purportedly opening the door to the subject. The court reserved ruling on the admissibility of insurance pending briefing from the parties.

-20-

On the seventh day of trial, the court heard argument outside of the jury's presence concerning the admissibility of insurance. Ventura's counsel again argued that Taya should not be permitted to "'plead poverty if an insurance company is going to pick up the tab.'" But Ventura's counsel conceded that the insurance policy covered *only* the defamation claim, not the misappropriation and unjust-enrichment claims. In a written order, the district court denied Ventura's motion to question Taya regarding the insurance policy. The court concluded that "Taya Kyle's testimony did not open the door to evidence of insurance because her testimony was accurate—the insurance policy covers only the defamation claim, not unjust enrichment or misappropriation, and thus proceeds from *American Sniper* are at risk, as she testified."

Undaunted, the next day, Ventura's counsel acknowledged the court's ruling but made an offer of proof to preserve the issue for appellate review. Ventura's counsel proceeded to attempt to introduce, as part of that offer of proof, the insurance policy. "And related to that matter," Ventura's counsel asked the court's permission to "inquire [pursuant to Rule 411] as to the existence of insurance" with Rosenblum and Hubbard, HarperCollins representatives, because of those witnesses' purported "direct financial interests in this litigation" as representatives of the insured party. The court again reserved ruling on the issue. When the court raised the issue later in the day, Kyle's counsel reiterated that the witnesses were "not affected by any insurance coverage at all" and that "if HarperCollins or th[ese] witness[es] were direct defendants, the introduction of any evidence regarding insurance would be just as off limits as it is against Mrs. Kyle. It would be completely inappropriate to delve into the question of insurance here." The court overruled Kyle's counsel's objection and permitted the inquiry, although it explained that the inquiry would not "be lengthy or in detail."

Thereafter, Ventura's counsel asked Rosenblum whether the witness was "aware that the legal fees for the estate's attorneys . . . are being paid by the insurance

-21-

company for HarperCollins." Rosenblum answered no. Ventura's counsel then asked whether Rosenblum was "aware that HarperCollins has a direct financial interest in the outcome of this litigation because they are providing the insurance." Rosenblum again answered no. During a sidebar conference, Kyle's counsel moved for a mistrial based on the "introduction of the insurance testimony." The district court denied the motion.

Ventura's counsel subsequently asked Hubbard, whether "you obtain insurance coverage in the case when an author may get sued for libel or defamation." Hubbard responded, "I don't know about that." Kyle's counsel objected based on relevance, and the court overruled the objection. Ventura's counsel then inquired whether the witness was "aware of any insurance provisions in [Kyle's publishing] contract." Kyle's counsel again objected based on relevance, and the court again overruled the objection. Hubbard answered, "I'm not aware."

On the final day of trial, during closing arguments, Ventura's counsel briefly highlighted[11] Rosenblum's and Hubbard's ignorance of an insurance provision in Kyle's publishing contract. Thereafter, the court orally instructed the jury. One of its general instructions was that "[q]uestions, objections, statements, and arguments of lawyers are not evidence in the case." The "[j]ury retired at 11:59 a.m." After dispensing with a couple routine matters, the court asked whether there was anything else that it needed to cover. At that point, Kyle's counsel moved for a mistrial based on Ventura's counsel's references to insurance in his closing argument. The district court denied the motion for mistrial. Court adjourned at 12:02 p.m.

---

[11]The district court permitted each side an hour for closing arguments. Ventura's counsel's closing argument covers approximately 30 pages of transcript.

Based on the record, I first conclude that the district court did not err in denying Kyle's motion for mistrial. Kyle's motion for mistrial after the retirement of the jury was untimely.

"When reviewing the denial of a motion for a new trial under Fed. R. Civ. P. 59(a), we give great deference to the district court's ruling and will not reverse in the absence of a clear abuse of discretion." *Brown v. Davis*, 813 F.3d 1130, 1138–39 (8th Cir. 2016) (citation omitted). We will reverse the district court's denial of a motion for new trial "only to prevent a miscarriage of justice." *Behlmann*, 794 F.3d at 963 (quotation and citation omitted). Likewise, we "will not disturb a trial court's denial of a motion for mistrial absent a clear showing of abuse of discretion." *Warger v. Shauers*, 721 F.3d 606, 609 (8th Cir. 2013) (quotation and citation omitted). Here, the district court's denial of the mistrial motion was not an abuse of discretion.

The majority concludes that "[w]e are not convinced Kyle's counsel's motion for a mistrial *as soon as the jury was excused* was untimely." *See supra* Part II.A (emphasis added) (citing *Lange*, 627 F.2d at 127 (citing *Thomson*, 123 F.2d at 495–96)). *Lange* provides that "'counsel must either make an objection or . . . move for a mistrial at the time of the alleged misconduct, or where it involves a closing argument, counsel . . . should[] make his objection, take his exception, or ask for remedial action at the close thereof and *before the case is submitted to the jury*.'" 627 F.2d at 127 (emphasis added) (quoting *Thomson*, 123 F.2d at 495–96 ("[N]o exception to [the closing] remarks was taken by the defendant either during the argument or at its close.")).

The record shows that Kyle's counsel failed to make his motion for mistrial "before the case [was] submitted to the jury." *See id*. at 127. Here, the record clearly shows that the court gave oral instructions to the jury and that, after that charge, the "[j]ury retired at 11:59 a.m." Thus, the case was already "submitted to the jury" at 11:59 a.m. *before* Kyle's counsel moved for a mistrial based on improper closing

-23-

argument. For that reason, I conclude that no timely objection was made. *See Lange*, 627 F.3d at 127.[12]

Second, I do agree with the majority that the district court erred in permitting Ventura's counsel's questions to HarperCollins's witnesses regarding insurance under Rule 411. The record contains no evidence that "Rosenblum and Hubbard had any economic tie or 'substantial connection' to HarperCollins's insurance carrier" and "Ventura never established by direct evidence or reasonable inference that Rosenblum and Hubbard even knew about insurance coverage or possible insurance payment." *See supra* Part II.A. But the district court's error does not automatically render a new trial necessary. "Rule 411 does not deal with the standard for reversal," which is an abuse of discretion. 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5369 (1980) (citing, *inter alia*, *Church Ins. Co. v. Trippe Mfg. Co.*, 250 F. App'x 420, 422 (2d Cir. 2007) (abuse of discretion); *King v. Harrington*, 447 F.3d 531, 533 (7th Cir. 2006) (abuse of discretion)). In fact, "some courts have found minor violations of Rule 411 to be 'harmless error.'" *Id.* (citing *Nguyen v. Myers*, 442 S.W.3d 434, 440 (Tex. Ct. App. 2013)).

---

[12]Although Ventura did not object to Kyle's motion for mistrial based on untimeliness, "we may affirm [the district court's denial of the motion for mistrial] for any reason supported by the record, even if different from the reasons given by the district court." *Robins v. Becker*, 794 F.3d 988, 992 (8th Cir. 2015) (quotation and citation omitted); *see also Emery v. Am. Airlines, Inc.*, No. 15-10100, 2016 WL 1425939, at *3 (11th Cir. Apr. 12, 2016) ("Because the district court issued a summary order, it is not apparent from the face of the order that the motion was denied as untimely. We nevertheless may affirm the district court's decision for any reason supported by the record, even if not relied upon by the district court." (citation omitted)).

-24-

This interpretation is given some support by a former member of the Advisory Committee who has argued that reversals for violations of Rule 411 be limited "to those instances of gross mi[s]conduct in which counsel has made a deliberate and apparently successful attempt to prejudice the jury." In other words, reversal is required only when the injection of insurance has resulted in an excessive verdict.

*Id*. (footnotes omitted).

After reviewing the record, I conclude that any error in allowing Ventura's counsel to inquire about insurance was, at most, harmless and non-prejudicial. First, Ventura's counsel asked a total of four questions about insurance to two witnesses who disclaimed any knowledge about the subject during the course of an eleven-day trial. Second, the inquiry about insurance came *after* Taya first testified that she would be responsible for paying the judgment—at least as to the misappropriation and unjust-enrichment claims—were Ventura to prevail. Thus, the jury was on notice that Taya would be responsible for paying at least part of any judgment rendered against Kyle. Third, the issue of insurance did not permeate the entire trial; instead, in addition to the four questions asked of the HarperCollins witnesses, the only other references to insurance were the two statements in Ventura's counsel's hour-long closing argument. Fourth, the $500,000 in damages on the defamation claim is not an excessive verdict; as even the majority concedes, the verdict "is probably not beyond the bounds of rationality." *See supra* Part II.A. (quotations and citations omitted).

-25-

For these reasons, I conclude that the district court did not abuse its discretion in denying Kyle a new trial on the defamation claim.[13]

––––––––––––––––––––––––––––––––

---

[13]Because the majority vacates and remands the defamation judgment for new trial based on the references to insurance in trial testimony and closing argument, the majority does not address Kyle's additional arguments that Kyle is entitled to a new trial on the defamation claim because the district court failed to instruct the jury that Ventura had to prove material falsity by clear and convincing evidence and Ventura failed to establish actual malice. On remand, these issues will likely be raised again. Out of an abundance of caution, I decline to issue an advisory opinion on the merits of these questions.

-26-

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __Dec. 7, 2017__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                      :
HANNA BOUVENG,                                        :
                                                      :
                              Plaintiff,              :        **OPINION AND ORDER**
                                                      :
             -v-                                      :        14-CV-5474 (PGG) (JLC)
                                                      :
NYG CAPITAL LLC, et al.,                              :
                                                      :
                              Defendants.             :
----------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

           This opinion addresses the failure of plaintiff's counsel, Benedict P. Morelli, Esq., to

attend a settlement conference before the Court on November 13, 2017 in violation of two court

orders.  In response to the Court's order to show cause why he should not be sanctioned for this

conduct, plaintiff's counsel has responded by stating that he did not intend to disrespect the

Court's authority by his non-appearance but believed it was in his client's best interests not to

attend given certain actions taken by defendants' counsel shortly before the settlement

conference.  However, it is for the Court and the Court alone to determine whether to adjourn a

settlement conference.  A party may not unilaterally cancel a court-ordered settlement

conference.  Accordingly, the Court concludes that sanctions against plaintiff's counsel are

appropriate, and, for the reasons discussed below, he is directed to pay $6,250 to counsel for

defendants and $1,000 to the Clerk of the Court.

                                              I.

           The following chronology of events is recited in order to provide context for the Court's

decision to sanction plaintiff's counsel.

Dockets.Justia.com

By letter dated October 12, 2017 (Dkt. No. 346), the parties jointly requested that the assigned district judge, the Honorable Paul G. Gardephe, refer this case to me for a settlement conference. Judge Gardephe thereafter issued an amended order of reference on October 13, 2017 (Dkt. No. 347).[1]

On October 16, 2017, the Court issued an order scheduling a settlement conference for November 13, 2017 at 10:00 a.m. and calling for the submission of ex parte settlement letters and acknowledgement forms to the Court by November 6 (Dkt. No. 348).[2]

Plaintiff's counsel, by letter dated October 26 (sent by email), requested that plaintiff be permitted to attend the conference by telephone rather than in person, and defendants opposed that application in a letter (also sent by email) dated October 27. After a telephone conference on October 31, the Court ordered that plaintiff could attend the settlement conference by telephone as long as she was available to come to the courthouse on the day of the conference should the need arise (such as to put the terms of a settlement on the record).

Defendants timely submitted their ex parte settlement letter and acknowledgement form on November 6. The letter was eight pages, single-spaced.

On November 6, plaintiff's counsel requested (by email), and was granted, leave to file plaintiff's ex parte settlement letter no later than 5 p.m. on November 10 (a court holiday).

On November 9, plaintiff filed her acknowledgement form, and on November 10, at 12:38 p.m., submitted her ex parte settlement letter.

On November 10, at 5:25 p.m., by email, Perry Fallick, Esq., an associate at the Morelli Law Firm LLC, counsel for plaintiff, wrote "to inform [the Court] that do [sic] to the unexpected

---

[1] The Court had held a settlement conference with the parties in 2015.

[2] Due to a conflict in the Court's schedule, the conference start time was subsequently moved from 10:00 a.m. to 2:30 p.m.

actions this afternoon of Defendants' new counsel, Catafago Fini LLP, Plaintiff is no longer willing to participate in the settlement conference on Monday at 2:30 p.m.  Our office will be available Monday morning if you would like further information, but our position is that the settlement conference will no longer be moving forward."

The Court subsequently scheduled a telephone conference for that Friday evening, November 10, at which Fallick appeared for plaintiff and Glenn Colton, Esq., and Thomas Fini, Esq., appeared for defendants, at the conclusion of which the Court made clear that the settlement conference was to proceed on November 13 at 2:30 p.m.[3]

On November 13 at 11:56 a.m., the Court received the following email from Morelli: "After speaking with Mr. Colton on Friday, assessing the actions of Mr. Wey's new attorney Mr. Fini and speaking with my associate Perry Fallick, I have decided, calmly, to not participate in any mediation.  I cannot be persuaded otherwise especially because my client and I are not interested in a partial settlement involving only the contract action.  I trust you appreciate my position."

In response to Morelli's letter, the Court responded by email as follows:  "Dear Counsel: The settlement conference will proceed at 2:30 p.m.  All clients must be available to participate. Failure to attend may result in sanctions.  Judge Cott."  The Court simultaneously issued an order (Dkt. No. 353) indicating that the settlement conference would proceed and putting counsel on notice that "[f]ailure to attend the conference will be considered a violation of a court order and may result in sanctions, including contempt."

Following the issuance of the Court's order, Morelli contacted the Court by telephone and took issue with the Court's order, and then hung up on the Court.

_____

[3] Colton is defendants' outgoing counsel and Fini is defendants' incoming counsel.

3

At 2:28 p.m., Morelli filed a letter (Dkt. No. 354) characterizing the Court's order as "inaccurate and misleading," expressing his "opinion that [the] Order was issued purposefully with the intent to make [his] client and [him] look bad," and stating that he and his client would not attend the settlement conference.

At 2:30 p.m., defendants and their counsel appeared in court for the settlement conference but Morelli and Fallick did not appear.

After waiting for 30 minutes, the Court went on the record with a court reporter and recited the history of these events as set forth herein and advised the defendants and their counsel that the Court intended to issue an order to show cause regarding sanctions. Subsequently, the Court ordered plaintiff's counsel to show cause why sanctions should not be imposed under Rule 16(f) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, or the inherent powers of the Court for failure to attend the conference and his violation of at least two court orders: the October 16 Order Scheduling Settlement Conference and the November 13 Order reaffirming that the conference would proceed (Dkt. No. 355). The Court gave plaintiff's counsel until November 20 to submit any memoranda of law, affidavits, or other evidence in response to the order to show cause, including any case law standing for the proposition that a party may unilaterally cancel a court-ordered settlement conference. Among the submissions, the Court required a sworn statement from plaintiff personally attesting that she was, in fact, present in New York City on November 13 in order to participate in the settlement conference. The Court also permitted defendants' counsel to make any submission regarding potential sanctions by November 20 as well, including, but not limited to, one regarding the fees incurred in their preparation for, and attendance at, the settlement conference.

II.

A.

On November 17, Morelli submitted a 30-paragraph declaration in response to the order

to show cause.  Declaration of Benedict P. Morelli, Esq., dated November 17, 2017 ("Morelli

Dec.") (Dkt. No. 358).  In his declaration, Morelli argued that no sanctions of any kind would be

appropriate in these circumstances.  Id. at ¶ 2.  He asserted that he did not intend to "disrespect

the authority of [the] Court or your Honor," and that his "actions were solely a response to the

uncalled for aggressive tactics of the Defendants."  Id. at ¶ 3.  Morelli invoked his "duty to

protect [his] client's best interests, no matter the circumstance," and added that the decision not

to attend the conference was his alone.  Id. at ¶¶ 3-4.

In his declaration, Morelli expressed his view that "because Plaintiff had voluntarily

agreed to participate in the settlement conference[,] . . . Plaintiff could cancel the settlement

conference should circumstances change."  Id. at ¶ 5.   Morelli then summarized certain actions

taken by defendants' incoming counsel, the Catafago Fini law firm, which he construed to

indicate that defendants and their new counsel were "insincere about their potential interest in

settling the underlying lawsuit or participating in the settlement conference in good faith."  Id. at

¶ 14.

Morelli then recounted his version of the events immediately preceding the settlement

conference, including the Friday afternoon email from his associate Perry Fallick and the Friday

evening call with the Court, in which Fallick had made clear that the actions taken by the

Catafago Fini law firm had "poisoned the well," making a "successful settlement conference

5

impossible." Id. at ¶ 24.[4]  Nonetheless, Morelli acknowledged that, as of Friday evening, the Court had "declined to cancel the settlement conference."  Id.  Morelli also reviewed the email he sent to the Court on Monday morning, November 13, confirming that plaintiff no longer wanted to participate in the conference and the reasons therefor.  Id. at ¶ 25.  Morelli then concluded that "[a]t that point, the Court and defense counsel were aware through 3 separate advisories that Plaintiff would not be attending the settlement conference that had been sabotaged by the Defendants and their new counsel."  Id. at ¶ 26.

Morelli ended his declaration with the following:

> I regret any misunderstanding with the Court or your Honor, or any disrespect your Honor may have perceived.  I take zealous advocacy as one of my foundational principles.  I never intended that it be disrespectful and regret that the Court may have interpreted it as such.  My actions were in no way meant to disrespect your Honor, but only meant to do what I felt was best for my client.

Id. at ¶ 27.

Counsel also filed a declaration from the plaintiff reporting that she had been physically present in New York City on November 13 in order to participate in the settlement conference and that she had "agreed to follow the advice of [her] attorneys and cancel the previously scheduled settlement conference."  Declaration of Hanna Bouveng dated November 16, 2017 ("Bouveng Dec."), at ¶ 9.[5]

---

[4] Fallick submitted his own declaration in response to the order to show cause as well, recounting his version of the events of November 10, including the telephone conference with the Court. Declaration of Perry Fallick, Esq., dated November 17, 2017 (Dkt. No. 359).

[5] On November 14, after the order to show cause had been issued, Morelli requested by letter a telephone conference with the Court (Dkt. No. 356).  The Court denied the request without prejudice to renewal once plaintiff's counsel filed his response to the order to show cause, because the application did not identify a reason that such a conference should take place at that time (Dkt. No. 357).  Morelli has now renewed his request for a telephone conference, and would like to speak with the Court ex parte (Dkt. No. 371).  Morelli has still not provided a reason for

B.

Outgoing counsel for defendants filed a letter dated November 20, 2017 ("Colton Letter") in response to the order to show cause (Dkt. No. 361).  In his letter, Colton, inter alia, advised the Court that defendants' fees for preparing for the settlement conference (largely drafting and editing the required ex parte mediation statement) consisted of the time costs for Julie Singer (an associate billed at the rate of $385/hour) of $4,812.25[6] and his own time costs (as a partner billed at the discounted rate of $500) of $2,650 for a total in preparation fees of $7,462.50.  Colton Letter at 1-2.  In addition, Colton reported that the fees for attending the aborted settlement conference are time costs for himself of $1,250 (2.5 hours including travel time to and from the courthouse of one hour).  Thus, the total cost to defendants related to the conference was $8,712.50.

III.

A.

A court may not require litigants to settle an action.  Kothe v. Smith, 771 F.2d 667, 669 (2d Cir. 1985).  However, "it is well-established that a court may require parties to appear for a settlement conference, and that it is entirely appropriate for a court to impose sanctions pursuant to Rule 16(f) [of the Federal Rules of Civil Procedure] if a party fails to do so."  Mordechai v. St. Luke's-Roosevelt Hosp. Ctr., No. 99-CV-3000 (RWS) (THK), 2001 WL 699062, at *2 (S.D.N.Y. June 20, 2001); see, e.g., Sosinsky v. Chase Manhattan Bank, No. 99-CV-0043 (JGK), 1999 WL 675999, at *2 (S.D.N.Y. Aug. 31, 1999) (upholding magistrate judge's imposition of sanctions

---

the telephone conference – neither in the two letters he submitted, nor in his declaration. Accordingly, the Court does not believe there is a basis to schedule a telephone conference, ex parte or otherwise.  Morelli has been given ample opportunity to set forth his response to the order to show cause and has submitted his own declaration, as well as two other declarations.

[6]  It appears this number should be $4,812.50, not $4,812.25.

for failure to appear at settlement conference); Dan River, Inc. v. Crown Crafts, Inc., No. 98-CV-3178 (LMM) (AJP), 1999 WL 287327, at *2 (S.D.N.Y. May 7, 1999) ("[T]he [c]ourt has the power under Rule 16 to require a party to appear for at least one settlement conference.  A party cannot be allowed to flout such an order."); Francis v. Women's Obstetrics & Gynecology Grp. P.C., 144 F.R.D. 646, 647 (W.D.N.Y. 1992) ("It is, of course, well-established that a district court cannot coerce parties to settle.  However, a court may direct a party or a party's attorney to attend a settlement conference.  That authority is specifically provided for in Rule 16(a), Fed. R. Civ. P. . . . To ensure compliance, the court may also sanction a party or a party's attorney for not complying with [such an] order.") (citations omitted).

In addition, "[i]t is well settled that a magistrate judge has the authority to issue an order containing sanctions in connection with a matter that has been properly referred to the magistrate judge."  Sosinsky, 1999 WL 675999, at *2; see, e.g., Malave v. Nat'l Pension Fund, No. 92-CV-3824 (DC), 1996 WL 175090, at *3-4 (S.D.N.Y. April 15, 1996), aff'd, 125 F.3d 844 (2d Cir. 1997); Arons v. Lalime, 167 F.R.D. 364, 368–69 (W.D.N.Y. 1996); Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc., No 87-CV-0167 (JMC), 1990 WL 164859, at *5 (S.D.N.Y. Oct. 24, 1990).

"Pursuant to Federal Rule of Civil Procedure 16(f) and its inherent power, a . . . court may issue an order imposing sanctions on a party or his attorney for 'failing to appear at a scheduling or other pretrial conference' or 'failing to obey a scheduling or other pretrial order.'" Xu v. UMI Sushi, Inc., No. 15-CV-4710 (RJS), 2016 WL 3523736, at *3 (S.D.N.Y. June 21, 2016) (citing Fed. R. Civ. P. 16(f)) (alterations omitted); see, e.g., Mickle v. Morin, 297 F.3d 114, 125 (2d Cir. 2002) (a court has inherent power to sanction an attorney "for disobeying the court's orders"); Mahoney v. Yamaha Motor Corp. U.S.A., 290 F.R.D. 363, 369-372 (E.D.N.Y. 2013) (sanctioning plaintiff's counsel $3,500 pursuant to Rule 16(f) for "failure to comply with

multiple court orders"); McConnell v. Costigan, No. 00-CV-4598 (SAS), 2002 WL 313528, at

*15 (S.D.N.Y. Feb. 28, 2002) (imposing sanction of $1,000 for, in part, failure to comply with

court's prior scheduling order and delay ).

     "[A]ppropriate sanctions" imposed pursuant to Rule 16(f) and the court's inherent

sanctions power "include a fine payable to the Clerk of the Court."  Xu, 2016 WL 3523736, at *4

(citing Woo v. City of New York, No. 93-CV-7007 (AJP) (HB), 1996 WL 284930, at *2

(S.D.N.Y. May 29, 1996)); see, e.g., Macolor v. Libiran, No. 14-CV-4555 (JMF), 2015 WL

337561 at *2 (S.D.N.Y. Jan. 23, 2015) (requiring defendant's counsel pay $3,000 to Clerk of the

Court and $1,000 to plaintiff's counsel "to compensate him for the time and resources spent

preparing for and attending the aborted [pretrial] conference as well as his subsequent

communications with the [c]ourt."); Kerestan v. Merck & Co. Long Term Disability Plan, No.

05-CV-3469 (BSJ) (AJP), 2008 WL 2627974, at *1 (S.D.N.Y. July 2, 2008) (imposing $3,400

sanction against plaintiff pursuant to "Rule 16(f) and the [c]ourt's inherent authority," to be paid

to Clerk of the Court, for failure to appear at scheduled court conference); Mordechai, 2001 WL

699062 at *2 (requiring that plaintiff pay monetary sanctions to both defendant's counsel and

Clerk of the Court, where plaintiff's failure to appear at two settlement conferences "ha[d]

wasted not only opposing counsel's time, but also that of the [c]ourt"); Miltope Corp. v. Hartford

Cas. Ins. Co., 163 F.R.D. 191, 195 (S.D.N.Y. 1995) (noting that "[d]ue regard for the need to

vindicate the public interest in the sound administration of justice" warrants "the imposition of a

fine, payable to the Clerk of the Court," and that "purpose" of such fine "imposed upon an

offending attorney" is "essentially punitive and deterrent").  Indeed, the Supreme Court has

stated that "sanctions for violation of . . . scheduling orders 'must be applied diligently both to

penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who

might be tempted to such conduct in the absence of such a deterrent.'" Miltope Corp., 163 F.R.D. at 194 (quoting Roadway Exp., Inc. v. Piper, 447 U.S. 752, 753 (1980)) (alterations omitted).

B.

The Court is reluctant to impose sanctions, but believes it has no choice in this case. Morelli's violation of two court orders was flagrant and knowing, and even if done with a client's interest in mind and without any intent to disrespect the Court, these motives are no excuse for failing to appear at the settlement conference in these circumstances.

It should go without saying that "[a] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." Hnot v. Willis Grp. Holdings Ltd., No. 01-CV-6558 (GEL), 2006 WL 2381869, at *3 (S.D.N.Y. Aug. 17, 2006) (citing Goewey v. United States, 886 F. Supp. 1268, 1283 (D.S.C. 1995)). But that is exactly what Morelli did in this case, and he did so more than once. The Court issued a scheduling order for a settlement conference on October 16. That was a court order and it required the parties to attend a settlement conference on November 13. That order was never vacated. Morelli's failure to attend the conference was thus a violation of a court order.

Morelli also violated the Court's order issued on November 13, which explicitly reaffirmed that the settlement conference would proceed that afternoon. Moreover, the Court's order put Morelli on notice that he could face sanctions if he failed to attend.

If Morelli believes that an attorney may unilaterally cancel a court-ordered settlement conference, as his submission to the Court suggests, he is mistaken. An attorney has no authority to cancel a settlement conference; that is for the court alone to do. Morelli's actions here are particularly egregious because on the eve of the settlement conference, Friday November 10, the Court held a telephone conference (after business hours and on a court holiday) for the purpose of determining whether the conference should, in fact, proceed on Monday November 13.

10

Despite the late hour, all involved counsel were able to participate in a telephone conference with the Court.[7]  The upshot of the conference was an unequivocal instruction to counsel that the settlement conference would proceed as scheduled on Monday afternoon.

Despite the fact that the Court, after hearing from all counsel on the Friday night call, had decided to proceed, Morelli emailed the Court less than three hours before the conference on Monday to inform the Court that he had "decided, calmly, to not participate in any mediation" and could not "be persuaded otherwise."  Morelli seemed to continue to operate under the belief that he could announce his non-appearance and that would be the end of the conference.  He attempts to justify his conduct by contending that he takes "zealous advocacy" as one of his "foundational principles," and that he "only meant to do what [he] felt was best for his client."  Morelli Dec. ¶ 27.[8]  While the Court has no doubt that Morelli believed he was acting in the best interest of his client, it nonetheless finds that, in disregarding the Court's orders, Morelli abdicated his responsibilities as an officer of the court.  Moreover, it represented a significant inconvenience to the Court to have prepared for (and held open a block of time for) a settlement conference only to have been forced to adjourn it due to the unilateral withdrawal of plaintiff and her counsel.  There must, accordingly, be consequences for these violations.

---

[7]  Fallick represented the plaintiff on this call.  Colton and Fini both participated as well.

[8]  It is worth noting that "zealous advocacy" would not justify Morelli's actions under the New York State Rules of Professional Conduct, which the Court looks to under its Local Rules.  See S.D.N.Y. Local Rule 1.5(b)(5).  The concept of zealous advocacy is no longer enshrined in the rules of professional conduct, as it once was.  Compare N.Y. Rules of Prof'l Conduct Rule 1.3 cmt. 1 (2017) ("A lawyer must also act with commitment and dedication to the interests of the client and in advocacy upon the client's behalf.") (emphasis added), with  N.Y. Model Code of Prof'l Responsibility Canon 7 ("A Lawyer Should Represent a Client Zealously Within the Bounds of the Law"), and DR 7-101 ("Representing a Client Zealously") (N.Y. Bar Ass'n) (repealed by N.Y. Rules of Prof'l Conduct, 2009); see also Steven C. Krane and David A. Lewis, In with the Rules, Out with the Code, 81 N.Y. St. B.J. 24, 26 (June 2009) ("The world 'zeal' has been totally eliminated from the [New York] Rules and replaced by the concept of 'diligence.'").

The Court believes monetary sanctions in the form of defense counsel's fees for preparation for and attendance at the conference are appropriate.  However, the Court believes that the 17.8 hours that two attorneys billed for preparing the ex parte settlement letter were slightly excessive and, accordingly, finds it appropriate to reduce the amount sought by defense counsel.[9]  In its discretion, the Court directs that counsel for plaintiff reimburse Colton and his firm in the amount of $5,000 for the work related to the letter and $1,250 for attendance at the conference for a total of $6,250.

In addition, the Court concludes that in evaluating the totality of the circumstances here, a fine is also appropriate.  Accordingly, the Court directs that plaintiff's counsel pay a fine of $1,000 to the Clerk of the Court.

IV.

For all these reasons, the Morelli Law Firm is directed to pay the sum of $6,250 to the Dentons law firm, and to pay $1,000 to the Clerk of the Court.  These payments should be made no later than 14 days from the date of this Opinion and Order.

**SO ORDERED.**

Dated: New York, New York
       December 7, 2017

_____
JAMES L. COTT
United States Magistrate Judge

---

[9]   By the Court's calculation, associate Julie Singer worked 12.5 hours ($4,812.50 at a rate of $385/hour) and partner Glenn Colton worked 5.3 hours ($2,650 at a (reduced) rate of $500/hour) for a total of 17.8 hours.

12

**422**



## COUNSEL

Dhillon & Smith, Harmeet K. Dhillon and Nitoj P. Singh for Defendant and Appellant.

Stein & Lubin, Michael F. Donner and Daniel K. Slaughter for Plaintiffs and Respondents.

## OPINION

**BANKE, J.**—Defendant Andreas G. Papaliolios (Papaliolios) appeals from an order denying his special motion to strike a libel claim under Code of Civil Procedure section 425.16[1] (the "anti-SLAPP" statute). The claim arises from a negative review of an apartment building Papaliolios posted to Yelp, an Internet Web site. Papaliolios asserts his review is mere opinion or, alternatively, substantially true and, therefore, nonlibelous. While many Internet critiques are nothing more than ranting opinions that cannot be taken seriously, Internet commentary does not ipso facto get a free pass under defamation law. Papaliolios's review, in part, is susceptible of being read as containing factual assertions, not just mere opinion, and plaintiffs submitted sufficient evidence to meet their minimal burden under the anti-SLAPP statute to show a probability of prevailing on at least some aspect of their libel claim. We therefore affirm the order denying Papaliolios's special motion to strike.

### FACTUAL AND PROCEDURAL BACKGROUND

Bently Nob Hill, LP, has owned the apartment building at 1360 Jones Street (the Jones Building) since March 2005. Christopher Bently (Bently) is an owner and managing partner of the limited partnership. Amber Marie Bently is Christopher's wife. Bently and his wife later took up residence in the Jones Building penthouse, unit 1001.

Papaliolios moved into the Jones Building in 2004. After three years of contentious and litigious relations with his new landlord-*cum*-cotenant, Papaliolios left in early 2008.

---

[1] All further statutory references are to the Code of Civil Procedure unless indicated.

Four years later, between late February and early March 2012, Papaliolios, employing the user name "Sal R.," posted a review of the Jones Building on Yelp, a Web site that collects consumer reviews of businesses. The review, which appeared on a Yelp page devoted to the Jones Building, read:

"Sadly, the Building is (newly) owned and occupied by a sociopathic narcissist—who celebrates making the lives of tenants hell. Of the 16 mostly-long-term tenants who lived in the Building when the new owners moved in, the new owners' noise, intrusions, and other abhorrent behaviors (likely) contributed to the death of three tenants (Pat, Mary, & John), and the departure of eight more (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order. Notice how they cleared-out all the upper-floor units, so they could charge higher rents?

"They have sought evictions of 6 of those long-term tenants, even though rent was paid-in-full, and those tenants bothered nobody. And what they did to evict the occupants of unit #902, who put many of tens of thousands of dollars into their unit, was horrific and shameful.

"This is my own first-hand experience with this building, and its owners. I know this situation well, as I had the misfortune of being in a relationship with one of the Building's residents at the time, have spent many days and nights over many years in the Building, and have personally witnessed the abhorrent behavior of the owners of the Building.

"There is NO RENT that is low enough to make residency here worthwhile."

Papaliolios posted substantially the same review several times.[2] Each time, Bently complained to Yelp and asked Yelp to remove the review. Each time, Yelp complied. One version of the review, however, remained on Yelp's forum related to complaints about how Yelp handles removal of reviews from its Web site.

On March 28, 2012, based on the posting quoted above, Bently, his wife, and Bently Nob Hill (collectively, plaintiffs) sued Papaliolios for libel.[3]

Two months later, on May 25, 2012, Papaliolios responded with a special motion to strike under section 425.16. Papaliolios claimed the libel cause of

---

[2] At least one version of the review substituted the words "resulted in" for the words "contributed to," so the middle sentence of the first paragraph read: ". . . the new owners' noise, intrusions, and other abhorrent behaviors (likely) resulted in the death of three tenants (Pat, Mary, & John), and the departure of eight more (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order."

[3] The complaint also contains a cause of action for trespass brought by another entity, Bently Reserve, LP, against Papaliolios. That claim is not at issue in this appeal.

**424**

action was aimed at suppressing his right to speak in an open forum about an issue of public interest and further claimed plaintiffs would be unable to show a probability of prevailing on their libel claim because the statements in the review were mere opinions and thus not provably false.

Plaintiffs opposed the motion, asserting numerous statements in the review were indeed provably false and offering evidence of that. For instance, plaintiffs juxtaposed these statements with evidence they submitted:

| Statement | Evidence |
|---|---|
| "the Building is (newly) owned and occupied by a sociopathic narcissist . . ." | Bently's declaration that there is no such medical diagnosis for Bently or his wife. |
| "the new owners noise, intrusions, and other abhorrent behaviors (likely) contributed to the death of three tenants (Pat, Mary, & John) . . ." | Declarations of relatives and a city death certificate showing Mary and John are alive, while Pat died in 2008 of pneumonia and cancer. |
| "the new owners noise, intrusions, and other abhorrent behaviors (likely) contributed to . . . the departure of eight more [of the 16 mostly long-term tenants who lived in the Building when the new owners moved in] (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order." | Bently's declaration that exit interviews did not reveal tenants leaving for these reasons; the tenants in 801 and 802 continue to reside in their apartments; the tenants in 1001 agreed to move to unit 702 in 2005 when Bently and his wife expressed interest in residing in unit 1001, then those tenants vacated 702 in 2006 to move to the East Coast; tenants in 902 stayed until 2009; tenants in 602 and 502 stayed until 2007; and Papaliolios rented 701 and stayed until 2008. |
| "They have sought evictions of 6 of those long-term tenants, even though rent was paid-in-full, and those tenants bothered nobody." | Bently's declaration that plaintiffs did not seek to evict any tenant except Papaliolios, and that proceeding did not result in his eviction (left on his own). |
| "they . . . evict[ed] the occupants of unit #902 . . ." | Bently's declaration that there was no eviction of the occupants of unit 902. |
| "they cleared-out all the upper-floor units, so they could charge higher rents . . ." | Bently's declaration that of the tenants on floors 8, 9, and 10, only the tenants of 902 vacated after an attempt to raise rent. |

In conjunction with his reply memorandum, Papaliolios submitted evidence he claimed undermined plaintiffs' showing as to how the Jones Building tenants departed. He contended, based on a copy of a notice to terminate

tenancy served in April 2005, that the four former tenants of unit 1001 were, in fact, evicted to make room for Bently and his wife. He provided a copy of a notice, ultimately filed with the San Francisco Rent Stabilization and Arbitration Board, from Bently Nob Hill's attorney to the two tenants of unit 402, demanding they remove a rug and chair from the foyer outside their apartment or vacate within three days. He pointed to hearsay statements of another tenant suggesting the tenants in 902 were forced out after Bently repeatedly hauled them before the San Francisco Rent Board, assertedly to reap the benefits of $60,000 in renovations the tenants had made. He pointed to an admission by Bently Nob Hill, in answering the complaint in another of the parties' lawsuits, that "in August 2005 [(five months after acquiring the Jones Building)], unit 802 became available for rent," an admission confirmed by the declaration of the current tenant of 802 who took possession in September 2005. Finally, as to unit 602, Papaliolios attached a printout from the San Francisco Rent Board showing a landlord petition filed on March 20, 2006, against that unit's tenants (for unknown reasons and with an unknown result).

The trial court heard and denied the anti-SLAPP motion on July 17, 2012. The court concluded that, while the libel claim fell within the ambit of the anti-SLAPP statute, plaintiffs had "provid[ed] evidence showing" the "requisite minimal merit" of their claim and thus had carried their burden under the statute.

## DISCUSSION

Resolving the merits of an anti-SLAPP motion under section 425.16 is ordinarily "a two-part analysis, concentrating initially on whether the challenged cause of action arises from protected activity within the meaning of the statute and, if it does, proceeding secondly to whether the plaintiff can establish a probability of prevailing on the merits." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699 [61 Cal.Rptr.3d 29] (*Overstock.com*).) In this case, "we bypass the initial inquiry because everyone agrees that the first hurdle in obtaining anti-SLAPP relief has been met" (*ibid.*), and, indeed, the libel claim undoubtedly arises from protected activity. We therefore focus solely on the second prong—whether plaintiffs carried their burden of showing a probability of prevailing on the merits of their libel claim. (*Ibid.*)

In this regard, our review is de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326 [46 Cal.Rptr.3d 606, 139 P.3d 2]; *Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609 [39 Cal.Rptr.3d 21].) We apply a "summary-judgment-like" test (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714 [54 Cal.Rptr.3d 775, 151 P.3d 1185]), accepting as true the evidence favorable to

**426**

the plaintiff and evaluating the defendant's evidence only to determine whether it defeats the plaintiff's evidence as a matter of law (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823 [33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685]). The evidence put forward at this stage must be admissible; even allegations in a verified complaint are insufficient. (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1212 [128 Cal.Rptr.3d 205].)

███ "In addition to considering the substantive merits of the plaintiff's claims," the court "must also consider all available defenses to the claims . . . ." (*No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1026 [122 Cal.Rptr.3d 397].) When a cause of action states multiple grounds for relief, "the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any" one of those grounds. (*Wallace v. McCubbin, supra*, 196 Cal.App.4th at p. 1212.)

███ " 'Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation. [Citations.]' [Citation.] ' "The sine qua non of recovery for defamation . . . is the existence of falsehood." [Citation.]' " (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695 [142 Cal.Rptr.3d 40] (*Summit Bank*).) Papaliolios contends his Yelp review of the Jones Building is, given its context, mere opinion and thus not actionable, or in the alternative, is substantially true.

*Provably False Assertion of Fact*

███ To be libelous, a " 'statement must contain a provable falsehood . . .' " and, to this end, " 'courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.' " (*Summit Bank, supra*, 206 Cal.App.4th at p. 695.)

Not all statements that appear to be opinions, however, are immunized. (*Summit Bank, supra*, 206 Cal.App.4th at p. 696.) "In *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 17 [111 L.Ed.2d 1, 110 S.Ct. 2695] (*Milkovich*), the United States Supreme Court moved away from the notion that defamatory statements categorized as opinion as opposed to fact enjoy wholesale protection under the First Amendment. Significantly, the court recognized that 'expressions of "opinion" may often imply an assertion of objective fact.' (*Milkovich*, at p. 18.) The court went on to explain: 'If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the

statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications . . . .' (*Id.* at pp. 18–19.)" (*Overstock.com, supra,* 151 Cal.App.4th at p. 701; cf. *Weller v. American Broadcasting Companies., Inc.* (1991) 232 Cal.App.3d 991, 1004 [283 Cal.Rptr. 644] (*Weller*) ["we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' or even putting it in the form of a question, necessarily defuses the impression that the speaker is communicating an actual fact"].)

◼ "Thus a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. (*Milkovich, supra,* 497 U.S. at p. 19.) The key is not parsing whether a published statement is fact or opinion, but 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429], citing *Milkovich, supra,* 497 U.S. at p. 19, among other authority.)" (*Overstock.com, supra,* 151 Cal.App.4th at p. 701.) For example, "an opinion based on implied, undisclosed facts is actionable if the speaker has no factual basis for the opinion" but "[a]n opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true." (*Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 [37 Cal.Rptr.3d 133] (*Ruiz*).)

◼ To decide whether a statement expresses or implies a provably false assertion of fact, courts use a totality of the circumstances test. (*Summit Bank, supra,* 206 Cal.App.4th at p. 696.) "[A] court must put itself in the place of an average reader and determine the natural and probable effect of the statement . . . ." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011 [113 Cal.Rptr.2d 625].) Thus, a court considers both the language of the statement and the context in which it is made. (*Ibid.*; *Summit Bank, supra,* 206 Cal.App.4th at p. 696.) "The contextual analysis requires that courts examine the nature and full content of the particular communication, as well as the knowledge and understanding of the audience targeted by the publication." (*Overstock.com, supra,* 151 Cal.App.4th at p. 701.)

◼ The " 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court.' " (*Summit Bank, supra,* 206 Cal.App.4th at p. 696.) But if a statement is "ambiguous and cannot be characterized as factual or nonfactual as a matter of law," a jury must determine whether the statement contains an actionable assertion of fact. (*Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1608 [284 Cal.Rptr. 244]; see *Summit Bank, supra,* 206 Cal.App.4th at p. 696; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 347 [37 Cal.Rptr.3d 480], quoting *Weller, supra,* 232 Cal.App.3d at p. 1001, fn. 8; *Ruiz, supra,* 134 Cal.App.4th at

**428**

p. 1471; accord, *Manufactured Home Communities, Inc. v. County of San Diego* (9th Cir. 2008) 544 F.3d 959, 963.)

"The allocation of functions between court and jury with respect to factual content is analogous to the allocation with respect to defamatory meaning in general. On the latter issue, the court must first determine as a question of law whether the statement is reasonably susceptible of a defamatory interpretation; if the statement satisfies this requirement, it is for the jury to determine whether a defamatory meaning was in fact conveyed to the listener or reader. [Citations.] Similarly, it is a question of law for the court whether a challenged statement is reasonably susceptible of an interpretation which implies a provably false assertion of actual fact. If that question is answered in the affirmative, the jury may be called upon to determine whether such an interpretation was in fact conveyed." (*Kahn v. Bower, supra*, 232 Cal.App.3d at p. 1608.)

Looking at the totality of the circumstances in this case, we conclude Papaliolios's review was "reasonably susceptible of an interpretation which implies a provably false assertion of actual fact." (*Kahn v. Bower, supra*, 232 Cal.App.3d at p. 1608.)

First, we look at Papaliolios's language. Although he used some hyperbole and name calling—"sociopathic narcissist," "celebrates making the lives of tenants hell," "other abhorrent behaviors"—the review also included purported *facts* about the Jones Building. He asserted plaintiffs sought to evict six tenants, and further stated details about the alleged eviction of tenants from unit 902 after they "put many of tens of thousands of dollars into their unit." He further asserted plaintiffs' activities "(likely) contributed" to the "deaths" of three particular tenants, "Pat, Mary, & John," and to the departure of tenants in eight particular units "(units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order." Hedging his statements with the word "likely" does not insulate them from examination. (See *Milkovich v. Lorain Journal Co., supra*, 497 U.S. at p. 18 [" 'In my opinion John Jones is a liar . . .' . . . implies a knowledge of facts which lead to the conclusion that Jones told an untruth."]; *Weller, supra*, 232 Cal.App.3d at p. 1004 ["we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' . . . , necessarily defuses the impression that the speaker is communicating an actual fact"].) In fact, Papaliolios went out of his way to win credibility with his audience as to these factual assertions, stating: "This is my own first-hand experience with this building, and its owners. I know this situation well, as I had the misfortune of being in a relationship with one of the Building's residents at the time, have spent many days and nights over many years in the Building, and have personally witnessed the abhorrent behavior of the owners of the

Building." Such assurances suggest facts are being communicated, not opinions. (See Elder, Defamation: A Lawyer's Guide (2012) Fact Versus Opinion, § 8:2 [representation that speaker has "private, firsthand knowledge" relevant to the fact/opinion distinction]; see also *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.* (N.D.Tex. 2008) 553 F.Supp.2d 680, 689 [where defendant "claims to verify the accuracy of the information he posts" his online "statements are not protected opinions"].)

■    We next turn to the broader context of his statements—posting on an Internet site under an assumed user name. Papaliolios contends Internet fora are notorious as "places where readers expect to see strongly worded opinions rather than objective facts," and that "anonymous, or pseudonymous," opinions should be " 'discount[ed] . . . accordingly.' " (*Summit Bank, supra*, 206 Cal.App.4th at pp. 696–697.) However, the mere fact speech is broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable opinion and immune from defamation law.

To be sure, anonymous Internet fora "promote[] a looser, more relaxed communication style" in which users may "substitute gossip for accurate reporting and often . . . adopt a provocative, even combative tone." (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1162–1163 [72 Cal.Rptr.3d 231] (*Krinsky*); see *id.* at p. 1163 ["online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas . . ."]; *ibid.* [" 'online pseudonyms tends to heighten this sense that "anything goes," and some commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world' "]; *Summit Bank, supra*, 206 Cal.App.4th at p. 697; *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1148 [147 Cal.Rptr.3d 496] (*Chaker*).)

Thus in *Krinsky*, the defendant, using a concealing screen name on an Internet discussion forum, felt free to claim a corporate president was part of a management team of " 'boobs, losers, and crooks' " and " 'has fat thighs, a fake medical degree, "queefs" and has poor feminine hygiene.' " (*Krinsky, supra*, 159 Cal.App.4th at p. 1159.) The plaintiff served a subpoena on the forum's host seeking the defendant's identity and the defendant, appearing as "Doe 6," moved to quash. (*Id.* at pp. 1158–1159.) The appellate court, viewing the defendant's posts in the context of what was a particularly "[h]eated" discussion forum in which numerous other posts questioned the defendant's credibility, and noting the defendant's "crude, ungrammatical" language, satirical tone, and vituperative, "juvenile name-calling," concluded

**430**

the defendant's railing was nonactionable opinion and ordered the subpoena quashed.[4] (*Krinsky, supra*, 159 Cal.App.4th at pp. 1175–1177.)

Similarly, in *Summit Bank*, the defendant posted under a pseudonym, "in a section of the Craigslist Web site entitled 'Rants and Raves,' " "free-flowing diatribes (or 'rants')" about a bank that lacked "proper spelling or grammar." (*Summit Bank, supra*, 206 Cal.App.4th at pp. 696, 699.) The Court of Appeal concluded readers would be predisposed to view the comments "with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts." (*Summit Bank, supra*, 206 Cal.App.4th at p. 696; see p. 680 & fn. 10.) Thus, statements that the bank's CEO " 'thinks that the Bank is her personel [*sic*] Bank to do with it as she pleases,' " that the bank was a " 'problem Bank,' " and that the bank left clients " 'high and dry' " were nonactionable, and the appellate court reversed the denial of an anti-SLAPP motion. (*Id.* at pp. 698, 699, 701.)

In *Chaker*, the court confronted a "series of derogatory statements" on the Ripoff Report "Internet Web site where members of the public may comment on the reliability and honesty of various providers of goods and services" and on topix, "a social networking site."[5] (*Chaker, supra*, 209 Cal.App.4th at pp. 1142, 1146.) The defendant wrote of the plaintiff: " 'This guy is a criminal and a deadbeat dad. As you can see, I am the child's grandma so I know. If you should eve [*sic*] come across this person, be very careful. He may be taking steroids so who knows what could happen.' 'I would be very careful dealing with this guy. He uses people, is into illegal activities, etc. . . .' " (*Id.* at p. 1142.) The Court of Appeal concluded, "alleged embellishments, to the effect [the plaintiff] picks up streetwalkers and homeless drug addicts and is a deadbeat dad," were too generalized, nonspecific, and vitriolic to be actionable. (*Id.* at pp. 1149–1150.) "The only statement which might arguably fall outside the scope of nonactionable opinion or epithet [was] the statement Mateo is a criminal. However, that statement [was] true." (*Id.* at p. 1150.) Accordingly, the Court of Appeal affirmed the grant of an anti-SLAPP motion. (*Ibid.*)

*Krinsky*, *Summit Bank*, and *Chaker* illustrate the significant role context plays in distinguishing fact from opinion, but by no means do they categorically immunize anonymous Internet speech or even give anonymity special

[4] Even the " 'fake medical degree' " comment "was only the latest entry in a protracted online debate about whether plaintiff's medical degree from Spartan Health Sciences University in the West Indies justified her use of the 'M.D.' title in company documents. No reasonable reader would have taken this post seriously . . . ." (*Krinsky, supra*, 159 Cal.App.4th at p. 1177.)

[5] It is unclear which statements appeared where, and although the opinion suggests the statements were anonymous, it does not say so.

weight. While *Krinsky* recognizes the long-enduring right to speak anonymously in a lawful manner, it warns, on the Internet, the "informal ability to 'sound off,' often in harsh and unbridled invective, . . . opens the door to libel and other tortious conduct," and "[w]hen vigorous criticism descends into defamation, . . . constitutional protection is no longer available." (*Krinsky, supra*, 159 Cal.App.4th at pp. 1163–1164; see *id.* at p. 1164 [further warning, "criticism on the Internet is often so recklessly communicated that the harm to its targets, particularly in the financial arena, may extend far beyond what is covered by rules applicable to oral rhetoric and pamphleteering"].) While the defendant's anonymity in *Krinsky* may have freed him to engage in "crude, satirical hyperbole," it was the overall nature and context of his comments, not his anonymity, that led the court to conclude the comments nonactionable. (*Id.* at pp. 1175–1178.)

Likewise, in *Summit Bank* and *Chaker*, the courts examined a variety of contextual factors. The anonymity of the defendant in *Summit Bank* appeared relevant to that court, but so was the name of the forum the defendant used—"Rants and Raves"—as well as the posts' "diatribe" nature, lack of formality, poor grammar and spelling. (*Summit Bank, supra*, 206 Cal.App.4th at pp. 697–699.) In *Chaker*, the court, citing *Krinsky* and *Summit Bank*, noted, "a number of recent cases have relied heavily on the fact that statements were made in Internet forums" (*Chaker, supra*, 209 Cal.App.4th at p. 1148), but went on to analyze other aspects of the defendant's speech, such as its "angry" and "generalized" character and "lack [of] any specificity." (*Id.* at pp. 1149–1150.)

■ Thus, while *Krinsky, Summit Bank*, and *Chaker* allow courts to dispense quickly with defamation claims arising from true rants and raves, they do not preclude the courts from taking serious Internet speech seriously. Internet posts, where the "tone and content is serious," where the poster represents himself as "unbiased" and "having specialized knowledge," or where the poster claims his posts are "Research Reports" or "bulletins" or "alerts," may indeed be reasonably perceived as containing actionable assertions of fact. (*Overstock.com, supra*, 151 Cal.App.4th at pp. 705–706.) And while "generalized" comments on the Internet that "lack any specificity as to the time or place of" alleged conduct may be a "further signal to the reader there is no factual basis for the accusations," specifics, if given, may signal the opposite and render an Internet posting actionable. (*Chaker, supra*, 209 Cal.App.4th at pp. 1149–1150 [making this distinction but finding the comments at issue too generalized to support a defamation claim]; cf. *ComputerXpress, Inc. v. Jackson, supra*, 93 Cal.App.4th at p. 1013 [though generally dismissing Internet postings as nonactionable, suggesting that in a "few instances in which the postings did contain apparent statements of

**432**

facts—such as the statement that a company owned by the former president had filed for bankruptcy"—they could have been actionable had there been evidence of falsehood].)

This brings us to *Wong v. Jing* (2010) 189 Cal.App.4th 1354 [117 Cal.Rptr.3d 747] (*Wong*), which dealt with more serious Internet speech and rounds out the discussion on the topic. In *Wong*, the Court of Appeal affirmed the denial of an anti-SLAPP motion in a defamation action based on a review on Yelp, the same forum Papaliolios used. The review, of a dentist, read: " '1 star rating . . . . [¶] Let me first say I wish there is [*sic*] "0" star in Yelp rating. Avoid her like a disease! [¶] My son went there for two years. She treated two cavities plus the usual cleaning. She was fast, I mean really fast. I won't necessarily say that is a bad thing, but my son was light headed for several hours after the filling. So we decided to try another dentist after half a year. [¶] I wish I had gone there earlier. First the new dentist discovered seven cavities. All right all of those appeared during the last half a year. Second, he would never use the laughing gas on kids, which was the cause for my son's dizziness. To apply laughing gas is the easiest to the dentist. There is no waiting, no needles. But it is general anesthetic, not local. And general anesthetic harms a kid's nerve system. Heck, it harms mine too. Third, the filling Yvonne Wong used is metallic silver color. The new dentist would only use the newer, white color filling. Why does the color matter? Here is the part that made me really, really angry. The color tells the material being used. The metallic filing, called silver amalgams [*sic*], has a small trace of mercury in it. The newer composite filling, while costing the dentist more, does not. In addition, it uses a newer technology to embed fluoride to clean the teeth for you. [¶] I regret ever going to her office. [¶] P.S. Just want to add one more thing. Dr Chui, who shares the same office with Yvonne Wong is actually decent.' " (*Wong, supra*, 189 Cal.App.4th at p. 1361.)

The dentist claimed the review was libelous per se because it falsely implied the following facts: "(1) Wong 'had failed to tell [Jing and Ma that their] son's filling contained mercury'; (2) Wong 'mis-diagnosed the case'; [and] (3) Wong 'used a General Anesthetic,' " something beyond her allowed scope of practice. (*Wong, supra*, 189 Cal.App.4th at p. 1370.) The appellate court agreed Wong had carried her burden under the second prong of the anti-SLAPP analysis because: "a jury reasonably could find that the review falsely implied that Wong had failed to warn and advise about silver amalgam and arguably better alternatives to its use" (*id.* at p. 1372); "a reasonable person could probably understand these statements to be criticism of Wong for working hastily, failing to find all of the cavities that the boy had, and thereby substantially misdiagnosing or underdiagnosing the condition of the boy's teeth" (*id.* at pp. 1373–1374); and "a jury reasonably could find that the

433

implied assertion that to make her job easier and quicker, Wong put defendant's son under general anesthesia to fill his cavities, exposed the boy's nervous system to potential harm and harmed him was false and defamatory" (*id.* at p. 1375).

Papaliolios's Yelp review is every bit as factually specific and earnest as the Yelp review in *Wong*. While Papaliolios's review does contain epithets not meant to be taken as serious assertions of fact, it also contains statements that could reasonably be understood as conveying facts—each provable and each meant to be used by prospective tenants to evaluate the Jones Building as a future residential choice.

Papaliolios asserts *Wong* is distinguishable because it did not involve "anonymous" speech. The review at issue in *Wong* "did not state the name of the person who wrote the review, but it did reveal the person's initials—T.J." (*Wong, supra*, 189 Cal.App.4th at p. 1368.) Papaliolios wrote as "Sal. R." We see no meaningful distinction between the identifying information in *Wong* and in this case—in both cases, the consuming public had no way of identifying the poster from the reviews. Moreover, as we have discussed, anonymity is only one of many contextual factors to be considered. (See *Krinsky, supra*, 159 Cal.App.4th 1154, 1164 ["targets" of anonymous "online aspersions may seek redress by filing suit against their unknown detractors"].)[6] Here, given other contextual considerations, Papaliolios's use of a pseudonym does not render his Yelp review incapable of being reasonably susceptible of a defamatory interpretation.

*Substantial Truth*

Papaliolios alternatively argues that even if his review contains express or implied statements of provable fact and even if some of his

---

[6] Other jurisdictions concur that speaking anonymously or with a pseudonym on the Internet does not immunize the speaker from liability. (E.g., *In re Indiana Newspapers Inc.* (Ind.Ct.App. 2012) 963 N.E.2d 534, 549 ["Although free speech is vigorously protected, a statement will not be afforded constitutional protection if it is defamatory."]; *Mortgage Specialists, Inc. v. Implode-Explode Heavy Industries, Inc.* (2010) 160 N.H. 227, 237 [999 A.2d 184] [" 'viable causes of actions for defamation' " against speakers using pseudonyms " 'should not be barred in the Internet context' "]; *Maxon v. Ottawa Publishing Co.* (Ill.App.Ct. 2010) 402 Ill.App.3d 704, 713 [341 Ill.Dec. 12, 929 N.E.2d 666] [finding no "support [for] the proposition that anonymous Internet speakers enjoy a higher degree of protection from claims of defamation than" others]; *In re Greenbaum* (N.Y.Sup.Ct. 2007) 18 Misc.3d 185, 187 [845 N.Y.S.2d 695] ["cases also recognize, however, that the right of anonymous speech is not absolute and cannot shield tortious acts such as defamation" ]; *John Doe No. 1 v. Cahill* (Del. 2005) 884 A.2d 451, 456 ["First Amendment does not protect defamatory speech."]; see generally Nimmer and Towle, The Law of Electronic Commercial Transactions Scope Information (2007) Liability for Informational Content, ¶ 10.05[2] [agreeing with courts finding no blanket protection for anonymous Internet speech].)

**434**

statements are false, the gist of his review is true, and truth is a complete defense to a libel claim. (*Summit Bank, supra,* 206 Cal.App.4th at p. 697.) Indeed, even "substantial truth" is a defense. (See *ibid.*) "[T]he law does not require [the defendant] to justify the literal truth of every word of the allegedly defamatory content, nor must we parse each word . . . to determine its truthfulness. 'It is sufficient if the defendant proves true the substance of the charge, irrespective of slight inaccuracy in the details, "so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." [Citations.]' [Citation.]" (*Ibid.*, italics omitted.)

"By the same token, not every word of an allegedly defamatory publication has to be false and defamatory to sustain a libel action. See *Masson*[ *v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496,] 510 [115 L.Ed.2d 447, 111 S.Ct. 2419] (interpreting California law, the Court explained, '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text . . . .') " (*Kaelin v. Globe Communications Corp.* (9th Cir. 1998) 162 F.3d 1036, 1040.) " 'Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [Citations.]' [Citation.]" (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936 [19 Cal.Rptr.3d 247].) Or yet another way: "[i]f any *material* part be not proved true, the plaintiff is entitled to damages in respect to that part." (*Shumate v. Johnson Publishing Co.* (1956) 139 Cal.App.2d 121, 132 [293 P.2d 531], italics added.)

■ When evaluating an affirmative defense in connection with the second prong of the analysis of an anti-SLAPP motion, the court, following the summary-judgment-like rubric, generally should consider whether the defendant's evidence in support of an affirmative defense is sufficient, and if so, whether the plaintiff has introduced contrary evidence, which, if accepted, would negate the defense. (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 715 [151 Cal.Rptr.3d 406]; *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398, 404 [13 Cal.Rptr.3d 353].)[7]

---

[7] *No Doubt v. Activision Publishing, Inc., supra,* 192 Cal.App.4th at page 1029, footnote 4, noted potentially divergent statements in appellate court decisions concerning the operation of affirmative defenses in connection with anti-SLAPP motions. Some courts state a defendant bears the burden of proof on an affirmative defense. (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 676 [35 Cal.Rptr.3d 31]; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2006) 136 Cal.App.4th 464, 477 [39 Cal.Rptr.3d 43]; *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 969 [106 Cal.Rptr.3d 290].) Others state the burden ultimately remains on the plaintiff to demonstrate a defense is " ' "not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses." ' " (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285 [67 Cal.Rptr.3d 190], italics omitted, quoting *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1367 [102 Cal.Rptr.2d 864], disapproved on

**435**

Among the express and implied factual assertions made by Papaliolios, perhaps the standout is that the "death[s]" of three former Jones Building tenants were "(likely)" connected to plaintiffs' conduct. Papaliolios presented no evidence whatsoever as to the nature and cause of these "death[s]." He offered only speculation the statement was true enough, since "dust and debris" from unspecified construction at the building may have had, or may someday have, some unspecified deleterious effects on tenants. Plaintiffs, on the other hand, offered evidence two of the three supposedly dead tenants are, in fact, alive, and the other died of pneumonia and cancer. We do not agree, as Papaliolios claims, that his assertion of three "death[s]" connected to plaintiffs' conduct is a mere " 'slight inaccuracy.' " (See *Summit Bank, supra*, 206 Cal.App.4th at p. 697.) On this basis, alone, plaintiffs succeeded in carrying their minimal burden under the anti-SLAPP statute as to probable merit of their libel claim.

Plaintiffs also adduced evidence raising a triable issue that tenants were not sweepingly "evict[ed]," as Papaliolios asserted. While Papaliolios responded with evidence countering plaintiffs' evidence concerning the timing and reasons for tenant departures, the present state of the evidence is, at best, murky. It certainly is not sufficiently clear to conclude Papaliolios is entitled to a defense judgment as a matter of law, even as to his statements about tenant departures, on the basis of "substantial truth."

Given these triable issues in connection with the merits of plaintiffs' libel claim, and the material nature of Papaliolios's statements to a prospective tenant, a trier of fact might conclude his review was not substantially true and was defamatory. (*Hughes v. Hughes, supra*, 122 Cal.App.4th at p. 937 ["whether a statement is true or substantially true is normally considered to be a factual one"]; *Kahn v. Bower, supra*, 232 Cal.App.3d at p. 1608 [whether statement is defamatory is for jury in close cases].)[8]

In his reply memorandum in the trial court, Papaliolios included a two-sentence footnote asserting, without citation to authority or evidence and without further explanation, that plaintiffs "are limited-purpose public figures

---

another ground in *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 68, fn. 5; cf. *Flatley v. Mauro, supra*, 39 Cal.4th at p. 323 ["The litigation privilege . . . may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."].) Given the evidence presented in this case, we need not resolve any apparent conflict.

[8] Because we conclude Papaliolios's review could be defamatory on the bases just discussed, we need not, for purposes of this anti-SLAPP analysis, analyze the showing made as to other statements in the review. (See *Masson v. New Yorker Magazine, Inc., supra*, 501 U.S. at p. 510 ["It matters not under California law that petitioner alleges only part of the work at issue to be false."]; cf. *Wallace v. McCubbin, supra*, 196 Cal.App.4th at p. 1212 ["the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any" grounds of a cause of action].)

**436**

and are required to provide evidence of malice." The footnote continued: "Given [p]laintiffs have not proven simple defamation, [Papaliolios] has not briefed the malice issue here but is prepared to provide the Court a supplemental brief on the issue upon request." There was no mention of this point at the hearing on the special motion to strike and no supplemental brief. Nor was any mention made of it in the trial court's order denying the motion.

Nevertheless, Papaliolios attempts to raise the issue of malice on appeal, arguing plaintiffs were limited purpose public figures because they advertised on Yelp and thus fell short in their merits showing because they presented no evidence Papaliolios was motivated by actual malice. Even if it were appropriate for Papaliolios to withhold a malice argument until his trial court reply brief (see *Wong, supra*, 189 Cal.App.4th at pp. 1368–1369 [suggesting arguments on "merits" prong of anti-SLAPP motion need not be raised in trial court opening brief and may be raised for first time in trial court reply brief]), his reply brief made no intelligible malice argument, lacking any authority, evidence, or analysis. Indeed, in that brief, Papaliolios conceded he "ha[d] not briefed" the malice issue, rendering his footnote a mere placeholder. We therefore conclude Papaliolios did not timely raise this factual issue in the trial court, and he cannot attempt to breathe life into it for the first time in this appeal. (See *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 384, fn. 6 [124 Cal.Rptr.3d 598] ["Defendants did not adequately raise this issue in the trial court and therefore forfeited the issue on appeal."]; *People v. Redd* (2010) 48 Cal.4th 691, 731–732 & fn. 19 [108 Cal.Rptr.3d 192, 229 P.3d 101] [passing reference in pleading to argument insufficient to preserve it].)

■ Furthermore, while use of the media to advocate on a particular public controversy can give rise to public figure status (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25 [53 Cal.Rptr.3d 752]), merely advertising one's goods or services does not (*Hufstedler, Kaus & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 69–70 [49 Cal.Rptr.2d 551] ["a person in the business world advertising his wares does not necessarily become part of an existing public controversy"]). The record before us in this appeal does not begin to contain the evidence necessary to conclude plaintiffs' presence on Yelp rendered them public figures. Finally, given the tenor of the Yelp review and evidence of the parties' rancorous relationship, there is some inkling of malice here.

■ In sum, plaintiffs made the requisite minimal showing required under the anti-SLAPP statute as to the merits of their libel claim, and Papaliolios's special motion to strike was properly denied.

437

## DISPOSITION

The trial court's order denying Papaliolios's special motion to strike is affirmed. Respondents to recover costs on appeal.

Margulies, Acting P. J., and Dondero, J., concurred.

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 200 of 271

# JUSTIA

# Rouch v. Enquirer & News

**440 Mich. 238 (1992)**

**487 N.W.2d 205**

ROUCH v. ENQUIRER & NEWS OF BATTLE CREEK.

Docket No. 89799, (Calendar No. 2).

**Supreme Court of Michigan.**

Argued December 3, 1991.

Decided July 15, 1992.

John M. Jereck for the plaintiff.

Nixon, Hargrave, Devans & Doyle (by Robert C. Bernius and Sharon Ochs Boston) and Sullivan, Hamilton, Schulz, Allen & Lettering (by James M. Sullivan) for the defendant.

Amici Curiae:

Honigman, Miller, Schwartz & Cohn (by Herschel P. Fink and Michael A. Gruskin); Mendes & Mount, of counsel (by Edward G. Spacek and Glenn M. Bieler), and Samuel A. Terilli, *242 Jr., General Counsel, for Detroit Free Press, Inc., and David Lawrence, Jr.

Kasiborski, Ronayne & Flaska, P.C. (by John J. Ronayne, III), for Post-Newsweek Stations, Michigan, Inc., and Adams Publishing Corporation.

Butzel, Long (by Richard E. Rassel, James E. Stewart, Leonard M. Niehoff, and Kevin F. O'Shea) for The Detroit News, Inc.

Marco, Litzenburger, Smith, Brown & Erhart, P.C. (by Seberon Litzenburger), for Northern Michigan Review, Inc., Otsego County Herald Times, Inc., Maurer Publishing Company, Cadillac Evening News, and Silbar Communications.

Dawn L. Phillips and Karen Russell for Michigan Press Association.

AFTER REMAND

BOYLE, J.

A responsible press has always been regarded as the handmaiden of effective judicial administration .... Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. [Sheppard v Maxwell, 384 US 333, 350; 86 S Ct 1507; 16 L Ed 2d 600 (1966).]

In this case we are called upon to examine the balance between protecting an individual's reputation from false and defamatory statements and fostering energetic, tumultuous public debate to ensure continued scrutiny of police, prosecutors, and the courts through cherished constitutional *243 rights guaranteeing freedom of speech and the press.[1] Newspapers have a longstanding tradition of reporting on criminal justice and police conduct. "With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice." Cox Broadcasting Corp v Cohn, 420 US 469, 492; 95 S Ct 1029; 43 L Ed 2d 328 (1975). Protecting that tradition without trampling the rights of individual citizens is the task facing this Court.

The plaintiff, David Rouch, was arrested, booked on a charge of first-degree criminal sexual conduct by the police upon authorization from an attorney in the prosecutor's office, and released after an informal bond hearing by a magistrate acting in her formal capacity pursuant to MCR 6.104. The defendant newspaper, the Enquirer & News of Battle Creek, published an account of Rouch's arrest, the charge against him, and his release on bond. Later, when Rouch appeared for his formal arraignment, he was told that the charges had been dropped. Rouch predicates his suit upon inaccuracies in the newspaper report.

Perhaps it is not surprising that with such important rights at stake, this controversy has required so much appellate court time.[2] When this Court first considered the case, it reviewed an *244 abbreviated record prepared prior to a summary disposition motion to determine "the applicability of Michigan's statutory `public and official proceedings'

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 202 of
271

statute, MCL 600.2911(3); MSA 27A.2911(3), and the viability of its common-law qualified
public-interest privilege." 427 Mich 157, 160; 398 NW2d 245 (1986). With further factual
development, the matter returns to this Court for additional review. We now consider
whether the defendant published a materially false article. We need not reach the issue
whether it was negligently published,[3] and whether the more complete factual record
brings the case within Michigan's statutory privilege.[4]

*245 We hold that the article was not materially false,[5] and we therefore reverse the
decision of the Court of Appeals and remand for entry of judgment notwithstanding the
verdict in favor of the defendant.

I

A. THE PROCEDURAL HISTORY

On December 5, 1980, David Rouch commenced this libel action against the Enquirer &
News of Battle Creek by filing a complaint in the Calhoun Circuit Court. Rouch claimed
that the newspaper had falsely published an article describing his arrest as a suspect for the
rape of a seventeen-year-old girl who was baby-sitting for his former wife. After initial
discovery, the newspaper filed a motion for summary disposition, seeking an order of no
cause of action because the newspaper was entitled to qualified privilege under the terms of
MCL 600.2911(3); MSA 27A.2911(3). In support of its motion, the newspaper relied on the
depositions *246 of the plaintiff, affidavits of the news reporter who authored the article,
and a police sergeant who provided a copy of the incident report with respect to Rouch's
arrest. Relying on Schultz v Newsweek, Inc, 668 F2d 911 (CA 6, 1982), the trial court ruled
that the newspaper was entitled to a qualified privilege for matters of general public
interest. As a result, the trial court concluded that the plaintiff was required to prove actual
malice in order to sustain his claim. The trial court granted summary judgment in favor of
the defendant on the basis that the plaintiff was unable to establish a genuine issue of
material fact regarding the defendant newspaper's malice.

The Court of Appeals reversed the ruling of the trial court, stating that the statutory
privilege was unavailable on the basis that no warrant was issued in the case, that the
common-law privilege to report matters in the public interest was unavailable because the
details of the alleged crime fell outside the scope of matters promoting the public interest,
and that the trial court erred in requiring a showing of malice.[6] We granted the defendant
leave to appeal.[7]

In Rouch v Enquirer & News of Battle Creek, 427 Mich 157; 398 NW2d 245 (1986)

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 203 of 271

(hereafter Rouch I), we considered the scope of Michigan's statutory privilege, the continued existence of Michigan's qualified privilege in light of the constitutional dimensions of the law of defamation as developed by the United States Supreme Court in New York Times Co v Sullivan, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), and its progeny, and the burden of proving falsity. Writing for the majority, Justice BRICKLEY considered the questions of privilege and discussed the applicability of *247 the "official proceedings privilege" statute, MCL 600.2911(3); MSA 27A.2911(3). Justice BRICKLEY concluded that an arrest, absent judicial action, falls outside the scope of "public and official proceedings" as covered in Michigan's statute.[8] In rejecting an interpretation of Michigan's statutory privilege that would reach arrests or police reports absent judicial action, Justice BRICKLEY reasoned that the language "evoke[d] notions of adjudicatory action, rather than of government action generally." 427 Mich 172. Justice BRICKLEY further explored the effect of constitutional mandates on the availability of Michigan's public-interest privilege. Concluding that the public-interest privilege had been largely subsumed by the more expansive constitutional protections afforded by the New York Times standard, we adopted the Gertz[9] negligence standard in place of the former public-interest privilege, 427 Mich 202, and remanded the case to the trial court for further proceedings, with the instruction that the plaintiff bore the burden of proving falsity.

On February 9, 1988, an eight-day trial commenced in circuit court. Witnesses included the news reporter responsible for the story, police officers, the plaintiff, the magistrate responsible for holding the informal bond hearing, and several expert witnesses. Significantly, John Bell, a Battle Creek police officer, testified that the prosecutor, Mr. Pattison, authorized Mr. Rouch to be arrested on the charge of first-degree criminal sexual conduct. *248 The defendant introduced a copy of the police report that detailed the booking of Rouch for criminal sexual conduct on the basis of the authorization of Prosecutor Pattison. Officer Bell also explained that an arraignment for bond purposes was held before the magistrate.[10] Adding to the factual record in Rouch I, which focused on the facts regarding the arrest and police reports, the trial record included testimony from the magistrate who was responsible for setting bond. The magistrate testified that one of her official duties was to set bond for persons being held in custody. Although the magistrate did not specifically recall the details of this hearing, the defendant introduced a bail bond form signed by Rouch which evidenced a $10,000 personal recognizance bond with appearance for arraignment required on December 28, 1979. The form detailed the offense as criminal sexual conduct in the first degree. The magistrate agreed that the form indicated that she had set bond and described the manner in which such bonds were set. She explained that to set bond, she would consider the length of the defendant's residence in the community, his employment status, his reputation and character, his prior criminal

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 204 of 271

record, his record of appearance or nonappearance on other occasions, the nature of the offense, and the probability of conviction.[11]

The defendant renewed its motion for directed *249 verdict incorporating all its prior arguments, and again raised the contention that the case fell within Michigan's statutory privilege, relying particularly on the magistrate's testimony as evidence of an official proceeding. The jury returned a verdict in favor of the plaintiff and awarded damages of one million dollars. The defendant unsuccessfully moved for judgment notwithstanding the verdict. A stay was granted, and the newspaper appealed in the Court of Appeals.

The Court of Appeals addressed numerous issues in affirming the jury verdict. The Court rejected the defendant's contention that the plaintiff failed to prove that the article was materially false. The Court disagreed with the defendant's assertion that the plaintiff failed to submit sufficient evidence to establish negligence. In addition, the Court disagreed with the defendant's suggestion that publication of the article was within the protection of the official proceedings statute.

We granted the defendant leave to appeal. 437 Mich 1035 (1991).

B. THE FACTUAL BACKGROUND

This case began on December 21, 1979, with the arrest of David Rouch as a suspect in the rape of his former wife's baby-sitter. Rouch was arrested without a warrant, held by the police, booked on the charge of first-degree criminal sexual conduct, as authorized by the prosecutor, and released on $10,000 personal recognizance bond after an informal hearing before a magistrate.[12] It is undisputed *250 that Rouch was never formally arraigned on a warrant and that the police eventually pursued another suspect. The facts surrounding Rouch's arrest were set forth in an article published by the Battle Creek News & Enquirer. [13] Mr. Rouch conceded that the article in question and its references to his arrest, booking, and release on bond were accurate. Plaintiff complained, however, about three supposedly material errors. First, plaintiff contended that the article falsely asserted that Rouch was "charged" with sexual assault. Second, the plaintiff complained that the article falsely stated that he was identified by his children when, in reality, he was identified by his former wife's children, his former stepchildren. Third, plaintiff complained that the article was inaccurate in that it asserted that the charge against Rouch was authorized by the Calhoun County Prosecutor's office.

The facts regarding the manner in which the newspaper reporter received the information are in dispute. The reporter claimed that he contacted members of the Bedford Police

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 205 of
271

Department in Calhoun County who relayed the information to him, and that he held the
information until he was informed that court action had occurred and Rouch was released
on bond with an arraignment set for the following week. Because the reporter could not
identify with certainty to whom he spoke at the police department, and the officers who
testified could not recall speaking with the reporter about this specific case, the plaintiff
suggests that the reporter uncovered the information in some other way.[14]

*251 II

A proper determination of the plaintiff's defamation claims requires consideration of the
elements of libel under Michigan law in light of the constitutional requirements and
principles that shape libel law to be consistent with First Amendment strictures. Michigan
adheres to the commonly accepted meaning of a defamatory communication set forth in
the Restatement of Torts. Nuyen v Slater, 372 Mich 654, 662; 127 NW2d 369 (1964). 3
Restatement Torts, 2d, § 559, p 156, provides:

A communication is defamatory if it tends so to harm the reputation of another as to lower
him in the estimation of the community or to deter third persons from associating or
dealing with him.

In Locricchio v Evening News Ass'n, 438 Mich 84, 115-116; 476 NW2d 112 (1991), we
enumerated four components for a cause of action for libel: 1) a false and defamatory
statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3)
fault amounting to at least negligence on the part of the publisher, and 4) either
actionability of the statement irrespective of special harm or the existence of special harm
caused by publication.

In addition to satisfying Michigan's common-law requirements for a libel cause of action, a
litigant must comply with constitutional requirements. As we recognized in Locricchio,
analysis under the constitution has focused on three elements: "the public- or private-
figure status of the plaintiff, the *252 media or nonmedia status of the defendant,[15] and
the public or private character of the speech." Id. at 118. In this case involving a private
plaintiff, a media defendant, and a publication regarding an area of public concern, the
constitution requires that the plaintiff bear the burden of proving falsity. Philadelphia
Newspapers, Inc v Hepps, 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986). Further, after
Gertz v Welch, Inc, 418 US 323, 347; 94 S Ct 2997; 41 L Ed 2d 789 (1974), invited states to
"define for themselves the appropriate standard of liability for a publisher or broadcaster of
defamatory falsehood injurious to a private individual," this Court adopted negligence as
the standard in Michigan. Rouch I, 427 Mich 195.[16] Thus, the plaintiff must establish

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 206 of
271

that the defendant's publication of the communication at issue was negligent.[17]

The Court of Appeals affirmed the jury verdict in this case, ruling that the plaintiff met his burden of proving falsity, that sufficient evidence was submitted to establish the defendant's negligence, and that the defendant could not invoke the protection of Michigan's "official proceedings" statute, MCL 600.2911(3); MSA 27A.2911(3). Rouch v Enquirer & News (On Remand), 184 Mich App 19; *253 457 NW2d 74 (1990). We disagree with the ruling on material falsity.[18]

III

In Locricchio, 438 Mich 110-114, we held that in reviewing a libel case affecting constitutionally protected public discourse, an appellate court must independently review the record with regard to falsity. The concept of independent appellate review of the record reflects a longstanding concern that judges "exercise such review in order to preserve the precious liberties established and ordained by the Constitution." Bose Corp v Consumers Union of United States, Inc, 466 US 485, 511; 104 S Ct 1949; 80 L Ed 2d 502 (1984). Since New York Times Co v Sullivan, supra at 285, the United States Supreme Court has emphasized the importance of careful appellate review of the evidence to ensure that constitutional principles are properly applied. There, the Court explained:

This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across "the line between speech unconditionally guaranteed and speech which may legitimately be regulated." ... In cases where that line must be drawn, the rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the *254 Fourteenth Amendment, protect." ... We must "make an independent examination of the whole record," ... so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

Reiterating this conclusion in Time, Inc v Pape, 401 US 279; 91 S Ct 633; 28 L Ed 2d 45 (1971), the Court underscored its concern that an independent examination of the evidence be conducted. Writing for the majority, Justice Stewart stated:

Inquiries of this kind are familiar under the settled principle that "[i]n cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the

conclusions of lower courts, but will re-examine the evidentiary basis on which those
conclusions are founded." [Id. at 284.]

Justice Stewart recalled that the occasion for such review "frequently" arose in "the area of
tension between the First and Fourteenth Amendments on the one hand and state
defamation laws on the other...." Id.

More recently, the United States Supreme Court revisited the question of the proper
standard of appellate review in Bose Corp v Consumers Union of United States, Inc, supra.
Bose rejected the imposition of the clearly erroneous standard of FR Civ P 52(a) in
reviewing a determination of actual malice in cases governed by New York Times Co v
Sullivan, supra. Recounting the lengthy tradition of independent review in the context of
constitutional facts, the Bose Court characterized the requirement as "a rule of federal
constitutional law" that "emerged from the exigency of deciding concrete cases; it is law in
its purest form under our common-law heritage ... reflect[ing] a deeply *255 held
conviction that judges and particularly Members of this Court must exercise such review in
order to preserve the precious liberties established and ordained by the Constitution." Bose
at 510-511.

Likewise, the United States Supreme Court independently reviewed the record in Harte-
Hanks Communications, Inc v Connaughton, 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562
(1989), to conclude that the judgment was supported by clear and convincing proof of
actual malice. The Court reiterated its conclusion in Bose that the sufficiency of evidence to
support a finding of actual malice is a question of law. It emphasized the "unique character
of the interest protected by the actual malice standard," Harte-Hanks at 686. The Court
predicated the rule requiring independent review on the difficulty in giving "content to
these otherwise elusive constitutional standards," coupled with the importance of "such
elucidation ... in the area of free speech...." Id.

Although the scope of this doctrine had not been clearly delineated by the United States
Supreme Court, in Locricchio, we concluded that "an independent appellate review of the
burden of proof with regard to falsity in private-figure, public-interest cases deters
`forbidden intrusion on the field of free expression' as a logical corollary to independent
review of actual malice." Id. at 113 (quoting Sullivan at 285). We reasoned that Hepps
abrogated the common-law presumption of falsity in libel cases, creating "an issue of
constitutional fact regarding whether a plaintiff carries the burden of proving falsity." 438
Mich 113.[19] We considered *256 that the absence of meaningful appellate review might
result in upholding a jury verdict lacking adequate evidentiary support. We analogized this
result to a "failure to review for clear and convincing evidence of actual malice," id., and

concluded that the promised protection for media defendants afforded by placing the burden of proof on the plaintiffs would "ring hollow" in the absence of meaningful review of the trial court's finding regarding falsity. Id. at 114.[20]

The Court has acknowledged that the "appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive." Miller v Fenton, 474 US 104, 113; 106 S Ct 445; 88 L Ed 2d 405 (1985). In discussing this problem, the Court at 114, stated:

*257 At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question. Where, for example, as with proof of actual malice in First Amendment libel cases, the relevant legal principle can be given meaning only through its application to the particular circumstances of a case, the Court has been reluctant to give the trier of fact's conclusions presumptive force and, in so doing, strip a federal appellate court of its primary function as an expositor of law.

The Miller Court at 114, cited with approval Monaghan's article discussing Constitutional fact review, 85 Colum L R 229 (1985). The author placed the Bose case within the context of numerous United States Supreme Court decisions establishing that "absent limiting legislation, federal appellate courts, particularly the Supreme Court" possess the authority to "sort out the relevant facts and apply to them the controlling constitutional norms." Monaghan at 238. Monaghan explained that independent review enabled the appellate court to "elaborate the governing norm." Id. at 236. Since law application is "situation-specific" and norm elaboration is often invisible or buried in a general verdict, Monaghan noted that unless appellate courts conduct independent review they are unable to carry out their law declaration function by providing general norm elaboration when they conclude that it is necessary.[21] In accord with Monaghan's view, the Miller Court *258 emphasized the question of allocation of decision making embodied in the categorization of issues as fact/law or mixed fact/law questions.

We perceive an additional need for independent review grounded on the fear that juries may give short shrift to important First Amendment rights. The Miller Court recalled that the Court has tended to allocate decision making to appellate courts where necessary to avoid perceived shortcomings of the trier of fact and to allocate decision making to trial courts where the issue involves the credibility of witnesses. In the area of libel actions, we have acknowledged that independent review "reflects an inherent distrust of allocating

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 209 of
271

unlimited decisional power to juries in the First Amendment context." Locricchio, supra at
114, n 20. Even Justice Rehnquist, who dissented in Bose, supra, conceded that the
doctrine of independent review of facts "exists ... so that perceived shortcomings of the trier
of fact by way of bias or some other factor may be compensated for." 466 US at 518.

We therefore independently review the whole record in this case to consider whether
material falsity was shown.

IV

The common law has never required defendants to prove that a publication is literally and
absolutely accurate in every minute detail. For example, the Restatement of Torts provides
that "[s]light inaccuracies of expression are immaterial provided that the defamatory
charge is true in *259 substance."[22] Michigan courts have traditionally followed this
approach.[23] At early common law, Michigan courts predicated a claim for libel on the
question whether the article was substantially true. In McAllister v Detroit Free Press Co,
85 Mich 453, 460-461; 48 NW 612 (1891), this Court explained that liability could not be
imposed for a slight inaccuracy:

It is sufficient for the defendant to justify so much of the defamatory matter as constitutes
the sting of the charge, and it is unnecessary to repeat and justify every word of the alleged
defamatory matter, so long as the substance of the libelous charge be justified.... [A] slight
inaccuracy in one of its details will not prevent the defendant's succeeding, providing the
inaccuracy in no way alters the complexion of the affair, and would have no different effect
on the reader than that which the literal truth would produce....

Thus, the test looked to the sting of the article to determine its effect on the reader; if the
literal truth produced the same effect, minor differences were deemed immaterial.

In contrast to the early common law, where falsity was presumed and the defendant was
required to prove substantial truth as a defense, the burden of proving falsity has now been
shifted to the plaintiff.[24] Despite this constitutionally required alteration in the
allocation of the burden of proof, the definition of falsity remains based on the common-
law doctrine. Masson v New Yorker Magazine, Inc, 501 US ____; 111 S Ct 2419; 115 L Ed
*260 2d 447 (1991). In determining the falsity component of an actual malice finding, the
United States Supreme Court grounded the concept of falsity on its historical definition of
falsity in common-law libel. Masson, 111 S Ct 2432-2433. The Court explained:

The common law of libel takes but one approach to the question of falsity, regardless of the
form of the communication.... It overlooks minor inaccuracies and concentrates upon

substantial truth.... The essence of that inquiry, however, remains the same whether the
burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so
long as "the substance, the gist, the sting, of the libelous charge be justified." ... Put another
way, the statement is not considered false unless it "would have a different effect on the
mind of the reader from that which the pleaded truth would have produced."

Although Masson pertained to the falsity component of an actual malice determination, it
is clear that the constitutional requirement for testing falsity mirrors Michigan's common-
law test.

The substantial truth doctrine is frequently invoked to solve two recurring problems: minor
inaccuracies and technically incorrect or flawed use of legal terminology. This case raises
both questions. The Court of Appeals held that "whether the article is read for its gist or
simply for the information presented as fact, plaintiff has met his burden of proving
falsity." 184 Mich App 32. In reaching this result, the Court of Appeals focused on the
assertions that the article indicated that plaintiff was "charged" with the crime of first-
degree criminal sexual conduct, sexual assault, that "charges" had been authorized by the
prosecutor when no formal arraignment had occurred, *261 and that the article suggested
that "his children" identified him as the person who committed the crime when the
identification was made by his former wife's children. We disagree.

In order to properly evaluate the falsity of the article, we have reproduced the language
from the article as published in the newspaper followed by a version that contains language
which corrects the inaccuracies complained of by the plaintiff.

This is the text of the report and headline published by the Enquirer & News of Battle
Creek:

POLICE ARREST SUSPECT IN BABY-SITTER ASSAULT

A 43-year-old man has been arrested and charged with the sexual assault of a 17-year-old
wom[a]n who was baby-sitting with his children at his ex-wife's house on North Finlay
Avenue in Bedford Township. The suspect has been identified by Bedford Township police
as David J. Rouch of 631 Golden Ave. He is free on a $10,000 personal recognizance
interim bond pending his arraignment in District 10 Court next week. Rouch is charged
with first-degree criminal sexual conduct. Police said Rouch allegedly entered the house
about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut
the victim's clothes off, police said. The victim later called a relative, who took her to
Community Hospital and then called police. The suspect was identified by his children,

according to police. Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators. The charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office. [Emphasis added.]

The following version substitutes language that *262 the plaintiff asserts should have been used in the article:

POLICE ARREST SUSPECT IN BABY-SITTER ASSAULT

A 43-year-old man has been arrested and accused of sexual assaulting a 17-year-old woman who was babysitting his ex-wife's children at her house on North Finlay Avenue in Bedford Township. The suspect has been identified by Bedford Township police as David J. Rouch of 631 Golden Avenue. He is free on a $10,000 personal recognizance interim bond pending his arraignment in District 10 Court next week. Rouch is accused of committing first-degree criminal sexual conduct. Police said that Rouch allegedly entered the house about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut the victim's clothes off, police said. The victim later called a relative, who took her to Community Hospital and then called police. The suspect was identified by his ex-wife's children, according to police. Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators. The Calhoun County Prosecutor's Office authorized the incarceration of Rouch on allegations of criminal sexual conduct in the first degree.

We cannot agree that the gist or sting of the article is changed by these minor differences.

The primary criticism that plaintiff raises is with the use of the word "charges," absent formal arraignment. The Court of Appeals concluded that the message conveyed to readers of the article by the several references to "charge" or "charges" was materially false. First, it interpreted this Court's opinion in Rouch I as requiring this result. It apparently concluded from the statement in *263 Rouch I that "plaintiff was never formally charged" with the crime, that the use of the word "charged" was false. Second, it relied upon a textual analysis of the plain meaning of the word "charge," questioning the defendant's suggestion that "charge" is synonymous with "accuse." Conceding that Webster's New World Dictionary of the American Language, Second College Edition (1984), includes "accuse" as one of the possible meanings of "charge," the Court pointed out the additional listed term "indictment." It also referred to The Random House College Dictionary, Revised Edition (1984), which defined "charge" as "to accuse formally or explicitly" and as "an accusation." On the basis of these authorities, the Court reasoned that "charge" carries a more serious connotation than "accuse" and that the article's use of the term "in a much more specific

and legal sense" was false. 184 Mich App 34. Finally, the Court of Appeals attempted to draw an analogy with this Court's reasoning regarding the distinction between "proceedings" under the privilege statute and mere apprehensions.

We cannot agree with this reasoning. The linchpin of the Court of Appeals analysis is a formalistic interpretation of the word "charge" that belies any attempt to ascertain the "gist" or "sting" of the article to the lay reader. The United States Supreme Court has cautioned that recovery can be refused for "choice of language which, though perhaps reflecting a misconception, represented `the sort of inaccuracy that is commonplace in the forum of robust debate to which the New York Times rule applies.'" Masson, 111 S Ct 2434, quoting Bose, 466 US 513.[25]

*264 Technical inaccuracies in legal terminology employed by nonlawyers such as those at issue here fall within this category. Numerous courts have rejected claims of falsity when based on a misuse of formal legal terminology.[26] We have recognized that the popular sense of a term may not be technically accurate. See, e.g., Bailey v Kalamazoo Publishing Co, 40 Mich 251, 255-256 (1879). The Court reasoned:

A prosecution before a justice is not in a technical sense an indictment, but it serves a similar purpose. Grand juries are seldom summoned now, and very few cases are tried at the circuit on indictment. Informations have generally superseded the old method. Yet we use the term "indictment" in ordinary conversation and often in judicial *265 opinions to express any criminal prosecution. The burden of this charge was that Bailey had been prosecuted for malfeasance, and we do not think there was any substantial variance between the charge and proof. The popular sense was made out by showing the prosecution for misconduct.

Thus, if technical and common parlance yield different interpretations of the same word, the constitutionally required breathing space affords protection of the writer's choice.

Another typical example involved reports of statements made by a trial judge at a sentencing hearing of a defendant who had pleaded no contest to a charge of second-degree sexual assault. Simonson v United Press Int'l, Inc, 654 F2d 478, 479-480 (CA 7, 1981). The article had set forth the judge's comment regarding a "sexually permissive" community and questioning whether a severe sentence should be imposed on "an impressionable person 15 or 16 years of age," who responded. The plaintiff, the trial judge, was recalled from office after the report. He sued the newspaper for defamation, contending that its description of a sexual assault as "rape" and its use of the word "ruled" when describing the judge's comments constituted defamation. The Simonson court rejected this argument, noting that

rape in its common usage included nonconsensual sex and that intercourse had occurred
without the consent of the victim. The court further rejected the judge's contention that he
never "ruled" that sexual assault was a "normal reaction to prevalent sexual
permissiveness," but simply remarked on this during the hearing. Noting that a plain and
ordinary meaning of "ruling" might include statements and comments made by a judge
when sitting on the bench, the court rejected the judge's contention that his *266
"rhetorical question" should not be seen as a ruling. Id. at 482.

Just as the judge in Simonson asserted that "ruling" should be reserved for words uttered
by the judge as a formal decree and that "rape" should not be used for a no-contest plea to
second-degree sexual assault, plaintiff asserts that "charge" should be limited to
circumstances in which a formal arraignment has been held. As in Simonson, the word at
issue in this case encompasses the formal legal sense as well as a broader lay sense. Just as
the Simonson court concluded that use of a word in accord with one of its meanings could
not be deemed materially false, so too do we conclude that use of "charge" absent formal
arraignment cannot be deemed materially false.

Not only does "charge" in a popular sense accord with the newspaper's use of the term, it
accords with the legal description of the status of an arrestee before judicial process is
issued. For example, the Legislature used "charge" to describe the disposition of a person
following arrest without a warrant. See MCL 764.13; MSA 28.871(1).[27] Similarly,
Michigan Court Rules use "charge" to mean accuse. See MCR 6.106(E)(8).[28] Panels of
the Court of Appeals and this Court's Criminal Jury Instructions likewise use "charged" as a
synonym for *267 accusations made by the police in conjunction with arrests made without
a warrant.[29] Thus, the popular and legal sense of the term "charge" may not be identical
before the police act on an accusation; once the police act on an accusation, the popular
and legal terms are synonymous.

Furthermore, both testimony and documents from the trial illustrate the numerous uses to
which the word can be put. Plaintiff himself used "charge" at numerous points in the
proceedings to describe the accusations brought against him.[30] Furthermore, plaintiff
conceded that "the article in question and its reference to the Plaintiff being arrested and
being charged [with] CSC and thereafter released on bond were true."[31] In addition, the
police reports used "charge" to describe the accusations against Rouch.[32]

The word "charge" is an umbrella term covering all stages of the charging process. It is
used by the *268 law in contradistinction to a conviction. Even if plaintiff's argument that
"charge" connotes a more serious formal involvement of judicial process than "accuse"
were correct as a matter of law, we think it apparent that the word may be used in a

popular sense as a synonym for accuse. While one meaning of "charge" is simply "accuse," carrying with it no intimation of governmental involvement, here, if the word "charge" is measured by the gist of what happened, there was not only a charge or accusation by an individual, but a booking by the police, an authorization by the prosecution to lodge the suspect on the charge, and an involvement by the magistrate recognizing these actions. Thus, even if "charge" connotes the existence of governmental involvement, that was present here.[33]

At best, one might conclude that the use of "charge" in its technical formal sense was inaccurate. We cannot accept this as a basis for liability. To do so would totally eviscerate the "breathing space" that the constitution requires in order to protect important First Amendment rights. When writing about criminal justice or legal matters, newspapers would be forced to recapitulate technical legal terminology employed by courts or law enforcement personnel even where popular words might be clearer for the lay reader. Attempting to reframe legal documents and events with legal significance into popular or lay terminology would be fraught with peril, and newspapers would do so at their risk. As one court remarked, there is "no *269 authority for plaintiff's contention that a newspaper article reporting a judicial proceeding must indicate every possible interpretation of every word used in a complaint or other legal document."[34] We agree. Having conducted an independent review of the record to determine whether use of the word "charge" rendered the article materially false, we conclude that it did not.

Plaintiff's additional complaint falls within the second category of cases arising under the substantial truth doctrine, those that involve minor inaccuracies. Plaintiff protests the article's suggestion that he was identified by his children, rather than the children of his former wife. The Court of Appeals concluded that this constituted material falsity because it seemed to eliminate the possibility that there was a mistaken identification. We cannot accept this reasoning.

Numerous courts have considered the falsity of articles in which the gist of the story was accurate, but minor inaccuracies marred the report. Drury v Feeney, 505 So 2d 111 (La App, 1987), cert den 506 So 2d 1225 (1987), is illustrative. Despite the defendant's failure to report precisely the nature of the plaintiff's conviction, the court found that the article was substantially true. The article described the plaintiff's conviction of "21 counts of mail fraud to cheat insurance companies and his clients of money in car accident suits." Actually, the plaintiff had been convicted for failure to disclose to his clients a fee-splitting arrangement. In colorful language, the court concluded *270 that the discrepancy was "`an infinitesimal aberrant grain of sand hidden in an entire seashore of reprehensible conduct and truths....'"

505 So 2d 112.[35]

Like courts in other jurisdictions, Michigan courts have found substantial truth despite
minor inaccuracies in the details of an article. McCracken v Evening News Ass'n, 3 Mich
App 32; 141 NW2d 694 (1966), epitomizes the reasoning that undergirds such a finding.
The defendant newspaper reported that the plaintiff was charged with "$100,000 fraud"
when, in fact, he had altered construction invoices in an amount between $37,000 and
$39,000. The Court of Appeals rejected the plaintiff's claim that the article was
substantially untrue, noting that this constituted "an inaccuracy that does not alter the
complexion of the affair and would have no different effect on the reader than that which
the literal truth would produce." 3 Mich App 40.[36]

The essence of plaintiff's argument is that the statement in the article that his children had
identified him would eliminate in the reader's mind the possibility of a mistake. We think
the gist or sting of the article was that plaintiff was arrested on the basis of the
identification of persons *271 who knew him. While we might agree that a reader
acquainted with the facts might have more reason to suspect the motives of the identifiers,
this is an argument regarding the weight of the identification, not its truth or falsity.

In sum, neither of the asserted errors, taken individually or as a group, alters the gist or
sting of the article. The sting of the article was that the plaintiff had been identified by
persons to whom he was well known and was charged with CSC I. That is true. The
question whether a formal warrant had been issued or an arraignment held, like the
question whether it was his children or former stepchildren who identified him, did not
affect the article's substantial truth. Thus, the Court of Appeals erred in affirming the trial
court judgment on this issue.

V

After painstaking review of the whole record in light of Michigan libel law and the latest
constitutional pronouncements on the subject, we conclude that the evidence was not
sufficient to establish material falsity.

Accordingly, because we disagree with the reasoning and result of the Court of Appeals, we
vacate its opinion and remand this matter to the trial court for entry of judgment in favor of
the defendant.

BRICKLEY, GRIFFIN, and MALLETT, JJ., concurred with BOYLE, J.

RILEY, J. (concurring).

Although I agree essentially with the opinion of the majority, I write separately to make the following observations.

I concur in the result reached by the majority *272 that this Court has a constitutional duty to independently evaluate the evidence in defamation cases and that, in this case, plaintiff failed to establish material falsity. I also agree with the majority that the decision of the Court of Appeals must be vacated. However, as a threshold matter, I suggest that plaintiff's failure to allege and identify in his pleading, supplemental pleading, and answers to defendant's interrogatories, specifically which statements he considered to be materially false and how the newspaper either was negligent or reckless in publishing the story, were proper grounds for summary judgment by the trial court.

I

In Locricchio v Evening News Ass'n, 438 Mich 84, 115-116; 476 NW2d 112 (1991), we reviewed our common-law precedent[1] and listed the four components required to state a cause of action for libel: (1) a false and defamatory statement of and concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. We also stated that a cause of action for libel requires a plaintiff to show defamatory meaning as well as falsity, fault, and publication. Locricchio, supra at 116. Inherent in these requirements is the well-established rule that a defamation plaintiff must plead with specificity who published the defamatory statement, when it was published, and, most importantly, a plaintiff must identify the precise materially false statement published. MacGriff v Van Antwerp, 327 Mich 200, 204-205; 41 NW2d 524 (1950). In MacGriff, *273 we held that the plaintiff's failure to directly identify the defamatory statements entitled the defendant to summary judgment. Id. at 204. In subsequent cases, the Court of Appeals routinely followed this rule by affirming trial court rulings that granted summary judgment to defamation defendants.[2]

In recent years, however, a conflict developed in the Court of Appeals over whether a general allegation of malice is sufficient to establish a genuine issue of material fact. The conflict began with Parks v Johnson, 84 Mich App 162, 169; 269 NW2d 514 (1978), wherein a Court of Appeals panel held that because courts are liberal in finding the existence of a genuine issue of material fact, they should not grant summary judgment unless convinced that the claim cannot be supported at trial. The Parks rationale was disapproved, however, in Hayes v Booth Newspapers, Inc, 97 Mich App 758, 774-775; 295 NW2d 858 (1980); Lins v Evening News Ass'n, 129 Mich App 419, 435; 342 NW2d 573 (1983); Dienes v Associated

Newspapers, Inc, 137 Mich App 272, 283; 358 NW2d 562 (1984); and again in Kurz v
Evening News Ass'n, 144 Mich App 205, 213; 375 NW2d *274 391 (1985), vacated on other
grounds 428 Mich 886; 403 NW2d 805 (1987). These panels of the Court of Appeals
concluded that a plaintiff must plead specific facts in support of showing actual malice to
defeat a motion for summary judgment. The issue was settled until yet another panel held
that Parks was correct; malice can be generally alleged and plaintiff should be given ample
opportunity to demonstrate actual malice. Grostick v Ellsworth, 158 Mich App 18, 23; 404
NW2d 685 (1987). The Grostick decision was abandoned shortly thereafter in Smith v
Fergan, 181 Mich App 594, 597; 450 NW2d 3 (1989). The Smith Court reaffirmed the
principle that because the issue of actual malice is one for the jury, specific supporting facts
must be alleged and general allegations of malice are, therefore, insufficient to establish a
genuine issue of material fact. The Smith decision is now controlling authority, and under
Administrative Order Nos. 1990-6, 1991-11, binding precedent. See Gonyea v Motor Parts
Federal Credit Union, 192 Mich App 74, 80; 480 NW2d 297 (1991); Prysak v R L Polk Co,
193 Mich App 1, 14; 483 NW2d 629 (1992).

In a similar vain, MCR 2.111(B)(1), and its predecessor GCR 1963, 111.1(1) requires
plaintiffs to state in their pleadings "[a] statement of the facts, without repetition, on which
the pleader relies in stating the cause of action, with the specific allegations necessary
reasonably to inform the adverse party of the nature of the claims the adverse party is
called on to defend" (emphasis added). Failure to identify a false statement should result in
summary disposition in favor of the defendant pursuant to MCR 2.116(C)(8).

II

In the instant case, plaintiff, deemed a private *275 person implicated in a matter of public
concern,[3] filed his complaint dated December 2, 1980, alleging that defendant defamed
him by stating that he was arrested, charged, and released on $10,000 personal
recognizance bond for sexually assaulting the baby-sitter of his children.[4] Shortly
thereafter, defendant sent plaintiff a set of interrogatories requesting him to "[s]et forth
separately each statement of fact in the article which Plaintiff alleges was false, separately
quoting each alleged false statement of fact," and then to "describe the exact nature and
extent of the alleged falsity." In his answers, plaintiff apparently understood this to mean
that the issue of falsity went to the question whether he committed the assault, which he
did not, and because he had not, the article was materially false.

Upon receiving the answers, defendant forwarded *276 a supplemental set of
interrogatories requesting plaintiff to specifically describe which statement in the article
was false. Plaintiff objected to the supplemental interrogatories, arguing that the question

"deal[s] with legal principles or at least the application of facts to legal principles which only Plaintiff's attorney is qualified to answer...." Defendant responded with a motion for summary judgment alleging first, that the article is substantially true because the falsity issue did not relate to whether he committed the assault, but rather to whether the defendant's report of plaintiff's arrest was accurate and, second, that it is privileged under Michigan's common-law qualified privilege and the official proceedings act, MCL 600.2911(3); MSA 27A.2911(3). Plaintiff also moved for summary judgment alleging that defendant admitted in its affirmative defense that the story was false, and, therefore, the only issue at trial was damages.

Calhoun Circuit Court Judge Stanley Everett denied both motions, but ordered plaintiff to answer defendant's supplemental interrogatories. At this hearing, Judge Everett recognized that plaintiff had failed to plead with specificity the defamatory statements published, how the statements related to him, and what was materially false within the statement. Judge Everett also recognized that the specificity requirement is needed in defamation pleadings, as it is in the ordinary negligence cases, to allow the parties to narrow their focus on the allegedly libelous statements and to determine if the article, taken as a whole, is materially false.[5] Plaintiff's counsel again argued *277 that his client's guilt or innocence of the underlying assault is determinative regarding whether the article is materially false. Defense counsel posited in response that "the Judge put his finger on it when [he] made the analogy to the negligence case. All that [plaintiff's] complaint says is that ... the publication was made maliciously. Now, under the [Court] Rules, ... there has to be some showing of falsity and knowledge of falsity, and so on, ... to make out a case [for] libel...."

Upon receiving plaintiff's answers to the supplemental interrogatories which stated that the article was false because he did not commit the rape, and that defendant committed various omissions in publishing the story defendant moved again for summary judgment. Defense counsel argued that "none of those answers state or raise any issue of malice in the sense that is applicable to this libel action."[6] Plaintiff responded by alleging *278 that the article was not privileged under the official proceedings act, that the article was defamatory because it falsely accused him of a crime he did not commit, and that the paper failed to make an effort to assess the truthfulness of the report.

This time, Judge Everett granted defendant's motion. He based his conclusion on the fact that there was a qualified privilege to publish the story, and that plaintiff failed to specify in his answers to the supplemental interrogatories "any allegation which suggests that the statements were known to be false on the part of the people involved in its publication or with reckless disregard whether they were false or not."[7]

III

Thus, I write separately to indicate my agreement with the trial court and to emphasize my *279 belief that although this Court abandoned the "actual malice" standard for private person-public interest defamation actions in Rouch I[8] and adopted the "negligence" standard of liability, defendant was, nevertheless, entitled to summary disposition, as a matter of law, on the basis of our common-law precedent[9] and our court rules.[10] The relatively simple requirement of pleading facts to support allegations of material falsity, negligence, or reckless disregard for the truth should be followed by plaintiffs in defamation actions, and, pursuant to MCR 2.116(C)(8), defendant should have been entitled to summary disposition on this ground alone a decade ago.

GRIFFIN, J., concurred with RILEY, J.

CAVANAGH, C.J.

I respectfully dissent. I agree that the correct legal test is one of material falsity and that the court is required to conduct an independent review of the record. I disagree, however, with the majority's conclusion that there is insufficient evidence of material falsity.

I

The disputed article in this case does contain inaccuracies. The defendant concedes that the plaintiff was not identified by his own children, but by his ex-wife's children. In addition, the article's assertion that the plaintiff was "arrested and charged" was inaccurate if "charged" is interpreted to mean subjected to formal charges. And, perhaps most significantly, there were never any charges "authorized by the Calhoun County Prosecutor's *280 Office." Under long-established principles of defamation law, however, the issue is not merely whether there are inaccuracies but whether the inaccuracies constitute material falsity.[1] The test is whether the evidence supports the finding that the article was materially false in that the "sting" of the article would have a different effect upon the mind of the reader than would the literal truth.

In determining whether the concededly false aspects of the publication are significant, for defamation purposes, in relation and comparison to the concededly true portions, the inquiry necessarily goes beyond the strictly factual level and requires interpreting the likely effect of the publication on the reader's mind, and the likely meaning conveyed. But as the Court in Locricchio v Evening News Ass'n, 438 Mich 84, 111, n 17; 476 *281 NW2d 112 (1991), recognized, "in reviewing a libel verdict an appellate court does not and should not exercise review of credibility determinations, disregard previous factfindings, or create new

factfindings. Rather, the court should exercise independent judgment regarding whether, as a matter of constitutional law, the evidence in the record supports the verdict." Similarly, the United States Supreme Court has declared:

Indeed, it is not actually necessary to review the "entire" record to fulfill the function of independent appellate review.... The independent review function is not equivalent to a "de novo" review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff. [Bose Corp v Consumers Union of United States, Inc, 466 US 485, 514, n 31; 104 S Ct 1949; 80 L Ed 2d 502 (1984).]

The task before this Court, therefore, is to undertake an independent review of the record and make a judgment regarding whether the evidence supports the finding that this article was materially false. While the standard calls for "independent appellate review," and this Court is not constrained to agree with the jury, it is important to recognize that in this case a jury, adequately instructed with respect to the need for material falsity, has reached a conclusion regarding the likely effect of the article at issue on the mind of the average reader.[2] Indeed, when the entire newspaper *282 article consists of only ten sentences, and those ten sentences contain six factual inaccuracies, this Court should not lightly overturn the jury's conclusion that the overall effect was materially false.

II

Turning now to a review of the evidence in this case, the Court of Appeals declared that the article was materially false in two respects: (1) by inaccurately stating that the plaintiff had been identified as the assailant by his own children when in fact it was his former stepchildren who had identified him, and (2) by stating several times that plaintiff was arrested and charged with sexual assault when he was in fact merely arrested. As a purely factual matter, the statement that the plaintiff's own children had identified him as the assailant was false; the question, however, is whether it was a materially false statement; would it create a different impression in the mind of the reader than would the actual truth? I would conclude that the evidence supports such a finding. A man's children would presumably know him very well by *283 sight, and their reported identification of him would likely be treated by the reader as deserving of exceptional credibility because it "would seem to eliminate the possibility that there might have been a mistaken identification." 184 Mich App 36. In light of the "sting" of the entire article, that there was more involved than a mere apprehension of a suspect, this statement would have had a strong effect on the mind of the reader. This Court previously declared that both the fact of the arrest and "the facts used to establish the probable cause for the arrest" are of public

concern. Rouch I, 427 Mich 206. Certainly identification by one's own children would affect probable cause for the arrest and, in determining whether the reasons for the arrest were materially false, the misidentification of the stepchildren as children is not inconsequential. Even if this question is seen as a close one, I cannot conclude that the reader would not have a different reaction than if the literal truth had been reported. Therefore, the jury's determination should stand.

The second aspect of falsity flows from the declaration that the plaintiff was "charged" with criminal sexual conduct. As a legal matter, it was inaccurate to state that the plaintiff had been "charged." In fact, no warrant had been issued by the prosecutor, the plaintiff had not been arraigned, and there had been no judicial determination of probable cause; the plaintiff was merely arrested and booked on suspicion of the crime.

As a preliminary matter, the dissenting judge on the Court of Appeals is correct in maintaining that "newspapers should not be held to technical legal language. Instead, they should be held to the use of words as they are customarily and popularly used." 184 Mich App 53 (opinion of ALLEN, J.). But even in light of common, colloquial usage by non-lawyers *284 and the general public, when the article declared that the prosecutor had authorized the charge, the allegations became one of formal charges, not merely suspicion. [3] The effect on the mind of the reader was materially different from the effect that would have resulted from the actual truth. Indeed, the last sentence of the article strongly suggests that the term "charged" was being employed in the formal sense; the article claimed that "[t]he charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office." Within this context the term "charge" would normally be interpreted to mean formal charges. Since no formal charges were ever pursued, this could properly have been considered by the jury to constitute a material falsity.

A final note in this area is that I believe it is inappropriate for the majority to focus merely on the definition of the single word "charge." Ante, p 263.[4] Michigan's law of libel requires an examination *285 of the article as a whole. See Gustin v Evening Press Co, 172 Mich 311, 314; 137 NW 674 (1912) ("To test its libelous quality, a publication must be considered as a whole ..."); O'Connor v Sill, 60 Mich 175, 181; 27 NW 13; 28 NW 162 (1886) ("The article... must all be read together. Parts of it cannot be severed ..."). Read as a whole, the article conveyed the impression that there was overwhelming evidence and that judicial proceedings had been instituted against Rouch. The effect of this on the mind of the reader is different from that of a mere "apprehension." Rouch I, 427 Mich 172. The "sting" that results from this impression of formal charges created a substantially different effect on the mind of the reader. The evidence demonstrated, and the jury obviously found, that the

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 222 of 271

article as a whole conveyed an impression quite different from that which the actual truth would have produced.

I would affirm the judgment of the Court of Appeals.

LEVIN, J., concurred with CAVANAGH, C.J.

LEVIN, J. (separate opinion).

I have signed the Chief Justice's opinion.

*286 I

While I fully agree with the Chief Justice that "it is inappropriate for the majority to focus merely on the definition of the single word `charge,'"[1] I would be inclined to conclude that it is not defamatory in itself to describe an arrest as a "charge" to say that a person who has been arrested has been charged, rather than to say that he has been arrested.

The news article here in question, however, said more. The article said that Rouch had been "arrested and charged," and that "[t]he charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office."

Arrests are often made by police officers without prior authorization from the prosecutor. The import therefore of a news article describing an arrest merely as a "charge" is significantly different than the import of an article stating that a person has been "arrested and charged" and that the "charge" "was authorized" by the prosecutor. In stating that Rouch had been arrested and charged, and that the charge was authorized by the prosecutor, the news article implied that the governmental official responsible for the administration of justice had concluded that Rouch should be arrested and charged. This suggests more than an ordinary arrest by a police officer.

The majority dwells at length on the meaning of "charge." The sentence stating that the charge "was authorized" by the prosecutor significantly changed the import and sting of the article. As stated by the Chief Justice, the article read as a whole conveyed "the impression that there was *287 overwhelming evidence and that judicial proceedings had been instituted against Rouch."[2]

Rouch was arrested and detained at 5:25 A.M. by police officers without prior authorization by the prosecutor. After Rouch arrived at the station house, a police officer telephoned an assistant prosecutor who authorized the officer to further detain Rouch.[3] The prosecutor had not, and did not later authorize the filing of a "charge." That afternoon, Rouch was

taken before a magistrate and released from custody.

A reasonable factfinder could conclude that the statements in the news article, that Rouch had been "arrested and charged" with first-degree criminal sexual conduct and that the "charge against Rouch was authorized" by the prosecutor, implied[4] falsely that a prosecutor had authorized the police to arrest Rouch on charges of CSC-1.

II

The concurring opinion overlooks the distinction between stating a cause of action and providing a "statement of the facts, without repetition, on which the pleader relies in stating the cause of action."[5]

A motion of the Enquirer and News of Battle Creek seeking summary disposition on the ground that Rouch had "failed to state a claim on which *288 relief can be granted"[6] could not properly be granted because of any failure in the complaint filed by Rouch adequately to state the facts on which he relied in seeking to state a cause of action.

A claim that a pleader has failed adequately to state facts may be raised at the trial level by a motion to correct or strike pleadings pursuant to MCR 2.115. If the motion is granted, the pleader *289 may as of course file an amended pleading more fully stating the facts on which the pleader relies.[7]

The plaintiff's answers to interrogatories fully supported the cause of action stated in the complaint.[8]

*290

*291 A claim that the facts have not been adequately stated cannot properly be raised after the trial has commenced, let alone for the first time in the Supreme Court and without even an assignment of error. Ordinarily, the allegations in the complaint are fleshed out during the discovery process, at status conferences, and in mediation statements. *292 The approach of the concurring opinion, if observed generally, would elaborate on motion practice, to the dismay of bench and bar, and would needlessly increase the paper flow and the already heavy cost of litigation.

III

The Enquirer and News moved for a remittitur of the $1,000,000 verdict, which was denied. The denial was assigned as error in the Court of Appeals. The Court of Appeals, on consideration of this Court's decision in Palenkas v Beaumont Hosp, 432 Mich 527; 443

NW2d 354 (1989), concluded that the judge did not err in denying a remittitur. The
Enquirer and News did not challenge that conclusion in this Court.

NOTES

[1] Both of these values are explicitly embodied in Const 1963, art 1, § 5:

Every person may freely speak, write, express and publish his views on all subjects, being
responsible for the abuse of such right; and no law shall be enacted to restrain or abridge
the liberty of speech or of the press.

[2] This case began more than a decade ago and has been considered twice by the Michigan
Court of Appeals and once by this Court. See 137 Mich App 39; 357 NW2d 794 (1984); 184
Mich App 19; 457 NW2d 74 (1990); 427 Mich 157; 398 NW2d 245 (1986).

[3] Because of our resolution of the material falsity-issue, we need not resolve the question
of negligence. Nevertheless, we observe that plaintiff's theory regarding fault apparently
was that the newspaper reporter had been poorly trained and consequently failed to further
investigate information provided to him by the police. The existence and scope of any
constitutionally based doctrine of neutral reportage remains as yet undefined. See Smith v
Daily Mail Publishing Co, 443 US 97, 102; 99 S Ct 2667; 61 L Ed 2d 399 (1979) ("state
action to punish the publication of truthful information seldom can satisfy constitutional
standards"); The Florida Star v BJF, 491 US 524; 109 S Ct 2603; 105 L Ed 2d 443 (1989);
Butterworth v Smith, 494 US 624; 110 S Ct 1376; 108 L Ed 2d 572 (1990); Landmark
Communications, Inc v Virginia, 435 US 829; 98 S Ct 1535; 56 L Ed 2d 1 (1978); Oklahoma
Publishing Co v District Court, 430 US 308; 97 S Ct 1045; 51 L Ed 2d 355 (1977); Greenbelt
Cooperative Publishing Ass'n v Bresler, 398 US 6; 90 S Ct 1537; 26 L Ed 2d 6 (1970); Cox
Broadcasting Corp v Cohn, supra. Other state and federal courts have questioned the extent
to which newspapers should be required to verify information obtained from governmental
sources such as police reports absent evidence that the publisher had good reason to
suspect falsity. Torres-Silva v El Mundo, 3 Media L Rptr 1508, 1512 (PR, 1977); Wilson v
Capital City Press, 315 So 2d 393 (La App, 1975); Appleby v Daily Hampshire Gazette, 395
Mass 32; 478 NE2d 721 (1985); LaMon v Butler, 44 Wash App 654; 722 P2d 1373 (1986);
Walters v Sanford Herald, Inc, 31 NC App 233; 228 SE2d 766 (1976); Ricci v Venture
Magazine, Inc, 574 F Supp 1563 (D Mass, 1983). In this case, there was no suggestion that
the information was inherently implausible. Nor was there any proof or allegation that cast
doubt on the accuracy of the police report regarding Rouch's arrest.

[4] In Rouch I, I was unwilling to hold that the statutory privilege had been subsumed. The

factual predicate for assertion of the statutory privilege is contained in the record. Although I would conclude that the privilege is applicable to an informal arraignment for bond purposes before a magistrate, see MCL 600.8511 et seq.; MSA 27 A. 8511 et seq., MCL 765.1; MSA 28.888, MCL 600.8512a; MSA 27A.8512(1), and MCR 6.104(G), a majority of the Court being unpersuaded that we should reach this issue, the opinion does not address it.

[5] Contrary to the observation in the separate dissent, the arrest (which Justice LEVIN concedes it is not defamatory to describe as a charge) was authorized by the prosecutor. The record establishes that the Bedford Township police called the assistant prosecutor before they took plaintiff into custody and that the prosecutor, after being "briefed on the complaint and the circumstances surrounding the arrest of suspect advised to lodge" plaintiff on a charge of first-degree criminal sexual conduct. Indeed, the plaintiff acknowledges that the prosecutor authorized the incarceration. If what Justice LEVIN means is that the article should have reported that the prosecutor authorized the incarceration of the plaintiff on the charge of Criminal Sexual Conduct I, as plaintiff contends, we respond to that argument in section IV. If what he means is that there was governmental involvement in the lodging of the charge of CSC I, that is true, and plaintiff does not contend otherwise.

[6] 137 Mich App 39.

[7] 422 Mich 937 (1985).

[8] Since our decision in Rouch I, the Legislature has amended Michigan's statutory privilege to broaden its scope to cover matters of public record, governmental notices, announcements, and written or recorded reports or records generally available to the public. MCL 600.2911(3); MSA 27A.2911(3), as amended by 1988 PA 396, § 1. See also Nichols, HB 4932 and the Rouch case: A brief sketch of Michigan libel law, 1989 Det C L R 689.

[9] Gertz v Welch, Inc, 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974).

[10] Bell explained that Magistrate Strong sometimes conducted the proceeding to set a personal recognizance bond over the telephone, and other times she did it in her office. Bell called the proceeding an "arraignment for bond purposes." Magistrate Strong agreed that she sometimes conducted the hearing by telephone. When this was done, the sheriff's department would prepare the form, and the defendant would sign it and be released.

[11] Michigan law authorizes magistrates to carry out a wide range of judicial functions,

including setting bond for defendants. See MCL 600.8511 et seq.; MSA 27 A. 8511 et seq. See also MCL 765.1; MSA 28.888 (which authorizes a magistrate to set bail and to let an accused out of jail on recognizance).

[12] Bedford Township officers, the township where the crime occurred requested Emmett Township officers to arrest Rouch at his home in Emmett Township. He was placed in the custody of the Bedford Township police. Upon authorization from the Calhoun County Prosecutor's office, Rouch was removed to the county jail in Marshall and booked on a charge of CSC I. The magistrate for the 10th District Court in Calhoun County released Rouch on a personal recognizance bond until his formal arraignment could be held.

[13] The full text of the article is set forth infra at 261.

[14] We need not resolve this factual dispute in view of our resolution of the other issues.

[15] We noted in Locricchio that it is unclear whether the media status of the defendant necessitates a higher level of protection. 438 Mich 90, n 7. The United States Supreme Court has not yet resolved the issue.

[16] We reserved for another occasion the question whether the standard of proof with regard to falsity or negligence is "clear and convincing evidence" or some lesser standard. Locricchio, 438 Mich 123.

[17] We note that both common-law and constitutional questions regarding the availability of and necessary proofs for damages were raised in this case. Because of our resolution of the other issues, we leave these issues for another day.

[18] The Court of Appeals also considered numerous trial court rulings on negligence, the official proceedings statutes, evidentiary matters, and instructional issues. Because we conclude that plaintiff's claim cannot survive review of the initial issue, we need not reach these issues.

[19] Constitutional facts have been defined as "facts fundamental to the existence of a constitutional right for example, whether a confession was coerced or a film was obscene." Louis, Allocating adjudicative decision making authority between the trial and appellate levels: A unified view of the scope of review, the judge/jury question, and procedural discretion, 64 NC L R 993, 995, n 13 (1986). The doctrine of independent review of constitutional facts has arisen in First Amendment and other constitutional contexts. See, e.g., Jacobellis v Ohio, 378 US 184, 190; 84 S Ct 1676; 12 L Ed 2d 793 (1964) (the court has an "obligation to test challenged judgments against the guarantees of the First and

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 227 of 271

Fourteenth Amendments," and in doing so "cannot avoid making an independent constitutional judgment on the facts of the case"); Payne v Arkansas, 356 US 560, 562; 78 S Ct 844; 2 L Ed 2d 975 (1958) ("where the claim is that the prisoner's confession is the product of coercion we are bound to make our own examination of the record"); Norris v Alabama, 294 US 587; 55 S Ct 579; 79 L Ed 1074 (1935) (appellate courts have the duty to analyze the facts to safeguard constitutional rights where the facts and conclusions of law are intermingled); Ng Fung Ho v White, 259 US 276; 42 S Ct 492; 66 L Ed 938 (1922) (sanctioning constitutional fact review of a challenge to an administrative deportation warrant).

[20] We realize that the Harte-Hanks Court construed the requirement for an independent review more narrowly than Bose. This different emphasis formed the basis for disagreement between Chief Justice CAVANAGH and the majority in Locricchio. Chief Justice CAVANAGH contended that falsity involves "a classic issue of pure historical fact," while actual malice, like the voluntariness of a confession, involves a mixed fact/law question. Chief Justice CAVANAGH there urged this Court to reject mandatory independent review of such pure historical facts in favor of applying a sufficiency-of-the-evidence standard that construes the evidence in the light most favorable to the verdict. Locricchio at 136 (CAVANAGH, C.J., concurring in the result).

[21] Monaghan suggests that although it is clear that appellate courts have the authority to conduct independent review, it is not clear that they have the duty to do so. He argues that the judicial role in preserving constitutional rights requires courts to "expound and refine the applicable constitutional law" and elaborate the constitutional norms when necessary. Monaghan at 268.

[22] 3 Restatement Torts, 2d, § 581A, comment f, p 237.

[23] See, e.g., Hay v Reid, 85 Mich 296; 48 NW 507 (1891); McAllister v Detroit Free Press Co, 85 Mich 453; 48 NW 612 (1891); McGuire v Vaughan, 106 Mich 280; 64 NW 44 (1895); Sanders v Evening News Ass'n, 313 Mich 334; 21 NW2d 152 (1946).

[24] See Philadelphia Newspapers, Inc v Hepps, supra.

[25] The precise meaning and choice of words employed is a critical factor in any evaluation of the falsity. We are mindful of the inherent imprecision of language and the difficulties this poses to any evaluation of the truth or falsity of an article, particularly one that rests upon the use of a word with ambiguous implications. See, generally, Schauer, Language, truth, and the First Amendment: An essay in memory of Harry Canter, 64 Va L

R 263, 268 (1978). Schauer contends that "the choice of language may be as much a part of the freedom protected by the first amendment as is the choice of the underlying propositions which that language expresses." To ensure the requisite "breathing space" for free and robust debate on matters of public concern, we think it important to allow for imprecision and ambiguity in the choice of language.

[26] See, e.g., Vachet v Central Newspapers, Inc, 816 F2d 313, 316 (CA 7, 1987) (the gist of the article concerned the plaintiff's association with a suspected rapist because he was arrested for harboring a fugitive, but the "particulars of the arrest whether it was pursuant to an arrest warrant or authorized by a state statute are inoffensive details of secondary importance"); Simonson v United Press Int'l, Inc, 654 F2d 478 (CA 7, 1981) (use of the technical term "ruled" for remarks made by the judge during a sentencing hearing and of "rape" where the defendant had pleaded no contest to a charge of second-degree sexual assault was not enough to establish falsity); Lambert v Providence Journal Co, 508 F2d 656 (CA 1, 1975), cert den 423 US 828 (1975) (the use of the term "murder" where the defendant denied guilt did not constitute an actionable innuendo regarding his guilt despite the article's failure to use a more neutral term like "homicide" or "shooting death"); Piracci v Hearst Corp, 263 F Supp 511 (D Md, 1966), aff'd 371 F2d 1016 (CA 4, 1967) (per curiam) (a newspaper report that the plaintiff was arrested for "possession of marijuana" was substantially accurate despite the fact that the actual charge was "delinquency due to the act of possessing marijuana").

[27] The statute provides:

A peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is charged to have been committed, and shall present to the magistrate a complaint stating the charge against the person arrested. [Emphasis added.]

[28] The rule provides that the court shall consider "the nature of the offense presently charged and the apparent probability of conviction" (emphasis added) along with other factors when deciding whether a person is entitled to release on personal recognizance, conditional release, or release on money bail.

[29] See, e.g., People v Suchodolski, 22 Mich App 389, 394-395; 178 NW2d 524 (1970). See also Michigan Criminal Jury Instructions (2d ed), § 3.5(4) (the "fact that the defendant is charged with a crime ... is not evidence").

[30] Plaintiff testified that a police officer told him that he "was getting picked up on a

sexual charge or something." He also stated that he asked "what the charge was" and was told "it was a sexual assault on a child." He further commented that he was told "that, you know, the charge that they that I was being charged with." When asked when he understood that he was arrested and charged, plaintiff explained that he was told that "we're charging you with this, and that's what they said."

[31] After trial, plaintiff apparently sought to shift the emphasis of his claim to the question whether, in publishing an account of his arrest, the article suggested that he had actually committed the crime, rather than that the reporting of his arrest and subsequent release on bond included materially false details. The trial court considered this broader argument, but ultimately based its ruling on the narrower ground that the details in the article were materially false.

[32] The Bedford Township police report stated that the "Bedford Township Police Department wanted Mr. Rouch picked up on this charge." The 10th District Court Bail Bond form also stated that Rouch had secured his release "from custody pending final disposition of the charge or charges."

[33] All the elements necessary to obtain a formal warrant were present. The only thing lacking was the officer's appearance before the magistrate to swear to what was in the complaint. In 1 Criminal Procedure, § 1.4, p 21, LaFave and Israel state that in "most jurisdictions, the post-arrest issuance of a warrant is viewed as an unnecessary formality, and the magistrate's finding of probable cause will combine with the complaint to authorize continuing custody."

[34] Handelsman v San Francisco Chronicle, 11 Cal App 3d 381, 387; 90 Cal Rptr 188 (1970) (ruling that use of the criminal term "theft" was not substantially untrue despite the fact that the complaint involved a civil action for conversion). See also Hopkins v Keith, 348 So 2d 999, 1002 (La App, 1977), writ not considered 350 So 2d 893 (La, 1977) (an article that reported that the plaintiff had been convicted for "running a gambling game" when he had merely forfeited bond on the charge was substantially true).

[35] See also Stevens v Independent Newspapers Inc, 15 Media L Rptr 1097 (Del Super Ct, 1988) (a newspaper inaccurately reported that the plaintiff had used a state car to drive seventy-two miles to work when in fact the distance was only fifty-five miles); Brueggemeyer v Associated Press, 609 F2d 825 (CA 5, 1980) (news reports that the court ordered restitution might equal $700,000 were substantially accurate despite the fact that the case involved only 1400 customers with a right to press claims involving purchases that averaged only $500); Gomba v McLaughlin, 180 Colo 232; 504 P2d 337 (1972) (a

newspaper account that accurately reported that the plaintiff assaulted an elderly
gentleman, but misstated the geographic location where the assault occurred, was
substantially true).

[36] See also Shutt v Harte-Hanks Communications, Inc, 7 Media L Rptr 2559 (ED Mich,
1981) (a headline inaccurately reported that during a blackout the plaintiff had used the
city's generator to light his home, but in fact he had used it to power his home freezer).

[1] Nuyen v Slater, 372 Mich 654, 662, n [*]; 127 NW2d 369 (1964).

[2] De Guvera v Sure Fit Products, 14 Mich App 201, 206; 165 NW2d 418 (1968) ("`[t]he
law requires the very words of the libel to be set out in the declaration in order that the
court or judge may judge whether they constitute a ground of action'"); Pursell v
Wolverine-Pentronix, Inc, 44 Mich App 416, 421; 205 NW2d 504 (1973) (applying the De
Guvera-MacGriff rule to slander actions); Hernden v Consumers Power Co, 72 Mich App
349, 356; 249 NW2d 419 (1976) (a plaintiff's failure to allege "where, when, or to whom
this statement [publication that the plaintiff was fired for lack of productivity] was
published, or that there even was a publication to anyone other than the plaintiff himself"),
Ledl v Quik Pik Food Stores, Inc, 133 Mich App 583, 589-590; 349 NW2d 529 (1984)
(referring to Hernden and Pursell with approval, the Ledl Court held that the failure of a
plaintiff to set forth with specificity the necessary elements of a defamation cause of action:
the defamatory words complained of, the connection of the defamatory words with the
plaintiff, and the publication of the alleged defamatory words, entitled the defendant to
summary judgment).

[3] Rouch v Enquirer & News of Battle Creek, 427 Mich 157, 204; 398 NW2d 245 (1986).

[4] Plaintiff's complaint, dated December 2, 1980, alleged the following facts.

3. That on or about December 22, 1979, said Defendant falsely and/or maliciously
published an article concerning your Plaintiff in said newspaper and that the charges made
therein were false and defamatory as follows: that Plaintiff was arrested and charged with
the sexual assault of a 17-year old woman who was babysitting with Plaintiff's children at
Plaintiff's ex-wife's residence; that Plaintiff was free on a $10,000 personal recognizance
bond; that Plaintiff was charged with first-degree sexual conduct; that Plaintiff attacked
said 17-year old woman and used a knife to cut her clothes off; that Plaintiff was identified
as the person making said assault by his children.

4. That by said words, Defendant meant and was understood to mean that Plaintiff was the
person who sexually assaulted and raped a 17-year old woman who was babysitting his

children.

5. That said publication of said facts as they related to your Plaintiff were false.

Subsequently, plaintiff amended his complaint on December 19, 1980, alleging the same facts with the identical paragraphs.

[5] As he explained:

How is it different, Mr. Jereck, from the ordinary negligence case in which the interrogatory may say, specify what acts on the part of the defendant you claim were negligent? Now, the term negligence has a special meaning in the law, it is a little more a little easier probably for the layman to recognize it than malice, as we're using it. But, he could easily say, I don't know what negligence is and, therefore, I can't what the legal definition of negligence is, therefore, I can't answer your question, and avoid it.

[6] Defense counsel proceeded with the argument:

Malice in this sense in the State of Michigan, means malice in the sense of the New York Times v Sullivan [376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964)]. That test has been reiterated in case after case in our courts; that where a publication is made by a news media of a newsworthy story, the burden is upon the plaintiff to establish that the publication was made with malice, that is, with knowledge of falsity or reckless disregard of falsity. It is our position, Your Honor, that none of the answers to the interrogatories that are on file in any way establish that at the time that the news story was published, that anyone at the newspaper knew that the matter material was false or had reckless disregard of the falsity.

It is also important to recognize that defense counsel did not rely on the official proceedings act.

[7] The court concluded with the following thoughts:

Now, many of the things set forth which you read, Mr. Jereck, relate to events after the publication which might very well go to damages and mitigating damages, but the fact as presented to the court at this time is that the reporter contacted the police, was given information, some of which, admittedly, was true; but the important point was false, and that is that there had been an authorization for a warrant charging the defendant with a specific criminal offense of some significance. I don't find anything that suggests there was an actual knowledge of the falsity of the statement or anything to suggest there was reckless disregard of the truthfulness or falsity of the statements. Consequently, I am satisfied and I

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 232 of
271

am relying on particularly on Schultz v Newsweek Incorporated [668 F2d 911 (CA 6,
1982)], which is the most recent decision which has been called to my attention, at least, in
this evolving state of law. I am satisfied that (1) there is a qualified privilege, (2) that no
suggestion has been made on the part of plaintiff that he can substantiate malice; and,
therefore, that the defendant is entitled to have the matter dismissed by way of summary
judgment.

[8] Rouch, n 3 supra.

[9] MacGriff, supra at 204-205.

[10] MCR 2.111(B)(1). See also Niehoff, The Michigan law of defamation, 1985 Det C L R
975, 980-982.

[1] The Court of Appeals stated that this Court had rejected the approach requiring
material falsity:

Our dissenting colleague ... finds that not only must the disputed statements be proven
false, they must be false in a material aspect. Under this analysis, if the gist, or sting, of the
article is substantially true, the falsity test is not met. The earlier Supreme Court opinion in
this case specifically rejected this approach: "[W]e decline to distinguish, as did the Court
of Appeals, the essence of the article from its supporting facts or details." 427 Mich 204.
[184 Mich App 31-32.]

This Court in its earlier Rouch opinion, however, did not even address the issue of material
falsity. The language quoted by the Court of Appeals is taken out of context. In the quoted
passage, this Court was discussing whether the article constituted speech of public concern,
not whether the falsity must be a material one. Nevertheless, the Court of Appeals applied
the test for material falsity and concluded that the plaintiff should prevail under either test:

[W]hether the article is read for its gist or simply for the information presented as fact,
plaintiff has met his burden of proving falsity. [Id. at 32.]

Accordingly, this error by the Court of Appeals does not require reversal.

[2] The trial court's instructions to the jury included:

Secondly, that statements in the article were false. In deciding whether any statements in
the article were false, you must interpret the words according to their ordinary and obvious
meaning. You must give the words the fair and reasonable interpretation that an average
reader would give them. You need not look at words used in the article according to any

technical or legal definition. Whether the statements in the article were false is for you to decide after considering the statements in the article, in the light of all of the evidence in the case.

Thirdly, the Plaintiff must prove that false statements in the article were materially false and tended to harm the Plaintiff's reputation. That is, that they made the article libelous. In determining whether an article is libelous, it is necessary to read the article as a whole, and fairly and reasonably construe it in determining whether the false portions make the article libelous in character. [Emphasis added.]

Furthermore, the jury was given a special verdict form in which it was asked, in part: "Were the statements materially false, tending to harm the plaintiff's reputation, that is, did they make the article libelous?"

[3] The Court of Appeals eloquently summed up the evidence on this point:

The plain language and clear implication of the Enquirer article are that there was more than a simple accusation against plaintiff. The article says twice that plaintiff was charged with a sex crime, and the final paragraph says that the prosecutor's office authorized the charge. The prosecutor, as is commonly known and as noted by the trial judge, does not just accuse; the prosecutor authorizes formal criminal proceedings, and that is exactly what the article says happened. There can be no doubt that both the details as reported and the gist of the article say that plaintiff was formally charged with a serious crime, not that there was merely an accusation of wrongdoing. [184 Mich App 34-35. First emphasis in original, second emphasis added.]

[4] The Court of Appeals also rejected the argument based on the definition of the word "charge" considered in isolation:

The dissent in this case says that the common usage of the word "charge" means "accuse" and that plaintiff was accused of the assault and so the article was not false. There are problems with this line of reasoning ... [W]e do not agree that the commonly understood meaning of the word "charge" is merely to accuse. Webster's New World Dictionary of the American Language, Second College Edition (1984), includes "accuse" in its definition of "charge," but it also includes the term "indictment," a word of far more serious import and implications. Indeed, "indictment" implies a formal criminal accusation....

Even if we were to accept the proposition that the common usage of the term "charge" relates only to an accusation, the article, as written, and particularly the last paragraph, certainly uses the term in a much more specific and legal sense. [Id. at 33-34.]

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 234 of 271

[1] Ante, p 284.

[2] Id., p 285.

[3] The police report states that the assistant prosecutor "was briefed on the complaint and the circumstances surrounding the arrest of suspect. He advised to lodge the suspect on CSC1st." (Emphasis added.)

[4] dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the Diadiun column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. [Milkovich v Lorain Journal Co, 497 US 1, 21; 110 S Ct 2695; 111 L Ed 2d 1 (1990).]

[5] MCR 2.111(B)(1). (Emphasis added.)

[6] MCR 2.116(C)(8).

The actual motion for summary disposition filed by the Enquirer and News reads as follows:

Now Comes Defendant Enquirer & News of Battle Creek, Michigan, a Delaware corporation, through its attorneys, Sullivan, Hamilton, Ryan & Schulz and moves the Court that an Order be entered granting a summary judgment of no cause for action in favor of Defendant and against Plaintiff in this case. This Motion is the renewal of a Motion previously filed in this action and the statements contained in the original Motion are herein incorporated by reference as though the same were set forth word for word.

That the hearing on the Motion for Summary Judgment originally filed was held in conjunction with a hearing on a Motion to compel Plaintiff to answer certain interrogatories dealing with Plaintiff's assertion of malice on the part of Defendant.

That the Court denied the Motion for Summary Judgment and at the same time entered an order requiring Plaintiff to answer Defendant's interrogatories.

That Plaintiff has filed answers to interrogatories and the same are part of the files and records of this case.

That said answers to interrogatories do not contain any factual statements or allegations which, if proved, would establish that Defendant published the article with knowledge that it was false or with reckless disregard of whether it was false or not and, therefore, do not raise any issues of fact on the question of malice.

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 235 of 271

That the article in question is a substantially true report of a matter of general public interest.

That the published information was obtained from police officials, upon whom Defendant had the right to rely.

That the publication is entitled to qualified privilege under the laws of this state and, therefore, in the absence of proof of malice, cannot be the basis for a judgment in an action for libel.

[7] MCR 2.115 and MCR 2.116(I)(5).

[8] The interrogatories directed to plaintiff read as follows:

Interrogatories Directed to Plaintiff

You are hereby notified that within fifteen (15) days from the time of service upon you, you shall answer separately, fully, in writing and under oath, each and every of the following interrogatories in accordance with the provisions of General Court Rule No. 309, and various subsections thereof.

These interrogatories shall be deemed continuing and supplemental answers thereto shall be required immediately upon receipt thereof, if the Plaintiff directly or indirectly obtains further or different information, from the time the answers are served to the time of trial.

1. Set forth separately each statement of fact in the article which Plaintiff alleges was false, separately quoting each alleged false statement of fact.

2. With respect to each statement of fact set forth in response to Interrogatory No. 1, describe the exact nature and extent of the alleged falsity.

3. Specify whether Plaintiff intends to rely upon a claim of common law malice, as implied by law in favor of Plaintiffs in libel actions, or upon an affirmative claim of actual malice on the part of Defendant in publication of the alleged defamatory statements.

4. If affirmative evidence of actual malice (as opposed to the common malice implied by law in favor of plaintiffs in libel actions) will be introduced at trial of this action, set forth separately and describe fully each item of evidence of fact upon which plaintiff will rely to establish actual malice on the part of Defendant Enquirer & News of Battle Creek.

5. If Plaintiff contends that the false statements of fact in the article were published with

Case 1:25-cv-21417-BB   Document 15-5   Entered on FLSD Docket 06/05/2025   Page 236 of 271

reckless disregard on the part of Defendant Enquirer & News of Battle Creek, set forth each item of evidence upon which Plaintiff will rely to establish such reckless disregard.

The answer to interrogatories reads as follows:

Answer to Interrogatories

Now comes the above-named Plaintiff who being first duly sworn deposes and says in answer to Defendant's Interrogatories as follows:

1. a. Plaintiff was taken into custody with regard to an alleged offense, but was never formally charged with any offense.

b. Plaintiff was never charged with the sexual assault of a 17-year-old woman.

c. 17-year-old woman was not babysitting Plaintiff's children.

d. Plaintiff was never formally charged with first-degree sexual conduct.

e. Plaintiff never entered the house at 4:00 A.M. Friday and attacked a young woman.

f. Plaintiff never used a knife to cut victim's clothes off.

g. Plaintiff was not identified by any of his children as being the alleged assailant.

h. No formal charges were authorized by the Calhoun County Prosecuting Attorney's Office.

2. All of the items set forth in Paragraph 1 are false.

3. My attorney advises me that we intend to rely on both the claim of common law malice and an affirmative claim of actual malice.

4. My attorney advises me that he has not completed discovery and, therefore is not able to answer this question at this time.

5. My attorney has not completed his investigation and, therefore, I cannot answer this question at this time.

Plaintiff's answers to defendant's supplemental interrogatories read as follows:

Plaintiff's Answers to Defendant's Supplemental Interrogatories

Now comes the above-named plaintiff, David J. Rouch, who being first duly sworn, deposes

and says as follows:

1. In answering these Interrogatories, based on what I have been told by my attorney, that actual malice (knowledge of falsity of statements made or reckless disregard of their truth or falsity) and common law malice or malice in law (false and defamatory statements made without sufficient cause or excuse) are more often tha[n] not supported by the same factual basis except in unusual instances. He further advised that in ordinary cases, malice can be implied from the defamatory nature of the statements and the fact that they are false. Malice can be proved by both intrinsic evidence and extrinsic evidence. Therefore, I am unable to necessarily distinguish whether the following facts will suport [sic], as you say, "actual malice" or "common law malice," but are those facts as I best know them at this time which I will rely on in support of my Complaint:

a. That the article was false;

b. The style and tone of the original article and the alleged retraction;

c. That normally the names of criminal defendants are not published by the Defendant newspaper until the criminal defendant has been formally charged or arraigned in Court;

d. That the Defendant failed to publish the fact that no formal charges had been brought against the Plaintiff and that he had been released from custody until approximately one year later when Plaintiff made a demand for retraction upon Defendant;

e. That the Defendant did not publish the fact that another individual was arrested for the same charges subsequent to Plaintiff's release, at the time of his arrest;

f. That Plaintiff is not a public or quasi-public person;

g. That the publication in question was not a qualified or absolute privilege of the Defendant;

h. That prior to publishing the article in question, Defendant made no investigation whatsoever to determine whether or not the facts as published were true;

i. That Defendant only made a telephonic inquiry of police departments to acquire the information published;

j. That Defendant made no effort to determine the truthfulness of the charge or facts contained in the publication;

k. That Defendant made no effort to contact Plaintiff concerning the facts as published;

l. That no immediate necessity existed which would have justified the libelous publication of the article in question without making reasonable efforts to confirm the truthfulness of the facts set forth in the publication;

m. That Defendant has no standards, instructions, or guidelines to protect private citizens such as the Plaintiff from libelous publications;

n. That despite a demand from Plaintiff, Defendant failed to publish a retraction;

o. That Defendant has not at any time, by conduct or otherwise, demonstrated the slightest interest or concern of Plaintiff's rights prior to or subsequent to the publication in question.

2. See # 1 above.

3. See # 1 above.

4. See # 1 above.

5. See # 1 above.

Some case metadata and case summaries were written with the help of AI, which can produce inaccuracies. You should read the full case before relying on it for legal research purposes.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Downloaded from vLex by Nikhil M

© Copyright 2025, vLex. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Aldous v. Bruss

| | |
|---|---|
| **Decision Date:** | 07 May 2013 |
| **Docket Number:** | No. 14–11–01108–CV., 14–11–01108–CV. |
| **Citation:** | Aldous v. Bruss, 405 S.W.3d 847 (Tex. App. 2013) |
| **Parties:** | Warren ALDOUS and Michael Aldous, Appellants v. Eric BRUSS, Appellee. |
| **Court:** | Texas Court of Appeals |

**vLex Document Id:** VLEX-888059666

**Link:** https://app.vlex.com/vid/aldous-v-bruss-no-888059666

Downloaded from vLex by Nikhil M

**405 S.W.3d 847**

**Warren ALDOUS and Michael Aldous, Appellants**

**v.Eric BRUSS, Appellee.**

**No. 14–11–01108–CV.**

**Court of Appeals of Texas, Houston (14th Dist.).**

**April 4, 2013.**

**Rehearing and En Banc Overruled May 7, 2013.**

OPINION TEXT STARTS HERE[*851]

Anthony P. Griffin, Galveston, for Appellant.

Michael Aldous, Santa Fe, pro se.

Daniel Krieger, League City, for Appellee.

**Panel consists of Chief Justice HEDGES and Justices BOYCE and DONOVAN.**

# OPINION

**ADELE HEDGES, Chief Justice.**

In this defamation case, appellant Warren Aldous challenges the trial court's partial summary judgment on liability entered against him on deemed admissions and the legal and factual sufficiency of the evidence to support the damages award to appellee Eric Bruss after a contested hearing. Appellant Michael Aldous asserts that (1) the trial court erred by denying his motion for new trial in which he alleged the discovery of new evidence, (2) the trial court erroneously denied his special exceptions to Bruss's petition, and (3) the allegedly defamatory statements he made were protected by an absolute or qualified privilege. We affirm the trial court's judgments.[1]

### BACKGROUND

Eric Bruss, a police officer with the Santa Fe, Texas, police department, sued Michael Aldous for defamation in January 2009. In his petition, he made the following allegations. Around February 2008, he arrested Michael for driving while intoxicated ("DWI"). Later that year, Michael's father, Warren Aldous, was arrested by another officer from the Santa Fe police department for a traffic offense. After Warren's arrest, Michael began to "repeatedly make and publish false statements regarding [Bruss]'s professional reputation. [Michael] also repeatedly and publicly falsely accused [Bruss] of numerous criminal offenses." Michael also published numerous false statements via email and on the internet.

Bruss asserted that these defamatory statements constituted slander per se, directly[*852] attacked his professional reputation, tended to impeach his "honesty, integrity, virtue, or reputation," and were made with malice. He further contended that Michael had intentionally published numerous false statements and had

Downloaded from vLex by Nikhil M



falsely accused him of crimes. Bruss claimed that, as a direct and proximate result of Michael's false and defamatory statements, he had endured shame, public embarrassment, public humiliation, and mental pain and anguish in the past and would continue to suffer in the future. He sought both actual and exemplary damages, pre- and post-judgment interest, and costs of suit. In September 2009, Bruss amended his petition to add Warren as a defendant, alleging that both Michael and Warren engaged in the conduct described above.2 Because the procedural facts between the proceedings against Warren and Michael diverge, we will first confine our discussion to the trial proceedings against Michael and then discuss the summary-judgment proceedings against Warren.

**A. Trial Proceedings Against Michael3**

In his February 2010 no-evidence motion for summary judgment, Michael asserted that there was no evidence of his having intentionally published any false statements. His assertion that all the statements at issue were true was based on their having been taken from news broadcasts and licensed attorneys. He further contended that any statement he published that was not a statement of fact was an expression of opinion, which was not actionable. Finally, he argued that Bruss had failed to prove that he had made any statements with any knowledge that they were false. In his response, Bruss asserted, among other things, that discovery was still on-going and would not be completed until June 14, 2010, based on the court's Discovery and Docket Control Order. The trial court denied Michael's summary-judgment motion on April 15, 2010.

Two weeks after his summary-judgment motion was denied, Michael filed special exceptions to Bruss's petition. Michael asserted that Bruss's allegations were so general that he did not have fair notice of the claim against him. He further complained that Bruss had failed to describe any specific statements that were made to defame Bruss, when any such statements were made, where these statements were made, or which such published statements were false. Michael specially excepted that Bruss's "entire petition does not contain a single statement that was allegedly made by [Michael] that allegedly constitutes slander per se." Michael requested that Bruss state the maximum amount of his alleged damages. He asked that the court sustain his exceptions and order Bruss to replead.

In his response to the special exceptions, Bruss claimed that he was not required to plead all the factual details of his case in his pleadings. He stated that he would amend his pleading to state his actual damages.4 The trial court denied Michael's special exceptions on June 1, 2010.

A jury trial on Bruss's defamation claim against Michael was held from May 25 to **[*853]** June 2, 2011. Michael, a lawyer, represented himself. The trial centered around an incident that had occurred at a gas station and involved Michael, his father, Warren, the owners/operators of a towing company called "Peanuts," and Bruss. During this incident, Michael apparently made at least one 911 call. Bruss's patrol unit camera also recorded this incident. The audio of the 911 call(s) and the video from Bruss's patrol unit were admitted into evidence. Michael also filed complaints with the Santa Fe police department regarding Bruss's actions during this incident.5 During trial, Michael moved for a directed verdict, asserting that Bruss had failed to prove his damages and that, as a police officer, he should have "thicker skin." The trial court denied this motion. After both sides closed, the following bench conference occurred:

THE COURT: Let the record reflect we're outside the presence of the jury. Mr. Krieger [Bruss's counsel], have you received a copy of the Court's charge?

MR. KRIEGER: I have.

THE COURT: Do you have any objections to the Court's charge?

Downloaded from vLex by Nikhil M



MR. KRIEGER: No, your Honor.

THE COURT: Mr. [Michael] Aldous, have you received a copy of the Court's charge?

MR. ALDOUS: Yes, your Honor.

THE COURT: Do you have any objections to [the] Court's charge?

MR. ALDOUS: No, you Honor.

In the charge, the jury was provided with thirty-seven specific statements Michael was alleged to have made regarding Bruss. The jury found that (1) Michael had published thirty-six of the thirty-seven statements and (2) Michael knew that twenty-five of these statements were defamatory and false at the time they were made. Of these twenty-five statements, the jury found that each of the following five statements proximately caused Bruss $7,500.00 in damages for injury to his reputation sustained in the past and $7,500.00 in damages for injury to reputation that, in reasonable probability, Bruss will sustain in the future. These statements were:

"Bruss left the scene and the Peanut's towing gentlemen waited for me outside the store and eventually his wife talked him into leaving."

"I have been going to city council against this officer that's here and there are his buddies that go spy on the city council meetings cause we just got out of because the city is about to fire the officer and so me and my dad are afraid to leave they have our car blocked in with ah... with ah... police car."

"The officers sitting here watching the guy say he's going to kick my ass.... taking his shirt off."

"Eric Bruss is here and he's just sitting there watching."

"Bring me another one of your complaint forms because Bruss stood here and watched the whole thing happen and didn't do a thing about it."

Thus, in total, the jury awarded Bruss $75,000.00 for injury to his reputation sustained in his past and injury that Bruss will, with reasonable probability, sustain in the future.

On June 15, Michael filed a motion for mistrial, in which he challenged the jury's damages award, asserted that the charge was confusing, contended that certain witnesses failed to appear at trial despite proper subpoenas, explained that he had **[\*854]** discovered new evidence, complained of improper interaction between Bruss and a member of the jury, stated that the jury may have been intimidated because the venire information sheets were left with the parties, and contended that the jury instructions were "altered and changed after being presented to the jury." This motion was denied on July 22, the same day on which the trial court signed a judgment awarding Bruss $75,000.00 in accord with the jury's verdict.

Michael filed a motion for new trial on August 19, 2009, asserting the discovery of new evidence. In this motion, Michael identified new evidence that had come to light since trial and could not have been discovered earlier through any diligence on his part. Michael described this evidence and attached a purported recording from a witness who, although subpoenaed, did not testify at trial. He stated that this evidence contradicted statements made by Bruss during trial. He attached police reports from the owners and operators of Peanuts towing company that he had not been provided prior to trial. In the motion, Michael identified several witnesses who he asserted would contradict Bruss's testimony and undermine Bruss's credibility, as well as a witness who would undermine the testimony of Bruss's ex-wife. However, Michael attached no supporting affidavits to his motion for new trial. The trial court denied Michael's motion for new

Downloaded from vLex by Nikhil M

v|lex

trial on September 9, 2011. His appeal timely ensued thereafter.

## B. Summary–Judgment Proceedings Against Warren

On February 10, 2010, Bruss moved for partial summary judgment as to Warren. In this motion, Bruss asserted that Warren had not responded to his request for admissions, which had been served on December 19, 2009. Bruss asserted that Warren had therefore admitted to the following:

• Bruss properly named Warren in his petition.

• Warren made defamatory statements about Bruss.

• Warren made remarks accusing Bruss of criminal acts.

• Warren made false defamatory remarks about Bruss.

• Warren slandered Bruss.

• Warren made false statements accusing Bruss of criminal acts.

• Warren made remarks that harm Bruss's business reputation.

• Warren made remarks that injured Bruss's office, profession, or occupation.

• Warren made remarks that harmed Bruss.

• Warren made remarks that harmed Bruss's office, profession, or occupation.

• Warren made defamatory statements against Bruss with actual malice.

• Bruss is entitled to damages related to the suit.

• Bruss is entitled to nominal damages related to this suit

• Bruss is entitled to special damages related to this suit.

On February 12, 2010, Warren's deposition was taken. Warren filed a general denial on April 26, 2010, three weeks after the trial court denied his motion to quash service of process on April 5. The trial court granted Bruss's motion for partial summary judgment as to liability against Warren on May 14, 2010. 6 The trial court [*855] set a hearing on damages for June 25, 2010.

Due to various delays,7 the hearing on damages was not held until February 23, 2011. Warren was represented by counsel at this contested hearing. Bruss and his ex-wife, Sylvia Sandoval were the only testifying witnesses at the hearing.

During the testimony at this hearing, Bruss testified as follows. He had previously had a good reputation within the law enforcement community. After Bruss arrested Michael for DWI, Warren and Michael appeared at Santa Fe city council meetings to defame him, filed false complaints against him with the Santa Fe police department, posted false statements about him on the internet, and sent numerous defamatory emails to law enforcement agencies, public officials, and websites. Bruss applied for jobs with other police departments that would have been career advancements for him, but withdrew his applications because of the ongoing defamation by Warren and Michael. At the time of the hearing, Bruss had been subject to

Downloaded from vLex by Nikhil M



Warren's slander and lies for "probably two years." Warren and Michael made a video about Bruss that was sent to the Texas Rangers, several members of congress, and the judiciary. This conduct by the Aldouses affected Bruss's work performance and reputation, as well as his personal life, his relationship with his now ex-wife, and his relationships with his children. Bruss was required to undergo counseling following an officer-involved shooting unrelated to this case. During this counseling for that incident, he spent a majority of the time dealing with stress induced by the ongoing harassment caused by the Aldouses and their publication of false and defamatory statements about him. On cross-examination, Bruss admitted that he did not lose his employment or have any reduction in his salary as a result of Warren's defamatory statements. He stated, however, that he believed his job to have been in jeopardy for some time when the Aldouses first began their defamatory campaign against him.

Sylvia Sandoval testified to the following. She is a police officer who works for the City of Webster, Texas. She has known and lived with Bruss since 2000; they married in 2007. The Aldouses' defamation of Bruss led to their divorce. She observed Bruss as visibly depressed, unable to engage romantically, and unable to participate in family activities because of the stress caused by the Aldouses' conduct. She had been concerned that Bruss would commit suicide. She saw that Bruss was ridiculed at work by coworkers because of Warren's defamatory statements, and Bruss had difficulty speaking with citizens due to the Aldouses' ongoing campaign against him. Bruss's problems manifested only after the Aldouses began their pattern of attacks on him. Because of the Aldouses' behavior, she became concerned for the safety of their children and instructed them to call 911 if they ever saw the Aldouses. In her experience, she had never seen this type of attack on a police officer.

After hearing the evidence and argument of counsel, the trial court took the matter under advisement. On March 7, 2011, the trial court signed a judgment awarding Bruss general damages of $150,000.00 against Warren. Warren filed **[\*856]** a *Craddock*8 motion for new trial on April 6, 2011, seeking to set aside the "default judgment" rendered against him. The trial court denied Warren's motion on May 5, 2011. The judgment against Warren became final and appealable when the judgment against Michael was signed, as noted above, on July 22, 2011. Warren's appeal timely ensued thereafter. Although Warren and Michael filed separate appellate briefs, their cases were never severed, so we address them both in this opinion.

## ANALYSIS

### A. Issues Relating to Michael's Appeal

Michael presents three issues for our review. First, he asserts that the trial court abused its discretion by failing to set aside the judgment against him and granting a new trial. In his second issue, he complains that the trial court erred in denying his special exceptions to Bruss's petition. Finally, in issue three, he contends that the award for damages for defamation is void because the alleged defamatory statements were made under absolute or qualified privilege on a 911 call and in a police complaint packet requesting commencement of a criminal investigation against an officer for his misconduct while on duty.

### 1. Denial of Motion for New Trial

The grounds for Michael's motion for new trial were newly discovered evidence. A party seeking a new trial on such grounds establish that (1) the evidence has come to his knowledge since the trial, (2) the failure the discover the evidence sooner was not due to a lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably result in a different outcome if a new trial were granted. *Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 813 (Tex.2010). We review the denial of such a motion for an abuse of discretion. *Id.* Every reasonable presumption will be made in favor of a trial court's order refusing a new trial. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809–10 (Tex.1983), *overruled on other grounds by Moritz v. Preiss,* 121 S.W.3d 715 (Tex.2003).

Downloaded from vLex by Nikhil M

Michael asserts that his "newly discovered evidence" consists of information obtained during a hearing before the Santa Fe Public Safety Committee from Debra O'Connor, a witness he had subpoenaed to testify at his trial. O'Connor failed to appear at his trial. In his brief, Michael claims, with no record support, that the trial court "would not compel Debra O'Connor to appear because a witness fee was not attached to the trial subpoena." Michael contends that the witness fee attached to his previously served deposition notice to Debra O'Connor "should cover the witness fee for the trial subpoena." Michael contends that he issued another trial subpoena with a witness fee attached, which was served upon O'Connor, but she failed to appear, and the trial court refused to compel her appearance. There is no record support for the trial court's refusal to compel the appearance of this witness. 9

In conclusory fashion, Michael asserts that the "statements" provided by O'Connor were not cumulative as to any evidence introduced at trial and that they "led to the discovery of an incident report and two other witnesses that would have changed the outcome of the trial." He provides no **[*857]** meaningful discussion of his efforts to discover any of this "evidence" or how this "evidence" would likely have changed the outcome of his trial. Indeed, he neither explains nor identifies what this "evidence" is in his appellate brief. *See*Tex.R.App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); Moreover, his motion for new trial had no affidavits attached from any of these witnesses indicating what their testimony would be or an affidavit from Michael establishing his diligence in discovering this "evidence." 10*Cf. Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 757 (Tex.App.-Amarillo 1995, writ denied) (stating that a movant's mere allegations will not suffice to obtain a new trial on the basis of newly discovered evidence).

In short, Michael has not established that the trial court abused its discretion in denying his motion for new trial. Not only did he fail to provide the trial court with anything more than mere allegations rather than any evidence, he neglects to identify his new evidence on appeal. For the foregoing reasons, we overrule his first issue.

## 2. Denial of Special Exceptions

In his second issue, Michael challenges the trial court's denial of his special exceptions. A defendant challenges the legal sufficiency of a plaintiff's petition through special exceptions. *Ross v. Goldstein,* 203 S.W.3d 508, 512 (Tex.App.-Houston [14th Dist.] 2006, no pet.). To properly present a special exception, the defendant must identify the particular pleading excepted to, and do so "intelligibly and with particularity." Tex.R. Civ. P. 91. General demurrers are not acceptable. Tex.R. Civ. P. 90. We review a trial court's ruling on special exceptions for an abuse of discretion. *Ross,* 203 S.W.3d at 512. We liberally construe pleadings; special exceptions are only a challenge to determine if "fair notice" requirements have been met. *Id.*

In his special exceptions to Bruss's petition, Michael complained that Bruss failed to set out enough factual details regarding his claim. It is not a valid objection to generally complain that the pleading does not set out enough factual details if fair notice of the claim is given. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 616–17 (Tex.2004). The only specific omission identified in Michael's special exception is the following statement: "The pleadings for the alleged slander in paragraph II, do not plead all the elements **[*858]** necessary to support slander per se because Plaintiff omitted the element of actually pleading an alleged defamatory statement." This aversion is contradicted by Bruss's petition, in which he pleaded:

[T]he Defendants began to repeatedly make and publish false statements regarding the Plaintiff's professional reputation. *The Defendants also repeatedly and publicly falsely accused the Plaintiff of numerous criminal offenses.* The Defendants have published a number of false statements via email, regular mail, orally, in writing, and on the internet....

Downloaded from vLex by Nikhil M



These defamatory statements constitute slander per se. *The statements falsely accuse the Plaintiff of a crime and directly attack the professional reputation of the Plaintiff.* Further, the statements tend to impeach the Plaintiff's honesty, integrity, virtue, or reputation. The Defendants' statements were made with malice. The Defendants have intentionally published numerous false statements to the public and *falsely accused the Plaintiff of crimes....*

(emphasis added). Michael has not explained how these allegations fail to sufficiently place him on notice that Bruss was suing him for defamation per se (falsely accusing Bruss of crimes and attacking his professional reputation as a police officer) 11 or cited a single authority for the proposition that Bruss was required to notify him of the specific statement(s) alleged to have been defamatory per se. In fact, his special exception is more in the nature of an unacceptable general demurrer. *See* Tex.R. Civ. P. 90. Thus, we cannot say the trial court abused its discretion in denying Michael's special exceptions. 12 Accordingly, we overrule Michael's second issue. **[\*859]**

### 3. "Privileged" Statements

In his third issue, Michael asserts that the statements for which Bruss was awarded damages were made under an absolute or qualified privilege because they were made in a 911 phone call or a complaint package he filed with the Santa Fe police department. He contends that these type of statements are related to judicial proceedings and are absolutely privileged. Thus, he contends that none of these statements can support an award of damages for defamation.

The issue of whether an alleged defamatory matter is related to a proposed or existing judicial proceeding is a legal question to be determined by the court. *Randolph v. Walker,* 29 S.W.3d 271, 278 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). Communications subject to this privilege "cannot constitute the basis of a civil action" and may not form a basis for civil liability. *See Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 912 (1942); *Randolph,* 29 S.W.3d at 278.

We disagree with Michael that any of his communications were made under an absolute privilege. Rather, we conclude that his communications were made under a qualified privilege. Such qualified or conditional privileges arise out of the occasion upon which the false statement is published and do not rise to the level of an immunity. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 768 (Tex.1987). Initial communications to a "public officer ... who is authorized or privileged to take action" are subject to only a qualified privilege, not absolute immunity. *Id.; see also Clark v. Jenkins,* 248 S.W.3d 418, 432 (Tex.App.-Amarillo 2008, pet. denied). Even the filing of a criminal complaint is not absolutely privileged because, at that point, judicial proceedings have not begun, and no investigating body has discovered sufficient information to present to a grand jury or file a complaint. *Clark,* 248 S.W.3d at 432 (citing *San Antonio Credit Union v. O'Connor,* 115 S.W.3d 82, 99 (Tex.App.-San Antonio 2003, pet. denied)). We conclude that Michael's statements, allegedly made during a 911 call or in a complaint filed with Bruss's employer, the Santa Fe police department, are subject only to a qualified or conditional privilege. *Cf. id.*

Michael has failed to establish whether any sort of privilege even applies to the statements he made. The only record reference to the statements in his brief is to the jury charge, which does not identify the source of these statements. Appellant states in his brief that these statements were made in a 911 call and a complaint packet, but there is no record support for this allegation. A party asserting error on appeal bears the burden of showing that the record supports the contention raised and of specifying the place in the record where matters upon which he relies or of which he complains are shown. *See* Tex.R.App. P. 38.1(i); *Franz v. Katy Indep. Sch. Dist.,* 35 S.W.3d 749, 754 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

Moreover, Michael has not directed us to, and we have not found, any location in the record where he raised

Downloaded from vLex by Nikhil M



the issue of qualified privilege with the trial court,13 either as an affirmative defense,14**[\*860]** or otherwise.15*See*Tex.R.App. P. 33.1(a) (requiring that, generally, to present a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion). Under these circumstances, Michael has both waived this issue by failing to properly brief it and failed to preserve it by presenting it to the trial court. We therefore overrule his third and final issue.

## B. Warren's Appellate Issues

Warren challenges the trial court's partial summary judgment on liability in favor of Bruss in his first issue. In his second issue, he asserts that the trial court's award of $150,000.00 in damages to Bruss following a contested hearing is excessive.

### 1. Partial Summary Judgment in Favor of Bruss

Warren filed a *Craddock*16 motion for new trial following the trial court's partial summary judgment on liability in favor of Bruss. " *Craddock* does not apply to a motion for new trial filed after judgment has been granted on a summary-judgment motion to which the nonmovant failed to timely respond when the movant had an opportunity to seek a continuance or obtain permission to file a late response." *Carpenter v. Cimarron Hydrocarbons Corp.,* 98 S.W.3d 682, 686 (Tex.2002). Here, it is unclear whether Warren was aware that the motion for summary judgment had been filed or that a response was due before the partial summary judgment was granted.17 Thus, in an abundance of caution, we will apply the *Craddock* standard in evaluating his motion for new trial, even though a default judgment was not granted against him.18

We review a trial court's refusal to grant a new trial for an abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma,* 288 S.W.3d 922, 926 (Tex.2009) (per curiam). A trial court is required to set aside a default judgment and grant a new trial if (1) the defendant's failure to answer before judgment was not intentional or the result of conscious indifference on his part, but was due to a mistake or accident, (2) the motion sets up a meritorious defense, and (3) granting the motion will "occasion no delay" or otherwise injure the plaintiff. *Sutherland v. Spencer,* 376 S.W.3d 752, 755 (Tex.2012) (quoting *Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Com.App.1939)). If a defaulting parting moving for new trial meets the *Craddock* test, a trial court abuses its discretion by failing to grant a new trial. *Id.*

We look to the knowledge and acts of the defendant to determine whether he satisfied his burden regarding the first *Craddock* element. *Dir., State Emp. Workers' Comp. Div. v. Evans,* 889 S.W.2d 266, 269 (Tex.1994). But when a **[\*861]** party relies on a representative to file an answer or respond, the party must establish that the failure to answer or respond was not intentional or the result of conscious indifference of either the party or the representative. *See Est. of Pollack v. McMurrey,* 858 S.W.2d 388, 391 (Tex.1993); *Ferguson & Co. v. Roll,* 776 S.W.2d 692, 698 (Tex.App.-Dallas 1989, no writ). Conscious indifference is generally interpreted to mean a failure to take some action that would seem indicated to a person of reasonable sensibilities under the same circumstances. *See Prince v. Prince,* 912 S.W.2d 367, 370 (Tex.App.-Houston [14th Dist.] 1995, no writ) (quoting *Johnson v. Edmonds,* 712 S.W.2d 651, 652–53 (Tex.App.-Fort Worth 1986, no writ)); *Todd v. Heinrich,* No. 01–10–00267–CV, 2011 WL 2183881, at \*6 (Tex.App.-Houston [1st Dist.] June 2, 2011, no pet.) (mem. op.) (quoting *In re A.P.P.,* 74 S.W.3d 570, 573 (Tex.App.-Corpus Christi 2002, no pet.)).

In his affidavit, Warren states:

When I was served with the lawsuit, I hired my daughter-in-law, Meghan Aldous, to represent my interest....

I first learned of the discovery that was not answered after the motion for default was granted. I was never

Downloaded from vLex by Nikhil M



told by my lawyer that discovery was outstanding, nor was I told that there was a hearing scheduled on the default judgment....

When I learned that there was outstanding discovery, I asked my lawyer what happened—she said she just missed it. I asked her to file a responsive document (motion for the court to reconsider and to explain what occurred) and to answer the discovery—she did neither.

These statements in Warren's affidavit indicate that his failure to respond to these discovery requests resulted from his representative's conscious indifference. *See, e.g., Fiske v. Fiske,* No. 01–03–00048–CV, 2004 WL 1847368, at *7 (Tex.App.-Houston [1st Dist.] Aug. 19, 2004, no pet.) (mem. op.) (holding that agent's inaction after opposing counsel informed her of possible default judgment constituted conscious indifference); *cf. First Nat'l. Bank v. Peterson,* 709 S.W.2d 276, 279–80 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (equating conscious indifference with inaction resulting from alleged ignorance); *Johnson v. Edmonds,* 712 S.W.2d 651, 652–53 (Tex.App.-Fort Worth 1986, no writ) (holding that appellant's failure to seek help or advice or make inquiries about import of "papers" he received constituted conscious indifference). Accordingly, we conclude that the trial court did not abuse its discretion in denying his motion for new trial based on *Craddock*.19 We therefore overrule his first issue.

## 2. Damages

The trial court conducted a contested hearing on damages in which both Bruss and his ex-wife, Sylvia Sandoval, testified. On appeal, he challenges the legal and factual sufficiency of the evidence to support the trial court's general damages award of $150,000.00. To determine whether the evidence is legally sufficient**[*862]** to support the judgment, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We assume that the finder of fact decided questions of credibility or conflicting evidence in favor of the verdict if it reasonably could do so. *Id.* at 819, 820. If the evidence would enable reasonable and fair-minded people to differ in their conclusions, then it is legally sufficient to support the verdict. *Id.* at 822. Under a factual sufficiency review, we consider and weigh all of the evidence in the record, overturning the verdict only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996).

Bruss sued Warren for defamation per se. As is relevant to our analysis of the propriety of the trial court's damages award, Warren admitted to making false statements accusing Bruss of criminal acts and injury to his office, profession, and occupation. These type of statements fall within the categories of statements that are defamatory per se. *See Downing v. Burns,* 348 S.W.3d 415, 424 (Tex.App.-Houston [14th Dist.] 2011, no pet.) (defamatory per se statements include those imputing a crime and those that cause injury to a person's office, business, or profession, among others). When a factfinder determines that the defendant made the allegedly defamatory statement about the plaintiff, and the statement is defamatory per se, then the factfinder may presume that the statement injured the plaintiff's reputation. *Id.* (citing *Bentley v. Bunton,* 94 S.W.3d 561, 604 (Tex.2002)). In such a case, the plaintiff is entitled to recover general damages, such as for loss of reputation. *See id.*

In granting Bruss's partial summary judgment, the trial court ruled that Warren made these defamatory per se statements as a matter of law. Because these statements were defamatory per se, general damages are presumed. *Id.* (citing *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984) (op. on reh'g)). The amount to award for harm to the plaintiff's reputation lies within the factfinder's discretion. *See id.* "At a minimum, the plaintiff is entitled to a nominal sum, but is not limited to that amount, and the [factfinder] may choose to award damages that are 'substantial.' " *Id.* (quoting *W. Tex. Utils. Co. v. Wills,* 164 S.W.2d 405, 408 (Tex.Civ.App.-Austin 1942, no writ)). Warren also admitted that he made these

Downloaded from vLex by Nikhil M

**vLex**

defamatory statements with malice.

At the hearing on damages, both Bruss and his ex-wife testified that his long-term relationship with his wife and children had deteriorated, and his marriage ended in divorce. Bruss testified that the defamatory statements affected his work performance, his reputation, and his personal life. He stated that when he was required to undergo counseling for an unrelated event, he spent the majority of the counseling session(s) discussing the impact the Aldouses' behavior had had on his life. Sandoval testified that Bruss was visibly depressed, unable to engage romantically, and could not participate in family activities. She further expressed concern that he would commit suicide. Both Bruss and Sandoval attributed the end of their marriage to Warren's and Michael's pattern of defamation.

After reviewing the evidence presented in this case, we conclude that reasonable and fair-minded people could have determined that $150,000.00 would be a sufficient amount to compensate Bruss for the injury to his reputation caused by Warren's defamatory statements. Further, **[\*863]** this damages award is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cf. Knox v. Taylor,* 992 S.W.2d 40, 49, 60 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (concluding that $750,000 in damages awarded for injury to reputation in defamation per se case was not excessive); *see also Adolf Coors Co. v. Rodriguez,* 780 S.W.2d 477, 488 (Tex.App.-Corpus Christi 1989, writ denied) (noting that under presumption of damages applicable to libel per se, damages "are within the jury's discretion, are purely personal, and cannot be measured by any fixed rule or standard"); *Bradbury v. Scott,* 788 S.W.2d 31, 39 (Tex.App.-Houston [1st Dist.] 1989, writ denied) (holding, in case of libel per se, "where the amount of the actual damages is not capable of definite ascertainment, and prima facie liability is established, the determination of the amount is necessarily lodged in the discretion of the jury"); *Freeman v. Schwenker,* 73 S.W.2d 609, 611 (Tex.Civ.App.-Austin 1934, no writ) (same). Accordingly, we conclude that the evidence is both legally and factually sufficient to support the trial court's damages award. We overrule Warren's second and final issue.

## CONCLUSION

We have overruled each of Michael's three appellate issues. We thus affirm the trial court's judgment against Michael. Likewise, having overruled Warren's two issues on appeal, we affirm the trial court's judgment against him.

1. The "final" judgment against Warren Aldous was signed on March 4, 2011, awarding Bruss $150,000.00 in damages. This judgment became final and appealable when the judgment against Michael Aldous was signed on July 22, 2011 because Bruss had sued both Warren and Michael. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 203–04 (Tex.2001).

2. The record reflects that Warren was served with this petition by certified mail on September 10, 2009. Warren answered on April 26, 2010, generally denying the allegations in Bruss's petition.

3. Michael has not challenged the sufficiency of the evidence, so we discuss the facts of the case briefly here and as necessary throughout the opinion to the disposition of his appellate issues. *See*Tex.R.App. P. 47.1.

4. Our record contains no such amended petition.

5. Michael lodged evidentiary objections to the admission of the audio of the 911 calls, the video from Bruss's patrol car, and the complaints he filed with the police department. These evidentiary objections were overruled by the trial court.

6. Warren attempted appeal of this interlocutory summary judgment was dismissed by this court for want of

Downloaded from vLex by Nikhil M



jurisdiction on July 29, 2010. *See Aldous v. Bruss,* No. 14–10–00539–CV, 2010 WL 2968587, at *1 (Tex.App.-Houston [14th Dist.] July 29, 2010, no pet.) (mem. op.) (per curiam).

7. Warren notified the trial court that he had removed his suit to federal court on June 23, 2010. The case was remanded back to the trial court on August 17, 2010.

8.*See Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Com.App.1939).

9. The subpoena reflects that it was served *after* the time the witness was to appear at court and contains a hand-written notation that Ms. O'Connor was "with her husband in the hospital."

10. One of the exhibits attached to Michael's motion for new trial appears to be an investigative response to Michael's complaint regarding Bruss and Peanut's Towing Company. It appears to be written on Santa Fe Police Department letterhead and signed by interim police chief K. Campbell. At the top, it lists the following under "Investigators Findings": "Peanuts Wrecker Sustained; Sgt. Eric Bruss Exonerated." The body of the letter, addressed to Michael Aldous, contains the following paragraphs specifically regarding Bruss and Michael's statements in his complaint and 911 calls:

I further assigned your complaint ... to Lieutenant Meadows who conducted a thorough investigation of the incident [at the West End Shell Station on September 25, 2008]. Said investigation to include video documentation *does not support Sgt. Bruss failing to act, rather it does support Sgt. Bruss acting in a professional manner while de-escalating a negative situation.*

*I must also make you aware that there are several discrepancies in your own complaint which are not supported by video evidence. There are also discrepancies in your 911 call regarding the incident which are not supported by video evidence.* I share these concerns with you because there are state law penalties regarding false reports and/or false statements.

(emphasis added).

11. An oral statement is defamatory per se if it falls within one of the following categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling, or (4) imputation of sexual misconduct. *Downing v. Burns,* 348 S.W.3d 415, 424 (Tex.App.-Houston [14th Dist.] 2011, no pet.).

12. Michael also complained that Bruss had not specified his maximum damages. Further, during trial, he made an oral motion for directed verdict, as follows:

Thus far in this case I feel the Plaintiffs [sic] have failed to present their case—failed to prove their case. They [sic] have things that—there's things that have to be proven up in this case in accordance with the law. They [sic] failed to prove up their damages.

The Plaintiff is, as you know, a police officer, which they're—they're supposed to have a little bit of a thicker shell or thicker skin, so to speak. They have to have more than a mere loss of sleep to recover for a defamation case. In this case I don't see where they've [sic] established damages in any way, shape or form. I don't see what statements have been alleged that actually are defamatory that I've made. Every statement that has been made was made—was made based on a truth. It was based on statements made by other individuals and nothing has been made to—in an obvious attempt to harm the Plaintiff's reputation, your Honor.

The only similarity between this oral motion for directed verdict and Michael's prior-filed special exceptions

Downloaded from vLex by Nikhil M



is his complaint regarding damages. It appears that Michael was under the impression that Bruss was required to allege and prove both the existence and amount of damages. However, this is so only if Bruss were alleging defamation *per quod,* which requires both proof of the existence and the amount of damages. *See Exxon Mobil Corp. v. Hines,* 252 S.W.3d 496, 501 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). But in cases involving defamation per se, "damages are presumed to flow from the nature of the defamation itself; thus, such an action can be sustained even without specific proof of the existence and amount of harm." *Id.* Once a jury finds that a defendant made a statement that is defamatory per se, the factfinder may presume the statement injured the plaintiff's reputation. *See Downing,* 348 S.W.3d at 424. Because Michael alleged defamation per se, he was not required to allege or prove a specific amount of damages. *Id.*

13. When these exhibits were admitted, Michael lodged only evidentiary objections to their admission.

14. Generally, one must plead the affirmative defense of qualified privilege. *E.g., Thomas–Smith v. Mackin,* 238 S.W.3d 503, 509 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (stating that defendant was entitled to jury question on qualified privilege because she pleaded it as an affirmative defense).

15. We reviewed Michael's answer, summary-judgment motion, his oral motion for directed verdict, the charge conference, his motion for mistrial, and his motion for new trial. He did not raise the issue of qualified or conditional privilege—or absolute privilege—in any of these documents in the clerk's record or locations in the reporter's record.

16. *Craddock,* 133 S.W.2d at 126.

17. As discussed below, it is apparent that his counsel was aware that discovery responses were outstanding.

18. In *Ivy v. Carrell*, the Supreme Court of Texas extended *Craddock* to post-answer default judgments. 407 S.W.2d 212, 213 (Tex.1966).

19. Warren did not seek to withdraw his deemed admissions in his motion for new trial, and he has he not sought to withdraw them on appeal. *Cf. Wheeler v. Green,* 157 S.W.3d 439, 442 (Tex.2005) (holding that an appellant preserved appellate review of whether her deemed admissions should have been the basis for summary judgment without filing motion to withdraw deemed admissions by filing a motion for new trial in which arguments and requests made put trial court on notice of her claim that she should not have been deemed to have made admissions based on failure to timely respond to request for admissions).

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| TERA SHANLEY a/k/a T.S. JOYCE and WICKED WILLOW PRESS, LLC, a Texas limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>ROBYN A. HUTCHINGS a/k/a TERRY BOLRYDER a/k/a DOMINO SAVAGE,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING [45] PLAINTIFFS' RULE 56(d) MOTION AND DENYING WITHOUT PREJUDICE [32] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00549-DBB-JCB<br><br>District Judge David Barlow |

Before the court are two matters. Defendant Robyn A. Hutchings a/k/a Terry Bolryder a/k/a Domino Savage ("Ms. Hutchings") moves for summary judgment on Plaintiffs Tera Shanley a/k/a T.S. Joyce ("Ms. Shanley") and Wicked Willow Press, LLC's (collectively "Plaintiffs") claims.[1] Plaintiffs seek relief under Federal Rule of Civil Procedure 56(d).[2] Having considered the briefing and relevant law, the court determines that oral argument would not materially assist the court.[3] As explained below, the court grants the Rule 56 motion and denies without prejudice the motion for summary judgment.

---

[1] Mot. for Summ. J. & Mem. in Support ("MSJ"), ECF No. 32, filed Mar. 23, 2023.
[2] Pls. R. 56(d) Mot. ("R. 56 Mot."), ECF No. 45, filed Apr. 24, 2023.
[3] *See* DUCivR 7-1(g).

## BACKGROUND

Ms. Shanley and Ms. Hutchings both write paranormal romance fiction.[4] Readers of such fiction gather online to discuss books and promote authors.[5] For instance, Ms. Hutchings avers that she has 8,000 followers on Facebook and 1,500 followers on Instagram.[6] Ms. Shanley and Ms. Hutchings interacted in one online community for four months in 2016.[7]

At diverse times, Ms. Hutchings published various negative comments about Ms. Shanley.[8] She accused Ms. Shanley of being a "known homewrecker[,]" "sexually coerc[ing] and blacklist[ing] male models[,]" and engaging in "white supremacy dog whistling."[9] She asked Ms. Shanley to "come answer for all the cheating and husband stealing[.]"[10] Ms. Hutchings called Ms. Shanley a "repeat offender" rapist who "ruined everyone's rep[utation]" and said, "now its [sic] your turn."[11] In addition to the rape allegations, Ms. Hutchings accused Ms. Shanley of being "an actual child molester" who "raped a kid[,]"[12] including her own child.[13] She offered one thousand dollars if "anyone brings [Ms. Shanley] . . . here."[14] And she uploaded a picture of a man with a noose around his neck after a post stating, "I'm really mad [Ms. Shanley] . . . you existing is like a total blight on humanity."[15]

---

[4] Answer ¶ 11. "The fantasy and paranormal romance fiction genre is one of the fastest growing romance genres and includes such well-known works as the Twilight series by Stephenie Meyer." *Id.* ¶ 9.
[5] *Id.* ¶ 12.
[6] *Id.* ¶ 15.
[7] *Id.* ¶ 13.
[8] Ms. Hutchings admits to making these statements. *See id.* ¶¶ 18, 20–21, 24–29, 31–35, 37–38, 40–41.
[9] Answer ¶ 18.
[10] *Id.* ¶ 18.
[11] *Id.* ¶¶ 24, 26, 27.
[12] *Id.* ¶ 31.
[13] *Id.* ¶ 37 ("[Ms. Shanley] you have three victims one is your son stop making me humiliate him with your crimes you monster.").
[14] Answer ¶ 41.
[15] *Id.* ¶ 42.

Plaintiffs filed their Complaint on August 29, 2022.[16] The Complaint alleges defamation per se, defamation, injurious falsehood, false light, tortious interference with economic relations, and intentional infliction of emotional distress.[17] On November 14, 2022, Ms. Hutchings filed her Answer.[18] She denies the claims, admits making various statements, and asserts an affirmative defense of truth.[19] On February 7, 2023, she filed her initial disclosures.[20] Eight days later, Plaintiffs served Ms. Hutchings with discovery requests.[21] Ms. Hutchings submitted responses and served written discovery requests on Plaintiffs on March 13, 2023.[22] Plaintiffs responded to Ms. Hutchings's written discovery requests on April 12, 2023.[23]

Ms. Hutchings moved for summary judgment on March 23, 2023.[24] Five days later, Plaintiffs filed a short form discovery motion to compel Ms. Hutchings to supplement her responses to their first set of discovery requests.[25] The court granted the motion and ordered Ms. Hutchings to supplement her responses by May 5, 2023.[26] On April 24, 2023, Plaintiffs filed their opposition to Ms. Hutchings's motion for summary judgment[27] and their Rule 56(d) motion.[28] Plaintiffs support their motion with a declaration from their attorney.[29] Ms. Hutchings

---

[16] *See* Compl., ECF No. 2.
[17] *Id.* ¶¶ 58–106.
[18] Answer, ECF No. 17.
[19] *Id.* at 36–37.
[20] Def. Initial Disclosures, ECF No. 46-1, filed Apr. 24, 2023. Plaintiffs also filed their initial disclosures on February 7, 2023. Pls. Initial Disclosures, ECF No. 45-1, filed Apr. 24, 2023.
[21] Pls. First Set of Disc. Reqs. to Def. ("Pls. Disc. Reqs."), ECF No. 45-2, filed Apr. 24, 2023.
[22] Def. Resps. to Pls. First Set of Interrogs. ("Def. Resps. to Interrogs."), ECF No. 45-3, filed Apr. 24, 2023.
[23] Pls. Resps. to Def. First Set of Interrogs., ECF No. 47-1, filed Apr. 24, 2023.
[24] *See* MSJ.
[25] ECF No. 35.
[26] ECF No. 40.
[27] Pls. Opp'n to Defs. Mot. for Summ. J. ("Opp'n"), ECF No. 47.
[28] *See* R. 56 Mot.
[29] Aff. of Juliette Palmer White in Support of Pls. Rule 56(d) Mot. ("White Aff."), ECF No. 46, filed Apr. 24, 2023.

3

has not filed a reply for her summary judgment motion nor a response to the Rule 56(d) motion,[30] and the time for doing so has passed.[31] Fact discovery closes on June 30, 2023.[32]

## STANDARD

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[34] "The summary judgment standard requires [the court] to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor."[35] "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[36]

## DISCUSSION

Ms. Hutchings contends Ms. Shanley is a public figure and has the burden of proving under the actual malice standard that Ms. Hutchings knew her statements were false or had serious doubts as to their truth.[37] To prevail on summary judgment, Ms. Hutchings must show

---

[30] On May 15, 2023, the court directed Ms. Hutchings to inform the court by May 22, 2023 whether she intended to file an opposition or reply brief. ECF No. 50. As of the date of this Memorandum Decision and Order, Ms. Hutchings has not done so.

[31] DUCivR 7-1(a)(4)(B)(iv), (D)(ii). "Failure to respond to arguments in opposition [m]emorandum means that [the] non-movant has conceded those matters." *David v. Midway City*, No. 2:20-cv-00066, 2021 WL 6930939, at *16 n.163 (D. Utah Dec. 14, 2021), *appeal dismissed*, No. 22-4009, 2022 WL 3350513 (10th Cir. Aug. 3, 2022) (citation omitted); *see Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (unpublished). Under the local rules, "failure to respond timely to a motion may result in the court granting the motion without further notice." DUCivR 7-1(f).

[32] ECF No. 23, at 3.

[33] Fed. R. Civ. P. 56(a).

[34] *Est. of Beauford v. Mesa County*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[35] *Id.*

[36] *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (cleaned up).

[37] MSJ 11 (citing *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964)).

4

there is no genuine dispute of material fact and Plaintiffs' claims fail as a matter of law. Pursuant to Federal Rule of Civil Procedure 56(d), Plaintiffs ask the court to deny Ms. Hutchings's motion for summary judgment or postpone a decision in favor of more time for discovery.

"[T]he general rule is that summary judgment should not be entered 'where the nonmoving party has not had the opportunity to discover information that is essential to his opposition[.]'"[38] Under Rule 56(d), a court may defer ruling on a motion for summary judgment or deny it outright "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."[39] The affidavit must "(1) identify[] the probable facts that are unavailable, (2) stat[e] why these facts cannot be presented without additional time, (3) identify[] past steps to obtain evidence of these facts, and (4) stat[e] how additional time would allow for rebuttal of the adversary's argument[.]"[40] Rule 56(d) "is designed to safeguard against a premature or improvident grant of summary judgment."[41] "Requests for further discovery should ordinarily be treated liberally. But relief . . . is not automatic."[42] Courts "expect Rule 56(d) motions to be robust."[43] The court "may not look beyond the affidavit in considering [the motion]."[44]

Plaintiffs must first identify facts likely to result from discovery and explain why the facts are unavailable. The affidavit must "'state with specificity' how discovery would yield

---

[38] *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 904 (10th Cir. 2016) (quoting *Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000)).

[39] Fed. R. Civ. P. 56(d).

[40] *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1119 (10th Cir. 2021) (internal quotation marks and citation omitted).

[41] *Jurgevich v. McGary*, 63 F. App'x 448, 453 (10th Cir. 2003) (unpublished) (quoting *Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 833 (10th Cir. 1986)).

[42] *Nat'l Union Fire Ins. of Pittsburgh v. Dish Network, LLC*, 17 F.4th 22, 34 (10th Cir. 2021) (citation omitted).

[43] *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1206 (10th Cir. 2015); *see Adams v. C3 Pipeline Constr. Inc.*, 30 F.4th 943, 969 (10th Cir. 2021) ("Speculation cannot support a Rule 56(d) motion.").

[44] *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1110 (10th Cir. 2017).

5

'probable facts' that would 'rebut the summary judgment motion.'"[45] Plaintiffs identify four areas for currently unavailable probable facts.

One area pertains to David Hendricks's ("Mr. Hendricks") affidavit. He asserts Ms. Shanley stalked and abused him when he was a child and tried to cover up her actions.[46] Plaintiffs seek to discover the alleged abuse and its factual basis, who committed the abuse, when and where the abuse occurred, who witnessed the abuse, and which of Ms. Hutchings's comments in the Complaint were based on the alleged abuse.[47] Plaintiffs further identify as probable facts the supposed "many felonies" Mr. Hendricks allegedly witnessed Ms. Shanley commit against him, other children, and animals.[48]

For the next area, Plaintiffs expect to obtain facts about posted "community warnings."[49] Specifically, they seek to know when the comments were made, on what platform, and by whom.[50] Plaintiffs also expect to discover which books or ideas Ms. Shanley allegedly plagiarized, who she allegedly blackmailed, and who she allegedly used to threaten others' children and how.[51] As to Ms. Hutchings's myriad accusations, Plaintiffs seek discovery for the claims of rape, human trafficking, and white supremacy. They identify probable facts concerning who Ms. Shanley allegedly trafficked, the basis for Ms. Shanley's alleged white supremacist

---

[45] *Adams*, 30 F.4th at 969 (quoting *Trask v. Francoi*, 446 F.3d 1036, 1042 (10th Cir. 2006)).
[46] David S. Hendrick's Aff. in Support of Def. Mot. for Summ. J. ¶¶ 2, 6–7, ECF No. 34, filed Mar. 23, 2023.
[47] White Aff. ¶ 5.a.
[48] *Id.*; Def. Initial Disclosures 5.
[49] MSJ 6; ECF No. 32-3; ECF No. 32-4; ECF No. 32-5; ECF No. 32-6.
[50] White Aff. ¶ 5.b.
[51] *Id.*

6

comments, and who Ms. Shanley allegedly raped.[52] Finally, Plaintiffs assert the need for discovery regarding Ms. Hutchings's claim that Ms. Shanley is a public figure.[53]

Plaintiffs contend these facts are unavailable. They declare they have not received supplemental written discovery responses or document productions.[54] And they have not deposed Mr. Hendricks, Ms. Hutchings, or other relevant witnesses.[55] Plaintiffs aver more discovery will support their causes of action by showing Ms. Hutchings's comments are "entirely false."[56]

Ultimately, Ms. Hutchings's summary judgment motion rests on whether there is a genuine dispute of material fact as to the truth of her accusations. Plaintiffs seek specific facts necessary to help determine the comments' truth. For this reason, Plaintiffs' affidavit sufficiently identifies "useful evidence" to "rebut the summary judgment motion."[57]

Next, Plaintiffs' affidavit must explain past efforts to obtain necessary evidence, state why more time is needed to present the evidence, and clarify how additional time will help them rebut the motion for summary judgment. It does so. Plaintiffs served discovery requests on Ms. Hutchings on February 15, 2023.[58] The requests sought to obtain the factual bases for Ms. Hutchings's allegations through responses and document production. In particular, Plaintiffs asked Ms. Hutchings to explain the factual bases for Ms. Shanley's alleged acts of sexual coercion, white supremacy, rape, child molestation, human trafficking, stalking, abuse, and other offenses.[59] But Ms. Hutchings did not provide Plaintiffs with adequate responses. The responses

---

[52] *Id.* ¶ 5.c.
[53] *Id.* ¶ 5.d.
[54] *Id.* ¶ 5.a
[55] White Aff. ¶¶ 5.a–c, 8.
[56] *Id.* ¶¶ 4, 6.
[57] *Adams*, 30 F.4th at 969, 970 (citation omitted).
[58] White Aff. ¶ 4.
[59] Pls. Disc. Reqs. 8–11.

mainly consisted of boilerplate objections[60] or were vague and incomplete.[61] After a hearing, the court ordered Ms. Hutchings to supplement her discovery responses.[62] Plaintiffs have not received any supplemental responses.[63] While Plaintiffs have not yet deposed Mr. Hendricks or Ms. Hutchings, they have not been "dilatory in conducting discovery."[64]

Plaintiffs easily have met their burden to show that more time is needed before the court rules on summary judgment. Additional discovery will address potential facts surrounding Ms. Hutchings's accusations. If present, such facts may help Plaintiffs "understand the claims against [them] and to prove the falsity of those claims."[65] The court thus grants Plaintiffs' Rule 56(d) motion. In consequence, Ms. Hutchings's motion for summary judgment is premature.

## ORDER

Accordingly, the court GRANTS Plaintiffs' Rule 56(d) Motion.[66] The court DENIES without prejudice Defendant's Motion for Summary Judgment.[67] Defendant may refile a renewed summary judgment motion, if appropriate, after the close of discovery.

---

[60] *E.g.* ECF No. 35, at 1–2 ("Explain the factual basis for your Social Media Post . . . claiming that Plaintiff 'sexually coerced and blacklisted male models.' **ANSWER:** Defendant objects to this interrogatory on the grounds that it is premature, overly vague and confusing. Premature because the interrogatory appears to be a contention interrogatory and discovery is still ongoing. It is also vague and confusing in that the terms 'explain' and 'factual basis' need further definition in order for the defendant to ascertain what specific information is requested by the interrogatory.").

[61] *E.g.*, *id.* at 4 ("Explain the factual basis for your Social Media Post . . . claiming that Plaintiff sold and/or trafficked her son. **ANSWER:** Defendant . . . responds that to the best of her understanding of what the interrogatory is requesting, and subject to updates as discovery is ongoing, her answer is: First-hand witness of the plaintiff being involved in and or committing criminal acts against young boys and men and description by a victim of being called her son and raped.").

[62] *See* ECF No. 40.

[63] White Aff. ¶¶ 7–8.

[64] *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1180 (10th Cir. 2008) (quoting *Bolden v. City of Topeka*, 441 F.3d 1129, 1151 (10th Cir. 2006)).

[65] White Aff. ¶ 6.

[66] ECF No. 45.

[67] ECF No. 32.

8

Signed May 26, 2023.

BY THE COURT

_____

David Barlow
United States District Judge

Downloaded from vLex by Nikhil M

© Copyright 2025, vLex. All Rights Reserved.
Copy for use in the context of the business of the vLex customer only. Otherwise, distribution or reproduction is not permitted

# Lafferty v. Jones

| | |
|---|---|
| **Docket Number:** | AC 45401 |
| **Decision Date:** | 19 December 2023 |
| **Citation:** | Lafferty v. Jones, 222 Conn.App. 855, 307 A.3d 923 (Conn. App. 2023) |
| **Parties:** | Erica LAFFERTY et al. v. Alex Emric JONES et al. William Sherlach v. Alex Jones et al. William Sherlach et al. v. Alex Emric Jones et al. |
| **Court:** | Connecticut Court of Appeals |

**vLex Document Id:** VLEX-1036764993

**Link:** https://app.vlex.com/vid/lafferty-v-jones-1036764993

Downloaded from vLex by Nikhil M

vLex

**307 A.3d 923**

**222 Conn.App. 855**

**Erica LAFFERTY et al.**

**v.Alex Emric JONES et al.**

**William Sherlach**

**v.Alex Jones et al.**

**William Sherlach et al.**

**v.Alex Emric Jones et al.**

**(AC 45401)**

**Appellate Court of Connecticut.**

**Argued September 18, 2023**

**Officially Released December 19, 2023[*925]**

Norman A. Pattis, Bethany, for the appellants (named defendant in each case).

Alinor C. Sterling, Bridgeport, for the appellees (plaintiff David Wheeler et al. in the first case, named plaintiff in the second case, and named plaintiff et al. in the third case).

Elgo, Suarez and Seeley, Js.

SUAREZ, J.

[858]The defendant Alex Jones appeals from the judgments of the trial court, *Bellis, J.,* granting the joint motion for contempt filed by the plaintiffs[1] for the defen-[*926] dant's violation of the court's orders to attend a deposition scheduled on March 23 and 24, 2022. On appeal, the defendant claims that the court (1) abused its discretion by holding him in contempt of court for [859]failing to appear at his deposition after the court was provided an affidavit and two letters from his physicians attesting that he was too ill to attend the deposition, and (2) violated his due process rights by not requesting additional information from his physicians regarding his medical condition prior to holding him in contempt.[2] We affirm the judgments of the trial court.

The following facts, as found by the court or otherwise undisputed in the record, and procedural history are relevant to this appeal. On December 14, 2012, Adam Lanza entered Sandy Hook Elementary School (Sandy Hook), and thereafter shot and killed twenty first-grade children and six adults, in addition to wounding two other victims who survived the attack. In the underlying consolidated actions, the plaintiffs, consisting of a first responder, who was not a victim of the Sandy Hook shooting but was depicted in the media following the shooting, and the immediate family members of five of the children, one educator, the principal of Sandy Hook, and a school psychologist who were killed in the shooting, brought these separate actions against the defendant. See footnote 1 of this opinion.

Downloaded from vLex by Nikhil M



In the complaints, the plaintiffs alleged that the defendant hosts a nationally syndicated radio program and owns and operates multiple Internet websites that hold**[\*927]** themselves out as news and journalism platforms. The <sub>860</sub>plaintiffs further alleged that the defendant began publishing content related to the Sandy Hook shooting on his radio and Internet platforms and circulated videos on his YouTube channel. Specifically, the plaintiffs alleged that, between December 19, 2012 and June 26, 2017, the defendant used his Internet and radio platforms to spread the message that the Sandy Hook shooting was a staged event to the millions of his weekly listeners and subscribers. The complaints each consisted of five counts, including causes of action sounding in invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, negligent infliction of emotional distress, and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. On November 15, 2021, the court entered a default against the remaining defendants as a sanction for failing to fully and fairly comply with the plaintiffs' discovery requests. The cases proceeded to trial for a hearing in damages, and, during the pendency of this appeal, a verdict was reached and a judgment was rendered in each case in favor of the plaintiffs.3

On March 11, 2022, prior to the hearing in damages, the plaintiffs properly noticed a videotaped deposition of the defendant to take place in his hometown of Austin, Texas. By agreement of the parties, the deposition was to be conducted on March 23 and 24, 2022. On March 22, 2022, the defendant filed a motion for a protective order, asserting that he was under the care of a physician for medical conditions that required immediate testing and that, in his physician's opinion, he should not sit for the scheduled deposition. On the same day, the court held an emergency hearing on the <sub>861</sub>defendant's motion, during which the defendant's counsel, on behalf of the defendant who was not present for the hearing, submitted a letter from a physician, under seal, for an in camera review.4 After the court conducted an in camera review of the letter, the court stated, on the record, that it had "never seen [a medical letter] as bare bones as this one. This [letter] does not have any letterhead. It had no address on it. … It doesn't indicate what kind of doctor it is. … The letter fails to address the length of the patient/physician relationship. It does not say that the physician examined [the defendant] or evaluated [him]. … [T]his is not actually a medical record, it is just this bare bones note." In addition, the court also noted that the physician's letter, dated March 21, 2022, stated that the defendant "'is remaining home' under the doctor's supervision." However, during the court proceeding, the plaintiffs' counsel argued that the defendant was not, in fact, at home under his physician's care but, instead, "[the defendant] appears to be on the air right now broadcasting his live show …." The court subsequently denied the defendant's motion for a protective order and issued an order for the defendant's attorney to disclose where the defendant's March 22, 2022 broadcast took place. The defendant's counsel later conceded that this denial of the defendant's motion for a protective order constituted a**[\*928]** court order for the defendant to appear for the March 23 and 24, 2022 deposition.

**[1–3]** On March 23, 2022, the defendant's attorney filed a notice with the court stating that, while the March 22, 2022 hearing on his motion for a protective order was taking place, the defendant simultaneously conducted <sub>862</sub>his March 22, 2022 broadcast live at his studio in Austin, Texas. The defendant's attorney also represented that the defendant's studio was not located at his home. The plaintiffs further filed an emergency motion for an order to require the defendant to appear for the March 24, 2022 deposition on penalty of civil contempt and requested an order for a capias.5 On the same day, the court held a hearing and allowed the defendant to file an opposition to the plaintiffs' emergency motion and to submit additional medical documents by the end of the day. The defendant responded, that day, by filing an objection to the plaintiffs' emergency motion, and a renewed motion for a protective order with an attached affidavit from Dr. Benjamin Marble and a letter from Dr. Amy Offutt,6 recommending that the defendant not attend the deposition.7**[\*929]**

Downloaded from vLex by Nikhil M

863At the conclusion of the hearing, the court issued two orders on the plaintiffs' motion. The court declined to issue a capias but ordered the defendant to appear at the March 24, 2022 deposition. The court also denied the defendant's renewed motion for a protective order and reasoned that the defendant had not demonstrated that his alleged medical conditions were serious enough to excuse his attendance at his deposition. The court explained that "the [defendant's] medical issues, while potentially serious, are not currently serious enough to either require his hospitalization, or convince him to stop engaging in his broadcasts. [The defendant] cannot unilaterally decide to continue to engage in his broadcasts but refuse to participate in a deposition. … [If the defendant] develops escalating symptoms such that he is hospitalized, that change in circumstances would excuse his attendance at the court-ordered deposition."

On March 24, 2022, the plaintiffs filed a notice with the court indicating that the defendant did not attend 864the deposition scheduled for that day. On March 25, 2022, the plaintiffs filed a motion for civil contempt against the defendant.8 On March 28, 2022, the defendant filed an objection to the plaintiffs' motion for contempt. On March 30, 2022, the court held a hearing on the plaintiffs' motion for contempt and, in an oral decision, granted the plaintiffs' motion, stating that "the court finds by clear and convincing evidence that the defendant … wilfully and in bad faith violated, without justification, several clear court orders requiring his attendance at his depositions on March [23] and March [24]. That is, the court finds that [the defendant] intentionally failed to comply with the orders of the court and that there was no adequate factual basis to explain his failures to obey the orders of the court." The court further ordered that the defendant "has the ability to purge the contempt … when [he] completes two full days of depositions at the office of [the] plaintiffs' counsel in Bridgeport. [The defendant] is to pay conditional fines of $25,000 each weekday beginning on Friday, April 1st, increasing by $25,000 per weekday … and it will be suspended on each day that [the defendant] successfully completes a full day's deposition …."

[4] On March 31, 2022, pursuant to General Statutes § 52-265a, the defendant filed a petition for an expedited public interest appeal of the trial court's contempt finding with our Supreme Court and an emergency motion to stay the court's order holding him in contempt until after our Supreme Court ruled on his petition.9 This 865appeal followed. On March 31, 2022, the defendant also filed an emergency motion to stay the trial court's orders, which the trial court denied. On April 1, 2022, the defendant filed, with this court, an emergency motion for review of the[*930] trial court's denial of his request to stay the trial court's orders pursuant to Practice Book § 61-14. On April 4, 2022, this court denied the defendant's emergency motion for review of the trial court's denial of his request for a stay. On April 5 and 6, 2022, the defendant appeared for a deposition at the offices of the plaintiffs' counsel in Bridgeport, Connecticut. On April 6, 2022, the defendant filed a motion for an order declaring that he be purged of contempt and for the clerk to return the paid fines he had deposited at the clerk's office. On April 14, 2022, the court granted the defendant's motion and directed the clerk to return $75,000 in fines to the defendant.10

I

The defendant claims that the court abused its discretion by holding him in contempt of court for failing to appear at his deposition after his counsel provided the court with an affidavit and two letters from his physicians attesting that he was too ill to attend the deposition.11 Specifically, the defendant argues that the court 866improperly substituted its judgment about his health for that of his physicians. We are not persuaded.

[5–9] "We begin by setting forth the legal principles relevant to this claim. Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. … [C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. … In part because the contempt remedy is particularly harsh …

Downloaded from vLex by Nikhil M



such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring … rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. .. To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. … It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. … The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. … If we answer that question affirmatively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Internal quotation marks omitted.) *Scott v. Scott,* 215 Conn. App. 24, 38–39, 282 A.3d 470 (2022). "Under the abuse of discretion standard, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. … [Thus, our] review of such rulings is limited to the questions of[**931**] whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *Mazza v. Mazza,* 216 Conn. App. 285, 297–98, 285 A.3d $_{867}$90 (2022), cert. granted, 346 Conn. 904, 287 A.3d 600 (2023).

**[10]** The defendant does not challenge the court's findings that its orders requiring him to attend the March 23 and 24, 2022 deposition were clear and unambiguous, or that he did not attend the deposition.12 Therefore, we focus our analysis on the sole issue of whether the court abused its discretion in determining that the defendant's violation of the court's orders was wilful.

**[11, 12]** "Whether a party's violation was wilful depends on the circumstances of the particular case and, ultimately, is a factual question committed to the sound discretion of the trial court. … Without a finding of wilfulness, a trial court cannot find contempt and, it follows, cannot impose contempt penalties." (Internal quotation marks omitted.) *Mitchell v. Bogonos,* 218 Conn. App. 59, 69, 290 A.3d 825 (2023).

In the present case, the court denied the defendant's motions for a protective order after reviewing, among other evidence, a letter and an affidavit from Dr. Marble, and a letter from Dr. Offutt, recommending that the defendant not attend the deposition due to a medical condition. The initial letter from Dr. Marble indicated that the defendant was "remaining home" under the care of his physician. The plaintiffs' counsel, however, alerted the court that the defendant was broadcasting his radio program, live from his studio on March 22, 2022, when he purportedly was at home under the care of his physician. After the court issued an order requiring the defendant's attorney to disclose where the defendant's March 22 broadcast took place, the defendant's attorney confirmed that the defendant was, in fact, engaging in his live broadcasts from his studio at $_{868}$the same time his attorney was arguing in court that he was too ill to attend his deposition. In its denial of the defendant's motion for a protective order, the court reasoned that "the [defendant's] medical issues, while potentially serious, are not currently serious enough to either require his hospitalization, or convince him to stop engaging in his broadcasts. [The defendant] cannot unilaterally decide to continue to engage in his broadcasts, but refuse to participate in a deposition." We agree with the trial court that the undisputed fact that the defendant chose to host a live radio broadcast from his studio at the time of the scheduled hearing on his motion for a protective order significantly undercuts his claim that he was too ill to attend the deposition. We conclude that the court reasonably inferred, on the basis of the facts before it, that the defendant's failure to attend his deposition on March 23 and March 24, 2022, was wilful. Accordingly, the court did not abuse its discretion in finding the defendant in contempt of its orders.

II

**[13]** The defendant next claims, for the first time on appeal, that the court violated his due process rights by not requesting additional information from his physicians regarding his medical condition prior to holding

Downloaded from vLex by Nikhil M



him in contempt.13 Specifically, the defendant argues that, if the court suspected that his physicians' letters were tendered in bad faith, "the [c]ourt has a re-[*932] sponsibility absent exigent circumstances to tread with caution" when evaluating a party's health and a court ₈₆₉should not make a determination as to whether a party's failure to abide by a court order was wilful "without [making a] further inquiry." We are not persuaded.

The defendant's claim that he did not receive the process that he was due focuses on his belief that the court improperly discredited the medical opinions of Dr. Marble and Dr. Offutt "on their face, ascribing the general disdain it felt toward [the defendant]—as evidenced by its prior rulings on sanctions—to his physicians. In any other context, the result would be, and should be even in this context, regarded as a shocking departure from judicial norms." The defendant's argument is not a model of clarity, but he appears to suggest that the court improperly rejected the "medical evidence [that he] tendered in the face of exigency" without having conducted a deeper inquiry. He argues that, "[i]f the [medical] letters were tendered in bad faith, the court could take what steps were necessary to vindicate the authority of the court in [an] orderly process and by the use of competent evidence." The defendant states that, "[i]f the trial court had reasons for stating that Dr. Marbles' instructions were not in fact made, or were not legitimate … then the trial court should have, and could have, requested additional information from the physicians. … The defendant would then have been in familiar territory sculp[t]ed by such cases as *State v. Esposito,* [192 Conn. 166, 179–80, 471 A.2d 949 (1984)], which provide interested parties the opportunity either to disclose otherwise confidential medical information, or face consequences."14

**[14]** ₈₇₀Initially, we note that the defendant's constitutional claim is unpreserved, as he did not adequately raise the claim before the trial court. Although he has adequately briefed the constitutional claim in his principal brief, he has failed to provide this court with any analysis of the reviewability of the unpreserved claim to invoke any extraordinary type of review, including review under the bypass doctrine set forth in *State v. Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.,* 317 Conn. 773, 781, 120 A.3d 1188 (2015). The defendant's failure to include any analysis of the reviewability of his unpreserved constitutional claim in his brief, however, does not bar our review of his claim under *Golding*.15 See *State v. Elson,* 311 Conn. 726, 755, 91 A.3d 862 (2014). Further, we are persuaded that the defendant's analysis of his due process claim satisfies the first two prongs[*933] of *Golding* because the record is adequate for our review and a constitutional right is involved. Therefore, we turn to the third prong of *Golding* and consider whether he has satisfied his burden of demonstrating that a constitutional violation exists and deprived him of a fair trial.

**[15, 16]** "It is beyond question that due process of law … requires that one charged with contempt of court be ₈₇₁advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. … Adjudication of a motion for civil contempt implicates these constitutional safeguards." (Internal quotation marks omitted.) *Barr v. Barr,* 195 Conn. App. 479, 484, 225 A.3d 972 (2020). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (Internal quotation marks omitted.) *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

The defendant has not provided us with any persuasive authority to support his argument that, because the court found the representations of his physicians to be lacking, it was obligated to affirmatively seek additional evidence concerning the defendant's medical condition prior to making a determination as to whether he wilfully disregarded the court's orders to attend the deposition. We conclude that the defendant's novel claim requires scant analysis.16

Downloaded from vLex by Nikhil M

In the present case, the court held a hearing on the plaintiffs' motion for contempt and provided the defendant with an opportunity to be heard. The defendant was represented by counsel at the contempt hearing. Because of the recent prior hearings concerning the defendant's duty to attend his deposition, the court had evidence before it that was relevant to the contempt hearing. At the beginning of the contempt hearing, however, the court gave the defendant an opportunity to provide additional evidence when it asked the defendant's attorney, "Are you presenting any new evidence [872]today or are we proceeding on what's been submitted to date?" The defendant's attorney stated that "as far as what [we are] prepared to do today, we were proceeding on [what has] been submitted." During the contempt hearing, the defendant's attorney requested additional time to gather evidence and to decide whether to prepare a witness for the hearing, which the court addressed by noting, "[this hearing] was scheduled one week ago. … I never received any motion for continuance, formally or informally, from any party indicating that more time was needed to arrange for witness testimony or … other evidence." The defendant's attorney thereafter did not ask the court for a continuance and did not suggest that the defendant wished to submit any further evidence beyond what had been submitted.[*934]

Therefore, the record reflects that the defendant was provided sufficient due process of law regarding the court's contempt finding, as he was allowed a meaningful opportunity to be heard during the contempt hearing, was represented by counsel during the proceeding, and was given the opportunity to submit additional evidence. The court did not in any way preclude the defendant from presenting additional medical information to the court or from asking the court to review such information under seal in an in camera review, if he wished to do so. Instead, the defendant, who had notice that the court was considering the plaintiffs' motion for contempt, chose not to submit any additional evidence. As stated by the United States Supreme Court, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States,* 554 U.S. 237, 243, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008). Thus, our adversarial system places the responsibility on the parties and their counsel, rather than on the [873]court, to frame the issues and to submit additional information on behalf of their client if they deem it necessary.[17]

As we stated in part I of this opinion, the court reasonably exercised its discretion by concluding that the undisputed evidence established that the defendant, by going to work, disregarded the medical opinions that he had submitted to the court, and, therefore, his failure to comply with the court's orders to attend his deposition reflected a wilful disregard for the court's authority. The defendant's due process claim fails the third prong of *Golding* because the constitutional violation does not exist.

The judgments are affirmed.

In this opinion the other judges concurred.

[1]There are three underlying actions. In the first action, the plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos Soto, Jillian Soto, and William Aldenberg. On November 29, 2018, the plaintiffs moved to consolidate the second and third cases; *Sherlach v. Jones,* Superior Court, judicial district of Waterbury, Docket No. CV-18-6046437-S, and *Sherlach v. Jones,* Superior Court, judicial district of Waterbury, Docket No. CV-18-6046438-S; with their action pursuant to Practice Book § 9-5. William Sherlach is a plaintiff in the second and third cases and Robert Parker is a plaintiff in the third case. On December 17, 2018, the court granted the motion to consolidate the cases. Jeremy Richman died while this action was pending, and, on June 7, 2021, the court granted the plaintiffs' motion to substitute Jennifer Hensel, executrix of the estate of Jeremy Richman, as a plaintiff in his place; however, on June 8, 2021, Jennifer Hensel, in her capacity as executrix of estate of Jeremy Richman, withdrew her claims against the defendants. On October 20, 2021, the court granted Erica Lafferty's motion to substitute Richard Coan,

Downloaded from vLex by Nikhil M



trustee of the bankruptcy estate of Erica L. Garbatini, in her place as a plaintiff in this case. All references in this opinion to the plaintiffs are to the remaining plaintiffs and do not include Erica Lafferty, Jeremy Richman, or Jennifer Hensel, as executrix of the estate of Jeremy Richman.

In the underlying actions, the plaintiffs originally named the following persons and entities as defendants: Alex Emric Jones, Wolfgang Halbig, Cory T. Sklanka, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, Prison Planet TV, LLC, Genesis Communications Network, Inc., and Midas Resources, Inc. Throughout the course of the litigation, the plaintiffs have withdrawn their underlying actions against Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., and, therefore, they are not participating in this appeal. On May 31, 2022, this court, sua sponte, ordered the parties to file memoranda giving reasons, if any, as to why this appeal should not be dismissed for lack of aggrievement as to any remaining defendant except Jones. On June 16, 2022, after reviewing the memoranda submitted by the parties, this court dismissed the appeal for all remaining defendants, except Jones, for lack of aggrievement. All references to the defendant in this opinion are to Jones only.

2 We note that the defendant briefed his claim on appeal as "whether the trial court abused its discretion and relied on clearly erroneous findings of fact when, after reviewing sworn statements from his physicians attesting that [the defendant] was too ill to attend a deposition, the trial court ordered [the defendant] to appear nonetheless; when [the defendant] obeyed his doctor's order, the court held [the defendant] in contempt absent any real findings of fact?" We interpret his claim to be twofold: the first claim being that the court abused its discretion in determining that his violation of the court's orders to attend the deposition was wilful, and the second claim raising a due process violation due to the court not requesting additional information from his physicians at the contempt hearing. We will address these claims in that order.

3 The present appeal relates to the plaintiffs' joint motion for contempt only. A separate appeal on the merits of the consolidated cases is currently pending before this court.

4 The letter submitted under seal was a note from the defendant's physician, Benjamin Marble. The court marked the sealed letter as an exhibit and conducted an in camera review of it. The defendant has not authorized the letter to be part of the court's open file. We have reviewed the contents of the letter, in camera, as part of our review of the record.

5 "A capias is a vehicle to compel attendance at a judicial proceeding. See *Pembaur v. Cincinnati,* 475 U.S. 469, 472 n.1, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) ('[a] capias is a writ of attachment commanding [an] official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt'); *DiPalma v. Wiesen,* 163 Conn. 293, 298, 303 A.2d 709 (1972) ('[i]f one is not warranted in refusing to honor a subpoena and it is clear to the court that his absence will cause a miscarriage of justice, the court [is permitted to] issue a capias to compel attendance'). As one court has noted, 'it is an extraordinary measure' … that involves the arrest of the witness in question. See General Statutes § 52-143 (e)." (Citation omitted.) *State v. Shawn G.,* 208 Conn. App. 154, 176–77, 262 A.3d 835, cert. denied, 340 Conn. 907, 263 A.3d 822 (2021).

6 The defendant represents that Dr. Offutt's letter was a sworn statement, signed under oath. Dr. Offutt's letter, however, only includes the notary's stamp of acknowledgement and is not a verification that the letter is a sworn statement. "[A]n acknowledgement is a public declaration or a formal statement of the person … that the [signing of the document] was his free act and deed. … A verification, on the other hand, is a sworn statement of the truth of the facts stated in the [document] verified. It always involves the administration of an oath." (Internal quotation marks omitted.) *Stone-Krete-Construction, Inc. v. Eder,* 280 Conn. 672, 680, 911 A.2d 300 (2006); see also General Statutes § 3-94a (1) and (3). Dr. Offutt's letter does not contain a

Downloaded from vLex by Nikhil M



jurat; see General Statutes § 3-94a (1) and (3); or a verification that the notary administered an oath; see General Statutes § 3-94a (1), (3) and (4); and, therefore, the letter is not a sworn statement.

7The affidavit from Dr. Marble, dated March 23, 2022, which also includes information on his background and credentials, states in relevant part: "On March 21, 2022, I was so alarmed by my personal observations of [the defendant's] physical health that I conducted a physical examination of him. … Based on that assessment, I immediately advised [the defendant] to go to an [e]mergency [r]oom or call 911…. [The defendant] refused to do so. … I then advised him to stay at home and rest until further medical testing could be conducted. It is my understanding that [the defendant] has not remained home as advised. … I then arranged for [the defendant] to have a comprehensive medical workup, to be conducted by Dr. Amy Offutt—of Marble Falls, Texas. … [The defendant's] medical testing with Dr. Offutt was scheduled for this morning—March 23, 2022…. Based on my communications with Dr. Offutt's office, subsequent to [the defendant's] initial evaluation and testing, I stand by my recommendation that [the defendant] neither attend a deposition nor return to work until the test results are completed and returned. … In my opinion [the defendant] stands at serious risk of harm if he submits to stressors."

In a letter, dated March 23, 2022, Dr. Offutt made the following representations: "This morning, I had a medical visit with [the defendant] for acute medical issues that were time-sensitive and potentially serious. We started a comprehensive medical evaluation and he has labs that are pending to assess his … status. I have asked him to avoid too much stress until we have results from the blood tests this morning. I also gave him [emergency room] precautions if he develops escalating symptoms. As a result of these findings, I am advising him not to attend court proceedings for now."

8We note that, in the plaintiffs' motion for contempt, they alleged that, on March 25, 2022, the defendant went back on the air from his studio and told his audience that he had been suffering from an emergent medical condition that turned out to be "a blockage in his sinus," and now that the blockage has cleared, he "feels like a new person."

9The record reflects that, on the day the defendant filed the petition at the Supreme Court, the clerk returned his petition without consideration of its merits. The defendant did not subsequently file anything further regarding this public interest appeal.

10We do not consider this appeal to be moot even though the defendant has been purged of contempt and the fines have been returned because the contempt finding may have collateral consequences for the defendant in the future. See *Medeiros v. Medeiros,* 175 Conn. App. 174, 196, 167 A.3d 967 (2017) ("[w]e recognize that an appeal challenging the validity of a court's finding of contempt, even when purged by making payments, is not moot because a contempt finding has collateral consequences in that it may impact the contemnor's future status in the action").

11The defendant also argues that the court "relied on clearly erroneous findings of fact" when it found him in contempt after reviewing medical evidence from his physicians. Although it is unclear exactly what erroneous findings of fact the defendant believes the court relied on when making its contempt finding, we consider this to be in reference to the court's conclusion that his noncompliance was wilful.

12At oral argument before this court, the defendant's appellate counsel acknowledged that the trial court's orders were clear and unambiguous and that the defendant did not attend the deposition.

13In his appellate brief to this court, the defendant specifically describes the gravamen of his due process claim to be that the trial court cannot "run roughshod over the unrebutted advice of a physician," and to do so "places litigants in the uncomfortable position of having to choose between their health and a judge's ire." Further, "[b]efore a judge makes a decision that countermands a doctor's orders, minimal due process

Downloaded from vLex by Nikhil M



requires that something more than what took place here occur."

14 In *Esposito,* our Supreme Court held that, "in certain circumstances, the privileged psychiatric records of a witness testifying for the state are subject to in camera review by the trial court so that the court can determine whether the accused's constitutional right of confrontation entitles him to access to those records; if the witness refuses to authorize such review, the witness' testimony generally must be stricken." *State v. Fay,* 326 Conn. 742, 744, 167 A.3d 897 (2017).

15 "Under *Golding,* a party can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation … exists and … deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. [We are] free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances. … The test set forth in *Golding* applies in civil as well as criminal cases." (Internal quotation marks omitted.) *Tilsen v. Benson,* 347 Conn. 758, 787 n.15, 299 A.3d 1096 (2023). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two … involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State v. Armadore,* 338 Conn. 407, 437, 258 A.3d 601 (2021).

16 We note that the defendant's disparaging remarks concerning the fairness of the trial court, namely, the court's "high-handed rejection of [the] medical evidence" and its transfer of its "general disdain" of the defendant to his physicians, lack any support in the record.

17 Our Supreme Court has articulated that "[t]he American legal system historically has been considered more adversarial than most, and its basic principle is that the parties, not the judge, have the major responsibility for and control over the definition of the dispute. … The justifications for the adversarial system are that self-interested adversaries will uncover and present more useful information and arguments to the decision maker than would be developed by the judicial officers in an inquisitorial system … the system preserves individual autonomy and dignity by allowing a person the freedom to make his case to the court … and a party who is intimately involved in the adjudicatory process and feels that he has been given a fair opportunity to present his case . is likely to accept the results whether favorable or not . In addition, requiring parties to frame the issues promotes judicial economy, efficient resolution of disputes, and finality …. Finally, it has been argued that the adversarial system promotes judicial neutrality and the integrity of the adjudicative process itself …" (Citations omitted; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc. v. Brown & Brown of Connecticut, Inc.,* 311 Conn. 123, 146–47, 84 A.3d 840 (2014). Indeed, the defendant's claim would subvert the adversarial process, by imposing an affirmative duty on the court to buttress evidence proffered by one party that it found inadequate.

**Prepared By:**

**Sameer Somal, CFA**

**CEO, Blue Ocean Global Technology**