## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-21417

KEVIN O'LEARY,

Plaintiff,

v.

BENJAMIN ARMSTRONG,

Defendant.

_____/

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Kevin O'Leary ("O'Leary") respectfully submits the following proposed findings of fact and conclusions of law for the Court's consideration.

### PLAINTIFF'S PROPOSED FINDINGS OF FACT

#### A. Procedural History

Plaintiff filed this case on March 26, 2025. ECF No. 1. On March 28, 2025, a process server served Defendant Armstrong with the Summons and Complaint, as evidenced by the Return of Service. ECF No. 5. Pursuant to that service date, Armstrong's deadline to respond was April 18, 2025. *Id*. On April 21, 2025, following a *sua sponte* review of the docket, the Court noted Armstrong's failure to timely respond and ordered him to respond no later than April 25, 2025. ECF No. 6. The Court further noted that "[f]ailure to do so may result in appropriate sanctions, including the entry of default." *Id.*

That same day, the Clerk docketed a letter from Armstrong addressed to the Clerk's Office. ECF No. 7. In the letter, Armstrong requested a continuance, stating he was currently incarcerated

1

in Cobb County, Georgia for a period of 70 days.[1] *Id.* He further indicated that, upon release, he planned to enter a "mental health facility" and then reside at 462 Fincher Road, Canton, GA 30114. *Id.* The Court granted Armstrong's request and extended the deadline for his Answer or response to May 2, 2025. ECF No. 8. The Clerk was directed to mail a copy of the Order to 462 Fincher Road, Canton, GA 30114. *Id.* The following day, the Clerk filed a notice confirming compliance with the Court's mailing instructions. ECF No. 9.

On May 6, 2025, Plaintiff brought a motion for clerk's entry of default. ECF No. 12. The Clerk entered a default on that same date. ECF No. 13. Plaintiff mailed both the Clerk's Default and this Court's Order on Default Judgment Procedure to Defendant at two of his last-known addresses.

On June 5, 2025, Plaintiff moved for entry of a final default judgment against Defendant and served him with the motion. ECF No. 15. Defendant failed to respond to that default motion, and in July, the Court granted the motion as to liability on the six defamation *per se* counts (Counts I-VI) and the single Publication of Private Facts Count (Count VI). ECF No. 16. The Court scheduled an evidentiary hearing to determine damages. *Id.* at 13. That hearing occurred on October 30, 2025. ECF No. 24. Defendant did not appear. Ex. 11 (Transcript of October 30, 2025 Evidentiary Hearing to Determine Damages, hereafter "Hr'g Tr.").[2]

---

[1]      Armstrong was arrested for issuing threats against a judge presiding over a case involving him in Cobb County Superior Court, Georgia. *See* https://www.law.com/dailyreportonline/2025/03/26/crypto-influencer-arrested-over-threatening-emails-sent-to-georgia-judge/

[2]      At the hearing, Plaintiff submitted Trial Exhibits 1–10, which appear on the docket at ECF Nos. 25-1 through 25-10. For consistency, the additional exhibits attached to these proposed findings are numbered beginning with Exhibit 11.

### B. The Parties

Plaintiff O'Leary is an internationally renowned entrepreneur, investor, and television commentator. Complaint at ¶ 1.[3] He first found success as a founder of The Learning Company, a company that sold software programs for math and reading. H'rg Tr. at 11:10-13. He sold The Learning Company to Mattel in the early 2000s and has been investing in hundreds of businesses since then in all 11 sectors of the economy. *Id.* at 12:2-10. O'Leary later became widely known for his role on the television show *Shark Tank*, where he and the other Sharks evaluate and invest in a range of emerging and start-up businesses. *Id.* at 12:11-22. Around that same time, he started appearing on American television networks as a frequent contributor on "business affairs, policy, and technology." *Id.* In addition to his investing activities and television work, O'Leary also serves as a keynote speaker for major financial institutions. *Id.* at 14:19-20. O'Leary's social media presence spans 11.1 million followers, a substantial portion of whom are entrepreneurs. *Id.* at 13:17-25.

O'Leary filed this case against Defendant Ben Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods calling O'Leary a murderer and claiming O'Leary "paid millions to cover" up his role in a murder. Compl. ¶ 1. These posts were intended to destroy O'Leary's reputation. *Id.* at ¶¶ 23-137.

In 2019, O'Leary and his wife were involved in a tragic boating accident in which their vessel struck another boat, resulting in two fatalities. *Id.* at ¶ 43. O'Leary was not operating the boat at the time and was never charged with any violation of law. *Id.* His wife, Linda O'Leary,

---

[3]     By his default, Defendant admits the well-pleaded allegations in the Complaint. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987) (effect of default judgment is that Defendant "admits the plaintiff's well-pleaded allegations of fact …").

was charged with careless operation of a vehicle, but after a 13-day trial she was fully exonerated. *Id.* at ¶¶ 43–54. The court found that the other vessel had been operating without its lights on. *Id.*

The accident—and the unfounded allegations that Linda had engaged in wrongdoing—had a significant negative impact on O'Leary and his family. Hr'g Tr. at 18:4-23. In the aftermath, and before Linda's exoneration, O'Leary's speaking engagements "dried up," leaving him with virtually no income. *Id.* at 16:1-14. Production of his primary television program, *Shark Tank*, was paused for "six months," effectively putting his entertainment career on hold. *Id.* Following the trial, O'Leary and his wife spent years working to move past the tragedy. *Id.* at 25:24-26:9.

Yet, as detailed below, Armstrong's March 2025 posts sought to reopen these painful events by resurrecting false allegations that O'Leary murdered a couple and paid millions to cover it up.

Turning to Defendant Armstrong—Armstrong is a formerly prominent crypto influencer who once ranked among the most popular cryptocurrency personalities on X and YouTube, drawing more than a million followers with his promotional content and lavish lifestyle. At the height of his online presence, he amassed over 3.3 million followers across his social media platforms. Compl. ¶¶ 15-22.

Armstrong's public standing began to unravel in August 2023, when he was removed from his own production company, HIT Network, following allegations of misconduct and violent behavior at the office. *Id.* In the months that followed, Armstrong experienced significant financial setbacks, and his wife filed for divorce. *Id.* at ¶ 19. His reputation deteriorated further as additional accusations—including workplace harassment and disputes with former business partners—became public. *Id.*

**C.  Armstrong's Documented History of Aggressive and Inappropriate Conduct Towards Members of the Legal System.**

Armstrong also has a history of aggressive and inappropriate conduct toward the legal system more broadly. In the period immediately preceding the defamatory posts at issue, he repeatedly launched hostile attacks against the lawyers and judges involved in litigation in which he was a party.

For example, in 2023, Armstrong was named as a defendant in a class action filed in this district arising from his promotion of the FTX cryptocurrency platform. Ex. 3.[4] Shortly after being sued, Armstrong lashed out at the lead plaintiff's lawyer, Adam Moskowitz, in a series of posts on X. Ex. 3 at 6. In one post, Armstrong wrote, "Adam Moskowitz is literally a walking piece of human garbage." In another X post, he warned: "There is only one person who better be careful and it's Adam Moskowitz. I've already told him privately. YOU DO NOT GET TO MAKE LIES UP. You will be held accountable." *Id.* at 52.

Moskowitz also received a voicemail at his office containing threatening language: "You're choosing a war with an anonymous community while you yourself are not. Only a couple of bitcoins get you and your family shot. Please be careful. These people are dangerous and you have provoked them." *Id.* at 48.

Judge Melissa Damian ordered Armstrong to appear at a show-cause hearing to address his behavior; he failed to appear at the first hearing. Ex. 4 at 6:8-23. At the hearing, attorney Adam Moskowitz testified under oath that he feared for his safety and the safety of his family. *Id.* at 12:17–13:1. After considering the evidence of Armstrong's communications directed toward Moskowitz, Judge Damian observed that the evidence in the record was "concerning and

---

[4]     At the October 30, 2025 hearing, the Court admitted into evidence Exhibits 1-10. H'rg Tr. at 21:1-5.

disturbing" (*id.* at 21:7–16), and she ordered "a referral to the FBI because I think that we have crossed the line into criminal conduct here. That's my view of the evidence that I have been presented with today." *Id.* at 17:3-8.

Armstrong eventually appeared before Judge Damian a few days later for the show cause hearing. Ex. 5. After Armstrong addressed the Court, Judge Damian discharged the show cause order but warned Armstrong to cease the threatening communications: "So with that said, we will issue an order discharging the show cause order and ceasing the need for contempt proceedings … [Y]ou've been admonished and ordered not to issue any threatening or harassing communications. I would also admonish you that you might want to let your followers know – I know you have a lot of them – it runs to them too. They can't do it either, right." *Id.* at 24:7-20.

A few years later, in 2025, Armstrong had pending suits before Judge Kimberly Childs in Georgia state court. Ex. 6. During these proceedings, in early March 2025, Armstrong sent expletive-laden and threatening messages to Judge Childs via email. *Id.* In one message, he told the Judge "F*** you corrupt c*** I will never step foot inside a courtroom with your Oompa Loompa lookin a** bi*** Thank you, Ben Armstrong." *Id.* at 3. In another message, he emailed the same judge and said "I'm going to be emailing your [sic] quite frequently b**** … You are F*****. And this berating WILL NOT STOP until you yourself are locked up b****." *Id.* at 4. Based on these messages, Armstrong was ordered to be arrested and serve a 70-day sentence. Ex. 7; Ex. 8.

Plaintiff served Armstrong while Armstrong was incarcerated in Florida and in the process of being extradited back to Cobb County, Georgia where he was set to serve a "70-day sanction." Ex. 9; ECF No. 7.

**D. Armstrong Defames O'Leary and Publicly Discloses His Private Cell Phone Number.**

Shortly after sending expletive-laden messages to Judge Kimberly Childs, Armstrong spent roughly a week in late March 2025 posting on X, accusing O'Leary of murder and asserting that he paid millions to conceal his alleged involvement. Compl. at ¶¶ 23-24. Thousands of people viewed and liked those posts. *Id.* at ¶¶ 62, 74, 98, 110, 122. Armstrong escalated his harassment campaign by releasing O'Leary's private cell phone number and urging his followers to "call a real life murderer." *Id.* at ¶ 3. That tweet—disclosing O'Leary's cell phone number—resulted in Armstrong being temporarily suspended from Twitter for 12 hours. *Id.* at ¶¶ 35-36. Nevertheless, he continued to post defamatory content afterward. *Id.* The posts that are the subject of the seven counts are laid out below.

| Date and Time | Post | Count |
|---|---|---|
| March 17, 2025 at 8:49 AM | "You guys think I'm kidding about all this stuff and all these claims. There is a reason my life is actually in danger. Kevin O'Leary has already verifiably murdered one couple in Toronto." | Count I (Defamation *Per Se*) |
| March 19, 2025 at 12:32 PM | "Doesn't everybody think it's weird that I've been publicly calling both @gordonlawltd & @kevinolearytv murderers and yet not a single word or legal action? It's almost like they 'can't' because a lawsuit would open up their actual crimes and they know it." | Count II (Defamation *Per Se*) |
| March 19, 2025 at 12:42 PM | "Have you ever wanted to call a real life murderer?! You can NOW! @kevinolearytv is waiting for your call." In this post, Armstrong released O'Leary's private cell phone number. | Count III (Defamation *Per Se*)<br><br>Count VII (Publication of Private Facts) |

|  |  |  |
|---|---|---|
| March 20, 2025 at 11:32 AM | "That's right guys – I was forced to delete the murderer @kevinolearytv's phone number by X. I was in X jail for 12 hours. Meaning I guess I'm an X-Con now." | Count IV (Defamation *Per Se*) |
| March 20, 2025 at 12:27 PM | "Hey how is another free day @kevinolearytv? Do you ever think [of] the couple you murdered?" | Count V (Defamation *Per Se*) |
| March 21, 2025 at 8:55 AM | "Daily reminder that @kevinolearytv and his wife Linda O'Leary murdered a couple and paid millions to cover it up. Not a single cease and desist has been sent to me Kev. Wonder why?" | Count VI (Defamation *Per Se*) |

Just minutes later, in a final post, Armstrong said "Hey @kevinolearytv, what in the f*** are you going to do with me? You can't sue me. You can't stop me. You can't shut me up. I'm a rabid dog with my teeth sunk deep into your leg." Compl. at ¶ 39.

### E. Plaintiff Endures Significant Harm Following Defendant's Defamation and Public Release of His Private Cell Phone Number.

As an internationally renowned entrepreneur, investor, and television commentator, O'Leary testified that his reputation is invaluable to him. Hr'g Tr. at 11:3-5. O'Leary explained that television networks and event organizers will not invite him to appear if they have any doubts or concerns about his background. *Id.* at 15:1-17. It is not only his own financial well-being that is at stake. O'Leary testified that his television and speaking-engagement work supports more than "20 families," generating millions in annual revenue—income that would vanish if he were no longer invited to speak, appear on television, or endorse products. *Id.* at 13:17-14:10. In O'Leary's

words, his team "has a stake in [his] reputation, and they let [him] know it everyday." *Id.* at 15:16–17; 37:14-17.

O'Leary testified that he first became aware of Armstrong's posts while he was on air at Fox News on a show called *The Big Money Show. Id.* at 18:12-23. He explained that the posts had an immediate and significant impact on him. *Id.* O'Leary further testified that, as part of the show, he wore an earpiece through which producers communicated with him in real time. *Id.* at 20:12–17.

When Armstrong first made the posts and released O'Leary's private cell phone number, the posts went "viral," and the producers immediately began asking him questions via his earpiece—including whether he had been accused of murder and whether he was withholding information about an alleged murder from them. *Id.* at 22:18–23:21. The allegations in the posts were quickly elevated to the Fox "executives," and O'Leary was forced to defend himself against them. *Id.*

Because his private cell phone number had been released, O'Leary's phone began "lighting up" in the middle of the show. *Id.* at 23:18-21. Fox executives also became concerned about his security, as well as the safety of the other guest hosts on *The Big Money Show. Id.* at 23:9-13.

And it was not only Fox that had questions in the immediate aftermath. O'Leary's PR team, including Nancy Cheung, received calls from his business partners and partner television networks, all inquiring about the allegations. *Id.* at 24:11-19.

In the weeks and months that followed, O'Leary testified that Armstrong's posts and the disclosure of his phone number significantly affected him, both in his professional endeavors and in his personal life.

First, O'Leary has been inundated with inquiries from his business partners and television network partners regarding Defendant's allegations that O'Leary was a murderer and paid millions to cover it up. Hr'g Tr. at 31:12-32:23. He has had to devote significant time and effort to discussing these false accusations with his partner networks. *Id.* For example, O'Leary is a hired spokesperson for Start Engine, whose representatives questioned him about the accusations and told him it "isn't good for business." *Id.* at 33:9-10. Further, whenever anyone conducts due diligence on him for potential work, he has needed to address the allegations. *Id.* at 35:11–14.

O'Leary further testified that it is difficult to measure the full effect of Defendant's posts on his business relationships because "what we don't know is how many people see [the posts], and say, let's just stay away from this. [O'Leary] is just too controversial." *Id.* at 34:5-9. But he also explained that one need not speculate about whether an accusation of involvement in a murder could harm his business. *Id.* at 16:1-14. When the accident occurred, and before his wife was exonerated, O'Leary credibly testified that his professional life was on hold for "18 months" while the matter proceeded through the court system. *Id.*

Second, O'Leary testified that since Armstrong made the posts, he has been forced to change his approach to security. Armstrong has "a lot of very energetic" followers on social media. Hr'g Tr. at 20:5-7; *see also* Ex. 3 at 48 (noting that one follower left a voicemail with a lawyer's office who sued Armstrong, stating: "You're choosing a war with an anonymous community while you yourself are not. Only a couple of bitcoins get you and your family shot. Please be careful. These people are dangerous and you have provoked them."). O'Leary testified that Armstrong's labeling him as a murderer and encouraging his followers to call him caused him "100 percent" concerns about his security and personal safety. Hr'g Tr. at 29:19-22.

O'Leary explained that, since the posts, none of his colleagues at places like CNN and Fox want to walk out the door with him. *Id.* at 30:2-13. He also testified that, per Fox's instructions, he no longer enters or exits through the main entrance and instead has a car waiting for him at a side door. *Id.* O'Leary further stated that he no longer walks alone in most cities, instead hiring security: "I mean, you don't realize how much you like to just walk by yourself until you can't do it anymore. Like, that's – which is what this guy has done to me." *Id.* at 30:17–23. He estimates that he now spends an additional $200,000 per year on security, and noted that even his staff believes he should have more protection than he currently does. *Id.* at 30:14-31:4.

O'Leary's security concerns are not speculative; they are grounded in the fact that Armstrong has threatened lawyers and judges, and that his supposed followers have left threatening messages for individuals with whom Armstrong is in dispute. Ex. 3 at 49; Ex. 6. His fears also stem from the fact that many callers have bombarded his personal cell phone in a "rabid" manner, demanding to speak to a murderer. Hr'g Tr. at 27:14-24.

Third, the defamatory material has caused mental anguish to O'Leary and those close to him. His family believed they had put the traumatic boating accident behind them, but the posts have reopened old wounds. *Id.* at 18:12-13. Both his wife and his children have had to confront the posts, and O'Leary has had to spend considerable time dealing with the emotional anguish the posts have caused his family. *Id.* at 25:6-14; 35:8-14.

Fourth, Armstrong, without permission, released O'Leary's private cell phone number, which has caused him significant harm. *Id.* at 27:6–29:17. O'Leary testified that he received hundreds of calls from individuals he did not know after Armstrong disclosed his number. *Id.* Many times, he answered believing it was a business associate, only to be met by some "rabid" individual calling him a murderer. *Id.* at 27:17–24. O'Leary testified that he continues to receive such calls.

*Id.* He has had to block more than 100 numbers from callers he does not know. *Id.* at 28:5-24; Ex. 2 (list of blocked numbers through Verizon). O'Leary further testified that he cannot change his cell phone number because all of his important business and government contacts use that number, and it is part of his "DNA" now. *Id.* at 29:4-11.

### F. Expert Testimony on Damage to O'Leary's Reputation and a Rehabilitation Campaign.

At the October 30, 2025 hearing, the Court heard expert testimony from Sameer Somal, who addressed online reputation management and reputation damages. Somal testified that the damages he analyzed fell into two primary categories—reputation damages and rehabilitation damages. Hr'g Tr. at 44:13-23. He emphasized that he was not assigning any value to mental anguish or punitive damages, as those determinations are for the Court, as fact finder, to make. *Id.* at 44:24-45:14.

Somal testified that the posts "absolutely harmed" O'Leary's reputation. *Id.* at 44:13-23. He explained that "[b]ecause Mr. O'Leary has a degree of known presence, [the defamatory material] actually has an outsized impact on his life and his ability to live a normal life personally speaking as well as professionally." *Id.* at 46:11-17. Somal also testified about the lasting nature of the harm, noting that the permanence of internet content, and the proliferation and durability of information within large language models, means that O'Leary will likely have to confront Armstrong's defamatory content for the "rest of [his] life to some degree no matter what." *Id.* at 47:6-14.

To quantify the reputational harm from the defamatory posts, Somal used what he described as an "ultraconservative" methodology known as the "three rings." *Id.* at 48:3-17. Under this approach, he categorized the individuals affected by the posts into three groups: (1) close friends and family, (2) acquaintances, and (3) those aware of O'Leary without having a close connection

to him. *Id.* at 49:1-15. To apply this analysis, he reviewed the documented number of public views of the defamatory posts on X—approximately 156,000. *Id.* at 49:16-50:16. He described this approach as conservative because it excluded the many millions of individuals who may have heard about the posts indirectly through O'Leary's extensive social media presence, focusing only on the documented public views. *Id.*

Somal then further discounted the 156,000 figure to 10 percent—15,600 unique viewers—to account for possible repeat views. *Id.* He testified that he would be comfortable multiplying that number by 20, but used the 15,600 figure because it was "ultraconservative." *Id.* at 50:20-51:5. Relying on academic studies, he then applied a $5-per-fan value to quantify reputational harm. *Id.* at 51:9-23. Using that approach, Somal concluded that the posts caused $78,000 in reputation damage.

Somal also noted that this figure does not capture potential lost business opportunities. He testified that the proliferation of the negative posts likely cost O'Leary business opportunities, and that even a single lost opportunity could have been worth "several million dollars"' *Id.* at 53:4-7.

In addition to the rings-of-harm analysis, Somal also "pressure-tested" whether the posts had altered O'Leary's online narrative. *Id.* at 50:20–51:5. He concluded that they had. *Id.* As an example, Somal recounted that a business colleague, upon learning he was testifying for O'Leary, asked whether he was "testifying in the murder trial," demonstrating that Armstrong's posts had generated a false public narrative linking O'Leary to wrongdoing. *Id.* at 56:10-57:4.

Finally, Somal testified about rehabilitation damages, estimating the cost of an online campaign aimed at removing negative content and publishing positive, truthful information about O'Leary. *Id.* at 53:16-56:5. Drawing on his experience developing and executing online reputation repair campaigns for individuals and businesses, *id.* at 41:4–9, Somal concluded that an 18-24

13

month campaign costing between $800,000 and $1.2 million would be required to correct and counteract Armstrong's false posts. *Id.* at 53:16–56:5. His conclusion was based on the unique "challenge" of countering the word "murderer" online and combating the ongoing reposting of negative content. *Id.*

<u>**PLAINTIFF'S PROPOSED CONCLUSIONS OF LAW**</u>

**A.  Applicable Law on Damages**

Under Florida law, a wronged party is not required to demonstrate the amount of damages sustained with mathematical certainty. As the Supreme Court of Florida held, "[t]he law guarantees every person a remedy when he has been wronged … [w]hen the wrong is shown it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so." *Fla. Pub. Utilities Co v. Wester*, 150 Fla. 378, 382 (1942); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person … it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Where the plaintiff's damages are difficult to quantify, "the damages rule must be flexibly applied so as to provide fair compensation under the circumstances of the specific case." *Slip-N-Slide Recs., Inc. v. TVT Recs.*, LLC, No. 05-21113-CIV, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007).

Florida courts also recognize the principle that, "the risk of uncertainty in calculating damages falls on the wrongdoer." *ME Tech., Inc. v. Brownstein*, No. 20-61508-CIV, 2020 WL 7211694, at *5 (S.D. Fla. Nov. 13, 2020), *report and recommendation adopted*, No. 20-61508-CIV, 2020 WL 7187740 (S.D. Fla. Dec. 7, 2020); *see also Story Parchment*, 282 U.S. at 563 ("The

wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible, if the case, which he alone is responsible for making, were otherwise.").

### B.  General Damages for Defamation *Per Se*

Under Florida law, a court may award general damages to the victim of defamation to compensate him for the reputational damage and the mental anguish caused by the defamation. *See Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (under Florida law, an injured party may recover general damages "resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering); 19A FLA. JUR. 2D DEFAMATION AND PRIVACY § 127 ("When a libel is calculated to humiliate or injure a person's reputation or character, the law infers general damages for injuries to his or her feelings and reputation."). A plaintiff may recover such general damages "even if there is no evidence that assigns an actual dollar value to the injury." *Lustig v. Stone*, No. 15-20150-CIV, 2015 WL 13326350, at *2 (S.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, No. 15-20150-CIV-2015, WL 13326383 (S.D. Fla. Dec. 7, 2015), *aff'd*, 679 F. App'x 743 (11th Cir. 2017). Because the reputational and emotional harms addressed through general damages are inherently difficult to quantify, Florida courts have recognized that "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1260.

### C.  In a Defamation Per Se Case, Reputation Repair Damages are General, not Special, Damages.[5]

---

[5]     At the October 30, 2025 hearing, the Court requested Plaintiff to cite legal authority addressing whether rehabilitation damages may be awarded in a defamation *per se* case before they are actually incurred. In this section, Plaintiff explains that the cost of a reputation repair

Florida law recognizes two categories of compensatory damages for defamation: general and special. The difference was summarized in *Blythe v. Fifth Third Bank*:

> General damages are those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander. They are allowable whenever the immediate result is to impair the plaintiff's reputation, *although no actual pecuniary loss is demonstrated*. When the defamatory statements are per se, general damages are presumed. By contrast, [t]he chief characteristic of special damages is a realized or liquidated loss.

2010 WL 11432601, at *6 (M.D. Fla. Jan. 19, 2010) (internal quotations omitted and emphasis added). Because this Court has already found defamation *per se*, O'Leary is presumed to have suffered general damages as a matter of law, and the costs of a repair campaign are correctly treated as general damages in a defamation *per se* case.

In federal defamation *per se* cases, judges have found that the cost of a reputational repair campaign are allowed *before* the defendant incurs the cost of the campaign. For example, in *Ludwin v. Proman*, a case in this district, defendant claimed that plaintiffs were not "entitled to reputation repair costs as damages" in a defamation *per se* case. 2023 WL 315909, at *2 (S.D. Fla. Jan. 19, 2023). The court rejected that argument, permitted Mr. Somal to testify regarding the costs of a reputation repair campaign, and concluded that his testimony about the estimated cost of such a campaign "will assist the trier of fact **in understanding potential damages for Plaintiffs' defamation per se claims in particular.**" 2023 WL 315909, at *2 (emphasis added); *see also Menge v. Ash-Shafii*, No. 23-11339, 2025 WL 2058320, at *1 (E.D. Mich. July 22, 2025) (allowing Somal to testify about the estimated cost of restoring plaintiff's online reputation in a defamation *per se* case before the costs had been incurred).

---

campaign may be recovered as general damages in a defamation *per se* action even if those costs have not yet been incurred.

Courts in other federal jurisdictions have likewise recognized that unincurred reputational repair campaigns or marketing plans may serve as credible evidence of general damages in defamation *per se* cases, offering persuasive guidance for the present matter. For example, in *Carroll v. Trump*, Judge Kaplan upheld a jury award that included the estimated and unicurred cost of a "reputation repair program" proposed by an expert witness, even though the campaign had not yet been implemented. 683 F. Supp. 3d 302, 322 (S.D.N.Y. 2023). In that case, the expert testified that the cost to undertake a reputation repair management plan for plaintiff would be between $368,000 and $2.7 million. *Id.* at 317. The jury verdict sheet specifically bifurcated defamation damages between those reputational damages excluding the program and those attributable to the repair program itself, and the jury ultimately awarded $1.7 million for the yet-to-be incurred reputation repair campaign in addition to $1 million in compensatory damages for other reputational harm. *Id.* at 322, 332.

Similarly, in *White Cap, L.P. v. Mowers*, a federal court in the Eleventh Circuit awarded damages for a proposed marketing plan designed to address reputational harm resulting from defamatory statements, explicitly stating that the unincurred cost was "properly awarded as general damages." 2022 WL 35594, at *4 (N.D. Ga. Jan. 3, 2022). And finally, in another recent defamation *per se* case, Judge Howell upheld a jury award in a defamation *per se* case that awarded plaintiffs as "compensation for reputational harm" an "expert's calculation of the cost of repairing their reputations" before the repair campaign was undertaken. *Freeman v. Giuliani*, 732 F. Supp. 3d 30, 41.[6] These cases demonstrate that expert testimony regarding the estimated cost of restoring a

---

[6]     New York, Georgia, and D.C.'s defamation causes of action do not differ in any relevant way from Florida's where harm is presumed in a defamation *per se* case. *See Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) ("Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special

plaintiff's reputation is a permissible and persuasive measure of general damages (where loss is presumed and need not be first realized) in a defamation *per se* case.

Additionally, in the analogous Lanham Act context—where courts exercise broad remedial discretion like they do in the defamation *per se* context—the Eleventh Circuit has confirmed that plaintiffs may recover the costs of ***proposed***, corrective advertising programs intended to repair harm to a business's reputation caused by defamatory statements.[7]

To the extent the Court may be focused on the proposition in *Sirer* that "special damages include actual expenditures by a plaintiff to repair his or her reputation," 2023 WL 3166453, at *8, that language does not control here. *Sirer* simply recognized that actual expenditures to repair one's reputation may qualify as special damages in cases that require proof of such losses.

The cases cited for the above proposition from *Sirer* are distinguishable. Each involved causes of action that required proof of special damages as an element of the claim. In *Daniels v. HSN, Inc.*, the plaintiff was required to bring a claim for defamation *per quod*, which—unlike defamation *per se*—requires proof of actual pecuniary loss. 2020 WL 533927, at *4–*5 (M.D. Fla. Feb. 3, 2020). Because the plaintiff had not actually incurred the claimed "digital reputation repair"

---

damages or per se actionability."); *see Eason v. Marine Terminals Corp.*, 309 Ga. App. 669, 672 (Ga. Ct. App. 2011) ("The four elements of the tort of defamation are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm."); *see Zimmeran v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017) ("A valid claim for defamation also requires a showing of legal harm (i.e., defamation per se) or special harm as a result of the publication.").

[7]       *See Aronowitz v. Health-Chem Corp.,* 513 F.3d 1229, 1241 (11th Cir. 2008) (affirming jury verdict awarding damages for corrective advertising despite objection that prevailing party had not "spent any money on corrective advertising."); *Ramada Inns, Inc. v. Gadsden Motel Co*., 804 F.2d 1562, 1564-65 (11th Cir. 1986); *PODS v. U-Haul*, 126 F. Supp. 3d 1263, 1283 (M.D. Fla. 2015) ("And significantly, this Circuit has accepted an estimate of future expenditures to support a jury's verdict of damages for corrective advertising.").

expenses, those damages were deemed unrecoverable. *Id.* at *6. *Thermolife International LLC v. Vital Pharmaceuticals, Inc.* involved a trade libel claim, which similarly required the plaintiff to allege "special damages proximately caused as a result of the published falsehood." 2020 WL 409594, at *2 (S.D. Fla. Jan. 24, 2020). And in *Jameson Land Co., LLC v. Mosaic Fertilizer, LLC,* a slander of title claim, the plaintiff's alleged expenses to counteract the false publication were treated as special damages because such a showing was necessary to sustain the claim. 2016 WL 7206122, at *2 (M.D. Fla. Feb. 5, 2016).

None of those cases involved a defamation *per se* claim like the present one, in which general damages are presumed and no proof of realized loss is required. The reasoning of those cases therefore does not limit this Court's discretion to consider the cost of a proposed rehabilitative campaign as evidence of general damages. The campaign is not sought as reimbursement for an incurred expense, but as credible expert evidence quantifying the magnitude of the reputational harm suffered by O'Leary. Because the campaign reflects an expert's assessment of the amount necessary to redress O'Leary's loss—not to restore a business or asset, but to compensate for his personal and professional reputational harm—it squarely falls within the category of general damages presumed under Florida law in cases of defamation *per se*.

### D. General Damages: Mental Anguish Award

Here, Plaintiff's testimony establishes that he is entitled to general damages for the substantial mental anguish, humiliation, and emotional suffering caused by Defendant's defamatory accusations that he is a "murderer" and that he paid "millions" to conceal his involvement in a murder. Plaintiff testified that he has expended significant time and effort attempting to dispel these false allegations and to reassure his entertainment and business partners

of their falsity. Despite his repeated denials and the filing of this action, Plaintiff continues to field inquiries from current and prospective business partners regarding Defendant's false claims.

Plaintiff is further entitled to emotional damages because Defendant's conduct has forced him to repeatedly revisit a tragic event he believed had long been resolved. Moreover, the fear that Defendant—or Defendant's followers—may target him has become a persistent concern. This fear is neither speculative nor unfounded; it is supported by Defendant's history of misconduct, including sending threatening messages to attorneys and judges in other lawsuits.

On the basis of this evidence, an award of $750,000 is appropriate to compensate Plaintiff for the emotional damage caused by Defendant's misconduct. *See Sirer*, 2023 WL 3166453, at *8 (awarding $750,000 for, in part, emotional damages caused by defendant's assertion that plaintiff was affiliated with a terrorist organization); *Stone*, 2015 WL 13326350, at *4 (awarding $500,000 for, in part, mental anguish caused by defendant's defamatory accusations posted on the internet that labeled plaintiff a "terrorist" and "criminal"); *Osio v. Moros*, No. 21-20706-CIV, 2022 WL 4280499, at *10 (S.D. Fla. Sept. 5, 2022) (recommending award of $1 million where defendant, on television, accused plaintiff of plotting to assassinate political figure.).

### E.  General Damages: Reputation and Reputation Repair Award

Here, Plaintiff's testimony and that of his expert independently establish that he is entitled to general damages for the harm to his reputation. Plaintiff testified that his reputation is "everything" to his work as an investor, television commentator, and paid spokesperson. Expert Sameer Somal, using reliable and accepted methodologies, quantified the reputational harm in two ways. First, applying the rings-of-harm model and taking an ultraconservative approach, Somal estimated that the defamatory posts caused $78,000 in reputational damage. That figure, however,

does not account for the substantial corrective efforts required to counteract Defendant's false statements, which have proliferated online and been widely disseminated.

Somal's proposed rehabilitative campaign provides an appropriate measure of the compensation necessary to restore Mr. O'Leary's reputation. As Somal testified, an estimated cost of $800,000 to $1,200,000 represents the professional and financial resources—conservatively calculated—needed to remediate the reputational injury caused by Defendant's repeated and egregious accusations.

Based on this evidence, an award of $1,278,000 is warranted to compensate Plaintiff for the reputational harm resulting from Defendant's false assertions that he was a murderer who paid millions to conceal his involvement in the murder. *See Trump*, 683 F. Supp. 3d at 322 (upholding a jury award of $1 million in compensatory, defamation damages in addition to $1.7 million for a reputation repair program); *Giuliani*, 732 F. Supp. 3d at 41 (upholding jury awards totaling approximately $16 million in defamation damages, including the cost of a yet-to-be-incurred reputation repair program).

### F. Punitive Damages

Florida law permits the imposition of punitive damages on a defendant who acts with malice. "In a suit for libel or slander … upon some proof of the malicious character of the publication, a plaintiff may recover punitive damages, the purpose of which is not to compensate but rather to serve as a deterrent to others inclined to commit a similar offense." *Saunders Hardware Five & Ten, Inc. v. Low*, 307 So. 2d 893, 894 (Fla. 3d DCA 1974); *see also Carroll v. TheStreet.com Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *4 (S.D. Fla. May 25, 2012) ("It is well established that … presumed and punitive damages in a defamation action are recoverable

only if liability is based on proof of actual malice, i.e. knowledge of falsity or reckless disregard for the truth.").

Further, in defamation *per se* cases, "punitive damages may be the primary relief." *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010). Indeed, substantial punitive awards have been upheld even where "actual damages were absent or merely nominal." *Id.* at 729 n.28 (upholding $5 million punitive damages award where the jury awarded no compensation beyond presumed nominal damages). Punitive damages are also appropriate when necessary to deter "misconduct [that] cannot be tolerated in a civilized society and must be deterred by a strong message to [defendant] and other [potential bad] actors in the future." *Stone*, 2015 WL 13326350, at *6.

This Court has already held that the allegations in the Complaint, taken as true, plausibly allege that Defendant acted with actual malice and therefore support an award of punitive damages. ECF No. 16 at 10-12 (holding that the allegation that Defendant made the posts "with knowledge or reckless disregard as to the falsity of the statements" sufficiently pleads actual malice). By virtue of his default, Defendant has now admitted those allegations.

Accordingly, the Court should find that punitive damages are warranted. The Court is independently empowered to award punitive damages here because Defendant's statements—falsely asserting that Plaintiff was a murderer and paid millions to cover up a murder—are actionable *per se*. *Sirer*, 2023 WL 3166453, at *10 (collecting cases).

Punitive damages are especially justified in this case to send Defendant a clear and unequivocal message. His history of threatening and harassing communications directed at lawyers, judges, and prominent individuals, even after admonishment by a judge in this district, is reprehensible and grotesque. A strong punitive award is necessary to deter Defendant and others

who persist in such misconduct despite repeated warnings. While sending uncivilized and hostile messages to a judge in Georgia, Defendant simultaneously and deliberately spread defamatory and dangerous falsehoods about Plaintiff and encouraged his followers to harass and call Plaintiff directly. Nothing short of a substantial punitive award will convey that Defendant's pattern of misconduct has no place in a civilized society.

For these reasons, the Court should assess $2,000,000 in punitive damages against Defendant. *See Sirer*, 2023 WL 3166453, at *11 (awarding $2,000,000 in punitive damages where defendant spread dangerous falsehoods accusing plaintiff of terrorism); *Lawnwood*, 43 So. 3d at 725 (affirming $5,000,000 punitive award against hospital that maliciously destroyed a physician's reputation); *Rety v. Green*, 546 So. 2d 410, 421 (Fla. 3d DCA 1989) (holding that a $2,500,000 punitive award was appropriate where defendant maliciously destroyed plaintiff's reputation with false accusations of antisemitism).

## **CONCLUSION**

For the reasons stated above, the Court should award Plaintiff $750,000.00 for mental anguish damages, $1,278,000.00 for reputational damages, and $2,000,000.00 in punitive damages.

Dated November 17, 2025

Respectfully submitted,

**NEIMAN MAYS FLOCH & ALMEIDA PLLC**

By: **/s/**Brandon S. Floch
Jeffrey A. Neiman, Esq.
Florida Bar No. 544469
jneiman@nmfalawfirm.com
Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@nmfalawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2025, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system. I further certify that a copy of the document and all supporting materials was sent by U.S. Mail, postage prepaid, to Defendant at his last known addresses as follows:

Benjamin Charles Armstrong
462 Fincher Road
Canton, GA 30114-7637

By: */s/ Brandon S. Floch*

24