```
 1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                    CASE NO. 1:25-cv-21417-BB
 3

 4    KEVIN O'LEARY,                  Miami, Florida

 5          Plaintiff,               October 30, 2025

 6       vs.                         9:32 a.m. - 10:58 a.m.

 7    BENJAMIN ARMSTRONG,             Pages 1 to 72

 8          Defendant.

 9
                      TRANSCRIPT OF EVIDENTIARY HEARING
10                  BEFORE THE HONORABLE BETH BLOOM
                    UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    FOR THE PLAINTIFF:     BRANDON SCOTT FLOCH, ESQ.
                             JEFFREY NEIMAN, ESQ.
14                           MARCUS NEIMAN RASHBAUM & PINEIRO LLP
                             2 South Biscayne Boulevard
15                           Suite 2530
                             Miami, Florida 33131
16

17

18

19

20

21
                      STENOGRAPHICALLY REPORTED BY:
22              MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL
                         Official Court Reporter
23                    United States District Court
                      Southern District of Florida
24                      400 North Miami Avenue
                         Miami, Florida 33128
25              MaryAnn_Casale@flsd.uscourts.gov
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1
2

<u>I   N   D   E   X</u>

3

<u>WITNESS</u>                                                    <u>PAGE</u>

4

TERRENCE THOMAS KEVIN O'LEARY
  Direct Examination by Mr. Neiman                     10

5

6

SAMEER SOMAL
  Direct Examination by Mr. Floch                      40

7

8

9

10

<u>PLAINTIFF EXHIBITS</u>

11

<u>EXHIBIT NUMBER</u>                                      <u>RECEIVED</u>

12

  Exhibit No. 1                                         21
  Exhibit No. 2                                         21

13

  Exhibit No. 3                                         21
  Exhibit No. 4                                         21

14

  Exhibit No. 5                                         21
  Exhibit No. 6                                         21

15

  Exhibit No. 7                                         21
  Exhibit No. 8                                         21

16

  Exhibit No. 9                                         21
  Exhibit No. 10                                        21

17

18

19

20

21

22

23

24

25

1      (Call to the Order of the Court.)

2          THE COURT:  Good morning to everyone.  Go ahead and

3   have a seat.  How is everyone this morning?

4          If you will give me a moment to get into the

5   computer, we'll get started.

6          THE COURTROOM DEPUTY:  Calling civil Case

7   No. 25-21417, *Kevin O'Leary versus Benjamin Armstrong*.

8          Counsel, please state your appearances for the

9   record, beginning with plaintiff's counsel.

10          MR. NEIMAN:  Good morning, Your Honor.  Jeffrey

11   Neiman and Brandon Floch on behalf of Mr. O'Leary, who is

12   present in the courtroom.

13          THE COURT:  All right.  Good morning to each of you.

14          Before the Court for hearing is based on the Court's

15   order, which is ECF16.  Certainly, the Court notes that the

16   record reflects a default, but since the reputational damages

17   are unliquidated, at this time we'll proceed to a trial on the

18   issue of damages.

19          I do want to note that the Court has received Docket

20   Entry 25, an affidavit.  It's actually the declaration of

21   Brandon Floch in advance of the evidentiary hearing to address

22   damages.

23          Is that individual going to be present?

24          MR. NEIMAN:  He's here, Your Honor.

25          THE COURT:  All right.  Thank you.

1            MR. NEIMAN:   Essentially, those are just the

2    exhibits that we will be using during our presentation.

3            THE COURT:  All right.  Certainly.

4            Let me note that no one has appeared on behalf of the

5    defendant Armstrong, so at this point in time if you're ready

6    to proceed.

7            MR. NEIMAN:  Thank you, Your Honor.

8            And, Your Honor, if I may approach.

9            THE COURT:  Yes, of course.

10           MR. NEIMAN:  I'm just going to do a brief opening.

11   We're going to call Mr. O'Leary to the stand.  We're going to

12   call our damages expert to the stand.  And we'll address

13   whatever questions, obviously, the Court has in the process.

14           THE COURT:  Certainly.

15           MR. NEIMAN:  So, look, as the Court noted, we have a

16   default here.  The Court's already found defamation, per se.

17   The Court's already found malice.  We're simply here to

18   quantify the damages.

19           Our motion for default, I think, talked about

20   damages.  Today we're going to refine our actual request to

21   the Court.  We'll present all the evidence, and we're going to

22   ask the Court at the end of today's hearing to award about

23   $4 million in damages.  I break them down in the following

24   buckets.  And, again, we'll spend some time during the

25   hearing, kind of, addressing the reasons behind each bucket,

1    but we have about $78,000 in reputational damages.  We have

2    about $750,000 in emotional damages.  We have about

3    $1.2 million in rehabilitational damages.  And then we have

4    punitive damages.  We're asking for $2 million.

5          I want to focus or start with the punitive damages.

6    The defendant in this case has a history that I think the

7    Court needs to consider and take into consideration, and it's

8    part of what the exhibits are that we submitted to the Court.

9    He has a history of aggressive and inappropriate conduct

10   towards not just Mr. O'Leary, but the legal system in general.

11         In 2023 Mr. Armstrong was accused of harassing and

12   threatening a plaintiff's lawyer here in Miami, Mr. Moskowitz

13   actually, involving the FTX class action lawsuit.  He publicly

14   shared that lawyer's home address.  He left intimidating

15   messages and encouraged his millions of followers to protest

16   at the attorney's house.

17         In 2025 the same defendant, his legal troubles

18   escalated.  He was arrested in Florida on a warrant out of

19   Georgia for making harassing and threatening posts about the

20   Judge in his case there who was presiding over a family law

21   dispute.  And then it was almost immediately thereafter that

22   the same defendant's attack of my client, Mr. O'Leary, began

23   and commenced.

24         So I think when we, kind of, look at the totality of

25   the facts here -- and you're going to hear from Mr. O'Leary

1   about who he is and why his reputation is important and how he

2   makes a living on his reputation.  And the post in question

3   here brought up an old subject matter, primarily.

4   Mr. O'Leary's wife was involved in a boating accident.  There

5   was a death associated with the boating accident.  She was

6   acquitted of any charges.  She's been cleared of any

7   wrongdoing.

8          And the defendant went on social media.  There was a

9   series of about eight posts over about five days in which he

10  called Mr. O'Leary a murderer, accused him of covering up a

11  crime, posted his phone number on X for the world to see --

12  was it X or Twitter then?  I'm not exactly sure.  I think it

13  was X -- and basically said, If you want to talk to a real

14  murderer, now's your chance, call him.

15         So you're going to hear from Mr. O'Leary, kind of how

16  he was dealing with these issues in realtime.

17         We're then going to call to the stand Sameer Somal,

18  who is our digital reputation and defamation damage expert.

19  He submitted a report to the Court.  It was part of our motion

20  for default.  And he'll testify about the reputational

21  damages, how he computed what that number is.  He used a

22  theory called rings of harm.  And the rings of harm model is

23  based on calculating how many people the defamatory statements

24  reached, and then assigning, in essence, a dollar value to

25  each post and how they were impacted by the actual statement.

1           He'll also testify about rehabilitational damages,

2      which in this case he estimates to be in the range of about

3      810,000 to 1.2 million, and he based that upon 18 to 24 months

4      of repair online.  And, by the way, this boating accident

5      happened six or seven years ago, and Mr. O'Leary has spent

6      years kind of correcting the record as to what really

7      happened, which, kind of, just adds to the pain in which

8      Mr. O'Leary's kind of suffered here as a result of having to

9      go through this.  So he kind of brought it back into the

10     limelight again and forces us to kind of deal with these

11     issues.

12          We've read the Court's prior rulings in, I believe it

13     was, *Sirer versus Vaksoy,* S-I-R-E-R, V-A-K-S-O-Y, which was

14     another defamation case before you.  It was another default

15     case.  It was a damages hearing.  And we're going to do our

16     best today to kind of follow what we believe is the Court's

17     reasoning in that case to allow the Court hopefully to apply

18     what we think is the same analysis that should be applied in

19     this case as well.

20          So, I guess, kind of, to just wrap it up, we're going

21     to ask for about $4 million in damages.  Again, liability and

22     malice are not in dispute here.  You're going to hear from

23     Mr. O'Leary about his emotional and reputational injury.

24     You'll hear from our expert about his objective economic

25     damages for reputational rehabilitation.  You'll hear about

1   the pain and suffering.  Mr. O'Leary, you will hear him

2   testify when these posts first were happening, he was at Fox

3   doing coverage or doing TV.  And the reaction and the need to

4   get additional security.  These are real costs, especially in

5   what is a very toxic crazy time with people on the internet

6   saying all sorts of nonsense, and it just takes one bad actor

7   for a catastrophe to really happen.

8          And I want to, kind of, just close my opening with

9   the words of the defendant in this case where -- and this is

10  part of what is composite Exhibit 1 where the defendant says:

11  Hey, Kevin O'Leary, what in the F are you going to do with me.

12  You can't sue me.  You can't stop me.  You can't shut me up.

13  I'm a rabid dog with my teeth sunk deep into your leg.  Your

14  usual tricks don't work.  Going to be hard to put the rabid

15  dog down with everyone watching.

16         And, Your Honor, everyone is watching and we're going

17  to ask you to hold him accountable for his conduct here, send

18  a message that this type of -- these posts, this reckless

19  behavior this intentional attack needs to result in a real

20  damage amount that will allow Mr. O'Leary to do his best to

21  move on from this incident.

22         THE COURT:  Thank you, Mr. Neiman.  And, obviously,

23  the Court has entered a default with regard to each of the

24  seven counts; however, it would be helpful to the Court in

25  terms of your presentation of damages if you will advise the

1  Court -- there are six counts where there are separate posts

2  on different dates.  And, of course, Count 7 the publication

3  of private facts permit the plaintiff to seek punitive

4  damages.  So if you would somewhat compartmentalize -- I

5  understand there is an overlap but compartmentalize the

6  damages that you are seeking.

7          MR. NEIMAN:  Per post or per category?

8          THE COURT:  I think per category.  Obviously, these

9  post were over the course of March 17th, March 19th, March

10  20th, and March 21st.  So I understand that overlap.  But in

11  terms of each of the counts it would be helpful for the court

12  if you somewhat attempt to delineate, particularly the

13  punitive damages from the reputational damages.

14          MR. NEIMAN:  We'll do our best, Your Honor.

15          THE COURT:  Thank you.

16          MR. NEIMAN:  So with that being said, may we call our

17  first witness?

18          THE COURT:  Yes, of course.

19          MR. NEIMAN:  Your Honor, we'll call Mr. Kevin O'Leary

20  to the stand.

21          THE COURT:  All right.  Certainly.

22          Mr. O'Leary, good morning, sir.  It is a pleasure to

23  see you.  If you will step forward.

24          Sir, let me ask that you remain standing, raise your

25  right hand, to be placed under oath.

1      (Witness duly sworn at 9:44 a.m.)

2           THE WITNESS:  I do.  Thank you.

3           THE COURTROOM DEPUTY:  Would you please state your

4  name and spell it for the record.

5           THE WITNESS:  Terrence Thomas Kevin, Kevin O'Leary,

6  K-E-V-I-N, O, apostrophe, L-E-A-R-Y.

7                    TERRENCE THOMAS KEVIN O'LEARY,

8  called as a witness herein on behalf of the Plaintiff, having

9  been first duly sworn, was examined and testified as follows:

10                   DIRECT EXAMINATION

11  BY MR. NEIMAN:

12  Q.   Good morning, Mr. O'Leary.

13  A.   Good morning.

14  Q.   Could you please tell the Court where you reside?

15  A.   I live in Toronto, Canada, for about six months and I

16  live here in Miami for other the other six.

17  Q.   And how long have you had a residence here in Miami,

18  Florida?

19  A.   About seven years.

20  Q.   If you can please briefly describe for the Court your

21  professional background.

22  A.   I am an investor and an investor on Shark Tank, which is

23  a show about supporting small American business.  Quite

24  successful actually.  It's on in 54 countries around the

25  world.  I, along with the other investors, have become

1    ambassadors of the American dream worldwide, and I support

2    that aggressively.  I support small business in American, and

3    I also invest in small business in America.  So my reputation

4    is everything.  I mean, it's everything.  Everything I do is

5    tied to my reputation.

6    Q.   Well, do you have a business background?

7    A.   I do.  I do.

8    Q.   Can you briefly describe your business background?

9    A.   Sure.

10        I was one of the co-founders of The Learning Company

11   back in the early '90s that did math and reading scores.  We

12   have the largest educational software company on earth,

13   reader-rabbit.com in San Diego --

14        (Court reporter clarification.)

15        THE WITNESS:  We did all of the software for 110,000

16   schools in America for math and reading.  It was a very

17   successful business.  It was eventually sold to the Mattel

18   Company for 4.2 billion years later.  From there I got

19   involved in many other enterprises using the capital we

20   received from that successful sale.

21   BY MR. NEIMAN:

22   Q.   All right.  So the sale to Mattel for about 4.2 billion,

23   around what year was that sale?

24   A.   I think it was '99, 2000.

25   Q.   Since '99, 2000 if you can just generally describe the

1   types of business ventures you --

2   A.   I have been invested in hundreds of businesses, most of

3   them venture startups, in all 11 sectors of the economy,

4   everything from wireless charging to insecticides to

5   commercial kitchens for airlines, here in Miami Basepaws, DNA

6   testing for cats.  You name it, I have invested in it.  Some

7   of these have been wildly successful, and many have failed, as

8   you find in venture capital.  About half of them don't make

9   it.  But that doesn't mean you don't do it because when you

10  get a winner, it pays for all your mistakes.

11  Q.   And is it with this background that you began appearing

12  on Shark Tank?

13  A.   Yes.  Shark Tank started, 17 years ago.  Prior to that.

14  I was working for Discovery Channel in England and on a show

15  called Dragon's Dent in Toronto, Canada.  I have been on

16  television for 22 years, and eventually that turned into --

17  I'm a contributor to most American networks around business

18  affairs, policy, technology.  I advise Senators and their

19  staff on certain laws regarding crypto and digital payments.

20  I've testified in front of the Senate and the House multiple

21  times for small business and for the forward nature of what's

22  going on in regulating crypto.

23  Q.   And is this part of the reason why you have the nickname

24  Mr. Wonderful?

25  A.   No.  That was Barbara Corcoran, we think, being facetious

1    in year one.  I offered the first royalty deal, and she said,

2    Oh, aren't you just Mr. Wonderful.  And I thought that was a

3    great name.  Look what happened.

4    Q.   What have you done with the nickname Mr. Wonderful?

5    A.   It just -- it took a life of its own.  It's very often

6    when I will arrive somewhere, and there will be a sign, you

7    know, for the transfer service, the car service, it will say

8    Mr. Wonderful on it.  And I ask the driver, Do you know my

9    real name.

10              They say, No, you're Mr. Wonderful.

11              So I can assure you my wife does not call me

12   Mr. Wonderful.

13   Q.   Mr. O'Leary, I guess, you mentioned you made many

14   appearance.

15              About how many do you do maybe a week or month, just

16   ball park?

17   A.   I work everyday on television.  I work for every network

18   as a contributor, commentator, analyst.  I've generally spent

19   about two-and-a-half hours per day on television, and I do

20   that for no fee.  But the reason I do that is I have a

21   collaborative arrangement with all of them.  I have 11.1

22   million followers, most of them entrepreneurs.  And we

23   collaborate together.  The networks sell their advertising on

24   my version of their live feed.  And then I take that and I

25   sell advertising to my platform.

1        In most cases now -- and this is not unique to me --

2   as a contributor, as a celebrity, I'm five times bigger than

3   any network is in terms of live viewers.  So we have to

4   collaborate.  The world has changed for them, and it's changed

5   for me.  I have my own network now.  So what I do and what I

6   say really matters, and -- because I support over 20 families

7   now in my business and their kids, and they make their

8   livelihood supporting my network, the entire O'Leary Ventures

9   platform.  It's a big business.  It generates anywhere from

10  18 million to 25 million a year, just by being Mr. Wonderful.

11  Q.   And, I guess, you make it sound just by being

12  Mr. Wonderful.  It's obviously a big deal.

13       Explain how your reputation matters in the branding

14  of Mr. Wonderful and all of these --

15  A.   Sure.

16  Q.   -- potential --

17  A.   So let's just take the different buckets of how that

18  income comes in.

19       One of the fastest-growing aspects is I act as a

20  speaker for companies like Goldman Sachs, Morgan Stanley,

21  Raymond James.  When they bring their companies together for

22  an annual conference, they usually hire a keynote speaker.

23  And I do a lot of that work in every sector of the economy.  I

24  have spoken to technology companies, gas and oil companies,

25  pipeline manufacturing, everything.  And so that is -- the way

1    that works is as a giant agency business.  In America the

2    biggest is Big Speak out of Los Angeles.  They are my agent

3    for that.  They put forward a name, and it has to be pristine.

4    And if Goldman Sachs is going to hire you to speak to their

5    staff, it can't be on a blemished reputation.  That's not

6    going to happen.

7            And so they do a lot of scrutiny, a lot of background

8    checking, to vet that business, and then you're invited.  The

9    fees for that range from $150,000 for 45 minutes to $400,000

10   depending where in the world it's taking place.  I will do

11   this in -- next week I will be in Riyadh, Abu Dhabi, the

12   capital of Poland.  In that week alone, I'll generate over a

13   million in fees in speaking.  And a lot of that will be paid

14   to the staff that support it and the logistics of moving and

15   the airplane company that flies me around and the families

16   that are working at Big Speak.  So everybody has a stake in my

17   reputation, and they let me know it everyday.

18           I mean, I've changed my life a lot to protect my

19   reputation.  For example, I rarely drive a car after that

20   boating accident.  I just never want to be at the wheel of any

21   vehicle again because of what that did for two years to me.

22   Q.   Well, look, I guess, has it -- I guess, if your

23   reputation were blemished, do you feel as if your income would

24   be --

25   A.   We don't have to speculate.

1          After the boating accident in the almost year and a

2    half prior to the trial, I had virtually no income because I

3    was kicked off all network television waiting the outcome --

4    not kicked off, but excused is probably the right word, from

5    all of them.  No speaking engagements.  That dried up.  Shark

6    Tank was actually on hold for six months.  That was a big deal

7    in my life.  That was a real game-changer for a while.

8          You know, part of the Shark Tank issue was not just

9    the boating accident.  I was -- at the time had run for

10   leadership of the conservative party of Canada, and this also

11   got into a lot of problems with that boating accident.  It

12   really suspended my life for 18 months.  So I know with

13   certainty if an event like that happens to me, it will wipe

14   out my business.

15   Q.   Let's talk about the boating incident, if we can, for a

16   minute.

17          It happened in August of 2019; is that correct?

18   A.   Correct.

19   Q.   If you can just briefly describe to the Court, what

20   happened and the legal proceedings that kind of --

21   A.   Sure.

22   Q.   -- came --

23   A.   That evening, as is a tradition -- we live in -- I have a

24   home on a lake up in Canada called Lake Joseph.  Very often,

25   because it's a boating community, people boat over to each

1    other homes for dinner.  And we went, as we always do, to one

2    of our neighbors.  And my wife Linda grew up with boats.  You

3    know, her whole family built and raced boats, and so she

4    always drives the boat and always has.

5         And we were coming home, and we struck another boat

6    very close to our dock that had no lights on.  There was no

7    moon that night, so it was impossible to see.  From that, two

8    lives were lost on the other boat in the accident, and my

9    wife's right foot was shattered.  She went to hospital.  Her

10   foot is now basically made out of titanium and she suffers

11   from arthritis.  It's really sad, but there's not much we can

12   do about that.

13        But then the police charged her with reckless boating

14   and high-speed boating, and the hint of intoxication was part

15   of that claim.  And, of course, she never drank when he was

16   she was going boating, ever.  And so she didn't drink that

17   night.  What eventually happened was the police in the case

18   subpoenaed all the video cameras, the situated cameras on the

19   route of that trip.  And it was clear that her claims that the

20   boat had no lights on were authenticated by video, and the

21   driver was basically star-gazing and decided to turn their

22   lights off after the they left their boathouse.  That was also

23   documented on their security camera.

24        The Judge noted that in the findings.  She was tested

25   for alcohol and was not found to be intoxicated.  He

1    exonerated her on every charge.

2    Q.   The Judge, that is?

3    A.   Yes.  And that's in his findings.

4         And so, however, that was very difficult on her

5    because during that period there was a lot of speculation, and

6    it never quite was easy for her to deal with it for two years.

7    And she went through, you know, a lot of tough times.  Her

8    family supported her, obviously.  But she never felt

9    completely exonerated because social media kept hounding her

10   and still does today.  I mean, this is just document.  You can

11   see it.

12        So when this thing started with the boat murder

13   stuff, it was opening a wound with salt.  It was really brutal

14   because it wasn't just at me.  I can take it.  I get this

15   every day, but not like this, and mentioning her and dragging

16   her into it and naming her specifically in these posts.  But

17   then, you know -- he had done that two years earlier, maybe a

18   year and a half earlier, and I just ignored it.  But then when

19   he did it again last March, that was malicious.  It was

20   intentional.  It was done -- in my opinion, he did it

21   intentionally while I was on the air at Fox while I was on a

22   show called The Big Money Show for two hours, from 12:00 to

23   2:00.

24   Q.   If I can slow you down for a second.  If there was

25   another lawyer here, they would be objecting to your

1    nonresponsive monolog, just so we're clear.  I want to do our

2    best to stay within the rules, even though --

3    A.   All right.  I'm just recalling it as I remember it.

4    Q.   All good.  And if the Judge is okay with this, then I'll

5    let him just kind of give his --

6            THE COURT:  Well, in terms of the timing, I would be

7    interested because the post was at a specific time.

8            MR. NEIMAN:  Correct.

9    BY MR. NEIMAN:

10   Q.   But let's -- before we get to the actual post, I want to

11   be clear as day.

12           Did you murder anybody?

13   A.   No.

14   Q.   Did your wife murder anybody?

15   A.   No.

16   Q.   Have you ever covered up a murder?

17   A.   Never.

18   Q.   All right.  And has your wife ever covered up a murder?

19   A.   No.  And this was an accident.  There's no murder.  I

20   mean, it's just -- anyway, no, no murder involved.

21   Q.   Now let's get to the specific post and the actions of the

22   defendant in this case.

23           When did you first become aware that Benjamin

24   Armstrong was posting about you on social media, if you

25   recall?

1    A.    During the -- I was hired as a spokesperson, along with

2    many other people, during the beginning of FTX when they were

3    building up that franchise.  And he was a very active member

4    of crypto community known as BitBoy.  And I didn't know who

5    BitBoy was, but he started posting.  He has a lot of

6    followers, a lot of very energetic followers in terms of how

7    much social media they use.  And for whatever reason -- I've

8    never known why -- he started to be negative, particularly

9    after the boating accident.  And he brought it up a few times.

10   But I ignored it, and it died away until last March when -- I

11   mean, the timing is the timing.  It's factual.

12          I'm on the air.  It's the second hour of the show.

13   It has five hosts, and I am the sixth guest host.  And it's

14   very much involved with social media because people are

15   watching the show live and they're posting, so the producers

16   are constantly in your ear with what's called an IFB so they

17   can talk to you.

18          And BitBoy puts out that post about, How would you

19   like to talk to a real murderer, here's his phone number,

20   something to those -- whatever the post says.

21          MR. NEIMAN:  If I may approach, Your Honor, with --

22          THE COURT:  Certainly.

23          MR. NEIMAN:  -- what's been already, I guess, given

24   to the Court as Exhibit 1.  We'll formally move in Exhibit 1

25   through 10 at this time, if that's okay, Your Honor.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1           THE COURT:  Exhibits 1 Through 10 are admitted into

2    evidence.

3        (Plaintiff's Exhibit Nos. 1 through 10 were

4        identified and admitted into evidence.)

5           MR. NEIMAN:  Thank you.  And I have a copy for you.

6           THE COURT:  Thank you.

7           THE WITNESS:  Thank you.

8    BY MR. NEIMAN:

9    Q.   So, Mr. O'Leary, I am handing you what's been marked as

10   Exhibit 1.  This is a composite exhibit of the post in

11   question here.

12          If we can turn to, I guess, what I will call Post

13   1 --

14   A.   Yeah.

15   Q.   -- is this the post you were referencing that was --

16   A.   This is before the show.  This is now 8:49 a.m. that

17   morning.

18   Q.   Okay.

19   A.   And this is the first when it comes out, Already verified

20   murder of one couple in Toronto.  You don't to think

21   Mr. One-to-two-inch would like to try and kill the old BitBoy.

22   He swatted me once.

23          I don't know what he's talking about here.  That's

24   very strange to put out there.  And then this is where he

25   steps into the actual air time.

1    Q.    And that's the post -- what's labeled as Post 2 of
2    Government's Exhibit 1?
3    A.    And Post 3.  This is the rapid fire stuff coming out of
4    him.  But the one that really did the damage was at 2:35 with
5    the phone number there, Have you ever wanted to call a
6    real-life murderer?  You can now.  Kevin O'Leary TV -- that's
7    my ID on X and Instagram -- is waiting for your call.
8             Now, when that happened, I mean --
9    Q.    Well, first off, Mr. O'Leary, there is a portion of the
10   exhibit that says redacted.
11            The reacted portion, that was actually your phone
12   number; was it not?
13   A.    Yeah.  That's my phone number.
14   Q.    It was your real phone number?
15   A.    Yes, it was.
16   Q.    And as a result of that, did you actually receive real
17   phone calls from --
18   A.    Well, it was more than that because it wasn't just phone
19   calls.  What was happening was this thing was going viral, and
20   people were reposting it on the platform -- on multiple
21   platforms.
22            And so the producers who monitor the flow based on
23   the topic of the show being broadcast live said, What is
24   happening here?  What is this.  And they were in my ear
25   saying, There's something really crazy going on because you're

1   lighting up the -- there's something -- did you murder

2   somebody?  Are you being accused of murder?  Is there

3   something we don't know?

4           And so as soon as the commercial break came on, I

5   talked directly to the producer and said, No, this is this guy

6   BitBoy.  You can go back and look at the history of this

7   thing.  This is about a boating accident my wife was involved

8   in.

9           So here I am explaining to Fox network's producers,

10  and it went straight upstairs to the executive.  And they

11  said, Look this is crazy what's going on.  We better get some

12  security down there.  But it's not just you.  The rest of the

13  your hosts are on this show, too.

14          We were trying to scramble to try to explain, you

15  know, during live programming what this guy was doing.  Now,

16  whether he knew I was on the air or not, I don't know.  But it

17  certainly had a very big impact because there I was live.  So

18  people were calling the number.  The phone was lighting up.

19  It was going to voicemail, and they were piling up.  I was

20  trying to block them when I could, but we had to go back on

21  the air.

22          This is when -- and there's more.

23  Q.   Yeah, there are.  I want to, kind of, slow down the

24  timeline a little bit --

25  A.   Sure.

1    Q.   -- so that the record is clear as to, kind of, what's

2    happening at what point.

3                So we have Post No. 1 and Post No. 2 and Post No. 3

4    and Post No. 4 are all on March 19th, 2025?

5    A.   Yeah.

6    Q.   Do you see that?

7    A.   Yeah.

8    Q.   And Posts 2, 3, and 4 were going on while you were live

9    on the air and reacting -- having to react with Fox at that

10   time; is that correct?

11   A.   Yeah.  I wasn't sure exactly what was going on until I

12   had a chance to go to a commercial break and read all this

13   stuff and then read some of the responses that were coming

14   out.  Plus, I was getting phone calls from my own staff, Nancy

15   Chung, who runs our media coordination with the networks.

16   That wasn't the only network calling.  They were all calling

17   and saying what is this, and -- including many of the

18   companies I do business with, all calling saying, What is

19   this?  Is this something new?

20   Q.   We're going to get to later in time, kind of, how you had

21   to deal with the fallout of these posts in a second.  But just

22   going through the actual post themselves, we have Posts 5,

23   6 -- 5 and 6 are one day later on March 20th.

24                Do you remember anything specific about where you

25   were with those posts?

1  A.    I was still in New York.   I just couldn't believe this

2  guy kept going.

3  Q.    And then Posts 7 and 8 are from the following day, March

4  21st.

5        Do you see that?

6  A.    Yeah, he's piling it on.   I mean, it's definitely getting

7  him traction, and he's getting engagement, which is what a guy

8  like this does.   You're doing -- If you want impact, you can

9  measure it.   Post 7, by this time my wife is completely

10  freaking out:   Daily reminder that Kevin O'Leary and his wife

11  Linda O'Leary murdered a couple and paid millions to cover it

12  up.   Not a single cease and desist has been sent to me, Kev.

13  Wonder why.   It's breakfast time, Kevin.   Who are you eating

14  for breakfast today?

15  Q.    And the implication there is like taunting you to do

16  something; is it not?

17  A.    Yes, but this is going above and beyond.   I mean, it's --

18  I am now trying to deal with the inbound of this from the

19  previous day, which is --

20  Q.    Do you remember talking to your wife during this time

21  period?

22  A.    Yeah.

23  Q.    What do you recall about how these posts made you feel?

24  A.    Well, I mean, you know -- we're reliving the past again

25  that we worked for four years to try and put behind us.   And,

1    you know, for her it was brutal.  I mean, she was crying on

2    the phone to me.  She was in Toronto that morning -- Well,

3    maybe she was in Miami.  She was either in Miami or Toronto.

4    I don't remember.  But she called me and said, Look, why is

5    this happening to us?  Why?  Who is this guy?

6         You know, it's just because my daughter, Savannah,

7    and, Trevor, my son, also started is to see this stuff.  Their

8    second name is O'Leary, so they were getting caught up in

9    this.

10         What's bothersome about it is he's not referencing

11   the boating accident anymore in these posts.  He's just saying

12   they're murderers.  And this opened up a new can of worms.  It

13   just -- people needed clarification, Is this a new kind of

14   claim.  What is this?  There's no, you know -- anyways, it was

15   a big problem.

16   Q.   Well, look, the complaint in this case was filed on March

17   26th, so one day after what is the last exhibit, I believe --

18   A.   Well, I said I got to do something.

19   Q.   Right.

20   A.   I mean, this has gone too far.  I called you.  I said, We

21   got to do something.  My wife asked me, What are you going to

22   do about this?  You can't just let this guy keep doing this

23   over and over and over and over again.

24   Q.   I'm sorry.  Four days after.  I correct the record.

25   A.   My entire infrastructure of support for all of my

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   businesses were all asking, If this isn't true, what are you

2   doing about it?  Like, what are you doing about it?  And my

3   tendency from the prior years was just to let it go if he'd

4   calmed down and stop it, but this was too crazy.  The phone

5   number was the final thing.  It just --

6   Q.   I want to talk about the phone number for a second.

7            Did you ever give Mr. Armstrong permission to post

8   your phone number?

9   A.   Never.

10  Q.   Do you know how he got your phone number?

11  A.   No, idea.  But, you know, I think you can hack it on the

12  dark web or I don't know how they do this stuff.

13  Q.   And after your number was posted, I think -- you

14  mentioned you received phone calls from his followers?

15  A.   Yes.

16  Q.   About how many phone calls have you received?

17  A.   I still get them.  So it's not just on the traditional

18  phone.  From around the world, when you -- you can use

19  WhatsApp to do video inbound phone calls.  And so you'll

20  receive a plus 44 and then a bunch of numbers, and it's a

21  video call.  And many times I would take those thinking that

22  it was a business associate that I just didn't have in my

23  database, and it turned out to be some rabid four or five

24  people on the line saying, We want to talk to a murderer.

25           And that still happens.  The number is still out

1    there.

2    Q.    Can you quantify about how many times you believe that's

3    happened to you since these posts?

4    A.    Well, over 100.

5              MR. NEIMAN:  If I can approach again with another

6    exhibit.  This is Exhibit 2.

7              THE COURT:  Certainly.

8    BY MR. NEIMAN:

9    Q.    Mr. O'Leary, if you can take a look at Exhibit 2.

10   A.    Yeah.

11   Q.    Is this a composite of all the phone numbers that have

12   called you since these posts in March --

13   A.    These are just the ones that are blocked that you can go

14   dig up from my Verizon account.  There's many others that come

15   through WhatsAapp and have been hidden or whatever else.  This

16   is just the traditional ones.

17             Now I have no choice but to -- when one of these

18   comes in and it's not in my database, I have to block it

19   because I have to make an assumption it's BitBoy, like from --

20   what else is it?

21   Q.    And there's more than 120 numbers on this list --

22   A.    Yeah.

23   Q.    -- is that about right?

24   A.    Yes.

25   Q.    Let me just ask, kind of, a simple question.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1             Why didn't you just change your number?

2    A.   Can't do that.

3    Q.   Why not?

4    A.   Because I have had this number since, I think, 30 years

5    ago.  All of my contacts that I do business with have it.

6    It's -- some very important relationships in Government have

7    it, very important contacts.  And I just can't change it.

8    And, you know, when I get a text from somebody I know because

9    that number is for a lot of texts that come in, I could never

10   change it.  It's part of my DNA now.  There's nothing I can do

11   about that.

12   Q.   The phone number is?

13   A.   Yeah, 617 phone number.  By the way, you can't get a 617

14   phone number anymore.

15   Q.   It's like 305 these days.  We have to revert to 786.

16   A.   I mean, that 617 number is part of the core

17   infrastructure of how I do business.

18   Q.   I want to talk about security issues.

19             Obviously, calling you a murderer putting your number

20   out there, encouraging millions of followers to reach out to

21   you, did that give you concerns about your personal security?

22   A.   100 percent.

23   Q.   How so?

24   A.   Well, I don't know what triggers anybody to do anything,

25   but certainly this is inciting a lot of people to call me and,

1   you know, make outrageous claims during the period when I was

2   accepting these calls.  And, you know, I -- but it's not just

3   what I want, you know.  I work with colleagues and go in and

4   out of buildings at CNN and Fox, Fox Business, CNBC, Yahoo

5   Finance, Bloomberg.  Nobody wants to walk out the door with

6   me.  Like, they just don't want to do it.

7   Q.   And have you taken specific security measures to protect

8   yourself?

9   A.   Yes, we have an agreement.  So I go out the side door at

10  Fox now, as per their instructions.  The security knows that,

11  and the car is waiting about 18 steps from there.  So they

12  protect me right to the door, and I get in it, and we leave.

13  I can't walk around anymore.

14  Q.   Have you had to hire additional staff or security from

15  time to time?

16  A.   Yeah, yeah, yeah.  It's a pretty big bill.

17  Q.   Can you quantify it, approximately?

18  A.   I probably spend -- I'm going to just guess -- 200,000 a

19  year now, at least, just on the additional guard and limo

20  services in every city I'm in, maybe 250.  I mean, you don't

21  realize how much you like to just walk by yourself until you

22  can't do it anymore.  Like, that's -- which is what this guy

23  has done to me.

24  Q.   And has there been a change in what you perceive to be

25  the security threat since these post?

1    A.    Yeah.  My staff wants to do more.  They want to start

2    doing full time, 24 hour a day wherever I am.  You know, it's

3    too intrusive on my family.  They don't want to see police

4    outside our door everywhere.  It's a debate we're having.

5          Certainly, when I'm on my own in any major city, in

6    some weeks because of the speaking -- this week I have been in

7    five cities, maybe six.  That's all with security, all of it.

8    And all of it, as I walk around with security and that's

9    provided for by the logistics of the speaking agencies and the

10   companies.  But I pay for it.  It's not free.  So it's billed

11   into the fee, but I have to have it.  I mean, it's...

12   Q.    I want to shift gears for a second, if we can, to, kind

13   of, how this has impacted your professional relationships.

14   Obviously, we talked about how you regularly appear on various

15   networks.

16         Have you had any networks specifically ask you about

17   these tweets beyond the Fox situation we talked about while

18   you're on the air?

19   A.    Not some.  All of them.

20   Q.    Please explain to the Court in as much detail as you can

21   what you recall about some of these conversations.

22   A.    So any time something like this goes viral, all of the

23   chase producers on every network you're getting booked on,

24   they monitor everything I post.  That's how they come up with

25   content to talk about.  But when we get something like this,

1    they immediately question it, what -- is this something we

2    should be worried about?  You know, we're in a partnership

3    here.  So they're asking, What is this claim of murder?

4              And I'm saying, Well, it goes back to the boating

5    accident of seven years ago, and it's that story again, of

6    which they all know.

7              Most of the contracts I have in producing a show like

8    Shark Tank, there's a morality clause in it.  That was put in

9    by the networks a few years ago.  So they have the right to

10   just cancel the contract if, in fact, you are in a situation

11   where you, you know, are on trial for murder.  They're going

12   to wait for the outcome.  Or if ou have been accused of

13   murder, that's a problem.  And so they need to understand what

14   exactly this is, and they need support to understand it.  We

15   make a claim that they go and dig on their own, and they can

16   see these claims that -- everybody can see this stuff.  This

17   is open to the public all around the world.

18             And so one of the questions I started getting about

19   this specific thing in March is, What are you doing about

20   this?  What are you doing about this because you're in a

21   partnership with us, and we need to understand that you are

22   going to do something about this because if it's not true,

23   what are you going to do about it?

24             And that's why we're here.

25   Q.   Other than the networks, did you -- do you remember

1   receiving any questions about these posts from business

2   partners?

3   A.    Yes.

4   Q.    If you can please describe --

5   A.    I am a hired spokesperson for Tax Hive and for Start

6   Engine.  Start Engine is an equity crowd funding source.  Many

7   Shark Tank companies use it.  I have a pretty close

8   relationship with the CEO there.  And he called me and said,

9   What is this?  Why are we seeing this?  This isn't good for

10  business.

11       And I said, Yeah, Howard, it goes back to the whole

12  thing with the boating accident.

13       Everybody wanted to understand what this was because

14  it went on for days.  So where there's smoke, there's fire in

15  this kind of a thing.  And so they were asking, Is there a

16  fire here somewhere?  We need to know about it.

17       I said, No.  I'm going to file a complaint against

18  this guy.  It's serious enough now.

19       And they expected to see it, and they did.

20  Q.    Do you believe you lost any business opportunities as a

21  result of these posts?

22  A.    That's the problem.  I don't know.

23       What I don't -- my name is put forward every day as a

24  potential speaker or advocate for brand or service every day

25  by the agents that profit from it.  UTA is my agent for

1    network television, and Big Speak is my agent for speaking.

2    My name is put forward all the time to support credit card

3    campaigns or whatever it is that they want to push my name

4    forward on.

5           What we don't know is how many people see this stuff

6    and say, Let's just stay away from this.  This is just too

7    controversial.  Because a lot of time that I do work in this

8    financial services, that's what I am known as, an investor.

9    And so you really have to have a very superclean history.  I

10   mean, you know, it's no different than, you know,

11   testifying -- when I got hauled through the whole FTX --

12   whatever you want to call FTX -- that was very heightened out

13   there.  And the outcome of that was I survived that by just

14   telling the truth.

15          My mother taught me something when I was 16:  Always

16   tell the truth.  You never have to remember what you said.

17   And I do that now.  And I built a reputation on that.  I'm

18   known the tough Shark guy who just tells the truth, even

19   though it's tough for people.  But that got me through, and I

20   became even more sought after as an expert in crypto after

21   FTX.  So then this thing comes back up and it brings the whole

22   thing back into focus again.

23          The real challenge with this was in explaining that

24   it's tied back to the boating accident six years ago because

25   he's trying to extend it, it seems to me, to distance -- but

1    just saying murder, murder, murder, there was never any claim

2    of murder in the boating accident.  He made that up.

3    Q.    Everything in the post is made up, are they not, except

4    for your phone number?

5    A.    Yeah.  That's real.

6    Q.    Have you had to spend time dealing with these posts?

7    A.    In multiple ways.  Here's how.

8           Dealing with my wife, who I can get calmed down for

9    two days, and then she'd get another post, and it would start

10   over again.  That's never-ending.

11          Number two, explaining to my kids what this is.  It's

12   all family related.  But then in every case when someone's

13   diligence-ing me for whatever relationship we're about to

14   have, they go back to this and say, What is this about?

15          And I have to say to them, I have filed a complaint.

16   It's going through the court system.  This is completely

17   fictitious and malicious, as far as I'm concerned.  I don't

18   know, whatever you want to call it.

19          To me, if you're just looking at it, in measurement

20   of social media, the measurement of engagement, he's using me

21   to rile up his base to get higher engagement because somehow

22   he's -- I don't know how he does it, but BitBoy is a known

23   crypto -- I guess they call them crypto cowboys.  He was in

24   the post-regulatory period.  And he riled against -- if you go

25   back and look at his schtick, or whatever you call it, it's

1  always about the cowboy nature or the freedom of crypto and

2  not being government controlled and all this stuff that he was

3  doing.  But this is off in a new direction.

4  Q.   Even today, since six months or so or seven months after

5  these posts, are you still dealing with these issues?

6  A.   Yeah.  We're dealing with it right now.

7  Q.   How so?

8  A.   We're here.

9  Q.   How about from external parties?  Are you still getting

10  comments more recently from business partners or networks?

11  A.   Yeah.  People want to know the outcome of the complaint.

12  They want to know.  They want to know what the outcome is

13  because in a way this will validate my claims that this is not

14  factual.  Not that it's my right to ask, but I would like to

15  see this guy -- I mean, he clearly don't care.  He doesn't

16  care about me.  He doesn't care about a Judge.  He doesn't

17  care about a lawyer.  In my world you pay for that.  How can

18  you do that?  How can you continue to do that and not, at

19  least, have some adversarial affect?  So I am doing my part to

20  shut this guy down.  This is bad stuff.  He's a bad guy.  He's

21  a bad guy.

22  Q.   Did he ever call you to apologize?

23  A.   Never.

24  Q.   Are you aware of him ever retracting any of these

25  comments?

1   A.   Never.

2   Q.   Has he ever showed any sympathy or regret for having done

3   this?

4   A.   Never.

5   Q.   Has there been any accountability, as far as you know,

6   for having made these posts?

7   A.   Never, none.  Nancy monitors this guy --

8   Q.   Nancy, who works with you?

9   A.   Yeah.

10        -- and has said -- you know, she was the one that

11  said, You've got to do something.  We've got inbounds coming

12  in like crazy.  You got to do something here.  This can't go

13  on.

14        You know why?  It's her life, too.  She gets paid off

15  the dollars that are coming in on managing the speaking

16  engagements, the business relationships.  She's worried about

17  her own family.

18  Q.   I think you've addressed this, but why did you bring this

19  lawsuit?

20  A.   The pressure for me to do something to support my claims

21  that this is just not true got immense.  It just got immense.

22  In my world, it just -- you know, we've talked about all these

23  different entities that I am involved with.  They were all

24  saying the same thing.  If this is not factual, why haven't

25  you filed a complaint?  You know, I couldn't even answer that.

1   Why haven't I filed a complaint?  Now I have.

2   Q.   We like to proceed cautiously, right?

3   A.   Right.

4   Q.   Is there anything else you would like to tell the Court

5   related to this incident?

6   A.   I would like the Court to consider what message are you

7   sending if you don't -- if you allow this kind of activ- --

8   forget about me.  What are other people?  If other BitBoys are

9   out there doing this and using the vehicle of social media

10  thinking that there is no consequence -- let me draw an

11  analogy that I think everybody can understand.  This is a wild

12  analogy, but think about it this way.

13          China, 2020 joins the World Trade Organization.

14  Never abides by its rules.  People like me that invest there

15  get completely screwed over by IP theft.  No consequences from

16  an administration until this one.  Finally somebody stands up

17  to them and says, You can't steal our stuff anymore.

18          Well, I would like this Court to do the same thing.

19  You have to stop.  There are rules you have you have to abide

20  by.  You can't do this to everybody.  There is a consequence

21  to it.  I'd like it to be stiff, and I had like to send a

22  message.  And, you know, I want to show people that there's a

23  cost to doing this and doing this to my family and doing this

24  to the people that work for me, doing -- the families that

25  they support with their income from the O'Leary enterprises.

1          I'm pretty pissed off at this guy, and I thought I

2    was incredibly lenient and reasonable for two years until

3    this.  And now I urge the Court to consider what they see

4    here.  The very fact that he's not even here -- if I were you,

5    Judge, I'd be pissed.  I mean, that's an insult.  That's an

6    insult.  That's what I think.  It's my opinion.

7          MR. NEIMAN:  Your Honor, I have no other questions.

8    Obviously, if the Court has any of Mr. O'Leary, it should feel

9    free to ask him whatever seems appropriate.

10         THE COURT:  No, thank you.  Thank you Mr. Neiman.

11         MR. NEIMAN:   You're welcome.

12         And thank you, Mr. O'Leary.

13         THE WITNESS:  Thank you very much, Your Honor.

14      (Witness excused.)

15         MR. NEIMAN:  Your Honor, we'll call our expert, if

16   that's okay.

17         THE COURT:  Yes, of course.

18         MR. NEIMAN:  Mr. Floch is going to handle the direct

19   of that.

20         THE COURT:  All right then.

21         MR. FLOCH:  Good morning, Your Honor.  At this time

22   we'd like to call Mr. Sameer Somal to the witness stand.

23         THE COURT:  Of course.

24         Mr. Somal, welcome.  If you'll come forward, sir.

25   Sir, if you would remain standing, raise your right hand to be

1    placed under oath, please.

2        (Witness duly sworn at 10:27 a.m.)

3            THE WITNESS:  I do.

4            THE COURTROOM DEPUTY:  Thank you.  You may be seated.

5            MR. NEIMAN:  Your Honor, may I approach the witness

6    just to hand him his expert report to refresh his

7    recollection?

8            THE COURT:  Certainly.

9            THE COURTROOM DEPUTY:  Would you please state your

10   name and also spell it for the record.

11           THE WITNESS:  Yes.  My name a Sameer Somal,

12   S-A-M-E-E-R, last name Somal, S-O-M-A-L.

13                      SAMEER SOMAL,

14   called as a witness herein on behalf of the Plaintiff, having

15   been first duly sworn, was examined and testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. FLOCH:

18   Q.   Good morning, Mr. Somal.

19   A.   Good morning.

20   Q.   Where are you currently employed?

21   A.   Blue Ocean Global Technology.

22   Q.   And Mr. Somal, what is your position at Blue Ocean Global

23   Technology?

24   A.   I am the CEO and co-founder.

25   Q.   And when you did you found Blue Ocean Global Technology?

1   A.   2012.

2   Q.   Can you briefly tell the Court what Blue Ocean Technology

3   does?

4   A.   We specialize in building, monitoring, and repairing

5   digital reputations for individuals, businesses, publicly

6   traded companies, and even governments.  We also do

7   considerable work on litigation consulting when there are

8   issues around economic analysis, valuation, and providing

9   context on damages.

10  Q.   Mr. Somal, can you just briefly give the Court an

11  understanding of your educational background?

12  A.   Yes.  I have a degree in finance and accounting from

13  Georgetown University.

14  Q.   Do you have any professional designations or licenses?

15  A.   Yes.  I am a CFA charter holder, a CFP professional, and

16  a charter alternative investment analyst.

17  Q.   You mentioned that Blue Ocean is in the business of

18  online reputation management, right?

19       Could you explain to the Court just briefly what

20  online reputation management is?

21  A.   I think aptly put by Eric Schmidt, the former CEO of

22  Google, identity will be the most valuable commodity for

23  citizens and businesses in the future, and it will exist

24  primarily online.  And so taking the trust, goodwill

25  relationship, capital that you have in real life, your

1   identity, and representing that to a degree on the internet is

2   how we are able to help organizations, not only valuing that

3   but also playing a lead role in implementation or mitigating

4   the consequence thereof.

5   Q.   Mr. Somal, how many times have you been engaged as an

6   expert witness or expert consultant?

7   A.   I have been engaged as an expert witness and expert

8   consultant on 500-plus cases.

9   Q.   Can you just generally describe what types of case you

10  have been engaged as an expert for?

11  A.   Most of my cases involve the internet, social media,

12  economic analysis, valuation related to mergers and

13  acquisitions, and quantifying tangible and intangible assets,

14  including reputation.

15  Q.   And have you authored any peer-reviewed articles about

16  online reputation management or damages associated with

17  defamation?

18  A.   I've published in the New York State Bar, the American

19  Bar Association.  Most recently I authored an article on -- it

20  was called 3D on Defamation Damages in a framework that was

21  recently published actually earlier this month by the Midwest

22  Law Journal of the Academy of Legal Studies in Business

23  published and co-authored by William Choslovsky, an attorney

24  in Chicago, that I handled four cases with against the Chicago

25  Public School District.

1    Q.    Beyond your scholarship, Mr. Somal, have you led any

2    continuing legal education programs?

3    A.    Yes.  I've authored a number of continuing legal

4    education programs associated with Abraham Lincoln; his life,

5    legacy, online reputation management, and the subject of

6    defamation and valuation from a legal context.  I've presented

7    before the New York State Bar, the Philadelphia Bar

8    Foundation, Louisville Bar Association, among others.

9    Q.    Mr. Somal, were you retrained to provide expert testimony

10   in this case?

11   A.    Yes, I was.

12   Q.    And were you asked to prepare an expert report?

13   A.    Yes.

14   Q.    What materials did you review in preparing your report?

15   A.    I received documentation from counsel regarding the -- I

16   guess you could say the paper trail existing from the courts.

17   I also conducted my own investigation.  I had -- Mr. O'Leary

18   reached out and said, Hey, I need help with my reputation.

19   What would be the process that we'd follow?

20          And we used a number of tools.  I also conducted

21   several interviews, including speaking with Nancy Chung, the

22   head of, I believe, public relations and communication for

23   Mr. O'Leary, and I spoke with Mr. O'Leary as well.

24   Q.    Have you testified for my law firm before?

25   A.    No.

1   Q.   Are you being compensated for your testimony today?

2   A.   Yes.

3   Q.   Is your compensation tied in any way to the outcome of

4   this proceeding?

5   A.   No.

6        MR. FLOCH:  Your Honor, at this time I'd like to

7   tender Mr. Somal as an expert in the online reputation

8   management and reputation damages.

9        THE COURT:  All right.  Certainly.

10  BY MR. FLOCH:

11  Q.   Mr. Somal, did you reach any conclusions in preparing

12  your report?

13  A.   Yes.  I believe they're outlined briefly at the beginning

14  of the report as well as detailed throughout.  Mr. O'Leary's

15  reputation has absolutely been harmed by the defamatory,

16  harmful -- I know we have defamation, per se, in this case.

17  And I also outlined and quantified damages in two specific

18  categories, one reputational harm.  I took an

19  ultraconservative approach, and I can outline why that is the

20  case on reputational harm.  I also outlined rehabilitation of

21  damages for reputation harm, again, ultraconservative.  I

22  outlined between 15,000 to $78,000; and for rehabilitation,

23  800,000 -- 810,000 to $1.2 million.

24  Q.   And, Mr. Somal, am I correct in understanding that you

25  are not testifying or putting a number today on any mental

1    anguish or pain and suffering damages suffered by

2    Mr. O'Leary?

3    A.    That would be correct.  You know, I'm not a medical

4    doctor.  I think it is worthy of note, as through our

5    discussion, that I own a company that's helped hundreds of

6    people deal with a harm, negative, erroneous content.

7    Regretfully, a number of those people we have to turn away and

8    don't become clients, and they don't have legal recourse.

9          I do know how harmful and painful it is when people

10   are helpless with respect to what they can't control online.

11   Many of our clients are suicidal about it and very successful

12   and prominent people, including celebrities and C-level

13   executives.  Having said that, I'm not tendering an opinion on

14   that.

15   Q.    So I want to move to the first topic.  I just want to ask

16   you generally about personal branding, digital online

17   reputation, okay.

18         So, Mr. Somal, does Mr. O'Leary have a significant

19   social media presence based on your analysis in this case?

20   A.    That's well documented on platforms such as LinkedIn,

21   Instagram, TikTok, YouTube.  He has millions of followers.

22   Q.    In your report, you use the phrase reputation is brand

23   and currency.

24         Can you explain to the Court what you mean by that?

25   A.    Certainly.  Our entire opportunity set is guided by, like

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   it or not, what our digital presence is and what our

2   reputation is and, as articulated by Mr. O'Leary and anyone

3   that has a degree of presence, how you're able to earn money.

4   And in addition to that being foundational to one's

5   opportunity set, it's also cornerstone to risk and can be a

6   liability as well.

7   Q.   And, Mr. Somal, based on your history of working with

8   other celebrities or high-profile individuals, why does

9   reputation online matter so much for those types of people

10  like Mr. O'Leary?

11  A.   Well, the reality is is that people make decisions and

12  inferences based upon what they read and what they find.  And,

13  for better or worse, the narrative that one has online has

14  real-life consequences.  Because Mr. O'Leary has a degree of

15  known presence, it actually has an outsized impact on his life

16  and his ability to live a normal life personally speaking as

17  well as professionally.

18  Q.   So let's turn to the post that you reviewed in connection

19  with your analysis today.

20       What is your understanding of the defamatory

21  statements that were made?

22  A.   Defamatory statements were made that he, along with his

23  wife, Linda, not only murdered but covered up a murder.  And I

24  believe the word even "verified" was used, and those

25  statements were publicly made, a series of them, as outlined

1    here today.

2    Q.    And before we get to your damages analysis, I just want

3    to ask you a question about the internet generally.

4              Does the permanence of internet content affect your

5    reputational harm analysis?

6    A.    Absolutely.  Whether it's the dark web or whether it's

7    the reality that there's Section 230 and organizations,

8    companies can't be held liable, the content that exists out

9    there is somewhat permanent.  You can put toothpaste in the

10   tube to do a degree of reputation repair, but the reality of

11   it in this case for Mr. O'Leary or for anyone that has endured

12   a degree of defamation and harm, they're going to have to deal

13   with that likely for the rest of their life to some degree no

14   matter what.

15   Q.    And how, if at all, does the proliferation of large

16   language models like ChatGPT affect online reputational damage

17   from defamatory posts?

18   A.    It's quite relevant.  I'm founder of another company

19   called legalexperts.ai, which is a marketplace.  I do

20   considerable work in generative AI.  There are about 375

21   searches on search engines from one on ChatGPT.  But if you go

22   to Perplexity, Grok, ChatGPT, and you ask about Kevin O'Leary,

23   the information about him being involved in a case where he

24   was accused of murder and has to defend himself is readily

25   there and apparent.  And there are ways to go back and reverse

1   engineer what people are typing in in order to find that.  But

2   the reality is this issue has gone from traditional search on

3   search engines to large language models.  And that's only

4   going to continue, which is an even bigger quantum of damages

5   that I didn't outline in here, being ultraconservative.  But

6   it's a reality that I don't think anyone can deny.

7   Q.   So let's move to the first bucket of damages you opined

8   on.

9          You said you opined on something called reputational

10  damages, right?

11  A.   Yes.

12  Q.   What methodology did you use to come up with a

13  reputational damage number in this case?

14  A.   I used a framework known as the three rings that we've

15  used with clients for the last ten years to conceptualize the

16  harm.  And there's three rings of harm, and I took a quite

17  conservative approach in terms of how I valued that.

18  Q.   Can you explain how the rings of harm model works to the

19  Court?

20  A.   Simply put, because reputation is an intangible and how

21  do you measure the love you have for a parent or child, how do

22  you measure the trust that you can call someone in your

23  Rolodex and they'll do a favor for you.  For us it was a

24  challenge, being in the reputation business, to have people

25  just understand and to be able to conceptualize that.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          So ring one we say is close friends and family.  So

2     those would be people in this particular case that know

3     Mr. O'Leary, and when they saw about -- information about him

4     being accused of murder, they called him.  They messaged him.

5          Ring two would be acquaintances, people that maybe

6     Mr. O'Leary speaks with once a month, maybe once a year, maybe

7     not even once a year, but they know of him, he knows of them.

8     He considers them friendly.  But many of those people won't

9     reach out.  They won't reach out and ask him.

10          And then ring three is the largest ring.  Those are

11     all the people out there that are aware of Mr. O'Learym, but

12     he doesn't have any direct connection with them.  And many of

13     those people not only would be affected by this content, but

14     they also would have a decreased or harmed effect on his

15     reputation.

16     Q.   And so can you just walk the Court through the steps of

17     the rings of harm analysis.

18          What is step one?

19     A.   Step one is you got to take inventory in terms of what

20     content is out there and what was harmed.  So at the time of

21     this report, we looked at what statements were out there.  We

22     didn't look at statements that had been taken down.  Also, the

23     reality is because Mr. O'Leary has a name, he has a following,

24     we only looked at the statements made by the defendant.  And

25     we looked at -- I believe there are about, conservatively,

1    about 156,000 views on those statements.

2    Q.    So you started with that 156,000 number as the number of

3    views of the defamatory post, right?

4    A.    Correct.  Documented views publicly.  You know, again,

5    we're not talking about millions of followers and looking at a

6    percentage of those.  We're literally only looking at the

7    actual views on those posts.  And then we discounted it again

8    to take an ultra-conservative view to say if there were

9    repeats, 10 percent of those people would be 15,600.  It would

10   also be easier -- and it's used a number of times -- to be

11   able to take because he is a known commodity because search

12   engines have bias towards negative content.  It's what Google

13   calls -- they want to have a balanced approach.  We also could

14   have taken a percentage of his followers to say it reached

15   them.  Instead, we only looked at the actual views on the

16   posts that were out there.

17   Q.    So using your rings of harm methodology, how many unique

18   individuals did you determine had viewed the defamatory post

19   from March 2025?

20   A.    Again, at an absolute minimum 15,600.  But I would be

21   comfortable -- again, we took an ultraconservative approach.

22   But if you were to say 20 times that number viewed, I would be

23   also comfortable saying that that's easily the case, as not

24   only through my analysis in leveraging our multiple enterprise

25   subscription tools, my understanding assessing reputation and

1    the fact that I personally pressure-tested what took place

2    over the course of the last six months as I worked on this

3    case to be able to say, you know, Hey, look, this is something

4    that actually is part of his narrative as a professional and

5    as somebody that you would call an influencer.

6    Q.   So once you determined the number of unique individuals

7    who likely saw the post, did you assign a dollar value to each

8    individual?

9    A.   There's been a number of studies, even over the last 10

10   years, going back to assign a dollar value to a fan or a

11   follower.  Now, somebody that in this case follows and pays

12   attention to Mr. O'Leary, there's an amount of money that you

13   can spend to gain a fan.  And there's been a wide range.

14   That's been anywhere from a couple dollars in studies all the

15   way up to 150, $200 plus.  One could argue that because of the

16   prominence because who Mr. O'Leary is in terms of the outlier

17   on one side, that you can take a higher end of that range,

18   took an ultra conservative approach and applied one dollar

19   against the baseline ultra-bare minimum of 15,600 and $5 to

20   get a range of 15,000 to approximately 78,000.

21           And, as I'm stating here, and as I reviewed this,

22   even my own team questioned and said that is really

23   conservative given Mr. O'Leary's profile and brand value.

24   Q.   And the methodology you just talked about, this is a

25   methodology that has been recognized by other courts, the

1    rings of harm methodology?

2    A.    Rings of harm and being able to apply a dollar value

3    based upon confirmed number of individual users is

4    well-documented.  And there are a number of studies that I

5    cited related to celebrity brand value and valuation and how

6    that has a positive effect.  It also has a negative effect.

7    Q.    And so just so the record is clear for the Court, what is

8    your recommended range for reputational damages in this case?

9    A.    As outlined in the report, 15,000 to 78,000.  I also

10   would be quite comfortable with much higher numbers.  I think

11   it's important to note there's even a recent study that came

12   out, I believe, in the last few weeks, you know, from a talent

13   management agency that highlighted Mr. O'Leary as it being --

14   if you wanted to hire him -- so not his brand value.  If you

15   simply wanted to hire him, that would be worth to a brand

16   approximately $6 million.

17            So when you think about the opportunity cost, when

18   you think about the reputational harm of him having to pause

19   his life for 18 months, when you look at the fact that -- how

20   do you measure the opportunity costs of people whispering down

21   the lane, Hey, we have five people to consider here, but let's

22   scratch off Mr. O'Leary.  I don't want to touch that murder

23   thing.  I am here to testify that that absolutely would have

24   happened without a doubt.

25            One of those situations is worth millions of dollars

1    to Mr. O'Leary.  That's unique to cases where there's a

2    prominent company or there is an individual that makes a

3    living off of their brand.  So I'm putting some context just

4    how conservative those numbers are.  Because if we would have

5    taken another approach, we could have easily said that, Well,

6    Mr. O'Leary lost one opportunity, that easily would be

7    several million dollars.

8    Q.   And just so the record is clear, you're not testifying

9    about pain and suffering.  This is -- your rings of harm

10   analysis is specifically about reputation damages from the

11   post that we talked about?

12   A.   Specifically, reputation, following the academic article

13   I published, not looking at economic analysis and opportunity

14   cost of lost business, again, taking an ultraconservative

15   approach.

16   Q.   Okay.  Mr. Somal, I want to move to that second bucket

17   you talked about.  You called it rehabilitation damages.

18          Can you explain to the court what rehabilitation

19   damages is?

20   A.   Yes.  Any time there's been information that's been

21   published that is negative, that is harmful, that is

22   defamatory, and you can never go back to all the people that

23   have seen that and change their mind and say, you know what,

24   that didn't happen.  But you can repair the reputation and, as

25   I mentioned earlier, put some of the toothpaste back in the

1   proverbial tube.

2          And so rehabilitation is the process of taking one's
3   online presence and narrative and changing it and featuring
4   positive content and making sure that it's harder to find that
5   negative content.  That involves removal of information.  That
6   involves suppression of information.  And that's an area that
7   we've specialized in for quite sometime.

8   Q.   Did you develop an online rehabilitation plan for
9   Mr. O'Leary?

10  A.   I looked at Mr. O'Leary as if he came off the street.
11  There was no court case.  How would we go about
12  rehabilitating?  And I have followed the same process that I
13  have used to help law firm clients for the last ten years that
14  resulted in me having successfully launched and led those
15  campaigns with top law firms that led me to becoming an expert
16  witness.

17  Q.   And can you just briefly describe the nuts and bolts of
18  what a rehabilitation plan online for Mr. O'Leary would look
19  like?

20  A.   Simply put, it would be taking an inventory of, one, the
21  most important assets out there to what is it that
22  Mr. O'Leary's comfortable having known out there.  We work
23  with his public relations team to publish content on specific
24  guidelines that fit within his comfort zone.  Again, that's
25  unique to each individual.  So there is a degree of public

1    relations.  There is a component of content creation.  And

2    probably the most important, which is oftentimes overlooked

3    which is where we've had a competitive advantage for quite

4    sometime is the technical work to actually strengthen specific

5    assets relative to others and weaken them, so that somebody

6    who's looking up Mr. O'Leary has a smaller and smaller

7    percentage chance of finding information out that's false.

8          The challenge and problem is is that the word

9    "murder," it's not, you know, he spoke something bad, he had a

10   bad investment.  I mean, I don't know what would be worse than

11   being called a murderer or being called a rapist.  That is, I

12   don't know, a stark of a contrast that you can have to his

13   stellar profile.

14   Q.   And based on your development of this rehabilitation

15   plan, can you explain to the Court what the estimated cost

16   would be for that plan?

17   A.   Yes.  I outlined that to be about 800,000 to $1.2 million

18   over 18 to 24 months.  And following a process, that would be

19   to target and mitigate not just the specific posts that

20   remain, but also the subsequent syndication of that

21   information on social media, someone not liking Mr. O'Leary,

22   someone having too much time on their hands -- I think we call

23   them keyboard warriors -- and reposting that and saying, Oh,

24   look at this murderer.  Why do you care about Shark Tank?

25   Those things are out there.  .they weren't factored in and

1   included, again, again, taking our ultra conservative
2   approach.
3   Q.   And, in your professional opinion, is a rehabilitation
4   campaign necessary for Mr. O'Leary?
5   A.   You know, absolutely.
6         You know, I'm an Abraham Lincoln historian.
7   Mr. Lincoln once said, You can fool some of the people all the
8   time, all the people some of the time, but you can't fool all
9   the people all the time.
10        And case in point.  Last night, I had a call from a
11  woman named Frankie Picasso, she's worked for a foundation
12  that run called Girl Power U.S.A.  And she called me.  We
13  hadn't spoken in probably eight months.  And she said, What
14  are you doing, where are you at?
15        I said, I'm in Miami.  I'm here for a sensitive case.
16  And she kept questioning me, What are you there for, because
17  she knows I do some sensitive -- she's a friend of mine.
18        I said, Oh, I'm here for a case.
19        She said, do I know the person?
20        I said, Maybe.  And I mentioned Mr. O'Leary's name.
21  Immediately what came out of her mouth is, You're testifying
22  in that murder trial?
23        And I said to her -- I said, Look, the rehabilitation
24  is so important.  You're a living example of that.  I will
25  call with you tomorrow and we can catch up.  But I may have to

1    just mention the fact, Frankie Picasso, that you said that and

2    brought up his murder trial, which is completely false, as

3    reason why I am here.  And I ended the call because I was

4    preparing for this.

5              MR. FLOCH:  Your Honor, at this time we don't have

6    any other questions, unless Your Honor has questions.

7              THE COURT:  Yes.  Mr. Floch, it's a little unclear to

8    the Court with regard to the rehabilitative damages whether,

9    in fact, Mr. O'Leary actually incurred those expenses or is

10   the expert, Mr. Somal, merely saying that this is what it

11   would cost.

12             MR. FLOCH:  The latter, Your Honor.  He has not

13   incurred those costs yet.

14             Your Honor, at this time may I ask Mr. Somal to step

15   down?

16             THE COURT:  Certainly.

17             Thank you, sir.  Appreciate your time.

18             THE WITNESS:  Thank you, your Honor.

19       (Witness excused.)

20             THE COURT:  Mr. Neiman, are there additional

21   witnesses?

22             MR. NEIMAN:  There are no additional witnesses, Your

23   Honor.

24             I could do a brief closing, if you want, if there are

25   specific issues you want us to address.  If you want us to

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    brief something.  We defer to the Court.

2            The only point I do want to make is going back

3    through, kind of, the four buckets.  And we, obviously, have

4    the expert's testimony on the reputational damages of about

5    $78,000.  We have the rehabilitation, which we understand the

6    Court's reasoning in other cases as to incurred versus

7    anticipated, but we believe the anticipated costs would be

8    about 1.2 million.

9            Pain and suffering, Your Honor, we -- really hard to

10   put a number on it.  We think, again, it's similar to the

11   other case which the Court has discretion.  It's not anything

12   an expert could opine on.  It's not anything that Mr. O'Leary

13   himself would opine on.  We think a fair number there would be

14   about $750,000.

15           And then there's the punitive damages, which to me,

16   Your Honor, the $2 million number is really the only right

17   number.  And part of our exhibits that I want to just

18   highlight, which we didn't talk about from the stand, are

19   Exhibits 3 through 7 or 3 through 8, which are, kind of, the

20   defendant's history here, right.  And we have in Exhibit 3

21   the -- this is from March, April 2023, where this same

22   defendant said to a lawyer from Miami, You're choosing war

23   with an anonymous community while you yourself are not.  Only

24   a couple of Bitcoins get you and your family shot.  Please be

25   careful.  These people are dangerous, and you provoked them.

1           And that's from Exhibit 3, Page 49.  So, again, I

2    want the Court on the punitive side to remember that.  That's

3    not where the story ends.

4           He was ordered to court in April of 2023 before Judge

5    Damian, then a magistrate.  He didn't appear.  Just didn't

6    show up at all.  April 24th, he was ordered to appear.  He

7    actually came at that point and didn't apologize to the lawyer

8    at that time.  He said -- he was given a stern warning from

9    Judge Damian:  So with that said, we will issue an order

10   discharging the show cause order and ceasing the need for

11   contempt proceedings.  Again, you've been admonished.

12          And then it went on.

13          So, again, he's told -- and this in April of 2023 --

14   to, kind of, behave.  And then around the same time period he

15   was harassing Mr. O'Leary.  In March of 2025 he was involved

16   in both a business and personal divorce.  And this is detailed

17   in Exhibit 6 with the Georgia State Court.  And there he sent

18   a threatening message to the judge there, where he said,

19   quote:  I am going to be emailing you quite frequently.

20   Referred to her as a bitch.  I hope you understand the

21   decision you made to take a bribe, deal, whatever it is.  You

22   see, Judge, the thing -- the think [sic] about a real RICO

23   conspiracy is that you don't actually have to have the exact

24   paper trail for everything.  You are -- expletive -- and this

25   berating will not stop until you yourself are locked up,

1    bitch.

2              Again, that's Exhibit 6, PDF Page 4.  That's about

3    the same time he was harassing Mr. O'Leary.  He was sued then.

4    He was actually in custody on a bench warrant and served with

5    the lawsuit while in custody.  He clearly knew about the case.

6    He's shown no remorse.  He's done nothing to make amends.

7    He's done no retraction.  The punitive damages to me here,

8    Your Honor, are the easiest bucket for the Court to really

9    send a message.  Your have broad discretion, that we urge you

10   to -- you can go higher than my $2 million if you think it's

11   appropriate.  But that's kind of where we want to just

12   summarize our position.

13             And, again, if there's anything else, I'm happy --

14             THE COURT:  Yes.  Mr. Neiman, as you know, the Court

15   is required to enter an order with regard to its findings of

16   fact and conclusions of law related specifically to the issue

17   of damages in this case.

18             I would request not only that you submit a proposed

19   order, but also perhaps a separate memo or contained within

20   the proposal some case law that supports the entitlement to

21   rehabilitative damages where there is no evidence presented to

22   the Court that they have actually been incurred.

23             MR. NEIMAN:  We will, Your Honor.  If it exists, we

24   will.  And, again, obviously, we're aware of the Court's prior

25   ruling.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1           THE COURT:  And if there is case law that supports

2      the claim, then certainly if you will present that to the

3      Court.

4           MR. NEIMAN:  We will let you know, and we trust you

5      will take it into consideration.

6           THE COURT:  How much time do you need to submit that

7      to the court, sir?

8           MR. NEIMAN:  Two weeks, Your Honor, would be

9      sufficient.

10           THE COURT:  All right.  Certainly.

11           Okay, sir.  Anything further?

12           MR. NEIMAN:  I don't believe so.  Thank you for your

13      time.

14           THE COURT:  Thank you, sir.  Have a nice afternoon.

15           MR. NEIMAN:  You, too.  Thank you.

16        (The proceedings adjourned at 10:58 a.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing pages represent a true

4    and correct transcript of the above-styled proceedings as

5    reported on the date, time, and location listed.

6

7          I further certify that I am neither counsel for,

8    related to, nor employed by any of the parties to the action

9    in which this hearing was reported, and further that I am not

10   financially nor otherwise interested in the outcome of the

11   above-entitled matter.

12

13

     DATE: 11/10/25    /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
14                     Official Court Reporter
                       United States District Court
15                     Southern District of Florida
                       400 North Miami Avenue
16                     Miami, Florida 33128
                       MaryAnn_Casale@flsd.uscourts.gov
17

18

19

20

21

22

23

24

25

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 63 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

63

## $

**$150,000** [1] - 15:9
**$200** [1] - 51:15
**$400,000** [1] - 15:9
**$750,000** [2] - 5:2, 58:14
**$78,000** [3] - 5:1, 44:22, 58:5

## '

**'90s** [1] - 11:11
**'99** [2] - 11:24, 11:25

## 1

**1** [10] - 2:12, 8:10, 20:24, 21:1, 21:3, 21:10, 21:13, 22:2, 24:3
**1.2** [6] - 5:3, 7:3, 44:23, 55:17, 58:8
**10** [7] - 2:4, 2:16, 20:25, 21:1, 21:3, 50:9, 51:9
**100** [2] - 28:4, 29:22
**10:27** [1] - 40:2
**10:58** [1] - 61:16
**11** [1] - 12:3
**11.1** [1] - 13:21
**110,000** [1] - 11:15
**120** [1] - 28:21
**12:00** [1] - 18:22
**15,000** [3] - 44:22, 51:20, 52:9
**15,600** [2] - 50:9, 50:20, 51:19
**150** [1] - 51:15
**156,000** [2] - 50:1, 50:2
**16** [1] - 34:15
**17** [1] - 12:13
**17th** [1] - 9:9
**18** [6] - 7:3, 14:10, 16:12, 30:11, 52:19, 55:18
**19th** [2] - 9:9, 24:4

## 2

**2** [9] - 2:12, 5:4, 22:1, 24:3, 24:8, 28:6, 28:9, 58:16, 60:10
**20** [2] - 14:6, 50:22
**200,000** [1] - 30:18
**2000** [2] - 11:24, 11:25
**2012** [1] - 41:1
**2019** [1] - 16:17
**2020** [1] - 38:13
**2023** [4] - 5:11, 58:21, 59:4, 59:13
**2025** [4] - 5:17, 24:4, 50:19, 59:15
**20th** [2] - 9:10, 24:23
**21** [10] - 2:12, 2:12, 2:13,

2:13, 2:14, 2:14, 2:15, 2:15, 2:16, 2:16
**21st** [2] - 9:10, 25:4
**22** [1] - 12:16
**230** [1] - 47:7
**24** [3] - 7:3, 31:2, 55:18
**24th** [1] - 59:6
**25** [2] - 3:20, 14:10
**25-21417** [1] - 3:7
**250** [1] - 30:20
**26th** [1] - 26:17
**2:00** [1] - 18:23
**2:35** [1] - 22:4

## 3

**3** [8] - 2:13, 22:3, 24:3, 24:8, 58:19, 58:20, 59:1
**30** [1] - 29:4
**305** [1] - 29:15
**375** [1] - 47:20
**3D** [1] - 42:20

## 4

**4** [6] - 2:13, 4:23, 7:21, 24:4, 24:8, 60:2
**4.2** [2] - 11:18, 11:22
**40** [1] - 2:6
**44** [1] - 27:20
**45** [1] - 15:9
**49** [1] - 59:1

## 5

**5** [4] - 2:14, 24:22, 24:23, 51:19
**500-plus** [1] - 42:8
**54** [1] - 10:24

## 6

**6** [6] - 2:14, 24:23, 52:16, 59:17, 60:2
**617** [3] - 29:13, 29:16

## 7

**7** [5] - 2:15, 9:2, 25:3, 25:9, 58:19
**78,000** [2] - 51:20, 52:9
**786** [1] - 29:15

## 8

**8** [3] - 2:15, 25:3, 58:19
**800,000** [2] - 44:23, 55:17
**810,000** [2] - 7:3, 44:23
**8:49** [1] - 21:16

## 9

**9** [1] - 2:16
**9:44** [1] - 10:1

## A

**a.m.** [4] - 10:1, 21:16, 40:2, 61:16
**abide** [1] - 38:19
**abides** [1] - 38:14
**ability** [1] - 46:16
**able** [6] - 42:2, 46:3, 48:25, 50:11, 51:3, 52:2
**Abraham** [2] - 43:4, 56:6
**absolute** [1] - 50:20
**absolutely** [4] - 44:15, 47:6, 52:23, 56:5
**Abu** [1] - 15:11
**academic** [1] - 53:12
**Academy** [1] - 42:22
**accepting** [1] - 30:2
**accident** [16] - 6:4, 6:5, 7:4, 15:20, 16:1, 16:9, 16:11, 17:8, 19:19, 20:9, 23:7, 26:11, 32:5, 33:12, 34:24, 35:2
**account** [1] - 28:14
**accountability** [1] - 37:5
**accountable** [1] - 8:17
**accounting** [1] - 41:12
**accused** [6] - 5:11, 6:10, 23:2, 32:12, 47:24, 49:4
**acquaintances** [1] - 49:5
**acquisitions** [1] - 42:13
**acquitted** [1] - 6:6
**act** [1] - 14:19
**action** [1] - 5:13
**actions** [1] - 19:21
**activ** [1] - 38:7
**active** [1] - 20:3
**actor** [1] - 8:6
**actual** [7] - 4:20, 6:25, 19:10, 21:25, 24:22, 50:7, 50:15
**addition** [1] - 46:4
**additional** [5] - 8:4, 30:14, 30:19, 57:20, 57:22
**address** [4] - 3:21, 4:12, 5:14, 57:25
**addressed** [1] - 37:18
**addressing** [1] - 4:25
**adds** [1] - 7:7
**adjourned** [1] - 61:16
**administration** [1] - 38:16
**admitted** [2] - 21:1, 21:4
**admonished** [1] - 59:11
**advance** [1] - 3:21
**advantage** [1] - 55:3

**adversarial** [1] - 36:19
**advertising** [2] - 13:23, 13:25
**advise** [2] - 8:25, 12:18
**advocate** [1] - 33:24
**affairs** [1] - 12:18
**affect** [3] - 36:19, 47:4, 47:16
**affected** [1] - 49:13
**affidavit** [1] - 3:20
**afternoon** [1] - 61:14
**agencies** [1] - 31:9
**agency** [2] - 15:1, 52:13
**agent** [3] - 15:2, 33:25, 34:1
**agents** [1] - 33:25
**aggressive** [1] - 5:9
**aggressively** [1] - 11:2
**ago** [6] - 7:5, 12:13, 29:5, 32:5, 32:9, 34:24
**agreement** [1] - 30:9
**ahead** [1] - 3:2
**AI** [1] - 47:20
**air** [7] - 18:21, 20:12, 21:25, 23:16, 23:21, 24:9, 31:18
**airlines** [1] - 12:5
**airplane** [1] - 15:15
**alcohol** [1] - 8:17
**allow** [3] - 7:17, 8:20, 38:7
**almost** [2] - 5:21, 16:1
**alone** [1] - 15:12
**alternative** [1] - 41:16
**ambassadors** [1] - 11:1
**amends** [1] - 60:6
**America** [3] - 11:3, 11:16, 15:1
**American** [5] - 10:23, 11:1, 11:2, 12:17, 42:18
**amount** [2] - 8:20, 51:12
**analogy** [2] - 38:11, 38:12
**analysis** [11] - 7:18, 41:8, 42:12, 45:19, 46:19, 47:2, 47:5, 49:17, 50:24, 53:10, 53:13
**analyst** [2] - 13:18, 41:16
**Angeles** [1] - 15:2
**anguish** [1] - 45:1
**annual** [1] - 14:22
**anonymous** [1] - 58:23
**answer** [1] - 37:25
**anticipated** [2] - 58:7
**anyway** [1] - 19:20
**anyways** [1] - 26:14
**apologize** [2] - 36:22, 59:7
**apostrophe** [1] - 10:6

**apparent** [1] - 47:25
**appear** [3] - 31:14, 59:5, 59:6
**appearance** [1] - 13:14
**appearances** [1] - 3:8
**appeared** [1] - 4:4
**appearing** [1] - 12:11
**applied** [2] - 7:18, 51:18
**apply** [2] - 7:17, 52:2
**appreciate** [1] - 57:17
**approach** [12] - 4:8, 20:21, 28:5, 40:5, 44:19, 48:17, 50:13, 50:21, 51:18, 53:5, 53:15, 56:2
**appropriate** [2] - 39:9, 60:11
**April** [4] - 58:21, 59:4, 59:6, 59:13
**aptly** [1] - 41:21
**area** [1] - 54:6
**argue** [1] - 51:15
**Armstrong** [5] - 3:7, 4:5, 5:11, 19:24, 27:7
**arrangement** [1] - 13:21
**arrested** [1] - 5:18
**arrive** [1] - 13:6
**arthritis** [1] - 17:11
**article** [2] - 42:19, 53:12
**articles** [1] - 42:15
**articulated** [1] - 46:2
**aspects** [1] - 14:19
**assessing** [1] - 50:25
**assets** [3] - 42:13, 54:21, 55:5
**assign** [2] - 51:7, 51:10
**assigning** [1] - 6:24
**associate** [1] - 27:22
**associated** [3] - 6:5, 42:16, 43:4
**Association** [2] - 42:19, 43:8
**assumption** [1] - 28:19
**assure** [1] - 13:11
**attack** [2] - 5:22, 8:19
**attempt** [1] - 9:12
**attention** [1] - 51:12
**attorney** [1] - 42:23
**attorney's** [1] - 5:16
**August** [1] - 16:17
**authenticated** [1] - 17:20
**authored** [4] - 42:15, 42:19, 42:23, 43:3
**award** [1] - 4:22
**aware** [4] - 19:23, 36:24, 49:11, 60:24

## B

**background** [6] - 10:21, 11:6, 11:8, 12:11, 15:7,

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 64 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

64

41:11
**bad** [6] - 8:6, 36:20, 36:21, 55:9, 55:10
**balanced** [1] - 50:13
**ball** [1] - 13:16
**Bar** [5] - 42:18, 42:19, 43:7, 43:8
**Barbara** [1] - 12:25
**bare** [1] - 51:19
**base** [1] - 35:21
**based** [9] - 3:14, 6:23, 7:3, 22:22, 45:19, 46:7, 46:12, 52:3, 55:14
**baseline** [1] - 51:19
**Basepaws** [1] - 12:5
**became** [1] - 34:20
**become** [3] - 10:25, 19:23, 45:8
**becoming** [1] - 54:15
**began** [2] - 5:22, 12:11
**beginning** [3] - 3:9, 20:2, 44:13
**behalf** [4] - 3:11, 4:4, 10:8, 40:14
**behave** [1] - 59:14
**behavior** [1] - 8:19
**behind** [2] - 4:25, 25:25
**bench** [1] - 60:4
**Benjamin** [2] - 3:7, 19:23
**berating** [1] - 59:25
**best** [4] - 7:16, 8:20, 9:14, 19:2
**better** [2] - 23:11, 46:13
**between** [1] - 44:22
**beyond** [2] - 25:17, 31:17, 43:1
**bias** [1] - 50:12
**Big** [4] - 15:2, 15:16, 18:22, 34:1
**big** [6] - 14:9, 14:12, 16:6, 23:17, 26:15, 30:16
**bigger** [1] - 14:2, 48:4
**biggest** [1] - 15:2
**bill** [1] - 30:16
**billed** [1] - 31:10
**billion** [2] - 11:18, 11:22
**bit** [1] - 23:24
**BitBoy** [7] - 20:4, 20:5, 20:18, 21:21, 23:6, 28:19, 35:22
**BitBoys** [1] - 38:8
**bitch** [2] - 59:20, 60:1
**Bitcoins** [1] - 58:24
**blemished** [2] - 15:5, 15:23
**block** [2] - 23:20, 28:18
**blocked** [1] - 28:13
**Bloomberg** [1] - 30:5
**Blue** [5] - 40:21, 40:22,

40:25, 41:2, 41:17
**boat** [6] - 16:25, 17:4, 17:5, 17:8, 17:20, 18:12
**boathouse** [1] - 17:22
**boating** [19] - 6:4, 6:5, 7:4, 15:20, 16:1, 16:9, 16:11, 16:15, 16:25, 17:13, 17:14, 17:16, 20:9, 23:7, 26:11, 32:4, 33:12, 34:24, 35:2
**boats** [2] - 17:2, 17:3
**bolts** [1] - 54:17
**booked** [1] - 31:23
**bothersome** [1] - 26:10
**brand** [7] - 33:24, 45:22, 51:23, 52:5, 52:14, 52:15, 53:3
**branding** [2] - 14:13, 45:16
**Brandon** [2] - 3:11, 3:21
**break** [3] - 4:23, 23:4, 24:12
**breakfast** [2] - 25:13, 25:14
**bribe** [1] - 59:21
**brief** [3] - 4:10, 57:24, 58:1
**briefly** [6] - 10:20, 11:8, 16:19, 41:2, 41:10, 41:19, 44:13, 54:17
**bring** [2] - 14:21, 37:18
**brings** [1] - 34:21
**broad** [1] - 60:9
**broadcast** [1] - 22:23
**brought** [4] - 6:3, 7:9, 20:9, 57:2
**brutal** [2] - 18:13, 26:1
**bucket** [4] - 4:25, 48:7, 53:16, 60:8
**buckets** [3] - 4:24, 14:17, 58:3
**building** [2] - 20:3, 41:4
**buildings** [1] - 30:4
**built** [2] - 17:3, 34:17
**bunch** [1] - 27:20
**business** [27] - 10:23, 11:2, 11:3, 11:6, 11:8, 11:17, 12:1, 12:17, 12:21, 14:7, 14:9, 15:1, 15:8, 16:14, 24:18, 27:22, 29:5, 29:17, 33:1, 33:10, 33:20, 36:10, 37:16, 41:17, 48:24, 53:14, 59:16
**Business** [2] - 30:4, 42:22
**businesses** [4] - 12:2, 27:1, 41:5, 41:23
**BY** [7] - 10:11, 11:21, 19:9, 21:8, 28:8, 40:17, 44:10

# C

**C-level** [1] - 45:12
**calculating** [1] - 6:23
**calmed** [2] - 27:4, 35:8
**camera** [1] - 17:23
**cameras** [2] - 17:18
**campaign** [1] - 56:4
**campaigns** [2] - 34:3, 54:15
**Canada** [4] - 10:15, 12:15, 16:10, 16:24
**cancel** [1] - 45:19
**capital** [4] - 11:19, 12:8, 15:12, 41:25
**car** [3] - 13:7, 15:19, 30:11
**card** [1] - 34:2
**care** [3] - 36:15, 36:16, 36:17, 55:24
**careful** [1] - 58:25
**Case** [1] - 3:6
**case** [34] - 5:6, 5:20, 7:2, 7:14, 7:15, 7:17, 7:19, 8:9, 17:17, 19:22, 26:16, 35:12, 42:9, 43:10, 44:16, 44:20, 45:19, 47:11, 47:23, 48:13, 49:2, 50:23, 51:3, 51:11, 52:8, 54:11, 56:10, 56:15, 56:18, 58:11, 60:5, 60:17, 60:20, 61:1
**cases** [6] - 14:1, 42:8, 42:11, 42:24, 53:1, 58:6
**catastrophe** [1] - 8:7
**catch** [1] - 56:25
**categories** [1] - 44:18
**category** [2] - 9:7, 9:8
**cats** [1] - 12:6
**caught** [1] - 26:8
**cautiously** [1] - 38:2
**cease** [1] - 25:12
**ceasing** [1] - 59:10
**celebrities** [2] - 45:12, 46:8
**celebrity** [2] - 14:2, 52:5
**CEO** [2] - 33:8, 40:24, 41:21
**certain** [1] - 12:19
**certainly** [15] - 3:15, 4:3, 4:14, 9:21, 20:22, 23:17, 28:7, 29:25, 31:5, 40:8, 44:9, 45:25, 57:16, 61:2, 61:10
**certainty** [1] - 16:13
**CFA** [1] - 41:15
**CFP** [1] - 41:15
**challenge** [3] - 34:23, 48:24, 55:8
**chance** [3] - 6:14, 24:12,

55:7
**change** [5] - 29:1, 29:7, 29:10, 30:24, 53:23
**changed** [3] - 14:4, 15:18
**changer** [1] - 16:7
**changing** [1] - 54:3
**Channel** [1] - 12:14
**charge** [1] - 18:1
**charged** [1] - 17:13
**charges** [1] - 6:6
**charging** [1] - 12:4
**charter** [2] - 41:15, 41:16
**chase** [1] - 31:23
**ChatGPT** [3] - 47:16, 47:21, 47:22
**checking** [1] - 15:8
**Chicago** [2] - 42:24
**child** [1] - 48:21
**China** [1] - 38:13
**choice** [1] - 28:17
**choosing** [1] - 58:22
**Choslovsky** [1] - 42:23
**Chung** [2] - 24:15, 43:21
**cited** [1] - 52:5
**cities** [1] - 31:7
**citizens** [1] - 41:23
**city** [2] - 30:20, 31:5
**civil** [1] - 3:6
**claim** [6] - 17:15, 26:14, 32:3, 32:15, 35:1, 61:2
**claims** [5] - 17:19, 30:1, 32:16, 36:13, 37:20
**clarification** [2] - 11:14, 26:13
**class** [1] - 5:13
**clause** [1] - 32:8
**clear** [6] - 17:19, 19:1, 19:11, 24:1, 52:7, 53:8
**cleared** [1] - 6:6
**clearly** [2] - 36:15, 60:5
**client** [1] - 5:22
**clients** [4] - 45:8, 45:11, 48:15, 54:13
**close** [4] - 8:8, 17:6, 33:7, 49:1
**closing** [1] - 57:24
**CNBC** [1] - 30:4
**CNN** [1] - 30:4
**co** [3] - 11:10, 40:24, 42:23
**co-authored** [1] - 42:23
**co-founder** [1] - 40:24
**co-founders** [1] - 11:10
**collaborate** [2] - 13:23, 14:4
**collaborative** [1] - 13:21
**colleagues** [1] - 30:3
**comfort** [1] - 54:24

**comfortable** [4] - 50:21, 50:23, 52:10, 54:22
**coming** [4] - 17:5, 22:3, 24:13, 37:11, 37:15
**commenced** [1] - 5:23
**commentator** [1] - 13:18
**comments** [2] - 36:10, 36:25
**commercial** [3] - 12:5, 23:4, 24:12
**commodity** [2] - 41:22, 50:11
**communication** [1] - 43:22
**community** [4] - 16:25, 20:4, 58:23
**companies** [9] - 14:20, 14:21, 14:24, 24:18, 31:10, 33:7, 41:6, 47:8
**Company** [2] - 11:10, 11:18
**company** [5] - 11:12, 15:15, 45:5, 47:48, 53:2
**compartmentalize** [2] - 9:4, 9:5
**compensated** [1] - 44:1
**compensation** [1] - 44:3
**competitive** [1] - 55:3
**complaint** [6] - 26:16, 33:17, 35:15, 36:11, 37:25, 38:1
**completely** [5] - 18:9, 25:9, 35:16, 38:15, 57:2
**component** [1] - 55:1
**composite** [3] - 8:10, 21:10, 28:11
**computed** [1] - 6:21
**computer** [1] - 3:5
**conceptualize** [2] - 48:15, 48:25
**concerned** [1] - 35:17
**concerns** [1] - 29:21
**conclusions** [2] - 44:11, 60:16
**conduct** [2] - 5:9, 8:17
**conducted** [2] - 43:17, 43:20
**conference** [1] - 14:22
**confirmed** [1] - 52:3
**connection** [2] - 46:18, 49:12
**consequence** [3] - 38:10, 38:20, 42:4
**consequences** [2] - 38:15, 46:14
**conservative** [7] - 16:10, 48:17, 50:8, 51:18, 51:23, 53:4, 56:1
**conservatively** [1] - 49:25

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 65 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

65

consider [4] - 5:7, 38:6, 39:3, 52:21
considerable [2] - 41:7, 47:20
consideration [2] - 5:7, 61:5
considers [1] - 49:8
conspiracy [1] - 59:23
constantly [1] - 20:16
consultant [2] - 42:6, 42:8
consulting [1] - 41:7
contacts [2] - 29:5, 29:7
contained [1] - 60:19
contempt [1] - 59:11
content [11] - 31:25, 45:6, 47:4, 47:8, 49:13, 49:20, 50:12, 54:4, 54:5, 54:23, 55:1
context [3] - 41:9, 43:6, 53:3
continue [2] - 36:18, 48:4
continuing [2] - 43:2, 43:3
contract [1] - 32:10
contracts [1] - 32:7
contrast [1] - 55:12
contributor [3] - 12:17, 13:18, 14:2
control [1] - 45:10
controlled [1] - 36:2
controversial [1] - 34:7
conversations [1] - 31:21
coordination [1] - 24:15
copy [1] - 21:5
Corcoran [1] - 12:25
core [1] - 29:16
cornerstone [1] - 46:5
correct [8] - 16:17, 16:18, 19:8, 24:10, 26:24, 44:24, 45:3, 50:4
correcting [1] - 7:6
cost [5] - 38:23, 52:17, 53:14, 55:15, 57:11
costs [4] - 8:4, 52:20, 57:13, 58:7
counsel [3] - 3:8, 3:9, 43:15
Count [1] - 9:2
countries [1] - 10:24
counts [3] - 8:24, 9:1, 9:11
couple [4] - 21:20, 25:11, 51:14, 58:24
course [8] - 4:9, 9:2, 9:9, 9:18, 17:15, 39:17, 39:23, 51:2
court [6] - 9:11, 35:16,

53:18, 54:11, 59:4, 61:7
Court [43] - 3:1, 3:14, 3:15, 3:19, 4:13, 4:15, 4:21, 4:22, 5:7, 5:8, 6:19, 7:17, 8:23, 8:24, 9:1, 10:14, 10:20, 11:14, 16:19, 20:24, 31:20, 38:4, 38:6, 38:18, 39:3, 39:8, 41:2, 41:10, 41:19, 45:24, 48:19, 49:16, 52:7, 55:15, 57:8, 58:1, 58:11, 59:2, 59:17, 60:8, 60:14, 60:22, 61:3
COURT [30] - 3:2, 3:13, 3:25, 4:3, 4:9, 4:14, 8:22, 9:8, 9:15, 9:18, 9:21, 19:6, 20:22, 21:1, 21:6, 28:7, 39:10, 39:17, 39:20, 39:23, 40:8, 44:9, 57:7, 57:16, 57:20, 60:14, 61:1, 61:6, 61:10, 61:14
Court's [7] - 3:14, 4:16, 4:17, 7:12, 7:16, 58:6, 60:24
COURTROOM [4] - 3:6, 10:3, 40:4, 40:9
courtroom [1] - 3:12
courts [2] - 43:16, 51:25
cover [1] - 25:11
coverage [1] - 8:3
covered [3] - 19:16, 19:18, 46:23
covering [1] - 6:10
cowboy [1] - 36:1
cowboys [1] - 35:23
crazy [5] - 8:5, 22:25, 23:11, 27:4, 37:12
creation [1] - 55:1
credit [1] - 34:2
crime [1] - 6:11
crowd [1] - 33:6
crying [1] - 26:1
crypto [7] - 12:19, 12:22, 20:4, 34:20, 35:23, 36:1
currency [1] - 45:23
custody [2] - 60:4, 60:5

D

daily [1] - 25:10
damage [5] - 6:18, 8:20, 22:4, 47:16, 48:13
damages [42] - 3:16, 3:18, 3:22, 4:12, 4:18, 4:20, 4:23, 5:1, 5:2, 5:3, 5:4, 5:5, 6:21, 7:1, 7:15, 7:21, 7:25, 8:25, 9:4, 9:6, 9:13, 41:9, 42:16, 44:8, 44:17, 44:21, 45:1, 47:2, 48:4, 48:7, 48:10, 52:8,

53:10, 53:17, 53:19, 57:8, 58:4, 58:15, 60:7, 60:17, 60:21
Damages [1] - 42:20
Damian [2] - 59:5, 59:9
dangerous [1] - 58:25
dark [2] - 27:12, 47:6
database [2] - 27:23, 28:18
dates [1] - 9:2
daughter [1] - 26:6
days [5] - 6:9, 26:24, 29:15, 33:14, 35:9
deal [10] - 7:10, 13:1, 14:12, 16:6, 18:6, 24:21, 25:18, 45:6, 47:12, 59:1
dealing [5] - 6:16, 35:6, 35:8, 36:5, 36:6
death [1] - 6:5
debate [1] - 31:4
decided [1] - 17:21
decision [1] - 59:21
decisions [1] - 46:11
declaration [1] - 3:20
decreased [1] - 49:14
deep [1] - 8:13
Defamation [1] - 42:20
defamation [7] - 4:16, 6:18, 7:14, 42:17, 43:6, 44:16, 47:12
defamatory [6] - 6:23, 44:15, 46:20, 46:22, 47:17, 50:3, 50:18, 53:22
default [6] - 3:16, 4:16, 4:19, 6:20, 7:14, 8:23
defend [1] - 47:24
defendant [9] - 4:5, 5:6, 5:17, 6:8, 8:9, 8:10, 19:22, 49:24, 58:22
defendant's [2] - 5:22, 58:20
defer [1] - 58:1
definitely [1] - 25:6
degree [8] - 41:12, 42:1, 46:3, 46:14, 47:10, 47:12, 47:13, 54:25
delineate [1] - 9:12
Dent [1] - 12:15
deny [1] - 48:6
DEPUTY [4] - 3:6, 10:3, 40:4, 40:9
describe [7] - 10:20, 11:8, 11:25, 16:19, 33:4, 42:9, 54:17
designations [1] - 41:14
desist [1] - 25:12
detail [1] - 31:20
detailed [2] - 44:14, 59:16
determine [1] - 50:18

determined [1] - 51:6
develop [1] - 54:8
development [1] - 55:14
Dhabi [1] - 15:11
died [1] - 20:10
Diego [1] - 11:13
different [4] - 9:2, 14:17, 34:10, 37:23
difficult [1] - 18:4
dig [2] - 28:14, 32:15
digital [5] - 6:18, 12:19, 41:5, 45:16, 46:1
diligence [1] - 35:13
diligence-ing [1] - 35:13
dinner [1] - 17:1
direct [2] - 39:18, 49:12
Direct [2] - 2:4, 2:6
DIRECT [2] - 10:10, 40:16
direction [1] - 36:3
directly [1] - 23:5
discharging [1] - 59:10
discounted [1] - 50:7
Discovery [1] - 12:14
discretion [2] - 58:11, 60:9
discussion [1] - 45:5
dispute [2] - 5:21, 7:22
distance [1] - 34:25
District [1] - 42:25
divorce [1] - 59:16
DNA [2] - 12:5, 29:10
dock [1] - 17:6
Docket [1] - 3:19
doctor [1] - 45:4
document [1] - 18:10
documentation [1] - 43:15
documented [4] - 17:23, 45:20, 50:4, 52:4
dog [2] - 8:13, 8:15
dollar [5] - 6:24, 51:7, 51:10, 51:18, 52:2
dollars [4] - 37:15, 51:14, 52:25, 53:7
done [7] - 13:4, 18:17, 18:20, 30:23, 37:2, 60:6, 60:7
door [4] - 30:5, 30:9, 30:12, 31:4
doubt [1] - 52:24
down [11] - 4:23, 8:15, 18:24, 23:12, 23:23, 27:4, 35:8, 36:20, 49:22, 52:20, 57:15
dragging [1] - 18:15
Dragon's [1] - 12:15
drank [1] - 17:15
draw [1] - 38:10

dream [1] - 11:1
dried [1] - 16:5
drink [1] - 17:16
drive [1] - 15:19
driver [2] - 13:8, 17:21
drives [1] - 17:4
duly [4] - 10:1, 10:9, 40:2, 40:15
during [4] - 4:2, 4:24, 18:5, 20:1, 20:2, 23:15, 25:20, 30:1

E

ear [2] - 20:16, 22:24
early [1] - 11:11
earn [1] - 46:3
earth [1] - 11:12
easier [1] - 50:10
easiest [1] - 60:8
easily [3] - 50:23, 53:5, 53:6
easy [1] - 18:6
eating [1] - 25:13
ECF16 [1] - 3:15
economic [4] - 7:24, 41:8, 42:12, 53:13
economy [2] - 12:3, 14:23
education [2] - 43:2, 43:4
educational [2] - 11:12, 41:11
effect [3] - 49:14, 52:6
eight [2] - 6:9, 56:13
either [1] - 26:3
emailing [1] - 59:19
emotional [2] - 5:2, 7:23
employed [1] - 40:20
encouraged [1] - 5:15
encouraging [1] - 29:20
end [4] - 4:22, 51:17
ended [1] - 57:3
ending [1] - 35:10
ends [1] - 59:3
endured [1] - 47:11
energetic [1] - 20:6
engaged [3] - 42:5, 42:7, 42:10
engagement [3] - 25:7, 35:20, 35:21
engagements [2] - 16:5, 37:16
Engine [2] - 33:6
engineer [1] - 48:1
engines [3] - 47:21, 48:3, 50:12
England [1] - 12:14
enter [1] - 60:15
entered [1] - 8:23

enterprise [1] - 50:24
enterprises [2] - 11:19, 38:25
entire [3] - 14:8, 26:25, 45:25
entities [1] - 37:23
entitlement [1] - 60:20
entrepreneurs [1] - 13:22
Entry [1] - 3:20
equity [1] - 33:6
Eric [1] - 41:21
erroneous [1] - 45:6
escalated [1] - 5:18
especially [1] - 8:4
essence [1] - 6:24
essentially [1] - 4:1
estimated [1] - 55:15
estimates [1] - 7:2
evening [1] - 16:23
event [1] - 16:13
eventually [3] - 11:17, 12:16, 17:17
everyday [2] - 13:17, 15:17
everywhere [1] - 31:4
evidence [4] - 4:21, 21:2, 21:4, 60:21
evidentiary [1] - 3:21
exact [1] - 59:23
exactly [3] - 6:12, 24:11, 32:14
EXAMINATION [2] - 10:10, 40:16
Examination [2] - 2:4, 2:6
examined [2] - 10:9, 40:15
example [2] - 15:19, 56:24
except [1] - 35:3
excused [3] - 16:4, 39:14, 57:19
executive [1] - 23:10
executives [1] - 45:13
EXHIBIT [1] - 2:11
exhibit [4] - 21:10, 22:10, 26:17, 28:6
Exhibit [22] - 2:12, 2:12, 2:13, 2:13, 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 8:10, 20:24, 21:3, 21:10, 22:2, 28:6, 28:9, 58:20, 59:1, 59:17, 60:2
exhibits [3] - 4:2, 5:8, 58:17
EXHIBITS [1] - 2:10
Exhibits [2] - 21:1, 58:19
exist [1] - 41:23

existing [1] - 43:16
exists [2] - 47:8, 60:23
exonerated [2] - 18:1, 18:9
expected [1] - 33:19
expenses [1] - 57:9
expert [17] - 4:12, 6:18, 7:24, 34:20, 39:15, 40:6, 42:6, 42:7, 42:10, 43:9, 43:12, 44:7, 54:15, 57:10, 58:12
expert's [1] - 58:4
explain [8] - 14:13, 23:14, 31:20, 41:19, 45:24, 48:18, 53:18, 55:15
explaining [1] - 23:9, 34:23, 35:11
expletive [1] - 59:24
extend [1] - 34:25
external [1] - 36:9

**F**

facetious [1] - 12:25
fact [7] - 32:10, 39:4, 51:1, 52:19, 57:1, 57:9, 60:16
factored [1] - 55:25
facts [2] - 5:25, 9:3
factual [3] - 20:11, 36:14, 37:24
failed [1] - 12:7
fair [1] - 58:13
fallout [1] - 24:21
false [2] - 55:7, 57:2
families [3] - 14:6, 15:15, 38:24
family [9] - 5:20, 17:3, 18:8, 31:3, 35:12, 37:17, 38:23, 49:1, 58:24
fan [2] - 51:10, 51:13
far [3] - 26:20, 35:17, 37:5
fastest [1] - 14:19
fastest-growing [1] - 14:19
favor [1] - 48:23
featuring [1] - 54:3
fee [2] - 13:20, 31:11
feed [1] - 13:24
fees [2] - 15:9, 15:13
felt [1] - 18:8
few [2] - 20:9, 32:9, 52:12
fictitious [1] - 35:17
file [1] - 33:17
filed [4] - 26:16, 35:15, 37:25, 38:1
final [1] - 27:5
finally [1] - 38:16

Finance [1] - 30:5
finance [1] - 41:12
financial [1] - 34:8
findings [3] - 17:24, 18:3, 60:15
fire [3] - 22:3, 33:14, 33:16
firm [2] - 43:24, 54:13
firms [1] - 54:15
first [10] - 8:2, 9:17, 10:9, 13:1, 19:23, 21:19, 22:9, 40:15, 45:15, 48:7
fit [1] - 54:24
five [6] - 6:9, 14:2, 20:13, 27:23, 31:7, 52:21
flies [1] - 15:15
FLOCH [6] - 39:21, 40:17, 44:6, 44:10, 57:5, 57:12
Floch [5] - 2:6, 3:11, 3:21, 39:18, 57:7
Florida [2] - 5:18, 10:18
flow [1] - 22:22
focus [2] - 5:5, 34:22
follow [2] - 7:16, 43:19
followed [1] - 54:12
follower [1] - 51:11
followers [9] - 5:15, 13:22, 26:6, 27:14, 29:20, 45:21, 50:5, 50:14
following [5] - 4:23, 25:3, 49:23, 53:12, 55:18
follows [3] - 10:9, 40:15, 51:11
fool [2] - 56:7, 56:8
foot [2] - 17:9, 17:10
forces [1] - 7:10
forget [1] - 38:8
formally [1] - 20:24
former [1] - 41:21
forward [7] - 9:23, 12:21, 15:3, 33:23, 34:2, 34:4, 39:24
Foundation [1] - 43:8
foundation [1] - 56:11
foundational [1] - 46:4
founder [2] - 40:24, 47:18
founders [1] - 11:10
four [5] - 25:25, 26:24, 27:23, 42:24, 58:3
Fox [8] - 8:2, 18:21, 23:9, 24:9, 30:4, 30:10, 31:17
framework [2] - 42:20, 48:14
franchise [1] - 20:3
Frankie [2] - 56:11, 57:1
freaking [1] - 25:10
free [2] - 31:10, 39:9

freedom [1] - 36:1
frequently [1] - 59:19
friend [1] - 56:17
friendly [1] - 49:8
friends [1] - 49:1
front [1] - 12:20
FTX [5] - 5:13, 20:2, 34:11, 34:12, 34:21
full [1] - 31:2
funding [1] - 33:6
future [1] - 41:23

**G**

gain [1] - 51:13
game [1] - 16:7
game-changer [1] - 16:7
gas [1] - 14:24
gazing [1] - 17:21
gears [1] - 31:12
general [1] - 5:10
generally [5] - 11:25, 13:18, 42:9, 45:16, 47:3
generate [1] - 15:12
generates [1] - 14:9
generative [1] - 47:20
Georgetown [1] - 41:13
Georgia [2] - 5:19, 59:17
giant [1] - 15:1
Girl [1] - 56:12
given [3] - 20:23, 51:23, 59:8
Global [3] - 40:21, 40:22, 40:25
Goldman [2] - 14:20, 15:4
goodwill [1] - 41:24
Google [2] - 41:22, 50:12
Government [1] - 29:6
government [1] - 36:2
Government's [1] - 22:2
governments [1] - 41:6
great [1] - 13:3
grew [1] - 17:2
Grok [1] - 47:22
growing [1] - 14:19
guard [1] - 30:19
guess [10] - 7:20, 13:13, 14:11, 15:22, 20:23, 21:12, 30:18, 35:23, 43:16
guest [1] - 20:13
guided [1] - 45:25
guidelines [1] - 5:10
guy [15] - 23:5, 23:15, 25:2, 25:7, 26:5, 26:22, 30:22, 33:18, 34:18, 36:15, 36:20, 36:21, 37:7, 39:1

**H**

hack [1] - 27:11
half [4] - 12:8, 13:19, 16:2, 18:18
hand [3] - 9:25, 39:25, 40:6
handing [1] - 21:9
handle [1] - 39:18
handled [1] - 42:24
hands [1] - 55:22
happy [1] - 60:13
harassing [4] - 5:11, 5:19, 59:15, 60:3
hard [2] - 8:14, 58:9
harder [1] - 54:4
harm [17] - 6:22, 44:18, 44:20, 44:21, 45:6, 47:5, 47:12, 48:16, 48:18, 49:17, 50:17, 52:1, 52:2, 52:18, 53:9
harmed [3] - 44:15, 49:14, 49:20
harmful [3] - 44:16, 45:9, 53:21
hauled [1] - 34:11
head [1] - 43:22
hear [6] - 5:25, 6:15, 7:22, 7:24, 7:25, 8:1
hearing [5] - 3:14, 3:21, 4:22, 4:25, 7:15
heightened [1] - 34:12
held [1] - 47:8
help [3] - 42:2, 43:18, 54:13
helped [1] - 45:5
helpful [2] - 8:24, 9:11
helpless [1] - 45:10
herein [2] - 10:8, 40:14
hidden [1] - 28:15
high [2] - 17:14, 46:8
high-profile [1] - 46:8
high-speed [1] - 17:14
higher [4] - 35:21, 51:17, 52:10, 60:10
highlight [1] - 58:18
highlighted [1] - 52:13
himself [2] - 47:24, 58:13
hint [1] - 17:14
hire [5] - 14:22, 15:4, 30:14, 52:14, 52:15
hired [2] - 20:1, 33:5
historian [1] - 56:6
history [6] - 5:6, 5:9, 23:6, 34:9, 46:7, 58:20
Hive [1] - 33:5
hold [2] - 8:17, 16:6
holder [1] - 41:15
home [3] - 5:14, 16:24, 17:5

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 67 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

67

homes [1] - 17:1
Honor [26] - 3:10, 3:24,
4:7, 4:8, 8:16, 9:14, 9:19,
20:21, 20:25, 39:7, 39:13,
39:15, 39:21, 40:5, 44:6,
57:5, 57:6, 57:12, 57:14,
57:18, 57:23, 58:9, 58:16,
60:8, 60:23, 61:8
hope [1] - 59:20
hopefully [1] - 7:17
hospital [1] - 17:9
host [1] - 20:13
hosts [2] - 20:13, 23:13
hounding [1] - 18:9
hour [2] - 20:12, 31:2
hours [2] - 13:19, 18:22
House [1] - 12:20
house [1] - 5:16
Howard [1] - 33:11
hundreds [2] - 12:2, 45:5

I

ID [1] - 22:7
idea [1] - 27:11
identified [1] - 21:4
identity [2] - 41:22, 42:1
IFB [1] - 20:16
ignored [2] - 18:18,
20:10
immediately [3] - 5:21,
32:1, 56:21
immense [1] - 37:21
impact [3] - 23:17, 25:8,
46:15
impacted [2] - 6:25,
31:13
implementation [1] -
42:3
implication [1] - 25:15
important [7] - 6:1, 29:6,
29:7, 52:11, 54:21, 55:2,
56:24
impossible [1] - 17:7
inappropriate [1] - 5:9
inbound [2] - 25:18,
27:19
inbounds [1] - 37:11
inch [1] - 21:21
incident [3] - 8:21,
16:15, 38:5
inciting [1] - 29:25
included [1] - 56:1
including [4] - 24:17,
42:14, 43:21, 45:12
income [4] - 14:18,
15:23, 16:2, 38:25
incredibly [1] - 39:2
incurred [4] - 57:9,
57:13, 58:6, 60:22

individual [5] - 3:23,
51:8, 52:3, 53:2, 54:25
individuals [4] - 41:5,
46:8, 50:18, 51:6
inferences [1] - 46:12
influencer [1] - 51:5
information [7] - 47:23,
49:3, 53:20, 54:5, 54:6,
55:7, 55:21
infrastructure [2] -
26:25, 29:17
ing [1] - 35:13
injury [1] - 7:23
insecticides [1] - 12:4
Instagram [2] - 22:7,
45:21
Instead [1] - 50:15
instructions [1] - 30:10
insult [2] - 39:5, 39:6
intangible [2] - 42:13,
48:20
intentional [2] - 8:19,
18:20
intentionally [1] - 18:21
interested [1] - 19:7
internet [5] - 8:5, 42:1,
42:11, 47:3, 47:4
interviews [1] - 43:21
intimidating [1] - 5:14
intoxicated [1] - 17:25
intoxication [1] - 17:14
intrusive [1] - 31:3
inventory [2] - 49:19,
54:20
invest [2] - 11:3, 38:14
invested [2] - 12:2, 12:6
investigation [1] - 43:17
investment [2] - 41:16,
55:10
investor [3] - 10:22, 34:8
investors [1] - 10:25
invited [1] - 15:8
involve [2] - 42:11
involved [8] - 6:4, 11:19,
19:20, 20:14, 23:7, 37:23,
47:23, 59:15
involves [2] - 54:5, 54:6
involving [1] - 5:13
IP [1] - 38:15
issue [5] - 3:18, 16:8,
48:2, 59:9, 60:16
issues [6] - 6:16, 7:11,
29:18, 36:5, 41:8, 57:25
it's.. [1] - 31:11

J

James [1] - 14:21
Jeffrey [1] - 3:10
joins [1] - 38:13

Joseph [1] - 16:24
Journal [1] - 42:22
judge [1] - 59:18
Judge [9] - 5:20, 17:24,
18:2, 19:4, 36:16, 39:5,
59:4, 59:9, 59:22

K

keep [1] - 26:22
kept [3] - 18:9, 25:2,
56:16
Kev [1] - 25:12
KEVIN [3] - 2:4, 10:6,
10:7
Kevin [9] - 3:7, 8:11,
9:19, 10:5, 22:6, 25:10,
25:13, 47:22
keyboard [1] - 55:23
keynote [1] - 14:22
kicked [2] - 16:3, 16:4
kids [2] - 14:7, 35:11
kill [1] - 21:21
kind [25] - 4:25, 5:24,
6:15, 7:6, 7:7, 7:8, 7:9,
7:10, 7:16, 7:20, 8:8,
16:20, 19:5, 23:23, 24:1,
24:20, 26:13, 28:25,
31:12, 33:15, 38:7, 58:3,
58:19, 59:14, 60:11
kitchens [1] - 12:5
known [9] - 20:4, 20:8,
34:8, 34:18, 35:22, 46:15,
48:14, 50:11, 54:22
knows [3] - 30:10, 49:7,
56:17

L

L-E-A-R-Y [1] - 10:6
labeled [1] - 22:1
lake [1] - 16:24
Lake [1] - 16:24
lane [1] - 52:21
language [2] - 47:16,
48:3
large [2] - 47:15, 48:3
largest [2] - 11:12, 49:10
last [10] - 18:19, 20:10,
26:17, 40:12, 48:15, 51:2,
51:9, 52:12, 54:13, 56:10
latter [1] - 57:12
launched [1] - 54:14
Law [1] - 42:22
law [7] - 5:20, 43:24,
54:13, 54:15, 60:16,
60:20, 61:1
laws [1] - 12:19
lawsuit [3] - 5:13, 37:19,
60:5

lawyer [5] - 5:12, 18:25,
36:17, 58:22, 59:7
lawyer's [1] - 5:14
lead [1] - 42:3
leadership [1] - 16:10
Learning [1] - 11:10
least [2] - 30:19, 36:19
leave [1] - 30:12
led [3] - 43:1, 54:14,
54:15
left [2] - 5:14, 17:22
leg [1] - 8:13
legacy [1] - 43:5
legal [7] - 5:10, 5:17,
16:20, 43:2, 43:3, 43:6,
45:8
Legal [1] - 42:22
legalexperts.ai [1] -
47:19
lenient [1] - 39:2
level [1] - 45:12
leveraging [1] - 50:24
liability [2] - 7:21, 46:6
liable [1] - 47:8
licenses [1] - 41:14
life [13] - 13:5, 15:18,
16:7, 16:12, 22:6, 37:14,
41:25, 43:4, 46:14, 46:15,
46:16, 47:13, 52:19
lighting [2] - 23:1, 23:18
lights [3] - 17:6, 17:20,
17:22
likely [2] - 47:13, 51:7
limelight [1] - 7:10
limo [1] - 30:19
Lincoln [3] - 43:4, 56:6,
56:7
Linda [3] - 17:2, 25:11,
46:23
line [1] - 27:24
LinkedIn [1] - 45:20
list [1] - 28:21
literally [1] - 50:6
litigation [1] - 41:7
live [11] - 10:15, 10:16,
13:24, 14:3, 16:23, 20:15,
22:23, 23:15, 23:17, 24:8,
46:16
livelihood [1] - 14:8
lives [1] - 17:8
living [3] - 6:2, 53:3,
56:24
locked [1] - 59:25
logistics [2] - 15:14, 31:9
Look [4] - 13:3, 23:11,
26:4, 56:23
look [12] - 4:15, 5:24,
15:22, 23:6, 26:16, 28:9,
35:25, 49:22, 51:3, 52:19,

54:18, 55:24
looked [5] - 49:21, 49:24,
49:25, 50:15, 54:10
looking [5] - 35:19, 50:5,
50:6, 53:13, 55:6
Los [1] - 15:2
lost [4] - 17:8, 33:20,
53:6, 53:14
Louisville [1] - 43:8
love [1] - 48:21

M

magistrate [1] - 59:5
major [1] - 31:5
malice [2] - 4:17, 7:22
malicious [2] - 18:19,
35:17
management [6] - 41:18,
41:20, 42:16, 43:5, 44:8,
52:13
managing [1] - 37:15
manufacturing [1] -
14:25
March [15] - 9:9, 9:10,
18:19, 20:10, 24:4, 24:23,
25:3, 26:16, 28:12, 32:19,
50:19, 58:21, 59:15
marked [1] - 21:9
marketplace [1] - 47:19
materials [1] - 43:14
math [2] - 11:11, 11:16
Mattel [2] - 11:17, 11:22
matter [3] - 6:3, 46:9,
47:14
matters [2] - 14:6, 14:13
mean [20] - 11:4, 12:9,
15:18, 18:10, 19:20,
20:11, 22:8, 25:6, 25:17,
25:24, 26:1, 26:20, 29:16,
30:20, 31:11, 34:10,
36:15, 39:5, 45:24, 55:10
measure [4] - 25:9,
48:21, 48:22, 52:20
measurement [2] -
35:19, 35:20
measures [1] - 30:7
media [1] - 6:8, 18:9,
19:24, 20:7, 20:14, 24:15,
35:20, 38:9, 42:11, 45:19,
55:21
medical [1] - 45:3
member [1] - 20:3
memo [1] - 60:19
mental [1] - 44:25
mention [1] - 57:1
mentioned [5] - 13:13,
27:14, 41:17, 53:25, 56:20
mentioning [1] - 18:15
merely [1] - 57:10

KEYWORD INDEX

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 68 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

68

**mergers** [1] - 42:12
**message** [5] - 8:18, 38:6, 38:22, 59:18, 60:9
**messaged** [1] - 49:4
**messages** [1] - 5:15
**methodology** [5] - 48:12, 50:17, 51:24, 51:25, 52:1
**Miami** [8] - 5:12, 10:16, 10:17, 12:5, 26:3, 56:15, 58:22
**Midwest** [1] - 42:21
**million** [16] - 4:23, 5:3, 5:4, 7:3, 7:21, 13:22, 14:10, 15:13, 44:23, 52:16, 53:7, 55:17, 58:8, 58:16, 60:10
**millions** [6] - 5:15, 25:11, 29:20, 45:21, 50:5, 52:25
**mind** [1] - 53:23
**mine** [1] - 56:17
**minimum** [2] - 50:20, 51:19
**minute** [1] - 16:16
**minutes** [1] - 15:9
**mistakes** [1] - 12:10
**mitigate** [1] - 55:19
**mitigating** [1] - 42:3
**model** [2] - 6:22, 48:18
**models** [2] - 47:16, 48:3
**moment** [1] - 3:4
**money** [2] - 46:3, 51:12
**Money** [1] - 18:22
**monitor** [2] - 22:22, 31:24
**monitoring** [1] - 41:4
**monitors** [1] - 37:7
**monolog** [1] - 19:1
**month** [3] - 13:15, 42:21, 49:6
**months** [10] - 7:3, 10:15, 16:6, 16:12, 36:4, 51:2, 52:19, 55:18, 56:13
**moon** [1] - 17:7
**morality** [1] - 32:8
**Morgan** [1] - 14:20
**morning** [12] - 3:2, 3:3, 3:10, 3:13, 9:22, 10:12, 10:13, 21:17, 26:2, 39:21, 40:18, 40:19
**Moskowitz** [1] - 5:12
**most** [10] - 12:2, 12:17, 13:22, 14:1, 32:7, 41:22, 42:11, 42:19, 54:21, 55:2
**mother** [1] - 34:15
**motion** [2] - 4:19, 6:19
**mouth** [1] - 56:21
**move** [5] - 8:21, 20:24, 45:15, 48:7, 53:16
**moving** [1] - 15:14
**MR** [37] - 3:10, 3:24, 4:1,

4:7, 4:10, 4:15, 9:7, 9:14, 9:16, 9:19, 10:11, 11:21, 19:8, 19:9, 20:21, 20:23, 21:5, 21:8, 28:5, 28:8, 39:7, 39:11, 39:15, 39:18, 39:21, 40:5, 40:17, 44:6, 44:10, 57:5, 57:12, 57:22, 60:23, 61:4, 61:8, 61:12, 61:15
**multiple** [4] - 12:20, 22:20, 35:7, 50:24
**murder** [24] - 18:12, 19:12, 19:14, 19:16, 19:18, 19:19, 19:20, 21:20, 23:1, 23:2, 32:3, 32:11, 32:13, 35:1, 35:2, 46:23, 47:24, 49:4, 52:22, 55:9, 56:22, 57:2
**murdered** [2] - 25:11, 46:23
**murderer** [8] - 6:10, 6:14, 20:19, 22:6, 27:24, 29:19, 55:11, 55:24
**murderers** [1] - 26:12

## N

**name** [14] - 10:4, 12:6, 13:3, 13:9, 15:3, 26:8, 33:23, 34:2, 34:3, 40:10, 40:11, 40:12, 49:23, 56:20
**named** [1] - 56:11
**naming** [1] - 18:16
**Nancy** [4] - 24:14, 37:7, 37:8, 43:21
**narrative** [3] - 46:13, 51:4, 54:3
**nature** [2] - 12:21, 36:1
**necessary** [1] - 56:4
**need** [8] - 8:3, 32:13, 32:14, 32:21, 33:16, 43:18, 59:10, 61:6
**needed** [1] - 26:13
**needs** [2] - 5:7, 8:19
**negative** [6] - 20:8, 45:6, 50:12, 52:6, 53:21, 54:5
**neighbors** [1] - 17:2
**Neiman** [6] - 2:4, 3:11, 8:22, 39:10, 57:20, 60:14
**NEIMAN** [31] - 3:10, 3:24, 4:1, 4:7, 4:10, 4:15, 9:7, 9:14, 9:16, 9:19, 10:11, 11:21, 19:8, 19:9, 20:21, 20:23, 21:5, 21:8, 28:5, 28:8, 39:7, 39:11, 39:15, 39:18, 40:5, 57:22, 60:23, 61:4, 61:8, 61:12, 61:15
**network** [8] - 13:17, 14:3, 14:5, 14:8, 16:3, 24:16, 31:23, 34:1

**network's** [1] - 23:9
**networks** [8] - 12:17, 13:23, 24:15, 31:15, 31:16, 32:9, 32:25, 36:10
**never** [17] - 15:20, 17:15, 18:6, 18:8, 19:17, 20:8, 27:9, 29:9, 34:16, 35:1, 35:10, 36:23, 37:1, 37:4, 37:7, 38:14, 53:22
**never-ending** [1] - 35:10
**new** [4] - 24:19, 26:12, 26:13, 36:3
**New** [3] - 25:1, 42:18, 43:7
**next** [1] - 15:11
**nice** [1] - 61:14
**nickname** [2] - 12:23, 13:4
**night** [3] - 17:7, 17:17, 56:10
**nobody** [1] - 30:5
**none** [1] - 37:7
**nonresponsive** [1] - 19:1
**nonsense** [1] - 8:6
**normal** [1] - 46:16
**Nos** [1] - 21:3
**note** [4] - 3:19, 4:4, 45:4, 52:11
**noted** [2] - 4:15, 17:24
**notes** [1] - 3:15
**nothing** [2] - 29:10, 60:6
**now's** [1] - 6:14
**NUMBER** [1] - 2:11
**number** [41] - 6:11, 6:21, 20:19, 22:5, 22:12, 22:13, 22:14, 23:18, 27:5, 27:6, 27:8, 27:10, 27:13, 27:25, 29:1, 29:4, 29:9, 29:12, 29:13, 29:14, 29:16, 29:19, 35:4, 35:11, 43:3, 43:20, 44:25, 45:7, 48:13, 50:2, 50:10, 50:22, 51:6, 51:9, 52:3, 52:4, 58:10, 58:13, 58:16, 58:17
**numbers** [5] - 27:20, 28:11, 28:21, 52:10, 53:4
**nuts** [1] - 54:17

## O

**O'LEARY** [2] - 2:4, 10:7
**O'Leary** [58] - 3:7, 3:11, 4:11, 5:10, 5:22, 5:25, 6:10, 6:15, 7:5, 7:23, 8:1, 8:11, 8:20, 9:19, 9:22, 10:5, 10:12, 13:13, 14:8, 21:9, 22:6, 22:9, 25:10, 25:11, 26:8, 28:9, 38:25, 39:8, 39:12, 43:17, 43:23, 45:2, 45:18, 46:2, 46:10,

46:14, 47:11, 47:22, 49:3, 49:6, 49:23, 51:12, 51:16, 52:13, 52:22, 53:1, 53:6, 54:9, 54:10, 54:18, 55:6, 55:21, 56:4, 57:9, 58:12, 59:15, 60:3
**O'Leary's** [6] - 6:4, 7:8, 44:14, 51:23, 54:22, 56:20
**O'Learym** [1] - 49:11
**oath** [2] - 9:25, 40:1
**objecting** [1] - 18:25
**objective** [1] - 7:24
**Obviously** [1] - 39:8
**obviously** [6] - 4:13, 8:22, 9:8, 14:12, 18:8, 29:19, 31:14, 58:3, 60:24
**Ocean** [5] - 40:21, 40:22, 40:25, 41:2, 41:17
**offered** [1] - 13:1
**often** [2] - 13:5, 16:24
**oftentimes** [1] - 55:2
**oil** [1] - 14:24
**old** [2] - 6:3, 21:21
**once** [6] - 21:22, 49:6, 49:7, 51:6, 56:7
**one** [27] - 4:4, 8:6, 11:10, 13:1, 14:19, 17:1, 21:20, 21:21, 22:4, 24:23, 26:17, 28:17, 32:18, 37:10, 38:16, 44:18, 46:13, 47:21, 49:1, 49:18, 49:19, 51:15, 51:17, 51:18, 52:25, 53:6, 54:20
**one's** [2] - 46:4, 54:2
**one-to-two-inch** [1] - 21:21
**ones** [2] - 28:13, 28:16
**online** [15] - 7:4, 41:18, 41:20, 41:24, 42:16, 43:5, 44:7, 45:10, 45:16, 46:9, 46:13, 47:16, 54:3, 54:8, 54:18
**open** [1] - 32:17
**opened** [1] - 26:12
**opening** [3] - 4:10, 8:8, 18:13
**opine** [2] - 58:12, 58:13
**opined** [2] - 48:7, 48:9
**opinion** [4] - 18:20, 39:6, 45:13, 56:3
**opportunities** [1] - 33:20
**opportunity** [6] - 45:25, 46:5, 52:17, 52:20, 53:6, 53:13
**order** [6] - 3:15, 48:1, 59:9, 59:10, 60:15, 60:19
**Order** [1] - 3:1
**ordered** [2] - 59:4, 59:6
**Organization** [1] - 38:13
**organizations** [2] - 42:2,

47:7
**ou** [1] - 32:12
**outcome** [6] - 16:3, 32:12, 34:13, 36:11, 36:12, 44:3
**outlier** [1] - 51:16
**outline** [2] - 44:19, 48:5
**outlined** [7] - 44:13, 44:17, 44:20, 44:22, 46:25, 52:9, 55:17
**outrageous** [1] - 30:1
**outside** [1] - 31:4
**outsized** [1] - 46:15
**overlap** [2] - 9:5, 9:10
**overlooked** [1] - 55:2
**own** [9] - 13:5, 14:5, 24:14, 31:5, 32:15, 37:17, 43:17, 45:5, 51:22

## P

**PAGE** [1] - 2:3
**Page** [2] - 59:1, 60:2
**paid** [3] - 15:13, 25:11, 37:14
**pain** [5] - 7:7, 8:1, 45:1, 53:9, 58:9
**painful** [1] - 45:9
**paper** [2] - 43:16, 59:24
**parent** [1] - 48:21
**park** [1] - 13:16
**part** [11] - 5:8, 6:19, 8:10, 12:23, 16:8, 17:14, 29:10, 29:16, 36:19, 51:4, 58:17
**particular** [1] - 49:2
**particularly** [2] - 9:12, 20:8
**parties** [1] - 36:9
**partners** [2] - 33:2, 36:10
**partnership** [2] - 32:2, 32:21
**party** [1] - 16:10
**past** [1] - 25:24
**pause** [1] - 52:18
**pay** [2] - 31:10, 36:17
**payments** [1] - 12:19
**pays** [2] - 12:10, 51:11
**PDF** [1] - 60:2
**peer** [1] - 42:15
**peer-reviewed** [1] - 42:15
**people** [38] - 6:23, 8:5, 16:25, 20:2, 20:14, 22:20, 23:18, 26:13, 27:24, 29:25, 34:5, 34:19, 36:11, 38:8, 38:14, 38:22, 38:24, 45:6, 45:7, 45:9, 45:12, 46:9, 46:11, 48:1, 48:24, 49:2, 49:5, 49:8, 49:11, 49:13, 50:9, 52:20, 52:21,

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 69 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

69

53:22, 56:7, 56:8, 56:9, 58:25
**per** [7] - 4:16, 9:7, 9:8, 13:19, 30:10, 44:16
**perceive** [1] - 30:24
**percent** [2] - 29:22, 50:9
**percentage** [3] - 50:6, 50:14, 55:7
**perhaps** [1] - 60:19
**period** [5] - 18:5, 25:21, 30:1, 35:24, 59:14
**permanence** [1] - 47:4
**permanent** [1] - 47:9
**permission** [1] - 27:7
**permit** [1] - 9:3
**Perplexity** [1] - 47:22
**person** [1] - 56:19
**personal** [3] - 29:21, 45:16, 59:16
**personally** [2] - 46:16, 51:1
**Philadelphia** [1] - 43:7
**phone** [24] - 6:11, 20:19, 22:5, 22:11, 22:13, 22:14, 22:17, 22:18, 23:18, 24:14, 26:2, 27:4, 27:6, 27:8, 27:10, 27:14, 27:16, 27:18, 27:19, 28:11, 29:12, 29:13, 29:14, 35:4
**phrase** [1] - 45:22
**Picasso** [2] - 56:11, 57:1
**piling** [1] - 23:19, 25:6
**pipeline** [1] - 14:25
**pissed** [2] - 39:1, 39:5
**place** [2] - 15:10, 51:1
**placed** [2] - 9:25, 40:1
**plaintiff** [1] - 9:3
**PLAINTIFF** [1] - 2:10
**Plaintiff** [2] - 10:8, 40:14
**Plaintiff's** [1] - 21:3
**plaintiff's** [2] - 3:9, 5:12
**plan** [4] - 54:8, 54:18, 55:15, 55:16
**platform** [3] - 13:25, 14:9, 22:20
**platforms** [2] - 22:21, 45:20
**playing** [1] - 42:3
**pleasure** [1] - 9:22
**plus** [2] - 27:20, 51:15
**Plus** [1] - 24:14
**point** [5] - 4:5, 24:2, 56:10, 58:2, 59:7
**Poland** [1] - 15:12
**police** [3] - 17:13, 17:17, 31:3
**policy** [1] - 12:18
**portion** [2] - 22:9, 22:11
**position** [2] - 40:22,

60:12
**positive** [2] - 52:6, 54:4
**post** [25] - 6:2, 6:25, 9:7, 9:9, 19:7, 19:10, 19:21, 20:18, 20:20, 21:10, 21:15, 22:1, 24:22, 25:9, 27:7, 30:25, 31:24, 35:3, 35:9, 35:24, 46:18, 50:3, 50:18, 51:7, 53:11
**Post** [7] - 21:12, 22:1, 22:3, 24:3, 24:4
**post-regulatory** [1] - 35:24
**posted** [2] - 6:11, 27:13
**posting** [3] - 19:24, 20:5, 20:15
**Posts** [3] - 24:8, 24:22, 25:3
**posts** [21] - 5:19, 6:9, 8:2, 8:18, 9:1, 18:16, 24:21, 24:25, 25:23, 26:11, 28:3, 28:12, 33:1, 33:21, 35:6, 36:5, 37:6, 47:17, 50:7, 50:16, 55:19
**potential** [2] - 14:16, 33:24
**Power** [1] - 56:12
**prepare** [1] - 43:12
**preparing** [3] - 43:14, 44:11, 57:4
**presence** [5] - 45:19, 46:1, 46:3, 46:15, 54:3
**present** [4] - 3:12, 3:23, 4:21, 61:2
**presentation** [2] - 4:2, 8:25
**presented** [2] - 43:6, 60:21
**presiding** [1] - 5:20
**pressure** [2] - 37:20, 51:1
**pressure-tested** [1] - 51:1
**pretty** [3] - 30:16, 33:7, 39:1
**previous** [1] - 25:19
**primarily** [2] - 6:3, 41:24
**pristine** [1] - 15:3
**private** [1] - 9:3
**problem** [4] - 26:15, 32:13, 33:22, 55:8
**problems** [1] - 16:11
**proceed** [3] - 3:17, 4:6, 38:2
**proceeding** [1] - 44:4
**proceedings** [3] - 16:20, 59:11, 61:16
**process** [5] - 4:13, 43:19, 54:2, 54:12, 55:18
**producer** [1] - 23:5

**producers** [4] - 20:15, 22:22, 23:9, 31:23
**producing** [1] - 32:7
**professional** [6] - 10:21, 31:13, 41:14, 41:15, 51:4, 56:3
**professionally** [1] - 46:17
**profile** [3] - 46:8, 51:23, 55:13
**profit** [1] - 33:25
**programming** [1] - 23:15
**programs** [2] - 43:2, 43:4
**proliferation** [1] - 47:15
**prominence** [1] - 51:16
**prominent** [2] - 45:12, 53:2
**proposal** [1] - 60:20
**proposed** [1] - 60:18
**protect** [3] - 15:18, 30:7, 30:12
**protest** [1] - 5:15
**proverbial** [1] - 54:1
**provide** [1] - 43:9
**provided** [1] - 31:9
**providing** [1] - 41:8
**provoked** [1] - 58:25
**Public** [1] - 42:25
**public** [4] - 32:17, 43:22, 54:23, 54:25
**publication** [1] - 9:2
**publicly** [4] - 5:13, 41:5, 46:25, 50:4
**publish** [1] - 54:23
**published** [5] - 42:18, 42:21, 42:23, 53:13, 53:21
**punitive** [7] - 5:4, 5:5, 9:3, 9:13, 58:15, 59:2, 60:7
**push** [1] - 34:3
**put** [13] - 8:14, 15:3, 21:24, 25:25, 32:8, 33:23, 34:2, 41:21, 47:9, 48:20, 53:25, 54:20, 58:10
**puts** [1] - 20:18
**putting** [3] - 29:19, 44:25, 53:3

**Q**

**quantified** [1] - 44:17
**quantify** [3] - 4:18, 28:2, 30:17
**quantifying** [1] - 42:13
**quantum** [1] - 48:4
**questioned** [1] - 51:22
**questioning** [1] - 56:16
**questions** [6] - 4:13, 32:18, 33:1, 39:7, 57:6
**quite** [8] - 10:23, 18:6,

47:18, 48:16, 52:10, 54:7, 55:3, 59:19
**quote** [1] - 59:19

**R**

**rabbit.com** [1] - 11:13
**rabid** [3] - 8:13, 8:14, 27:23
**raced** [1] - 17:3
**raise** [2] - 9:24, 39:25
**range** [6] - 7:2, 15:9, 51:13, 51:17, 51:20, 52:8
**rapid** [1] - 22:3
**rapist** [1] - 55:11
**rarely** [1] - 15:19
**Raymond** [1] - 14:21
**reach** [3] - 29:20, 44:11, 49:9
**reached** [3] - 6:24, 43:18, 50:14
**react** [1] - 24:9
**reacted** [1] - 22:11
**reacting** [1] - 24:9
**reaction** [1] - 8:3
**read** [4] - 7:12, 24:12, 24:13, 46:12
**reader** [1] - 11:13
**reader-rabbit.com** [1] - 11:13
**readily** [1] - 47:24
**reading** [2] - 11:11, 11:16
**ready** [1] - 4:5
**real** [14] - 6:13, 8:4, 8:19, 13:9, 16:7, 20:19, 22:6, 22:14, 22:16, 34:23, 35:5, 41:25, 46:14, 59:22
**real-life** [2] - 22:6, 46:14
**reality** [6] - 46:11, 47:7, 47:10, 48:2, 48:6, 49:23
**realize** [1] - 30:21
**really** [13] - 7:6, 8:7, 14:6, 16:12, 17:11, 18:13, 22:4, 22:25, 34:9, 51:22, 58:9, 58:16, 60:8
**realtime** [1] - 6:16
**reason** [4] - 12:23, 13:20, 20:7, 57:3
**reasonable** [1] - 39:2
**reasoning** [2] - 7:17, 58:6
**reasons** [1] - 4:25
**recalling** [1] - 19:3
**receive** [2] - 22:16, 27:20
**RECEIVED** [1] - 2:11
**received** [5] - 3:19, 11:20, 27:14, 27:16, 43:15
**receiving** [1] - 33:1
**recent** [1] - 52:11

**recently** [3] - 36:10, 42:19, 42:21
**reckless** [2] - 8:18, 17:13
**recognized** [1] - 51:25
**recollection** [1] - 40:7
**recommended** [1] - 52:8
**record** [9] - 3:9, 3:16, 7:6, 10:4, 24:1, 26:24, 40:10, 52:7, 53:8
**recourse** [1] - 45:8
**redacted** [1] - 22:10
**referencing** [2] - 21:15, 26:10
**referred** [1] - 59:20
**refine** [1] - 4:20
**reflects** [1] - 3:16
**refresh** [1] - 40:6
**regard** [3] - 8:23, 57:8, 60:15
**regarding** [2] - 12:19, 43:15
**regret** [1] - 37:2
**regretfully** [1] - 45:7
**regularly** [1] - 31:14
**regulating** [1] - 12:22
**regulatory** [1] - 35:24
**rehabilitating** [1] - 54:12
**rehabilitation** [12] - 7:25, 44:20, 44:22, 53:17, 53:18, 54:2, 54:8, 54:18, 55:14, 56:3, 56:23, 58:5
**rehabilitational** [2] - 5:3, 7:1
**rehabilitative** [2] - 57:8, 60:21
**related** [5] - 35:12, 38:5, 42:12, 52:5, 60:16
**relations** [2] - 43:22, 54:23, 55:1
**relationship** [3] - 33:8, 35:13, 41:25
**relationships** [3] - 29:6, 31:13, 37:16
**relative** [1] - 55:5
**relevant** [1] - 47:18
**reliving** [1] - 25:24
**remain** [3] - 9:24, 39:25, 55:20
**remember** [7] - 19:3, 24:24, 25:20, 26:4, 32:25, 34:16, 59:2
**reminder** [1] - 25:10
**remorse** [1] - 60:6
**removal** [1] - 54:5
**repair** [3] - 7:4, 47:10, 53:24
**repairing** [1] - 41:4
**repeats** [1] - 50:9
**report** [5] - 6:19, 40:6, 43:12, 43:14, 44:12,

Case 1:25-cv-21417-BB Document 29 Entered on FLSD Docket 11/24/2025 Page 70 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

70

44:14, 45:22, 49:21, 52:9
**reporter** [1] - 11:14
**reposting** [2] - 22:20, 55:23
**representing** [1] - 42:1
**reputation** [33] - 6:1, 6:2, 6:18, 11:3, 11:5, 14:13, 15:5, 15:17, 15:19, 15:23, 34:17, 41:18, 41:20, 42:14, 42:16, 43:5, 43:18, 44:7, 44:8, 44:15, 44:21, 45:17, 45:22, 46:2, 46:9, 47:10, 48:20, 48:24, 49:15, 50:25, 53:10, 53:12, 53:24
**reputational** [15] - 3:16, 5:1, 6:20, 7:23, 7:25, 9:13, 44:18, 44:20, 47:5, 47:16, 48:9, 48:13, 52:8, 52:18, 58:4
**reputations** [1] - 41:5
**request** [2] - 4:20, 60:18
**required** [1] - 60:15
**reside** [1] - 10:14
**residence** [1] - 10:17
**respect** [1] - 45:10
**responses** [1] - 24:13
**rest** [2] - 23:12, 47:13
**result** [4] - 7:8, 8:19, 22:16, 33:21
**resulted** [1] - 54:14
**retracting** [1] - 36:24
**retraction** [1] - 60:7
**retrained** [1] - 43:9
**reverse** [1] - 47:25
**revert** [1] - 29:15
**review** [1] - 43:14
**reviewed** [3] - 42:15, 46:18, 51:21
**RICO** [1] - 59:22
**rile** [1] - 35:21
**riled** [1] - 35:24
**ring** [3] - 49:1, 49:10
**Ring** [1] - 49:5
**rings** [10] - 6:22, 48:14, 48:16, 48:18, 49:17, 50:17, 52:1, 52:2, 53:9
**risk** [1] - 46:5
**Riyadh** [1] - 15:11
**role** [1] - 42:3
**Rolodex** [1] - 48:23
**route** [1] - 17:19
**royalty** [1] - 13:1
**rules** [3] - 19:2, 38:14, 38:19
**ruling** [1] - 60:25
**rulings** [1] - 7:12
**run** [2] - 16:9, 56:12
**runs** [1] - 24:15

## S

**S-O-M-A-L** [1] - 40:12
**Sachs** [2] - 14:20, 15:4
**sad** [1] - 17:11
**sale** [3] - 11:20, 11:22, 11:23
**salt** [1] - 18:13
**Sameer** [3] - 6:17, 39:22, 40:11
**SAMEER** [3] - 2:6, 40:12, 40:13
**San** [1] - 11:13
**Savannah** [1] - 26:6
**saw** [2] - 49:3, 51:7
**Schmidt** [1] - 41:21
**scholarship** [1] - 43:1
**School** [1] - 42:25
**schools** [1] - 11:16
**schtick** [1] - 35:25
**scores** [1] - 11:11
**scramble** [1] - 23:14
**scratch** [1] - 52:22
**screwed** [1] - 38:15
**scrutiny** [1] - 15:7
**se** [2] - 4:16, 44:16
**search** [4] - 47:21, 48:2, 48:3, 50:11
**searches** [1] - 47:21
**seat** [1] - 3:3
**seated** [1] - 40:4
**second** [7] - 18:24, 20:12, 24:21, 26:8, 27:6, 31:12, 53:16
**Section** [1] - 47:7
**sector** [1] - 14:23
**sectors** [1] - 12:3
**security** [11] - 8:4, 17:23, 23:12, 29:18, 29:21, 30:7, 30:10, 30:14, 30:25, 31:7, 31:8
**see** [15] - 6:11, 9:23, 17:7, 18:11, 24:6, 25:5, 26:7, 31:3, 32:16, 33:19, 34:5, 36:15, 39:3, 59:22
**seeing** [1] - 33:9
**seek** [1] - 9:3
**seeking** [1] - 9:6
**sell** [2] - 13:23, 13:25
**Senate** [1] - 12:20
**Senators** [1] - 12:18
**send** [3] - 8:17, 38:21, 60:9
**sending** [1] - 38:7
**sensitive** [2] - 56:15, 56:17
**sent** [2] - 25:12, 59:17
**separate** [2] - 9:1, 60:19
**series** [2] - 6:9, 46:25
**serious** [1] - 33:18

**served** [1] - 60:4
**service** [3] - 13:7, 33:24
**services** [2] - 30:20, 34:8
**set** [2] - 45:25, 46:5
**seven** [5] - 7:5, 8:24, 10:19, 32:5, 36:4
**several** [2] - 43:21, 53:7
**shared** [1] - 5:14
**Shark** [9] - 10:22, 12:12, 12:13, 16:5, 16:8, 32:8, 33:7, 34:18, 55:24
**shattered** [1] - 17:9
**shift** [1] - 31:12
**shot** [1] - 58:24
**show** [12] - 10:23, 12:14, 18:22, 20:12, 20:15, 21:16, 22:23, 23:13, 32:7, 38:22, 59:6, 59:10
**Show** [1] - 18:22
**showed** [1] - 37:2
**shown** [1] - 60:7
**shut** [2] - 8:12, 36:20
**sic** [1] - 59:22
**side** [3] - 30:9, 51:17, 59:2
**sign** [1] - 13:6
**significant** [1] - 45:18
**similar** [1] - 58:10
**simple** [1] - 28:25
**simply** [4] - 4:17, 48:20, 52:15, 54:20
**single** [1] - 25:12
**Sirer** [1] - 7:13
**SIRER** [1] - 7:13
**situated** [1] - 17:18
**situation** [2] - 31:17, 32:10
**situations** [1] - 52:25
**six** [9] - 7:5, 9:1, 10:15, 10:16, 16:6, 31:7, 34:24, 36:4, 51:2
**sixth** [1] - 20:13
**slow** [2] - 18:24, 23:23
**small** [4] - 10:23, 11:2, 11:3, 12:21
**smaller** [2] - 55:6
**smoke** [1] - 33:14
**social** [10] - 6:8, 18:9, 19:24, 20:7, 20:14, 35:20, 38:9, 42:11, 45:19, 55:21
**software** [2] - 11:12, 11:15
**sold** [1] - 11:17
**SOMAL** [2] - 2:6, 40:13
**Somal** [19] - 6:17, 39:22, 39:24, 40:11, 40:12, 40:18, 40:22, 41:10, 42:5, 43:1, 43:9, 44:7, 44:11, 44:24, 45:18, 46:7, 53:16, 57:10, 57:14

**someone** [3] - 48:22, 55:21, 55:22
**sometime** [2] - 54:7, 55:4
**somewhat** [3] - 9:4, 9:12, 47:9
**somewhere** [2] - 13:6, 33:16
**son** [1] - 26:7
**soon** [1] - 23:4
**sorry** [1] - 26:24
**sorts** [1] - 8:6
**sought** [1] - 34:20
**sound** [1] - 14:11
**source** [1] - 33:6
**speaker** [3] - 14:20, 14:22, 33:24
**speaking** [8] - 15:13, 16:5, 31:6, 31:9, 34:1, 37:15, 43:21, 46:16
**speaks** [1] - 49:6
**specialize** [1] - 41:4
**specialized** [1] - 54:7
**specific** [10] - 19:7, 19:21, 24:24, 30:7, 32:19, 44:17, 54:23, 55:4, 55:19, 57:25
**specifically** [5] - 18:16, 31:16, 53:10, 53:12, 60:16
**speculate** [1] - 15:25
**speculation** [1] - 18:5
**speed** [1] - 17:14
**spell** [2] - 10:4, 40:10
**spend** [4] - 4:24, 30:18, 35:6, 51:13
**spent** [2] - 7:5, 13:18
**spoken** [2] - 14:24, 56:13
**spokesperson** [2] - 20:1, 33:5
**staff** [6] - 12:19, 15:5, 15:14, 24:14, 30:14, 31:1
**stake** [1] - 15:16
**stand** [4] - 4:11, 4:12, 6:17, 9:20, 39:22, 58:18
**standing** [2] - 9:24, 39:25
**stands** [1] - 38:16
**Stanley** [1] - 14:20
**star** [1] - 17:21
**star-gazing** [1] - 17:21
**stark** [1] - 55:12
**Start** [2] - 33:5, 33:6
**start** [3] - 5:5, 31:1, 35:9
**started** [8] - 3:5, 12:13, 18:12, 20:5, 20:8, 26:7, 32:18, 50:2
**startups** [1] - 12:3
**state** [3] - 3:8, 10:3, 40:9
**State** [3] - 42:18, 43:7, 59:17

**statement** [1] - 6:25
**statements** [8] - 6:23, 46:21, 46:22, 46:25, 49:21, 49:22, 49:24, 50:1
**stating** [1] - 51:21
**stay** [2] - 19:2, 34:6
**steal** [1] - 38:17
**stellar** [1] - 55:13
**step** [3] - 9:23, 49:18, 57:14
**Step** [1] - 49:19
**steps** [3] - 21:25, 30:11, 49:16
**stern** [1] - 59:8
**stiff** [1] - 38:21
**still** [7] - 18:10, 25:1, 27:17, 27:25, 36:5, 36:9
**stop** [4] - 8:12, 27:4, 38:19, 59:25
**story** [2] - 32:5, 59:3
**straight** [1] - 23:10
**strange** [1] - 21:24
**street** [1] - 54:10
**strengthen** [1] - 55:4
**struck** [1] - 17:5
**studies** [3] - 51:9, 51:14, 52:4
**Studies** [1] - 42:22
**study** [1] - 52:11
**stuff** [10] - 18:13, 22:3, 24:13, 26:7, 27:12, 32:16, 34:5, 36:2, 36:20, 38:17
**subject** [2] - 6:3, 43:5
**submit** [2] - 60:18, 61:6
**submitted** [2] - 5:8, 6:19
**subpoenaed** [1] - 17:18
**subscription** [1] - 50:25
**subsequent** [1] - 55:20
**successful** [5] - 10:24, 11:17, 11:20, 12:7, 45:11
**successfully** [1] - 54:14
**sue** [1] - 8:12
**sued** [1] - 60:3
**suffered** [2] - 7:8, 45:1
**suffering** [4] - 8:1, 45:1, 53:9, 58:9
**suffers** [1] - 17:10
**sufficient** [1] - 61:9
**suicidal** [1] - 45:11
**summarize** [1] - 60:12
**sunk** [1] - 8:13
**superclean** [1] - 34:9
**support** [9] - 11:1, 11:2, 14:6, 15:14, 26:25, 32:14, 34:2, 37:20, 38:25
**supported** [1] - 18:8
**supporting** [2] - 10:23, 14:8
**supports** [2] - 60:20,

Case 1:25-cv-21417-BB   Document 29   Entered on FLSD Docket 11/24/2025   Page 71 of 72

Kevin O'Leary vs. Benjamin Armstrong
Case No. 1:25-cv-21417-BB

71

61:1
  **suppression** [1] - 54:6
  **survived** [1] - 34:13
  **suspended** [1] - 16:12
  **swatted** [1] - 21:22
  **sworn** [4] - 10:1, 10:9, 40:2, 40:15
  **sympathy** [1] - 37:2
  **syndication** [1] - 55:20
  **system** [2] - 5:10, 35:16

**T**

  **talent** [1] - 52:12
  **tangible** [1] - 42:13
  **Tank** [8] - 10:22, 12:12, 12:13, 16:6, 16:8, 32:8, 33:7, 55:24
  **target** [1] - 55:19
  **taught** [1] - 34:15
  **taunting** [1] - 25:15
  **Tax** [1] - 33:5
  **team** [2] - 51:22, 54:23
  **technical** [1] - 55:4
  **technology** [2] - 12:18, 14:24
  **Technology** [4] - 40:21, 40:23, 40:25, 41:2
  **teeth** [1] - 8:13
  **television** [5] - 12:16, 13:17, 13:19, 16:3, 34:1
  **ten** [2] - 48:15, 54:13
  **tendency** [1] - 27:3
  **tender** [1] - 44:7
  **tendering** [1] - 45:13
  **terms** [8] - 8:25, 9:11, 14:3, 19:6, 20:6, 48:17, 49:19, 51:16
  **Terrence** [1] - 10:5
  **TERRENCE** [2] - 2:4, 10:7
  **tested** [2] - 17:24, 51:1
  **testified** [4] - 10:9, 12:20, 40:15, 43:24
  **testify** [4] - 6:20, 7:1, 8:2, 52:23
  **testifying** [4] - 34:11, 44:25, 53:8, 56:21
  **testimony** [3] - 43:9, 44:1, 58:4
  **testing** [1] - 12:6
  **text** [1] - 29:8
  **texts** [1] - 29:9
  **THE** [42] - 3:2, 3:6, 3:13, 3:25, 4:3, 4:9, 4:14, 8:22, 9:8, 9:15, 9:18, 9:21, 10:2, 10:3, 10:5, 11:15, 19:6, 20:22, 21:1, 21:6, 21:7, 28:7, 39:10, 39:13, 39:17, 39:20, 39:23, 40:3,

40:4, 40:8, 40:9, 40:11, 44:9, 57:7, 57:16, 57:18, 57:20, 60:14, 61:1, 61:6, 61:10, 61:14
  **theft** [1] - 38:15
  **themselves** [1] - 24:22
  **theory** [1] - 6:22
  **thereafter** [1] - 5:21
  **thereof** [1] - 42:4
  **thinking** [2] - 27:21, 38:10
  **THOMAS** [2] - 2:4, 10:7
  **Thomas** [1] - 10:5
  **threat** [1] - 30:25
  **threatening** [3] - 5:12, 5:19, 59:18
  **three** [3] - 48:14, 48:16, 49:10
  **throughout** [1] - 44:14
  **tied** [3] - 11:5, 34:24, 44:3
  **TikTok** [1] - 45:21
  **timeline** [1] - 23:24
  **timing** [3] - 19:6, 20:11
  **titanium** [1] - 17:10
  **today** [9] - 4:20, 7:16, 18:10, 25:14, 36:4, 44:1, 44:25, 46:19, 47:1
  **today's** [1] - 4:22
  **together** [2] - 13:23, 14:21
  **tomorrow** [1] - 56:25
  **took** [6] - 13:5, 44:18, 48:16, 50:21, 51:1, 51:18
  **tools** [2] - 43:20, 50:25
  **toothpaste** [2] - 47:9, 53:25
  **top** [1] - 54:15
  **topic** [2] - 22:23, 45:15
  **Toronto** [5] - 10:15, 12:15, 21:20, 26:2, 26:3
  **totality** [1] - 5:24
  **touch** [1] - 52:22
  **tough** [3] - 18:7, 34:18, 34:19
  **towards** [2] - 5:10, 50:12
  **toxic** [1] - 8:5
  **traction** [1] - 25:7
  **Trade** [1] - 38:13
  **traded** [1] - 41:6
  **tradition** [1] - 16:23
  **traditional** [3] - 27:17, 28:16, 48:2
  **trail** [2] - 43:16, 59:24
  **transfer** [1] - 13:7
  **Trevor** [1] - 26:7
  **trial** [5] - 3:17, 16:2, 32:11, 56:22, 57:2
  **tricks** [1] - 8:14

**triggers** [1] - 29:24
  **trip** [1] - 17:19
  **troubles** [1] - 5:17
  **true** [3] - 27:1, 32:22, 37:21
  **trust** [3] - 41:24, 48:22, 61:4
  **truth** [3] - 34:14, 34:16, 34:18
  **try** [3] - 21:21, 23:14, 25:25
  **trying** [4] - 23:14, 23:20, 25:18, 34:25
  **tube** [2] - 47:10, 54:1
  **turn** [4] - 17:21, 21:12, 45:7, 46:18
  **turned** [2] - 12:16, 27:23
  **TV** [2] - 8:3, 22:6
  **tweets** [1] - 31:17
  **Twitter** [1] - 6:12
  **two** [13] - 13:19, 15:21, 17:7, 18:6, 18:17, 18:22, 21:21, 35:9, 35:11, 39:2, 44:17, 49:5, 61:8
  **two-and-a-half** [1] - 13:19
  **type** [1] - 8:18
  **types** [3] - 12:1, 42:9, 46:9
  **typing** [1] - 48:1

**U**

  **U.S.A** [1] - 56:12
  **ultra** [4] - 50:8, 51:18, 51:19, 56:1
  **ultra-bare** [1] - 51:19
  **ultra-conservative** [1] - 50:8
  **ultraconservative** [5] - 44:19, 44:21, 48:5, 50:21, 53:14
  **unclear** [1] - 57:7
  **under** [2] - 9:25, 40:1
  **unique** [5] - 14:1, 50:17, 51:6, 53:1, 54:25
  **University** [1] - 41:13
  **unless** [1] - 57:6
  **unliquidated** [1] - 3:17
  **up** [32] - 6:3, 6:10, 7:20, 8:12, 16:5, 16:24, 17:2, 19:16, 19:18, 20:3, 20:9, 23:1, 23:18, 23:19, 25:12, 26:8, 26:12, 28:14, 31:24, 34:21, 35:2, 35:3, 35:21, 38:16, 46:23, 48:12, 51:15, 55:6, 56:25, 57:2, 59:6, 59:25
  **upstairs** [1] - 23:10
  **urge** [2] - 39:3, 60:9

**users** [1] - 52:3
  **usual** [1] - 8:14
  **UTA** [1] - 33:25

**V**

  **Vaksoy** [1] - 7:13
  **VAKSOY** [1] - 7:13
  **validate** [1] - 36:13
  **valuable** [1] - 41:22
  **valuation** [4] - 41:8, 42:12, 43:6, 52:5
  **value** [7] - 6:24, 51:7, 51:10, 51:23, 52:2, 52:5, 52:14
  **valued** [1] - 48:17
  **valuing** [1] - 42:2
  **various** [1] - 31:14
  **vehicle** [2] - 15:21, 38:9
  **venture** [2] - 12:3, 12:8
  **Ventures** [1] - 14:8
  **ventures** [1] - 12:1
  **verified** [2] - 21:19, 46:24
  **Verizon** [1] - 28:14
  **version** [1] - 13:24
  **versus** [3] - 3:7, 7:13, 58:6
  **vet** [1] - 15:8
  **video** [4] - 17:18, 17:20, 27:19, 27:21
  **view** [1] - 50:8
  **viewed** [2] - 50:18, 50:22
  **viewers** [1] - 14:3
  **views** [5] - 50:1, 50:3, 50:4, 50:7, 50:15
  **viral** [2] - 22:19, 31:22
  **virtually** [1] - 16:2
  **voicemail** [1] - 23:19

**W**

  **wait** [1] - 32:12
  **waiting** [3] - 16:3, 22:7, 30:11
  **walk** [5] - 30:5, 30:13, 30:21, 31:8, 49:16
  **wants** [2] - 30:5, 31:1
  **war** [1] - 58:22
  **warning** [1] - 59:8
  **warrant** [2] - 16:8, 60:4
  **warriors** [1] - 55:23
  **watching** [3] - 8:15, 8:16, 20:15
  **ways** [2] - 35:7, 47:25
  **weaken** [1] - 55:5
  **web** [2] - 27:12, 47:6
  **week** [4] - 13:15, 15:11, 15:12, 31:6
  **weeks** [3] - 31:6, 52:12, 61:8

**welcome** [2] - 39:11, 39:24
  **well-documented** [1] - 52:4
  **WhatsAapp** [1] - 28:15
  **WhatsApp** [1] - 27:19
  **wheel** [1] - 15:20
  **whispering** [1] - 52:20
  **whole** [4] - 17:3, 33:11, 34:11, 34:21
  **wide** [1] - 51:13
  **wife** [12] - 6:4, 13:11, 17:2, 19:14, 19:18, 23:7, 25:9, 25:10, 25:20, 26:21, 35:8, 46:23
  **wife's** [1] - 17:9
  **wild** [1] - 38:11
  **wildly** [1] - 12:7
  **William** [1] - 42:23
  **winner** [1] - 12:10
  **wipe** [1] - 16:13
  **wireless** [1] - 12:4
  **witness** [10] - 9:17, 10:8, 39:14, 39:22, 40:5, 40:14, 42:6, 42:7, 54:16, 57:19
  **WITNESS** [9] - 2:3, 10:2, 10:5, 11:15, 21:7, 39:13, 40:3, 40:11, 57:18
  **Witness** [2] - 10:1, 40:2
  **witnesses** [2] - 57:21, 57:22
  **woman** [1] - 56:11
  **wonder** [1] - 25:13
  **Wonderful** [2] - 12:24, 14:14
  **wonderful** [7] - 13:2, 13:4, 13:8, 13:10, 13:12, 14:10, 14:12
  **word** [3] - 16:4, 46:24, 55:8
  **words** [1] - 8:9
  **works** [3] - 15:1, 37:8, 48:18
  **World** [1] - 38:13
  **world** [8] - 6:11, 10:25, 14:4, 15:10, 27:18, 32:17, 36:17, 37:22
  **worldwide** [1] - 11:1
  **worms** [1] - 26:12
  **worried** [2] - 32:2, 37:16
  **worse** [2] - 46:13, 55:10
  **worth** [2] - 52:15, 52:25
  **worthy** [1] - 45:4
  **wound** [1] - 18:13
  **wrap** [1] - 7:20
  **wrongdoing** [1] - 6:7

**Y**

  **Yahoo** [1] - 30:4

**Kevin O'Leary vs. Benjamin Armstrong**
**Case No. 1:25-cv-21417-BB**

**year** [8] - 11:23, 13:1, 14:10, 16:1, 18:18, 30:19, 49:6, 49:7

**years** [19] - 7:5, 7:6, 10:19, 11:18, 12:13, 12:16, 15:21, 18:6, 18:17, 25:25, 27:3, 29:4, 32:5, 32:9, 34:24, 39:2, 48:15, 51:10, 54:13

**York** [3] - 25:1, 42:18, 43:7

**yourself** [4] - 30:8, 30:21, 58:23, 59:25

**YouTube** [1] - 45:21

## Z

**zone** [1] - 54:24