UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:25-cv-21417

KEVIN O'LEARY,

Plaintiff,

v.

BENJAMIN ARMSTRONG,

Defendant.
_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO SET ASIDE DEFAULT JUDGMENT**

Plaintiff Kevin O'Leary ("Plaintiff" or "O'Leary") hereby files his opposition to Defendant Benjamin Armstrong's ("Defendant" or "Armstrong") Motion to Set Aside Default Judgment (ECF No. 31) (the "Motion").

**INTRODUCTION**

Armstrong's Motion should be denied because the record reflects the opposite of "good cause." To establish "good cause" to set aside a non-final default judgment, a defendant must first provide a good reason for the failure to respond (*i.e.,* show the default was not willful), and must also show a meritorious defense and lack of prejudice to the plaintiff. Armstrong has shown none.

First, Armstrong cannot show that his default was anything other than willful. He was personally served, affirmatively appeared on the docket to request a continuance, and provided addresses for service—conclusively establishing actual notice and an ability to participate when he wished. Yet he then ignored nearly a dozen filings and Court orders (including the Clerk's Default, the Court's default-judgment procedures order, Plaintiff's motion for default judgment, the Court's liability judgment, and multiple orders rescheduling the damages hearing) and failed

1

to appear at the October 30, 2025 evidentiary hearing. That sustained inaction—followed by an unexplained delay of 285 days after service and 246 days after default—demonstrates, at minimum, a reckless disregard for these proceedings. Because a willful default alone defeats "good cause," the Court may deny the motion on that basis without reaching any other factor.

Nor does Armstrong carry his burden to present a meritorious defense. To vacate a default, the movant must establish a meritorious defense. Armstrong's "defense" is that general, mental health conditions *could have* rendered him "psychologically incapable" of actual malice, but that argument misapprehends the actual malice inquiry and is unsupported by competent evidence. His supporting "Physician Certification" is unsworn, dated July 2, 2025 (months after the March 2025 publications), and says nothing about his capacity when he uttered the defamatory statements in March 2025. That kind of vague, after-the-fact, and factually thin submission is precisely what courts find fatal on the meritorious defense prong.

Prejudice to Plaintiff independently warrants denial. The burden is on Armstrong to show a lack of prejudice, yet he offers only the incorrect assertion that the damages hearing has not yet occurred. Mot. at 3. In reality, Plaintiff and the Court have, collectively, spent dozens, if not hundreds, of hours preparing motions for default judgment, expert reports, drafting liability decisions, and participating in a full evidentiary hearing on damages where Plaintiff and his expert traveled from out-of-town to attend. Then, Plaintiff incurred the additional expense and devoted substantial resources to preparing proposed findings and a final damages submission. Reopening the case now would force O'Leary to relitigate issues after months of delay and substantial investment of time and money—prejudice that courts recognize as sufficient, particularly where the delay is self-inflicted.

Finally, to the extent Armstrong seeks refuge in Rule 60(b), his failure under Rule 55(c) is dispositive: if he cannot show "good cause" under Rule 55 to set aside a non-final default judgment, he certainly cannot satisfy Rule 60(b)'s more rigorous "excusable neglect" standard.

Because the record reflects willfulness—not neglect—the Motion should be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Plaintiff O'Leary is an internationally renowned entrepreneur, investor, and television commentator. Complaint (ECF No. 1) at ¶ 1. Defendant Armstrong is a formerly prominent crypto influencer who once ranked among the most popular cryptocurrency personalities on X and YouTube, drawing more than a million followers with his promotional content and lavish lifestyle. *See id.* at ¶¶ 15-22. At the height of his online presence, he amassed over 3.3 million followers across his social media platforms. *Id.* But Armstrong's public standing began to unravel in August 2023, when he was removed from his own production company, HIT Network, following allegations of misconduct and violent behavior at the office. *Id.*

O'Leary filed this case against Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods calling O'Leary a murderer and claiming O'Leary "paid millions to cover" up his role in a murder. *Id.* at ¶ 1. These posts were intended to destroy O'Leary's reputation. *Id.* at ¶¶ 23-137. In 2019, O'Leary and his wife were involved in a tragic boating accident in which their vessel struck another boat, resulting in two fatalities. *Id.* at ¶ 43. O'Leary was not operating the boat at the time and was never charged with any violation of law. *See id*. His wife, Linda O'Leary, was charged with careless operation of a vehicle, but after a 13-day trial she was fully exonerated. *Id.* at ¶¶ 43–54. The court found that the other vessel had been operating without its lights on. *Id.*

3

The accident—and the unfounded allegations that Linda had engaged in wrongdoing—had a significant negative impact on O'Leary and his family. ECF No. 28-1 (Transcript of October 30, 2025 Evidentiary Hearing to Determine Damages, hereafter "Hr'g Tr.") at 18:4-23. In the aftermath, and before Linda's exoneration, O'Leary's speaking engagements "dried up," leaving him with virtually no income. *Id.* at 16:1-14. Production of his primary television program, *Shark Tank*, was paused for "six months," effectively putting his entertainment career on hold. *Id.* Following the trial, O'Leary and his wife spent years working to move past the tragedy. *Id.* at 25:24-26:9. Armstrong's March 2025 barrage on X sought to reopen these painful events by resurrecting false allegations that O'Leary murdered a couple and paid millions to cover it up.

**B. Procedural History**

Plaintiff filed this case on March 26, 2025. *See* ECF No. 1. On March 28, 2025, a process server served Defendant Armstrong with the Summons and Complaint, as evidenced by the Return of Service. ECF No. 5. Pursuant to that service date, Armstrong's deadline to respond was April 18, 2025. *Id.* On April 21, 2025, following a *sua sponte* review of the docket, the Court noted Armstrong's failure to timely respond and ordered him to respond no later than April 25, 2025. ECF No. 6. The Court further noted that "[f]ailure to do so may result in appropriate sanctions, including the entry of default." *Id.*

That same day, the Clerk docketed a letter from Armstrong addressed to the Clerk's Office. ECF No. 7. In the letter, Armstrong requested a continuance, stating he was currently incarcerated in Cobb County, Georgia for a period of 70 days.[1] *Id.* He further indicated that, upon release, he

---

[1] Armstrong was arrested for issuing threats against a judge presiding over a case involving him in Cobb County Superior Court, Georgia. *See* https://www.law.com/dailyreportonline/2025/03/26/crypto-influencer-arrested-over-threatening-emails-sent-to-georgia-judge/.

planned to enter a "mental health facility" and then reside at 462 Fincher Road, Canton, GA 30114. *Id.* The Court granted Armstrong's request and extended the deadline for his Answer or response to May 2, 2025. ECF No. 8. The Clerk was directed to mail a copy of the Order to 462 Fincher Road, Canton, GA 30114. *Id.* The following day, the Clerk filed a notice confirming compliance with the Court's mailing instructions. ECF No. 9.

On May 5, 2025, Plaintiff brought a motion for clerk's entry of default. ECF No. 12. The Clerk entered a default the next day. ECF No. 13. Plaintiff mailed both the Clerk's Default and this Court's Order on Default Judgment Procedure to Defendant at two of his last-known addresses. On June 5, 2025, Plaintiff moved for entry of a final default judgment against Defendant and served him with the motion. ECF No. 15. Defendant failed to respond to that default motion, and in July, the Court granted the motion as to liability on the six defamation *per se* counts (Counts I-VI) and the single Publication of Private Facts Count (Count VI). ECF No. 16. The Court scheduled an evidentiary hearing to determine damages. *Id.* at 13. That hearing occurred on October 30, 2025. ECF No. 25. Defendant did not appear. ECF 28-1 at 4:4-6. On January 12, 2026, Defendant's Motion to Set Aside was docketed. ECF No. 31.

A complete timeline of the mailings and filings provided to Armstrong underscores the sheer number of notices (nearly a dozen) he ignored—both after he was personally served with the Complaint and after he filed a letter on the docket that conclusively established he was aware of this suit but still did nothing to protect his rights:

- March 28, 2025 – Armstrong was personally served with the Summons and Complaint in Daytona Beach, Florida. He was required to respond by April 18, 2025. ECF No. 5.

- April 21, 2025 – The Court extended the deadline for Armstrong to respond to the Complaint from April 18, 2025 to April 25, 2025. ECF No. 6.

- April 21, 2025 – Armstrong filed a letter on the docket demonstrating his knowledge of the case and providing addresses. ECF No. 7.

5

- April 21, 2025 – The Court again extended the deadline for Armstong to respond to the Complaint from April 25, 2025 to May 2, 2025 and mailed a copy to the addresses Armstrong provided in his letter. ECF No. 8. ***Armstrong took no action in response.***

- April 28, 2025 – Armstrong's uncle filed a letter on the docket, further confirming that Armstrong and those close to Armstrong were aware of the case. ECF No. 10.

- May 5, 2025 – O'Leary filed a motion for clerk's default, which was mailed to Armstrong's last known addresses. ECF No. 12 at 4. ***Armstrong took no action in response.***

- May 6, 2025 – The Court entered an order on default judgment procedure, which was mailed to Armstrong's last known addresses. ECF No. 14 at 3. ***Armstrong took no action in response.***

- June 5, 2025 – O'Leary filed his motion for entry of final default judgment and mailed it to Armstrong's last known addresses. ECF No. 15 at 19. ***Armstrong took no action in response.***

- July 14, 2025 – The Court granted the motion for default judgment as to liability but scheduled an evidentiary hearing on damages. A copy was provided to Armstrong at his last known address. ECF No. 16 at 14. ***Armstrong took no action in response.***

- August 4, 2025 – The Court reset the evidentiary hearing on damages, and a copy of the order was provided to Armstrong. ECF No. 17 at 1. ***Armstrong took no action in response.***

- October 8, 2025 – O'Leary requested that the evidentiary hearing on damages be moved to a different date and provided a copy of the request to Armstrong at his last known addresses. ECF No. 23 at 4. ***Armstrong took no action in response.***

- October 8, 2025 (same day) – The Court reset the evidentiary hearing to October 30, 2025, and a copy of this order was provided to Armstrong. ECF No. 24 at 2. ***Armstrong took no action in response.***

- October 30, 2025 – The evidentiary hearing on damages occurred. ECF No. 28-1. ***Armstrong did not appear and did not send a representative.***

- November 17, 2025 – O'Leary filed proposed findings of fact and conclusions of law and sought a final damages award. A copy of this filing was provided to Armstrong at his last known address. ECF No. 28 at 24. ***Armstrong took no action in response.***

- January 12, 2026 – Armstrong filed the Motion to Set Aside, 285 days after being served and 246 days since the entry of default . ECF No. 31.

During this same period—and notably after the default was entered here—Armstrong appeared in separate litigation in Georgia on May 19, 2025, represented by counsel. That appearance underscores that he knew how to retain legal counsel and how to protect his rights when he chose to do so. Ex. A.

## ARGUMENT

### A. Legal Standard[2]

Where, as here, there is a non-final default judgment, courts look at whether a defendant sufficiently shows "good cause" to determine whether to set aside that non-final default judgment. *Omega Psi Phi Fraternity*, 2012 WL 13018427, at *2. Although there "is a strong policy of determining cases on the merits[,] … there is also a policy in favor of finality." *S.E.C. v. Simmons*, 241 F. App'x 660, 663 (11th Cir. 2007) (internal quotations omitted).

Although "good cause" is not susceptible to a precise definition, courts consider several factors in determining whether there is good cause to set aside a non-final default judgment

---

[2] Defendant moves to set aside the default judgment under Rule 60(b), but that is not the technically correct rule. Where, as here, the clerk has entered a default and the Court has entered a non-final default judgment, the Eleventh Circuit has directed courts to apply a "good cause" standard when determining whether to set aside the default judgment. *See Hornady v. Outokumpu Stainless USA, LLC,* 118 F.4th 1367, 1382 (11th Cir. 2024)*; Omega Psi Phi Fraternity, Inc v. HCE Grp. of Co., Inc.,* No. 11-CV-80479, 2012 WL 13018427, at *2 (S.D. Fla. Nov. 13, 2012) ("Where a default judgment does not provide relief nor damages it is not final, and the 'good cause' standard is applied to determine whether to set aside the non–final default judgment."). That said, courts also recognize that Rule 55(c)'s "good cause" standard and Rule 60's "excusable neglect" standard are very "similar." *See Forster v. Narain*, No. 11-CV-61073, 2020 WL 13536174, at *3 n.4 (S.D. Fla. July 7, 2020), *report and recommendation adopted*, No. 11-61073-CIV, 2020 WL 13536160 (S.D. Fla. Aug. 20, 2020), *aff'd*, 859 F. App'x 411 (11th Cir. 2021). Because the considerations relevant to each inquiry substantially overlap, cases analyzing either standard—and the familiar factors courts apply in that context—help illuminate the principles that underlie both standards. *See id.*

including: (1) whether the default was "culpable or willful"; (2) whether the defaulting party "acted promptly to correct the default;" (3) whether setting aside the non-final default judgment would "prejudice the adversary"; and (4) whether the defaulting party presents a meritorious defense. *Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996). "However, if a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings [on the other factors] in denying relief." *Id.* at 951-52.

### B. Defendant's Default Was Willful and He Did Not Act Promptly to Correct the Default.

Defendant's incarceration and asserted "mental health conditions" do not constitute good cause for his failure to respond to the Complaint. He had actual knowledge of this suit and was served with nearly a dozen filings and Court orders. He cannot evade the consequences of his own dilatory conduct.

"A party has a duty to monitor the progress of his case." *Simmons*, 241 F. App'x at 664 (cleaned up). A party must demonstrate diligence and relief from a default is unavailable when a party "appears to have done nothing to ensure that his interests were being sufficiently represented." *Fla. Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 784 (11th Cir. 1993). An "inexplicable delay in filing a motion to vacate" precludes relief under Rule 55 or Rule 60. *Simmons*, 241 F. App'x at 664 (finding that waiting "over four months" to set aside a default after learning about it weighed in favor of denying a set aside motion under Rule 60); *EEOC v. Mike Smith Pontiac GMC, Inc.*, 896 F.2d 524, 529 (11th Cir. 1990) (waiting almost four months to file a set aside weighed in favor of denying set aside motion); *United States v. Willbe, LLC,* No. 8:13-CV-413-T-31DAB, 2013 WL 12388655, at *2 (M.D. Fla. Nov. 21, 2013) (five month delay in seeking to set aside default weighed in favor of denying motion for set aside under Rule 55).

8

Where a party has "actual notice" that he is a named defendant, he cannot rely on vague, after-the-fact excuses to undo the predictable consequences of his own inaction. *See Tropical Paradise Resorts, LLC v. JBSHBM, LLC*, 343 F.R.D. 443, 449 (S.D. Fla. 2023) (Bloom, J.). For example, in *Tropical Paradise*, a party moved to set aside a default under Rule 55, claiming that certain ethical obligations precluded him from responding to the complaint and that he was hospitalized for two months during the time when he was supposed to respond to the complaint. *Id.* This Court found that the party's default was "willful" because he "knew" of the complaint, failed to respond to various orders telling him to comply, and his hospital records showed that he was not admitted until after his response deadline had already passed. *Id.* Determining that the default was "willful," this Court did not reach the other good cause factors and denied the motion to set aside on that basis alone. *Id.*

Even an incarcerated litigant must act diligently to protect his rights, and a failure to do so defeats any request to set aside a default. *Commodity Futures Trading Comm'n v. Empires Consulting Corp.,* No. 22-21997-CIV, 2025 WL 1696234, at *3 (S.D. Fla. June 17, 2025). In *Empires Consulting*, a defendant claimed that a default should be set aside because he was "incarcerated and lacked access to electronic communication or competent legal counsel." 2025 WL 1696234, at *3. Chief Judge Altonaga rejected that argument and noted that the defendant did "not claim that he was unaware of the litigation" and submitted multiple *pro se* filings in a separate case during the period in question. *Id.* at *4. Because the defendant failed to make a showing of good cause for the delay, the court did not reach his arguments concerning meritorious defense or prejudice and denied his motion to set aside. *Id.* at *3.

And, litigants, even those who have health issues, are not "free to appear before the court at their pleasure" based on "general allegations of mental illness." *United States v. Chesir*, 862 F.

9

Supp. 2d 286, 291 (E.D.N.Y. 2012); *see Stokes v. Merson,* 38 F. App'x. 622, 2002 WL 1364215, at \*1 (1st Cir. June 20, 2002) (general allegations of mental illness insufficient to constitute "excusable neglect"); *Alexander v. Saul*, 5 F.4th 139, 143 (2d Cir. 2021) ("While [Plaintiff] attributes her delay to her mental illness, which she argues is beyond her control, the record does not compel the conclusion that [Plaintiff's] impairments as opposed to her neglect caused her failure [to timely] appeal."); *Heendeniya v. St. Joseph's Hosp. Health Ctr.*, No. 15-CV-1238, 2019 WL 13185474, at \*3 (N.D.N.Y. Feb. 28, 2019) ("Without such evidence, it is impossible for this Court to give credence to Plaintiff's assertions that his mental disability so significantly impacts his ability to timely file documents and comply with the Court's orders that he would require an extensive amount of extra time."), *aff'd* 830 F. App'x 354 (2d Cir. 2020) (summary order).

For example, in *Sailormen, Inc. v. Tar Heels Spice*, a defendant moved to set aside a default under Rule 55 based on his "severe mental depression coupled with long bouts of alcoholism." 2025 WL 3091049, at \*1 (S.D. Fla. Mar. 12, 2025). Judge Williams summarily rejected his excuse and noted that while she recognized the severe nature of addiction and commended the defendant for his "rehabilitation" efforts, that was no excuse for missing a deadline especially where he was personally served with the Complaint. *Id.* at \*2. The Court found that "[Defendant] should have recognized the importance of a Summons and Complaint … The Court finds that Defendants displayed a reckless disregard for these proceedings and no other findings denying Defendants' Motion to Vacate Default are necessary." *Id.*

Here, based on the record, the Court can and should find that Armstrong's default was willful because he displayed an intentional or, at minimum, reckless disregard for these proceedings. Armstrong does not and cannot claim lack of notice; he admits he knew about the case, and the docket confirms actual knowledge. He was personally served with the Summons and

Complaint and then affirmatively wrote the Court to request more time and to provide addresses. This conclusively establishes awareness of the suit and an ability to engage with the process when it suited him. Despite that knowledge, he ignored nearly a dozen subsequent filings and court orders that were mailed to the addresses he provided or otherwise served on him, including the motion for clerk's default and the Court's default-judgment procedures order in May 2025, Plaintiff's motion for default judgment, the Court's non-final default judgment as to liability, multiple orders resetting the damages hearing, and Plaintiff's proposed findings and request for a final damages award. Because Armstrong had actual notice of this case, he cannot rely on vague, after-the-fact excuses to undo the predictable consequences of his inaction. *Tropical Paradise Resorts, LLC*, 343 F.R.D. at 449. Further, his Motion offers no meaningful explanation for the inexplicable nearly 250-day delay in seeking relief once the default was entered. *Mike Smith Pontiac GMC, Inc.*, 896 F.2d at 529 (waiting almost four months to file a set aside weighed in favor of denying set aside).

His asserted incarceration and "mental health conditions" do not change the analysis.[3] Those circumstances do not excuse a defendant who has actual notice from doing nothing to protect his rights, especially where the record shows repeated notice of the case's progression and opportunities to act. *See Empires Consulting Corp.*, 2025 WL 1696234, at *3; *Sailormen, Inc.*,

---

[3] Defendant's suggestion that he was too incapacitated to participate or understand these proceedings (Mot. at 2) rings hollow given his well-documented pattern of flouting court authority. "[I]f a party willfully defaults by displaying either an intentional or reckless disregard for the judicial proceedings, the court need make no other findings in denying relief." *Savoia-McHugh v. Glass*, 95 F.4th 1337, 1342 (11th Cir. 2024). Defendant's conduct here fits that pattern: he has threatened opposing counsel in other cases (ECF No. 25-3 at 48, 52), disregarded a federal show-cause order (ECF No. 25-4 at 6:8-7:23), and sent threatening, expletive-laden emails to a Georgia state court judge (ECF No. 25-6 at 3, 4), conduct that led to the Georgia incarceration he now invokes as a basis for his set aside. *See* ECF No. 25-7; ECF No. 25-8. This history underscores that his failure to respond here was not incapacity, but an intentional or reckless disregard for these proceedings.

2025 WL 3091049, at *1. Armstrong was capable of getting the Court's attention when he wanted an extension (ECF No. 7), and he was capable of retaining counsel and appearing in separate litigation during the same period (Ex. A), demonstrating that he knew how to obtain legal help and participate in legal proceedings when he chose to do so.

      Defendant's medical "diagnosis" and Physician Certification do not undermine the arguments above. The Physician Certification Form states only that Defendant was diagnosed with certain mental conditions as of July 2, 2025, and prescribes treatment. ECF No. 31 at B. It says nothing about Defendant's capacity to participate in litigation in March or April 2025, when he was served and when responsive pleadings were due. Nor does it explain how those conditions supposedly prevented him from defending this action while still permitting him to file a motion for continuance and otherwise monitor the case. He offers nothing beyond his self-serving statement that "his ability to understand" the case was "impaired" until now. Mot. at 2. Because Armstrong offers no competent evidence that any mental health condition actually impaired his ability to timely file, monitor the docket, or comply with Court orders, his mental illness excuse fails. *Heendeniya*, 2019 WL 13185474, at *3. And Defendant does not claim (nor can he) that he was unable to retain counsel to assist him in defending this suit while incarcerated or at a mental health clinic. In fact, he appeared with counsel in Georgia at a hearing roughly around the same time the default was entered in this case. Ex. A.

      Against that backdrop, the timing of the Motion for Set Aside underscores willfulness. Armstrong did not move promptly after learning of default; instead, he waited 285 days after service and 246 days after the entry of default to seek relief, and he sat out the October 30, 2025 damages hearing altogether. Nothing in the Motion explains why, if he admittedly knew about the case and knew by May 2025 that default proceedings were underway, he waited months to act.

12

That months-long, unexplained delay is powerful evidence of reckless disregard and, by itself, warrants denial. Under *Compania Interamericana*, where a defendant defaults through an intentional or reckless disregard for the proceedings, the Court "need make no other findings" to deny relief. 88 F.3d at 951-52. Armstrong had notice, received repeated filings and orders, and did nothing until consequences became unavoidable—conduct that forecloses vacatur. *See also Liangsword Ltd. v. Partnerships*, No. 24-60618-CIV, 2024 WL 4483317, at *2 (S.D. Fla. Sept. 17, 2024) (denying relief where movant offered nothing meaningful to rebut reckless disregard).

### C. Defendant Fails to Present a Meritorious Defense and Offers Only Conclusory, Unsupported Assertions.[4]

Defendant's claim that his "diagnosed mental conditions" made him "psychologically incapable" of entertaining doubts about the truth of his defamatory statements is not a meritorious defense because it misstates the actual malice standard under Florida law. Mot. at 9. To establish a meritorious defense, the moving party must establish the defense in his motion with some evidence. *See Omega Psi Phi Fraternity*, 2012 WL 13018427, at *3. Here, Armstrong fails to set forth a meritorious defense because, at most, he offers a general denial of the actual malice element and conclusive statements, both of which are insufficient to establish a meritorious defense. *Id.*

Actual malice "consists of knowledge of falsity or reckless disregard of truth or falsity[.]" *Nodar v. Galbreath*, 462 So. 2d 803, 806 (Fla. 1984). Under that test, a fact-finder must solely examine whether the publisher of the defamatory statement "*in fact* entertained serious doubts as to the truth of his publication." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (emphasis in original). There is no need for direct evidence of a defendant's state of mind. "[R]ecklessness

---

[4] Defendant fails to present any defense at all to Count VII (Publication of Private Facts) or otherwise provide an excuse for why he publicly shared O'Leary's cell phone number and told his followers to call a "real-life" murderer.

may be found where there are obvious reasons to doubt the veracity of the [source]." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). It can be inferred in certain circumstances, including where a story is fabricated by the publisher, is the product of a defendant's imagination, is so "inherently improbable" that only a reckless man would have put the statements in circulation, or was otherwise published without verification despite its extraordinary nature. *See id.*

Here, Armstrong's defamatory campaign was so outrageous and unsupported that reckless disregard is the only reasonable inference, an inference the Court necessarily adopted in entering default judgment as to liability. *See* ECF No. 16 at 8. Over the course of several days in March 2025, Defendant unleashed a barrage on X aimed at O'Leary and his wife, accusing them of murder and paying millions to cover up their roles in a murder. In one of the posts, Defendant stated "Kevin O'Leary has already *verifiably* murdered one couple in Toronto." ECF No. 1 at ¶ 26. But when another X user asked Grok, an AI fact-checking chatbot integrated into X, about the claims, Grok set the record straight based on publicly available information, stating there was "no evidence" supporting the claim that O'Leary was a murderer. *Id.* ¶ 33. Crucially, Defendant then proceeded to engage with Grok's response, asking whether O'Leary's wife had alcohol in her system at the time of the boat accident. *Id.* Grok confirmed that alcohol was detected in her system, but that a Canadian court had acquitted her of all wrongdoing in the accident. *Id.* Despite having the opportunity to verify his claims using Grok – or at the very least realize that the claims he was making were dubious at best – Defendant continued making his absurd claims for days.

These circumstances satisfy multiple independent bases for inferring recklessness in the Eleventh Circuit. Defendant's claims were called into question by both X users and Grok, and the nature and tone of his posts are undeniably extreme, erratic, and inflammatory. *See id.* ¶ 37 ("It's

14

breakfast time Kevin. Who are you eating for breakfast today?); *id.* ¶ 39 (""Hey @kevinolearytv, what in the f*** are [you] going to do with me? You can't sue me. You can't stop me. You can't shut me up. I'm a rabid dog with my teeth sunk deep into your leg."). The murder narrative is also fabricated and appears to be a product of Defendant's imagination. *Michel*, 816 F.3d at 703. While it is true that there was a boating accident involving the O'Leary family, that is the extent of the truth of his claims, confirmed by Grok using publicly available information. His story about O'Leary committing murder and paying millions to cover it up is also so inherently improbable that only a reckless man would have put them in circulation. *Michel*, 816 F.3d at 703. O'Leary has built a public-facing business reputation that is central to his professional standing. Allegations that he committed murder and paid to conceal it are so extraordinary and implausible in light of that public profile that their publication independently supports an inference of reckless disregard. Finally, the posts were published without verification, despite Defendant's claim that O'Leary "verifiably" murdered a couple. ECF No. 1 at ¶ 26. Defendant had an opportunity to verify his claim after it was directly called into question and to retract or correct his statements but instead doubled down and continued publishing the same accusations. *Id.* ¶ 34. These statements were clearly published with reckless disregard for their truth or falsity, satisfying the subjective test for actual malice.

Even assuming that Defendant's mental conditions could negate his ability to have actual malice, his showing is independently deficient because it is unsworn and lacks the factual detail necessary to support a meritorious defense. A lack of factual detail can be fatal to a movant's ability to establish a meritorious defense. *Savoia-McHugh*, 95 F.4th at 1345 n.12. In other words, "conclusory and superficial statements" do not make a meritorious defense. *Id.*

15

Here, the Motion's conclusory and superficial assertions about mental health fall far short of a meritorious defense to actual malice. To start, the "Physician Certification Form" attached as Exhibit B is not an affidavit, nor is it sworn to by the signor. *See* Ex. B to Mot. The form also does not go any further than certifying that Defendant has been "diagnosed with a mental illness," "does not require hospitalization at this time," and must be placed under 24-hour supervision. *Id.* It does not state what effect the mental illness had or has on Defendant, nor how long Defendant had been suffering from the illness. In addition, the form is signed as of July 2, 2025, but Defendant's misconduct occurred in March 2025. The form makes no mention of the case at hand, so there is no way to know whether the signor had any personal knowledge about the merits of the case to give an opinion as to Defendant's state of mind at the time of the defamatory misconduct. It also fails to state a basis for the information it sets forth; it merely states that Defendant was "diagnosed with a mental illness" and sets forth treatment needs. The Court is left to guess whether the signor personally observed or examined Defendant, or whether the form was prepared based on another's observations.

Based on Exhibit B, there is no way for the Court to determine whether Defendant was suffering from the diagnosed mental illness at the time he defamed O'Leary such that it would negate actual malice. The Motion even acknowledges as much, using hedging language. *See* Mot. at 9 ("*If* Armstrong was experiencing a manic episode when making the statements about O'Leary, he *may have* been psychologically incapable of entertaining such doubt, regardless of the objective falsity of his claims.") (emphasis added); *id.* ("Armstrong's [illness] *could have* impaired his ability to maintain consistent awareness of factual information, including his knowledge of the true circumstances of O'Leary's boating accident. *If* Armstrong was experiencing [] symptoms when making the statements, he *may not* have had the subjective awareness necessary to

16

knowingly make false statements or to act with reckless disregard for their truth.") (emphasis added). The factual detail provided is no more than mere speculation about Defendant's mental condition at the time of his misconduct and is fatal to the meritorious defense prong.

### D. Plaintiff Will be Prejudiced by a Set Aside.

Defendant does not carry his burden to show that O'Leary will not suffer prejudice from his delay in replying. "The burden is on the movant to show a lack of prejudice to the non-moving party, and to present evidence that the non-moving party would not suffer significant prejudice." *U.S. v. Wilkins*, No. 8:14–CV–993–T–17JSS, 2015 WL 4571304, at *5 (M.D. Fla. July 28, 2015). Here, Defendant only cites the fact that the "damages hearing has not yet occurred" in support of the proposition that O'Leary would not suffer prejudice. Mot. at 6. But Defendant's own motion appears to acknowledge the hearing was set for late October. *Id.* at 2. In fact, the evidentiary damages hearing did occur on October 30, 2025—approximately two and a half months prior to the filing of this Motion—with Defendant failing to appear. O'Leary submitted his Proposed Findings of Fact and Proposed Conclusions of Law (ECF No. 28) (the "Proposed Order") on November 17, 2025. As of the filing of the Motion, the Court had not yet entered a final determination of damages. Defendant identifies no other basis to show a lack of prejudice to O'Leary and therefore has failed to carry his burden.

O'Leary would suffer significant prejudice if the judgment were set aside. Armstrong's prolonged delay will result in additional and unfair expense if this Court's rulings were unwound and the case were reopened and litigated on the merits. The Eleventh Circuit has upheld denials of motions to vacate default judgments where substantial time and judicial resources have already been expended. *See Friedman v. Schiano*, 777 F. App'x 324, 335 (11th Cir. 2019) ("It has been almost a year since Plaintiffs filed their Verified Complaint. While Defendants were idle, Plaintiffs

and the Court devoted significant time and resources in adjudicating Plaintiffs' substantive claims.").

Courts likewise recognize that prejudice exists where reopening a case will unfairly increase a plaintiff's costs as a result of delay. *See Savoia-McHugh*, 95 F.4th at 1345 n.12 ("Prejudice may exist where a party faces 'additional expense caused by the delay.'"); *see also* 10A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2700 (4th ed. 2023) ("The most common type of prejudice is the additional expense caused by the delay, the hearing on the [motion], and the introduction of new issues.").

Here, it has been approximately ten months since the filing of the Complaint. During that time, O'Leary and the Court have devoted significant time and resources to this matter. The Court granted Armstrong a continuance upon request, further extending the time required to adjudicate this case. Counsel for O'Leary also devoted substantial resources to preparing for the damages hearing, including retaining an expert, preparing both the expert and O'Leary for testimony, and drafting the Proposed Order. This case is therefore not at an early stage of proceedings and reopening it would require O'Leary to incur substantial additional expense of precisely the type recognized as prejudicial by the Eleventh Circuit and courts in this district.

### E. Defendant Cannot Recover Under Rule 60(b).

Because Armstrong cannot meet Rule 55(c)'s "good cause" standard, he necessarily cannot satisfy Rule 60(b)'s more rigorous "excusable neglect" standard. *See Forster*, 2020 WL 13536174, at *3. The record reflects willfulness, not neglect: Armstrong had actual notice, received repeated filings and Court orders, and then waited 285 days after service and 246 days after default to move for relief, an "inexplicable delay" that independently forecloses vacatur. *Simmons*, 241 F. App'x at 664; *Compania Interamericana*, 88 F.3d at 951-52. On these facts, Armstrong falls well short

18

of "good cause," and thus necessarily cannot carry the heavier burden of showing "excusable neglect" under Rule 60(b), so the Motion should be denied.

## CONCLUSION

For the reasons stated above, the Court should deny the Motion to Set Aside Default Judgment and enter Plaintiff's Proposed Findings of Fact and Conclusions of Law (ECF No. 28).

Dated: February 3, 2026

Respectfully submitted,

**NEIMAN MAYS FLOCH & ALMEIDA PLLC**

By: **/s/**Brandon S. Floch
Jeffrey A. Neiman, Esq.
Florida Bar No. 544469
jneiman@nmfalawfirm.com
Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@nmfalawfirm.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on February 3, 2026, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system. I further certify that a copy of the document and all supporting materials was sent by U.S. Mail, postage prepaid, to Defendant at his last known addresses as follows:

Benjamin Armstrong
624 6th Ave S
Nampa, ID 83651

By: */s/ Brandon S. Floch*