UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-21417-BLOOM/Elfenbein

KEVIN O'LEARY,

    Plaintiff,

v.

BENJAMIN ARMSTRONG,

    Defendant.
_____/

**OMNIBUS ORDER ON FINDINGS OF FACT AND CONCLUSIONS OF LAW AND DEFENDANT'S MOTION TO SET ASIDE THE DEFAULT JUDGMENT**

**THIS CAUSE** is before the Court upon Plaintiff Kevin O'Leary's ("O'Leary") Motion for Default Judgment ("Motion"), ECF No. [15]. On July 14, 2025, this Court granted the Motion in part and scheduled an evidentiary hearing on the issue of damages, which was held on October 30, 2025. ECF Nos. [16]. After a consideration of the testimony and evidence, the Court awards $2,828,000.00 in damages. Also before the Court is Defendant's Motion to Set Aside the Default Judgment, ECF No. [31]. Plaintiff filed a Response in Opposition. ECF No. [36]. The Court has reviewed the Motion, the record, and is otherwise fully advised. For the reasons that follow, Defendant's Motion is denied.

**I.  BACKGROUND**

Plaintiff filed this defamation action on March 26, 2025. ECF No. [1]. On March 28, 2025, a process server served Defendant Armstrong with the Summons and Complaint, as evidenced by the Return of Service. ECF No. [5]. Armstrong's deadline to respond was April 18, 2025. *Id*. On April 21, 2025, following a *sua sponte* review of the docket, the Court noted Armstrong's failure to timely respond and ordered him to respond to the Complaint no later than April 25, 2025. ECF No. 6. The

Court further noted that "[f]ailure to do so may result in appropriate sanctions, including the entry of default." *Id.*

That same day, the Clerk of Court docketed a letter from Armstrong addressed to the Clerk's office. ECF No. [7]. In the letter, Armstrong requested a continuance, stating he was currently incarcerated in Cobb County, Georgia for a period of 70 days. *Id.* He further indicated that, upon release, he planned to enter a "mental health facility" and then reside at 462 Fincher Road, Canton, GA 30114. *Id.* The Court granted Armstrong's request and extended the deadline for his Answer or response to May 2, 2025. ECF No. [8]. The Clerk was directed to mail a copy of the Order to the address that Armstrong provided: 462 Fincher Road, Canton, GA 30114. *Id.* The following day, the Clerk of Court filed a notice confirming compliance with the Court's mailing instructions. ECF No. [9].

On May 6, 2025, after Defendant failed to file an Answer or response, Plaintiff filed his motion for clerk's entry of default. ECF No. [12]. The Clerk of Court entered a default on that same date. ECF No. [13]. Plaintiff mailed both the Clerk's Default and this Court's Order on Default Judgment Procedure to Defendant at two of his last-known addresses.

On June 5, 2025, Plaintiff moved for entry of a final default judgment against Defendant and served him with the motion. ECF No. [15]. Defendant failed to respond to Plaintiff's motion, and in July, the Court granted the motion as to liability on the six defamation *per se* counts (Counts I-VI) and the single Publication of Private Facts Count (Count VI). ECF No. [16]. As the damages were unliquidated and were required to be proven, the Court scheduled an evidentiary hearing with notice to both parties. Id. at 13. That hearing occurred on October 30, 2025. ECF No. [24]. Defendant was properly notified and failed to appear. ECF No. [29] (Transcript of October 30, 2025, Evidentiary Hearing to Determine Damages, hereafter "Hr'g Tr.").

2

## II.    FINDINGS OF FACT

O'Leary is an internationally renowned entrepreneur, investor, and television commentator. ECF No. [1] ¶ 1. He was the founder of The Learning Company, a company that sold software programs for math and reading. H'rg Tr. at 11:10-13. He sold The Learning Company to Mattel in the early 2000s and has been investing in hundreds of businesses since then in all 11 sectors of the economy. *Id*. at 12:2-10. O'Leary later became widely known for his role on the television show, *Shark Tank*, where he and the other "Sharks" evaluate and invest in a range of emerging and start-up businesses. *Id*. at 12:11-22. Around that same time, he started appearing on American television networks as a frequent contributor on "business affairs, policy, and technology." Id. In addition to his investing activities and television work, O'Leary also serves as a keynote speaker for major financial institutions. *Id*. at 14:19-20. O'Leary's social media presence spans 11.1 million followers, a substantial portion of whom are entrepreneurs. *Id*. at 13:17-25.

O'Leary filed this action against Defendant Ben Armstrong—known publicly as "Bitboy Crypto"—for maliciously publishing defamatory falsehoods calling O'Leary a murderer and claiming O'Leary "paid millions to cover" up his role in a murder. ECF No. [1] ¶ 1. Those posts were intended to harm O'Leary's reputation. H'rg Tr. at ¶¶ 23-137.

In 2019, O'Leary and his wife were involved in a boating accident in which their vessel struck another boat, resulting in two fatalities. *Id.* at ¶ 43. O'Leary was not operating the boat at the time and was never charged with any violation of law. *Id*. His wife, Linda O'Leary, was charged with careless operation of a vehicle. After a 13-day trial, she was exonerated after the court found the other vessel had been operating without its lights on. ¶¶ 43–54.

The accident—and the unsupported allegations that Linda O'Leary had engaged in wrongdoing—had a significant negative impact on O'Leary and his family. Hr'g Tr. at 18:4-23. In the aftermath, and before Linda's O'Leary's exoneration, O'Leary's speaking engagements "dried

3

up," leaving him with virtually no income. *Id.* at 16:1-14. Production of his primary television program, *Shark Tank*, was paused for "six months," effectively putting his entertainment career on hold. *Id.* Following the trial, O'Leary and his wife spent years working to move past the tragedy. *Id.* at 25:24-26:9. Yet, as detailed below, Armstrong's March 2025 posts sought to reopen those events by resurrecting false allegations that O'Leary murdered a couple and paid millions to cover it up.

Defendant Armstrong is a formerly prominent crypto influencer who once ranked among the most popular cryptocurrency personalities on X and YouTube, drawing more than a million followers with his promotional content and lavish lifestyle. At the height of his online presence, he amassed over 3.3 million followers across his social media platforms. ECF No. [1] ¶¶ 15-22.

Armstrong spent roughly a week in late March 2025 posting on X, accusing O'Leary of murder and asserting that he paid millions to conceal his involvement. Compl. at ¶¶ 23-24. Thousands of people viewed and liked those posts. *Id.* at ¶¶ 62, 74, 98, 110, 122. Armstrong escalated his harassment campaign by releasing O'Leary's private cell phone number and urging his followers to "call a real life murderer." *Id.* at ¶ 3. That tweet—disclosing O'Leary's cell phone number—resulted in Armstrong being suspended from Twitter for 12 hours. *Id.* at ¶¶ 35-36. Nevertheless, Armstrong continued to post defamatory content about O'Leary. *Id.*

During the evidentiary hearing, O'Leary testified that his reputation is invaluable to him. Hr'g Tr. at 11:3-5. O'Leary explained that television networks and event organizers will not invite him to appear if they have any doubts or concerns about his background. *Id.* at 15:1-17. And it is not only his own financial well-being at stake; his television and speaking-engagement work supports more than "20 families," generating millions in annual revenue—income that would vanish if he were no longer invited to speak, appear on television, or endorse products. *Id.* at 13:17-14:10.

4

O'Leary's team "has a stake in [his] reputation, and they let [him] know it every day." *Id.* at 15:16-17; 37:14-17.

O'Leary testified that he first became aware of Armstrong's posts while he was on air at a Fox News show, *The Big Money Show. Id.* at 18:12-23. He explained that the posts had an immediate and significant impact on him. *Id.* As part of the show, he wore an earpiece through which producers communicated with him in real time. *Id.* at 20:12–17. When Armstrong first made the posts and released O'Leary's private cell phone number, the posts went "viral," and the producers immediately began asking him questions via his earpiece—including whether he had been accused of murder and whether he was withholding information about a murder from them. *Id.* at 22:18–23:21. The posts were quickly elevated to the Fox executives, and O'Leary was forced to defend himself against them. *Id.*

Because his private cell phone number had been released, O'Leary's phone began "lighting up" in the middle of the show. *Id.* at 23:18-21. Fox executives also became concerned about his security, as well as the safety of the other guests on *The Big Money Show. Id.* at 23:9-13. And it was not only Fox that had questions in the immediate aftermath. O'Leary's PR team, including Nancy Cheung, received calls from his business partners and partner television networks inquiring about the posts. *Id.* at 24:11-19.

In the weeks and months that followed, Armstrong's posts and the disclosure of O'Leary's phone number significantly affected him, both in his professional and personal life. First, O'Leary has been inundated with inquiries from his business partners and television network partners regarding Defendant's posts that O'Leary was a murderer and paid millions to cover it up. Hr'g Tr. at 31:12-32:23. He has had to devote significant time and effort to discussing those false accusations with his partner networks. *Id.* O'Leary is a hired spokesperson for Start Engine, whose

5

representatives questioned him about the posts and told him it "isn't good for business." *Id.* at 33:9-10. Further, whenever anyone conducts due diligence on him for potential work, he has needed to address the posts. *Id.* at 35:11–14.

O'Leary further testified that it is difficult to measure the full effect of Defendant's posts on his business relationships because "what we don't know is how many people see [the posts], and say, let's just stay away from this. [O'Leary] is just too controversial." *Id.* at 34:5-9. But he also explained that one need not speculate about whether an accusation of involvement in a murder could harm his business. *Id.* at 16:1-14. When the accident occurred, and before his wife was exonerated, his professional life was on hold for "18 months" while the matter proceeded through the court system. *Id.*

Since Armstrong made the posts, O'Leary has been forced to change his approach to security. Armstrong has "a lot of very energetic" followers on social media. Hr'g Tr. at 20:5-7. Armstrong's labeling O'Leary as a murderer and encouraging his followers to call O'Leary caused him "100 percent" concerns about his security and personal safety. Hr'g Tr. at 29:19-22. None of his colleagues at CNN and Fox want to walk out the door with him. *Id.* at 30:2-13. Per Fox's instructions, he no longer enters or exits through the main entrance and instead has a car waiting for him at a side door. *Id.* O'Leary no longer walks alone in most cities, instead having to hire security: "I mean, you don't realize how much you like to just walk by yourself until you can't do it anymore. Like, that's – which is what this guy has done to me." *Id.* at 30:17–23. He estimates that he now spends an additional $200,000 per year on security and noted that even his staff believes he should have more protection than he currently does. *Id.* at 30:14-31:4. His fears also stem from the fact that many callers have bombarded his personal cell phone in a "rabid" manner, demanding to speak to the murderer. Hr'g Tr. at 27:14-24.

The defamatory posts have caused mental anguish to O'Leary and those close to him. His family believed they had put the traumatic boating accident behind them, but the posts have reopened old wounds. *Id.* at 18:12-13. His wife and his children have had to confront the posts, and O'Leary has had to spend considerable time dealing with the emotional anguish the posts have caused his family. *Id.* at 25:6-14; 35:8-14.

Armstrong, without permission, released O'Leary's private cell phone number, which has caused him significant harm. *Id.* at 27:6–29:17. O'Leary received hundreds of calls from individuals he did not know after Armstrong disclosed his number. *Id.* Many times, he answered believing it was a business associate, only to be met by some "rabid" individual calling him a murderer. *Id.* at 27:17–24. O'Leary testified that he continues to receive such calls. *Id.* He has had to block more than 100 numbers from callers he does not know. *Id.* at 28:5-24; Ex. 2 (list of blocked numbers through Verizon). O'Leary further testified that he cannot change his cell phone number because all his important business and government contacts use that number, and it is part of his "DNA" now. *Id.* at 29:4-11.

At the hearing, the Court heard expert testimony from Sameer Somal, who addressed online reputation management and reputation damages. Somal testified that the damages he analyzed fell into two primary categories—reputation damages and rehabilitation damages. Hr'g Tr. at 44:13-23. He emphasized that he was not assigning any value to mental anguish or punitive damages, as those determinations are for the Court. *Id.* at 44:24-45:14.

Somal testified that the posts "absolutely harmed" O'Leary's reputation. *Id.* at 44:13-23. He explained that "[b]ecause Mr. O'Leary has a degree of known presence, [the defamatory material] actually has an outsized impact on his life and his ability to live a normal life personally speaking as well as professionally." *Id.* at 46:11-17. Somal also testified about the lasting nature of the harm,

7

noting that the permanence of internet content, and the proliferation and durability of information within large language models, means that O'Leary will likely have to confront Armstrong's defamatory content for the "rest of [his] life to some degree no matter what." *Id.* at 47:6-14.

To quantify the reputational harm from the defamatory posts, Somal used what he described as an "ultraconservative" methodology known as the "three rings." *Id.* at 48:3-17. Under this approach, he categorized the individuals affected by the posts into three groups: (1) close friends and family, (2) acquaintances, and (3) those aware of O'Leary without having a close connection to him. *Id.* at 49:1-15. To apply this analysis, he reviewed the documented number of public views of the defamatory posts on X—approximately 156,000. *Id.* at 49:16-50:16. He described this approach as conservative because it excluded many millions of individuals who may have heard about the posts indirectly through O'Leary's extensive social media presence, focusing only on the documented public views. *Id.*

Somal then further discounted the 156,000 figure to 10 percent—15,600 unique viewers—to account for possible repeat views. *Id.* He testified that he would be comfortable multiplying that number by 20 but used the 15,600 figure because it was "ultraconservative." *Id.* at 50:20-51:5. Relying on academic studies, he then applied a $5-per-fan value to quantify reputational harm. *Id.* at 51:9-23. Using that approach, Somal concluded that the posts caused $78,000 in reputation damage.

Somal also noted that this figure does not capture potential lost business opportunities. He testified that the proliferation of the negative posts cost O'Leary business opportunities, and that even a single lost opportunity could have been worth "several million dollars"' *Id.* at 53:4-7.

In addition to the rings-of-harm analysis, Somal also "pressure-tested" whether the posts had altered O'Leary's online narrative. *Id.* at 50:20–51:5. He concluded that they had. *Id.* As an

8

example, Somal recounted that a business colleague, upon learning he was testifying for O'Leary, asked whether he was "testifying in the murder trial," demonstrating that Armstrong's posts had generated a false public narrative linking O'Leary to wrongdoing. *Id.* at 56:10-57:4.

Finally, Somal testified about rehabilitation damages, estimating the cost of an online campaign aimed at removing negative content and publishing positive, truthful information about O'Leary. *Id.* at 53:16-56:5. Drawing on his experience developing and executing online reputation repair campaigns for individuals and businesses, *id.* at 41:4–9, Somal concluded that an 18-month campaign costing between $800,000 and $1.2 million would be required to correct and counteract Armstrong's false posts. *Id.* at 53:16–56:5. His conclusion was based on the unique "challenge" of countering the word "murderer" online and combating the ongoing reposting of negative content. *Id.*

### III.  CONCLUSIONS OF LAW

#### A. Applicable Law on Damages

Under Florida law, a wronged party is not required to demonstrate the amount of damages sustained with mathematical certainty. As the Supreme Court of Florida held, "[t]he law guarantees every person a remedy when he has been wronged … [w]hen the wrong is shown it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so." *Fla. Pub. Utilities Co v. Wester*, 150 Fla. 378, 382 (1942); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person … it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Where the plaintiff's damages are difficult to quantify, "the damages rule must

be flexibly applied so as to provide fair compensation under the circumstances of the specific case." *Slip-N-Slide Recs., Inc. v. TVT Recs.*, LLC, No. 05-21113-CIV, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007).

Florida courts also recognize the principle that, "the risk of uncertainty in calculating damages falls on the wrongdoer." *ME Tech., Inc. v. Brownstein*, No. 20-61508-CIV, 2020 WL 7211694, at *5 (S.D. Fla. Nov. 13, 2020), *report and recommendation adopted*, No. 20-61508-CIV, 2020 WL 7187740 (S.D. Fla. Dec. 7, 2020); *see also Story Parchment*, 282 U.S. at 563 ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible, if the case, which he alone is responsible for making, were otherwise.").

### B.  General Damages for Defamation *Per Se*

Under Florida law, a court may award general damages to the victim of defamation to compensate him for the reputational damage and the mental anguish caused by the defamation. *See Army Aviation Heritage Found. & Museum, Inc. v. Buis*, 504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (under Florida law, an injured party may recover general damages "resulting from impaired reputation and standing in the community, humiliation, mental anguish, and suffering). A plaintiff may recover such general damages "even if there is no evidence that assigns an actual dollar value to the injury." *Lustig v. Stone*, No. 15-20150-CIV, 2015 WL 13326350, at *2 (S.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, No. 15-20150-CIV-2015, WL 13326383 (S.D. Fla. Dec. 7, 2015), *aff'd*, 679 F. App'x 743 (11th Cir. 2017). Because the reputational and emotional harms addressed through general damages are inherently difficult to quantify, Florida courts have recognized that "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage. Any award should be fair and just in light of the evidence." *Army Aviation*, 504 F. Supp. 2d at 1260.

### C. Reputation Repair Damages in a Defamation *Per Se* Case

Florida law recognizes two categories of compensatory damages for defamation: general and special. The difference was summarized in *Blythe v. Fifth Third Bank*:

> General damages are those which the law presumes must naturally, proximately and necessarily result from publication of the libel or slander. They are allowable whenever the immediate result is to impair the plaintiff's reputation, *although no actual pecuniary loss is demonstrated*. When the defamatory statements are per se, general damages are presumed. By contrast, [t]he chief characteristic of special damages is a realized or liquidated loss.

2010 WL 11432601, at *6 (M.D. Fla. Jan. 19, 2010) (internal quotations omitted and emphasis added). Because this Court has already found defamation *per se*, Plaintiff is presumed to have suffered general damages as a matter of law.

In federal defamation *per se* cases, courts have found that the cost of a reputational repair campaign can be allowed before the defendant incurs the cost of the campaign. For example, in *Ludwin v. Proman*, defendant claimed that plaintiffs were not "entitled to reputation repair costs as damages" in a defamation *per se* case. 2023 WL 315909, at *2 (S.D. Fla. Jan. 19, 2023). The court rejected that argument and permitted expert testimony regarding the costs of a reputation repair campaign, concluding that such testimony "will assist the trier of fact in understanding potential damages for Plaintiffs' defamation claims in particular." 2023 WL 315909, at *2 (emphasis added); *see also Menge v. Ash-Shafii*, No. 23-11339, 2025 WL 2058320, at *1 (E.D. Mich. July 22, 2025) (allowing expert to testify about the estimated cost of restoring plaintiff's online reputation in a defamation *per se* case before the costs had been incurred). In *Ludwin*, the court found "the costs of a reputational repair campaign may assist the trier of fact in understanding potential damages associated with Plaintiffs' defamation *per se* claims, where special damages are recoverable, and Plaintiffs need not plead actual damages." *Id*.

Courts in other federal jurisdictions have likewise recognized that unincurred reputational repair campaigns or marketing plans may serve as credible evidence of general damages in defamation *per se* cases. For example, in *Carroll v. Trump*, 683 F. Supp. 3d 302, (S.D.N.Y. 2023), the court upheld a jury award that included the estimated and unincurred cost of a "reputation repair program" proposed by an expert witness, even though the campaign had not yet been implemented. There, the expert testified that the cost to undertake a reputation repair management plan for plaintiff would be between $368,000 and $2.7 million. *Id.* at 317. The jury was instructed to bifurcate defamation damages between those reputational damages excluding the program and those attributable to the repair program itself, and the jury ultimately awarded $1.7 million for the yet-to-be incurred reputation repair campaign in addition to $1 million in compensatory damages for other reputational harm. *Id.* at 332.

Similarly, in *White Cap, L.P. v. Mowers*, the district court awarded damages for a proposed marketing plan designed to address reputational harm resulting from defamatory statements, explicitly stating that the unincurred cost was "properly awarded as general damages." 2022 WL 35594, at *4 (N.D. Ga. Jan. 3, 2022). In another recent defamation *per se* case, the court upheld a jury award in a defamation *per se* case that awarded plaintiffs as "compensation for reputational harm" an "expert's calculation of the cost of repairing their reputations" before the repair campaign was undertaken. *Freeman v. Giuliani*, 732 F. Supp. 3d 30, 41 (D.D.C. 2024). The cases demonstrate that expert testimony regarding the estimated cost of restoring a plaintiff's reputation is a permissible measure of general damages in a defamation *per se* case.

Moreover. "[t]he trial judge, sitting without a jury, has considerable latitude in determining the amount of the damages." *Virgin Recs. Am., Inc. v. Lacey*, 510 F. Supp. 2d 588,

593 (S.D. Ala. 2007) (quoting *Patray v. Nw. Pub., Inc.*, 931 F. Supp. 865, 870 (S.D. Ga. 1996)). Critically, other than the *Carroll v. Trump* jury award, none of the cases which support a general damages award for a not yet undertaken reputation repair campaign, awarded damages for both reputation damage and reputation repair damages. Here, expert Sameer Somal provided a conservative estimate that Plaintiff suffered $78,000 in reputational harm damages. "Damages in tort cases are compensatory—the goal is 'to restore the injured party to the position it would have been in had the wrong not been committed.'" *In re Biddiscombe Int'l, L.L.C.*, 392 B.R. 909, 918 (Bankr. M.D. Fla. 2008). To award Plaintiff $1.2 million for a not yet undertaken reputational repair campaign in addition to the $78,000, would make Plaintiff greater than whole and beyond the position he was in prior to the defamation. Moreover, the presumption of damages in defamation *per se* cases reflects the historical recognition that "proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985). Here, the damage figure is not unknown, as Plaintiff's expert testified to $78,000 in reputation harm damage.

IV. **DISCUSSION**

  A. **General Damages: Mental Anguish Award**

Plaintiff's testimony establishes that he is entitled to general damages for the substantial mental anguish, humiliation, and emotional suffering caused by Defendant's defamatory statements that he is a "murderer" and that he paid "millions" to conceal his involvement in a murder. Plaintiff testified that he has expended significant time and effort attempting to dispel these false statements and to reassure his entertainment and business partners of their falsity. Despite his repeated denials and the filing of this action, Plaintiff continues to field inquiries

from current and prospective business partners regarding Defendant's false statements.

Plaintiff is entitled to emotional damages because Defendant's conduct has forced him to repeatedly revisit a tragic event he believed had long been resolved. Moreover, the fear that Defendant—or Defendant's followers—may target him has become a persistent concern. This fear is neither speculative nor unfounded; it is supported by Defendant's history of misconduct, including sending threatening messages in other lawsuits. ECF No. [25-4].

Based on this evidence, an award of $750,000 is appropriate to compensate Plaintiff for the emotional damage caused by Defendant's misconduct. *See Sirer*, 2023 WL 3166453, at *8 (awarding $750,000 for, in part, emotional damages caused by defendant's assertion that plaintiff was affiliated with a terrorist organization); *Stone*, 2015 WL 13326350, at *4 (awarding $500,000 for, in part, mental anguish caused by defendant's defamatory accusations posted on the internet that labeled plaintiff a "terrorist" and "criminal"); *Osio v. Moros*, No. 21-20706-CIV, 2022 WL 4280499, at *10 (S.D. Fla. Sept. 5, 2022) (recommending award of $1 million where defendant, on television, accused plaintiff of plotting to assassinate political figure.).

### B. General Damages: Reputation and Reputation Repair Award

Plaintiff's testimony and the testimony of his expert establish that he is entitled to general damages for the harm to his reputation. Plaintiff testified that his reputation is "everything" to his work as an investor, television commentator, and paid spokesperson. Expert Sameer Somal, using reliable and accepted methodologies, quantified the reputational harm. Applying the rings-of-harm model and taking a conservative approach, Somal estimated that the defamatory posts caused $78,000 in reputational damage.

### C. Punitive Damages

Florida law permits the imposition of punitive damages on a defendant who acts with

malice. "In a suit for libel or slander … upon some proof of the malicious character of the publication, a plaintiff may recover punitive damages, the purpose of which is not to compensate but rather to serve as a deterrent to others inclined to commit a similar offense." *Saunders Hardware Five & Ten, Inc. v. Low*, 307 So. 2d 893, 894 (Fla. 3d DCA 1974); *see also Carroll v. TheStreet.com Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *4 (S.D. Fla. May 25, 2012) ("It is well established that … presumed and punitive damages in a defamation action are recoverable only if liability is based on proof of actual malice, i.e. knowledge of falsity or reckless disregard for the truth.").

Further, in defamation *per se* cases, "punitive damages may be the primary relief." *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010). Indeed, substantial punitive awards have been upheld even where "actual damages were absent or merely nominal." *Id.* at 729 n.28 (upholding $5 million punitive damages award where the jury awarded no compensation beyond presumed nominal damages). Punitive damages are also appropriate when necessary to deter "misconduct [that] cannot be tolerated in a civilized society and must be deterred by a strong message to [defendant] and other [potential bad] actors in the future." *Stone*, 2015 WL 13326350, at *6.

This Court has already held that the allegations in the Complaint, taken as true, plausibly allege that Defendant acted with actual malice and support an award of punitive damages. ECF No. [16] at 10-12 (holding that the allegation that Defendant made the posts "with knowledge or reckless disregard as to the falsity of the statements" sufficiently pleads actual malice). By virtue of his default, Defendant has now admitted those allegations.

Accordingly, punitive damages are warranted because Defendant's statements—falsely asserting that Plaintiff was a murderer and paid millions to cover up a murder—are actionable

15

*per se*. *Sirer*, 2023 WL 3166453, at *10 (collecting cases).

Punitive damages are especially justified to send Defendant a clear and unequivocal message. His history of threatening and harassing communications, even after admonishment by a judge in this district, is reprehensible. Punitive damages are necessary to deter Defendant and others who persist in such misconduct despite repeated warnings. While sending uncivilized and hostile messages to a judge in Georgia, ECF Nos. [25-6], [25-7], Defendant simultaneously and deliberately spread defamatory and dangerous falsehoods about Plaintiff and encouraged his followers to harass and call Plaintiff directly. ECF No. [25-1].

The Court assesses $2,000,000 in punitive damages against Defendant. *See Sirer*, 2023 WL 3166453, at *11 (awarding $2,000,000 in punitive damages where defendant spread dangerous falsehoods accusing plaintiff of terrorism); *Lawnwood*, 43 So. 3d at 725 (affirming $5,000,000 punitive award against hospital that maliciously destroyed a physician's reputation); *Rety v. Green*, 546 So. 2d 410, 421 (Fla. 3d DCA 1989) (holding that a $2,500,000 punitive award was appropriate where defendant maliciously destroyed plaintiff's reputation with false accusations of antisemitism).

### D. Defendant's Motion to Set Aside Judgment

On January 9, 2026, Defendant filed a Motion to Set Aside Default Judgment. ECF No. [31]. Plaintiff filed a Response in Opposition. ECF No. [36]. As Defendant concedes, he was served with the Complaint in this matter on March 28, 2025. ECF No. [5]. Defendant sought and was granted a continuance to respond to the Complaint by May 2, 2025. ECF Nos. [7], [8]. Defendant failed to respond and was properly defaulted on May 6, 2025. ECF No. [14].

Defendant argues his failure to respond "was not due to willful neglect or disregard for judicial proceedings. Rather, his failure to respond was due to two extraordinary circumstances beyond his control: his incarceration and his serious mental health conditions." ECF No. [31] at 4.

As the Defendant acknowledges, despite his incarceration "he managed to file to a motion for a continuance". *Id*. Thus, Defendant asserts his mental health issues prevented his further participation. Specifically, Defendant suffers from bipolar disorder, narcissistic personality disorder, and dissociative identity disorder, which "significantly impaired his ability to understand and respond appropriately to the legal proceedings." *Id*. Defendant avers his mental health issues constitute excusable neglect under Rule 60(b)(1) and the default judgment should be set aside. Plaintiff responds, arguing the "the record reflects willingness, not neglect: Armstrong had actual notice, received repeated filings and Court orders, and then waited 285 days after service and 246 days after default to move for relief." ECF No. [36] at 18.

Fed. R. Civ. P. 60(b)(1) states that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for ... mistake, inadvertence, surprise, or excusable neglect[.]" To establish mistake, inadvertence, or excusable neglect under Rule 60(b)(1), a defaulting party must show that: "(1) it had a meritorious defense that might have affected the outcome; (2) granting the motion would not result in prejudice to the non-defaulting party; and (3) a good reason existed for failing to reply to the complaint." *Florida Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 783 (11th Cir. 1993).

Here, Defendant has failed to establish excusable neglect. Critically, Defendant argues "setting aside the default judgment would not unduly prejudice O'Leary, as the damages hearing has not yet occurred." ECF No. [31] at 6. To the contrary, a full evidentiary hearing was held on October 30th, 2025, regarding damages. Thus, setting aside the default judgment would cause undue prejudice to Plaintiff. As Plaintiff points out, he spent many hours "preparing motions for default judgment, expert reports, drafting liability decisions, and participating in a full evidentiary

hearing on damages where Plaintiff and his expert traveled from out of town to attend." ECF No. [36] at 2.

Moreover, "[w]hile courts will occasionally rely on the illness or disability of a party or attorney when finding excusable neglect, these cases involve extraordinary circumstances, such as a sudden, unexpected, or catastrophic illness, or the party has pointed to specific facts and circumstances demonstrating why the illness or disability caused them to miss the original deadline." *In re Payroll Mgmt., Inc.*, No. 18-30298-KKS, 2022 WL 17418868, at *7 (Bankr. N.D. Fla. Dec. 5, 2022). (quoting *Lehr Constr. Corp. v. Flaxer*, Case No. 16-cv-4048 (AJN), 2017 WL 464428, at *4 (S.D.N.Y. Feb. 2, 2017)). "Illness alone is not a sufficient basis for setting aside a judgment under Federal Rule 60(b)(1)." *Id*. While the Defendant cites to various mental health issues as the basis for his failure to respond, he has failed to provide specific facts and circumstances demonstrating why the illness or disability caused him to miss the original deadline. Moreover, Defendant sought a continuance despite the same mental health issues purportedly preventing him from participating further. As such, Defendant's Motion is denied.

## V.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff Kevin O'Leary is awarded a total of **$2,828,**000.00 in damages against the Defendant, consisting of $750,000.00 in mental anguish damages, $78,000.00 in reputational damages, and $2,000,000.00 in punitive damages.

2. Defendant's Motion to Set Aside the Default Judgment, **ECF No. [31]**, is **DENIED**.

3. Final Judgment will follow.

4. The Clerk shall **CLOSE** the case.

Case No. 25-cv-21417-BLOOM/Elfenbein

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 11, 2026.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:

counsel of record

Benjamin Armstrong
462 Fincher Road
Canton, GA 30114
*PRO SE*